UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————
                                  :

SECURITIES AND EXCHANGE COMMISSION,   :
                                    :

                       Plaintiff,     :

                                    :  11 Civ. 07388 (JSR)

               v.            :

                                    :  ECF Case

BRIAN H. STOKER,                       :
                                    :

                    Defendant.   :
————————————————————————————:

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

---

Jeffery T. Infelise
Assistant Chief Litigation Counsel
Jane M. E. Peterson
Assistant Chief Litigation Counsel
U.S. Securities and Exchange
Commission – Enforcement Division
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4904
(202) 772-9282 (fax)

January 6, 2012           Attorneys for Plaintiff
U.S. Securities and Exchange Commission

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 4

      A.   Structuring of the Class V III CDO ........................................................... 4

   B.   Marketing of the Class V III CDO ................................................................ 6

   C.   Closing of the Class V III CDO ................................................................... 8

ARGUMENT ............................................................................................................................ 9

I.   Standard For Motion To Dismiss Pursuant to FRCP 12(b)(6) ................................ 9

II.   The Commission Has Adequately Pled That Stoker Violated Section 17(a)(2) ................... 10

   A.   The Complaint Alleges The "Obtain Money of Property" Element ............................. 10

      1.   Stoker Deprived Victims of Money ........................................................ 11

      2.   Stoker Obtained Money or Property ......................................................... 12

         a.   Stoker Obtained Money or Property for Citigroup .............................. 12

         b.   Stoker Obtained Money or Property for Himself ................................. 14

   B.   The Complaint Alleges the "By Means Of" Element .................................................. 16

      1.   Liability Under Section 17(a)(2) Requires That a Defendant
         Obtain Money Or Property "By Means Of" a False Statement .............................. 16

      2.   Liability under Section 17(a)(2) Does Not Require
         Stoker "Make" Misleading Statements .................................................. 18

III.   The Complaint Contains Factual Allegations That Stoker Violated Section 17(a)(3) ........ 21

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Aaron v. SEC, 446 U.S. 680 (1980) ...............................................................21

Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972).......................3, 13

In re Alstom SA, Sec. Litig., 406 F. Supp. 2d 433 (S.D.N.Y. 2005)...............22, 23, 24

Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 1010) ...........................17

Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009).......................................9

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)....................................9, 10

Cassese v. Washington Mutual, Inc., 743 F. Supp. 2d 148 (E.D.N.Y. 2010)...................17

Chambers v. Time Warner, Inc., 282 F.3d 147 (2d. Cir. 2002).......................10

Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York,
    375 F.3d 168 (2d Cir. 2004).......................................................10

Finkel v. Stratton Corp., 962 F.2d 169 (2d Cir. 1992)...............................19, 22

Ideal Steel Supply Corp. v. Anza, 652 F.3d 310 (2d Cir. 2011).......................10

Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011)..............2, 19

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d. Cir. 2005).......................22

Porcelli v. United States, 404 F.3d 157 (2d Cir. 2005)..................................11

Ross v. Bank of America, N.A. (USA), 524 F.3d 217 (2d Cir 2008)...............17

SEC v. Am Comodity Exch., Inc., 546 F.2d 1361 (10th Cir. 1976)..................15

SEC v. Daifotis, Number C 11-00137, 2011 WL 3295139
    (N.D. Cal. Aug. 1, 2011).......................................................19

SEC v. Delphi Corp., No. 06-14891, 2008 WL 4539519
    (E.D. Mich. Oct. 8, 2008) .......................................................13

SEC v. Geswein, No. 10-cv-1235, 2011 WL4565861.......................................19

SEC v. Goldman Sachs & Co., 790 F. Supp. 2d 147 (S.D.N.Y. 2011) ...........................15

SEC v. Kelly, No. 08 Civ. 4612, 2011 WL 4431161 (S.D.N.Y. Sep. 22, 2011).........20, 23

SEC v. KPMG, LLP, 412 F. Supp. 2d 349 (S.D.N.Y. 2006).......................................16, 20

SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342 (D.N.J. 2099).......................................21

SEC v. Mercury Interactive, LLC, Number 5:07-cv-02822, 2011 WL 5871020
    (N.D. Cal. Nov. 22, 2011)...........................................................................................19

SEC v. Pimco Advisers Fund Management, LLC, 341 F. Supp. 2d 454
    (S.D.N.Y. 2004)..............................................................................................20, 22, 24

SEC v. Tambone, 550 F.3d 106 (1st Cir. 2008), reh'g en banc granted and
    opinion   withdrawn, 573 F. 3d 54 (2009), and opinion reinstated in relevant
    part, 597 F.3 436 (2010) (en banc) ..................................................10, 12, 15, 16, 20

SEC v. Wolfson, 539 F.3d 1249 (10th Cir. 2008) ................................................14, 16, 20

United States v. Autuori, 212 F.3d 105 (2d Cir. 2000)................................................23

United States v. Bilotti, 380 F.2d 649 (2d. Cir. 1967)................................................21, 23

United States v. Crispo, 306 F.3d 71 (2d Cir. 2002) ...................................................11

United States v. Gayle, 342 F.3d 89 (2d Cir. 2003)....................................................19

United States v. Males, 459 F.3d 154 (2d Cir. 2006) .................................................11

United States v. Naftalin, 441 U.S. 768 (1979) .........................................................21

United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003) ...............................................23

United States v. Savage, 67 F.3d 1435 (9th Cir. 1995) ..............................................13

United States v. Shellef, 507 F.3d 82 (2d Cir. 2007)...................................................11

WPP Luxembourg Gamma Three Sari v Spot Runner, Inc., 655 F.3d 1039
    (9th Cir. 2011)..............................................................................................23, 24

## MISCELLANEOUS CASES

Cady, Roberts & Co., 40 SEC 907 (1961).........................................................................3

# FEDERAL STATUTES AND RULES

**Securities Act 1933**

Section 17(a)……………...[15 U.S.C. §77q(a)] ........................................................10, 16
Section 17(a)(2)…………. [15 U.S.C. § 77q(a)(2)]................................................ passim
Section 17 (a)(3)………….[15 U.S.C. § 77q(a)(3)]................................................ passim

**Securities Exchange Act 1934**

Rule 10b-5………………..[17 CFR § 240.10b-5] ...................................................16, 17
Rule 10b-5(b)…………....[ 17 CFR § 240.10b-5(b)].................................................16, 17


18 U.S.C. § 1341.................................................................................................10


F.R.C.P. 12(b)(6) ..............................................................................................9

# MISCELLANEOUS

Robert A. Prentice, *Scheme Liability: Does It Have a Future After Stoneridge?*,
   Wisc. L. Rev. 351 (2009).............................................................................11

W.D. Staples*, Legislation: The Securities Act of 1933,* 20 Va. L. Rev. 451 (1934).........11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                                    :
SECURITIES AND EXCHANGE COMMISSION,                 :
                                                    :
                          Plaintiff,                :
                                                    :  11 Civ. 07388 (JSR)
            v.                                      :
                                                    :  ECF Case
BRIAN H. STOKER,                                    :
                                                    :
                          Defendant.                :
———————————————————————                             :

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

Pursuant to Local Civil Rule 7.1 and the Court's Order, dated November 17, 2011, Plaintiff, the Securities and Exchange Commission ("Commission"), respectfully submits its Memorandum of Law in Opposition to Defendant Brian H. Stoker's Motion to Dismiss.

## PRELIMINARY STATEMENT

On October 19, 2011, the Commission filed a complaint against Stoker alleging that he violated Section 17(a)(2) and (3) of the Securities Act of 1933 related to his role in the structuring and marketing of a largely synthetic collateralized debt obligation ("CDO") called Class V Funding III ("Class V III").  Dkt. No. 1 ("Compl.").  As a director of the CDO structuring desk at Citigroup Global Markets, Inc. ("Citigroup"), Stoker worked with Citigroup's CDO trading desk to structure a CDO from which Citigroup could purchase protection on (*i.e.*, short) assets that it had selected for inclusion in the CDO portfolio.  As the lead structure for the Class V III deal, Stoker had responsibility for ensuring the accuracy of the disclosure documents used to market the deal.  Nevertheless, the offering circular (which Stoker personally edited) and the pitch book (which Stoker personally distributed) falsely represented that an independent

collateral manager had selected the assets for the Class V III portfolio without disclosing that, in fact, Citigroup had selected a substantial portion of the assets.

Stoker moves to dismiss the claim that he violated Section 17(a)(2), arguing both that the Complaint fails to allege that he "obtained money or property by means of" the false statements at issue, and that he was not the "maker" of those false statements.  In addition, Stoker moves to dismiss the claim that he violated Section 17(a)(3), arguing that false statements alone cannot support such a claim.  Each of these arguments is without merit.

First, Section 17(a)(2), which prohibits a defendant from "directly or indirectly" "obtaining money" by means of false statements, does ***not*** require that a defendant personally receive money or property from victims as a result of the false statements or omissions. In the context of Section 17(a), the courts have held that a defendant "obtains money or property by means of" a false statement or omission if he obtains money or property for either himself or his employer.  And courts interpreting similar language in the mail fraud statute have held that a defendant "obtains money" if he deprives his victims of such.  The Complaint alleges that Stoker obtained money for performing his duties at Citigroup (including the preparation of Class V III marketing materials), that Citigroup (Stoker's employer) obtained money as a result of the false statements and omissions, and that Class V III investors were deprived of hundreds of millions of dollars.  Any one of these allegations is alone sufficient to allege that Stoker "obtained money or property" for purposes of Section 17(a)(2).

Second, the Complaint alleges that Stoker obtained money from investors "by means of" the false statements.  In contrast to Section 10(b) of the Exchange Act, Section 17(a)(2) does not require that a defendant be the "maker" of the false statements at issue.  Thus, the Supreme Court's decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011),

interpreting the "make" element of Section 10(b) has no application here.  As the courts have recognized, a defendant may violate Section 17(a)(2) if he prepares the false statements used by others or if he himself uses the false statements to solicit investors.  Here, the Complaint alleges that Stoker oversaw the drafting of the marketing materials, personally edited the misleading offering circular, and personally transmitted a copy of the misleading pitch book to potential investors.  This is sufficient to state a claim under Section 17(a)(2).

Third, Stoker's argument that a Section 17(a)(3) claim cannot be predicated on false statements or omissions is without merit.  The various subsections of Section 17(a) are not mutually exclusive.  Cady, Roberts & Co., 40 S.E.C. 907, 913 (1961) ("The three main subdivisions of Section 17 and Rule 10b-5 have been considered to be mutually supporting rather than mutually exclusive.").  Thus, the Supreme Court has held that a case based primarily on fraudulent statements and omissions can constitute a course of business operating as a fraud or deceit.  See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972).  In any event, where, as here, there is additional fraudulent conduct in conjunction with the false statements, a defendant may be found to have violated Section 17(a)(3).  The Complaint alleges that, in addition to his role in preparing and using the false statements, Stoker provided an analysis of how Citigroup could expect to profit from the transaction; sought to conceal Citigroup's intent with respect to Class V III from the asset manager; and attempted to convince an investor that Class V III was a good investment even though he was aware of the actions Citigroup took to create an investment that benefited Citigroup at the expense of investors.

Accordingly, Stoker's motion to dismiss should be denied.

## STATEMENT OF FACTS

### A.  Structuring of the Class V III CDO

During late 2006, Citigroup became aware of a large market demand to buy protection on CDOs whose assets consisted primarily of BBB-rated subprime, residential mortgage backed securities ("RMBS").  Compl. ¶ 20.  In particular, there was a large demand for protection on mezzanine CDOs that were part of a series of transactions named after constellations (the "Constellation Series") and for CDOs known as "President" deals.  Id. ¶ 21.  This increase in demand resulted in internal discussions at Citigroup about the feasibility of structuring and marketing a CDO squared collateralized by single A-rated CDO tranches.  Id.  A significant part of Citigroup's rationale for pursuing such a transaction was the desire of its CDO trading desk to buy protection on A-rated tranches of mezzanine CDOs originated in 2006 for its own account, without an offsetting long trade with a customer.  Such positions were known as "naked short" positions.  Id. ¶ 23.

During this time period, Stoker was a Director in the CDO structuring group at Citigroup.  Id. ¶ 9.  In October 2006, personnel from Citigroup's CDO trading desk had discussions with Stoker and others on Citigroup's CDO structuring desk about the possibility of establishing short positions in a specific group of assets, including several Constellation and President deals, by buying protection from a CDO squared that Citigroup would structure and market.  Id. ¶ 24.  Citigroup knew that representing to investors that an experienced, third-party investment adviser had selected the investment portfolio would facilitate the placement of the CDO squared's liabilities.  Id. ¶ 25.  As a result, on October 19, 2006, Citigroup initiated discussions with Credit Suisse Alternative Capital ("CSAC") about CSAC acting as collateral manager for the proposed CDO squared.  Id. ¶ 26.

On October 23, 2006, a Managing Director on Citigroup's CDO trading desk sent Stoker a list of 21 recent-vintage, mezzanine CDOs on which the CDO trading desk wished to buy protection from the CDO squared.  Eighteen of the 21 names the Managing Director forwarded were Constellation or President deals.  Id. ¶ 27.  On or about October 26, 2006, Stoker discussed with others within Citigroup potential structures for the CDO squared, as well as the possibility that Citigroup would short assets into the CDO squared.  Stoker prepared (or had prepared) models showing the potential profits from shorting assets into the CDO squared.  Id. ¶ 28.

On or about October 30, 2006, Stoker sent the list of 21 CDOs to the Citigroup CDO salesperson that covered CSAC, who forwarded it to CSAC.  Id. ¶¶ 29-30.  On November 3, 2006, in response to an inquiry from his immediate supervisor concerning whether Citigroup was going forward with the proposed "CSAC CDO squared," Stoker replied: "I hope so.  This is [the CDO trading desk]'s prop trade (don't tell CSAC).  CSAC agreed to terms even though they don't get to pick the assets."  Id. ¶ 32.  On November 22, 2006, Stoker distributed to Citigroup's CDO trading desk and others at Citigroup "the latest structure" of Class V III, in which he recommended that the President and Constellation deals included in the CDO squared be those having a single-A rating.  Id. ¶ 33.

On December 21, 2006, CSAC sent a list of 127 CDOs as potential candidates for inclusion in the CDO squared to the Citigroup CDO salesperson, who, in turn, forwarded it to Stoker and others at Citigroup.  Id. ¶ 36.  On the morning of January 8, 2007, Citigroup's CDO trading desk selected 25 CDOs from CSAC's list and provided the 25 names to the Citigroup CDO salesperson.  Later that morning, the Citigroup CDO salesperson sent the list of 25 names to CSAC and, within an hour, CSAC agreed to include the 25 CDOs in Class V III.  The notional amount of CDS referencing these CDOs was $250 million.  Id. ¶ 37.  That same day, Stoker

5

learned of CSAC's agreement to sell Citigroup protection on CDOs with a notional value of $250 million.  Id. ¶ 38.  On January 12, 2007, Citigroup and CSAC agreed to double Class V III's credit exposure to the original 25 CDOs that Citigroup selected for the investment portfolio, representing half of Class V III's investment portfolio.  Id. ¶ 42.  Ultimately, the size of the Class V III transaction was $1 billion.  Id. ¶ 41.

### B. Marketing of the Class V III CDO.

Citigroup marketed Class V III primarily through two documents, an offering circular and a pitch book.  As lead structurer for Class V III, Stoker was responsible for ensuring the accuracy and completeness of the offering circular and the pitch book.  Id. ¶ 47.  Although Stoker knew Class V III was intended to be the Citigroup CDO trading desk's "prop trade," nothing in the offering circular, or in the pitch book described the role played by Citigroup in selecting half of the Class V III investment portfolio or the $500 million short position Citigroup had taken on the 25 names it had selected for the Class V III portfolio.  Id. ¶¶ 57-58.

The pitch book for Class V III, which was finalized on or about February 5, 2007, represented in its "Transaction Overview" that CSAC was the "collateral manager" and that CSAC had selected the collateral for Class V III.  The twenty-page "Manager" section contained an overview of CSAC, described its track record and investment philosophy, and, most significantly included a detailed, nine-page section titled "Portfolio Construction and Management," purporting to describe CSAC's rigorous approach to selecting each asset it included in the investment portfolio of its CDOs.  The Risk Factors section of the pitch book, prepared by Citigroup, stated that CSAC had "selected" the collateral for Class V III.  Id. ¶ 49.

The offering circular was also drafted by Citigroup's structuring team under the direction of Stoker.  Id. ¶ 50.  In February 2007, Stoker made substantial edits to the preliminary offering

circular for Class V III but made no changes or edits to the sections stating that CSAC selected the assets or to the section describing Citigroup's position as initial swap counter-party.  Id. ¶ 51.  Stoker did nothing to determine whether the statements about the asset selection process, or about CSAC's role in selecting the assets, were accurate.  Id. ¶¶ 50-51.  At the time the Class V III offering circular was being drafted, Stoker had information that Citigroup's Trading desk was using Class V III to establish a large proprietary short position.  Id. ¶ 52.  Nevertheless, he made no attempt to obtain information about the size of its short position or otherwise take action to ensure the disclosures concerning Citigroup's interest in Class V III were accurate.  Id. ¶ 52.

On or about February 14, 2007, the Managing Director on the CDO trading desk communicated to Citigroup's Risk Management Group that the CDO trading desk intended to retain the short position in Class V III even if Citigroup sold all the tranches of Class V III.  This decision permitted Citigroup to remain positioned to profit from the negative performance of the Class V III collateral even as it was marketing Class V III to investors.  Id. ¶ 46.

On or about February 26, 2007, Citigroup finalized the offering circular for Class V III. Id. ¶ 53.  The finalized version of the Class V III offering circular stated that CSAC "will act as the manager for the portfolio of assets," and the body of the offering circular contained repeated references that the investment portfolio was "selected" by CSAC.  Id. ¶ 54.  Both the pitch book and the offering circular contained a disclosure concerning Citigroup's role as "Initial CDS Asset Counterparty," but did not disclose that Citigroup actually had taken naked short positions with respect to assets in the portfolio.  Id. ¶¶ 55-56.

Beginning in late January 2007, Citigroup broadly marketed Class V III to many of Citigroup's institutional clients, providing the pitch book and offering circular to prospective investors.  Id. ¶ 61.  On one occasion, Stoker personally sent a copy of the Class V III pitch

book to a prospective investor, along with a representation that Class V III was a "top-of-the-line CDO squared." Id. ¶ 62.

The largest investor in Class V III was Ambac, which received multiple drafts of the offering circular from Citigroup, one of which was provided by Stoker personally. Id. ¶¶ 66, 68. The participation of CSAC as the collateral manager for Class V III was an important consideration for Ambac. Id. ¶ 67. Ambac was unaware of Citigroup's approximately $500 million short position in Class V III or the extent of Citigroup's influence on the asset selection process. Information concerning Citigroup's short position would have been material to Ambac's decision to sell protection on the super senior tranche of Class V III. Id. ¶ 69.

### C. Closing of the Class V III CDO.

The Class V III transaction closed on February 28, 2007. Effective March 16, 2007, Ambac agreed to sell protection on the $500 million super senior tranche of Class V III, meaning it effectively invested in that tranche by assuming the credit risk associated with that portion of the capital structure via CDS in exchange for premium payments. Id. ¶ 71.

Citigroup also provided the pitch book and offering circular to approximately fourteen Subordinate Investors who purchased notes with a par value of $393 million in Class V III. Id. ¶ 70. At the time they invested in the Class V III transaction, the Subordinate Investors were unaware Citigroup had played a significant role in selecting 25 names for the Class V III investment portfolio, or that Citigroup had taken a $500 million short position on those assets. Ultimately, approximately 15 different investors purchased or sold protection on tranches of Class V III with a face value of approximately $893 million. Many of the investors in Class V III considered CSAC's purported experience as a collateral manager and rigorous asset selection process to be important to their investment decision. Id. ¶ 65.

By late July 2007, 14 of the 58 assets in the Class V III portfolio had been placed on negative watch by Moody's and/or Standard & Poor's, eleven of which were assets that Citigroup selected and on which it then purchased protection.  On November 19, 2007, Class V III was declared to be in an Event of Default.  Id. ¶¶ 75, 77.  The 25 names Citigroup selected for Class V III performed significantly worse than other names in Class V III and significantly worse than approximately 102 other names on the list that CSAC provided to Citigroup.  Id. ¶ 76.  As a result of the default of Class V III, Ambac suffered losses of about $305 million and the Subordinate Investors lost most, if not all, of their investment.  Id. ¶¶ 77-78.

As a result of the fees Citigroup received for structuring and marketing Class V III and its short position on the $500 million in assets in Class V III, Citigroup realized net profits of approximately $160 million.  Id. ¶ 79.  Stoker was paid a salary and a bonus by Citigroup for his work as a structurer on CDOs, including Class V III.  In 2006, Stoker was paid a salary of $150,000 and a bonus of $1.05 million, and in February 2007, Stoker negotiated a salary of $150,000 and a guaranteed bonus of $2.25 million for 2007.  Id. ¶ 80.

## ARGUMENT

### I.   Standard For Motion To Dismiss Pursuant To FRCP 12(b)(6)

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft, 129 S.Ct. at 1949.  However, this standard "'does not impose a probability standard at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery

will reveal evidence of illegal[ity].'" Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 324 (2d

Cir. 2011) (quoting Twombly, 550 U.S. at 556.).

In resolving a motion to dismiss, the court should accept all the allegations as true and

"draw[] all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282

F.3d 147, 152 (2d Cir. 2002). The court's role when reviewing a motion to dismiss is limited to

"merely assess[ing] the legal feasibility of the complaint, not to assay[ing] the weight of the

evidence which might be offered in support thereof." Eternity Global Master Fund Ltd. v.

Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004).

## II.      The Commission Has Adequately Pled That Stoker Violated Section 17(a)(2)

Stoker first argues that the Complaint fails to state a claim under Section 17(a)(2). Def.

Mem. at 10-19. To state a claim under Section 17(a)(2), the Commission must allege that Stoker

(1) directly or indirectly obtained money or property (2) by means of any untrue statement of

material fact or omission (3) with negligence (4) in the offer and sale of any security. SEC v.

Tambone, 550 F.3d 106, 125 (1st Cir. 2008), reh'g en banc granted and opinion withdrawn, 573

F.3d 54 (2009), and opinion reinstated in relevant part, 597 F.3d 436, 450 (2010) (en banc).

Stoker contends that the Complaint fails to allege facts sufficient to establish the first and second

elements of a claim under Section 17(a)(2). His arguments in this regard are meritless.

### A.  The Complaint Alleges The "Obtain Money or Property" Element.

Stoker first argues the Complaint fails to state a claim under Section 17(a)(2) because it

fails to allege that he "personally" obtained money or property as a result of the alleged

misstatements. Def. Mem. at 11. This argument distorts both the language and purpose of that

provision, ignores precedents interpreting other similarly-worded statutory provisions, and would

lead to absurd results. Accordingly, Stoker's reading of Section 17(a)(2) should be rejected.

**1.  Stoker Deprived Victims of Money or Property.**

Section 17(a) which prohibits both schemes to defraud and obtaining money or property by means of false statements, was modeled after the mail fraud statute, which contains the same two prohibitions.[1]  *See* Robert A. Prentice, <u>Scheme Liability: Does It Have a Future After Stoneridge?</u>, 2009 Wisc. L. Rev. 351, 365 n.77 (2009) ("Rule 10b-5's scheme to defraud language was copied from section 17(a) of the 1933 Act. . . .  Congress derived that language, in turn, from the mail-fraud statutes, which is currently codified at 18 U.S.C. § 1341 (2006)."); W.D. Staples, <u>Legislation: The Securities Act of 1933</u>, 20 Va. L. Rev. 451, 462 (1934) (noting that Section 17(a) is "couched almost verbatim in the language of the mail fraud statute").  Interpreting the "obtaining money or property" language of the mail fraud statute, the Second Circuit has "held that a 'defendant does not need to literally 'obtain' money or property to violate the statute.'"  <u>United States v. Males</u>, 459 F.3d 154, 158 (2d Cir. 2006) (quoting <u>Porcelli v. United States</u>, 404 F.3d 157, 162 (2d Cir. 2005)).  Rather, "it is sufficient that a defendant's scheme was intended <u>to deprive</u> another of property rights, even if the defendant did not physically 'obtain' any money or property by taking it from the victim."  <u>Id.</u> (emphasis added); <u>see also</u> <u>United States v. Shellef</u>, 507 F.3d 82, 109 (2d Cir. 2007).  Because Section 17(a)(2) was modeled after the mail fraud statute, it too should be read as requiring only that a defendant deprive his victims of money or property; literal acquisition of money or property by the defendant should not be required.  <u>See</u> <u>United States v. Crispo</u>, 306 F.3d 71, 79 (2d Cir. 2002) ("fraud statutes that use the same relevant language, should be analyzed in the same way").

---

[1] The mail fraud statute renders it unlawful to "devise any scheme or artifice to defraud, ***or*** for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1341 (emphasis added).

Here, the Complaint alleges that numerous victims were deprived of their money or property as a result of Stoker's false statements. Specifically, as a result of its investment in Class V III, Ambac suffered a loss of approximately $305 million, and the Subordinate Investors lost most, if not all, of their investment. Compl. ¶¶ 70, 77, 78. By alleging that Stoker deprived victims of their money or property, the Complaint alleges the "obtain money or property" element of a claim under Section 17(a)(2)**.**

## 2. Stoker Obtained Money or Property.

Even if Section 17(a)(2) is read to require that the defendant literally obtain money or property (and not simply deprive his victim of such) by means of false statements, that requirement can be satisfied in a number of ways. By its terms, Section 17(a)(2) renders it unlawful to, "in the offer or sale of any securities . . . , <u>directly or indirectly</u> . . . obtain money or property by means of any untrue statement of a material fact or any omission . . . ." (Emphasis added). In <u>Tambone</u>, the First Circuit court "read the 'directly or indirectly' language to modify the 'to obtain money or property' clause at the start of sub-section (2) of the statute." <u>Tambone</u>, 550 F.3d at 128 n.29. In other words, Section 17(a)(2) renders one liable for "<u>indirectly</u> obtaining money by means of an untrue statement." <u>Id.</u> at 128 (emphasis in original). Thus, a defendant can violate Section 17(a)(2) by directly <u>or</u> indirectly obtaining money or property by means of a false statement. The Complaint here alleges facts sufficient to satisfy either theory.

## a. Stoker Obtained Money or Property for Citigroup.

The Complaint properly alleges that Stoker indirectly obtained money or property, in violation of Section 17(a)(2). Specifically, the Complaint alleges that money was received by Citigroup, a company by which Stoker was employed and which participated in this fraud.

While Section 17(a)(2) requires that the defendant "obtain money or property" as a result of a fraud, it does not specify *for whom* that money or property must be obtained.  In <u>SEC v. Delphi Corp.</u>, No. 06-14891, 2008 WL 4539519 (E.D. Mich. Oct. 8, 2008), the court held that Section 17(a)(2) "does not require that the person alleged to have made the false or misleading statement . . . obtain money or property for [him]self.  Rather, it is sufficient that the complaint alleges that [the defendant] made false statements to investors in connection with [the company's] efforts to raise money through public offerings."  <u>Id.</u> at *20.  Thus, in the case where an individual is acting as an agent of a company, the "obtained money or property" element is satisfied when the defendant obtains the money or property for his principal or employer.

Accepting Stoker's argument that "[i]t is insufficient . . . to allege that Citigroup – Stoker's employer – obtained money or property," Def. Mem. at 11, would lead to the absurd result that an agent who makes false statements on behalf of and for the benefit of his principal is insulated from liability unless he personally received some portion of the money obtained as a result of the misstatement.  Stoker's proposed interpretation of the "obtain money or property" requirement is contrary to the intent of Section 17(a), which was to address fraud by stock brokers who sell stock so that companies or other investors, not the brokers themselves, "obtain" the proceeds of the sale.  <u>See</u> <u>Tambone</u>, 550 F.3d at 127 (explaining that "Section 17(a)(2) was drafted to apply to broker-dealers").  Stoker's proposed interpretation is also inconsistent with the principle that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purpose.'"  <u>Affiliated Ute</u>, 406 U.S. at 151.

The Complaint properly alleges that Stoker obtained money or property for his employer, in violation of Section 17(a)(2).  Specifically, the Complaint alleges that Stoker was employed

by Citigroup as a Director in the CDO structuring group at Citigroup and was the lead structure

for Class V III.  Compl. ¶ 9, 47.  Stoker's preparation of the pitch book and offering circular, and

his efforts to market Class V III were for the primary benefit of Citigroup, his employer.  And

Stoker's conduct resulted in Citigroup realizing net profits of approximately $160 million from

the fees it received and the short position it took on assets included in Class V III.  Id. ¶ 79.

Thus, Stoker's actions resulted in precisely the harm that Section 17(a)(2) was intended to

remedy – obtaining money from investors for Citigroup through the use of untrue statements.

### b.  Stoker Obtained Money or Property for Himself

The Complaint also alleges that Stoker "obtained money" when he was paid by Citigroup

for his work in preparing the false or misleading statements that were used to solicit investors.

Both the text and purposes of Section 17(a)(2) support the conclusion that a defendant need not

receive funds directly from a victim in order to violate that provision.  One can violate Section

17(a)(2) by receiving payment for his role in preparing fraudulent statements to investors.

Nothing in the text of Section 17(a)(2) requires that the defendant obtain funds directly

from the victims of the fraud.  The plain language of Section 17(a)(2) requires only that the funds

be obtained "by means of" a false statement.  The courts have held that this element is satisfied

when a defendant is paid for his participation in the solicitation efforts.  For example, in SEC v.

Wolfson, 539 F.3d 1249, 1264 (10th Cir. 2008), the court held that the "obtaining money"

element satisfied where defendant received a fee for preparing fraudulent offering documents.

Furthermore, Section 17(a)(2) applies to false statements made in "offers" of securities,

whether or not those offers result in consummated sales.  See Tambone, 550 F.3d at 122 (holding

that because Section 17(a) "applies to both sales and offers to sell securities, the SEC need not

base its claim of liability on any completed transaction at all"); Wolfson, 539 F.3d at 1264

14

(noting that "actual sales [are] not essential for liability to attach under § 17(a)" (internal quotation marks omitted)); <u>SEC v. Am. Commodity Exch., Inc.</u>, 546 F.2d 1366, 1366 (10th Cir. 1976) (same); <u>SEC v. Goldman Sachs & Co.</u>, 790 F. Supp. 2d 147, 164 (S.D.N.Y. 2011) (same). Thus, Section 17(a)(2) must be read so as to leave open the possibility that one can obtain money or property in an offer alone without a consummated sale.

The Complaint alleges Stoker was paid a salary and a bonus for his work as a structurer of CDOs.  Compl. ¶ 80.  The work at Citigroup for which Stoker was compensated, by necessity, included his work as the lead structurer on Class V III, including his preparation and distribution of the misleading Class V III offering circular and pitch book.  Thus, Stoker obtained money or property "by means of" false statements to investors.

Stoker's suggestion that he cannot be liable under Section 17(a)(2) unless there is evidence he received a commission directly attributable to his work on Class V III, Def. Mem. at 12, superimposes a tracing requirement on the "obtain money or property" requirement that is not supported by the plain language of the statute or the principles of respondeat superior. Whether an agent/officer is paid by commission or by a salary, he receives compensation for the actions taken on behalf of his principal.  In determining whether Stoker violated Section 17(a)(2), the issue is not <u>how</u> he was compensated for his work on behalf of Citigroup, but rather whether his fraudulent activities with regard to Class V III were within the scope of the employment for which he was compensated by Citigroup.  The Complaint clearly alleges that Stoker was compensated by Citigroup for his work as a structurer.  A plausible inference from this allegation is that Stoker was compensated for his role as lead structure on Class V III. Therefore, even assuming that Section 17(a)(2) requires an allegation that Stoker personally received money or property, the Complaint satisfies that requirement.

### B.      The Complaint Alleges The "By Means Of" Element.

Stoker argues that, as a matter of law, the Complaint is insufficient because it does not contain sufficient allegations that he was responsible for the misleading statements and omissions in the offering circular and pitch book.  Def. Mem. at 13.  Stoker's argument is two-fold.  First, he suggests the Complaint is legally deficient because it does not include an allegation that he "made" the misleading statements.  Id. at 14.  Second, he argues the Complaint does not sufficiently allege that he was "personally and primarily responsible for the misleading statements."  Id. at 15.  Stoker's first argument is based on a misunderstanding of the relevant law, and his second argument ignores the factual allegations in the Complaint.

### 1.      Liability Under Section 17(a)(2) Requires That a Defendant Obtain Money or Property "By Means Of" a False Statement.

As noted above, a Section 17(a)(2) claim requires allegations not only that a defendant obtained money or property, but also that he did so "by means of" a false statement.  While someone who makes a false statement to solicit investments certainly violates Section 17(a)(2), see, e.g., SEC v. KPMG, LLP, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006), such conduct is not required to violate that provision.  A defendant may also be primarily liable under Section 17(a)(2) if he assists in the preparation of false statements used by to offer or sell securities, see Wolfson, 539 F.3d at 1264, *or* if he "uses" a false statement prepared by himself or another, see Tambone, 550 F.3d at 127.  The Complaint alleges each of these theories.

Contrary to Stoker's argument that the Complaint merely includes conclusory statements concerning his responsibility for the material misstatements and omissions in both the offering circular and pitch book, Def. Mem. at 15-19,  the Complaint alleges facts supporting a claim that Stoker was personally responsible for and used material misstatements and omissions in the pitch

book and offering circular.[2]  The Complaint alleges, as a factual matter, that Stoker was responsible for the accuracy and completeness of both the offering circular and the pitch book. Compl. ¶ 47.  Under Stoker's direction, the pitch book, which was adapted from a different transaction, was revised to reflect the various deal terms in Class V III while specifically retaining the same risk factors listed in the original transaction.  Id. ¶ 48.  The risk factors in the pitch book, stated that CSAC had "selected" the collateral for Class V III.  Id. ¶ 49.  Therefore, the portion of the pitch book under Stoker's control and that was prepared under his direction claimed that CSAC selected the assets in Class V III and did not disclose Citigroup's role in the selection of certain of the assets on which it ultimately took a naked short position.  Taking these allegations as true, they clearly create, at the very least, a plausible inference that Stoker was directly responsible for the inclusion of the false statements in the pitch book concerning Citigroup's role in the selection of assets for Class V III.

The Complaint further alleges that the offering circular for Class V III was drafted by Citigroup's structuring team (not CSAC), under the direction of Stoker and that it was Stoker's decision to base the Class V III offering circular on an offering circular from an earlier transaction.  Compl. ¶ 50.  The Complaint also alleges that Stoker made substantial edits to the preliminary offering circular but elected to make no changes to the sections stating that CSAC selected the assets for Class V III or the section describing Citigroup's position as the initial swap counterparty.  Id. ¶ 51.  These factual allegations, taken as true, demonstrate that Stoker

---

[2]    Stoker's argument confuses the requirement that the Complaint contain sufficient facts necessary to "render a claim plausible," Ross v. Bank of America, N.A. (USA), 524 F.3d 217, 225 (2d Cir 2008), with the evidence necessary to prove the factual allegations.  Although the former is required to survive a motion to dismiss, the latter is not.  See Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 1010) (rejecting claim that complaint must include specific evidence supporting factual allegation); see Cassese v. Washington Mutual, Inc., 743 F. Supp.2d 148, 156 (E.D.N.Y. 2010) ("plaintiff need not plead facts that would *prove* the plaintiff's factual and legal conclusions in order to avoid dismissal").

had ultimate responsibility for the offering circular, personally determined the provisions to be included in it, and edited those provisions that he thought necessary.  Stoker's decision not to edit the sections of the offering circular that contained the false statements concerning these facts while editing other sections is an act of omission for which he is personally responsible.  The factual allegations create, at the very least, a plausible inference that Stoker was responsible for the inclusion of the false statements in the offering circular concerning Citigroup's role in selecting the assets for Class V III, and the fact that Citigroup had taken a $500 million proprietary short position on the Class V collateral.[3]

The Complaint also alleges that Stoker assumed an active role in using the pitch book and offering circular containing the false statements by Citigroup and CSAC to market Class V III.  On February 6, 2007, Stoker personally sent a copy of the pitch book to a prospective investor touting Class V III as a "top-of-the-line CDO squared," and on February 7, 2007, he personally provided a copy of the preliminary offering circular to Ambac.  Compl. ¶¶ 62, 68.  Ambac ultimately agreed to sell protection on $500 million on the super senior tranche of Class V III. Id. ¶ 71.  These allegations, taken as true, plead facts supporting the claim that Stoker used the pitch book and offering circular containing the false statements to obtain money from investors in violation of Section 17(a)(2).   Accordingly, Stoker's arguments should be rejected.

---

[3]   Stoker's repeated citations CSAC's role in drafting portions of the pitch book and offering circular, Def. Mem. at 16-18, do not negate the factual allegations concerning Stoker's role.  As described above, Stoker was responsible for ensuring the completeness and accuracy of the pitch book and offering circular, both of which he knew would be provided to investors by Citigroup.  Thus, the Complaint adequately alleges facts sufficient to establish Stoker's liability for the inclusion in those documents of statements that he should have known were materially misleading, regardless of any disclaimer under which those statements appear.  Moreover. the Complaint alleges Stoker was responsible for the drafting of sections of the pitch book and offering circular that contained false statements that were not prepared by CSAC.  Indeed, CSAC's failure to disclose Citigroup's role in the selection of assets underscored the need for Stoker to fully disclose Citigroup's role in the sections for which he was responsible.

2.      **Liability Under Section 17(a)(2) Does Not Require That Stoker "Make" Misleading Statements.**

Stoker argues that the Complaint must allege that he "made" the misleading statements to establish a violation of Section 17(a)(2).  Def. Mem. at 14.  This argument is based on a misreading of the Supreme Court's decision in <u>Janus Capital Group, Inc. v. First Derivative Traders</u>, 131 S. Ct. 2296 (2011).  In <u>Janus</u>, the Supreme Court addressed only what constitutes "mak[ing]" a false statement in violation of Section 10(b) and Rule 10b-5(b) thereunder.  <u>See</u> <u>id.</u> at 2302.  The Court based its interpretation of that term on two primary considerations.  First, the Court relied on the dictionary definition of the word "make" as used in the Rule 10b-5(b).  <u>Id.</u> Second, the Court reasoned that applying a broader definition of the term "make" would expand the scope of liability in implied private rights of action under Rule 10b-5.  <u>Id.</u> (explaining that "[c]oncerns with the judicial creation of a private cause of action caution against its expansion" (internal quotation marks omitted)); <u>see also</u> <u>id.</u> at 2303.

Neither of these considerations is applicable to the interpretation of Section 17(a).  Liability under Section 17(a)(2) is not based on "making" a false statement.  Rather, Section 17(a)(2) makes it unlawful to obtain money or property "by means of" any untrue statement or omission of material fact.  <u>See</u> 15 U.S.C. § 77q(a)(2).  Because the operative language of Section 17(a) does not contain the phrase "to make," <u>Janus</u> is inapplicable to Section 17(a) claims.  <u>See</u> <u>United States v. Gayle</u>, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.").  In addition, the policy concerns underlying <u>Janus</u> are absent here, as there is no implied private right of action under Section 17(a).  <u>Finkel v. Stratton Corp.</u>, 962 F.2d 169, 174 (2d Cir. 1992).  Accordingly, "<u>Janus</u> does not apply to claims brought under Section 17(a)."  <u>SEC v. Daifotis</u>, No. C 11-00137, 2011 WL 3295139, at *5 (N.D. Cal. Aug. 1, 2011); <u>SEC v. Mercury Interactive</u>, LLC, No. 5:07-cv-

19

02822, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) ("<u>Janus</u> may not be extended to statutes lacking the very language that <u>Janus</u> construed"); <u>SEC v. Geswein</u>, No. 10-cv-1235, 2011 WL 4565861, at *2 (N.D. Ohio Sept. 29, 20011) (denying dismissal of Section 17(a) claims in light of <em>Janus</em>).[4]

Because of the use of the expansive language – "by means of" – to describe the requisite relationship between a defendant and a false statement, liability under Section 17(a)(2) is not limited to defendants who "make" a false statement.  In <u>Tambone</u>, the court held that, notwithstanding general references in prior decisions to the similarity of the two provisions, the text of Section 17(a) makes clear that, unlike Rule 10b-5, a defendant need not "make" a statement to violate that provision.  <u>Tambone</u>, 550 F.3d at 127.  As the First Circuit explained:

> [Section 17(a)(2)] prohibits an individual from "obtain[ing] money or property by means of any untrue statement."  It does not state, however, that the seller must himself make that untrue statement. Indeed, the text suggests that the opposite is true-that it is irrelevant for purposes of liability whether the seller uses his own false statement or one made by another individual. Liability attaches so long as the statement is <em>used</em> "to obtain money or property," regardless of its source.

<u>Id.</u> at 127.  The court went on to explain that Section 17(a)(2) applies more broadly than Rule 10b-5: "[Section 17(a)(2)] covers conduct that may not be prohibited by Section 10(b) and Rule 10b-5.  Specifically, primary liability may attach under section 17(a)(2) <u>even when the defendant</u>

---

[4] <u>Contra</u> <u>SEC v. Kelly</u>, No. 08-4612 (CM), 2011 WL 4431161, at *5 (S.D.N.Y. Sept. 22, 2011) (holding that SEC must prove that defendant made a materially misleading statement to support a claim pursuant to Section 17(a)(2)).  The Commission believes that this case was wrongly decided for all of the reasons set forth above.  The opinion in <u>Kelly</u> failed to address any of these arguments, despite the fact that they were raised in that case.  Hence, <u>Kelly</u> is of little persuasive value on this issue.

Stoker's reliance upon <u>SEC v. Pimco Advisers Fund Mgmt, LLC</u>, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004); <u>SEC v. KPMG, LLP</u>, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006), and <u>SEC v. Wolfson</u>, 539 F.3d 1249, 1261 n.18 (10th Cir. 2008), to support his cramped reading of Section 17(a)(2), Def. Mem. at 13, is also unavailing because none of those cases address whether the specific language in Section 17(a)(2), "by means of any untrue statement," is broader than the "make any untrue statement" language found in Rule 10b-5(b).

has not himself made a false statement in connection with the offer or sale of a security."  Id. at

128 (emphasis added).  In short, Stoker's reliance on the "make" element of a Rule 10b-5(b)

claim and the Supreme Court's decision in Janus interpreting that provision, is misplaced.

### III.    The Complaint Contains Factual Allegations That Stoker Violated Section 17(a)(3)

Stoker also challenges the Commission's claim under Section 17(a)(3).  Def. Mem. at 19-

23.  That provision covers instances where a defendant directly or indirectly "engage[s] in any

transaction, practice, or course of business which operates or would operate as a fraud or deceit

upon the purchaser" of any security.  15 U.S.C. § 77q(a)(3).  Section 17(a)(3) "quite plainly

focuses upon the effect of particular conduct on members of the investing public."  Aaron v.

SEC, 446 U.S. 680, 697 (1980) (emphasis in original).

Stoker argues the Complaint does not sufficiently allege a violation of Section 17(a)(3)

because there are no factual allegations beyond his "purported failure to ensure the accuracy of

the pitch book and offering circular."  Def. Mem. at 19.  According to Stoker, as a matter of law,

Section 17(a)(3) is limited to conduct involving "'sham or inherently deception transactions.'"

Id. at 20 (quoting SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342, 360 (D.N.J. 2009)).  Stoker's

argument is once again based upon a misunderstanding of the relevant precedent and a disregard

of the factual allegations in the Complaint.

First, Stoker's suggestion that Section 17(a)(3) requires an allegation of conduct beyond

misrepresentations or omissions is incorrect.  The Supreme Court has expressly rejected the

notion that one subsection of Section 17(a) should be read to narrow another.  See United States

v. Naftalin, 441 U.S. 768, 774 (1979) (holding that "[e]ach succeeding prohibition is meant to

cover additional kinds of illegalities-not to narrow the reach of prior sections."); see also United

States v. Bilotti, 380 F.2d 649, (2d. Cir. 1967) (rejecting suggestion nondisclosure is only an

element of Section 17(a)(2) and not Section 17(a)(3) as not supported by "reason nor authority").[5]  In Affiliated Ute, the Supreme Court held that a plan to induce others to sell stock "without disclosing to them material facts that could have been expected to influence their decisions to sell" was a "course of business . . . that operated as a fraud."  406 U.S. at 153. Indeed, the Affiliated Ute court found the conduct there to constitute such a course of business despite the fact that it involved "primarily a failure to disclose."  Id.  Similarly, a plan to induce investors to purchase Class V III notes without disclosing to them material facts that could have been expected to influence their decisions to purchase is a "course of business which operates . . . as a fraud," in violation of Section 17(a)(3).

Further, even the cases cited by Stoker in support of his argument, have held that liability may arise under both Section 17(a)(2) and (3) out of the same set of facts where it is alleged that the defendants "undertook a deceptive scheme or course of conduct that went beyond the misrepresentations."  Alstom, 406 F. Supp. 2d at 475; see Kelly, 2011 WL 4431161, at *3 (scheme liability may be based on inherently deceptive act distinct from a misrepresentation); see also SEC v. Pimco Advisors Fund Mgmt. LLC, 341 F. Supp.2d 454, 467 (S.D.N.Y. 2004) (scheme liability may exist where "the fraudulent activity involved *some* conduct other than participation in a scheme to make 'a material misrepresentation'"; WPP Luxembourg Gamma Three Sari v Spot runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011) (defendant may be liable as part of a fraudulent scheme "when the scheme encompasses conduct beyond []

---

[5]The decision in In re Alstom Sec. Litig., 406 F. Supp.2d 433, 476 (S.D.N.Y. 2005), on which Stoker relies did not even consider Naftalin's statement in this regard.  Further, the Alstom decision involved an implied private action under Section 10(b), implicating policy concerns simply not present in the context of Section 17 action.  See Finkel, 962 F.2d at 175; see also Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d. Cir. 2005) (holding that private plaintiff could not re-cast Section 17(a)(2) claim as Section 17(a)(3) claim to avoid heightened pleading requirements of PSLRA).

misrepresentations or omissions.").  The mere fact that material misrepresentations are made as part of the scheme does not preclude claims that the scheme involved both a violation of Section 17(a)(2) and (3).  See Bilotti, 380 F.2d at 657 (nondisclosures may be considered part of a scheme to defraud); United States v. Rybicki, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (quoting United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000)) ("the phrase 'scheme or artifice to defraud' requires 'material misrepresentations.'") (emphasis added).

Contrary to Stoker's argument, the Complaint contains factual allegations that Class V III was a transaction that operated as a fraud on investors and that the material misrepresentations and omissions alleged were just one aspect of that transaction.  Moreover, the Complaint alleges that Stoker played an active role in the fraudulent transaction separate from and independent of his responsibility for and use of the material misrepresentations and omissions.

The Complaint alleges that one significant reason Citigroup pursued Class V III was its desire to buy protection on A-rated tranches of mezzanine CDOs for its own account.  Compl. ¶ 23.  Stoker was part of the discussions at Citigroup about taking this short position.  Id. ¶ 24.  In order to facilitate the marketing of Class V III while masking its intent to short a hand-picked set of assets, Citigroup engaged CSAC as a collateral manager for Class V III.  Id. ¶¶ 25-26.  Then, Citigroup sought to have CSAC include certain assets in Class V III on which it wished to take a short position.  Id. ¶¶ 27-30.  Stoker was involved in the discussions of what assets to include in Class V III and which assets to short, preparing (or having prepared) several models showing the potential profits to Citigroup from shorting specific assets into the CDO squared.  Id. ¶ 28.

Stoker was aware that the purpose of Class V III was to serve as a vehicle for Citigroup's proprietary trade and even cautioned his supervisor not to tell CSAC.  Id. ¶ 32.  Stoker also recommended the inclusion of A-rated President and Constellation deals in Class V III.  Id. ¶ 32.

Ultimately, Citigroup was able to induce CSAC to include 25 assets in Class V III, on which it took a $500 million short position.  Id. ¶¶ 36-38, 41-43.  These assets performed significantly worse than the other assets in Class V III and significantly worse than the other assets that CSAC proposed for inclusion in Class V III.  Id. ¶ 76.  Stoker actively promoted Class V III by personally sending to a prospective investor, along with a representation that Class V III was a "top-of-the-line CDO squared."  Id. ¶ 62.

Read together, the factual allegations in the Complaint depict Class V III as a transaction that was intended by Citigroup as a vehicle to position it to profit from the downturn in the United States housing market by buying protection through CDS on A-rated tranches of mezzanine CDOs.  Id. ¶ 20.  In order to ensure the marketability of this transaction, Citigroup sought to use a third-party collateral manager, while at the same time seeking to include in the transaction assets that it believed had a strong likelihood of failure.  Citigroup's interest in Class V III was different from the normal role of an arranging bank for a synthetic CDO that was understood to profit from the fees it charges for structuring and marketing the transaction, any fees it received for intermediating trades, and the spread it captured by buying protection from the CDO and selling protection to its customers.  Thus, the inadequacy of the disclosures concerning Citigroup's involvement in the selection of assets for Class V III and its decision to retain a naked short position on those assets was only one aspect of the fraudulent transaction.  Therefore, as a matter of law, the facts surrounding the creation and marketing of Class V III can be a basis for a claim under Section 17(a)(2) and Section 17(a)(3).  See Alstrom, 406 F. Supp. 2d at 475; Pimco, 341 F. Supp.2d at 467; WPP Luxembourg, 655 F.3d at 1057.

Further, the Complaint alleges that, in addition to his role in the material misrepresentations and omissions, Stoker had a direct role in the fraudulent transaction.  He

participated in discussions concerning the creation of a CDO squared to act as a proprietary trade

and created (or had created) models to show what profit Citigroup could expect from including

certain assets in Class V III.  Compl. ¶ 28.  He then sought to ensure that Citigroup's intent to

use Class V III as a vehicle for a proprietary trade was kept from the collateral manager,

cautioning his supervisor "don't tell CSAC."  Id. ¶ 28.  This action was separate and distinct

from the factual allegations that Stoker failed to make adequate disclosures to investors.

Finally, separate and distinct from Stoker's failure to make adequate disclosures to investors

concerning Citigroup's role in selecting assets in Class V III and the nature of its short position

in those assets, Stoker touted Class V III to an investor as  "top-of-the-line CDO squared,"

notwithstanding his knowledge of what assets were included in the transaction.  Id. ¶ 62.  Taken

as true these allegations are a substantial basis for the claim that Stoker violated Section 17(a)(3).

## CONCLUSION

For the reasons set forth above, the Court should deny Stoker's motion to dismiss in its

entirety.

Dated:  Washington, D.C.                                              Respectfully submitted,

   January 6, 2012

*/s/ Jeffery T. Infelise*
Jeffery T. Infelise (DC0456998)
Assistant Chief Litigation Counsel
Jane M. E. Peterson
Assistant Chief Litigation Counsel
U.S. Securities and Exchange
Commission – Enforcement Division
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481
(202) 772-9246 (fax)
infelisej@sec.gov
petersonjm@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non registered participants on November 6

2011.


## SERVICE LIST

John W. Keker
Jan Nielsen Little
Steven K. Taylor
Brook Dooley
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA94111
jkeker@kvn.com
jlittle@kvn.com
staylor@kvn.com
bdooley@kvn.com

*Attorneys for Brian H. Stoker*