# EXHIBIT 1

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:         )
                          ) File No. HO-10740
CITIGROUP, INC.    )

WITNESS: Robert K. Pinniger

PAGES:  1 through 175

PLACE:   Securities and Exchange Commission
         3 World Financial Center
         New York, New York 10281

DATE:    Thursday, September 30, 2010

The above-entitled matter came on for hearing, pursuant to notice, at 9:40 a.m.

Page 2

APPEARANCES:

On behalf of the Securities and Exchange Commission:

    ANDREW FELLER, ESQ.
    THOMAS D. SILVERSTEIN, ESQ.
    Division of Enforcement
    Securities and Exchange Commission
    100 F Street, NE
    Washington, DC 20549

On behalf of the Witness:

    SUSANNA M. BUERGEL, ESQ.
    MICHAEL N. BERGER, ESQ.
    Paul, Weiss, Rifkind, Wharton & Garrison, LLP
    1285 Avenue of the Americas
    New York, New York 10019-6064
    (212) 373-3553 (Ms. Buergel)
    (212) 373-3798 (Mr. Berger)

Page 3

CONTENTS

| WITNESSES | EXAMINATION |
|---|---|
| Robert K. Pinniger | 9 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 496 | Subpoena | 7 |
| 497 | Background Questionnaire | 8 |
| 498 | E-mail dated 1/24/07 with a 66 page attachment; BS CITI-15905929 to 5995 | 38 |
| 499 | E-mail dated 2/1/07 with a 17-page attachment; BS CITI-17296037 to 6055 | 45 |
| 500 | E-mail chain dated 1/29/07; BS CITI-15830868 | 71 |
| 501 | E-mail chain dated 2/1/07; BS CITI-15812210 to 12211 | 77 |
| 502 | E-mail chain dated 2/11/07; BS CITI-15879639 to 642 | 79 |
| 503 | E-mail chain dated 1/12/07; BS CITI-17830215 to 216 | 84 |
| 504 | E-mail BS CITI-18393532 and 533 dated 2/12 (Substituted & Replaced) 90 | 89 |
| 505 | E-mail BS CITI-18393540 | 90 |
| 506 | E-mail dated 4/6/07; BS CITI-19884889 | 94 |
| 507 | E-mail chain dated 3/9/07; BS CITI- | |

Page 4

| | 15745914 | 102 |
|---|---|---|
| 508 | E-mail chain BS CITI-158745918 to 919 | 107 |
| 509 | E-mail BS CITI-17309794 | 107 |
| 510 | E-mail dated 2/26/07; BS CITI-15695049 | 112 |
| 511 | E-mail chain; BS CITI-15694199 | |
| 512 | E-mail chain BS CITI-21715230 to 231 | 120 |
| 513 | E-mail chain dated 11/7/07; BS CITI-17371303 | 126 |
| 514 | E-mail chain dated 7/18/07; BS CITI-22033454 to 455 | 153 |
| 515 | E-mail chain BS CITI-20148394 to 396 | 155 |
| 516 | E-mail chain BS CITI-17449806 to 807 | 159 |

Page 37

1    Q   Did you have discussions with Samir Bhatt - B-H-A-
2  T-T - in the course of working on the Class V, III deal?
3    A   At various points throughout the transaction I
4  would have talked to Samir. Yes.
5    Q   Did Samir tell you anything about the process by
6  which the assets were selected for Class V, III?
7    A   I do not recall Samir telling me specifically how
8  the assets were selected. I don't recall talking to Samir
9  about that.
10   Q   Did he tell you generally?
11   A   Without a specific recollection of conversations,
12  it would have been a normal process for Samir and I to talk
13  at various points of a transaction. There may have been
14  questions on certain assets, for example, as we're going
15  through a deal. You know, now we're in the marketing stage
16  and someone asks a question about XYZ bond in the portfolio
17  or position in the portfolio. And to the extent we needed
18  their assistance in either getting data or however the
19  question came in, we might go to Samir or I might talk to
20  Samir about that. So it would have been normal practice for
21  me to interact with Samir in various ways. But I don't -- in
22  terms of early on talking to Samir about portfolio selection
23  and things on that, I don't recall talking to Samir about
24  that.
25   Q   Let me hand you what's been marked as 499.

Page 38

1           THE COURT REPORTER: 498.
2           MR. FELLER: 498. Thank you. Perfect. Thank you.
3              (Commission's Exhibit No. 498 was
4               marked for identification.)
5    Q   Exhibit 498 is a one-page e-mail with a 66 page
6  attachment. I think that's right. The Bate range CITI-
7  15905929 through 15905995. It's an e-mail from Frank Li, L-
8  I, to Samir Bhatt and Todd Kornfeld, copying Mr. Stoker, Mr.
9  Pinniger and Wen Hai Pan.
10   A   Yes.
11   Q   And it's dated January 24, 2007; Subject "Draft of
12  Class V Funding, III (CSAC CDO squared) Debt Book". And Mr
13  Li writes "Samir, Todd: Attached please find the draft debt
14  book of the Class V Funding, III CSAC CDO Squared deal. The
15  book is pretty clean and share the manager and risk factor
16  sections as the book of Adam Square Funding, II CSAC Mezz ADS
17  Deal. As of such, please provide any comments you may have no
18  later than 4 p.m. tomorrow. The deal has been announced, and
19  we are planning to send the book out by the end of the week".
20       So who put together the -- is this the first draft
21  -- is the attachment to Exhibit 498 the first draft of the
22  marketing book of Class V, III?
23   A   In looking at the attachment I can't tell if this
24  is the first draft or it's sort of further along. I don't
25  know what stage this was at.

Page 39

1    Q   Well let me go back. Who put together the first
2  draft of -- whether or not this is the first draft, who put
3  together the first draft of the Class V, III marketing book?
4    A   As a starting point it would have been my team. So
5  my Structuring Team would have done it. So it would have
6  been a combination of myself and Frank and Wen Hai, starting
7  with whatever is the most recent book we might have had and
8  trying to do what modifications we could to the book. And
9  then depending on at what stage it was ready to go out to
10  various folks to begin to add their comments to begin the
11  review.
12   Q   And did you use something -- a template for the
13  first draft of the Class V, III book?
14   A   We would have used a template. I don't recall what
15  we used. I'm just reading here in the e-mail, and it sounds
16  like we used a particular template. I don't recall that that
17  was the case, but I'm just reading this.
18   Q   In putting together the initial draft did anyone
19  explain to you any differences other than the collateral
20  being CDO traunches versus some mix of MBS and CDO traunches?
21  Did anyone explain to you any differences between the
22  transactions?
23       MS. BUERGEL: Which transactions? I'm sorry.
24       MR. FELLER: The transaction that served as the
25  template for -- the marketing book of which served as the

Page 40

1  template and then Class V, III.
2    A   I'm not recalling specific conversations with
3  anyone where we discussed the exact differences. But we
4  would have -- sort of similar to what I was saying before,
5  someone would have at some point probably given me at least a
6  rough outline on what the deal was intended. You know, just
7  a real high level of general starting point for the
8  transaction. By that, if I'm looking at Adam Square - and I'm
9  only going off what's in the e-mail. I don't recall that
10  that was our template. Adam Squared was a mezzanine deal.
11  Class V ended up being a CDO squared, so I already knew some
12  differences.
13       I forget exactly when I would have come to have
14  known that the portfolio was intended to be certain credit
15  quality or not. But I would have come to know information at
16  some point. I just don't -- I can't recall specifically of
17  talking to XYZ about that.
18   Q   Did anyone tell you that the asset selection
19  process was different in any way from the one that took place
20  in the transaction that served as the template for the Class
21  V, III deals?
22   A   I don't recall having discussed with anyone that
23  the asset selection process was different.
24   Q   Who would be responsible for insuring that the
25  description of the asset selection process - you know,

Page 41

1  marketing materials - is accurate?
2      A  It could come from one of two places or both. And
3  by that I mean primarily the manager would be reviewing that
4  to make sure that they are looking through a marketing book
5  and it's describing what they're going to be doing in a
6  transaction. They would be reading the marketing material
7  for making sure that their role is specified correctly. We
8  may also -- "we" meaning the Structuring Desk and it may be
9  in conjunction with our internal or external counsel to make
10 sure descriptions are correct. To the extent we know that
11 something is specific about a manager's role, whether or not
12 there was something different about it, we might also comment
13 on it and then look for the manager to -- we might look for
14 the manager to make sure our way of phrasing or framing it
15 was correct. So it could come from two different places.
16     Q  In the course of -- did you continue to work on the
17 Class V, III marketing book through to completion?
18     A  Yes.
19     Q  In the course of working on it did anyone raise any
20 concerns about the description of the asset selection
21 process?
22     A  I don't recall that anyone raised a concern.
23     Q  Was there any discussion about how it should be
24 described?
25     A  I can't recall that there were any conversations

Page 42

1  around the asset selection description in marketing.
2      Q  In the course of working on the Class V, III
3  marketing materials did you come to have any understanding of
4  any role that the Citi's CDO Trading Desk had in the
5  transaction?
6      A  I got caught up in the -- would you mind repeating
7  the question? I'm sorry.
8      Q  Sure. In the course of working on the marketing
9  materials for Class V, III over the time you worked on them,
10 did you come to have an understanding of any role that Citi's
11 CDO Trading Desk had in the transaction?
12     A  Without knowing the exact time frame, at some point
13 - and again, I forget exactly when I knew that the
14 transaction was going to be a mix of assets in terms of
15 synthetics or cash - but I would have come to know that at
16 some point synthetics were being contemplated in the
17 transaction. And with the underlying collateral being CDO's,
18 the group that would have been involved in the short leg of a
19 CDS trade into a CDO - the short leg being buying credit
20 protection from the CDO and in turn paying a premium to the
21 CDO for that credit protection - the Secondary Desk as the
22 market maker in CDO traunches would have also on our desk
23 been the desk who would have done CDS on CDO's. But I don't
24 -- and I'm sorry if I'm not answering the question. But at
25 some point I would have know that there would have been

Page 43

1  synthetic assets in there. I knew that the portfolio was a
2  CDO Squared. And as such, my general recollection would have
3  ben okay, the CDO Secondary Desk would be involved just
4  because they make a two-way market. But beyond that I don't
5  recall specifically knowing involvement beyond that.
6      Q  And was there anything you put in the marketing
7  book that specifically addressed that role?
8      A  I can't recall specifically. And to be honest, I
9  haven't looked at the marketing materials for this deal for a
10 long time. But we would have -- I don't recall if we noted
11 their involvement specifically or if we would have noted that
12 Citi would have acted a capacity as a short counterparty.
13     Q  And did you have an understanding of whether the
14 Secondary Desk was acting as an intermediary on those trades?
15 That is, on the short side of the collateral trades into
16 Class V, III. Or whether they were not acting as an
17 intermediary; whether they were the ultimate short
18 counterparty. Do you understand what I mean when I say an
19 intermediary?
20     A  I was just going to ask you to clarify to make
21 sure.
22     Q  Okay. Whether they were standing in the middle of
23 another client who was the ultimate short counterparty on
24 that particular asset or whether they - meaning the CDO
25 Trading Desk - was the ultimate short counterparty. Does

Page 44

1  that clarify --
2      A  -- Yes. I don't -- I can't recall if I would have
3  given consideration to that in terms of whether there was a -
4  - you know, they were facing on the long side a different
5  counterparty or they were just short to the CDO. I don't
6  recall considering that at this time.
7      Q  Would that have made a difference to you in putting
8  together the marketing material?
9      A  For me on the Structuring Desk I don't -- in my
10 capacity on the Structuring Desk I don't know if I would have
11 -- if that would have been a strong consideration. But had -
12 - and I'm not saying this is the arrangement and the deal.
13 But had that been an arrangement where they were -- let's say
14 in whatever capacity they were acting - whether it was an
15 intermediary as you described or they were just short to the
16 CDO - to the extent we became aware of that or when we became
17 aware of that, that would have -- while I might not have
18 considered it from my structuring perspective to be important
19 in terms of what I was doing, I would likely have raised that
20 to either internal or external counsel for their
21 consideration. Not out of any particular concern but just
22 here's another factor or fact in the transaction, and is
23 there anything that they can think that we would need to do
24 in that matter.
25     Q  Let me hand you what's being marked as Exhibit 499.

### Page 45

1  Exhibit 499 is a two-page e-mail and a 17 page attachment.
2  And the Bates range is CITI-17296037 through 17296055. It's
3  an e-mail from Todd Kornfeld, K-O-R-N-F-E-L-D, at Credit
4  Suisse to Frank Li, Samir Bhatt, copying Mr. Pinniger Wen Hai
5  Pan and what looks to be a lawyer at White & Case, and
6  Charles Abraham. I don't know who Charles Abraham is. Do
7  you?
8            (Commission's Exhibit No. 499 was
9            marked for identification.)
10  A    He worked for Samir and the folks at CSAC. He was
11  a more junior level person.
12  Q    It's an e-mail dated February 1, 2007; Subject "Re
13  Class V Funding III Equity Book". And if you look at the
14  attachment, it's some comments on some pages of what looks to
15  be another draft of the marketing materials. Is that right?
16  A    That's correct.
17  Q    Is there a distinction between the debt book and
18  the equity book?
19  A    The main distinction would -- sometimes you might
20  just do a general marketing book. Typically two types of
21  investors you're going -- an investor who would be looking in
22  buying one of the debt Traunches capital structure; or an
23  investor who might be looking to buy the equity. And they
24  might cross over. But sometimes they could be two distinct
25  sets of buyers. So the general approach is a one size fits

### Page 46

1  all type of book where you include analysis on the debt. And
2  by analysis, we might run very preliminary hypothetical
3  return analysis with a lot of disclaimers and disclosures
4  about how it was created. Just as an analysis.
5        And you might do the same thing for the equity
6  traunch in the structure, also to be known as income notes
7  where you're doing an IRR return scenario, and you're telling
8  the investor that you're doing that. So the one size fits
9  all is meant to describe how you might include both debt and
10  equity analysis in the same book. Or you might target it.
11  You know, an equity guy is like "Why do I care if you have
12  debt stuff in here? Just show me the equity", and so you
13  create either a debt or an equity book to target those
14  investors.
15        My best recollection is beyond that type of
16  analysis, the rest of the substance of the book would not
17  have been different.
18  Q    Okay. Who is Mr. Kornfeld?
19  A    Todd was an internal lawyer at Credit Suisse.
20  Q    I want to ask you specifically about one of Mr. --
21  well, one of CSAC's comments. The cover e-mail says the
22  comments are from both Mr. Bhatt and Mr. Kornfeld, so I don't
23  know whose comment it is. But if you look at Bates 6041 --
24  A    -- Is that a --
25      MS. BUERGEL: -- Those are the little control

### Page 47

1  numbers.
2      THE WITNESS: I'm sorry, can you repeat what the --
3  --
4  Q    6041. You're in the right place.
5  A    Okay.
6  Q    There's a comment written in at the top. Do you
7  see that?
8  A    In this middle section?
9  Q    Yes.
10  A    Yes, I see it.
11  Q    And he circled part of the transaction structured
12  diagram and written "We don't know what Citi is doing on its
13  side. This implies some kind of hedge". You see where I'm
14  looking?
15  A    Yes.
16  Q    Do you know what this comment meant? Did you have
17  any discussions with CSAC about this comment?
18  A    I don't recall what Todd was getting at in this.
19  And I don't recall talking to CSAC about this comment in
20  particular.
21  Q    Did you have any internal discussions about this
22  comment?
23  A    I can't recall having any internal conversation.
24  Q    Do you have any understanding of what Mr. Kornfeld
25  or Mr. Bhatt's comment means?

### Page 48

1  A    I'm not -- I don't know why he was making the
2  comment in the context of the box that he circled and
3  highlighted to move. Because my recollection of how we were
4  using that box wasn't meant to imply -- it was meant to say
5  that you're going to have a portion of the collateral in the
6  DOB synthetic. And the counterparty that's either buying or
7  selling credit protection, that's the portfolio they're
8  buying/selling credit protection on. So I'm not sure why his
9  comment applied to that box.
10  Q    Did this comment suggest to you at all that it
11  might be important to someone what Citi was doing on its side
12  of the trade?
13  A    I don't recall specifically discussing this
14  comment. And to the extent that it was important and it was
15  raised in what context -- I mean the way that I'm looking at
16  his comment to move the box and the comment, it doesn't seem
17  to me to relate to what the box was intended to be, which is
18  we're generally telling people there will be synthetic
19  collateral in the deal.
20  Q    Do you know if you made any changes to the diagram
21  based on this comment?
22  A    Just based on this without seeing the next version,
23  I don't know. I don't recall what, if any, action we would
24  have taken or not taken.
25  Q    At any point -- I think I had limited my question

Page 49

1  earlier to when you became involved with Class V Funding III.
2  But at any point did you come to have an understanding of how
3  the portfolio was selected for Class V Funding III?
4      A   Without recalling a specific time frame?
5      Q   Yes.
6      A   It strike me that I would have become aware of how
7  the portfolio was selected or originated or some context
8  around that.
9      Q   And what did you learn?
10     A   Well my best recollection is that CSAC selected
11 assets for the portfolio that they were managing. Whether it
12 went beyond that, I don't recall. But I have a general
13 recollection of knowing that -- or coming to an understanding
14 that CSAC as the manager had selected the portfolio.
15     Q   Anything else about the process?
16     A   By process in terms of how they went through and
17 analyzed each asset or how the bonds came into the --
18     Q   I guess how the names that ended up in the
19 portfolio ended up in the portfolio.
20     A   Again, nothing that I recall beyond a general
21 recollection that CSAC as the manager had selected assets
22 that they were comfortable including in a portfolio that they
23 were going to be either termed as having selected or managed.
24         BY MR. SILVER STEIN:
25     Q   How did you come to that understanding that CSAC

Page 50

1  had selected the assets for the portfolio?
2      A   I can't recall exactly how I came to that
3  understanding. If it was just through that normal process,
4  as I said, that the deal evolves. You start with zero and you
5  close a deal, and at some point maybe a question was raised
6  by an investor. Maybe in a conversation with Credit Suisse,
7  you know a general comment was made by them about how they
8  were selecting the portfolio. I don't recall exactly what
9  would have formed my understanding. But I have a
10 recollection of just believing that they were the asset
11 manager, and we would have selected the portfolio.
12     Q   Was that information that you sought on your own or
13 did it just happen to come to your attention during the
14 course of your working on the transaction?
15     A   I don't know if I actively picked up the phone and
16 gave them a call to confirm that or walked down the row and
17 confirmed or if I in the course of doing the deal just came
18 to learn about it. Know about it; sorry.
19     Q   Is that information that you at the time thought
20 you needed to know to perform your responsibilities in
21 connection with the transaction?
22     A   No, meaning --
23     Q   -- That being who was responsible for selecting
24 assets for the portfolio.
25     A   I would say that the -- I would have wanted to have

Page 51

1  known if it was, let's say, different than a normal process I
2  was familiar with on other transactions where a manager is
3  being paid a fee out of the transaction to have selected the
4  assets and continued to manage that portfolio. So in this
5  context I don't know if I came to know that through a random
6  conversation on the topic or actively sought the information.
7  But it would be my recollection that I would want to know if
8  it was different than what I was accustomed to.
9      Q   Why is that?
10     A   Simply that without tying it here, being involved -
11 - I can think of an instance where I'd be involved in the
12 marketing of the transaction. I might be at my desk on a
13 conference call with an investor, and I can tell you that
14 there are a number of times where an investor asks "How is
15 the portfolio selected? Who selected the portfolio?". And
16 so just sort of having this experience of either fielding
17 that question or being asked that question in some context, I
18 would want to feel comfortable that I can answer -- that
19 could be one of those easy answers without having to say
20 "Well let me go check". So I potentially think I'm probably
21 going to be asked at least in the marketing stage, so let me
22 figure out if there's at least a difference.
23     Q   And in connection with Class V Funding III did you
24 learn anything about whether there was a difference from what
25 you understood to be the normal process for selecting assets

Page 52

1  for a portfolio?
2      A   Without recalling specifically how I would have
3  come to the determination, I have a recollection that I was
4  comfortable it wasn't different from what I would call what I
5  was used to in other transactions. By "used to", that a
6  manager is selecting the assets for inclusion into their
7  portfolio.
8          BY MR. FELLER:
9      Q   When you talk about the normal process that you're
10 used to, did that contemplate the involvement of another
11 party in negotiating the contents of the portfolio?
12     A   A different party meaning other than the manager?
13     Q   Yes.
14     A   Not that I can recall. No.
15     Q   Let me give you a hypothetical. Okay? If the
16 manager of a deal provided a list of a hundred names and
17 another party identified 25 names off that list to go into a
18 portfolio, would that be a deviation from your normal
19 understanding such that you would have wanted to know?
20         MS. BUERGEL: Another party is any party in the
21 world?
22         MR. FELLER: Why don't you let him answer and then
23 if you --
24     A   Just going by that hypothetical and not
25 understanding the context on why the counterparties might be

Page 173

CERTIFICATE

I, Ann-Marie Kirkland, hereby certify that the foregoing transcript consisting of 175 pages is a complete, true and accurate transcript of the investigative hearing, held on September 30, 2010 at the Securities and Exchange Commission, 3 World Financial Center, New York, New York, In the Matter of Citigroup, Inc. (HO-10740. I further certify that this proceeding was recorded by Arabia A. Manuel, and that the foregoing transcript has been typed and proofread by me.

_____   _____
ANN-MARIE KIRKLAND              Date
Typist/Proofreader

Page 174

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
REPORTER'S CERTIFICATE

I, Arabia A. Manuel, reporter, hereby certify that the foregoing transcript of 175 pages is a complete, true and accurate transcript of the testimony indicated, held on September 30, 2010 at 3 World Financial Center, New York, New York, in the matter of Citigroup, Inc. I further certify that this proceeding was recorded by me and that the foregoing transcript was prepared under my direction.

Date: _____

Official Reporter: _____

Page 175

PROOFREADER'S CERTIFICATE

In the Matter of: Citigroup, Inc.
Witness: Robert K. Pinniger
File Number: HO-10740
Date: September 30, 2010
Location: 3 World Financial Center
         New York, New York 10281

This is to certify that I, Ann-Marie Kirkland, the undersigned, do hereby swear and affirm that the attached proceedings before the United States Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

_____   _____, 2010
Ann-Marie Kirkland              Date

Page 176

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of           )
                           ) File No. HO-10740
Citigroup, Inc.            )

WITNESS: Robert K. Pinniger

PAGES:   176 through 310

PLACE:   Securities and Exchange Commission
         100 F Street, N.E.
         Room 1590, Testimony Room 10
         Washington, DC

DATE:    Thursday, March 3, 2011

The above-entitled matter came on for hearing, pursuant to notice, at 9:30 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 189

1   I vaguely recall, I think, Darius was actually the
2   signer of our desk engagement letter. So he would have,
3   through that signing, he would have been aware of it and then
4   signed off on it.
5       BY MR. SILVERSTEIN:
6   Q   Who assigned you to work on Ridgeway Corp. II?
7   A   My best recollection is I don't know if I was
8   formally assigned or if Brian, and, you know, Brian and I had
9   this general understanding because I worked on Ridgeway I and
10  it had just been completed that it was just -- I don't recall
11  formally being assigned -- but I worked on it, so.
12  Q   Did Mr. Stoker ask that you be assigned to the
13  transaction?
14  A   I'm not aware of him asking anyone else to have me
15  assigned to it. Again, I don't have a specific recollection
16  of formally being assigned, and Darius would have come to me
17  and said you're all in this deal; or, if it was Brian and I
18  having just completed the other deal, picking the new deal up
19  and assuming it was the same deal team.
20      BY MR. FELLER:
21  Q   So within the deal team that you just described, who
22  had responsibility for being familiar with the indenture for
23  the deal.
24  A   From Citi's perspective?
25  Q   Yeah.

Page 190

1   A   I would have had involvement in reviewing the
2   debenture, our internal and external counsel would have had
3   involvement, and even though on a day-to-day basis, Brian
4   might not have had involvement in it. If Brian wanted to
5   review any aspect of the transaction anytime he could have.
6   So if he had asked me to provide him with the most current
7   draft of a document, I would have provided him with the most
8   current draft.
9   Q   And you said from Citi's perspective. Who else
10  would have had responsibility for being familiar with the
11  indenture terms?
12  A   The manager, the manager's internal and external
13  counsel, the rating agencies, S&P used an external law firm in
14  addition to their own review to review, to the best of my
15  recollection, every single draft that was provided. Moody's
16  would have used internal in-house counsel, but the ratings
17  analyst and an internal lawyer would have reviewed. And at
18  some point when they were engaged, the trustee and their
19  external counsel would have reviewed, and to the extent we
20  were asked to provide it to another party, they would have
21  reviewed it.
22  Q   And what about within the team you described the
23  responsibility for the offering memorandum?
24  A   So from Citi's perspective?
25  Q   Yeah. Thank you.

Page 191

1   A   It would have been the similar, sort of collective
2   process, meaning myself and potentially others on the
3   structuring desk, as well as our internal and external
4   counsel.
5   Q   When you say others on the structuring desk, what do
6   you mean?
7   A   Well, for example, if Brian asked me to provide him
8   a draft of the OM, I would have sent it to him. If another
9   part of the team had asked for a current draft of our OM, we
10  would have provided it to him.
11  Q   So did the deal manager have the primary
12  responsibility for the OM from Citi's perspective?
13  A   I would say from Citi's perspective, there was a
14  collective responsibility. I was reviewing it together with
15  my internal and external counsel, various parts of the
16  document, but I would say it would have been a collective
17  process, a collective responsibility.
18  Q   Was there any formal sign-off on the OM, any formal
19  sign-off process from Citi's perspective?
20  A   I can't recall a formal sign-off process, meaning I
21  had to send an e-mail; or, I had to get some sort of written
22  confirmation that I was done, and my respective counsel was
23  done, and then go to the manager. And through their review --
24  they own as well -- the manager, their internal and external
25  counsel, had signed-off.

Page 192

1   But we would not have printed the read or printed
2   the final without having, you know, that collective group of
3   people who were reviewing it having provided some form of
4   sign-off to it.
5       BY MR. SILVERSTEIN:
6   Q   Who was in that collective group for Ridgeway Corp.
7   II?
8   A   I think as indicated from Citi's side, it would have
9   been potentially various people on the structuring desk. It
10  would have been my internal and external counsel.
11  Q   Can you give the names of all of these in here?
12  A   Brian Stoker, myself, at various parts I may have
13  had either Belal and/or Amy either look at a certain section
14  or input some information to a certain section, so I'll
15  include them. If I recall, my counsel for this transaction
16  was Anna Choe, internal counsel -- C-h-o-e.
17      The external law firm that was representing Citi was
18  Milbank. The partner there was Elizabeth Hardin, and then I
19  frankly forget the five associates she had. She had several
20  associates. I forget their names.
21      At Credit Suisse, it would have been Mike
22  Shackelford and Samir Bhatt on the business side. I don't
23  know if they had. I have a recollection, you know, their
24  in-house lawyer sending it to some operations people asking
25  them to sign up, but I don't recall their name. Their

Page 269

1  actually might see as being realistic, just to be
2  conservative, just to allow for the fact that we haven't
3  marketed a deal that shows X.
4       And we have to go in and the returns become
5  dramatically worse, because we haven't anticipated that there
6  could be a tightening. So in many cases, we went out with
7  more conservative assumptions in various parts of the
8  structure. And then as we started getting closer to rating
9  the deal out or pricing the transaction is where we would
10 start refining things. Tranche sizes become more optimal.
11 Spreads become closer to pricing spreads.
12      If we're making certain conservative assumptions on
13 modeling the portfolio which hasn't been ramped, if we started
14 to see changes in the portfolio that's come in and started to
15 make those assumptions more in line with the rest of the
16 portfolio. And so it might not have been unrealistic at this
17 time that we were sort of engaged in what I would just call
18 our normal conservatism at certain parts of our structuring.
19 Q    Was the fee part of the structuring, or was that set
20 from the beginning?
21 A    The fee, in and of itself, I think, would have been
22 set, other than some agreement to increase or raise it by both
23 sides, or, you know, as we discussed in Ridgeway II, an
24 upsize, which would naturally free of caps or something else
25 would naturally increase the fee. But I don't recall there

Page 270

1  being some. Like I said, other than, you know, we would have
2  structured in the fee as an expense at the top. I don't
3  recall us having, in a sense, two fees we were modeling.
4  Q    Okay. I guess I'm still confused, because I mean
5  when I read Exhibit 501, it sounds like there's some linkage
6  between the reduction and the equity returns that Mr. Bhatt is
7  asking about, and what Mr. Li says about that we reserved some
8  money for potential loss?
9  A    I just don't recall, specifically, at this time.
10 And my point, I'm just trying to say where some other reserved
11 might, if I had to think of it, could have been just in this
12 other normal conservative --
13 Q    I see what you're saying: Not a loss reserve.
14 A    Not a loss reserve, but if we had for conservative
15 purposes, widening out the tranche liabilities we're modeling
16 by 15 basis points to allow for room. And if the structure
17 actually widens out or tightens, and conversely, we might have
18 gone out with extra subordination in the equity -- not extra
19 subordination to the equity, but a larger equity size -- that
20 might be in a sense reserved moneys that aren't necessarily
21 some pot of money sitting off to the side. They're just
22 structural reserves.
23 Q    Okay. Now I get what you're saying. And that's
24 your interpretation of this, but you don't remember what the
25 exchange is about. Is that correct?

Page 271

1  A    That's right.
2  Q    All right. You explained to us, beginning of today,
3  about the different functions of the different people on a
4  deal team. And you explained it in the context of Ridgeway
5  II, who played what role. In that same way, could you tell us
6  about the Class V Funding III deal team? Who played what role
7  for that deal?
8  A    Sure. My best recollection is in terms of, well, in
9  terms for my involvement, it would have been absent maybe some
10 minor differences, which I can't think of, identical to
11 Ridgeway II, so liaising was very counter parties, you know, a
12 principal contact for the rating agencies during that process.
13 A review, together with the manager and respective counsel of
14 the various documents, involved at various points in marketing
15 the transaction, so I would say similar to Ridgeway II in
16 most, if not all, respects.
17      On this team my recollection is I had an associate
18 working for me who I think either he was in the process of or
19 had just been promoted to VP, so he may have been in
20 transition, frankly. And, if I recall correctly, our analyst
21 was a very junior person named Wenhai Pan, and their
22 responsibilities for this transaction would have been very
23 similar to Ridgeway II. Although Frank Li, being someone who
24 was -- I think, if like I said -- if not having just been
25 promoted to VP was on the cusp of being promoted to VP, was

Page 272

1  more senior than the other person I mentioned, Belal Sabki.
2       So he had more transaction experience, more
3  experience under his belt, was participating a lot more than
4  just the modeling part of this transaction, although he would
5  have been integral to that. He would have also been looking
6  at transaction documents and involved in, you know,
7  potentially at points in time preparing the marketing
8  materials and things like that.
9       Brian Stoker was also involved, if memory serves, in
10 a similar capacity on the structuring side. He may have
11 reviewed documents at a certain point. Again, if Brian asked
12 me for any information or anything related to the transaction,
13 I would have provided it to him as my senior person. On a
14 day-to-day basis, you know, away from sort of his general
15 coverage of CSAC and anything else he might have been working
16 under, I likely wasn't privy to what he was really doing on a
17 full day, or if he included me on telling me everything he was
18 doing with respect to the transaction or not.
19 Q    You're referring to Mr. Stoker?
20 A    Yes.
21 Q    So who took charge of the deal documents from
22 Citigroup for Classified III?
23 A    From similar to Ridgeway II, the documentation
24 process, the review of the documents, the assembly of the
25 documents would have been a collective process. I would have

Page 273

1  had involvement in looking at the documents and reviewing
2  them. You know. As I recall, I think Frank had involvement
3  in that as well, being a more experienced person; our internal
4  and external counsel, I think.
5      I think our internal counsel is the same one as it
6  was on Ridgeway II, Anna Choe. And it was Milbank, again,
7  running the papers. It would have been CSAC as manager, and
8  then their respective internal and external counsel also
9  reviewing and taking part of what was a collective process to
10 review the documents.
11     Q   Did Mr. Stoker review the Classified III offering
12 memorandum?
13     A   I honestly don't recall if it he did or he didn't.
14 If he had asked, and he could have either asked me or Frank
15 for various drafts, he honestly could have went directly to
16 Milbank and gotten copies himself. It wouldn't strike me as
17 odd for him to have read them. I just don't recall if he did.
18
19     Q   What about the flip book for Classified III?
20     A   Would he have reviewed it or looked at it?
21     Q   Did he review it?
22     A   I have no reason to believe that he didn't,
23 indicating I don't know if he asked us to provide him a copy.
24 It would have been odd for me to have not provided him a
25 draft, or at least a final copy of it, as if we were marketing

Page 274

1  a transaction. In theory, a call could have come to him on
2  the deal on the book, if it was in front of an investor, and
3  it would have made complete sense for him to have at least had
4  a final form of it.
5      Q   And for Class V Funding III did Mr. Grant review any
6  of the deal documents?
7      A   Not that I'm aware of, given Darius's role in the
8  group. It would have been unlikely for him to have. He might
9  have seen the flip book, but it would have been highly
10 unlikely for him to have reviewed any of the transaction
11 documents.
12     Q   Did anyone from the secondary trading desk review
13 the deal documents?
14     A   I don't have a specific recollection of them either
15 reviewing or not reviewing, but in line with what I've said
16 before, if we were requested to provide someone on the
17 secondary desk either a draft of a document or the flip book,
18 marketing book, we would have done that.
19     Q   Okay. But do you have any memory of anyone from the
20 secondary desk reviewing the deal documents for Class V
21 Funding III?
22     A   No. I don't have a recollection of that.
23     Q   Did you consult with anyone on the secondary desk
24 about the deal documents for Classified III? That is, when
25 you were making your own review of those documents, did you go

Page 275

1  to the secondary desk for any information?
2      A   Not that I can specifically recall.
3          BY MR. SILVERSTEIN:
4      Q   Do you have a general recollection of doing that?
5      A   No.
6      Q   Did Mr. Grant review the offering memorandum for
7  Class V Funding III?
8      A   He may have looked at a draft of it; but, you know,
9  again, for Darius in his capacity, running ABX CDO
10 Structuring, it would have been unlikely for him to have
11 reviewed transaction documents.
12         BY MR. FELLER:
13     Q   What was your understanding of the secondary trading
14 desk's participation in the Classified III Funding
15 transaction?
16     A   My general recollection is their involvement was
17 that they were going to be shorts, or synthetics related to
18 CDOs in the portfolio. It was a CDO squared; and, as such,
19 their desk would be the intermediating party for those trades.
20     Q   The intermediating party?
21     A   Yeah. That was an expression we would have used for
22 the counterparty that would have faced the CDO for the shorts.
23 So, basically, the counterparty facing the CDO, it's short to
24 the transaction. The CDO is long to it, and creates the
25 trade.

Page 276

1      Q   Did it mean anything else?
2      A   It might also, but aside from just being the short
3  counterparty, intermediation might reflect the fact that there
4  is one party that's standing between the CDO, in effect, and
5  various other counterparties. So, in this context, the
6  intermediating party would be short to the CDO and long to
7  those respective other counterparties.
8      Q   Did somebody communicate to you that that was the
9  role the secondary desk was playing as the intermediating
10 party?
11     A   I don't recall if someone specifically communicated
12 it to me. I sought it out just for clarification, or if it
13 was an assumption on my part, just based on the fact that
14 these were going to be synthetics related to CDOs. And that
15 desk would have been, you know, the natural group to do it,
16 given they were in the market for CDO trading.
17     Q   I guess the distinction that I'm trying to get at
18 here is did someone tell you that the secondary desk would be
19 intermediating between the CDO on one side and other parties
20 on the other side?
21     A   Oh. I'm sorry. I don't know. I don't recall if
22 someone communicated that to me. It would not have been, but
23 that might not have been unlikely. That might not be
24 unreasonable for me to not know that, because in terms of my
25 structuring the CDO, I would have principally cared about the

26 (Pages 273 to 276)

Page 285

1  provide CDS.
2     Q   Correct.
3     A   Other than reading it now and reading it in
4  preparation a few days ago, I don't specifically recall this
5  sentence, but I'm reading it now.
6     Q   Did you make any effort in connection with the
7  preparation of this document, the offering memorandum, to
8  determine how much of the $869,256,000 was provided as an
9  intermediary with matching offsetting positions? And how much
10 was provided alone without any offsetting positions?
11    A   I don't remember if I made that inquiry or I didn't
12 make the inquiry.
13    Q   It may have been what you were answering, but did
14 you direct anyone to make that inquiry?
15    A   Not that I can remember.
16       BY MR. SILVERSTEIN:
17    Q   Were you aware of this statement during the time
18 when you were working on the transaction?
19    A   This sentence here that we just read?
20    Q   Yes. I may have been. Sitting here today, I don't
21 recall. I don't remember the sentence, and am only reading it
22 now, and then two days ago in preparation. So I don't recall
23 this particular sentence.
24    Q   Was one of your responsibilities with respect to the
25 preparation of the offering circular to read what was in the

Page 286

1  offering circular?
2     A   In various context, yes. One of my general
3  responsibilities would have been to be reviewing the offering
4  memorandum.
5     Q   Together with?
6     A   Our counsel, and internal and external counsel, and
7  the manager and their counsel, and both internal and external
8  counsel.
9     Q   Was there any portion of this offering circular for
10 which you were primarily responsible?
11    A   I don't recall having a primary responsibility for
12 reviewing a particular section of the document, and I may have
13 looked through or looked at the various points I may have
14 reviewed specific sections. But beyond that, I don't recall
15 having a specific responsibility to review particular
16 sections.
17    Q   What was the reason why you looked through some or
18 all of the document during the time when you were working on
19 the transaction?
20    A   Well, just as a general matter, the structuring team
21 is the one that is involved in structuring this transaction.
22 The offering memorandum is being used, in some respects to
23 sell the deal. Investors will see this document. There's
24 various parts of the document that relate to more structural
25 features of the transaction, the waterfall, in particular,

Page 287

1  collateral requirements, things along those lines. So I would
2  be reviewing it in that general context.
3        MS. BUERGEL: I'd just like to note for the record
4  that the last time Mr. Pinniger appeared for testimony, there
5  was quite a bit of questioning about these kinds of issues,
6  and his process in reviewing and preparing documents. So you
7  need to assess when that should be fairly read in the context
8  of the prior answers Mr. Pinniger gave as well, because
9  there's been some lapse in time.
10       BY MR. SILVERSTEIN:
11    Q   Do you know who drafted the first paragraph on page
12 88 of Exhibit 533?
13    A   Who drafted it?
14    Q   Yes.
15    A   Well, principally, this document is a legal
16 document. So the drafting of that document, of any of our
17 legal documents, would have been driven largely by counsel.
18 In terms of this document, the papers would have been run by
19 Citi's counsel, which was Milbank; and, you know, various
20 counsel could be submitting drafts of things. But lawyers
21 would have been drafting the language.
22       BY MR. FELLER:
23    Q   I wanted to ask about something. You said Citi's
24 counsel, which was Milbank. If you look at the last page,
25 Bates 353, also known as the last page, it lists the legal

Page 288

1  advisors, and it has Milbank as counsel to the initial
2  purchaser and placement agent. And I assume that's Citibank
3  or Citigroup. Or some Citigroup entity?
4     A   I think that's right, yes.
5     Q   Okay. And then it also says to the legal advisor to
6  the co-issuers is also Milbank. The co-issuers are Class V
7  Funding III Limited, and Class V Funding III Corp. Was that
8  the typical arrangement that counsel to the entity, the CDO
9  entity, would also be counsel to the arranger, to the
10 underwriter?
11    A   It may have been. My recollection is the reason
12 Milbank is counsel to co-issuer is that as we're going through
13 and structuring the transaction, a legal entity in the Cayman
14 Islands and I think Delaware, but in the Caymans Island in
15 particular it was being set up and arranged for with legal
16 documentation surrounding that special purpose vehicle.
17       And so just as a matter of the CDO getting formed,
18 there's some general legal work, I think, either on behalf of
19 the issuers or in relation to that. I forget if Milbank in
20 this context is doing work for the issuers in that context.
21 My best recollection is Milbank was our counsel. They were
22 running the transaction documents in the papers. I don't
23 recall Milbank having -- I just can't speak to it, whether
24 they were providing substantive legal advice to the
25 co-issuers.

Page 309

**PROOFREADER'S CERTIFICATE**

In the Matter of: CITIGROUP, INC.
Witness: Robert K. Pinniger
File Number: HO-10740-A
Date: Thursday, March 3, 2011
Location: Washington, D.C.

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

_____  _____
(Proofreader's Name)        (Date)

Page 310

**REPORTER'S CERTIFICATE**

I, Jon Hundley, reporter, hereby certify that the foregoing transcript of 133 pages is a complete, true and accurate transcript of the testimony indicated, held on _____, 2011, at Washington, D.C. in the matter of:
_____.

I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

Date: _____
Official Reporter: _____
Diversified Reporting Services, Inc.