# EXHIBIT 5



**Confidential**

# Class V Funding III, Ltd.

CREDIT SUISSE ALTERNATIVE CAPITAL, INC. AS MANAGER



**CREDIT SUISSE**

**PRELIMINARY DISCUSSION MATERIALS**

February 2007

Confidential Treatment Requested by Citi



## IMPORTANT NOTICE

The information presented in this material (the "Information") is preliminary and is superseded by a final offering circular (the "Offering Circular"). The Information is in condensed summary form and is not complete. The Information outlines the general structure, and summarizes certain but not all of the characteristics, of a collateralized debt obligation transaction of a portfolio of synthetic and cash asset-backed securities. This material is furnished to you, and, if applicable, to your beneficial owners (collectively, "you") to determine your preliminary interest in investing in the securities described herein (the "Securities") and on the understanding that as a sophisticated investor, you understand and accept its inherent limitations. You should base your investment decision with respect to the Securities on the information contained in the Offering Circular. An Offering Circular may be obtained by contacting your representative at Citigroup Global Markets Inc. ("Citigroup").

An investment in the Securities is speculative, not suitable for all clients, and intended for experienced and sophisticated investors who are willing to bear the high economic risk of the investment, which may include:

- loss of all or a substantial portion of the investment in the Securities due to leveraging or other speculative investment practices;
- lack of liquidity in that there may be no secondary market for the Securities and none expected to develop;
- volatility of returns;
- restrictions on transferring interests in the Securities;
- potential lack of diversification and resulting higher risk due to concentration within a single industry;
- absence of information regarding valuations and pricing;
- delays in tax reporting;
- phantom tax issues;
- less regulation and higher fees than mutual funds.

See the section titled "Risk Factors" herein and the risk factors in the Offering Circular.

Neither Citigroup nor any of its affiliates is responsible for the tax treatment of the Securities, whether or not the Securities are purchased by a trust or company administered by Citigroup or an affiliate. Citigroup assumes that, before making a commitment to purchase the Securities, you have taken whatever tax, legal or other advice you consider necessary and have arranged to account for any tax lawfully due on the income or gains arising from the Securities. Additionally, certain retirement plans covered by ERISA (including KEOGHs and IRAs) are restricted from holding some classes of Securities. Benefit plan investors subject to ERISA should confirm their status prior to making an investment.

None of Citigroup, Credit Suisse Alternative Capital, Inc. ("CSAC" or the "Manager") or their respective affiliates is acting as your advisor or agent. Therefore, prior to making any investment decision in the Securities, you should determine, without reliance upon Citigroup, CSAC or any of their respective affiliates, the economic risks and merits, as well as the legal, tax and accounting characterizations and consequences of the transaction, and independently determine that you are able to assume these risks. In this regard, by acceptance of these materials, you acknowledge that you have been advised that (a) Citigroup is not in the business of providing legal, tax or accounting advice, (b) you understand that there may be legal, tax or accounting risks associated with the transaction, (c) you should receive legal, tax and accounting advice from advisors with appropriate expertise to assess relevant risks and (d) you should apprise senior management in your organization as to the legal, tax and accounting advice (and, if applicable, risks) associated with this transaction and Citigroup's and Credit Suisse's disclaimers as to these matters. By acceptance of these materials, you and Citigroup hereby agree that from the commencement of discussions with respect to any transaction, and notwithstanding any other provision in this material, we hereby confirm that no participant in any transaction shall be limited from disclosing the U.S. tax treatment or U.S. tax structure of such transaction.

IRS Circular 230 Disclosure: Citigroup and its affiliates do not provide tax or legal advice. Any discussion of tax matters in these materials (i) is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and (ii) may have been written in connection with the

CITI 09570332



*"promotion or marketing" of the transaction described herein. Accordingly, you should seek advice based on your particular circumstances from an independent tax advisor.*

*The Securities will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and the issuer of the Securities will not be registered under the "Investment Company Act of 1940, as amended (the "Investment Company Act"). The Securities will not be recommended or approved by any United States federal or state securities commission or any other regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this material. Any representation to the contrary is a criminal offense. The Securities will be subject to certain restrictions on transfers as described in the Offering Circular and the indenture pursuant to which the Securities will be issue (the "Indenture").*

*By accepting this information, (A) you agree that you are (I)(a) a qualified institutional buyer (as defined in Rule 144A of the Securities Act and/or an "Accredited Investor" (as defined under Regulation D under the Securities Act) or (b) not a U.S. Person (as defined in Regulation S under the Securities Act) in accordance with Regulation S and (2) are also a "qualified purchaser" for purposes of the Investment Company Act of 1940 and (B) you understand that the Securities have not been and will not be registered under the Securities Act or the securities laws of any state and may not be offered, sold or otherwise transferred unless an exemption from registration under the Securities Act and applicable state securities laws is available.*

*This material is not intended for distribution to, or to be used by, any person or entity in any jurisdiction or country which distribution or use would be contrary to law or regulation.*

*Neither Citigroup nor any of its affiliates makes any representation or warranty, express or implied, as to the accuracy or completeness of the Information. Information or data about past performance is no assurance of future results. Information and materials related to CSAC and its affiliates have been provided by CSaC. Citigroup has not independently verified such information and is not responsible for the content of such information.*

*This material contains "forward-looking" information. Such information may include, among other things, projections, forecasts or estimates of cashflows, yields or return, scenario analyses and proposed or expected portfolio composition. The forward-looking information is based upon certain assumptions about future events or conditions and is intended only to illustrate hypothetical results under those assumptions (not all of which are specified herein). Actual events or conditions are unlikely to be consistent with, and may differ materially from, those assumed. In addition, not all relevant events or conditions may have been considered in developing such assumptions. Accordingly, actual results will vary and the variations may be material. You should understand such assumptions and evaluate whether they are appropriate for your purposes.*

*No representation is made that the Securities will actually perform as described in any of the illustrative calculations presented herein. Actual results will differ, and may differ substantially, from those illustrated in the Information. Illustrative performance results are based on mathematical models that calculate those results by using inputs that are based on assumptions about a variety of future conditions and events.*

*As with all mathematical models, results may vary significantly depending upon the value of the inputs given, so that a relatively minor modification of an assumption may have a significant impact on the result. Future conditions and events are unlikely to match those assumed, both because it is impossible to predict the future and because the inherent limitations of the modeling process require the relevant conditions and events to be significantly simplified in order to generate inputs to the model. Among other things, the illustrative calculations do not take into account all aspects of the applicable security's characteristics under certain conditions, including characteristics that can have a significant impact on the results. For example, the illustrative calculations do not indicate the effects of redemption or call events and cash flow priorities at all prepayment levels and/or interest rates. Further, in evaluating the illustrative performance results, you should understand that not all of the hypothetical assumptions used in the model are described herein, and conditions and events that are not accounted for by the model may have a significant effect on the performance of the Securities.*

*Neither Citigroup nor any of its affiliates makes any representation or warranty, expressed or implied, as to the reasonableness of any assumptions used in calculating the illustrative performance information or the accuracy (mathematical or otherwise) or validity of such information. You should consider whether the behavior of the Securities should be tested based on different and/or additional assumptions from those included in the Information. In addition, the models used in*



*any analysis may be proprietary, making the results difficult or impossible for any third party to reproduce. You may contact your Citigroup sales representative for detailed explanations of any modeling techniques employed in the Information. We undertake no obligation to provide you with any updated information reflecting changed circumstances or changed interpretations of the same circumstances. CUSTOMIZED CALCULATIONS WITH ASSUMPTIONS SPECIFIED BY YOU CAN BE PERFORMED BY CITIGROUP AT YOUR REQUEST.*

*Citigroup is required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with Citigroup. Citigroup will ask for an investor's complete name, street address, and taxpayer ID number. Citigroup may also request corporate formation documents, or other forms of identification, to verify information provided.*

*Although this material may contain publicly available information about Citigroup corporate bond research or economic and market analysis, Citigroup policy (i) prohibits employees from offering, directly or indirectly, a favorable or negative research opinion or offering to change an opinion as consideration or inducement for the receipt of business or for compensation; and (ii) prohibits analysts from being compensated for specific recommendations or views contained in research reports. So as to reduce the potential for conflicts of interest, as well as to reduce any appearance of conflicts of interest, Citigroup has enacted policies and procedures designed to limit communications between its investment banking and research personnel to specifically prescribed circumstances.*

*Except as otherwise permitted herein, distribution of this material to any person other than the person to whom this was originally delivered and to such person's advisors is unauthorized and any reproduction, in whole or in part, or the divulgence of its contents, without the prior consent of Citigroup in each such instance is prohibited.*

*For UK investors only: This document has been approved for distribution in the UK by Citigroup Global Markets Limited, which is regulated by the Financial Services Authority. The securities described herein are not available in the UK to private investors as defined by the Financial Services Authority.*

*For Hong Kong investors only: Citigroup represents and agrees that:*

*(a) will not offer or sell in Hong Kong, by means of any document, any Securities other than (i) to persons whose ordinary business is to buy or sell shares or debentures (whether as principal or agent); or (ii) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (iii) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance; and*

*(b) it has not issued or had in its possession for the purposes of issue, and will not issue or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Securities, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.*

*For China investors only:*

*These materials are for educational purposes only.  These materials are for the intended recipient only and must not be copied and/or distributed within the PRC.  If you are not the intended recipient of these materials please destroy them immediately and contact the sender.  Credit Suisse Alternative Capital, Inc. has represented and agreed that neither it nor any of its affiliates has offered or sold or will offer or sell any of the Securities in the People's Republic of China (excluding Hong Kong, Macau and Taiwan) as part of the initial distribution of the Securities.*

*For Thailand investors only:*

*Citigroup has represented, warranted and agreed that it has not offered or sold and will not offer or sell any Securities and it has not distributed and will not distribute any other documents or material in connection with the Securities, either directly or indirectly, in Thailand to any resident of Thailand.*

Confidential Treatment Requested by Citi



_For Korea investors only:_

NO REPRESENTATION IS MADE WITH RESPECT TO THE ELIGIBILITY OF ANY RECIPIENTS OF THIS MARKETING MATERIAL TO ACQUIRE THE SECURITIES DESCRIBED HEREIN UNDER THE LAWS OF KOREA, INCLUDING BUT WITHOUT LIMITATION THE FOREIGN EXCHANGE TRANSACTION ACT AND REGULATIONS THEREUNDER. PROSPECTIVE INVESTORS WHO ARE KOREAN RESIDENTS SHOULD BE ADVISED OF THE INVESTMENT PROCEDURES UNDER THE LAWS OF KOREA, INCLUDING BUT WITHOUT LIMITATION, FILING REQUIREMENTS UNDER THE FOREIGN EXCHANGE TRANSACTION ACT AND REGULATIONS THEREUNDER.

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES AND EXCHANGE ACT OF KOREA OR THE INDIRECT INVESTMENT ASSET MANAGEMENT BUSINESS ACT OF KOREA, AND NONE OF THE SECURITIES MAY BE OFFERED, SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA, OR TO ANY PERSON FOR RE-OFFERING OR RESALE, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA, EXCEPT AS PERMITTED BY APPLICABLE LAWS AND REGULATIONS OF KOREA.

_For Taiwan investors only:_

Any offering, or sales activities in connection with offshore securities in the territory of Taiwan are strictly regulated. Any offering or sales of the Securities in the territory of Taiwan or to Taiwanese investors must be subject to certain restrictions under the applicable laws and rules. Each subscriber or purchaser of the Securities must seek professional opinions on its eligibility in subscribing or purchasing the Securities and represents and warrants that it is duly qualified to subscribe or purchase the Securities under the applicable Taiwanese laws and rules. Any holder of the Securities might be restricted from reselling the Securities in Taiwan except as otherwise approved by the regulator in Taiwan or according to applicable Taiwanese laws or rules.

_For Singapore investors only:_

We acknowledge that this presentation has not been registered as a prospectus with the Monetary Authority of Singapore. Each dealer will represent, warrant and agree that it will not offer or sell such Securities or cause such Securities to be made the subject of an invitation for subscription or purchase, and has not circulated or distributed, nor will it circulate or distribute, this presentation or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of such Securities, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 239 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where Securities are subscribed or purchased under Section 275 by a relevant person which is:

(a) a corporation (which is not an accredited investor) (as defined in Section 4A of the SFA) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within 6 months after that corporation or that trust has acquired the Securities pursuant to an offer made under Section 275 except:

(i) to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA), or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

(ii) where no consideration is or will be given for the transfer; or



*(iii) where the transfer is by operation of law.*

*For Philippines investors only:*

In accordance with the requirements of the Securities Regulation Code ("SRC") and the Securities and Exchange Commission ("SEC"), we hereby disclose that: THE SECURITIES BEING OFFERED OR SOLD HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SRC. ANY FUTURE OFFER OR SALE OF THE SECURITIES IS SUBJECT TO REGISTRATION REQUIREMENTS UNDER THE SRC UNLESS SUCH OFFER OR SALE QUALIFIES AS AN EXEMPT TRANSACTION.

The Securities are being offered to investors in the Philippines on the understanding that each such offeree is a "qualified buyer" as defined in the SRC/this is a private placement to fewer than twenty (20) investors in the Philippines within a twelve-month period. Consequently, the offer of the Securities to such offeree is exempt from registration with the SEC under Sections [10.1(1)/10.1(K)] of the SRC. A confirmation of exception from the SEC that the offer and sale of the Securities in the Philippines so qualifies as an exempt transaction has not been obtained.

2007 Citigroup Global Markets Inc. Member SIPC. All rights reserved. CITIGROUP and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world.

2007 Citigroup Global Markets Limited. Authorized and regulated by the Financial Services Authority. All rights reserved. CITIGROUP and the Umbrella Device are trademarks and service marks of Citigroup or its affiliates and are used and registered throughout the world.

Confidential Treatment Requested by Citi



# Table of Contents

IMPORTANT NOTICE

1   TRANSACTION OVERVIEW

2   THE MANAGER
    A.  Credit Suisse Alternative Capital – Firm Overview
    B.  Portfolio Construction and Management
    C.  Credit Suisse Alternative Capital – Performance

3   STRUCTURAL ANALYSIS

APPENDIX
    A.  RISK FACTORS
    B.  CREDIT DEFAULT SWAP OVERVIEW
    C.  BIOGRAPHIES

Confidential Treatment Requested by Citi

CITI 09570337



# 1    TRANSACTION OVERVIEW

*This document outlines a potential investment vehicle structure and makes certain assumptions about the modeling parameters and market environment, including projections about the underlying assets, a part or all of which have yet to be purchased. The structure and assumptions contained herein are subject to change at anytime due to market conditions and other factors. Investment strategies may not achieve the desired results due to implementation lag, other timing factors, portfolio management decision-making, economic or market conditions or other unanticipated factors. The views and forecasts expressed in this presentation are as of January 2007, are subject to change without notice, may not come to pass and do not represent a recommendation or offer of any particular security, strategy, or investments.*

Confidential Treatment Requested by Citi

CITI 09570338



# Overview

▲ Class V Funding III, Ltd. (the "Issuer" or the "CDO") is a $[1.0] billion static CDO referencing ABS CDOs (the "Portfolio")

▲ The collateral manager is **Credit Suisse Alternative Capital, Inc.** ("CSAC" or the "Manager")

▲ The capital structure will be approximately [70]% unfunded, providing investors with a more efficient execution of the senior risk

▲ The Portfolio is expected to have an average rating of [A2]. It is anticipated that [100]% of the collateral in the Portfolio will be rated at or above [A3] by Moody's at closing

▲ Initial Portfolio will be comprised of [90]% synthetic assets

▲ The Class C Notes [Baa2/BBB] will be subject to an early amortization feature where on each Payment Date commencing on the [second] Payment Date, [25]% of the cashflows that would otherwise be paid to the Income Notes will be diverted to pay principal on the Class C Notes

1

Confidential Treatment Requested by Citi

# Transaction Details[1]

▶ The CDO will issue funded notes (the "Notes") rated "AAA" through "BBB" and funded income notes (the "Income Notes")

▶ Net proceeds from the issuance of the Notes and Income Notes will be invested in approximately $[100]MM of cash securities and the remainder will be invested in high quality assets ("Eligible Investments") and placed into an account (the "CDS Asset Collateral Account")

| | Class S[2] | Class A1A Unfunded SS[3] | Class A1B | Class A2 | Class A3 | Class B | Class C[4] | Income Notes |
|---|---|---|---|---|---|---|---|---|
| Rating (M/S) | [Aaa/AAA] | [Aaa/AAA] | [Aaa/AAA] | [Aaa/AAA] | [Aaa2/AA] | [A2/A] | [Baa2/BBB] | [NR/NR] |
| Principal (mm) | [39.2] | [500.0] | [20.0] | [120.0] | [75.0] | [50.0] | [35.0] | [22.0] |
| % of Structure | – | [50.0]% | [20.0]% | [12.0]% | [7.5]% | [5.0]% | [3.5]% | [2.2]% |
| % Subordination | – | [50.0]% | [30.0]% | [18.0]% | [10.5]% | [5.5]% | [2.0]% | – |
| WAL (yrs)[5] | [2.6] | [5.7] | [5.7] | [6.5] | [6.5] | [6.5] | [5.7] | – |
| Legal Stated Maturity | [2015] | [2047] | [2047] | [2047] | [2047] | [2047] | [2047] | [2047] |
| Coupon | 3mL + [ ] bps | [ ] bps | 3mL + [ ] bps | 3mL + [ ] bps | 3mL + [ ] bps | 3mL + [ ] bps | 3mL + [ ] bps | N/A |

| Coverage Tests | Class A | | Class B | | Class C[6] | |
|---|---|---|---|---|---|---|
| | Test | Initial Level | Test | Initial Level | Test | Initial Level |
| Principal Coverage Test: | [105.7]% | [111.7]% | [106.8]% | [105.8]% | [100.0]% | [102.0]% |
| Interest Coverage Test: | [111.0]% | [145.5]% | [108.0]% | [124.8]% | [105.0]% | [109.0]% |

[1] Terms and structure are indicative and may change prior to the closing date.
[2] The Class S notes will be pari passu with the Class A1A notes for principal & interest and will be paid primarily with interest proceeds.
[3] The Class A1A notes are not offered hereby and will be issuable from time to time in Class A1A note fundings to the Class A1A swap counterparty or its Class A1A designee in an aggregate amount up to the aggregate Class A1A swap notional amount.
[4] The Class C Notes will be subject to an early amortization feature where on each Payment Date commencing on the [second] Payment Date, [25]% of the cashflows that would otherwise be paid to the Income Notes will instead be diverted to pay principal on the Class C Notes.
[5] WAL is based on certain assumptions including a successful call in year [8].
[6] The Class C principal coverage test and interest coverage test use interest, but not principal, to amortize the Class C Notes, if triggered. Principal will then be used to pay down senior classes in an amount necessary to cure the tests.

citigroup

2

CITI 09570340



# Indicative Transaction Structure[1]



[1] Terms and structure are indicative and may change prior to the closing date.

3

Confidential Treatment Requested by Citi

CITI 09570341



# Indicative Target Asset Allocation[1]



▲ The Portfolio is expected to consist of approximately [55] issues with a projected average rating of [A2/A]

▲ All of the assets in the initial portfolio will be rated at [A3/A-] or above

▲ The Portfolio is expected to be [90]% ramped on the closing date

---

[1] Portfolio targets are indicative and subject to change.

4

Confidential Treatment Requested by Citi

CITI 09570342

# Indicative Transaction Terms[1]

| | |
|---|---|
| **Issuer:** | Class V Funding III, Ltd. |
| **Manager:** | Credit Suisse Alternative Capital, Inc. |
| **Transaction Type:** | A rule 3(c)(7) exempt Collateralized Debt Obligation |
| **Pricing Date:** | [ ], 2007 |
| **Closing Date:** | [ ], 2007 |
| **Form of Issue/Delivery:** | Rule 144A and Regulation S eligible (Global Notes); Physical Certificates for 144A Income Notes and Accredited Investor Purchasers of Class B and C Notes and Income Notes |
| **Payment Interval:** | [Quarterly] |
| **Senior Collateral Management Fee:** | [10] bps |
| **Non-call Period** | [3] years |
| **Trading:** | Manager has the discretion to sell (without reinvesting proceeds from sales) any credit impaired and/or defaulted assets |

citigroup‍ᴶ

[1] The information presented is preliminary and subject to change. Actual terms of the transaction may vary. Refer to the Offering Circular for a complete listing of transaction terms.

5

Confidential Treatment Requested by Citi

CITI 09570343



# 2    THE MANAGER

*Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*

Confidential Treatment Requested by Citi

CITI 09570344



**A.** Credit Suisse Alternative Capital – Firm Overview

*Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*

**Confidential Treatment Requested by Citi**

CITI 09570345



# Firm Overview

► Credit Suisse Alternative Capital, Inc. is an indirect subsidiary of Credit Suisse Group

► Credit Suisse Group is a leading global financial services company headquartered in Zurich. Credit Suisse Group is engaged in investment, private, and commercial banking, and asset management. Credit Suisse Group's registered shares (CSGN) are listed in Switzerland and Frankfurt, and in the form of American Depositary Shares (CSR) in New York

► Founded in 1856, Credit Suisse Group has 150 years of history and operates in over 50 countries with approximately 45,000 staff of over 100 different nationalities

6

Confidential Treatment Requested by Citi

CITI 09570346



# Firm Overview (continued)

CREDIT SUISSE ALTERNATIVE INVESTMENTS IS ONE OF THE PREMIER CREDIT & STRUCTURED PRODUCT INVESTMENT MANAGERS

▶ Credit Suisse Alternative Investments' Leveraged Investments Group ("LIG") through Credit Suisse Alternative Capital, Inc., will manage Class V Funding III, Ltd.

▶ LIG has two core competencies

  • Managing credit risk assets

  • Structured products

▶ Assets under management—approximately $15.0 billion market value, including $2.49 billion in structured products[1]



Senior Secured Loans 59.5%

Cash 5.6%

High Yield Bonds 12.5%

2nd Lien Loans 2.7%

Structured Products 19.7%

---

[1] Market value as of November, 2006. Includes uninvested principal cash and defaulted securities.

7

Confidential Treatment Requested by Citi



# Leveraged Investment Group (LIG) Organization

▶ LIG will have responsibility for the management of the CDO

**SENIOR MANAGEMENT**

John Popp, Managing Director*
Group Head
23 Years Experience

Andrew Marshak, Managing Director*
Portfolio Management & Trading
17 Years Experience

David Lerner, Managing Director*
U.S. Leveraged Loans
17 Years Experience

Thomas Flannery, Director*
U.S. High Yield Bonds
11 Years Experience

Glenn Clarke, Director**
Europe
10 Years Experience

Michael Shackelford, Director
ABS
14 Years Experience

Richard Quin, Director
Asia/Pacific
18 Years Experience

Lauri Whitlock, Director
Chief Operating Officer
17 Years Experience

**CREDIT ANALYSTS**

**U.S.**

Linda Karn - 12 Years*
Director
• Media & Telecommunications
• Printing and Publishing

Vance Shaw, CFA - 20 Years
Director
• Oil & Gas
• Utilities

Ed DeBruyn - 9 Years
Vice President
• Manufacturing
• Paper & Packaging

Louis Farano - 13 Years
Vice President
• Consumer Products
• Food, Beverage & Tobacco

Ryan Lim - 7 Years
Vice President
• Building Products
• Ecological
• Metals & Mining

David Mechlin - 1 Year
Analyst
• Technology

James Potesky - 21 Years
Director
• Chemicals
• Industrials

Adrienne Dale - 7 Years
Vice President
• Automotive
• Retail & Restaurants

Nicholas Milkovich - 10 Years
Vice President
• Aerospace & Defense
• Cargo & Transportation
• Healthcare

Raphael Savitz - 4 Years
Vice President
Hedge Fund

Ramin Kamali - 5 Years
Associate
• Financial Services
• Homebuilding
• Real Estate

Ilan Friedman - 6 Years
Associate
Trading

Berchmans Rivera - 1 Year
Analyst
• Gaming, Hotels

**Europe**

Daragh Murphy, CFA - 8 Years
Vice President

Regan Hoult, CFA - 7 Years
Vice President

Ayesha Chetory - 5 Years
Associate

Roberta Girard - 5 Years
Associate

Jakob von Kalckreuth - 4 Years
Associate

**Asia/Pacific**

Nk Persic - 8 Years
Vice President

**ABS**

Sami Bhat - 10 Years
Director

Judy Sun - 8 Years
Vice President

William Nunez - 12 Years
Vice President

Adam Kaplan - 7 Years
Associate

Brian Herr - 8 Years
Associate

**Investor Repository**
Charles Abraham, VP Mgr.
Gisele Almanzar, VP

**Trade Administration**
John Ladigoski, VP Mgr.
Yancy Reyes, AVP
Donya Ramsay, AVP

Jamie Abid, AVP
Ryan Wofford, AVP

**CDO Manager**
Jennifer Chen, VP Mgr.

**Middle Office**
Bill Cirozzo, Director

**Portfolio Administration**
Maggie Swales, VP Mgr.
Michelle Muniss, VP Mgr.
Paul Bochar, AVP

Josh Mednick, AVP
Doreen Nitoliano, AVP
Coryl Phillis, AVP

**System Administration**
Amy Altman, VP

Michelle Wagner
Andrew Worthington

* US and European Credit Committee member.

** European Credit Committee member.

8

Confidential Treatment Requested by Citi

CITI 09570348



# ABS Investment Team

▶ The 5 ABS investment committee members of LIG have extensive experience in structuring and investing in CDO's and ABS securities

| Name | Position | Years of Industry Experience |
|---|---|---|
| John G. Prep | Managing Director and LIG Group Head | 21 |
| Andrew H. Marshit | Managing Director and Head of Portfolio Management | 15 |
| Michael Shackelford | Director and Portfolio Manager | 13 |
| Samir Bhatt | Director and Credit Analyst | 10 |
| Thomas Flannery | Director and Portfolio Manager | 10 |

▶ The ABS investment committee meets once a week to review the portfolio and discuss purchases made pursuant to established investment parameters. The committee also meets on an ad hoc basis to approve credits for purchase that are not included within approved investment parameters

▶ LIG ABS portfolios are managed by Michael Shackelford. Mr. Shackelford has over 13 years of investment experience, including managing ABS portfolios for the past 8 years and managing ABS CDO portfolios for the past 4 years

▶ LIG ABS credit research is headed by Samir Bhatt. Mr. Bhatt has over 10 years of ABS credit research experience, including 5 years of ABS credit research at Credit Suisse's investment bank, and 2 years of purchasing ABS credits for LIG CDO portfolios

9

CITI 09570349



# LIG CDO Vehicles Under Management

| CDO Vehicles | Original Target Asset Mix | Total Approximate Initial Capitalization ($MM) | Closing Date |
|---|---|---|---|
| First Dominion Funding I-III | 75% Loans / 25% Bonds | 2,500 | 1998 - 1999 |
| CSAM Funding I-IV | 75 - 90% Loans / 10-25% Bonds | 2,200 | 2001 - 2004 |
| Atrium I-V | 85-90% Loans / 10-15% Bonds | 2,644 | 2002 - 2006 |
| Madison Park I-III | 85-90% Loans / 10-15% Bonds | 2,099 | 2005 - 2006 |
| Castle Garden Funding | 85% Loans / 15% Bonds | 850 | Oct 2005 |
| Cadogan Square CLO I - III[2] | 90% EURO Loans / 10% EURO Bonds | 1,862[3] | 2005-2006 |
| Class V Funding | ABS CDO's, CLO's and Real Estate CDO's | 205 | April 2005 |
| Class V Funding II | ABS CDO's, CLO's and Real Estate CDO's | 300 | May 2006 |
| Ridgeway Court Funding I | High Grade ABS Securities | 2,000 | July 2006 |
| Adams Square Funding I | Mezzanine ABS Securities | 500[4] | Dec 2006 |
| Other Vehicles[5] | High Yield Bonds | 1,355 | 1998 - 2000 |
| **Total** | | **$16,485** | |

[1] Leveraged Loans includes cash representing principal proceeds pending reinvestment in substitute portfolio assets.  High Yield Bonds includes CDO securities.

[2] Cadogan Square CLO I, II, and III are managed by the LIG team on behalf of Credit Suisse International.

[3] € 1,410.400000 @ 1.3129 as of December 31, 2006.

[4] Includes $338 MM of undrawn super senior swap.

[5] Other Vehicles' includes three CDO Vehicles currently managed by the LIG team consisting of primarily high yield bonds.  The current LIG team assumed the management of the Other Vehicles in connection with the acquisition of the asset management business of First Dominion Capital, LLC ("FDC") by DLJ Asset Management Group, Inc. ("DLJAM") and the subsequent acquisition of DLJAM by Credit Suisse in 2000.  Each of the CDO Vehicles was organized prior to the acquisition of the asset management business of FDC by DLJAM and the acquisition of DLJAM by Credit Suisse.

10

Confidential Treatment Requested by Citi

CITI 09570350



# B. Portfolio Construction and Management

*Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*

Confidential Treatment Requested by Citi



# Investment Philosophy

▲ LIG utilizes a credit-intensive, relative value investment approach in managing structured finance assets

▲ LIG believes performance is driven by a strong credit culture and systematic investment process

• Income, not trading gains, is intended to be the primary contributor of return

• Relative value discipline – mark-to-market versus new issue pricing

• Focus on preservation of principal – protect against downside

• Efficient diversification of asset type, issuer and servicer

11

Confidential Treatment Requested by Citi

CITI 09570352



# CDO Investment Process

Evaluation of
Underlying Collateral

Evaluation of
Transaction Structure

Evaluation of
Collateral Manager

Credit Committee and Investment Process

Ongoing Transaction Monitoring and Surveillance

12

Confidential Treatment Requested by Citi

CITI 09570353



# CDO Investment Process

▶ Evaluation of Transaction Structure

• Analysis of structural features and protections

• Specific collateral quality tests including investment restrictions

• Projected Cash-Flow from underlying collateral through CDO waterfall

• Break-even collateral default and loss levels for

▪ Break in yield

▪ 0% yield

▶ Evaluation of Collateral Manager

• Understanding the collateral manager's overall strategy and their motivation for the CDO transaction

• Manager organizational structure and resources dedicated to credit analysis and surveillance

• Historical performance of previous CDO transactions and/or manager track record as related to the underlying asset classes of particular CDO

▶ Evaluation of Underlying Collateral

• Break-down of assets by credit rating and underlying asset classification

• Further analysis of larger positions and/or lower-rated assets, including discussion with collateral manager or obtaining manager credit report

• Review purchase prices of underlying securities and recent mark-to-market (if secondary position) including valuation of hedges

13

Confidential Treatment Requested by Citi

CITI 09570354



# CDO Investment Process (continued)

▶ Ongoing Transaction Monitoring and Surveillance

Monitor CDO performance by evaluating distribution reports for:

- Collateral Characteristics
  - WARF, WAL, WAC, Weighted Average Spread
  - Compliance of OC/IC Coverage Tests
  - Change in underlying collateral mix
  - Fixed-rate assets vs. Size of hedge(s)
- Cash Flow Characteristics
  - Interest and Principal payments to debt classes
  - Hedge payments
  - Equity distributions
- Surveillance of underlying collateral characteristics:
  - Rating changes of underlying collateral
  - Delinquency and default performance of underlying ABS securities
  - Changes in credit outlook of underlying leveraged loans or bonds
  - Price movements of underlying collateral
- Surveillance Tools:
  - Distribution Reports
  - Rating agency reports and surveillance
  - Intex historical performance data

14

Confidential Treatment Requested by Citi

CITI 09570355



# CDO/ABS Investment Process

| Issuer and Servicer | Underlying Collateral | Transaction Structure | Investment Decision | Monitoring and Surveillance |
|---|---|---|---|---|
| ➢ Understand the Issuer's underwriting guidelines, methodology and exception process <br> ➢ Review historical performance of issuer's previous transactions <br> ➢ Assess servicer's resources dedicated to loan servicing and loss mitigation and firm's financial strength <br> ➢ Research servicer's track record as related to the underlying collateral | ➢ Examine key collateral characteristics (e.g., FICO, LTV, IO's, MTA's, 2nd liens, etc) <br> ➢ Scrutinize detailed break-down of collateral (e.g., by credit score, loan-to-value ratio, etc) <br> ➢ Derive defaults and loss curves using historical data | ➢ Study structural features and protections <br> ➢ Determine cash flow from underlying collateral through deal waterfall <br> ➢ Develop breakeven scenarios by adjusting default/loss levels, prepay speeds, interest rates and deal triggers | ➢ Discuss issuer/servicer, collateral and structure <br> ➢ Appraise loss coverage ratio versus rating <br> ➢ Compare relative value versus other available credits <br> ➢ Consensus decision making | ➢ Monitor key performance statistics using internal surveillance system <br> ➢ Track performance versus original expectations <br> ➢ Investigate poor performance <br> ➢ Obtain regular mark-to-market pricing <br> ➢ Evaluate performance and pricing for buy/sell/hold decision |

15

Confidential Treatment Requested by Citi

CITI 09570356



# Case Study—Key Asset Characteristics

- ▶ Scrutinize key collateral characteristics
- ▶ Examine detailed breakdown of collateral
- ▶ Derive default and loss curves using historical data

16



# Case Study—Estimated Cumulative Loss



**ARS1 2006-M2 Projected Net Losses**
(Assuming 50% Property Recovery or 50% Severity)

17

Confidential Treatment Requested by Citi

CITI 09570358



# Case Study—Scenario Analysis



18

Confidential Treatment Requested by Citi

CITI 09570359



# Surveillance Systems—Sample Deal Snapshot

▲ Evaluate performance for buy/sell/hold decision

19

CITI 09570360



# Conclusion—LIG Distinguishing Characteristics

▲ People
  • Stable team with diverse talents
  • Experienced in a variety of market environments
  • Global resources

▲ Philosophy
  • Consistent application of a credit focused, relative value investment philosophy

▲ Process
  • Bottom-up fundamental security selection by asset type
  • Disciplined, liquid and diversified strategy for management of risk
  • Credit, credit, credit
  • Robust legal and operational infrastructure

▲ Performance
  • Strong, industry leading results

20

Confidential Treatment Requested by Citi



## C.   Credit Suisse Alternative Capital – Performance

*Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*

*Historical results are for portfolios with investment guidelines that are different from the guidelines for the structure of Class V Funding III, Ltd.*

***PAST PERFORMANCE IS NO ASSURANCE OF FUTURE RESULTS.***

Confidential Treatment Requested by Citi

CITI 09570362



# Average Annual Equity Distribution History

| CDO Vehicle | Inception Date | Cumulative Distributions[1] | Average Annual Cash Distributions[2] |
|---|---|---|---|
| First Dominion Funding I | June 1998 | 160.73% | 19.88% |
| First Dominion Funding II | April 1999 | 112.32% | 14.95% |
| First Dominion Funding III | December 1999 | 104.43% | 14.88% |
| CSAM Funding I | March 2001 | 135.40% | 24.23% |
| CSAM Funding II | May 2002 | 98.48% | 22.47% |
| Atrium CDO | June 2002 | 103.21% | 23.82% |
| CSAM Funding III | July 2003 | 59.49% | 17.82% |
| Atrium II | December 2003 | 43.38% | 15.25% |
| CSAM Funding IV | June 2004 | 40.09% | 17.16% |
| Atrium III | October 2004 | 36.64% | 17.30% |
| Class V Funding | April 2005 | 23.15% | 14.65% |
| Madison Park Funding I | April 2005 | 27.40% | 17.64% |
| Atrium IV | June 2005 | 24.11% | 16.08% |
| Castle Garden Funding | October 2005 | 14.08% | 12.87% |
| Cadogan Square CLO[3] | December 2005 | 2.77% | 4.42% |
| Madison Park Funding II | February 2006 | 10.20% | 11.81% |
| Class V Funding II | May 2006 | 9.91% | 19.50% |
| Atrium V | July 2006 | 10.20% | 11.81% |
| Ridgeway Court Funding I | July 2006 | 12.05% | 43.83% |
| **AVERAGE** | | | **17.91%** |

PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS. THE CDO VEHICLES ARE NOT DIRECTLY COMPARABLE TO EACH OTHER. THE TERMS AND STRUCTURE OF A PARTICULAR CDO VEHICLE, THE MARKET ENVIRONMENT AND TIME WHEN IT WAS ORGANIZED, THE ASSETS INCLUDED IN ITS PORTFOLIO, ITS CAPITAL STRUCTURE, COST OF FINANCING, FEES AND EXPENSES (INCLUDING MANAGEMENT FEES), INTEREST RATE HEDGES, INVESTMENT CRITERIA AND OTHER FACTORS ARE DIFFERENT, AND SUCH DIFFERENCES MAY HAVE A MATERIAL IMPACT ON PERFORMANCE. AS SUCH, THE HISTORICAL PERFORMANCE OF A CDO VEHICLE IS NOT AN INDICATOR OF HOW OTHERS MAY PERFORM. IN PARTICULAR, THE HISTORICAL PERFORMANCE OF THE CDO VEHICLES SHOULD NOT BE RELIED UPON AS AN INDICATION OF THE PERFORMANCE OF THE ISSUER. OMITS CDOS NOT STRUCTURED BY LIG AND NON-CDO PORTFOLIOS.

[1] Represents total cash distributions to equity holders through the most recent distribution date (as of December 31, 2006) divided by the initial equity balance. Data presented is unaudited.
[2] The average return percentage represents the simple average of the annualized cash distributions to date of the specified CDO Vehicles.
[3] Managed by Credit Suisse International

21

Confidential Treatment Requested by Citi

CITI 09570363



# 3    STRUCTURAL ANALYSIS

*IMPORTANT NOTICE:*

*The information contained herein is designed to illustrate the sensitivity of returns to various factors and is not intended to predict or indicate actual results, which will differ and may differ substantially from those reflected herein.*

*Any illustrations contained herein are based on certain hypothetical assumptions specified herein. Assumptions are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the illustrations will not materialize or will vary significantly from actual results, and such variations may be material.*

*Internal Rate of Return ("IRR") as used in the Return Scenarios means the discount rate at which the present value of the future cash flows equals the cost of the investment.*

**Confidential Treatment Requested by Citi**



# Indicative Collateral Characteristics

| Portfolio Guidelines[1] | Expected Constraint |
|---|---|
| Moody's Weighted Average Rating Factor: | Max [122] (A2/A) |
| Average Life of Portfolio: | Max [7.0] years |
| Maximum Issuer Size: | Max [2.0] % |
| % Below A2/A: | Max [8.0]% |
| % Below A3/A-: | Max [0.0]% |
| % ABS CDO Securities: | Max [100.0]% |
| Moody's Asset Correlation | Max [31.0]% |
| % of Synthetic Collateral Debt Securities | Min [85.0]% |
| Weighted Average Spread: | Min [210] bps |

[1] As of January 2007. Subject to change.

22

Confidential Treatment Requested by Citi

CITI 09570365

# CDS Asset Collateral Account

▶ On the Closing Date, proceeds from the issuance of the Notes and Income Notes will be invested in high quality assets and placed in the CDS Asset Collateral Account

▶ The CDS Asset Collateral Account will be available to make payments to the swap counterparty (protection buyer) in the case of credit events or write-downs on the reference portfolio

▶ If any of the coverage tests are not satisfied, a ratings confirmation failure occurs, or the Class A1A Notes are funded:

- If CDS notional amount amortizes, the amortized amount will:
    - first reduce the notional amount of the Class A1A Swap, and
    - then allow release of funds from the CDS Asset Collateral Account to repay the Class A1A Notes, reduce the notional amount of the Class A1A Swap, and to be distributed amongst the other rated debt classes on a sequential basis

- If cash assets amortize, the amortized amount will be:
    - used to repay the Class A1A Notes, reduce the notional amount of the Class A1A Swap, and distributed amongst the rated debt classes on a sequential basis

citigroup

23

Confidential Treatment Requested by Citi

CITI 09570366



# Hypothetical Breakeven Default Rate Analysis[1]

THE TABLE BELOW SHOWS THE ANNUAL AND CUMULATIVE BREAKEVEN DEFAULT RATES ON THE UNDERLYING PORTFOLIO OF THE CLASS V FUNDING III, LTD.[2][3][4]

| Default Rates | CLASS A2 | | CLASS A3 | | CLASS B | | CLASS C | |
|---|---|---|---|---|---|---|---|---|
| | Annual | Cumulative | Annual | Cumulative | Annual | Cumulative | Annual | Cumulative |
| No Loss of Yield[5] | [10.8]% | [47.4]% | [6.4]% | [31.4]% | [3.3]% | [17.3]% | [1.8]% | [9.3]% |
| 0% Yield, No Loss of Principal[6] | [13.4]% | [55.6]% | [8.2]% | [38.1]% | [4.7]% | [24.0]% | [2.7]% | [14.5]% |

[1] The hypothetical breakeven scenarios shown herein are not predictions or projections of any future performance but rather intended to illustrate the hypothetical performance under certain assumptions, including those defined herein. The assumptions used in this analysis are not reflective of every conceivable scenario that may occur throughout the life of the transaction. These assumptions and thus these results, are unlikely to be consistent with and may differ materially from actual events. No assurance can be given as to the actual performance of the securities shown herein.

[2] Assumes that defaults are applied quarterly to the outstanding collateral balance (starting in month [7] with immediate recoveries of [60]% upon default).

[3] Cumulative default is the aggregate of all defaulted securities over the life of the transaction divided by the effective date portfolio balance.

[4] Refer to the pages titled "Modeling Assumptions" for additional modeling assumptions used in this analysis.

[5] "No Loss of Yield" corresponds to the default rate at which the first dollar of loss in yield occurs.

[6] "0% Yield, No Loss of Principal" is the default rate at which the total cashflows received equals the initial investment.

24

# Modeling Assumptions[1]

RETURN SCENARIOS ARE SHOWN UNDER VARIOUS HYPOTHETICAL ASSUMPTIONS. SOME, BUT NOT ALL, OF THE METHODOLOGIES AND ASSUMPTIONS USED ARE DESCRIBED BELOW.

| ASSUMPTIONS | |
| --- | --- |
| Default Rate: | That credit events occur starting in month [7] and continue throughout the life of the transaction at the indicated per annum rates. Default Rates are applied on the outstanding principal amount of assets |
| Recovery Rate: | Recovery rate equal to [60]% of the defaulted par amount, unless otherwise specified |
| Timing of Recoveries: | The Manager sells the defaulted collateral securities in the distressed market immediately upon default and achieves the recovery value upon sale. |
| Asset Spreads: | The assets in the Initial Portfolio are assumed to have a weighted average spread of [226] bps. |
| Short Term Reinvestment Rate: | 3 month LIBOR − [0.20]% for the intra-period reinvestment rate. |
| Management Fees: | A [0.10]% per annum senior management fee |
| Other Fees and Expenses: | Analysis includes all initial placement and issuance expenses as well as estimated ongoing annual operating expenses and fees |
| LIBOR Curve: | The forward LIBOR curve as of [1/10/2007] |
| Earnings from Eligible Investments: | The Eligible Investments in the CDS Asset Collateral Account earn interest at a rate of LIBOR flat |
| Spread on Liabilities: | Weighted average spread of liabilities = [0.72]% |

**Note:** Please note that this list of assumptions does not include all assumptions that may have been applied to a particular model and that the models themselves do not factor in every performance factor that can have a significant impact on the performance of the Notes. Since many potential scenarios exist, it is impossible to show all of the potential circumstances that would yield similar results. See also the additional disclosure at the outset of this section, the Important Notice section as well as the Risk Factors contained herein

[1] Actual events will vary and perhaps differ materially from those assumed. Customized scenarios using assumptions you specify can be provided upon request.

25

citigroup

Confidential Treatment Requested by Citi

CITI 09570368



APPENDIX

Confidential Treatment Requested by Citi

CITI 09570369



## A.   RISK FACTORS

Confidential Treatment Requested by Citi

CITI 09570370



# Risk Factors

Prospective investors in the Notes and the Income Notes (the "Securities") should consider, among other things, the following risk factors in connection with the purchase of the Securities. A more detailed description of the risks associated with an investment in the Securities is available in the final Offering Circular pursuant to which the Securities will be offered.

**Limited Assets to Make Payments on the Notes and Distributions on the Income Notes.** The Issuer, as a special purpose company, will have no significant assets other than the collateral pledged to secure the Securities (the "Collateral"). The Securities will be payable solely from and to the extent of the available proceeds from the Collateral in accordance with the priority of payments under the Indenture (the "Priority of Payments"). The Co-Issuer will have no substantial assets. Except for the Co-Issuers, no person or entity will be obligated to make any payments on the Notes. Except for the Issuer, no person or entity will pay distributions or be obligated to pay any other amounts with respect to the Income Notes. Consequently, holders of the Securities must rely solely upon distributions on the Collateral (including payments from the Class A1A Swap Counterparty under the swap agreement (the "Class A1A Swap Agreement") and the CDS Asset Collateral Account for the payment of amounts owed in respect of the Securities.

**Subordination of the Notes and the Income Notes.** Payments on the Notes and Income Notes will be subordinated to the payment of amounts owed to the Class A1A Swap Counterparty and certain fees and expenses of the Issuer, including senior management fees. No payment of interest on any Class of Notes will be made until all accrued and unpaid interest on the outstanding Notes of each Class that is senior to such Class has been paid in full. Except in certain limited circumstances, no payment of principal on any Class of Notes will be made until the outstanding principal amount of each Class of Notes that is senior to such Class has been paid in full. So long as any more senior Class of Notes remains outstanding, failure to pay interest on the Class B Notes or Class C Notes, on any payment date by reason of the Priority of Payments will not constitute an event of default under the Indenture (an "Event of Default"). There are no scheduled payments of distributions on the Income Notes. Distributions on the Income Notes are subordinated to payments to the other creditors of the Issuer under the Indenture; however, the Issuer will not be permitted to attempt a Mandatory Redemption unless the Holders of the Income Notes have achieved (or will achieve after giving effect to the payments on such date) a cumulative IRR of at least [0.00]%.

26

Confidential Treatment Requested by Citi

CITI 09570371



# Risk Factors

**Control of Remedies.** In the case of an Event of Default, the holders of 66 ⅔% of the most senior class of Notes outstanding (the "Requisite Noteholder") or the Class A1A Swap Counterparty (so long as Class A1A Swap Agreement has a notional balance greater than zero, the Class A-1 Swap Counterparty will be the "Requisite Noteholder") will be entitled to determine the remedies to be exercised under the Indenture and may, at their sole discretion, direct the liquidation of the Collateral and, in some specified circumstances, even if the anticipated net proceeds of such liquidation would not be sufficient to pay all the Notes in full. In the event the Collateral is liquidated under these circumstances, the likelihood that the Holders of the Notes will be paid in full, and the amounts payable to the Holders of the Income Notes, will depend upon the value of the Collateral Securities that may be realized upon their liquidation rather than the Issuer's ability to collect principal of and interest on the Collateral Securities as they become due. The market value of the Collateral Securities will generally fluctuate with, among other things, changes in market rates of interest, general economic conditions, world political events, developments or trends in any particular industry, the conditions of financial markets and the financial condition of the issuers of securities similar to the Notes.

Remedies pursued by the Requisite Noteholders could and are likely to be adverse to the interests of the Notes junior to the Requisite Noteholders. Holders of the Income Notes will have no right to determine the remedies to be exercised under the Indenture upon an Event of Default. There can be no assurance that, following any liquidation of the Collateral and the application of the proceeds thereof to pay the fees, expenses and other liabilities payable by the Co-Issuers, sufficient funds will remain to pay the Notes, or that any funds will remain to make any distributions on the Income Notes.

**Limited Liquidity and Restrictions on Transfer of the Securities.** There is no market for the Securities being offered hereby and as a result, a purchaser must be prepared to hold the Securities for an indefinite period of time or until the maturity or early redemption thereof. Citigroup and its affiliates will not be obligated to make a market in the Securities. The Securities are expected to be owned by a relatively small number of investors, and no assurance can be given that any secondary market for the Securities will develop, and it may be difficult for holders of the Securities to determine the value of the Securities at any particular time Purchasers of the Securities may find it difficult or uneconomic to liquidate their investment at any particular time.

The Securities have not been and will not be registered under the Securities Act of 1933 or under any U.S. state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and are being issued and sold in reliance on exemptions from registration provided by such laws. The Issuer and Co-Issuer will not be registered under the Investment Company Act of 1940.

The Securities will be subject to restrictions on transfer, and investors in Securities will be required to make or be deemed to make certain representations in connection with the purchase of Securities. Such restrictions on transfer may further limit the liquidity of the Securities.

27

CITI 09570372

# Risk Factors *(continued)*

**Leveraged Investment.** The Securities represent leveraged investments in the Collateral. This leverage will increase the potential cash flow available in respect of the amount invested by the holders of the Securities as compared with the cash flow that would be available in respect of a comparable investment in a non-leveraged transaction. Such increased cash flow will directly affect the return on the Securities. However, the use of leverage also creates risk for the holders of the Income Notes because it increases their exposure to losses on a leveraged basis as a result of credit events or payment shortfalls with respect to the synthetic securities ("CDS Assets") and cash collateral securities (together the "Collateral Securities") in the Collateral. As a result, the occurrence of credit events or payment shortfalls with respect to only a small portion of the Collateral Securities could result in the complete loss of the investment of the holders of the Income Notes and to a lesser extent, the subordinate classes of the Notes.

Due to the existence of leverage, changes in the market value of the Income Notes could be greater than the changes in the values of the underlying Collateral Securities, which themselves are subject to, among other things, credit, market, liquidity and prepayment risk. Purchasers of the Income Notes must consider with particular care the risks of leverage because, although the use of leverage creates an opportunity for substantial returns on the Income Notes, it increases substantially the likelihood that the holders of Income Notes could lose their entire investment if the pool of Collateral Securities held by the Issuer is adversely affected.

**Average Lives, Redemption and Prepayment Considerations. Distribution on the Income Notes.** The average lives of the Notes are expected to be shorter than the number of years until their applicable legal maturity dates.

The average lives of the Notes and the date of final payment with respect to the Income Notes will be affected by, among other things, the performance and characteristics of the Collateral Securities, including the existence and frequency of exercise of any prepayment, optional redemption or sinking fund features, the redemption price, the actual default or shortfall rate and the actual level of recoveries on any Collateral Securities for which defaults or shortfalls occur, the frequency of tender or exchange offers for the Collateral Securities, and any addition, termination or replacement of Collateral Securities.

**Projections, Forecasts and Estimates.** Estimates of the average lives of the Notes and the final payment with respect to the Income Notes and the expected return on the Income Notes, together with any other projections, forecasts and estimates provided to prospective purchasers of thereof, are forward looking statements. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Accordingly, the projections are only estimates. Actual results may vary from the projections, and the variations may be material.

Neither the Class A1A Swap Counterparty, the Manager nor any of their affiliates will have any obligation to update or otherwise revise any projections, including any revisions to reflect changes in economic conditions or other circumstances arising after the date of the Offering Circular or to reflect the occurrence of unanticipated events, even if the underlying assumptions do not come to fruition.

28

CITI 09570373



# Risk Factors *(continued)*

**Redemption of Securities; Potential Illiquidity and Volatility of Valuations.** An optional redemption, tax redemption or mandatory redemption is a potential source of liquidity for the Securities. There can be no assurance, however, that the Issuer's rights to an optional redemption or a tax redemption will be exercised or that the conditions for any redemption, including mandatory redemption, will be met.

An optional redemption, tax redemption or mandatory redemption would result in a termination and valuation of the CDS Assets. The amount payable to or by the Issuer with respect to the termination of the CDS Assets will depend in part on the value of the reference obligations for such CDS Assets ("CDS Reference Obligations"), which in turn will generally fluctuate with, among other things, changes in prevailing interest rates, general economic conditions, the condition of certain financial markets, U.S. and international political events, developments or trends in any particular industry and the financial condition of the issuers of the CDS Reference Obligations. A decrease in the market value of the CDS Reference Obligations could increase the amount of any swap termination payment owed by the Issuer or reduce the amount of any termination payment owed to the Issuer, which could adversely affect the Issuer's ability to make payments or distributions on the Securities. The termination value of the CDS Assets may also be affected by the condition of the market (including the liquidity of the market) for credit default swaps on asset-backed securities generally.

**Principal Prepayment of Notes.** The failure to meet any coverage test applicable to a Class of Notes could result in the application of amounts to the early prepayment of principal in the Notes and to reserve amounts and reduce the notional amount of the Class A1A Swap Agreement at a time when such amounts would otherwise be used to make (i) interest payments on the Class A2, Class A3, Class B, and Class C Notes and (ii) distributions to the holders of the Income Notes.

**Nature of the Collateral Securities and Inherent Risks.** All of the Collateral Securities will consist of cash asset-backed securities or CDS Assets referencing asset-backed securities, which will be predominantly collateralized debt obligations. These obligations are subject to a number of risks, including prepayment risk, credit risk, liquidity risk, structural risk, legal risk and interest rate risk, which may be different from those of other types of debt obligations. The performance of an asset-backed security may be affected by a variety of factors, including the amount and timing of payments and recoveries on the underlying assets.

29

Confidential Treatment Requested by Citi

CITI 09570374

# Risk Factors *(continued)*



**Nature of CDS Assets Generally.** Approximately [90]% of the Collateral Securities included in the Collateral is expected to consist of synthetic assets (referred to in these Risk Factors as "CDS Assets"), all of which will be in the form of credit default swaps documented on pay-as-you-go confirmations or any permitted alternative form of confirmation. The reference obligations defined above in respect of CDS Assets must satisfy the eligibility criteria for the Collateral Securities to be held by the Issuer. Investments in such types of assets through the purchase or acquisition of synthetic assets present risks in addition to those resulting from holding or selling the CDS Reference Obligations directly. CDS Assets are expected to be structured in such a way that the Issuer will receive periodic premium payments and will be required to make payments, from time to time in accordance with the terms thereof, to the synthetic asset counterparty in respect of any floating payments ("Floating Payments") and credit events ("Credit Events"). The obligation of the Issuer to make such payments at any time will result in a reduction in the amount that the Issuer has available to make distributions to the Securities at such time and may result in a lower yield (or the Notes and in the Income Notes receiving a lower IRR through their date of final redemption. The requirement of the synthetic asset counterparty to make payments in accordance with the CDS Assets will expose the Issuer to the default risk on the CDS Reference Obligation on an ongoing basis (in addition to the default risk of the synthetic asset Counterparty).

There is no central source for relevant data or a standardized method for measuring the likelihood of the occurrence Floating Payments or Credit Events. Furthermore, the historical experience of other asset-backed securities comparable to the CDS Assets that will comprise a substantial portion of the Collateral Securities is not necessarily indicative of the risk of Floating Payments and Credit Events occurring with respect to the CDS Assets. Accordingly, it is difficult to predict with any certainty the likely level and timing of a Floating Payments or Credit Events that may occur with respect to the CDS Assets.

Neither the Class A1A Swap Counterparty, the Manager nor any if their affiliates should be construed as making any representation with respect to the possibility of the Issuer having to make payments to a synthetic asset counterparty in respect of a Floating Payment or Credit Event occurring with respect to any of the Collateral Securities.

**New and Developing Structure of CDS Assets.** The CDS Assets are expected to be structured as credit default swaps and documented pursuant to one or more master agreements and one or more pay-as-you-go confirmations. Forms of pay-as-you-go confirmations were recently developed to accommodate the unique features of asset-backed and other structured finance securities. The standardized terms for these types of transactions are still evolving. Accordingly, the terms that ultimately become the standard for the market may be significantly different than the terms of the CDS Assets which will be established on the closing date (the "Closing Date") for the issuance of the Securities. Any difference between the Issuer's then existing CDS Assets and the evolving market standard documentation may have a negative impact on the liquidity and market value of any such CDS Assets. In addition, because of such potential differences, there can be no assurance that the Issuer will be able to acquire CDS Assets to the extent or in the manner anticipated on the Closing Date. The Collateral may therefore be less diversified than would otherwise be the case.

30

Confidential Treatment Requested by Citi

CITI 09570375



# Risk Factors *(continued)*

**Termination of CDS Assets.**  CDS Assets may provide for termination or liquidation based upon the occurrence of various events (including events related to collateral maintained by the Issuer for payments to the counterparties on CDS Assets) that would not apply if the Issuer had invested directly in the CDS Reference Obligations underlying the CDS Assets.  The Issuer may be obligated to make payments to the counterparties on the CDS Assets upon termination of CDS Assets.  The amount of termination payments owing by the Issuer or the related counterparty, as the case may be, would generally be determined as the replacement cost to the counterparty or the Issuer, as the case may be, for each terminated CDS Asset.  The Illiquidity and restrictions on transfer and termination of the CDS Assets also may affect the amount and the timing of receipt of proceeds from the termination of CDS Assets in connection with the acceleration of the Notes following an Event of Default or upon a redemption of the Securities.  The amount, if any, receivable by the Issuer upon any such termination or liquidation may be significantly less than the amount that the Issuer would have received upon the contemporaneous sale of the CDS Reference Obligation.  In addition, the Issuer may not be able to terminate CDS Assets as easily as it would be able to buy and sell the related CDS Reference Obligations, and, in particular, may not be able to terminate such CDS Assets without the consent of the related counterparty for the CDS Asset, and the such counterparty may have the ability to terminate the related CDS Assets without the consent of the Issuer.  Accordingly, the Issuer may not be able to manage its exposure to the related CDS Reference Obligations as efficiently or as economically as it would if it had purchased such CDS Reference Obligations directly.  Following a termination, the Issuer may not be able to enter into a replacement CDS Asset or may not be able to negotiate terms of a replacement that are substantially similar to the terminated CDS Asset or at an acceptable cost.

**Reliance on the Creditworthiness of the Class A1A Swap Counterparty and Counterparties to the CDS Assets.**  The ability of the Issuer to make payments and distributions on the Securities will depend, in part, on the receipt of payments from the (i) Class A1A Swap Counterparty under the Class A1A Swap Agreement and (ii) counterparties on the CDS Assets.  As a result, the Issuer will be relying not only on the credit quality of the Collateral Securities but also on the creditworthiness of the Class A1A Swap Counterparty.  In addition, an adverse change in the rating of the Class A1A Swap Counterparty or the counterparty in a material portion of the CDS Assets could adversely affect the rating of the Notes; for example, there may be practical impediments or timing delays associated with enforcement of the Issuer's rights against a Class A1A Swap Counterparty or any counterparty of a CDS Asset in the case of an insolvency of either such counterparty.

31

Confidential Treatment Requested by Citi

CITI 09570376

# Risk Factors *(continued)*

**Management of the Collateral Securities; Reliance on the Manager.** The Issuer has no employees and will be dependent on the employees of the Manager to make decisions on its behalf in accordance with the terms of the Indenture and a management agreement, which will be executed on the Closing Date and will outline the Manager's responsibilities acting on behalf of the Issuer in managing the Collateral Securities. Because the composition of the Collateral Securities will vary over time, the performance of the Collateral Securities depends on the investment strategy and investment process of the Manager in analyzing, selecting and managing the Collateral Securities. As a result, the performance of the Issuer will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Manager. There can be no assurance that the Manager's current investment professionals will continue to be affiliated with the Manager or actively involved in the management and administration of the Collateral for the Issuer. In the event that one or more of the investment professionals of the Manager were to cease to be affiliated with the Manager or actively involved in the management and administration of the Collateral for the Issuer, the Manager would have to re-assign responsibilities internally and/or hire one or more replacement individuals and such a loss could have a material adverse effect on the performance of the Issuer.

**Potential Conflicts of Interest with the Manager.** Various potential and actual conflicts of interest may arise from the overall investment activities of the Manager and certain parties related to the Manager. The Manager and certain parties related to the Manager may have economic interests in or other relationships with issuers whose obligations are Collateral Securities. In particular, such persons may make and/or hold an investment in an issuer's securities that may be pari passu, senior or junior in ranking to a CDS Reference Obligation. In addition, partners, security holders, officers, directors, agents or employees of the Manager and its affiliates may serve on boards of directors or otherwise have ongoing relationships with issuers of Collateral Securities. The Manager and its affiliates may act as collateral or Manager for other entities and may make different decisions with respect to those entities than with respect to the Collateral Securities. Each of such ownership and other relationships may affect the ability of the Manager to advise the Issuer with respect to such Collateral Securities. The Manager will receive senior and subordinate fees, which may create incentives for it to make decisions that conflict with the interests of a particular Class of Securities.

**Potential Conflicts of Interest with the Trustee.** In certain circumstances, the trustee or its affiliates may receive compensation in connection with the trustee's (or such affiliate's) investment in certain eligible investments from the managers of such eligible investments.

**Ratings.** Credit ratings of debt securities similar to the Notes represent the opinions of the rating agencies regarding their credit quality and are not guarantees of quality. Rating agencies attempt to evaluate the likelihood of contractual principal and interest payments and do not evaluate the risks of fluctuations in market value; therefore, they may not fully reflect the true risks of an investment. In addition, rating agencies may fail to make timely changes in credit ratings in response to subsequent events.

A rating is not a recommendation to purchase, hold or sell securities, and may be subject to revision or withdrawal at any time by the assigning rating agency. In the event that a rating initially assigned to any Class of Notes is subsequently lowered, qualified or withdrawn for any reason, no person or entity will be obligated to provide any additional support or credit enhancement with respect to such Notes, and the market value of such Notes will likely be adversely affected.

32

Confidential Treatment Requested by Citi

CITI 09570377

# Risk Factors *(continued)*

**Tax Treatment of the Issuer.** The Issuer will adopt certain operating procedures designed to reduce the risk that the Issuer will be deemed to have engaged in a trade or business in the United States. As long as the Issuer is not engaged in a United States trade or business, the Issuer will not be subject to United States Federal income tax on its net income. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is not entirely clear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being treated as engaged in a trade or business within the United States. If the Issuer were found to be engaged in a United States trade or business, it could be subject to substantial United States Federal income taxes whose imposition would materially impair its ability to pay interest on and principal of the Notes and make distributions with respect to the Income Notes. In addition, in that event payments in respect of the Notes may be treated as United States source income and could be subject to withholding.

**Withholding Taxes.** The Issuer expects that payments received on the Collateral Securities and the Eligible Investments generally will not be subject to withholding tax imposed by the United States or reduced by withholding taxes imposed by any other country. The Indenture will require that the Collateral Securities not be subject to withholding tax at the time of purchase thereof by the Issuer unless the issuer of the Collateral Security is required to make "gross-up" payments to cover the full amount of such withholding tax. There can be no assurance, however, that payments on the Collateral Securities and the Eligible Investments will not become subject to withholding as a result of any change in any applicable law, treaty, rule or regulation or contrary interpretation thereof or other causes. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is not entirely clear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being subject to excise or withholding taxes on payments in respect of such derivatives. The imposition of unanticipated withholding taxes could materially impair the Issuer's ability to make payments on the Notes and make distributions with respect to the Income Notes.

**Tax Treatment of holders of Income Notes.** Because the Issuer will be a passive foreign investment company, a U.S. person holding Income Notes may be subject to additional taxes unless it elects to treat the Issuer as a qualified electing fund and to recognize currently its proportionate share of the Issuer's income. A holder that makes a qualified electing fund election may recognize income in amounts significantly greater than the distributions received from the Issuer. A holder that makes the election will be required to include in current income its pro rata share of the earnings or discount whether or not the Issuer actually makes distributions. In this regard, prospective purchasers of the Income Notes should be aware that it is possible that a significant amount of the Issuer's income, as determined for U.S. federal income tax purposes, will not be distributed on a current basis for a number of potential reasons, including the investment by the Issuer in instruments that bear original issue discount or market discount, and the retirement of all or a portion of certain classes of Notes. Thus U.S. holders of the Income Notes that make a qualified electing fund election may owe tax on a significant amount of "phantom income". The holder may be able to elect to defer payment, subject to an interest charge for the deferral period, of the tax on income recognized on account of the qualified electing fund election. The Issuer also may be a controlled foreign corporation, in which case U.S. persons holding Income Notes could be subjected to different tax treatments.

**Investment Company Act Considerations.** While the Issuer may be considered similar in some ways to an investment company, it is not required and does not intend to register as such under the Investment Company Act of 1940, and, accordingly, investors in the Securities are not afforded the protections of that Act.

33

citigroup

CITI 09570378



# Risk Factors *(continued)*

**Certain ERISA Considerations.** The Securities will be subject to restrictions on transfers to investors subject to ERISA and certain other laws. In this regard, each purchaser and transferee of an Income Note or any interest therein will be deemed to have represented and agreed (or required to represent and agree in writing in the event such purchaser or transferee is purchasing a physical form of Income Note) at the time of its purchase or acquisition and throughout the period of its holding and disposition of such Income Notes that it is not, and is not acting on behalf of or using the assets of, a Benefit Plan Investor (including, without limitation, an insurance company general account). A Benefit Plan Investor is any employee benefit plan (as defined in section 3(42) of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, any plan to which Section 4975 of the Code applies and any entity whose underlying assets include plan assets by reason of such employee benefit plan's or plan's investment in the entity.

**Money Laundering Prevention.** The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), signed into law on and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "Treasury") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that Treasury will promulgate regulations requiring the Issuer or CSAC or other service providers to the Issuer, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Income Notes. Such legislation and/or regulations could require the Issuer to implement additional restrictions on the transfer of the Income Notes. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

The Administrator is also subject to anti-money laundering laws and regulations in the Cayman Islands which impose specific requirements with respect to the obligation "to know your client". Except in relation to certain categories of institutional investors, the Administrator will require a detailed verification of each initial investor's identity and the source of the payment used by such initial investor for purchasing the Income Notes in a manner similar to the obligations imposed under the laws of other major financial centers. If the Cayman Islands government determined the Administrator was in violation of the anti-money laundering provisions, the Issuer could be subject to substantial criminal penalties. Payment of any such penalties could materially adversely affect the timing and amount of distributions on the Income Notes.

34

Confidential Treatment Requested by Citi

CITI 09570379



# Risk Factors *(continued)*

**Potential Conflicts of Interest with Citigroup and its Affiliates.** Citigroup will act as the initial purchaser of the Notes and as placement agent for the Income Notes and has also previously provided the Issuer with financing and hedging arrangements under a warehouse facility (the "Warehouse Facility"). Citibank N.A., an affiliate of Citigroup, will be the initial Class A1A Swap Counterparty, and in such capacity (together in certain circumstances specified in the definition of "Requisite Noteholders"), will have certain voting and consent rights and other similar rights under the Indenture and certain other Transaction Documents. For purposes of the Indenture, Citigroup and its affiliates will be the Requisite Noteholder on the Closing Date by reason of its role as Class A1A Swap Counterparty. In its role as Class A1A Swap Counterparty, Citibank, N.A. will have the ability to control whether the CDS Assets are required to contain the CDS Counterparty Forbearance and whether certain mandatory funding requirements under the Class A1A Swap will be applicable to Citibank, N.A. The interests of Citibank, N.A. as Class A1A Swap Counterparty may conflict with the interests of the Holders of the Securities in respect of any matter requiring consent or any other matter subject to the discretion of Citibank, N.A. None of Citibank, N.A., Citigroup or any other affiliate of Citigroup will be required to consider the interests of the holders of the Securities in exercising such rights. As the Requisite Noteholder, Citibank, N.A. may (and currently expects to) delegate or assign certain of its rights to one or more third parties in connection with a hedging of its position.

Citigroup or its affiliates may have had in the past and may in the future have business relationships and dealings with one or more issuers of Collateral Securities and their affiliates and may own equity or debt securities issued by issuers of Collateral Securities or their affiliates. Citigroup or its affiliates may have provided and may in the future provide investment banking services and other services to an issuer or sponsor of Collateral Securities or its affiliates and may have received or may receive compensation for such services. Citigroup or its affiliates may buy securities from and sell securities to an issuer of Collateral Securities included in the Collateral or its affiliates for their own account or for the accounts of their customers.

In addition, Citigroup or an Affiliate thereof is expected to act as the initial CDS Asset counterparty pursuant to certain CDS Assets acquired by the Issuer on the Closing Date and may act as the swap counterparty under other derivative agreements entered into by the Issuer itself. In such capacity as swap counterparty, Citigroup (or such affiliate) may be expected to have interests that are adverse to the interests of the holders of Securities. Typically, such a swap counterparty would act as calculation agent pursuant to the derivative agreement and, in such capacity, have broad authorization to perform actions, such as calculations of payment amounts, that involve the exercise of judgment and discretion. As such a swap counterparty, Citigroup will have no duty to act on behalf of the holders of Securities and, directly or indirectly, may act in ways adverse to them.

Some of the Collateral Securities included in the Collateral may be obligations of issuers or obligors, or obligations sponsored or serviced by companies, for which Citigroup or one of its affiliates may have acted as underwriter, agent, placement agent or dealer or for which an affiliate of Citigroup has acted as lender or provided other commercial or investment banking services. The Issuer will purchase Collateral Securities from Citigroup or its affiliates only to the extent that such Collateral Securities have been selected by the Manager for inclusion under the Warehouse Facility and the purchase of such Collateral Securities is consistent with the investment guidelines described in the Warehouse Facility.

35

Confidential Treatment Requested by Citi

CITI 09570380



**B.** CREDIT DEFAULT SWAP OVERVIEW

Confidential Treatment Requested by Citi



# Pay-As-You-Go Credit Default Swaps

► In 2005, ISDA began to adopt Pay-As-You-Go mechanics

► Pay-As-You-Go CDS involves a monthly exchange of cashflows that closely match the cashflows of the underlying Reference Obligations

• **The protection buyer ("Swap Counterparty") will pay the CDO a specified fixed premium amount (the "Fixed Amount")**

• **The CDO, as protection seller, will pay the Swap Counterparty an amount (the "Floating Amount") equal to the sum of:**

  ▪ The relevant principal shortfall amount (if any)

  ▪ The relevant write down amount (if any)

  ▪ The relevant interest shortfall payment amount (if any)

• **Physical Settlement** – Following the occurrence of a Credit Event, the protection buyer may deliver all or a portion of the relevant Reference Obligation only

• **Credit Events:**

  ▪ Failure to pay principal

  ▪ Writedown

  ▪ Distressed rating downgrade

• **Credit Events do not include Bankruptcy or Restructuring**

36

Confidential Treatment Requested by Citi

CITI 09570382

# Credit Events[1]

▶ **Failure to Pay Principal:** Occurs when a Reference Obligation fails to make a scheduled principal payment or fails to pay the expected principal amount at maturity

- The Swap Counterparty may choose to deliver the Reference Obligation to the CDO, in which case the Swap Counterparty will receive an amount equal to the current face amount of the delivered obligation times the Reference Price [2]

- In the event that the Swap Counterparty chooses not to deliver the Reference Obligation, it will receive the amount of the principal shortfall times the Reference Price from the CDO. The swap notional will be reduced by the amount paid

▶ **Writedown:** Occurs when the principal constituent of a Reference Obligation is written down and cannot be recovered

- As with the "Failure to Pay Principal" credit event, the Swap Counterparty may choose to deliver the Reference Obligation to the CDO, in which case the Swap Counterparty will receive an amount equal to the current face amount of the delivered obligation times the Reference Price

- In the event that the Swap Counterparty chooses not to deliver the Reference Obligation, it will receive the amount of the writedown times the Reference Price from the CDO. The swap notional will be reduced by the amount paid

▶ **Distressed Rating Downgrade:** Occurs when a Reference Obligation is downgraded to CCC by S&P and Caa2 by Moody's

- As with the previous credit events, the Swap Counterparty may choose to deliver the Reference Obligation to the CDO, in which case the Counterparty will receive an amount equal to the notional amount of the delivered obligation times the Reference Price. In this case, however, no protection payments will be made if the Swap Counterparty chooses not to deliver the Reference Obligation

---

[1] The terms outlined below are a summary only and will be superseded by the governing terms and conditions of the notes.
[2] The Reference Price need not be equal to the market price

37

citigroup

CITI 09570383



# Contractual Terms

▲ Pay-As-You-Go allows for multiple physical settlements for each Reference Obligation. If a Reference Obligation is delivered to the Issuer under physical settlement, the Issuer has the option to hold the security or sell the security as a credit risk security. Any principal collection or sales proceeds will be reinvested in the Eligible Investments until the Class A1A Swap is fully amortized

▲ If one of the three credit events has taken place, the Swap Counterparty has the right to request physical settlement on all or parts of the CDS contract

38

Confidential Treatment Requested by Citi

CITI 09570384



# C.   BIOGRAPHIES

*Information related to CSAC, its personnel (and those of its affiliates), organization, processes and historical performance information has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*

Confidential Treatment Requested by Citi



# Biographies

▶ **John G. Popp – *Managing Director and Head of The Leveraged Investments Group***

Mr. Popp is Global Head of the Leveraged Investments Group, with primary responsibility for directing the investment decision and monitoring processes and managing/overseeing LIG's global investment strategy. Mr. Popp chairs the LIG ABS Credit Committee. Prior to joining LIG, Mr. Popp was a founding partner and head of asset management of First Dominion Capital, LLC, overseeing the management of $2.5 billion in CDO Vehicles. From 1992 through 1997, Mr. Popp was a Managing Director of Indosuez Capital and also served as President of Indosuez Capital Asset Advisors, Inc., and President of 1211 Investors, Inc. While at Indosuez, Mr. Popp was responsible for building that firm's asset management business, including the development of three CDO Vehicles aggregating $1.3 billion. Prior thereto, Mr. Popp was a Senior Vice President in the Corporate Finance Department of Kidder Peabody & Co., Inc., which he joined in 1989. Mr. Popp had previously been a Vice President in the Mergers and Acquisitions Department of Drexel Burnham Lambert. Mr. Popp is a council member of The Brookings Institution and a member of The Juilliard School Council. He holds a B.A. from Pomona College and a M.B.A. from the Wharton Graduate Division of the University of Pennsylvania.

▶ **Andrew H. Marshak – *Managing Director***

Mr. Marshak has global responsibility for overseeing LIG's portfolio management and trading. Mr. Marshak is a member of the LIG ABS Credit Committee. Prior to joining LIG, Mr. Marshak was a Managing Director and a founding partner of First Dominion Capital, LLC, which he joined in 1997 from Indosuez Capital, where he served as a Vice President. Prior to joining Indosuez Capital in 1992, Mr. Marshak was an Analyst in the Investment Banking Department of Donaldson, Lufkin & Jenrette. He holds a B.S., Summa Cum Laude, from the Wharton School of The University of Pennsylvania.

39

CITI 09570386



# Biographies (continued)

▶ **David H. Lerner** – *Managing Director*

Mr. Lerner is a portfolio manager and trader for LIG. Prior to joining LIG, Mr. Lerner served as Senior Vice President of First Dominion Capital, LLC, which he joined in 1998 from The Mitsubishi Trust and Banking Corporation where he was a Vice President in the Leveraged Finance Group. Prior thereto, Mr. Lerner was in the Corporate Finance Group at Banque Francaise where he also served as Vice President. Mr. Lerner began his career as an Associate at The Chase Manhattan Bank, and holds a B.B.A. from the George Washington University.

▶ **Samir Bhatt** – *Director*

Mr. Bhatt joined LIG in 2004 and is a member of the LIG ABS Credit Committee. Mr. Bhatt is lead ABS credit analyst and currently covers CDO's, RMBS and ABS. Prior to joining LIG, Mr. Bhatt worked in the structured finance markets for seven years, the first five in the Structured Products Research group at Credit Suisse First Boston and the previous two as an ABS research analyst and structurer at JP Morgan Chase. Mr. Bhatt holds a B.S. in Computer Science from Cornell University.

▶ **Glenn Clarke** – *Director*

Mr. Clarke joined LIG in 2005 and is resident in London. Mr. Clarke is the European portfolio manager and trader for LIG. Prior to joining LIG, Mr. Clarke was an Associate Director with AIB Capital Markets European Leveraged Finance team, which he joined in 2000. At AIB, he was responsible for sourcing and executing leveraged transactions for both the Bank's balance sheet and CDO's. Mr. Clarke began his career as an Assistant Manager at the Commonwealth Bank of Australia in 1997, and holds a B.Comm from the Murdoch University, Western Australia.

40

CITI 09570387



# Biographies (continued)

▶ **Thomas J. Flannery** – *Director*

Mr. Flannery joined LIG from First Dominion Capital, LLC, where he served as an Associate. Mr. Flannery joined First Dominion Capital, LLC in 1998 from Houlihan Lokey Howard & Zukin, Inc., where he served as an analyst in the Financial Restructuring Group, working on a variety of debtor and creditor representation assignments. Mr. Flannery is a member of the LIG ABS Credit Committee and currently is a credit analyst covering the leisure and entertainment industries and a high yield bond trader. Mr. Flannery holds a B.S. from Georgetown University.

▶ **Linda R. Karn** – *Director*

Ms. Karn is a member of the European LIG Credit Committee and currently covers the media, telecommunications and publishing sectors. Prior to joining LIG as a credit analyst, Ms. Karn served as a Vice President of First Dominion Capital, LLC, which she joined in 1998 from TD Securities (USA) Inc. where she served as a Vice President in the Media and Telecommunications Institutional Equity Research Group. Prior thereto, Ms. Karn was an Analyst in the High Yield Research Group at NationsBanc Capital Markets, Inc. Ms. Karn holds a B.S. from Babson College.

▶ **Michael Shackelford** – *Director*

Mr. Shackelford is a member of the LIG ABS Credit Committee. He joined LIG in 2006 and is primarily responsible for overseeing LIG's ABS investments. Prior to joining LIG, Mr. Shackelford was a portfolio manager and trader with INVESCO Institutional (N.A.) Inc. responsible for managing their ABS CDO portfolios. Prior to that Mr. Shackelford was a portfolio manager and trader with AEGON USA Investment Management, LLC. He was also with Credit-Based Asset Servicing and Securitization LLC (C-BASS) in their capital markets group. Mr. Shackelford began his investment career with The Money Store Inc. as a credit analyst and later traded whole loan portfolios. He holds a B.A. in Economics from the University of Texas at Austin and a M.A. in Economics from California State University, Sacramento.

41

Confidential Treatment Requested by Citi

CITI 09570388



# Biographies (continued)

▶ **James M. Potesky – *Director***

Mr. Potesky joined LIG in 2001 as a credit analyst from the Global High Yield Research group at Morgan Stanley where he served as a Vice President and senior chemical industry analyst. From 1998 to 2000, he was a Vice President and chemical industry analyst for the high yield department of Schroeder & Company. From 1990 to 1998, Mr. Potesky was a Director and senior credit analyst at the Standard and Poor's Ratings Group. He began his career as a corporate loan officer at Morgan Guaranty Trust Company in the early 1980s. Mr. Potesky currently covers automotive and chemical industries. Mr. Potesky holds a B.A. in Political Science from Washington University.

▶ **Vance P. Shaw, CFA – *Director***

Mr. Shaw joined Credit Suisse Group in 1998 as a senior high yield credit analyst. Mr. Shaw joined LIG in 1998 and currently covers the energy and utility industries. From 1995 to January 1998, Mr. Shaw was Director of High Yield Bond Research at Scotia Capital Markets in New York. Prior to joining Scotia, Mr. Shaw was a Senior Analyst - High Yield Industrials at Lehman Brothers Inc. Mr. Shaw served as a high yield analyst at Kidder Peabody & Co. from 1989 to 1991 and as a senior high yield research analyst at Prudential Capital Management from 1986 to 1989. Mr. Shaw covered U.S. and foreign banks as an analyst at the Federal Reserve Bank of New York from 1982 to 1985. He received his B.S. in Accounting and Finance from New York University and is a Chartered Financial Analyst.

▶ **Lauri Whitlock – *Director***

Ms. Whitlock joined CS in 2000 as manager of Post Venture Distribution Management Operations. She joined LIG as Middle Office Manager in 2001. From 1997 to 2000, Ms. Whitlock served as manager of Financial and Regulatory Reporting at Salomon Smith Barney. Prior to joining Salomon Smith Barney, Ms Whitlock served as Assistant Controller at Raymond James and Associates. Ms. Whitlock began her career at Price Waterhouse auditing financial services companies. Ms. Whitlock holds a B.S. in Accounting from the University of Maryland.

42

CITI 09570389



# Biographies (continued)

▶ **Adrienne Dale** – *Vice President*

Ms. Dale joined LIG in 2005 as a credit analyst and currently covers the automotive, retail and restaurant sectors. Prior to joining the group, Ms. Dale worked at CIBC World Markets as a credit analyst in the High Yield Research Group, where she covered the automotive supplier and retailer sectors. Ms. Dale earned her B.A. from the University of Pennsylvania and is completing her M.B.A. at the Stern Business School of New York University.

▶ **Edward DeBruyn** – *Vice President*

Mr. DeBruyn joined LIG in 2002 as a credit analyst and currently covers the paper/packaging and diversified manufacturing sectors. Prior to joining LIG, Mr. DeBruyn worked at Morgan Stanley, where he was a credit analyst in the Global High Yield research department covering primarily paper and packaging high yield debt issuers located in North America, South America and Asia. Before joining the research department at Morgan Stanley, Mr. DeBruyn spent two years working on Morgan Stanley's Global High Yield Sales desk. Mr. DeBruyn holds a B.S. in Business Management with a concentration in finance from Merrimack College.

▶ **Louis I. Farano** – *Vice President*

Mr. Farano joined LIG as a credit analyst in 2006 and currently covers the consumer products, food and tobacco sectors. Prior to joining the Group, Mr. Farano served as a Vice President in the High Yield department at SG America Securities Inc. Mr. Farano holds a B.B.A. in Accounting from James Madison University and an M.B.A. in Finance from UCLA's Anderson School.

43



# Biographies (continued)

▶ **Regan Hoult** – *Vice President*

Mr. Hoult joined LIG in 2006 and is resident in London. Prior to joining LIG, Mr. Hoult worked for two years at HSBC's Financial Sponsor Coverage Group. Prior to HSBC, he worked as an analyst within PriceWaterhouse Coopers' M&A Advisory division. Mr. Hoult holds a BCom and MBus from Otago University, Dunedin, and is a CFA charterholder.

▶ **Todd Kornfeld** – *Vice President and Counsel*

Mr. Kornfeld joined the legal department of CS in 2005. From 2000 to 2005, Mr. Kornfeld was an associate at Cleary Gottlieb Steen & Hamilton LLP in New York, concentrating in securities, capital markets, structured finance and derivatives. From 1998 to 2000, Mr. Kornfeld was an associate at Cadwalader, Wickersham & Taft in New York, concentrating in structured finance and derivatives. Mr. Kornfeld currently is the counsel to LIG. Mr. Kornfeld holds a B.S. in Computer Science from the State University of New York at Albany, a J.D. from Boston University and an LL.M. from New York University. Mr. Kornfeld is a member of the bar in New York, Massachusetts and Connecticut.

▶ **Ryan Lim** – *Vice President*

Mr. Lim joined LIG in 2004 and is a credit analyst currently covering the building products, metals/mining, retail and restaurants, equipment rental and environmental industries. Before joining LIG, Mr. Lim served as an Associate in the Investment and Corporate Banking Division of Harris Nesbitt. Previously, Mr. Lim was an Analyst at Goldman Sachs in the Leveraged Finance Bank Debt Portfolio Group, covering primarily industrial credits. Mr. Lim holds a B.A. in Environmental Science and Public Policy from Harvard University.

44

CITI 09570391

# Biographies (continued)

▶ **Nicholas Milovich** – *Vice President*

Mr. Milovich currently is an analyst covering the healthcare, transportation and aerospace and defense industries. Prior to joining LIG as a credit analyst, Mr. Milovich served as an Associate at First Dominion Capital, LLC, which he joined in 1999 from Bear, Stearns & Co., where he served as an Associate in the High Yield Research Group. Prior to joining Bear Stearns, Mr. Milovich served in the Equity Capital Markets Group at Lehman Brothers. Mr. Milovich holds a B.S.M.E from the General Motors Institute and an M.B.A from the University of Chicago.

▶ **William Nunez** – *Vice President*

Mr. Nunez joined LIG in 2006 as a credit analyst and currently covers CDOs and ABS. Prior to joining LIG, Mr. Nunez was a credit analyst with Merrill Lynch Investment Managers where he analyzed structure product securities. Previously, Mr. Nunez spent five years at Fitch Ratings in the ABS Consumer Group where his primary responsibilities included rating and monitoring asset backed transactions. He began his investment career with Bankers Trust Company's auction rate group. Mr. Nunez holds a B.S. in Business Administration from the Bernard Baruch College (CUNY) and a M.B.A. degree in Finance from Fordham University.

▶ **Raphael Savitz** – *Vice President*

Mr. Savitz joined LIG in 2006. Prior to joining LIG, Mr. Savitz was a credit analyst at Pinewood Capital Partners, LLC. Prior to joining Pinewood in 2004, Mr. Savitz spent two years in Citigroup's High Yield Research Group, focusing on the retail, food and drug retail and consumer products sectors. Mr. Savitz began his career in 2000 as an analyst in Salomon Smith Barney's International Debt Capital Markets Group. Mr. Savitz holds a B.S. in Finance from Yeshiva University.



45

CITI 09570392



# Biographies (continued)

► **Judy Sun** – *Vice President*

Ms. Sun joined LIG in 2005 as an analyst and currently covers structured products, primarily RMBS and ABS. Previously, Ms. Sun worked in the fixed-income research department of Freddie Mac for six years, where she developed repayment, default and pricing models for mortgage-backed securities. Ms. Sun holds a M.S. in Statistics from the University of Maryland and a B.A. in Mathematics from Randolph Macon Women's College.

► **Ayesha Chenoy** – *Associate*

Ms. Chenoy joined LIG in 2005 as a credit analyst and is resident in London. Prior to joining LIG, Ms. Chenoy served as a Manager in the Global Loan Syndication group in Barclays Capital which she joined from UBS Global Asset Management, where she served as an Associate Director in the Credit Research Group covering real estate, consumer products and industrials. Ms. Chenoy is a credit analyst covering European credits. Ms. Chenoy holds a MSc. in Accounting and Finance from the London School of Economics and a B.A. in Economics from Cambridge.

► **Ramin Kamali** – *Associate*

Mr. Kamali joined LIG in 2005 as a credit analyst and currently covers the real estate, homebuilding and financial services sectors. Prior to joining the group, Mr. Kamali was in Credit Suisse's Investment Banking Division in the Global Industrial and Services Group. Mr. Kamali joined Credit Suisse in July 2001 as an analyst and was promoted to Associate in July 2004. He holds a B.S. Degree in Economics from The Wharton School of the University of Pennsylvania.

46

Confidential Treatment Requested by Citi



# Biographies (continued)

► **Roberta Girard** – *Associate*

Ms. Girard joined LIG in 2006 as a credit analyst and is resident in London. Prior to joining LIG, Ms. Girard was an Associate in CS's European Mergers & Acquisitions Group and was previously an Analyst in CS's Global Industrial and Services Group. Ms. Girard joined CS in 2002 and is currently a credit analyst covering European credits. Ms. Girard holds a B.A. in Economics from Bocconi University in Milan.

► **Brian Herr** – *Associate*

Mr. Herr joined LIG in 2005 as a trader and credit analyst for structured products. Prior to joining LIG, Mr. Herr worked in the structured products department of Brown Brothers Harriman and Co. for two years, where his primary responsibilities included trading and sector management for the ABS, RMBS, and CMBS sectors. Prior to that, Mr. Herr was employed at Brown Brothers Harriman and Co. in a variety of positions within their institutional fixed income division. Mr. Herr holds a B.A. in Economics from Boston University.

► **Adam Kaplan** – *Associate*

Mr. Kaplan joined LIG in 2006 as a credit analyst and currently covers structured products, primarily RMBS and ABS. Prior to joining LIG, Mr. Kaplan worked in the asset backed securities department of Fitch Ratings for six years, where his primary responsibilities included rating and monitoring of asset backed transactions across a wide range of asset classes. Mr. Kaplan holds a B.A. in Economics from Queens College (CUNY) and is currently pursuing a M.B.A. degree in Finance from New York University.

47

CITI 09570394