**EXHIBIT 7**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 9268 / October 19, 2011

INVESTMENT ADVISERS ACT OF 1940
Release No. 3302 / October 19, 2011

ADMINISTRATIVE PROCEEDING
File No. 3-14594

| In the Matter of | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTIONS 203(e), 203(f), AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND CEASE-AND-DESIST ORDERS |
|---|---|
| CREDIT SUISSE ALTERNATIVE CAPITAL, LLC (f/k/a CREDIT SUISSE ALTERNATIVE CAPITAL, INC.), CREDIT SUISSE ASSET MANAGEMENT, LLC, and SAMIR H. BHATT | |
| Respondents. | |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Credit Suisse Alternative Capital, LLC (f/k/a Credit Suisse Alternative Capital, Inc.) ("CSAC") and Credit Suisse Asset Management, LLC ("CSAM") and Section 8A of the Securities Act and Sections 203(f) and 203(k) of the Advisers Act against Samir H. Bhatt ("Bhatt") (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, CSAC has submitted an Offer of Settlement of Credit Suisse Alternative Capital, LLC (f/k/a Credit Suisse Alternative Capital, Inc.) ("CSAC Offer"), CSAM has submitted an Offer of Settlement of Credit Suisse Asset Management, LLC ("CSAM Offer"), and Bhatt has submitted an Offer of Settlement of Samir H. Bhatt ("Bhatt Offer"), all of which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the

Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act, Making Findings, and Imposing Remedial Sanctions and Cease-and-Desist Orders ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that

### A. Summary

1. This matter involves violations of federal securities laws by CSAC, the predecessor of CSAM, and Bhatt, a former registered representative and portfolio manager at CSAC, in connection with the structuring and marketing of a largely synthetic collateralized debt obligation ("CDO") known as Class V Funding III ("Class V III"). The investment portfolio for Class V III consisted primarily of credit default swaps ("CDS") referencing other CDO securities with collateral consisting primarily of subprime residential mortgage-backed securities ("RMBS"). As a result, the value of Class V III and its underlying investment portfolio was tied to subprime mortgages and the United States residential housing market. CDO-squareds such as Class V III were designed to, and did, provide leveraged exposure to the housing market and therefore magnified the severity of losses suffered by investors when the United States housing market experienced a downturn.

2. Class V III was structured and marketed by Citigroup Global Markets Inc. ("Citigroup"). The marketing materials for Class V III – including a pitch book and an offering circular – represented that the investment portfolio was selected by CSAC, a registered investment adviser. CSAC promoted itself as having experience and expertise in analyzing credit risk in CDOs, using an extensive asset selection process. Undisclosed to either investors or the directors of the special purpose vehicles ("SPVs") that issued the securities to investors in Class V III, CSAC allowed Citigroup to exercise significant influence over the composition of Class V III's investment portfolio.

3. Bhatt was the portfolio manager at CSAC primarily responsible for the Class V III transaction. Bhatt was responsible for selecting the assets in accordance with CSAC's stated processes, as well as for negotiating and executing the purchase of those assets on behalf of Class V III. Bhatt and CSAC understood that Citigroup was seeking to short assets into Class V either for itself or for its customers (though did not necessarily know which), and thus that Citigroup was representing economic incentives potentially adverse to those of Class V III and its investors.

---

[1] The findings herein are made pursuant to the CSAC Offer, the CSAM Offer, and the Bhatt Offer and are not binding on any other person or entity in this or any other proceeding.

2

Rather than follow CSAC's stated asset selection process, Bhatt provided Citigroup with a list of potential assets with which he had some familiarity, and allowed Citigroup to select from the list the names on which it wanted to purchase protection. The CDO securities on which Citigroup bought protection had a notional value of approximately $500 million, representing half of the Class V III investment portfolio. Citigroup's selections were weighted towards assets that were regarded by the market as particularly risky.

4. CSAC and Bhatt also represented in the pitch book that CSAC performed extensive credit analysis on all of the assets that it selected for the portfolio. In actuality, CSAC and Bhatt performed little-to-no analysis on several of the assets in the portfolio. Specifically, CSAC and Bhatt purchased several cash bonds from deals underwritten by Citigroup without having done any credit work on those bonds. The final Class V III investment portfolio contained nine cash bonds with a total value of approximately $130 million (approximately 13% of Class V III's total investment portfolio). Of those nine bonds, six, with a face value of $92.25 million, were purchased from Citigroup. For five of the six bonds purchased from Citigroup, CSAC and Bhatt did not perform the credit analysis as represented in the marketing materials. Bhatt was responsible for purchasing these bonds.

5. The offering circular for Class V III represented that the assets in the portfolio were purchased at "fair market value." This statement was inaccurate. Rather than seeking market bids, CSAC and Bhatt purchased most of the synthetic assets (i.e. those referenced by the sale of protection via CDS) in two separate portfolio trades with Citigroup. After determining that Citigroup had paid prices well below what was available in the market for individual assets (i.e. Citigroup had purchased protection for lower premium payments than it would have had to pay for the individual assets in a market transaction as of that day) for the first portfolio trade, CSAC and Bhatt nevertheless proceeded with a second portfolio trade with Citigroup. The prices CSAC and Bhatt obtained in that second trade were higher than for the first trade, but well below what was available in the market for individual assets. CSAC and Bhatt did not take meaningful action to verify that CSAC was obtaining market prices in the transactions with Citigroup. CSAC and Bhatt did not disclose to its client or to investors in Class V III that the synthetic assets were not acquired at market value.

6. CSAC and Bhatt participated in drafting the marketing materials, including the pitch book and offering circular, and provided the original drafts of the sections concerning CSAC and its stated collateral selection process. The documents themselves attributed responsibility for the content of those sections to CSAC. CSAC and Bhatt also helped market Class V III in meetings and conference calls with actual and potential investors. CSAC and Bhatt, in the marketing materials and in conversations with investors, did not disclose material facts about both the asset selection process and the price of the assets purchased by Class V III.

7. Using the marketing materials which CSAC and Bhatt had helped draft, Citigroup sold approximately $847 million of notes across the capital structure of Class V III to approximately 15 different investors. Investors in Class V III focused on CSAC's role in selecting assets in making its investment decision. They also considered the representations about the asset purchase prices to be important.

3

8. CSAC collected approximately $1 million in fees for managing Class V III. An affiliate of CSAC also purchased equity in Class V III with a face value of $2 million for a payment of $1.3 million.

9. Class V III proved to be one of the worst-performing CDOs issued during the relevant period. As soon as it was issued, certain knowledgeable market participants noted the poor quality of the portfolio, and much of the underlying collateral declined precipitously in late 2007. By November 2007, collateral representing approximately 83% of the value of Class V III had been downgraded. As a result, an event of default was declared on November 19, 2007, making Class V III the second-fastest CDO-squared transaction to default. Investors in Class V III lost virtually their entire investments.

## Respondents

10. **Credit Suisse Alternative Capital, LLC (f/k/a Credit Suisse Alternative Capital, Inc.) ("CSAC"),** an investment adviser registered with the Commission and based in New York, was an investment adviser to various managed investment vehicles, including CDOs, throughout the relevant period. CSAC assigned its investment management agreements to its affiliate CSAM in January 2011. CSAC has not been a registered entity since December 2010. CSAC currently serves as the general partner of and administrator for certain limited partnerships, and does not serve as an investment adviser. CSAC is a wholly owned subsidiary of Credit Suisse Securities (USA) LLC, the principal U.S. broker-dealer and investment adviser subsidiary of Credit Suisse Group, a global financial services firm based in Switzerland.

11. **Credit Suisse Asset Management, LLC ("CSAM")** is an investment adviser registered with the Commission and based in New York. As a result of acquiring CSAC's investment advisory business, CSAM is the successor in interest to CSAC. CSAM is a wholly-owned subsidiary of Credit Suisse Securities (USA) LLC.

12. **Samir H. Bhatt ("Bhatt")**, age 37, worked at CSAC and related entities from 1999 to 2008. In 2004, he was part of the team in an asset management unit of Credit Suisse Securities USA that became CSAC, and was with CSAC until his departure in 2008. During 2006 and 2007, Bhatt served as a Director in CSAC's Leveraged Investment Group ("LIG"), which was responsible for the management of CDOs and other structured finance vehicles. Bhatt was a registered representative during 2006 and 2007. Bhatt resides in New York, New York.

## Other Relevant Entities

13. **Citigroup Global Markets Inc. ("CGMI,"** and along with certain affiliates, **"Citigroup")** is the principal U.S. broker-dealer subsidiary of Citigroup Inc. CGMI is a wholly owned subsidiary of Citigroup Inc. CGMI acted as the warehouse provider, arranger, initial purchaser, and placement agent for Class V III. An affiliate of CGMI served as the initial short counterparty to all the CDS assets in Class V III.

4

## Background

14.     CDOs are debt securities collateralized by fixed income obligations, such as RMBS. A CDO collateralized by bonds is known as a "cash CDO." A CDO collateralized by tranches of other CDOs is called a CDO-squared. Investors in a CDO-squared receive payments derived from the cash flows produced by the investment portfolio. The securities in the investment portfolio are packaged and held by a special purpose vehicle ("SPV"), an independent entity with its own board of directors, that issues the notes. Investors in a cash CDO-squared receive payments derived from the principal and interest paid by the underlying CDO tranches in the investment portfolio.

15.     The cash flows from the CDO-squared are distributed to the notes in a waterfall fashion, based on seniority. The "super senior" tranche is at the top of the waterfall and thus has the first right to receive principal and interest. It is considered to have the lowest likelihood of being affected by negative performance of the underlying collateral. Next in priority are the senior tranches, which are typically rated AAA or AA by the rating agencies. Below the senior tranches are the "mezzanine" tranches, rated A and BBB, which are junior in priority and, therefore, carry more risk. Below the mezzanine tranches are the subordinated notes, or equity, which are the first to experience losses based on negative performance of the underlying collateral.

16.     A CDO collateralized only by CDS is called a "synthetic CDO." A CDS is an over-the-counter derivative contract that functions like insurance on a so-called "reference asset" or "reference issuer." In a CDS transaction, a "protection buyer" makes periodic premium payments to a "protection seller." In exchange, the protection seller promises to pay the protection buyer if the reference asset experiences a "credit event," such as a default. Because the protection seller generally receives premium payments while the reference asset is performing but suffers a principal loss if the reference asset defaults, the protection seller is considered to have a long position on the reference asset. In contrast, because the protection buyer receives payments when the reference asset experiences a credit event, and thus declines in value, the protection buyer is considered to have a short position on the reference asset. Investors in a synthetic CDO-squared receive payments derived from the periodic premium payments that the SPV receives from the protection buyers on the CDS into which the SPV entered.

17.     A hybrid CDO is a CDO collateralized by both cash assets (i.e. bonds) and synthetic assets (i.e. CDS). Class V III was a hybrid CDO-squared. Typically, in a CDO-squared with synthetic assets (such as Class V III), the arranging bank, i.e. the bank that structures and markets the transaction, plays the role of initial CDS asset counterparty. In its role as initial CDS asset counterparty, the arranging bank typically acts through its trading desks as an intermediary between the CDO-squared SPV and other market participants. If there is a collateral manager, the collateral manager identifies a counterparty for a CDS that it wants to include in the investment portfolio of the CDO-squared and the arranging bank intermediates that trade (that is, sells protection to that counterparty and simultaneously buys protection from the CDO-squared) in exchange for a small "intermediation fee." In addition, the arranging bank can itself negotiate with the manager to purchase protection from the CDO, either for an interested customer or the arranging bank's own account. When the arranging bank trades directly with the CDO-squared, there is no intermediation fee. If the arranging bank sells protection to one of its customers, it

5

seeks to capture as profit the difference between what it pays for protection and what it charges its customer – the spread between the two trades.

19. Prior to the closing date in a CDO-squared transaction, it is typical for the arranging bank to have acquired most of the collateral (whether cash or synthetic) on behalf of the CDO-squared. During the resulting "warehouse" period, the arranging bank typically finances the acquisition of collateral and places that collateral in a segregated account or "warehouse." If there is a collateral manager for the CDO-squared, it is the collateral manager that directs what assets will be acquired by the warehouse. In the case of a synthetic CDO-squared, the arranging bank, in its role as initial CDS asset counterparty, will buy protection from the warehouse. When the CDO-squared transaction closes, the assets are transferred to the SPV, and the SPV becomes the protection seller. The SPV uses the money from investors in the CDO-squared's notes to make any contingent payments due under the CDS if there are credit events on the assets in the reference portfolio. Thus, once the arranging bank sells the CDO-squared notes to outside investors, those investors have effectively taken the long side of the underlying CDS transactions.

### **CSAC Allows Citigroup to Influence the Selection of Assets for Class V III's Investment Portfolio**

19. During late 2006 and early 2007, certain hedge funds and other market participants came to believe that CDOs whose assets consisted primarily of BBB-rated subprime RMBS (so-called "mezzanine" CDOs) would experience significant losses, leading even the A-rated tranches of "mezzanine" CDOs to potentially become worthless. These market participants sought to profit from a downturn in the United States housing market by buying protection through CDS on A-rated tranches of mezzanine CDOs originated in 2006. The increased demand for protection in the market led to the widening of spreads that market participants were willing to pay for protection on A-rated tranches of CDOs. CDS premiums are typically based on a spread over a risk free funding rate, such as LIBOR. All other things being equal, a wider spread on a CDS indicates a higher level of perceived riskiness in the reference asset underlying the CDS. With this widening of spreads, internal discussions began at Citigroup about the feasibility of structuring and marketing a CDO-squared collateralized by A-rated tranches.

20. On November 1, 2006, CSAC and Bhatt spoke with representatives of Citigroup to discuss the possibility of CSAC managing a CDO-squared to be underwritten by Citigroup. After the meeting, a Citigroup employee emailed Bhatt and Bhatt's supervisor, the head of LIG, with the subject line "CDO-squared Proposal – Portfolio," which read, "Thanks for taking the time to talk about the CDO-squared proposal earlier today. . . As discussed, I'm attaching herewith a list of about 30 CDOs that are contemplated to be in the portfolio. This is a first cut, but should be good enough to give both parties an idea of whether or not a trade is feasible." Attached was a list of 25 CDOs (the "Citigroup November 1 List").

21. Twenty-two of the 25 CDOs on the list provided by Citigroup were mezzanine CDOs. Mezzanine CDOs were perceived as risky investments (generally with higher spreads as a result). All 22 of the mezzanine CDOs on the Citigroup November 1 List were "2006 vintage," meaning they were structured and sold in 2006. 2006 vintage CDOs were perceived as being more risky than CDOs of earlier vintages, due to their exposure to mortgages originated in 2006. Many

6

of the CDOs on the Citigroup November 1 list were CDOs for which Bhatt knew there was a large amount of demand in the market to short. In other words, Bhatt should have known that Citigroup was proposing a portfolio weighted towards CDOs that many market participants believed would perform poorly.

22. In an internal email on November 2, the head of Citigroup's CDO Trading desk, who had supplied the list that was provided to CSAC on November 1, indicated that Bhatt was "amenable" to including in the prospective CDO-squared the assets that Citigroup suggested.

23. Between November 1 and December 21, Citigroup and CSAC held intermittent discussions regarding the potential agreement between the two firms for the CDO-squared, including extensive negotiations about the fee to be paid to CSAC. During that period, spreads continued to widen on A-rated tranches of mezzanine CDOs. In late December 2006, CDS spreads on single-A CDO tranches widened further, and Citigroup renewed its efforts to finalize the engagement with CSAC and move forward with the CDO squared. As a result of those efforts, CSAC and Citigroup agreed to proceed with the transaction.

24. On December 21, 2006, Bhatt held conversations with Citigroup personnel about moving forward with the CDO-squared. After those discussions, Bhatt sent Citigroup an email with a list of 127 CDO names for potential inclusion in the CDO-squared ("Bhatt December 21 List"). The 127 names, which Bhatt described as "[CDOs] that we own some part of in [other CDOs managed by CSAC] . . . [and] other deals I am familiar with," were diversified by deal type and vintage, with only a portion represented by recent-vintage, mezzanine CDOs. The list included approximately 19 of the original 25 names Citigroup provided CSAC on November 1, 2006.

25. Citigroup and CSAC executed an engagement letter on or about January 8, 2007, pursuant to which Citigroup agreed to arrange and place a CDO-squared with an investment portfolio of primarily cash and synthetic investments in CDOs, and CSAC agreed to select and manage that portfolio. The engagement letter provided that Citigroup would function as warehouse provider for the CDO-squared, and that CSAC, as manager, would "direct the purchase of securities" into the warehouse "for subsequent delivery by Citigroup to [the CDO SPV] on the Closing Date at the price such securities were purchased . . . ."

26. At approximately 9:58 AM on January 8, 2007, the Citigroup salesperson responsible for the CSAC account forwarded to Bhatt an email from a Citigroup CDO trader. The Citigroup CDO trader had written, "Here are the names where we would like to buy protection from CSAC," and had selected 25 names from the Bhatt December 21 List (the "Citigroup January 8 List"). All 25 of the names on the Citigroup January 8 List were mezzanine CDOs, and 24 of the 25 were from the 2006 vintage. Sixteen of the 25 names on the Citigroup January 8 List were also on the Citigroup November 1 List. Five of the nine names from the Citigroup November 1 List that were not on the Citigroup January 8 List were actually on the CSAC December 21 List, but Citigroup did not seek to short those names on January 8.

27. By approximately 10:57 AM, less than one hour later, CSAC had agreed to include all 25 of the names from the Citigroup January 8 List in the Class V III investment portfolio.

While CSAC had performed some due diligence on most of the 25 names on the Citigroup January 8 List at some point in the past, there is no evidence that CSAC undertook any additional action to analyze the collective properties of the particular set of 25 names on the Citigroup January 8 List to assess their propriety for use as collateral for Class V III.  Instead, CSAC simply agreed to fill half of the portfolio with the names that Citigroup wanted to short.

28. By approximately 12:34 PM, Bhatt had agreed to sell protection to Citigroup for $10 million face value on each of the 25 names, for a total of $250 million, or half of the anticipated total dollar value of the Class V III portfolio.

29. On January 12, 2007, Citigroup and CSAC agreed to double the total size of Class V III to $1 billion.  Bhatt agreed to allow Citigroup to short another $10 million each of the 25 names from the Citigroup January 8 List.  Thus, following the additional $250 million trade on January 12 (the "January 12 Upsize Trade), the assets that Citigroup selected and shorted comprised $500 million of the anticipated $1 billion total Class V III portfolio.  Notwithstanding all of the indications that there was significant demand in the market for protection on A-rated tranches of 2006 mezzanine CDOs, CSAC executed the January 12 Upsize Trade directly with Citigroup, without seeking competitive bids.

### CSAC Purchases Certain Citigroup Bonds without Performing Credit Analysis

30. The majority of the final Class V III portfolio was comprised of synthetic assets.  However, the portfolio also included nine actual bonds issued by other CDOs ("cash assets," and collectively, the "cash portfolio.")  As with the synthetic portfolio, CSAC, as the manager, had the responsibility for identifying, evaluating, and selecting cash assets for the Class V III portfolio.

31. Bhatt directed the purchase of nine cash assets for the Class V III portfolio, with a face value of approximately $130 million.  Of those nine bonds, six were purchased from Citigroup, with a total face value of approximately $92.25 million ("Citigroup Cash Assets").  The Citigroup Cash Assets were all tranches of CDOs structured and marketed by Citigroup.

32. CSAC's internal policies required that, in connection with CSAC's selection of CDO assets for portfolios that it managed, certain types of analysis must be performed in order to assess the asset prior to its purchase for the portfolio.  The analysis that CSAC was supposed to perform or obtain for each CDO asset was listed on a document titled "Documentation Requirements for Deal files – ABS Transactions" ("CDO Documentation Requirements").  Bhatt was aware that the analysis required by the CDO Documentation Requirements should have been performed for every CDO asset purchased by CSAC.

33. Bhatt directed the purchase of four of the Citigroup Cash Assets without having performed or obtained the analysis called for by the CDO Documentation Requirements.  Of the remaining two Citigroup Cash Assets, CSAC obtained the full analysis spreadsheet for only one, and obtained only partial results for another.  By contrast, Bhatt did obtain or perform the analysis called for by the CDO Documentation requirements for all three of the cash assets that were not purchased from Citigroup.

8

## **CSAC Failed to Obtain Market Value in the Two Portfolio Trades with Citigroup**

34. CDS assets are typically priced based on a spread over a risk free funding rate, such as LIBOR. For example, if a CDS trades at a spread of L+ 200 basis points, that means that the protection buyer will pay a total of LIBOR plus 2% per year of the insured amount to the protection seller. All other things being equal, a wider spread on a CDS indicates a higher level of perceived riskiness in the reference asset. Obtaining a fair market price for the assets in the investment portfolio is the responsibility of a CDO manager. With synthetic assets, that means the CDO manager should seek the widest spreads (i.e. the highest price) available for the assets in the CDO's investment portfolio. The wider the spread, the greater the amount of money available to the CDO to pay off the notes and the equity tranche.

35. When a manager wants to purchase synthetic assets for a CDO, the manager typically does so in one of two ways. The most common method is by conducting what is called a "BWIC," which stands for Bids Wanted in Competition. Simply put, a BWIC is a competitive bidding process in which the manager sends out, through various dealers, a list of reference assets on which it wishes to sell protection. Interested parties provide their bid (i.e. the widest spread they are willing to pay for protection), and, assuming the bids meet the manager's minimum requirements, the manager will then typically trade with the highest bidder. Conducting a BWIC helps ensure that the manager receives a fair market price for the assets.

36. Alternatively, the manager can source synthetic collateral by negotiating directly with a counterparty, such as a dealer who the manager knows has an "axe," or mandate to trade, on a specific name. The collateral manager uses its knowledge of the market and the specific reference asset to negotiate a price for the trade. If a manager decides to trade directly with a counterparty, the manager generally verifies that the price at which it is trading is fair and reasonable. Managers typically obtain such verification either by contacting other market participants to see where they would bid for assets, or by comparing the prices to contemporaneous trades in identical or similar assets.

37. CSAC and Bhatt agreed to prices on Citigroup's purchase of protection on $500 million of assets in the Class V III investment portfolio that were significantly lower than what was available in the market for those individual assets at the time of the trades. Rather than seeking market bids for the assets in the portfolio, CSAC purchased (i.e. sold protection on) most of the synthetic assets in the two separate portfolio trades with Citigroup, in order to allow Citigroup to source, or act as the protection buyer on, a significant portion of the collateral. Despite recognizing that Citigroup had paid prices (i.e. had agreed to pay ongoing premiums) significantly below those available in the market at the time of the first portfolio trade, CSAC and Bhatt nevertheless proceeded with a second portfolio trade with Citigroup at prices that, although higher than those for the first portfolio trade, it knew or should have known were below what was available in the market.

38. On the morning of January 8, 2007, within approximately two hours after CSAC agreed to allow Citigroup to short the names from the Citigroup January 8 List, Bhatt agreed to sell protection on $10 million of each name to Citigroup at an average spread of 200.8 basis points. Bhatt took no action to verify that the price he was accepting was a market price. Rather, Bhatt

9

based his position on prices at which he had seen similar assets trade in mid-December 2006. Internal Citigroup documents show that it was willing to pay up to 23% higher spreads for some of the names in the portfolio trade, and that Citigroup was willing to pay an average spread of 214.8 basis points for the portfolio trade as a whole – fully 14 basis points higher than CSAC obtained, which would translate to $350,000 per year in additional payments to Class V III.

39. Between the January 8 and January 12, 2007 trades with Citigroup, CSAC received sufficient information to put it on notice that significantly higher prices were available in the market than it had demanded from Citigroup. For example, on January 8, another collateral manager ("Third Party Manager") conducted a BWIC for 26 A-rated tranches of 2006 vintage mezzanine CDOs, seven of which were also part of the January 8 Portfolio Trade. As was customary in the market, after the BWIC was completed, the Third Party Manager distributed to various market participants a list showing the second-highest bid ("cover") that it received on each asset. For the seven assets that appeared in both the BWIC and the January 8 Portfolio Trade, the manager obtained a 21% higher spread, on average, than CSAC obtained from Citigroup in the January 8 Portfolio Trade. For the Third Party Manager's complete list of 25 names (one did not trade), the average cover (that is, *second* highest bid received) was 238.2 basis points, or an approximately 18.6% higher spread, on average, than CSAC obtained on a virtually identical asset pool in its portfolio trade with Citigroup. Several individuals at CSAC, including Bhatt, received the list of the Third Party Manager's BWIC covers on the afternoon of January 8.

40. In addition, between January 8 and January 12, Bhatt received at least three inquiries from other market participants seeking to buy protection from CSAC on assets which had been part of the January 8 Portfolio Trade. In each instance, the *bid* was higher than the price received by CSAC from Citigroup on January 8.

41. CSAC had even more direct evidence of how far below market the January 8 Portfolio Trade had been executed. On January 10, in order to fill out the rest of the Class V III synthetic portfolio, CSAC conducted a BWIC (the "January 10 BWIC") for additional A-rated, 2006 vintage mezzanine CDO tranches that it selected for the Class V III portfolio. Eighteen of the assets on the January 10 BWIC were placed into the Class V III portfolio. For the 18 assets on the January 10 BWIC, CSAC received an average spread of 252 basis points, a 25% higher spread than CSAC received from Citigroup in the January 8 Portfolio Trade. Bhatt conducted the January 10 BWIC for CSAC.

42. On January 12, 2007, Citigroup and CSAC executed the January 12 Upsize Trade. While CSAC did obtain more from Citigroup on January 12 than it did on January 8, CSAC knew or should have known that the price Citigroup paid on January 12 was in many cases still significantly lower than prices that were available in the market. For the three overlapping assets, the prices on the January 12 Upsize Trade were even lower than the bids on those assets that CSAC received from other market participants between January 8 and January 12. Indeed, the average spread that CSAC received for the 25 assets in the January 12 Upsize Trade was 230.8 basis points, significantly lower than the spreads that CSAC itself obtained for similar assets in the January 10 BWIC.

43. As of the time of the January 8 Portfolio Trade, CSAC and Citigroup had agreed to a "spread target" for the Class V III portfolio of 215 basis points, meaning the goal was for the weighted average spread of the assets in the portfolio to meet that target. Because the weighted average spread of the January 8 portfolio trade with Citigroup was only 200.8 basis points, CSAC was forced to add assets with wider spreads, and thus more risk, to achieve the target spread. This meant that even the portion of the portfolio selected without any influence by Citigroup was tilted towards higher risk assets than might otherwise have been the case. Had CSAC obtained market prices in the first portfolio trade, it could have sought less risky assets to complete the ramp, while still achieving the target spread. Essentially, by selling protection to Citigroup for below-market spreads, CSAC was assuming heightened risk for Class V and its investors without the necessary corresponding increase in premiums.

### CSAC's and Bhatt's Roles in Drafting Misleading Marketing Materials

44. The primary marketing materials for Class V III were the offering circular (similar in content to a prospectus in a registered offering) and the pitch book (a PowerPoint presentation provided to potential investors). Both documents represented that CSAC selected the investment portfolio pursuant to a detailed asset selection process. The marketing materials failed to disclose Citigroup's influence over the asset selection process and CSAC's deviations from its advertised process. The marketing materials also falsely represented that the assets were acquired at "fair market value."

45. CSAC and Bhatt helped draft a 64-page pitch book for Class V III dated February 2007, which was finalized on or about February 5, 2007. The pitch book described CSAC as the "Collateral Manager," and stated that the collateral for Class V III had been "selected" by CSAC. Specifically, CSAC and Bhatt were responsible for the contents of a 25-page section of the pitch book, titled "The Manager." The first page of the "Manager" section included a disclaimer that read, "*Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*"

46. The "Manager" section supplied by CSAC provided an overview of CSAC, and described its track record, investment philosophy, and most significantly, included a detailed, 9-page section titled "Portfolio Construction and Management," purporting to describe CSAC's rigorous approach to selecting each asset it put in the investment portfolio of its CDOs. In this section, CSAC claimed that it "utilizes a credit-intensive, relative value investment approach in managing structured finance assets," and that it "believes performance is driven by a strong credit culture and systematic investment process." In another sub-section, CSAC described its "CDO Investment Process," which it claimed included three steps: "Evaluation of Transaction Structure," "Evaluation of Collateral Manager," and "Evaluation of Underlying Collateral." Another page represented that a key element of CSAC's "process" was "bottom-up fundamental security selection." The "Portfolio Construction and Management" section also contained screenshots and descriptions of the detailed modeling and analysis that CSAC claimed to undertake in connection with its credit selection process.

11

47. Various CSAC personnel, including Bhatt, participated in the original drafting of the "Manager" section in connection with previous transactions. For Class V III, Bhatt reviewed and commented on multiple drafts of the pitch book, including the "Manager" section, in late January and early February 2007.

48. In addition to the pitch book, CSAC and Bhatt participated in drafting the 210-page offering circular for Class V III dated February 26, 2007. The offering circular states in at least six separate locations that the portfolio was "selected" by CSAC, and emphasizes the importance of CSAC's process for asset selection. A Risk Factor states that the performance of Class V III's investment portfolio "depends on the investment strategy and investment process of the Manager in analyzing, selecting and managing the [portfolio]."

49. Similar to the pitch book, CSAC and Bhatt were responsible for the contents of a section titled "The Manager," which included the following disclaimer: "*Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*" (emphasis in original) In addition, the offering circular contains a disclaimer that

> TO THE BEST KNOWLEDGE AND BELIEF OF THE MANAGER, HAVING TAKEN ALL REASONABLE CARE THAT SUCH IS THE CASE, THE INFORMATION CONTAINED IN THE SECTIONS ENTITLED "THE MANAGER", "RISK FACTORS—POTENTIAL CONFLICTS OF INTEREST INVOLVING THE MANAGER" AND "RISK FACTORS—CDO OF CDO SECURITIES EXPERIENCE; DEPENDENCE ON MANAGER AND KEY PERSONNEL THEREOF; RELATIONSHIP TO PRIOR INVESTMENT RESULTS" IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION.

50. The "Manager" section represented that "the Manager [CSAC] will select the portfolio of Eligible Collateral Debt Securities," and that "the Manager's selection of Eligible Collateral Debt Securities is based primarily on structural and credit analysis as well as technical factors which may influence trading levels and pricing." The "Manager" section also contains a description of CSAC, details on its track record, and biographies of its officers and employees.

51. The Class V III marketing materials also assured investors that CSAC's stated asset selection procedures would be followed even for assets purchased from Citigroup. For example, one of the Risk Factors in the offering circular stated that "The Issuer [the Class V III SPVs] will purchase Eligible Collateral Debt Securities from Citigroup or any affiliate thereof only to the extent the Manager determines that such purchases are consistent with the investment guidelines and objectives of the Issuer, the restrictions contained in the Indenture and applicable law," and continued, "all purchases of such Eligible Collateral Debt Securities from any third party (including . . . [CGMI] or any of its affiliates) will be . . . at fair market value (as determined by the Manager in its discretion at the time such Eligible Collateral Debt Security is originally acquired pursuant to the Warehousing Facility) and otherwise on an 'arm's length basis'. . . ."

52. Bhatt reviewed and provided edits to multiple versions of the offering circular in early February 2007.

53. As described above, neither the pitch book nor the offering circular contained a description of the actual process by which the assets in the Class V III investment portfolio were selected. There was no description in either document of either the significant role played by Citigroup in the selection process, or the fact that CSAC purchased several of the cash assets without following its internal procedures for evaluating those bonds.

54. On February 28, 2007, the closing date for the Class V III transaction, CSAC entered into a Management Agreement pursuant to which the Class V III SPV appointed CSAC as its investment adviser and CSAC agreed to select and manage the collateral. Bhatt signed the Management Agreement on behalf of CSAC. The Management Agreement executed by Bhatt on behalf of CSAC contained a certification to the SPV, CSAC's client, that the sections of the offering circular cited above "are true and correct in all material respects and do not omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading." On the basis of this certification, the Directors of the SPV authorized the issuance of the offering circular for use in marketing Class V III to potential investors.

## **Violations**

55. Section 206(2) of the Advisers Act prohibits investment advisers from "engage[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." Section 206(2) of the Advisers Act imposes a fiduciary duty on investment advisers obligating them to disclose all material information to their client. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194-97 (1963). Proof of scienter is not required to establish a violation of Section 206(2), but rather may rest on a finding of simple negligence. *SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing *Capital Gains*, 375 U.S. at 194-95.) *See also SEC v. Wash. Inv. Network*, 475 F.2d 392, 396 (D.C. Cir. 2007). Negligence is sufficient to establish liability for causing a primary violation that does not require scienter. *In the Matter of KPMG Peat Marwick LLP*, Admin. Proc. No. 3-9500 (2001).

56. Section 17(a)(2) of the Securities Act prohibits any person "in the offer or sale of any securities or securities-based swap agreement . . . to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Scienter is not required to establish violations of Section 17(a)(2). *See Aaron v. SEC*, 446 U.S. 680, 697 (1980). Instead, violations of this section may be established by showing negligent conduct. *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir. 1997).

57. As a result of the negligent conduct described above, CSAC and CSAM willfully[2] violated Section 206(2) of the Advisers Act and Section 17(a)(2) of the Securities Act.

---

[2] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C.

58. As a result of the negligent conduct described above, Bhatt willfully violated Section 17(a)(2) of the Advisers Act, and caused CSAC's violation of Section 206(2) of the Advisers Act.

## IV.

In view of the foregoing, the Commission deems it appropriate, in the public interest to impose the sanctions agreed to in the CSAC Offer, the CSAM Offer, and the Bhatt Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Sections 203(e), 203(f), and 203(k) of the Advisers Act, it is hereby ORDERED that**:**

A.  Respondents CSAC and CSAM shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act and Section 206(2) of the Advisers Act.

B.  Respondent Bhatt shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act and Section 206(2) of the Advisers Act.

C.  Respondent Bhatt be, and hereby is, suspended from association with any investment adviser for a period of six (6) months, effective on the second Monday following the entry of this Order.

D.  Respondents CSAC and CSAM shall, jointly and severally, within ten (10) days of the entry of this Order, pay disgorgement of $1,000,000 and prejudgment interest of $250,000, and a civil money penalty of $1,250,000 to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. Payment shall be: (A) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Securities and Exchange Commission, Office of Financial Management, 100 F St., NE, Stop 6042, Washington, DC 20549; and (D) submitted under cover letter that identifies Credit Suisse Alternative Capital, LLC and Credit Suisse Asset Management, LLC as Respondents in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Kenneth R. Lench, Chief of the Structured and New Products Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-6561.

E.  Respondent Bhatt shall, within ten (10) days of the entry of this Order, pay a civil money penalty of $50,000 to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. Payment shall be: (A) made by wire transfer, United States postal

---

Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" *Id.* (quoting *Gearhart & Otis, Inc. v. SEC*, 348 F.2d 798, 803 (D.C. Cir. 1965)).

money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Securities and Exchange Commission, Office of Financial Management, 100 F St., NE, Stop 6042, Washington, DC 20549; and (D) submitted under cover letter that identifies Samir H. Bhatt as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Kenneth R. Lench, Chief of the Structured and New Products Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-6561.

F.  Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the disgorgement, interest and penalties referenced in paragraphs IV.D. and IV.E., above. The foregoing payments may be combined in a single Fair Fund for distribution to injured investors. Additional monies paid by any defendant or respondent in a related proceeding arising from the underlying conduct also may be added to this Fair Fund for distribution. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payments of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent CSAC, Respondent CSAM, or Respondent Bhatt by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Elizabeth M. Murphy
Secretary