# EXHIBIT 26

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )

Citigroup, Inc.                ) File No. HO-10740

                                 Amended 10/22/2010

WITNESS:    David Salz

PAGES:      1 through 169

PLACE:      Securities and Exchange Commission

            3 World Financial Center

            New York, New York  10281

DATE:       Monday, June 28, 2010

        The above-entitled matter came on for hearing, pursuant to notice, at 9:42 a.m.

Page 50

1  Q  You said that the CDS trading desk at Citi and CSAC
2  might have been working together, what do you mean by that?
3  A  My understanding in ramping the portfolio is that
4  they would go to the traders or to the banker and say that,
5  you know, we want to buy - we want exposure to this name.
6      MR. SILVERSTEIN: Who's the they you're referring
7  to?
8      THE WITNESS: A manager, Credit Swisse Alternative
9  Capital, or another manager would go to the banker and or the
10 trader depending on the relationship and say we'd like to
11 take exposure or buy the following security. So they would
12 have that dialogue. As a manager it was completely
13 consistent that they would have a dialogue with the trading
14 desk and the sales person.
15 Q  When you say dialogue, what would be involved in
16 the dialogue as you understood it?
17 A  My understanding at that time was the dialogue was
18 basically on the availability of a security, or the
19 availability to reference it and more or less price, or a
20 means to price securities, take it Citi's price or whether
21 it's going through a B lit process.
22 Q  As you understood it, would the trading desk at the
23 bank have a role in identifying potential collateral for the
24 deal?
25 A  It would be part of a dialogue that as a trading

Page 51

1  desk who has a broader view of the market, you know, would
2  see something at an attractive spread would talk to a
3  portfolio manager, it's completely consistent.
4  Q  You said it was practice as you understood it for
5  the trading desk to be the protection buyer on the
6  collateral, is that correct?
7  A  The way the CDOs were being structured at that
8  time, yes, the CDS was the counter party. However, if a
9  manager wanted to go out to another party and have them
10 intermediate through Citigroup that was generally allowed
11 also.
12 Q  I think you just said that your understanding was
13 that the trading desk, which would be the protection buyer
14 would have some input as to - not input, I'm sorry, would
15 participate in a dialogue with the manager as to what credits
16 might go into the portfolio?
17 A  Yes, like a market, you know, here are the products
18 that we're seeing, here are the prices. They may say these
19 look cheap, these look rich.
20 Q  Was there any concern as an investor about the
21 protection buyer identifying names for the portfolio? In
22 that instance wouldn't the protection buyer have an incentive
23 to pick weaker names that are investments on the short side?
24 A  You've asked me to answer this from first quarter
25 2006?

Page 52

1  Q  Yes. Was that a concern at the time?
2  A  It was a concern that the manager was independent
3  in reviewing these names. One of the questions that we would
4  typically ask in a due diligence session is how many bonds
5  did you look at and how many did you select, so we expected
6  that managers would look at, you know, a large universe of
7  bonds. So it doesn't bother me that a trading desk would be
8  offering, you know, a series of bonds, but we implicitly
9  trusted the managers to pick better securities on average.
10 That's at least what our objective was.
11 Q  Did the manager have more information about
12 particular credits than Ambac did?
13 A  Yes.
14 Q  What type of information would a manager have?
15 A  Well, a manager was building a portfolio bond by
16 bond. He was - he catered to the street on each of those
17 securities in terms of information. He would probably have
18 - he would have more people working in terms of analysis,
19 you would expect that. So yes, you would expect a manager to
20 know a lot more about the bonds in the portfolio.
21 Q  Was that one of the reasons that you wanted a
22 manager on the deal?
23 A  Yes.
24 Q  Would Citigroup have more information about
25 particular credits than Ambac did?

Page 53

1  A  Absolutely. I mean again, we were not in the
2  trading area.
3  Q  You did say you had a trading desk?
4  A  A trading desk, but we weren't - given our
5  portfolios CDOs ABS were not something that we invested in at
6  the time for a number of reasons. We were more of a buy and
7  hold account, an insurance account, so we weren't an active
8  trader. Citigroup, Goldman, and any street firm was making a
9  market in these securities and would have insights to what
10 the two way flow was. Particular - we're an end user versus
11 an actual trading entity. I should have said we were - I
12 mean we were a buy and hold account. We had a trading desk
13 but it was a portfolio management trading desk.
14 Q  So would Citi have more information to develop a
15 view on the credit quality of a particular asset than Ambac
16 would?
17 A  Absolutely. We were concerned about that too.
18 Q  How so?
19 A  I mentioned earlier that we didn't participate in a
20 lot of the dealer Bespoke transactions, in part was because
21 we felt it was a lot of internal information gathered from
22 the market that we clearly did not have, and in part that's
23 why we required a third party manager to look over the
24 portfolio in addition to our oversight too. Given the number
25 of securities that we were looking at, given the number of

14 (Pages 50 to 53)

Page 90

1  could all transpire and it would be hard for a third party
2  looking at the transaction to figure that out, because during
3  due diligence you push in terms of their knowledge of the
4  names, and the analytics and the packages they have on those
5  transactions and if you find something that gee, they really
6  know their credits, hands off, here's a situation where they
7  have all that. So the due diligence process was very hard to
8  figure out what was really being constructed there, other
9  than something as blatant as, you know, all 25 deals or TCW
10  deals. Not to pick on TCW, but something as blatant as that
11  type of concentration. I could give you another example.
12  Sorry. Of the 130 deals, they're probably different vintages
13  involved, we might have been able to figure some of that out.
14  We actually would have. So I mean strike it if I can. It's
15  not an issue.
16     Q  The hypothetical that I gave you, is that - I
17  guess I'm asking the same question a different way. I asked
18  whether it was consistent with what you understood from CSAC.
19  Is it inconsistent with what you understood or were told from
20  or were told by CSAC about the asset selection process?
21     A  Yeah, it is inconsistent.
22     Q  How so?
23     A  I would have expected them to build a portfolio
24  asset by asset or, you know, or add some of the names we
25  know, because CSAC had more information to those deals. I

Page 91

1  mean even though, again, I have a list of 130 names that I
2  invested in the past, well, some I invested, you know, .25
3  percent and some I invested 2 percent, because I felt very
4  comfortable with what was going on here. So any portfolio
5  bias that you were introducing there in selection is
6  obliterated of what they did, because each name was roughly
7  the same size. I think that's the case in Class V III.
8     Q  I'm going to ask another hypothetical. Would you
9  from where you sit as a fairly experienced person in the ABS
10  and CDO market, would you expect that out of between 2005 and
11  now early 2007, out of all the deals that you invested in,
12  that after that time which is to say if some of them were in
13  the early 2006 and it was now 2007, there were certain of
14  them that you would not want to invest in by that point?
15     A  I think there was a double negative in there.
16     Q  Probably more than one.
17     A  There were no deals at the time early 2007 that we
18  said that's a very risky deal we wouldn't do that. We would
19  have had surveillance all over it. We didn't have knowledge
20  at that time or the concerns that the portfolio was
21  deteriorating as fast as it actually was.
22     Q  I think I'm asking a slightly different question.
23     A  Sorry.
24     Q  Would you expect that a manager if it had invested
25  in over 100 deals by early 2007 would have determined -

Page 92

1  would have changed its view in terms of the credit worthiness
2  of at least one of those?
3     A  Yes, absolutely.
4     Q  And probably more than one?
5     A  Yes, yes, in the same way that, you know, I would
6  rank my portfolios and say which ones have the most concerns
7  and which ones have the least concerns. It's standard
8  practice.
9     Q  If the counter party who was going to be the short
10  counter party proposed a sub set of approximately half of a
11  portfolio to a manger, would you expect the manager to reject
12  any of those proposed names, or what would you expect a
13  manager to do in that instance is probably a better question.
14     A  Thanks. Again, you would expect a manager to go
15  through the names and also to challenge why are these names
16  being proposed here, what's their role. If they were the
17  equity holder that would explain something, but if they're
18  the short on the other side as we've all learned that's a
19  different story. If they had no skin in the game in the deal
20  at all other than, you know, being along for the ride. So
21  you would hope if you're hiring a good manager and you trust
22  your manager that they're skeptical about why am I seeing
23  this right now, because that's market information, that's the
24  purest sense and I would never see that.
25     Q  What is that, there is short interest in particular

Page 93

1  names?
2     A  Well, there is - yes, someone has an interest in
3  shorting it, I'm not going to say that that's good or bad,
4  but it certainly should raise your antenna and say maybe I
5  should take a look at the assets a little further. Going
6  back to your example, you know, would you update your credit
7  write up, yes.
8     Q  But just to push back a little, I mean the mere
9  fact that they are able to go into a synthetic portfolio
10  means that they're short interest in those particular names,
11  right?
12     A  Sure.
13     Q  I mean you have a counter party?
14     A  Yeah, yeah, that is true. Thinking back to 2007 we
15  were led to believe that, and I think I wrote this in one of
16  the underwriting memos that the shorts so to speak were not
17  very specific about the names that they were shorting and
18  that the market itself was moving - there wasn't much
19  differentiation between that, which to me means, well, that's
20  an opportunity if you could pick the best names of the wider
21  spreads and that is what I believed at the time.
22     Q  What's the role of the manager in what you just
23  described?
24     A  Can you be more specific?
25     Q  Sure, let me rephrase it. Was your view as you

Page 166

1  short break during which there was no discussion of substance
2  between the staff and Mr. Salz or his counsel, is that
3  correct?
4      THE WITNESS:  Yes.
5      MR. FELLER:  Was there something you wanted to add
6  or clarify?
7      THE WITNESS:  No.
8      MR. FELLER:  Great. That was easy. Then we're
9  going to adjourn for now. Counsel, we, I think we're going
10 to be in touch about the notes.
11     MR. PICKHARDT:  Yes.
12     MR. FELLER:  So I'll look forward to a lengthy
13 phone call with you I'm sure. Other than that we have no
14 further questions at this time. If we want to speak with you
15 further we'll contact your counsel. Thank you for coming in.
16 We're off the record at 5:09.
17     (Whereupon, at 5:09 p.m., the hearing was adjourned.)

Page 167

1           C E R T I F I C A T E
2
3      I, Kelly Sellers, hereby certify that the foregoing
4  transcript consisting of 169 pages is a complete, true and
5  accurate transcript of the investigative hearing, held on
6  Monday, June 28, 2010 at 3 World Financial Center, New York,
7  New York, in the matter of Citigroup, Inc. I further certify
8  that this proceeding was recorded by Nicole Pino and that the
9  foregoing transcript has been typed and proofread by me.

12 Typist/Proofreader            Date

Page 168

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2            REPORTER'S CERTIFICATE
3
4  I, Nicole Pino, reporter, hereby certify that the
5  foregoing transcript of 169 pages is a complete, true, and
6  accurate transcript of the testimony indicated, held on June
7  28, 2010 at Securities and Exchange Commission, 3 World
8  Financial Center, New York, New York 10281, in the matter
9  of: Citigroup, Inc.
10
11 I further certify that this proceeding was recorded by me and
12 that the foregoing transcript was prepared under my
13 direction.
14
15 Date: _____
16
17 Official Reporter: _____

Page 169

1       PROOFREADER'S CERTIFICATE
2
3  In the Matter Of: Citigroup, Inc.
4  Witness:  David Salz
5  File Number: HO-10740
6  Date: June 28, 2010
7
8  Location:  Securities and Exchange Commission
9             3 World Financial Center
10            New York, New York 10281
11
12     This is to certify that I, Kelly Sellers, the
13 undersigned, do hereby swear and affirm that the attached
14 proceedings before the United States Securities and Exchange
15 Commission were held according to the record and that this is
16 the original, complete, true and accurate transcript that has
17 been compared to the reporting or recording accomplished at
18 the hearing.

21 Proofreader              Date