UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>                         Plaintiff,<br><br>    v.<br><br>BRIAN H. STOKER,<br><br>                         Defendant. | Case No. 11-CIV-7388 (JSR)<br><br>ECF Case |

**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF DEFENDANT BRIAN H. STOKER'S MOTION FOR SUMMARY JUDGMENT**

661994.01

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern

District of New York, Defendant Brian H. Stoker respectfully submits the following Statement

of Undisputed Material Facts in support of his Motion for Summary Judgment.[1]

## I.   MR. STOKER IS ENTITLED TO SUMMARY JUDGMENT ON THE SEC'S SECTION 17(a)(2) CLAIM.

### A.   Mr. Stoker was not legally responsible for the alleged omissions from the Class V III Pitchbook and Offering Circular.

#### 1.   Mr. Stoker did not have ultimate authority or personal and primary responsibility for the alleged misleading statements in the Pitchbook.

1.      Overall responsibility for the Class V III Pitchbook was shared by numerous

people, including: Citigroup employees at the structuring desk; Citigroup counsel; attorneys at

Milbank, counsel for the Class V III SPV; CSAC employees; and in-house and external counsel

for CSAC.  Dooley Decl. Ex. 1, (SEC Investigative Deposition of R. Keith Pinniger ("Pinniger

Invest. Tr.")) at 272:21-273:10[2]; Ex. 2 (Deposition of Nestor Dominguez ("Dominguez Tr.")) at

164:20-165:6; Ex. 3 (Deposition of Darius Grant ("Grant Tr.")) at 20:4-14; Ex. 4 (SEC

Investigative Deposition of Samir Bhatt ("Bhatt Invest. Tr.")) at 142:4-17, 192:11-193:3; 194:4-

14; 194:25-195:9.

2.      To the extent Mr. Stoker or the Citigroup structuring desk had any particular

responsibility for the Pitchbook, it related primarily to assembling the document and not to its

content.  Ex. 2 (Dominguez Tr.) at 165:9-20, 171:3-18.

---

[1] The exhibits cited herein are exhibits to the Declaration of Brook Dooley, dated May 7, 2012, and filed concurrently.

[2] Investigative testimony given under oath is admissible, *see McKay v. Principi*, No. 03 Civ. 1605, 2004 WL 2480455, at *1 n.10 (S.D.N.Y. Nov. 4, 2004), and "in considering a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial," *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994).

661994.01

3.      The Class V III Pitchbook states that "(i)nformation related to CSAC . . . has been provided by CSAC" and "Citigroup is not responsible for the content of the following section and has not independently verified any such information."  Ex. 5 (Class V III Pitchbook) at CITI09570344.

4.      CSAC prepared the Manager section of the Class V III Pitchbook.  Ex. 4 (Bhatt Invest. Tr.) at 142:4-17, 189:23-190:8, 192:11-193:9.

5.      CSAC employees and counsel for CSAC reviewed the Manager section.  Ex. 4 (Bhatt Invest. Tr.) at 192:11-193:3.

6.      CSAC was responsible for providing, and ensuring the accuracy of, all information relating to CSAC in the Pitchbook.  Ex. 6 (Jan. 8, 2007 Engagement Letter ("Engagement Letter")) at CITI18318429; Ex. 1 (Pinniger Invest. Tr.) at 40:24-41:7.

7.      The SEC admitted that "CSAC and Bhatt were responsible for the contents of (the) section of the pitch book, titled 'The Manager;'" that "(v)arious CSAC personnel, including Bhatt, participated in the original drafting of the 'Manager' section in connection with previous transactions;" and that "Bhatt reviewed and commented on multiple drafts of the (Class V III) pitch book, including the 'Manager' section."  Ex. 7 (Order, *In re Credit Suisse Alternative Capital LLC*, Admin. Proceedings No. 3-14594 (SEC Oct. 19, 2011)) at 11-12.

**2.      Mr. Stoker did not have ultimate authority over, or personal and primary responsibility for, the alleged misleading statements in the Offering Circular.**

8.      Milbank was responsible for creating the Class V III Offering Circular, and it maintained the document while soliciting and incorporating feedback from other parties, including CSAC, counsel for CSAC, and various Citigroup employees and counsel.  Ex. 8 (Jan. 30, 2007 email re "Citi/Class V Funding III – Draft Preliminary Offering Memorandum"); Ex. 9 (Feb. 22, 2007 email re "Class V Funding III – Final Offering Circular Draft

2

Distribution"); Ex. 10 (Feb. 19, 2007 email re "Class V Funding III: Closing List") at

CITI18428730; Ex. 1 (Pinniger Invest. Tr.) at 287:11-21, 288:5-25; Ex. 3 (Grant Tr.) at 22:7-23;

Ex. 11 (SEC Investigative Deposition Transcript of Brian Stoker ("Stoker Invest. Tr.")) at

292:18-293:6.

9.      No single Citigroup employee had primary responsibility for Citigroup's

involvement in the preparation of the Offering Circular.  Ex. 1 (Pinniger Tr.) at 190:22-191:4,

191:11-17; Ex. 2 (Dominguez Tr.) at 165:21-166:11; Ex. 11 (Stoker Invest. Tr.) at 288:19-23,

292:20-23.

10.      To the extent Mr. Stoker or Citigroup's structuring desk were involved in the

preparation of the Offering Circular, their focus was on the economic terms of the transaction.

Ex. 3 (Grant Tr.) at 21:5-12; Ex. 2 (Dominguez Tr.) at 165:25-166:11; Ex. 11 (Stoker Invest. Tr.)

at 288:19-289:7, 289:12-16.

11.      CSAC was responsible for the section of the Offering Circular titled "The

Manager."  Ex. 12 (Class V Funding III Offering Circular ("Offering Circular")) at

CITI09572405; Ex. 6 (Jan. 8, 2007 Engagement Letter) at CITI18318429; Ex. 7 (Order, *In re

Credit Suisse*) at 11-12.

12.      CSAC was responsible for the statement in the Risk Factors section of the

Offering Circular regarding "the investment strategy and investment process of the Manager in

analyzing, selecting and managing (the portfolio)," which the SEC claims was false or

misleading.  Ex. 12 (Offering Circular) at CITI09572297, CITI09572343-44; Ex. 6 (Jan. 8, 2007

Engagement Letter) at CITI18318429.

13.      With the exception of materials relating to the manager, Milbank, not Mr. Stoker,

was responsible for the Risk Factors in the Offering Circular.  Ex. 1 (Pinniger Invest. Tr.) at

661994.01

287:10-21; Ex. 2 (Dominguez Tr.) at 165:21-166:11, 171:3-18; Ex. 11 (Stoker Invest. Tr.) at 70:12-13, 71:15-23; Ex. 13 (Jan. 29, 2007 email re "RE:Class V Funding III – Draft Preliminary Offering Circular").

> **B.      The Class V III Pitchbook and Offering Circular did not contain misleading statements.**
>
> > **1.      There were no misleading statements in the Pitchbook or the Offering Circular regarding the asset selection process.**

14.      CSAC selected the Class V III assets.  Ex. 4 (Bhatt Invest. Tr.) at 50:5-51:10, 51:15-52:13, 53:11-15, 263:18-264:11; Ex. 14 (SEC Investigative Deposition of Michael Shackelford ("Shackelford Invest. Tr.")) at 57:25-59:6, 60:11-18; Ex. 15 (SEC Investigative Deposition of John Popp ("Popp Invest. Tr.")) at 27:23-28:16, 59:19-60:10, 66:8-23; Ex. 1 (Pinniger Invest. Tr.) at 48:25-49:14; Ex. 16 (SEC Investigative Deposition of Shalabh Mehrish ("Mehrish Invest. Tr.")) at 74:21-76:4; Ex. 17 (SEC Investigative Deposition of Brian Carosielli (Carosielli Invest. Tr.")) at 44:8-11; Ex. 11 (Stoker Invest. Tr.) at 29:25-30:10, 303:19-24.

15.      CSAC made these selections on the basis of its own extensive research on and analysis of the assets, most of which CSAC already owned in other deals.  Ex. 4 (Bhatt Tr.) at 117:2-23, 118:8-16, 174:8-176:14, 345:23-346:17; Ex. 14 (Shackelford Invest. Tr.) at 16:6-17:22; Ex. 15 (Popp Invest. Tr.) at 54:20-56:12; see also Ex. 18 (12/21 email re "Re: Maybe we call you a 'Selection Agent'"); Ex. 19 (Dec. 21, 2006 email re "List of CDOs"); Ex. 20 (1/8 email re "FW: List of CDOs").

16.      There is nothing unusual or significant about an arranging bank and an asset manager discussing potential assets.  Ex. 21 (Rebuttal Report of SEC Expert Witness Robert M. MacLaverty, April 6, 2012 ("MacLaverty Rebuttal Report")) ¶ 7; Ex. 22 (Expert Report of SEC Expert Witness Robert M. MacLaverty, March 16, 2012  ("MacLaverty Opening Report")) at ¶ 7; Ex. 23 (Deposition of Robert MacLaverty ("MacLaverty Tr.") at 79:14-20, 80:7-11, 91:19-

23, 92:15-19; Ex. 24 (Deposition of Denise Crowley ("Crowley Tr.") at 73:13-74:8, 76:25-77:9;

Ex. 15 (Popp Invest. Tr.) at 26:24-27:17.

17.     There is also nothing unusual or significant about an arranging bank providing a

list of assets it is willing to source to an asset manager.  Ex. 23 (MacLaverty Tr.) at 92:10-14,

250:22-25, 251:11-252:6; *accord* Ex. 21 (MacLaverty Rebuttal Report) ¶ 7; Ex. 15 (Popp Invest.

Tr.) at 26:24-28:10; Ex. 14 (Shackelford Invest. Tr.) at 38:12-39:9.

18.     It is not unusual for an asset manager to provide an arranging bank with a list of

approved assets from which the arranging bank can choose assets to source.  Ex. 22 (MacLaverty

Opening Report) ¶¶ 7, 8; Ex. 23 (MacLaverty Tr.) at 94:21-95:2.

19.     The SEC's expert opined that there were only two facts regarding the asset

selection process that he believes should have been disclosed by Citigroup—that "Citigroup had

suggested inclusion in Class V III of 16 of the 25 assets on which it purchased protection," and

that "Citigroup had asked CSAC to include 25 assets in Class V III."  Ex. 22 (MacLaverty

Opening Report) ¶¶ 6, 25; Ex. 23 (MacLaverty Tr.) at 229:20-24, 230:7-16. The SEC's expert

admitted that he could not identify a single statement in the Pitchbook or Offering Circular that

was false or misleading in light of either of these allegedly undisclosed facts regarding asset

selection, either alone or in combination.  Ex. 23 (MacLaverty Tr.) at 232:17-233:16, 235:3-7,

235:13-236:5.

**2.     There were no misleading statements in the Pitchbook or the Offering Circular regarding the position of Citigroup's trading desk.**

20.     The Offering Circular disclosed that Citigroup-- through its affiliate Citibank--

would purchase protection on the synthetic assets in the Class V III portfolio in its role as the

"Initial CDS Asset Counterparty."  Ex. 12 (Offering Circular) at CITI09572307, CITI09572340.

661994.01

21.      The Offering Circular disclosed that, "(i)n such capacity as swap counterparty, Citigroup . . . may be expected to have interests that are adverse to the interests of the Noteholders" and that Citigroup "will have no duty to act on behalf of the Noteholders and, directly or indirectly, may act in ways adverse to them." Ex. 12 (Offering Circular) at CITI09572351.

22.      The Pitchbook disclosed that "Citigroup or an Affiliate thereof is expected to act as the initial CDS Asset counterparty pursuant to certain CDS Assets acquired by the Issuer on the Closing Date and may act as the swap counterparty under other derivative agreements entered into by the Issuer itself. In such capacity as swap counterparty, Citigroup (or such affiliate) may be expected to have interests that are adverse to the interests of the holders of Securities. Typically, such a swap counterparty would act as calculation agent pursuant to the derivative agreement and, in such capacity, have broad authorization to perform actions, such as calculations of payment amounts, that involve the exercise of judgment and discretion. As such a swap counterparty, Citigroup will have no duty to act on behalf of the holders of Securities and, directly or indirectly, may act in ways adverse to them." Ex. 5 (Class V III Pitchbook) at CITI09570380.

23.      It was customary and well understood that for synthetic CDOs, the arranging bank would serve as the initial CDS counterparty and, in that role, buy protection on the assets in the portfolio. Ex. 25 (Deposition of Dwight Jaffee, Ph.D. ("Jaffee Tr.")) at 145:1-17; Ex. 23 (MacLaverty Tr.) at 122:15-123:18; Ex. 26 (SEC Investigative Deposition of David Salz ("Salz Invest. Tr.")) at 51:4-11.

24.      The Offering Circular states that "(t)he Initial CDS Asset Counterparty (Citigroup) may provide CDS Assets as an intermediary with matching off-setting positions

6

661994.01

requested by the Manager or may provide CDS Assets alone without any off-setting positions."
Ex. 12 (Offering Circular) at CITI09572393; *see also* at CITI09572339-40 ("A CDS Asset
Counterparty may seek to eliminate its credit exposure to the CDS Reference Obligations by
entering into back-to-back hedging transactions . . . .").

26.     Citibank bought protection on 24 synthetic assets in the Class V III portfolio and
intermediated those positions in matching trades with other investment banks and hedge funds.
Ex. 27 (Report of SEC Expert Dwight M. Jaffee, Mar. 16, 2012 ("Jaffee Report") at 38-39;
Ex. 28 (Jan. 10, 2007 email re "List for 1_10_2007").

26.     Citibank also bought protection on 25 synthetic assets in the Class V III portfolio
without intermediating those positions in matching trades.  Ex. 27 (Jaffee Report) at 38-39;
Ex. 21 (MacLaverty Rebuttal Report) at ¶ 13.

27.     The SEC's expert admitted that, even though he believes that Citigroup's alleged
intention to maintain its short positions on the 25 assets is the one additional fact regarding the
trading desk's positions that should have been disclosed, he cannot identify a statement in the
Pitchbook or Offering Circular that is false or misleading in light of this alleged fact. Ex. 23
(MacLaverty Tr.) at 229:20-24, 230:7-16, 233:25-234:10, 235:3-7, 235:13-236:5; Ex. 22
(MacLaverty Opening Report) ¶¶ 6, 25.

28.     Citigroup's trading desk had no intention to maintain its short positions in the 25
Class V III reference assets on which it bought protection without entering into offsetting trades
for any defined period of time.  Ex. 29 (Deposition of Donald Quintin ("Quintin Tr.")) at 157:14-
19, 185:17-25, 186:9-16, 188:19-25; Ex. 30 (SEC Investigative Deposition of Donald Quintin
("Quintin Invest. Tr.")) at 57:6-58:3, 88:18-89:13; Ex. 17 (Carosielli Invest Tr.) at 54:4-15, 55:1-
8, 55:14-56:22.

29.     Citigroup's trading desk decided whether or not, and to what extent, to trade out of its short positions on a day-by-day basis.  Ex. 17 (Carosielli Invest. Tr.) at 114:2-9, 137:18-138:20, 144:2-6; Ex. 30 (Quintin Invest. Tr.) at 57:19-23; Ex. 29 (Quintin Tr.) at 161:9-162:25, 188:24-25; Ex. 21 (MacLaverty Rebuttal Report) at ¶ 12; Ex. 23 (MacLaverty Tr.) at 263:23-264:3, 265:25-266:11.

30.     Beginning before Class V III closed on February 28, 2007, Citigroup offset its short positions in at least eleven of the 25 assets in the Class V III portfolio that the SEC alleges it did not offset, and as of June 8, 2007, the trading desk had entirely offset its short positions with respect to eight of those 25 assets.  Ex. 21 (MacLaverty Rebuttal Report) at ¶ 12 and Exhibit 2; Ex. 23 (MacLaverty Tr. at 274:22-275:4. 276:19-23).

**C.      Mr. Stoker did not obtain money or property by means of the alleged omissions from the Class V III Pitchbook or Offering Circular.**

31.     Mr. Stoker's annual salary was set based on his position at Citigroup and was not related to his job performance or the success, failure, or existence of any deal, including Class V III.  Ex. 2 (Dominguez Tr.) at 20:11-19, 102:17-23, 102:25-103:4, 145:15-16; Ex. 31 (Brian Stoker Compensation Guarantee ("Compensation Guarantee")); Ex. 32 (Feb. 26, 2007 email re "Brian Stoker" ("Compensation Email")) .

32.     Mr. Stoker's 2006 bonus was set by Citigroup management by December 15, 2006, and approved by Citigroup's board in early January 2007.  Ex. 2 (Dominguez Tr.) at 147:7-9, 147:20-148:4, 155:25-156:9.

33.     The engagement letter between Citigroup and CSAC regarding Class V III was signed effective January 8, 2007.  Ex. 6 (Jan. 8, 2007 Engagement Letter).

34.     Class V III closed on February 28, 2007.  Ex. 12 (Offering Circular) at CITI 09572310.

35.     Mr. Stoker's 2007 bonus was awarded because Citigroup wanted to retain him at Citigroup and was not awarded based on Mr. Stoker's involvement on any particular deal or on Class V III.  Ex. 3 (Grant Tr.) at 154:4-8; Ex. 2 (Dominguez Tr.) at 159:6-11; Ex. 31 (Compensation Guarantee); Ex. 32 (Compensation Email), Ex. 33 (Feb. 23, 2007 Stoker Employment Offer Letter).

36.     Mr. Stoker's 2007 compensation, including his 2007 bonus, was approved on February 26, 2007, two days before Class V III closed on February 28.  Ex. 31 (Compensation Guarantee); Ex. 32 (Compensation Email); Ex. 2 (Dominguez Tr.) at 159:6-11.

37.     Mr. Stoker's 2007 compensation, including his 2007 bonus, was guaranteed as of February 26, 2007, and could not have been modified.  Ex. 2 (Dominguez Tr.) at 146:10-15; Ex. 32 (Compensation Email).

## II.     MR. STOKER IS ENTITLED TO SUMMARY JUDGMENT ON THE SEC'S SECTION 17(a)(3) CLAIM.

38.     There is not sufficient evidence to support a finding that any person at Citigroup acted with scienter.  Ex. 34 (*SEC v. Citigroup Global Markets, Inc.*, No. 11-CV-7387, Transcript, at 24:19-25 (S.D.N.Y. Nov. 9, 2011)).

39.     Citigroup's secondary CDO trading desk did not have any unique knowledge about the direction of the housing market or about the likely performance of the reference assets in the Class V III portfolio.  Ex. 30 (Quintin Invest. Tr.) at 59:1-12; 67:11-68:2; 92:13-24.

Dated:  May 7, 2012                                      Respectfully submitted,


                                              By:    */s/ Brook Dooley*
                                                     JOHN W. KEKER (*pro hac vice*)
                                                     JAN NIELSEN LITTLE (*pro hac vice*)
                                                     STEVEN K. TAYLOR (*pro hac vice*)
                                                     BROOK DOOLEY (*pro hac vice*)
                                                     Keker & Van Nest LLP
                                                     633 Battery Street
                                                     San Francisco, CA 94111-1809
                                                     Telephone:     415 391 5400
                                                     Facsimile:     415 397 7188
                                                     Email:    jkeker@kvn.com
                                                     Email:    jlittle@kvn.com
                                                     Email:    staylor@kvn.com
                                                     Email:    bdooley@kvn.com

                                                     Attorneys for Defendant
                                                     BRIAN H. STOKER

10

661994.01