UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────
                                          :
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                              Plaintiff,  :
                                          : 11 Civ. 07388 (JSR)
                  v.                      :
                                          : ECF Case
BRIAN H. STOKER,                          :
                                          :
                             Defendant.   :
─────────────────────────────────────────:

**PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(b),

Plaintiff, the Securities and Exchange Commission, hereby submits its Response to Defendant's

Statement of Undisputed Material Facts, and its Statement of Additional Undisputed Material

Facts.

**I.      Response to Defendant's Statement of Undisputed Material Facts**

1.      Disputed.  Stoker was the lead structurer or "deal manager" on Class V III,  (Exh.

14 at 199:10-11; Exh. 15 at 13:6-18; 18:21-19:13; Exh. 5 at 23:11-16) and was responsible for

reviewing the pitch book to make sure it was accurate and it also was his responsibility to

approve it before it could be finalized.  (Exh. 14 at 126:15-127:10)  Stoker and another

individual, Keith Pinniger ("Pinniger") worked on the disclosure documents for Class V III,

including the offering circular.  (Exh. 14 at 69:24-70:11)

2.      Disputed.   As lead structurer on Class V III, Stoker was responsible for reviewing

the pitch book to make sure it was accurate and approving it before it could be finalized.  (Exh.

14 at 126:15-127:10)  Citigroup's structuring desk would review the Manager section to ensure

its accuracy and provide comments to the Manager about anything that needed correcting.  (Exh.

9 at 40:24-41:15)  When preparing an offering circular for a new CDO, it was standard practice at Citigroup to use the offering circular from a previous deal as a template for the new one. (Exh. 15 at 32:10-14)  Stoker spent a lot of time modifying the deal documents used by the structuring desk so they could be used for any type of CDO.  (Exh. 14 at 70:24-71:6; Exh. 15 at 30:12-31:4) His goal was to have his deal documents used in all new CDOs at Citigroup.  (Exh. 15 at 32:3-9)

      3.     Do not dispute that the Class V III Pitchbook states that, "Information related to CSAC, its personnel, organization, affiliates, processes and historical performance has been provided by CSAC.  Citigroup is not responsible for the content of the following section and has not independently verified any such information."  (Def. Ex. 5 CITI09570344).  As lead structurer on Class V III, Stoker was responsible for reviewing the pitch book to make sure it was accurate and approving it before it could be finalized.  (Exh. 14 at 126:15-127:10)  The pitch book for Class V III was based on the pitch book for a CDO named Adams Square II, for which Stoker was the deal manager.  (Exh. 56; Exh. 15 at 18:19-23)  Citigroup's structuring desk would review the Manager section of a pitch book to ensure its accuracy and provide comments to the Manager about anything that needed correcting.  (Exh. 9 at 40:24-41:15)

      4.     Disputed.  The materials cited do not establish the absence of a genuine dispute. The testimony of the witness cited indicates he did not recall if he was involved in the preparation of the marketing materials (Exh. 1 at 142:4-6) and indicated that while CSAC sent materials to the underwriter for inclusion in the marketing materials, the underwriter controlled the process.  (Exh. 1 at 189:23-190:4) As lead structurer on Class V III, Stoker was responsible for reviewing the pitch book to make sure it was accurate and approving it before it could be finalized.  (Exh. 14 at 126:15-127:10)  Citigroup's structuring desk would review the Manager

section to ensure its accuracy and provide comments to the Manager about anything that needed correcting.  (Exh. 9 at 40:24-41:15)

5.      Disputed.  The materials cited do not establish the absence of a genuine dispute. The testimony of the witness cited indicated he did not recall his role in the manager's section beyond "put[ting] together maybe a couple of slides or review[ing] what was sent."  He stated that "typically" a lawyer for the group would review materials, but he does not specifically  refer to Class V III and what occurred with respect to that CDO. (Def. Ex. 4; Exh. 1 at 192:11-193-3)

6.      Disputed.  The engagement letter cited by the defendant does not say that CSAC is responsible for all information relating to CSAC in the Pitchbook.  Instead, it represents that "all information . . . provided by the Manager . . . and contained in any Offering Materials" will be accurate.  (Def. Exh. 6 at CITI 18318429)  Citigroup was responsible for assisting in the drafting, preparation and distribution of the transaction documentation and any marketing materials.  (Def. Ex. 6 CITI 18318427)  Further, the engagement letter provided that Citigroup had the right to approve all transaction documentation and other written communications furnished by CSAC.  (Def. Ex. 6 CITI 18318429).  As lead structurer on Class V III, Stoker was responsible for reviewing the pitch book to make sure it was accurate and approving it before it could be finalized.  (Exh. 14 at 126:15-127:10)  Citigroup's structuring desk would review the Manager section to ensure its accuracy and provide comments to the Manager about anything that needed correcting.  (Exh. 9 at Test. 40:24-41:15)

7.      Disputed.  The materials cited do not establish the absence of a genuine dispute. Defendant cites to a settled Administrative Proceeding Order, which is expressly and explicitly based upon Offers from the Respondents and not binding in any other proceeding.  (Def. Ex. 7 n.1)  Further, none of the excerpted quotes from the Administrative Order state that CSAC and

Bhatt were solely responsible for the manager section of the Pitchbook. (Def. Ex. 7 at 11-12) Finally, the selective quotes cited ignore the following additional language in the Order, "Rather than follow CSAC's stated asset selection process, Bhatt provided Citigroup with a list of potential assets with which he had some familiarity, and allowed Citigroup to select from the list the names on which it wanted to purchase protection," and "CSAC and Bhatt, in the marketing materials and in conversation with investors, did not disclose material facts about both the asset selection process and the price of the assets purchased by Class VIII." (Def. Ex. 7 at 3). As lead structurer on Class V III, Stoker was responsible for reviewing the pitch book to make sure it was accurate and approving it before it could be finalized. (Exh. 14 at 126:15-127:10)

8.      Disputed. The offering circular for Class V III was based on the offering circular that had been created for a CDO entitled Adams Square II. (Exh. 15 at 40:8-13) Stoker was the deal manager on Adams Square II. (Exh. 15 at 18:19-23) Stoker personally made substantial edits to the Class V III preliminary offering circular. (Exh. 68 at Citi 18416633-69). As deal manager for Class V III, Stoker was responsible for providing information to outside counsel for inclusion in the offering circular and he was responsible for providing counsel with information regarding differences between the Class V III and other CDOs. (Exh. 5 at 140:8-23; Exh. 8 at 73:18-74:12). In February 2007, Stoker reviewed the preliminary offering circular for Class V III and made substantial edits to portions of it. (Exh. 69; Exh. 15 at 41:18-42:23) However, he made no changes or edits to the sections stating CSAC selected the assets or to the section describing Citigroup's position as initial swap counter-party. (Exh. 69; Exh. 15 at 43:20-45:17)

9.      Disputed. Stoker, as deal manager, was responsible for providing information to outside counsel for inclusion in the offering memorandum and he was responsible for providing

4

counsel with information regarding differences between the Class V III and other CDOs.  (Exh. 5 at 140:8-23)

10.    Disputed.  Stoker provided comments and suggested edits to deal counsel throughout the draft offering memorandum, not just economic terms, (Exh. 68), including the section on risk factors. (Exh. 68 at 18416652-53)  Stoker, as deal manager, was responsible for providing information to outside counsel for inclusion in the offering memorandum and he was responsible for providing counsel with information regarding differences between the Class V III and other CDOs.  (Exh. 5 at 140:8-23)

11.    Disputed.  Defendant cites to a settled Administrative Proceeding Order, which is expressly and explicitly based upon Offers from the Respondents and not binding in any other proceeding.  (Def. Ex. 7 n.1)   Citigroup was responsible for assisting in the drafting, preparation and distribution of the transaction documentation and any marketing materials.  (Def. Ex. 6 at CITI 18318427)  Further, Citigroup had the right to approve all transaction documentation and other written communications furnished by CSAC.  (Def. Ex. 6 at CITI 18318429).

12.    Disputed.  Citigroup was responsible for assisting in the drafting, preparation and distribution of the transaction documentation and any marketing materials.  (Def. Ex. 6 at CITI 18318427) Citigroup had the right to approve all transaction documentation and other written communications furnished by CSAC.  (Def. Ex. 6 at CITI 18318429).  Stoker, as deal manager, was responsible for providing information to outside counsel for inclusion in the offering memorandum and he was responsible for providing counsel with information regarding differences between the Class V III and other CDOs.  (Exh. 5 at 140:8-23)

13.    Disputed.  Stoker, as deal manager, was responsible for providing information to outside counsel for inclusion in the offering memorandum and he was responsible for providing

counsel with information regarding differences between the Class V III and other CDOs.  (Exh. 5 at 140:8-23)  The offering circular for Class V III was based on the offering circular that had been created for a CDO entitled Adams Square II.  (Exh. 15 at 40:8-13)  Stoker was the deal manager on Adams Square II.  (Exh. 15 at 18:19-23)  In February 2007, Stoker reviewed the preliminary offering circular for Class V III, and "focused" on changes reflected in blacklines. (Exh. 14 at 72:2-17)  He personally made substantial edits to the Class V III preliminary offering circular, (Exh. 68), including edits to the Risk Factors. (Exh. 69; Exh. 15 at 41:18-42:23; Exh. 68 at 6651-52).  However, he made no changes or edits to the sections stating CSAC selected the assets or to the section describing Citigroup's position as initial swap counter-party.  (Exh. 69; Exh. 15 at 43:20-45:17)  As deal manager for Class V III, Stoker was responsible for providing information to outside counsel for inclusion in the offering circular and he was responsible for providing counsel with information regarding differences between the Class V III and other CDOs.  (Exh. 5 at 140:8-23; Exh. 8 at 73:18-74:12).

14.     Disputed.  (a)  On October 23, 2006, Quintin sent Stoker a list of 21 assets on which he wished to purchase protection from a CDO.  (Exh. 29).  (b) On November 1, 2006, Stoker forwarded the list of assets he received from Quintin, to Sohail Khan ("Khan") the sales person at Citigroup who dealt with CSAC.  (Exh. 36)  (c) This list was not in the normal format used by the structuring desk to propose a "dummy portfolio" for a CDO.  (Exh. 5 at 38:20-40:11, 80:15-82:1)  (d) Stoker did not normally send a list of potential assets for inclusion in a deal to a sales person at Citigroup, (Exh. 14 at 47:18-48) and he did not normally suggest specific assets for inclusion in a CDO he was structuring.  (Exh. 15 at 73:6-19)  (e) Khan forwarded this list along with the names of 4 other assets to Samir Bhatt ("Bhatt") at CSAC.  (Exh. 35)  (f) Stoker was aware that Khan forwarded the list to Bhatt.  (Id.)  (g) On November 2, 2006 Stoker was

informed by Quintin that CSAC was "amenable to the portfolio."  (Exh. 30)  (h) On November 3, 2006, in response to an inquiry from Grant concerning whether Citigroup was going forward with the proposed "CSAC CDO squared," Stoker replied: "I hope so.  This is DQ's prop trade (don't tell CSAC).  CSAC agreed to terms even though they don't get to pick the assets."  (Exh. 16; Exh. 17; Exh. 38)  (i) On November 14, 2006, Stoker personally forwarded the list of 25 assets to Bhatt's supervisor, Michael Shackelford.  (Exh. 39; Exh. 15 at 86:10-21)  (j) On December 21, 2006, Bhatt sent a list of approximately 127 CDOs as potential candidates for inclusion in the CDO squared to Khan, who, in turn, forwarded it to Stoker, Quintin and Mehrish.  (Exh. 46)  (k) Citigroup had never previously received a list of potential candidates of this length for inclusion in a CDO.  (Exh. 11 at 119:21-121:23)  (l) On the morning of January 8, 2007, after receiving approval from Quintin, Brian Caroselli ("Caroselli") selected 25 CDOs on which Citigroup wanted to purchase protection from CSAC's list and provided the 25 names of synthetic assets to Khan.  (Exh. 48; Exh. 49)  (m) Later that morning, Khan sent the list of 25 names to CSAC, (Exh. 49), and, within an hour, CSAC agreed to include the 25 CDOs in Class V III.  (Exh. 50)

      15.     Disputed.  See the response to Defendants Statement of Undisputed Facts No. 14.

      16.     Do not dispute that, as a general matter, an arranging bank and a collateral manager may have discussions regarding the selection of assets for a CDO.  Dispute that the extent of Citigroup's influence over the selection of assets for Class V III was not unusual and significant.  (Exh. 20 at ¶7; Exh. 7 at 252:3-21) Stoker did not normally send a list of potential assets for inclusion in a deal to a sales person at Citigroup, (Exh. 14 at 47:18-48) and he did not normally suggest specific assets for inclusion in a CDO he was structuring.  (Exh. 15 at 73:6-19); The list of potential assets that Citigroup sent to CSAC on November 1, 2006, was not in the

normal format used by the structuring desk to propose a "dummy portfolio" for a CDO. (Exh. 5 at 38:20-40:11, 80:15-82:1)  Prior to Class V III, Citigroup had never previously received a list of potential candidates for inclusion in a CDO of the length that CSAC provided on December 21, 2006.  (Exh. 11 at 119:21-121:23)  In Stoker's experience, there was a lot of give and take between an asset manager and an arranging bank at the beginning of a deal, but that give and take generally did not include discussions of specific assets.  (Exh. 14 at 84:14-85:15)

17.    Disputed.  The evidence cited does not state "there was nothing unusual or significant about an arranging bank providing a list of assets <u>it</u> is willing to source." (Emphasis added).  The evidence states that an arranging bank could have input concerning assets to be included in a CDO and whether the arranging bank believed it had "the ability to source particular assets for the CDO."  (Def. Exh. 23 at 91:9-14; Def. Exh. 21 at ¶ 7)  The evidence cited does not state that it was not unusual or significant for an arranging bank to provide a list of assets on which the arranging bank wanted to buy protection.  It is also disputed that the procedure for identifying assets for Class V III on which Citigroup wished to purchase protection was normal or consistent with general practice.  Stoker did not normally send a list of potential assets for inclusion in a deal to a sales person at Citigroup, (Exh. 14 at 47:18-48) and he did not normally suggest specific assets for inclusion in a CDO he was structuring.  (Exh. 15 at  73:6-19); The list of potential assets that Citigroup sent to CSAC on November 1, 2006, was not in the normal format used by the structuring desk to propose a "dummy portfolio" for a CDO. (Exh. 5 at 38:20-40:11; 80:15-82:1)  Prior to Class V III, Citigroup had never previously received a list of potential candidate for inclusion in a CDO of the length that CSAC provided on December 21, 2006.  (Exh. 11 at 119:21-121:23)

18.     Disputed.  See the responses to Defendants Statements of Undisputed Facts No. 16 and 17.

19.     Disputed.  Mr. MacLaverty identified three facts that were not disclosed in either the pitch book or the offering circular: "1.  Prior to ever receiving a proposed list of assets from CSAC, Citigroup had suggested inclusion in Class V III of 16 of the 25 assets on which it purchased protection; 2. Citigroup had asked CSAC to include 25 assets in Class V III; and 3. Citigroup took a $500 million proprietary short position on the 25 assets it sought to have included in Class V III." (Emphasis added).  (Def. Exh. 22 at ¶ 25; Exh. 7at 229:20-230:12)  It is also disputed that Mr. MacLaverty could not identify any misleading statements in the pitch book or offering circular.  The deposition testimony of Mr. MacLaverty upon which defendant relies to support this fact is taken out of context and ignores the third fact that Mr. MacLaverty should have been disclosed—that Citigroup took a $500 million proprietary short position on the 25 assets it sought to have included in Class V III.  Mr. MacLaverty specifically testified that he believed the pitch book and offering circular were misleading when he took into account the omission of information about the proprietary short position Citigroup took, (Exh. 7 at 229:20-230:12), and that his opinion was based on the omission of information he would have expected to see, given the facts of the case: "It's not what's there.  It's what's not there."  (Exh. 7 at 234:11-20)  He also testified it was his opinion that it was misleading for Citigroup to say it may take a position contrary to the buyer of the notes from Class V III, when "in fact, they already had done so."  (Exh. 7 at 185:12-21)

20.     Dispute.  The Offering Circular identifies Citigroup as the Initial CDS Asset Counterparty.  (Def. Ex. 12 at CITI 09572307)  The Offering Circular further states that, "Citibank, N.A. in its capacity as the Initial CDS Asset Counterparty, will be the counterparty

under CDS Assets with a Net Aggregate Adjusted Notional Amount of approximately U.S. $869,256,000 as of the Closing date, which will comprise all of the CDS Assets entered into as of the Closing Date." (Def. Ex. 12 at CITI 09572340) The Offering Circular does not state that Citigroup would purchase protection on the synthetic assets.

21.     Do not dispute that the Offering Circular states, "In such capacity as swap counterparty, Citigroup (or such Affiliate) may be expected to have interests that are adverse to the interests of the Noteholders. Typically, such swap counterparty would act as calculation agent pursuant to the derivative agreement and, in such capacity, have broad authorization to perform actions, such as calculations or payment amounts, which involve the exercise of judgment and discretion. As such a swap counterparty, Citigroup will have no duty to act on behalf of the Noteholders and, directly or indirectly, may act in ways adverse to them." (Def. Ex. 12 at CITI09572351)

22.     Do not dispute that the quotation from the Pitchbook for Class V III is accurate. (Def. Ex. 5 at CITI09570380)

23.     Do not dispute that rating agencies required Citigroup to act as the initial swap counterparty for any synthetic collateral in a CDO, (Exh. 11 at 95:9-13; 135:9-13; Exh. 12 at 180:2-23) and, therefore, Citigroup was the intermediary for all protection that was purchased on the synthetic collateral in a CDO. (Exh. 11 at 94:24-95:7) However, Citigroup's role with respect to the 25 assets in Class V III on which it purchased protection, was different from its role as initial swap counterparty. (Exh. 11 at 133:6-135:19; Exh. 10 at 47:11-48:3; Exh. 12 at 198:10-22; Exh. 4 at 78:2-79:14)

24.     Do not dispute that the Offering Circular states, "The Initial CDS Asset Counterparty may provide CDS Assets as an intermediary with matching off-setting positions

requested by the Manager or may provide CDS Assets alone without any off-setting positions."

(Def. Ex. 12 at CITI 09572393)  Further, do not dispute that the Offering Circular states, "A

CDS Asset Counterparty may seek to eliminate its credit exposure to the CDS Reference

Obligations by entering into back-to-back hedging transactions, and its ability to physically settle

such a transaction under which it is acting as protection buyer may be dependent on whether or

not the counterparties to such back-to-back hedging transactions perform their delivery

obligations."  (Def. Ex. 12 at CITI 09572339-40)

25.     Disputed.  The trade log for the CDO Group's secondary trading desk shows that

Citigroup intermediated 23 of the 24 assets in Class V III, on which it did not take a naked short

position and, with two exceptions, made off-setting trades on those assets before the closing of

Class V III, the vast majority of which occurred on the same day that Citigroup purchased

protection on the asset from Class V III.  (Exh. 94 at ¶ 5.)

26.     Do not dispute.

27.     Disputed.  Mr. MacLaverty specifically testified he believed the pitch book and

offering circular were misleading when he took into account the omission of information about

the proprietary short position Citigroup took, (Exh. 7 at 229:20-230:12), and that his opinion was

based on the omission of information he would have expected to see, given the facts of the case:

"It's not what's there.  It's what's not there."  (Exh. 7 at 234:11-20)  He also testified it was his

opinion that it was misleading for Citigroup to say that it may take a position contrary to the

buyer of the notes from Class V III, when "in fact, they already had done so."  (Exh. 7 at 185:12-

21)

28.     Disputed.  On or about February 14, 2007, Quintin communicated to Citigroup's

Risk Management Group that the secondary trading desk intended to retain the short position in

Class V III even if Citigroup sold all the tranches of Class V III and sell its positions if and when the market improved.  (Exh. 101; Exh. 103; Exh. 70)  Due to the excess risk this position created, a three-month exception to risk limitations was granted by the Independent Risk for this short position.  (Exh. 100)

29.     Do not dispute.

30.     Disputed.  Citigroup only made partially off-setting trades on 3 of its 25 naked short position prior to the closing of Class V III on February 28, 2007 and none of Citigroup's 25 naked short positions was fully off-set before February 28, 2007.  (Exh. 20 at ¶ 3; Exh. 96 at ¶ 5) Citigroup sold its short position on 10 other assets by June 25, 2007, at a very large profit.  (Exh. 20 at ¶ 13-14, Exh. 3)

31.     Dispute.  Stoker was paid a salary and a bonus by Citigroup for his work as a structurer on CDOs, including Class V III.  (Exh. 5 at 89:13-22, 147:10-150:18; Exh. 3 at 100:13-25)  His compensation was based on both qualitative considerations and quantitative considerations, i.e., the revenue he generated.  (Exh. 5 at 147:17-150:18)

32.     Do not dispute.

33.     Do not dispute.

34.     Do not dispute.

35.     Do not dispute.

36.     Do not dispute.

37.     Do not dispute.

38.     Dispute.  The only citation in support of this fact is a statement during oral argument concerning the settlement in SEC v. Citigroup Global Markets Inc., 11-cv-7387 on November 9, 2011.  The statement cited is not a fact but the Commission's assessment of the

evidence obtained during its investigation prior to any discovery being conducted in this case, is

not a judicial admission by the Commission and is not binding on a jury.  The Commission does

not dispute that Section 17(a)(2) and (3) do not require evidence that the Defendant acted with

scienter.  However, a jury is free to reach its own conclusion concerning whether the evidence

presented establishes the defendant acted with scienter or negligently and either finding would

support a finding that he violated Section 17(a)(2) and (3).

     39.     Dispute.  Citigroup's trading desk was among the largest CDO trading desk on

Wall Street and knew more than investors concerning the market for protection.   (Exh. 1 at

36:16-20; Exh. 2 at 164:10-15; Exh. 13 at 38:12-39:9; Exh. 12 at 80:13-81:18, 194:13-23,

239:17-240:14)  Citigroup had access to market information, "color," that was not available to

investors.  (Exh. 8 at 54:13-55:8; Exh. 5 at 26:24-27:18, 43:2-14)

**II**      **Plaintiff's Statement of Additional Undisputed Material Facts**

     40.     During the fall of 2006, Citigroup became aware of a large market demand to buy

protection on synthetic, collateralized debt obligations ("CDOs") with assets containing BBB-

rated subprime, residential mortgage backed securities ("RMBS").  (Exh. 23; Exh. 24; Exh. 26;

Exh. 27)

     41.     In particular, there was a large demand for protection on mezzanine CDOs that

were part of a series of transactions named after constellations (the "Constellation" deals) and for

CDOs known as "President" deals.  (Exh. 23; Exh. 24; Exh. 26; Exh. 27; Exh. 34)  The demand

for these deals was particularly strong from Magnetar Capital ("Magnetar") and its lead CDO

trader, James Prusko.  (Exh. 23; Exh. 25; Exh. 26; Exh. 27; Exh. 11 at 55:22-56:6)

     42.     A synthetic CDO does not hold actual assets, but merely references other assets.

This is accomplished by having the CDO sell insurance against the risk of loss facing investors

in the referenced RMBS.  If the mortgage borrowers default on the loans in the RMBS, the investors in a synthetic CDO face the same loss as the investors in the RMBS.  (Exh. 18 at ¶ 22).

43.     The insurance contract issued by a synthetic CDO is called a credit default swap ("CDS").  The investor in a CDS purchases "protection" from the CDO on a specific asset such as an RMBS or a tranche from another CDO.  (Exh. 18 at ¶ 23).

44.     Magnetar was a hedge fund that engaged in a strategy on certain CDOs, including the Constellation and President deals, of betting against the performance of the CDO by purchasing protection on the mezzanine tranches (taking a "short" position).  (Exh. 21 at ¶¶ 56, 58; Exh. 14 at 48:15-49:7; 87:17-25; Exh. 6 at 63:2-65:2)

45.     As a result of the increased demand to purchase protection on CDOs, Citigroup's CDO Group ("CDO Group") had internal discussions about the feasibility of structuring and marketing a CDO squared collateralized by single A-rated CDO tranches.  (Exh. 33; Exh. 102; Exh. 6 at 19:9-24)

46.     One of the co-heads of CDO Group during this time was Nestor Dominguez (Dominguez).  (Exh. 3 at 20:5-24).

47.     On October 19, 2006, Citigroup initiated discussions with Credit Suisse Alternative Capital ("CSAC") about CSAC acting as collateral manager for the proposed CDO squared.  (Exh. 28)

48.     In a CDO squared, the underlying assets are themselves CDO tranches of existing CDOs.  (Exh. 18 at ¶ 25)

49.     Citigroup knew that representing to investors that an experienced, third-party collateral manager had selected the investment portfolio would facilitate the placement of the

CDO squared's liabilities.  (Exh. 44; Exh. 76; Exh. 45 at 15819719, -722, -752, -757-58, Exh. 8 at 38:24-39:14)

50.     At approximately the same time, there were discussions between Donald Quintin ("Quintin") the Managing Director of the CDO Group's secondary trading desk and other members of the CDO group, including Stoker, about buying protection (taking short positions) on certain assets, including Constellation and President deals.  (Exh. 42; Exh. 43; Exh. 62; Exh. 11 at 84:11-85:15; Exh. 15 at 49:3-50:17).

51.     A "naked short position" is a short position that has not been hedged or covered. (Exh. 20 at ¶ 11)

52.     Stoker was a director on the CDO Group's structuring desk.  (Exh. 15 at 10:11-11:2).

53.     In October 2006, Quintin asked Stoker to begin structuring a CDO that was going to be used by Quintin to execute a proprietary trade.  (Exh. 15 at 49:3-17; Exh. 32)

54.     A proprietary trade is a trade executed by a trading desk that is not part of a dealer's market-making role.  (Exh. 19 at at ¶ 20)

55.     Twelve of the assets on this list were Constellation deals and three were President deals.  (Exh. 21 at ¶ 57)

56.     On October 26, 2006, Stoker informed Quintin, Darius Grant ("Grant"), a managing director and head of the CDO Group's structuring desk, (Exh. 5 at 15:9-22) and Shalabh Merish ("Merish"), a managing director and head of the CDO Group's syndicate desk, that he had prepared models for two structures for a CDO squared that included consideration of the profit Citigroup could make by taking short positions on the collateral in the CDO squared. (Exh. 31).

57.     In Stoker's experience, it was unusual for a sales person at Citigroup to send a proposed portfolio to a manager in advance of doing a deal.  (Exh. 14 at 54:6-11)

58.     On November 2, 2006, Stoker was informed by Quintin that CSAC was "amenable to the portfolio."  (Exh. 37)  That same day, Stoker distributed a draft engagement letter for a CDO squared with CSAC.  (Exh. 38)

59.     On November 3, 2006, in response to an inquiry from Grant concerning whether Citigroup was going forward with the proposed "CSAC CDO squared," Stoker replied: "I hope so.  This is DQ's prop trade (don't tell CSAC).  CSAC agreed to terms even though they don't get to pick the assets."  (Exh. 17 at ¶ 32; Exh. 16 at ¶ 32; Exh. 38)

60.     On November 22, 2006, Stoker distributed to Mehrish, Kahn, Quintin and Grant "the latest structure" of Class V III, in which he recommended that President and Constellation deals included in a "CSAC CDO squared" be those having a single-A rating.  (Exh. 41)

61.     Stoker understood that Magnetar purchased protection on the mezzanine tranches of the Constellation deals because the CDOs were structured so that if the equity lost value, it was because all the underlying assets had perform poorly and thus the mezzanine tranche would also perform poorly so that the protection purchaser would profit.  (Exh. 14 at 50:6-51:9; Exh. 21 at ¶¶ 58, n.41, 59)

62.     The list of assets CSAC sent to Citigroup on December 21, 2007, included 20 of the 25 assets that Khan sent to CSAC on November 1, 2006, (Exh. 19 at Exh. 2A), including 15 Constellation deals and 3 President deals.  (Exh. 21 at ¶ 56 & Exh. 5)

63.     Twelve of these 25 assets that Citigroup identified on January 8, 2007 for inclusion in Class V III, were Constellation deals and 3 were President deals.  (Exh. 21 at ¶ 57 & Exh. 5)

64.     The notional amount of the protection that Citigroup purchased on these 25 reference assets on January 8, 2007, was $250 million.  (Exh. 49)

65.     Stoker learned that CSAC agreed to sell Citigroup $250 million of protection on 25 assets on that same day.  (Exh. 51; Exh. 15 at 104:5-105:7)

66.     On January 12, 2007, Citigroup and CSAC agreed that Citigroup would double the amount of protection on each of the original 25 assets that Citigroup selected for the investment portfolio.  (Exh. 104; Exh. 99)

67.     Ultimately, the size of the Class V III transaction was approximately $1 billion, (Exh. 85 at AMB-V 00045162), and contained a total of 58 assets, 49 of which were synthetic.  (Exh. 18 at ¶ 42, Table 5; Exh. 19 at Exh. 1A).

68.     With one exception, Citigroup sold its position on 23 of the 24 synthetic assets in Class V III that it did not ask to have included in the CDO before Class V III closed—the vast majority of these sales occurring on the same day that Citigroup intermediated the purchase of protection from Class V III—for a fee of three basis points (.03%).  (Exh. 94; Exh. 71)

69.     Stoker understood that if someone picks synthetic assets for inclusion in a synthetic CDO for the purpose of purchasing protection on those assets, it is likely the person would want those assets to perform poorly.  (Exh. 15 at 151:11-152:18)

70.     The 25 reference assets on which Citigroup purchased protection were of a lower quality than the other candidate reference assets in Class V III, exhibited riskier structures and were more likely to default in the event of a downturn in housing prices than the other candidate assets identified by CSAC on December 21, 2006.  (Exh. 21 at ¶¶ 11, 53-73; Exh. 92)

71.     Citigroup's primary marketing materials for Class V III included a pitch book and an offering circular.  (Exh. 84; Exh. 85)

72.     The pitch book for Class V III represented in its "Transaction Overview" that CSAC was the "collateral manager" and that CSAC had selected the collateral for Class V III. (Exh. 84 at 09570339)

73.     The twenty-page "Manager" section prepared by CSAC contained a section purporting to describe how CSAC selected each asset it included in the investment portfolio of its CDOs.  (Exh. 84 at 09570351-61)

74.     Citigroup prepared the Risk Factors section of the pitch book that also stated CSAC had "selected" the collateral for Class V III.  (Exh. 84 at 09570380)

75.     The pitch book did not disclose that Citigroup had specifically requested that 25 assets be included in Class V III and that Citigroup had taken a $500 million naked short position on those assets.  Id.

76.     Stoker viewed Citigroup's normal role as initial swap counterparty for synthetic assets in a CDO as an "intermediary," "just an administrator moving money around."  (Exh. 14 at 63:5-9)

77.     Stoker made no attempt to obtain information about whether the secondary trading desk had taken a naked short position on any of the assets in Class V III and the size of its short position or otherwise take action to ensure the disclosures concerning Citigroup's interest in Class V III were accurate.  (Exh. 14 at 70:12-14; 293:11-295:18)

78.     Stoker believed he should tell the attorneys reviewing a CDO if he knew something in the offering circular was inaccurate or if he was aware of "something interesting" about it.  (Exh. 14 at 288:9-2902; Exh. 15 at 28:20-29:12)

79.     On or about February 26, 2007, Citigroup finalized the offering circular for Class V III.  (Exh. 85)

80.     The finalized version of the Class V III offering circular stated that CSAC "will act as the manager for the portfolio of assets," and the body of the offering circular contained repeated references that the investment portfolio was "selected" by CSAC.  (Exh. 85 at 45174, 45179, 45260)

81.     Both the pitch book and the offering circular contained a disclosure concerning Citigroup's role as "Initial CDS Asset Counterparty."  (Exh. 84 at 9590380; Exh. 85 at 45206) But, neither of these documents disclosed that Citigroup had any role in selecting 25 of the assets in Class V III and that it actually had taken naked short positions on those 25 assets.  (Exh. 84; Exh. 85)

82.     Beginning in late January 2007, Citigroup broadly marketed Class V III to many of Citigroup's institutional clients, providing the pitch book and offering circular to prospective investors (Exh. 59; Exh. 61; Exh. 63; Exh. 89)

83.     On one occasion, Stoker personally sent a copy of the Class V III pitch book to a prospective investor along with a representation that Class V III was a "top-of-the-line CDO squared."  (Exh. 16 at ¶ 62; Exh. 60)

84.     The largest investor in Class V III was Ambac Financial Group ("Ambac"), who received multiple drafts of the offering circular, one of which was provided by Stoker personally. (Exh. 63; Exh. 97 at AMB-V 00077692; Exh. 98)

85.     The participation of CSAC as the collateral manager for Class V III was an important consideration for Ambac.  (Exh. 12 at 36:2-38:4; 53:14-54:2 )

86.     Ambac was unaware of Citigroup's approximately $500 million naked short position in Class V III or the extent of Citigroup's role in the selection of assets in Class V III. (Exh. 12 at 181:11-23)

19

87.    The Class V III transaction closed on February 28, 2007.  (Exh. 83 at 09572290).

88.    Effective March 16, 2007, Ambac finalized its $500 million investment in Class V III's super senior tranche by agreeing to assume the credit risk associated with that portion of the capital structure in exchange for premium payments.  (Exh. 81; Exh. 88; Exh. 79)

89.    Had Ambac been informed that Citigroup had taken a $500 million naked short position on the 25 assets it asked Citigroup to include in Class V III, but only intermediated the protection on the other assets, it would have considered "walk[ing] away from the transaction." (Exh. 12 at 244:3-245:19; 248:13-249:6)

90.    Citigroup also provided the pitch book and offering circular to Subordinate Investors.  (Exh. 67; Exh. 75; Exh. 58; Exh. 65; Exh. 66; Exh. 77; Exh. 64)

91.    Ultimately, approximately 15 different investors purchased or sold protection on tranches of Class V III with a face value of approximately $893 million.  (Exh. 105; Exh. 93 at 22179908-11)

92.    By late July 2007, 14 of the 58 assets in the Class V III portfolio had been placed on negative watch by Moody's and/or Standard & Poor's.  (Exh. 86 at 26-27).

93.    Eleven of the assets that were placed on negative watch were assets that Citigroup selected and on which it then purchased protection.  (Exh. 86 at 27; Exh. 50 at CITI 14219308) On November 19, 2007, Class V III was declared to be in an Event of Default.  (Exh. 40)

94.    The 25 names Citigroup selected for Class V III performed significantly worse than other names in Class V III and significantly worse than the other names on the list that CSAC provided to Citigroup.  **(**Exh. 21 at ¶ 75**)**

95.    On the date Class V III was declared to be in default, six of the 25 assets selected by Citigroup were declared in default, while only 2 of the 102 other assets proposed by CSAC

were declared in default.  (Exh. 21 at ¶ 77)  This difference in default rates is statistically significant at the one percent level.  Id.

96.    None of the other 20 assets in Class V III from the list of names CSAC provided were declared in default.  (Exh. 21 at ¶ 89)

97.    The credit ratings of the 25 assets Citigroup selected were downgraded at a much higher rate than the other 102 assets that CSAC proposed.  (Exh. 21 at ¶¶81-86)

98.    As a result of the default of Class V III and the performance of its underlying collateral, Ambac suffered losses of about $305 million.  (Exh. 87)

99.    Typically, when Citigroup acted as the arranging bank for a CDO, it was compensated by receiving structuring fees from the investors. (Exh. 15 at 127:11-128:2)

100.    Citigroup received approximately $34 million from investors as fees for structuring Class V III.  (Exh. 74; Exh. 15 at 128:3-130:2)

101.    As a result of the short position it took on the 25 assets in Class V III, Citigroup made a profit of at least $250 million.  (78; Exh. 15 at 139:25-144:15)

102.    In 2006, Stoker was paid a salary of $150,000 and a guaranteed bonus of $1.05 million, and in February 2007, Stoker negotiated a salary of $150,000 and a guaranteed bonus of $2.25 million for 2007.  (Exh. 72)

103.    During the time Citigroup was structuring Class V III, Citigroup was aware that the performance of sub-mortgages and CDOs containing sub-prime mortgages was deteriorating—especially those that were originated in 2006.  (Exh. 47; Exh. 73; Exh. 57 at 30061811)

104.    As early as September 2006, Citigroup was aware that the default rate of a CDO squared could double, if as little as five or ten percent of the CDO assets included in it  were "weak."  (Exh. 22 at 30001412)

105.    All but one of the 25 assets Citigroup selected for Class V III were CDOs that closed in 2006.  (Exh. 21 at ¶ 67)

Dated:  Washington, D.C.                                    Respectfully submitted,

        May 23, 2012

                                                    /s/ Jeffery T. Infelise
                                                    Jeffery T. Infelise (DC0456998)
                                                    Assistant Chief Litigation Counsel
Jane M. E. Peterson
Assistant Chief Litigation Counsel
Andrew Feller
Senior Attorney
U.S. Securities and Exchange
Commission – Enforcement Division
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481
(202) 772-9246 (fax)
infelisej@sec.gov
petersonjm@sec.gov
fellera@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non registered participants on May 23, 2012.

                                                  s/Jeffery T. Infelise
                                                   Jeffery T. Infelise

## SERVICE LIST

John W. Keker
Jan Nielsen Little
Steven K. Taylor
Brook Dooley
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA94111
jkeker@kvn.com
jlittle@kvn.com
staylor@kvn.com
bdooley@kvn.com

*Attorneys for Brian H. Stoker*