Darius Grant  March 6, 2012
New York, NY

**Page 14**

1       Grant - March 6, 2012
2  let everyone in the CDO group go.
3       Q.   I see. Let me direct your attention
4  specifically to the period 2006-2007.
5            Who was your immediate supervisor?
6       A.   I had two supervisors. One was Nester
7  Dominguez and one was Janice Warne.
8       Q.   What was the relationship between
9  Mr. Dominguez and Ms. Warne?
10           MS. LITTLE: Objection, vague.
11           MR. INFELISE: Let me rephrase it.
12      Q.   You say you had two supervisors.
13           What do you mean by that?
14      A.   I believe when I first joined the CDO
15 group -- well, that's probably going back too early.
16           At one stage, Janice was in charge of
17 the overall group and Nester reported to her. Then
18 there was a period when I believe he was promoted to
19 co-head of the CDO group, and it was Janice and
20 Nester were then co-heads of that group up until the
21 time I left.
22      Q.   So during the period of 2006-2007, they
23 were co-heads, to the best of your recollection, of
24 the CDO group?
25      A.   I don't remember when Nester was

**Page 15**

1       Grant - March 6, 2012
2  promoted exactly.
3       Q.   During that period 2006-2007, did you
4  have more constant interaction with Ms. Warne or
5  Mr. Dominguez?
6            MR. COHEN: Objection to form. You can
7       answer.
8       A.   I would say with both. 50/50.
9       Q.   All right. Now, what was your position
10 in the CDO group in the period 2006-2007?
11      A.   I was in charge of a group called -- of
12 people who structured CDOs.
13      Q.   Was that what is known as the
14 structuring desk?
15      A.   Yes.
16      Q.   Approximately how many people worked for
17 you?
18      A.   I don't remember exactly, but I believe
19 at the peak it was 20 people to 25, maximum.
20      Q.   And was one of those individuals Brian
21 Stoker?
22      A.   Yes.
23      Q.   And was he -- did you supervise
24 Mr. Stoker the entire period of time from 2006
25 through 2007?

**Page 16**

1       Grant - March 6, 2012
2       A.   I don't understand exactly the question.
3       Q.   All right. Was Mr. Stoker a subordinate
4  of yours in the year 2006?
5       A.   Yes.
6       Q.   Was Mr. Stoker a subordinate of yours
7  during the entire time 2007 when you worked at
8  Citigroup?
9       A.   Yes.
10      Q.   All right, sir.
11           Do you hold any professional licenses?
12      A.   I believe they have lapsed because I
13 don't need them for my current job, but I did when I
14 worked at Citigroup.
15      Q.   While you worked at Citigroup, what
16 professional licenses, if any, did you have?
17      A.   There was Series 7, Series 63, I
18 believe. Which is the state one, and then there was
19 the -- there was one more. I don't remember the
20 number.
21      Q.   And were those -- did you keep these
22 current during the time you worked at Citigroup?
23      A.   Yes.
24      Q.   Now, within the CDO group, sir, could
25 you explain or describe for me what the role or

**Page 17**

1       Grant - March 6, 2012
2  function of the structuring desk was.
3            MS. LITTLE: Objection, vague.
4            MR. COHEN: Objection to form.
5       A.   The role was to structure CDOs which
6  meant, you know, putting the CDO together and
7  looking, working through the math of the models,
8  getting, you know -- dealing with the rating
9  agencies, you know, basically structuring the CDO.
10      Q.   Was the role any different with respect
11 to cash CDOs versus synthetic CDOs?
12           MR. COHEN: Objection to form.
13           MS. LITTLE: Objection, vague.
14      A.   They were -- I mean, there were
15 different complications between the two. Synthetic
16 CDOs I would say were more complex. There was also
17 other groups within the firm that were doing
18 synthetic CDOs, not just my group.
19      Q.   What other groups were those?
20      A.   There was a group in London which did
21 synthetic CDOs.
22      Q.   Well, specifically, then, you say that
23 as I understand your testimony, the synthetic CDOs
24 were more complex?
25      A.   I mean, in my opinion.

5 (Pages 14 to 17)

Darius Grant  March 6, 2012
New York, NY

## Page 18

1   Grant - March 6, 2012
2   Q. And did that require the structuring
3   desk to do anything different or additional or in
4   addition to what you did with a cash CDO?
5   A. I don't think in terms of the math.
6   There may have been legal differences which you know,
7   I'm not an expert in the legal side, so I wouldn't
8   know. But in terms of cash, you know, and modeling
9   the deal and looking at the cash flows, they were,
10  you know, similar.
11  Q. Well, let me go back. I have used the
12  term synthetic CDO.
13      Do you have an understanding of what
14  that is?
15  A. Yes.
16  Q. What's your understanding of what a
17  synthetic CDO is?
18  A. I mean, if I think carefully about it,
19  it could mean a number of different things, but I can
20  tell you what I do think is commonly thought of, is a
21  CDO which contained synthetic collateral instead of
22  cash collateral.
23  Q. Are you familiar with the term reference
24  assets?
25  A. Yes.

## Page 19

1   Grant - March 6, 2012
2   Q. And how, if at all, does that apply to a
3   synthetic CDO?
4   A. Synthetic CDO would contain credit fault
5   swap, and the credit fault swap would be based on a
6   reference asset.
7   Q. Okay. What about with respect to CDO
8   squareds; and specifically, my question is was the
9   function of the structuring desk any different with
10  respect to CDO squareds?
11      MR. COHEN: Objection to form.
12      MS. LITTLE: Objection, vague.
13  A. Again, the -- I don't think there was
14  any major difference. Again, there might have been
15  legal differences, the math, how the formulas were a
16  little bit different. But the essential role of
17  creating a spreadsheet, getting it rated, was really
18  the same.
19  Q. All right. Did the structuring desk
20  have any role in preparing the market documents for a
21  CDO that it was structuring?
22      MR. COHEN: Objection to form.
23      MS. LITTLE: Objection, vague.
24  A. I don't understand the question.
25  Q. Well, are you familiar with the type of

## Page 20

1   Grant - March 6, 2012
2   documents that were used to market CDOs?
3   A. Market, yeah.
4   Q. So my question was did the structuring
5   desk have any role in the preparation of those
6   marketing documents?
7       MR. COHEN: Objection to form.
8       MS. LITTLE: Objection.
9   A. Yes.
10  Q. And what was that?
11  A. They would assist in putting together a
12  flip book which would describe the transaction and
13  worked with lawyers on the offering materials to
14  extend. You call those marketing materials.
15  Q. So you're talking about a flip book.
16      Was there any other specific documents
17  that the structuring desk assisted in preparing for
18  the marketing of CDOs?
19  A. There may have been term sheets which
20  were used. Sometimes were external, sometimes were
21  internal use only.
22  Q. Are you familiar with the term offering
23  circular or offering memorandum?
24  A. Yes.
25  Q. And is that a document that the

## Page 21

1   Grant - March 6, 2012
2   structuring desk assisted in preparation of for the
3   purpose of marketing CDOs?
4   A. Yes.
5   Q. And specifically, what did the
6   structuring desk do with respect to the offering
7   circular preparing it for market?
8       MR. COHEN: Objection to form.
9   A. Typically, they would make sure the
10  mathematics -- the capital structure was, you know,
11  accurate in the offering circular. I mean, that was
12  the main task.
13  Q. And was it a standard practice while you
14  were supervising the structuring desk in 2006-2007
15  for you to review offering memorandums or flip books
16  that would be used to market CDOs that you were
17  structuring?
18      MR. COHEN: Objection to form.
19  A. No, normally.
20  Q. Did you have responsibility for
21  approving the offering memorandum or flip book that
22  was prepared for purposes of marketing the CDOs that
23  you were structuring?
24      MR. COHEN: Objection to form.
25  A. Sometimes I would review a flip book. I

6 (Pages 18 to 21)

Darius Grant                                                                 March 6, 2012
                              New York, NY

### Page 22

1  Grant - March 6, 2012
2  rarely reviewed offering documents. When I first
3  started the job, I was structuring deals myself and I
4  would look at the offering documents in detail and
5  create the flip books myself, but as my role
6  progressed, I did less and less of that.
7      Q.   Was there any formal procedure or
8  process by which an offering memorandum had to be
9  reviewed before it could be used and actually market
10 a CDO that you were structuring?
11         MR. COHEN: Objection to form.
12         MS. LITTLE: Objection, vague.
13     A.   There were external attorneys which were
14 deal counsel whose responsibility was to create the
15 offering materials. And so we typically relied on
16 the external counsel in, you know, ensuring those
17 were accurate.
18     Q.   Are you -- let me make sure I understand
19 your testimony, sir.
20         Was it standard practice, then, for
21 external counsel to actually prepare the offering
22 circular?
23     A.   Yes.
24     Q.   And where did they get the information
25 that they would use to include in the offering

### Page 23

1  Grant - March 6, 2012
2  memorandum?
3          MR. COHEN: Objection to form.
4      A.   They would -- as a matter of practice,
5  because there had been so many deals done, I believe
6  they would take a similar deal and use that previous
7  offering document as a template, and then the
8  structure would let them know the things that were
9  different, that needed to be changed in that
10 document.
11     Q.   You say the structure.
12         Would that be the structure responsible
13 for the particular CDO?
14         MR. COHEN: Objection to form.
15         MS. LITTLE: Objection.
16     A.   I would call that the deal manager.
17     Q.   The deal manager. Were each of the CDOs
18 that were structured on your desk actually assigned a
19 deal manager?
20     A.   Yes.
21     Q.   And it was that person's responsibility
22 to tell counsel if there were any differences in that
23 deal as compared to the templates that were being
24 used?
25         MS. LITTLE: Objection, vague.

### Page 24

1  Grant - March 6, 2012
2      Q.   I mean; is that correct, sir?
3      A.   To the extent the -- obviously, if there
4  were legal changes, they wouldn't probably know what
5  those legal changes was, but if the deal had a
6  different size of CDO, or a different, you know,
7  rating category, they would -- they were really
8  responsible for telling the counsel, deal external
9  counsel.
10     Q.   Now, you said you believed that counsel
11 normally would take a template from a previous deal
12 and use that as a starting point.
13         When you were on the structuring desk
14 and you were structuring a new CDO, how did you know
15 what template the external counsel was using as a
16 basis for the offering materials in that CDO?
17         MR. COHEN: Objection to form.
18         MS. LITTLE: Objection, vague, compound.
19     A.   So do I answer?
20     Q.   Yes, please.
21     A.   Sometimes the deal manager would suggest
22 an offering document. I think sometimes the external
23 counsel would recommend one. I mean, we tended to
24 use a few external counsel, and so they had worked on
25 probably a large number of deals for us, so they were

### Page 25

1  Grant - March 6, 2012
2  familiar with what documents --
3      Q.   All right.
4      A.   -- they should use.
5      Q.   When you say outside counsel,
6  specifically are you referring to outside counsel for
7  Citigroup?
8      A.   The role was deal counsel. So they were
9  not representing Citigroup. You know, to be honest,
10 I forget their precise legal roles. They were
11 counsel to the offering. So I don't know if that
12 makes them counsel to the legal entity in the
13 Caymens, for example.
14     Q.   The SPV, counsel for the SPV?
15     A.   No, they weren't -- actually, no, that
16 was someone in the Caymens. Typically, my
17 recollection is that they would be deal counsel and
18 underwriter's counsel, so they actually would be
19 performing the function of representing Citigroup as
20 underwriter, and then they would be -- manager's
21 counsel would be someone different.
22     Q.   Manager's counsel, what do you mean by
23 that?
24     A.   Counsel -- external counsel representing
25 the investment manager of the CDO.

Page 26

1    Grant - March 6, 2012
2    Q.   Okay. Now, was there, going back to
3    the -- my question concerning the approval process,
4    was there any written procedures that the structuring
5    desk were required to use in order to get approval
6    for the marketing documents for a CDO that it was
7    structuring?
8         MR. COHEN: Objection to form.
9         MS. LITTLE: Objection, vague.
10   A.   No, not that I'm aware of.
11   Q.   Was there any files or records
12   maintained of reviews that were done by anyone of the
13   marketing materials that were used for CDOs that the
14   structuring group was putting together?
15        MR. COHEN: Objection to form.
16   A.   Not that I'm aware of.
17   Q.   Now, in structuring a CDO, again,
18   looking at the period 2006-2007, did you work with
19   any other desks on the CDO group?
20   A.   Yes.
21   Q.   Which ones?
22   A.   We would always work with the syndicate
23   desk.
24   Q.   And when you say work with the syndicate
25   desk, what exactly did you do?

Page 27

1    Grant - March 6, 2012
2    A.   The syndicate desk's responsibility was
3    to distribute the CDO, the paper created by the CDO.
4    And so they would provide us with market color as to
5    what type of paper and type of structure would be
6    received, you know, favorably in the market; and they
7    would also be responsible for telling us what levels
8    to model the debt, the debt tranches at. So they
9    would be -- they would provide input to the model on
10   the spreads.
11   Q.   You say they provided market color.
12        What does that mean?
13   A.   They would tell us whether, you know, a
14   structure was -- whether investors would like the
15   deal, and therefore, be interested in buying the
16   paper, or whether they would dislike the deal and
17   theretofore, we would -- we may want to adjust the
18   structure.
19   Q.   Do you recall who, if anyone, on the
20   structuring desk you coordinated with the most with
21   respect to CDOs in structuring?
22        MR. COHEN: Objection to form.
23        MS. LITTLE: Objection.
24   A.   Sorry, can you repeat the question.
25   Q.   I'm sorry. Do you recall specifically

Page 28

1    Grant - March 6, 2012
2    who, if anyone, on the syndicate desk you coordinated
3    the most with in structuring the CDOs?
4         MS. LITTLE: Objection, vague.
5    A.   Typically, Shalabh Mehrish.
6    Q.   Shalabh Mehrish?
7    A.   But Shalabh had a number of people on
8    the desk that -- you know, he was in charge, so it
9    was probably the most -- he was probably the most
10   involved.
11   Q.   Now, sir, I'm going to direct your
12   attention again now to a specific CDO that was I
13   believe called Class V Funding III.
14        And I'm going to refer to that as just
15   Class V III. Is that all right?
16   A.   Sure, yes.
17   Q.   Are you familiar with that or recall
18   that CDO?
19   A.   I recall the name, not the details of
20   the transaction.
21   Q.   Did your review of any of the documents
22   that you said you reviewed for purposes of this
23   deposition refresh your memory concerning that
24   specific CDO?
25   A.   No.

Page 29

1    Grant - March 6, 2012
2    Q.   Okay. Do you recall whether or not you
3    contacted or worked with Mr. -- is it Mehrish?
4    A.   Mehrish.
5    Q.   Mehrish, on the Class V III?
6    A.   I don't remember.
7    Q.   Do you recall whether or not you
8    contacted or worked with anybody else in the
9    syndicate desk on Class V III?
10   A.   I don't remember.
11   Q.   Now, in addition to the syndicate desk,
12   did you coordinate with any other desks in the CDO
13   group when you were structuring the CDO?
14        MS. LITTLE: Objection, vague.
15   A.   Not -- I mean, there was a sales desk,
16   so you know, you might -- you would be talking to the
17   salespeople about the deal and maybe give them a term
18   sheet in dealing with the sales desk.
19   Q.   Was there a secondary trading desk in
20   the CDO group?
21   A.   Yes.
22   Q.   And was it a standard practice when you
23   were structuring a CDO to coordinate with the
24   secondary trading desk?
25        MR. COHEN: Objection to form.

Darius Grant                                                          March 6, 2012
New York, NY

### Page 30

1  Grant - March 6, 2012
2      MS. LITTLE: Objection, vague.
3      A.   Not frequently.
4      Q.   You say not frequently.
5           On occasion would you coordinate with
6  the secondary desk on a CDO that you were
7  structuring?
8      MS. LITTLE: Same objection.
9      A.   Well, I -- when you mean you, I didn't
10 really deal with the secondary desk.
11     Q.   Personally, you didn't?
12     A.   Right.
13     Q.   Are you aware whether or not other
14 individuals that worked for you on the structuring
15 desk coordinated with the secondary desk on the CDO
16 that you were structuring?
17     MR. COHEN: Objection to form.
18     MS. LITTLE: Objection.
19     A.   I don't remember.
20     Q.   Was it unusual for that to happen?
21     MR. COHEN: Objection to form.
22     MS. LITTLE: Objection.
23     A.   They weren't as a matter of course,
24 involved. It was really syndicate. I know syndicate
25 and trading coordinated -- worked a lot closer

### Page 31

1  Grant - March 6, 2012
2  together.
3      Q.   And how do you know that?
4      A.   Just the interaction on the desk, and
5  you saw them. They were involved in, you know, risk
6  meetings which we weren't involved in, for example.
7      Q.   Under what circumstances, to your
8  knowledge, would someone on the structuring desk
9  actually coordinate with someone on the secondary
10 trading desk with respect to the CDO that you were
11 structuring?
12     MR. COHEN: Objection to form.
13     MS. LITTLE: Objection.
14     A.   Actually, there is one area. There is
15 one area where there would be involvement, was the
16 approval of -- we would -- Citibank would provide a
17 warehouse for the CDO, and if you -- if the deal was
18 buying mortgages, then the mortgage desk would
19 approve the inclusion of that collateral into the
20 warehouse from a risk prospective because Citigroup
21 typically had the risk during the warehousing period.
22 So most of the collateral is mortgages. So it was
23 the mortgage desk which was a different desk all
24 together. If it was a corporate, the corporate desk
25 would approve it. If it was a CDO, going into a CDO,

### Page 32

1  Grant - March 6, 2012
2  then the -- my understanding is that the CDO trading
3  desk -- I think the CDO trading desk or syndicate
4  would approve the inclusion of that CDO into the
5  warehouse.
6      Q.   Now you're talking about a situation of
7  a cash CDO where the CDOs were actually purchased for
8  inclusion?
9      MR. COHEN: Objection to form.
10     A.   No.  Cash or synthetic because at the
11 end of the day, the risk, the economic risk, was
12 similar to Citigroup in the warehouse.
13     Q.   You say the economic risk on a synthetic
14 CDO was similar to the economic risk with respect to
15 a cash CDO?
16     A.   From the warehouse's perspective, yes.
17 Because the warehouse had risk that if something went
18 wrong, if one of the bonds defaulted, the warehouse
19 would lose money. So if it was a synthetic or a cash
20 bond and that bond defaulted, then the warehouse
21 would take a loss.
22     Q.   Now, you said that would be one
23 situation where the secondary trading desk would
24 approve or at least have an input as to the assets
25 that were going into the warehouse; is that correct?

### Page 33

1  Grant - March 6, 2012
2      A.   I don't remember if -- I don't remember.
3  It's not clear in my mind if it was secondary and/or
4  syndicate that was approving those CDOs.
5      Q.   Okay.
6      A.   I don't remember exactly which one.
7      Q.   Now, let me go back and ask in the CDO
8  group, was there any formal procedures or policies
9  for coordinating the activities of all the desks that
10 were in the CDO group?
11     MS. LITTLE: Objection, vague.
12     MR. COHEN: Objection to form.
13     A.   I don't understand it.
14     Q.   Were there any --
15     A.   The exact question.
16     Q.   Let me try it again.
17          Were there any written policies or
18 procedures of the CDO group as a whole concerning the
19 coordination of activities of the various desks in
20 the CDO group?
21     A.   I'm not aware of any.
22     Q.   Did you -- were there any meetings held
23 of the various individuals in the CDO group?
24     A.   Yes.
25     Q.   And who would attend those?

Page 34

1  Grant - March 6, 2012
2      MR. COHEN: Objection to form.
3      A.  There would be a -- there was a Monday
4  morning call which Janice ran which was for everyone
5  in the global CDO group which could be 100, 150
6  people. You know, London, Tokyo, et cetera. That
7  was certainly one time in a week when everyone was on
8  the call. There would then be ad hoc meetings.
9  There were, I recollect, there were managing director
10 meetings, but most of the meetings were fairly ad hoc
11 when an issue needed to be discussed. There were
12 also risk meetings which I was wasn't invited to. It
13 was -- I believe there was a risk pricing meeting
14 once -- I don't remember the frequency. I wasn't
15 invited.
16     Q.  All right. You mentioned this Monday
17 morning call.
18     What was the purpose of that?
19     MR. COHEN: Objection to form.
20     MS. LITTLE: Objection, vague.
21     A.  I personally thought it was so that
22 Janice could find out, make sure -- it was her way of
23 managing the whole group in understanding what was
24 going on, but I think the secondary purpose was so
25 that we all knew what each other were working on.

Page 35

1  Grant - March 6, 2012
2      Q.  During this meeting, was there
3  discussions by the various people involved concerning
4  what they were working on?
5      MR. COHEN: Objection to form.
6      A.  Yes.
7      Q.  Now, you mentioned there were also the
8  managing director meetings.
9      Who presided over those meetings?
10     A.  After Michael Raynes joined, he was head
11 of global structured credit products, Michael Raynes
12 presided over those meetings; and prior to that, it
13 was someone else.
14     Q.  Did Mr. Dominguez attend those meetings?
15     A.  Yes, if he was in the office.
16     Q.  And then the managing directors of the
17 other desks in the CDO group would attend those
18 meetings?
19     A.  Yes.
20     Q.  And what was the purpose of that, those
21 meetings?
22     MR. COHEN: Objection to form.
23     MS. LITTLE: Same objection.
24     A.  I think it was mainly so that Michael
25 could direct people in terms of where they should be

Page 36

1  Grant - March 6, 2012
2  focusing, understanding where the revenues were
3  coming from the different desks.
4      Q.  What were the frequency of those
5  managing director meetings?
6      A.  I don't remember exactly. I don't think
7  that they were regular.
8      Q.  Was it once a week?
9      A.  I don't remember.
10     Q.  Once a month?
11     A.  No. Probably in between.
12     Q.  Sometime between once a week and once a
13 month?
14     A.  Yes.
15     Q.  Now, was there any primary means of
16 communicating between the various desks and the CDO
17 group?
18     MR. COHEN: Objection to form.
19     MS. LITTLE: Objection, vague.
20     A.  Yes.
21     Q.  What was that?
22     A.  Typically verbal.
23     Q.  And when you say verbal, you mean oral
24 communications?
25     A.  Yes, oral communication.

Page 37

1  Grant - March 6, 2012
2      Q.  And did you engage in communication by
3  e-mails?
4      A.  Yes.
5      Q.  Was that a fairly standard practice to
6  use e-mails to communicate from one desk to another?
7      MS. LITTLE: Objection, vague.
8      A.  E-mails and/or going up -- because all
9  the desks were very close to one another, so it was
10 relatively easy to go and talk to people. I mean,
11 frankly, that was quicker. If someone was out, I
12 guess you might send them an e-mail.
13     Q.  Did you receive e-mails from the
14 individuals who worked for you?
15     A.  Yes.
16     Q.  Was that a standard practice or routine
17 practice?
18     MS. LITTLE: Objection to form.
19     A.  Yes.
20     Q.  And did you rely upon information you
21 received in that -- excuse me, strike that.
22     Did you rely upon the information in
23 those e-mails in doing your business as the I guess
24 directing manager of the structure desk; is that
25 correct?

Darius Grant
New York, NY
March 6, 2012

### Page 38

Grant - March 6, 2012
2  MR. COHEN: Objection to form.
3  MS. LITTLE: Objection.
4  A.  Managing director.
5  Q.  Managing director.
6  A.  I'm sorry, can you repeat the question.
7  Q.  Did you rely upon e-mails you received
8  to -- from individuals who worked for you in
9  conducting your activities as a managing director?
10     MR. COHEN: Objection to form.
11     MS. LITTLE: Objection, vague.
12  A.  Yes.
13  Q.  Okay. Mr. Grant, with respect to cash
14  CDOs, did the structuring desk have any role in
15  selecting or recommending assets for inclusion in the
16  cash CDO?
17     MR. COHEN: Objection to form.
18     MS. LITTLE: Objection.
19  A.  Sometimes, yes.
20  Q.  Under what circumstances would a
21  structuring desk have a role in selecting or
22  recommending the assets for inclusion in a cash CDO?
23     MS. LITTLE: Objection, vague and
24     compound.
25  A.  I'm not sure I would use the word

### Page 39

Grant - March 6, 2012
2  recommend, but as part of structuring, typically a
3  dummy portfolio would be created which listed the
4  securities that would go into a CDO, and it could
5  list actual securities, or it may list, you know,
6  RMBS 1, RMBS 2, RMBS 3 with various characteristics
7  such as spread and rating, and that would be the
8  basis by which the deal would be rated.
9  Q.  All right. Now, when you say in some
10 occasions it would be actual assets, would there be
11 assets that actually had names?
12  A.  Yes.
13  Q.  How would they be selected by the
14 structuring group desk?
15     MR. COHEN: Objection to form.
16  A.  Typically, we would take a previous
17 portfolio. I mean, frankly, the easiest thing to do
18 was to take a portfolio that we knew worked and
19 rated, was rated before, obviously subject to
20 confidentiality of those securities weren't -- you
21 know, you weren't just copying one manager's
22 portfolio for another, but you would take a similar
23 portfolio, and say you know, that we know this
24 portfolio will be rated by, you know CDO, AAA through
25 BBB, and work out what the return in equity would be

### Page 40

Grant - March 6, 2012
2  and make sure that was adequate, and then that would
3  become the dummy portfolio, and it would be provided
4  to the manager so that the manager would have an
5  understanding of what assets they were -- you know,
6  they would be buying, they would be expected to buy
7  subject to their approval, obviously.
8  Q.  And when you did that, was there an
9  assumption that the assets that you would actually
10 identify were included in the final CDO?
11  A.  No.
12     MR. COHEN: Objection to form. Darius,
13     you have to give us a moment to object.
14     THE WITNESS: Sorry.
15     MR. COHEN: That's okay. Just take your
16     time.
17     MS. LITTLE: Objection.
18  A.  No.
19  Q.  Well, then, why would you include
20 specific names of assets in the dummy portfolio?
21     MR. COHEN: Objection to form.
22     MS. LITTLE: Same objection.
23  A.  The managers would need to know the
24 types of securities to buy. So if there was, you
25 know, such and such issuer, you know, BBB, minus

### Page 41

Grant - March 6, 2012
2  security, then they would know that in order to meet
3  the rating requirements of the deal, that they could
4  buy something similar to that. But there was
5  never -- it was never mandated, to my knowledge, that
6  they buy those securities. Certainly from the
7  structuring desk.
8  Q.  When you provided that dummy portfolio
9  to the manager, was it a complete portfolio as an --
10 excuse me, when you provided the dummy portfolio, did
11 it include assets, specific assets or dummy assets,
12 for the entire portfolio, so the manager could see
13 how it would be structured?
14     MR. COHEN: Objection to form.
15     MS. LITTLE: Objection, vague.
16  A.  Typically, yes.
17  Q.  Let me then turn to a synthetic CDO as
18 you defined it.
19     Would the structuring desk, with respect
20 to synthetic CDOs, typically make recommendations
21 concerning the specific assets that should be
22 included in a synthetic CDO?
23     MS. LITTLE: Objection, vague.
24  A.  I'm sorry. Sorry, can you repeat the
25 question.

11 (Pages 38 to 41)

Darius Grant  March 6, 2012
New York, NY

### Page 42

1   Grant - March 6, 2012
2   Q.  Sure.  Again, focusing on synthetic
3   CDOs.
4   A.  Okay.
5   Q.  Would the structure desk typically make
6   recommendations concerning specific assets that
7   should be included in a synthetic CDO?
8       MS. LITTLE:  Objection, vague.
9   A.  My answer would be the same whether it
10  was synthetic or cash.  There would be a dummy
11  portfolio, but there wouldn't be recommendations to
12  buy securities.  It would be for the manager to know
13  what types of assets they were expected to manage.
14  Q.  Let me, then, ask you questions -- same
15  question concerning CDO squareds.
16      Did the structure desk make any
17  recommendations typically concerning the specific
18  assets that should be included in the CDO squared?
19      MR. COHEN:  Objection to form.
20      MS. LITTLE:  Objection.
21  A.  No. Same process of creating a dummy
22  portfolio.
23  Q.  So the same process applied to cash
24  CDOs, synthetic CDOs and CDO squareds?
25  A.  Correct.

### Page 43

1   Grant - March 6, 2012
2   Q.  When you were putting together the dummy
3   portfolio, was there any coordination between the
4   structuring desk and the syndicate desk concerning
5   what assets would be referenced in that dummy
6   portfolio?
7       MR. COHEN:  Objection to form.
8       MS. LITTLE:  Objection.
9   A.  The syndicate desk would provide spreads
10  on market color on the portfolio to make sure that it
11  was -- as we discussed earlier, that it was, you
12  know, market color would be -- we got from the market
13  was being taken into account in creating the dummy
14  portfolio.
15  Q.  What about with respect to the secondary
16  desk, was there any coordination between structuring
17  desk and secondary desk, secondary trading desk,
18  concerning the assets that were included in the dummy
19  portfolio that was provided to an asset manager?
20      MS. LITTLE:  Objection.
21      MR. COHEN:  Objection to form.
22  A.  I don't remember if the secondary desk
23  were involved.  Probably on CDOs -- if you would
24  take -- if the CDO itself was buying another CDO,
25  then they would probably provide spread guidance for

### Page 44

1   Grant - March 6, 2012
2   the dummy portfolio.
3   Q.  Was it typical for the secondary desk to
4   specifically request inclusion of specific assets in
5   the dummy portfolio that was provided to the asset
6   manager?
7       MR. COHEN:  Objection to form.
8       MS. LITTLE:  Objection.
9   A.  I don't remember.
10  Q.  You don't remember?
11  A.  The secondary desk.
12  Q.  You don't remember ever doing that or
13  you don't remember whether they did or not?
14      MR. COHEN:  Objection to form.
15      MS. LITTLE:  Objection.
16  A.  I don't remember if they did or not.
17  Q.  Now, when Citigroup selected an asset
18  manager for a CDO structuring, was there any policy
19  concerning instructions to the asset manager that
20  they should purchase assets from Citigroup?
21      MR. COHEN:  Objection to form.
22      MS. LITTLE:  Objection.
23  A.  No formal policy.
24  Q.  Was there any informal policy?
25      MR. COHEN:  Objection to form.

### Page 45

1   Grant - March 6, 2012
2       MS. LITTLE:  Same objection.
3   A.  I don't think there was a policy.
4   Q.  So there wasn't a formal or informal
5   policy?
6       MR. COHEN:  Objection to form.
7       MS. LITTLE:  Objection.
8   A.  We would like the manager to buy assets
9   from Citigroup.  Because we liked the risk of those
10  assets, so if we had a warehouse open, it would make
11  sense to buy assets from Citigroup.  Because if we
12  bought assets from another dealer, we would have to
13  assess the risk of those.  So frankly, it was more
14  attractive buying securities that Citigroup
15  structured itself, but there was no policy.
16  Q.  Was there any expectation that an asset
17  manager would purchase assets for the CDO from
18  Citigroup?
19      MS. LITTLE:  Objection to form.
20  A.  I don't -- expectation?  I don't know if
21  that's -- I understand that, what you mean by that.
22  Q.  Excuse me.  Did you expect that an asset
23  manager that was selected would actually purchase the
24  assets for the CDO from Citigroup?
25      MS. LITTLE:  Objection, vague.

12 (Pages 42 to 45)

Darius Grant                                                                      March 6, 2012
New York, NY

Page 46

1         Grant - March 6, 2012
2         MR. COHEN: Objection to form.
3     A.    I think that would be taking it too far.
4    That would be strong to say that.
5     Q.    So you did not expect --
6     A.    Well, again, I don't know what the word
7    expect or like. We would like the manager to buy
8    securities from Citigroup. I'm not sure there was
9    any formal expectations that they would. Certain
10   managers, frankly, were -- you know, may not have
11   bought many assets from Citigroup. But typically,
12   Citigroup was one of the largest dealers in the
13   market for mortgage-backed securities. And with, you
14   know, several other firms. And so you would normally
15   expect in a portfolio that was created by any manager
16   that a significant portion of those securities would
17   come from Citigroup. Because they wouldn't be able
18   to probably ramp up a portfolio without Citigroup.
19   Because I think Citigroup, at some stage, was number
20   one, the lead table for asset-backed securities and
21   mortgage-backed securities; and then there was .
22   Merrill and Lehman, about four or five other major
23   players. So to be honest, it might have been tough
24   if you really had to avoid buying securities from
25   Citigroup.

Page 47

1         Grant - March 6, 2012
2     Q.    Was the purchase of assets from
3    Citigroup ever made a condition to the selection of
4    an asset manager?
5         MR. COHEN: Objection to form.
6         MS. LITTLE: Objection, vague.
7     A.    Ever made a condition? I think we --
8    there is maybe one occasion when I think we may have
9    tried to do that, but I believe the manager pushed
10   back.
11    Q.    Do you recall what occasion that was?
12    A.    I think it may have been with TCW.
13    Q.    And do you recall whether or not you
14   ultimately ever did a CDO involving TCW?
15    A.    Oh, we did lots of CDOs with TCW, but I
16   don't think that we got -- I don't think that we were
17   able to -- I don't recall that we were able to get
18   that requirement. There was a period when Merrill
19   Lynch said they didn't want to buy anyone else's CDOs
20   into their warehouses, and so as a tit for tat, we
21   then said to Merrill Lynch we're not buying your
22   deals, and then Lehman said we're not buying your
23   deals, everyone said we're not buying your deals; and
24   I think it may have lasted for a week, and then
25   everyone realized it was counter productive. And

Page 48

1         Grant - March 6, 2012
2    that was -- yeah, that's my recollection.
3         MR. COHEN: Mr. Videographer, I was just
4    wondering how you were on the tape, because I
5    could use a break.
6         MR. INFELISE: We're going to take a
7    break right now.
8         MR. COHEN: Okay. Perfect.
9         THE VIDEOGRAPHER: This marks the end of
10   tape No. 1. We're going off the record at 10:08
11   a.m.
12        (Discussion off the record.)
13        THE VIDEOGRAPHER: This marks the start
14   of tape No. 2. We're back on the record at
15   10:23 a.m.
16   BY MR. INFELISE:
17    Q.    Mr. Grant, I had asked you a few
18   questions about whether or not there was any
19   expectation that asset managers that Citigroup
20   selected would actually acquire assets from
21   Citigroup.
22        Let me ask you this, was there normally
23   any expectation that an asset manager that Citigroup
24   selected would select assets from a source identified
25   by Citigroup?

Page 49

1         Grant - March 6, 2012
2         MR. COHEN: Objection to form.
3         MS. LITTLE: Objection, vague.
4     A.    No.
5     Q.    Did you ever instruct anyone who worked
6    on the structuring desk for you that they should
7    attempt to have an asset manager actually select
8    assets from a specific source identified by
9    Citigroup?
10        MS. LITTLE: Objection, vague.
11    A.    I don't remember.
12    Q.    You don't remember if you did or did not
13   or you don't remember ever doing it?
14        MR. COHEN: Objection to form.
15    A.    I don't remember.
16        MR. COHEN: You can answer.
17    A.    Can you repeat the question.
18    Q.    Yes. Do you recall whether or not you
19   ever instructed or directed anyone who worked for you
20   on the structuring desk to tell or instruct an asset
21   manager to select specific assets for a CDO from
22   another source other than Citigroup?
23        MR. COHEN: Objection to form.
24        MS. LITTLE: Objection to form.
25    A.    Other than Citigroup?

13 (Pages 46 to 49)

Darius Grant                                                                                    March 6, 2012
                                    New York, NY

### Page 74

1         Grant - March 6, 2012
2     A.  I don't remember.
3     Q.  Do you recall, again, whether you had
4  any discussion with Mr. Quintin concerning what
5  Mr. Stoker was referring to?
6     A.  I don't remember.
7     Q.  Sir, looking at that document, and
8  sitting here today, do you have an understanding of
9  what this means to you?
10         MR. COHEN:  Objection to form.
11         MS. LITTLE:  Objection.
12    A.  I don't remember.
13    Q.  I understand you don't remember, but
14  looking at the bottom e-mail from Mr. Stoker to you
15  and other individuals, and specifically, paragraph 2,
16  do you have any understanding of what Mr. Stoker was
17  referring to -- is referring to?
18         MR. COHEN:  When you say paragraph 2,
19      just to be clear, which one do you mean?
20         MR. INFELISE:  On the second page, the
21      paragraph 2.
22         MR. COHEN:  The one that begins with the
23      number 2?
24         MR. INFELISE:  That's the one.
25         MS. LITTLE:  Object, foundation.

### Page 75

1         Grant - March 6, 2012
2         MR. COHEN:  Objection to form.
3     A.  I'm sorry, can you repeat the question.
4     Q.  Sure.  Sitting here today, and I
5  understand you don't recall this, but reading this
6  e-mail, do you have any understanding of what
7  Mr. Stoker is referring to when he says Citi shorts
8  zero 50 percent and 100 percent of the collateral
9  into the CDO?
10        MR. COHEN:  Objection to form.
11        MS. LITTLE:  Objection.
12    A.  Yes.
13    Q.  All right.  What's your understanding?
14    A.  That Citi would take a short position in
15  zero 50 percent or 100 percent of the collateral in
16  the CDO.
17    Q.  All right.  Thank you.
18        Mr. Grant, I'm now going to show you --
19  well, I'm going to ask the court reporter to mark the
20  next document as Exhibit No. 614.
21        (Exhibit 614, Single-page Document Bates
22     numbered CITI 1946072, marked for
23     identification, as of this date.)
24        MR. INFELISE:  And this is, for the
25     record, a single-page document Bates numbered

### Page 76

1         Grant - March 6, 2012
2  1 -- CITI 1946072.
3     Q.  All right, Mr. Grant.
4         Have you had a chance to look at Exhibit
5  614?
6     A.  Yes.
7     Q.  And this appears to be an e-mail from
8  Brian Stoker to several individuals including
9  Mr. Quintin and you.
10        Do you recall, sir, receiving this
11  e-mail?
12    A.  No, although it was copied to me.
13    Q.  It was copied to you.
14        Do you have any reason to believe that
15  you didn't receive this e-mail?
16    A.  No.
17    Q.  All right.  Now, I would like to direct
18  your attention to the second sentence that starts
19  with also put.  It says we also put in a simple table
20  that shows the profits you can make shorting single A
21  assets into the deal or Shalabh selling new issue
22  bonds into the deal.
23        Do you have any recollection of what
24  Mr. Stoker is referring to?
25        MR. COHEN:  Objection to form.

### Page 77

1         Grant - March 6, 2012
2         MS. LITTLE:  Objection.
3     A.  I don't.  I don't remember.
4     Q.  Do you recall if you had any
5  conversation with Mr. Stoker concerning this subject?
6     A.  I don't recall.
7         MS. LITTLE:  Objection.
8     Q.  Prior to the date of this e-mail,
9  October 27, 2006, were there any CDOs that you're
10  aware of that Citigroup structured in which Citi
11  actually shorted single A assets into the deal?
12        MR. COHEN:  Objection to form.
13        MS. LITTLE:  Objection.
14    A.  I don't remember prior to that.
15    Q.  You don't remember if it ever happened?
16    A.  Yes.  I don't remember if it ever
17  happened at all.
18    Q.  Do you recall whether this would have
19  been an unusual event?
20        MR. COHEN:  Objection to form.
21        MS. LITTLE:  Objection.
22    A.  I don't remember at the time.
23    Q.  Well, sir, as I understand your earlier
24  testimony, one of the things the structuring desk did
25  was do the math concerning any structures.

                                                               20 (Pages 74 to 77)

**Page 78**

1  Grant - March 6, 2012
2  In light of that, do you have any
3  understanding of what Mr. Stoker is talking about
4  when he put -- he says we also put in a table that
5  shows the profits you can make shorting single A
6  assets into the --
7        MR. COHEN: Objection to form.
8        MS. LITTLE: Objection.
9     A.   I don't know what -- I don't know what
10 he was thinking.
11    Q.   And you don't recall him ever discussing
12 it with you?
13    A.   I don't remember.
14    Q.   All right. Do you recall whether
15 Mr. Quintin ever discussed it with you?
16    A.   I don't remember.
17    Q.   Sir, when you had conducted your
18 analysis as part of the structuring desk, did you
19 take into account the profits that were potentially
20 to be made by Citi as a result of the structuring?
21 .      MR. COHEN: Objection to form.
22       MS. LITTLE: Objection.
23    A.   The -- can you -- I don't think I
24 understand the question.
25    Q.   Well, as part of the mathematics you

**Page 79**

1  Grant - March 6, 2012
2  said you did, did that include attempting to
3  determine what, if any, profits Citi would make as a
4  result of that CDO?
5        MS. LITTLE: Objection. Vague and
6    misstates prior testimony.
7     A.   Yes. You would only do a deal if it was
8  going to contribute to the profits of Citigroup; and
9  it was fairly simple because we had a structuring fee
10 multiplied by the principal.
11    Q.   So the profit would normally be the
12 structuring fee multiplied by what was the principal.
13 Is that --
14    A.   The deal size.
15    Q.   The deal size. That was the normal
16 profits that you would expect?
17    A.   Yeah. The revenue.
18    Q.   Okay. Thank you. All right, sir.
19       I'm going to show you what was
20 previously marked as Exhibit 371, a one-page document
21 Bates numbered CITI 18143140.
22       All right, sir.
23       Have you had a chance to look at Exhibit
24 371?
25    A.   Yes.

**Page 80**

1  Grant - March 6, 2012
2     Q.   All right. And for the record, I note
3  that you are not on this e-mail either as sender or
4  recipient.
5        My question to you, sir, is were you
6  aware that on November the 1st of 2006, Mr. Stoker
7  had sent a list to a Mr. Khan containing what it
8  says, a first cut of names?
9     A.   I don't remember whether I was aware.
10    Q.   Do you recall whether Mr. Stoker ever
11 discussed this with you?
12       MR. COHEN: Objection to form.
13       MS. LITTLE: Objection.
14    A.   I don't remember.
15    Q.   Looking at Exhibit 371, is this the form
16 of the dummy portfolio that we talked about that you
17 would normally provide?
18       MR. COHEN: Objection to form.
19       MS. LITTLE: Objection.
20    A.   I don't know. It could be.
21    Q.   Well, all right, sir. I understood that
22 you said you provided a dummy portfolio that would
23 include an actual breakdown of what was in tranches.
24       MR. COHEN: Objection to form.
25    Q.   Is that correct?

**Page 81**

1  Grant - March 6, 2012
2     A.   Yes. It would include the side of the
3  securities or dummy securities.
4     Q.   And then why do you say that Exhibit 371
5  could actually be one of those dummy portfolios?
6        MR. COHEN: Objection to form. That's
7    not his testimony.
8        MS. LITTLE: Objection.
9     A.   It's a list of -- it's a list of CDOs.
10    Q.   Yes. And why is it you believe, then,
11 that this may have been, or as you said, could have
12 been, a dummy portfolio --
13       MR. COHEN: Objection to form.
14    Q.   -- provided to the asset manager?
15       MR. COHEN: Sorry, I didn't mean to cut
16   you off. Objection to form.
17    A.   I don't know. I'm just -- I don't know
18 what it is.
19    Q.   All right.
20    A.   I don't know.
21    Q.   Sir, this is not the normal format for a
22 dummy portfolio that your structure desk would
23 provide, is it?
24       MR. COHEN: Objection to form.
25       MS. LITTLE: Objection.

## Page 82

1  Grant - March 6, 2012
2  A.  No.
3  Q.  All right.
4      MR. INFELISE: This may be a good time
5  to take a break. Let's say, ten minutes.
6      THE VIDEOGRAPHER: This marks the end of
7  tape No. 2. We're going off the record at 11:14
8  a.m.
9      (There was a recess taken.)
10     THE VIDEOGRAPHER: This marks the start
11 of tape No. 3. We're back on the record at
12 11:29 a.m.
13 BY MR. INFELISE:
14     Q.  Mr. Grant, I'm going to show you what
15 has been previously marked as Exhibit 370, Bates
16 numbered CITI 15898475. All right.
17     Mr. Grant, have you had a chance to look
18 at Exhibit 370?
19     A.  Yes.
20     Q.  Do you have any recollection of any of
21 the e-mails documented on that page?
22     A.  No.
23     Q.  All right. The bottom of the page is
24 from Brian Stoker to you as well as Donald Quintin
25 and other individuals, and it's a reference to a CSAC

## Page 83

1  Grant - March 6, 2012
2  CDO squared.
3      Do you have any understanding or do you
4  have any recollection of what deal the CSAC CDO
5  squared references?
6      MR. COHEN: Objection to form.
7      MS. LITTLE: Objection.
8  A.  I don't remember. I was just copied on
9  the e-mail.
10 Q.  I'm sorry, you were what, just copied?
11 A.  Just copied on the e-mail.
12 Q.  Yes. Okay. Thank you.
13     Do you have any recollection of whether
14 Citi did any CDO squared with CSAC other than Class V
15 III?
16 A.  I don't remember. I remember we did
17 deals with CSAC. I don't remember what they were.
18 Q.  All right. Now, the e-mail directly
19 above that is from Darius Grant to Brian Stoker,
20 subject CSAC CDO squared.
21     And the statement is are we doing this.
22 Directly above that is -- appears to be a response
23 from Mr. Stoker to -- directly to you. I hope so.
24 This is DQ's prop trade (don't tell CSAC).
25     First, sir, do you know what the

## Page 84

1  Grant - March 6, 2012
2  reference to DQ is?
3  A.  I assume it's Donald Quintin.
4  Q.  I see.
5      And it goes on to say CSAC agreed to the
6  terms even though they don't get to pick the assets.
7      Sir, do you have any recollection of
8  Mr. Stoker telling you that in this CSAC CDO squared,
9  CSAC agreed to the terms even though they don't get
10 to pick the assets there?
11     MS. LITTLE: Objection, foundation.
12 A.  I don't remember.
13 Q.  Would that, sir, be an unusual situation
14 in your experience on the structuring desk in
15 2006-2007?
16     MR. COHEN: Objection to form.
17     MS. LITTLE: Objection.
18 A.  I mean, I don't remember getting the
19 e-mails, so I don't remember the context.
20 Q.  I understand that, sir.
21     My question was this; in 2006-2007,
22 would it have been, in your estimation, unusual that
23 an asset manager agreed to terms of CDOs even though
24 they didn't get to pick the assets?
25     MR. COHEN: Objection to form.

## Page 85

1  Grant - March 6, 2012
2      MS. LITTLE: Objection.
3  A.  Again, I don't remember. It seems
4  somewhat odd.
5  Q.  Do you recall any CDOs in which you were
6  involved or Citi was involved, in which the asset
7  manager agreed to the terms of the deal even though
8  they didn't get to pick the assets?
9      MR. COHEN: Objection to form.
10     MS. LITTLE: Objection.
11 A.  Well, there were the static deals where
12 there was no manager picking assets.
13 Q.  Right. That would be a situation where
14 there was no asset manager; and my question was with
15 respect to a CDO in which there was an asset manager,
16 do you recall that -- any CDO in which -- where there
17 was an asset manager, they agreed to the terms of the
18 CDO even though they didn't get to pick the assets?
19     MS. LITTLE: Objection.
20     MR. COHEN: Objection to form.
21 A.  I don't remember exactly.
22 Q.  You don't remember that ever happening?
23     MR. COHEN: I think you have asked him
24 five times now.
25 A.  I don't remember if -- sorry, can you

22 (Pages 82 to 85)

Darius Grant                                                                 March 6, 2012
                                   New York, NY

Page 86

1           Grant - March 6, 2012
2    repeat the question.
3        Q.   Sure. One more time.
4            MR. COHEN: Thank you. Sixth time.
5            MR. INFELISE: That will be the sixth
6    time. Thank you.
7            MR. COHEN: You're welcome.
8        Q.   Do you recall any CDO in which you were
9    involved where there was an asset manager in which
10   the asset manager agreed to the terms even though
11   they didn't get to pick the assets in the CDO?
12       A.   I don't remember.
13           MS. LITTLE: Objection.
14       Q.   The next e-mail up is from Darius Grant
15   to Brian Stoker, are you involved. Hopefully, so we
16   get the revenue.
17           Do you have any recollection of what
18   you're referring to?
19           MR. COHEN: Objection to form.
20           MS. LITTLE: Objection.
21       A.   I don't remember what I was referring
22   to.
23       Q.   Well, sir, wasn't it normal for the
24   structuring desk to be involved in a CDO that was
25   being structured by Citigroup?

Page 87

1           Grant - March 6, 2012
2            MS. LITTLE: Objection, vague.
3        A.   Yes.
4        Q.   All right. And I believe you testified
5    earlier that as part of the analysis you did, it
6    would be an analysis of the actual profit that was to
7    be -- Citigroup could realize from that CDO squared;
8    is that right?
9            MR. COHEN: Objection to form.
10           MS. LITTLE: Objection.
11       A.   Yes.
12       Q.   And in that situation, you said that it
13   was normal for that profit to be in the form of fees?
14           MR. COHEN: Objection.
15       Q.   Is that correct, sir?
16           MS. LITTLE: Objection.
17       A.   Yes, a structuring fee.
18       Q.   All right. And that structuring -- with
19   respect to that structuring fee, is that a profit
20   that your structuring desk would normally recognize
21   in these CDOs?
22           MR. COHEN: Objection to form.
23           MS. LITTLE: Objection.
24       A.   I don't understand what you mean
25   recognize.

Page 88

1           Grant - March 6, 2012
2        Q.   Well, who took credit for the
3    structuring deal? Let me put it that way.
4            MS. LITTLE: Objection.
5        A.   A number of people would take credit for
6    any revenue.
7        Q.   All right. With respect to the
8    structure fees, did the structure desk take credit
9    for all that revenue that was --
10           MS. LITTLE: Objection.
11       Q.   -- recognized as a result?
12       A.   I would try and make sure that we got
13   credit for it.
14       Q.   All right. You go on to say in the same
15   e-mail let's chat in Asia, can't discuss over e-mail.
16           Do you have any recollection of why you
17   told Mr. Stoker on November the 3rd, 2006, that you
18   couldn't discuss the matter over in e-mail?
19           MR. COHEN: Objection to form.
20           MS. LITTLE: Objection.
21           MR. COHEN: Also, it misstates what the
22   e-mail says.
23       A.   I don't remember getting this or writing
24   it.
25       Q.   During this period of time, was there

Page 89

1           Grant - March 6, 2012
2    any subjects that you normally wouldn't discuss with
3    respect to structuring the CDO in an e-mail?
4            MS. LITTLE: Objection.
5            MR. COHEN: Same objection.
6        A.   I don't remember if there were.
7        Q.   So there is nothing you can think of
8    specifically that you would not discuss in an e-mail
9    with respect to the structuring of the CDO?
10           MS. LITTLE: Objection.
11           MR. COHEN: Objection to form.
12       A.   No. I don't remember.
13       Q.   Sir, I think you testified that you
14   would try, to the extent possible, to take credit for
15   the revenue, the structuring fees.
16           Was that -- did you do that because the
17   revenue was relevant to the compensation that
18   individuals in the structuring group would receive on
19   the structuring desk?
20           MS. LITTLE: Objection, vague and
21   foundation.
22       A.   Generally speaking, yes.
23       Q.   Let me go back just a moment to 370, and
24   direct your attention to the e-mail from Mr. Stoker
25   in the middle of the page where it says I hope so,

                                              23 (Pages 86 to 89)

Darius Grant                                                              March 6, 2012
                               New York, NY

### Page 90

```
 1              Grant - March 6, 2012
 2   this is DQ's prop trade.
 3            Sir, do you have any understanding what
 4   the word prop, what that refers to?
 5            MR. COHEN: The word prop?
 6            MR. INFELISE: Prop, P-R-O-P.
 7       A.   I don't remember at the time.
 8       Q.   Do you have any understanding sitting
 9   here today what prop refers to?
10            MR. COHEN: Just the word prop?
11            MR. INFELISE: The word prop.
12       A.   I understand what -- I think I
13   understand what it means, proprietary.
14       Q.   Do you have any reason to believe that
15   on November the 3rd, that the reference by
16   Mr. Stoker, DQ's prop trade, wasn't to DQ's
17   proprietary trade?
18            MS. LITTLE: Objection, foundation.
19            MR. COHEN: Same objection.
20       A.   I don't remember that at that point.
21       Q.   Do you have any understanding of what
22   the reference to a prop trade could be other than a
23   reference to a proprietary trade?
24            MS. LITTLE: Objection, foundation.
25       A.   I don't remember. I don't remember.
```

### Page 91

```
 1              Grant - March 6, 2012
 2       Q.   Do you have any understanding sitting
 3   here today what the term prop trade could refer to
 4   other than a proprietary trade?
 5            MS. LITTLE: Objection, same objection.
 6       A.   I can't think of anything.
 7       Q.   I'm sorry? You can't --
 8       A.   Think of anything.
 9       Q.   Sir, I'm going to -- well, I'm going to
10   ask the court reporter to mark the next document as
11   615 which does not appear to have a Bates number on
12   it. It might be -- oh, I'm sorry. It looks like it
13   was cut off.
14            MR. INFELISE: Let me have the court
15       reporter mark it first, and then I'll identify
16       it for the record.
17            (Exhibit 615, Five-page Document, Bates
18       Nos. CITI 18158710 through 714, marked for
19       identification, as of this date.)
20            MR. INFELISE: And for the record, 615
21       is a five-page document and the Bates numbers on
22       this copy, which appear to be cut off on the
23       copy we've given the witness, is CITI 18158710
24       through 714.
25       Q.   All right, sir.
```

### Page 92

```
 1              Grant - March 6, 2012
 2            Have you had a chance to look through
 3   Exhibit No. 615?
 4       A.   Yes.
 5       Q.   All right. And sir, you can look at any
 6   portion you want. I'm going to direct your attention
 7   to the e-mail from Mr. Stoker to you at the top of
 8   the first page dated November 9, 2006.
 9            Again, sir, do you have any recollection
10   of receiving this e-mail from Mr. Stoker?
11       A.   No.
12       Q.   And do you have any reason to believe
13   that you did not receive this e-mail from Mr. Stoker?
14       A.   No.
15       Q.   All right. The first sentence says let
16   Jim into DQ's CDO squared with CSAC as manager.
17            Do you know what the reference to Jim
18   is?
19       A.   Yes.
20       Q.   And what's your understanding of what
21   the reference to Jim is?
22       A.   I assume it's Jim Prusko who was
23   referenced on all the previous trail of e-mails.
24       Q.   All right. Thank you.
25            It goes onto say will up size it to 1.5
```

### Page 93

```
 1              Grant - March 6, 2012
 2   BB.
 3            Is that 1.5 billion or is it your
 4   understanding that references 1.5 billion?
 5            MS. LITTLE: Objection, foundation.
 6       A.   Again, I don't remember getting it,
 7   but...
 8       Q.   Well, let me ask you this, when you see
 9   a reference to BB, was it standard practice to use
10   that as an abbreviation for billion?
11            MR. COHEN: Objection to form.
12            MS. LITTLE: Objection.
13       A.   I mean, I don't remember getting the
14   e-mail, so I guess I don't remember.
15       Q.   Well, aside from having -- remembering
16   getting the e-mail, in November of 2006, do you have
17   any recollection of whether or not it was a standard
18   practice to abbreviate billion as BB?
19            MR. COHEN: Objection to form.
20            MS. LITTLE: Objection, asked and
21       answered.
22       A.   I don't remember. I thought it was BN.
23       Q.   Okay. Do you have any recollection of
24   speaking with Mr. Stoker about this e-mail or the
25   topic covered in his e-mail?
```

Darius Grant                                                                 March 6, 2012
                              New York, NY

Page 134

1           Grant - March 6, 2012
2  have any recollection of what you're referring to
3  when you say I know we are doing a "prop" deal on our
4  own?
5      A.  I don't remember.
6      Q.  Do you recall whether or not as a result
7  of this e-mail, you had any discussions with
8  Mr. Stoker about a prop deal?
9      A.  I don't remember.
10     Q.  Do you recall if you had discussions
11 with anyone after this e-mail concerning doing a prop
12 deal?
13     A.  I don't remember.
14     Q.  Sir, if you look at the e-mail on the
15 bottom of the page from Mr. John Frontero.
16         Sir, do you know who John Frontero was?
17     A.  Yes.
18     Q.  Who is he?
19     A.  He was a salesperson on the fixed income
20 sales desk.
21     Q.  I note that you're not an addressee on
22 this e-mail. However, you obviously are responding
23 to it or commenting on it.
24         Do you have any recollection of how you
25 were made aware of Mr. Frontero's e-mail?

Page 135

1           Grant - March 6, 2012
2          MR. COHEN: I'm going to object to the
3      commentary. Just answer the question, please.
4          MS. LITTLE: Objection.
5      A.  I don't remember.
6      Q.  I see.
7          Who is Mr. -- is it Michael Psyllos?
8      A.  Yes. He was a deal manager.
9      Q.  Did he work for you?
10     A.  Yes.
11     Q.  I'm going to ask you just a minute, if
12 you would go back and look at Exhibit 370. It's the
13 one that was previously marked, so it will be a white
14 sticker in the lower right corner.
15     A.  Yes.
16     Q.  Do you have that, sir?
17     A.  Yes.
18     Q.  And I asked you a series of questions
19 about this. I'd like to again, direct your attention
20 back to the middle of the page where there's an
21 e-mail from Brian Stoker to you. It's November the
22 3rd, 2006, which says I hope so, this is DQ's prop
23 trade. (Don't tell CSAC.)
24         Sir, do you recall whether or not when
25 you read this, this raised any concerns in your mind

Page 136

1           Grant - March 6, 2012
2  about this CSAC CDO squared?
3          MR. COHEN: Objection to form.
4          MS. LITTLE: Objection.
5      A.  I don't remember.
6      Q.  Would it, as a matter of practice during
7  this time, would the fact that information concerning
8  the nature of a trade in a specific CDO that was not
9  told to the asset manager raise any question or
10 concern in your mind?
11         MR. COHEN: Objection to form.
12         MS. LITTLE: Objection.
13     A.  I don't know. I don't know the context
14 or the comments.
15     Q.  In your experience, would there be any
16 reason why the asset manager wouldn't be told that
17 Citigroup was doing a proprietary trade as part of a
18 CDO?
19         MS. LITTLE: Objection.
20         MR. COHEN: Objection to form.
21     A.  I think that would be a legal question .
22 which we would -- as to whether it was something
23 should be told to the manager, I guess.
24     Q.  I see. Do you know if Mr. Stoker ever
25 referred that question to any legal counsel?

Page 137

1           Grant - March 6, 2012
2      A.  I don't know.
3          MS. LITTLE: Objection, foundation.
4      Q.  Do you recall whether or not you ever
5  referred that question to any legal counsel?
6      A.  I don't remember.
7      Q.  When you -- well, sir, let me ask you.
8  You say you don't recall this e-mail at all.
9          Sitting here today and reading that
10 comment, did it raise any concerns in your mind
11 concerning what Mr. Stoker was doing as a deal
12 manager?
13         MR. COHEN: Objection.
14     Q.  Sitting here today.
15         MR. COHEN: Objection.
16         MS. LITTLE: Objection.
17         MR. WINSLETT: Could we have the
18     question reeled back.
19         MR. INFELISE: Why? Hold on a second.
20     Q.  Did you understand the question, sir?
21     A.  Well, could you repeat it. Sorry.
22     Q.  I'll be happy to repeat it.
23         Sitting here today, reading this e-mail,
24 does it raise any question in your mind concerning
25 Mr. Stoker's role as a deal manager working for you?

                                        35 (Pages 134 to 137)

Darius Grant                                                                                      March 6, 2012
New York, NY

### Page 138

```
 1          Grant - March 6, 2012
 2          MR. COHEN: Objection to form.
 3          MS. LITTLE: Objection.
 4      A.  I mean, I don't know -- I'd have to
 5  speculate because it's out of context, it's not the
 6  time frame. I don't know.
 7      Q.  Sir, if you had a deal manager who
 8  informed you that he was not providing information to
 9  an asset manager concerning the actual nature of a
10  transaction, would that have caused you any concern?
11          MS. LITTLE: Objection.
12          MR. COHEN: Objection to form.
13      A.  Yes.
14      Q.  Okay. Thank you.
15          Sir, in 2006-2007, I just want to make
16  sure, Brian Stoker was a deal manager that worked for
17  you in the structured desk?
18      A.  Yes.
19      Q.  And was he given authority to act on
20  behalf of Citi in that capacity?
21          MS. LITTLE: Objection.
22          MR. COHEN: Objection to form.
23      A.  I'm not sure there was a formal written
24  policy that said you are given authority.
25      Q.  Was it an understanding that he had
```

### Page 139

```
 1          Grant - March 6, 2012
 2  authority to act on behalf of Citigroup?
 3          MS. LITTLE: Objection.
 4          MR. COHEN: Objection to form.
 5      A.  Yes.
 6      Q.  Okay. And was it Mr. Stoker's
 7  responsibility as a deal manager to provide
 8  information concerning any -- the offering memorandum
 9  or the flip book, for any particular CDO to outside
10  counsel?
11          MR. COHEN: Objection.
12          MS. LITTLE: Objection.
13      A.  Could you repeat the question.
14      Q.  Sure. It wasn't worded very well. Let
15  me try it again.
16          As a deal manager, was Mr. Stoker
17  responsible with respect to deals that he was
18  managing to provide the copies of any offering
19  memorandum or flip book to outside counsel to obtain
20  their opinions?
21          MR. COHEN: Objection to form.
22          MS. LITTLE: Objection.
23      A.  Well, the offering document would start
24  being drafted at the external counsel's office, so
25  they would be the one that would actually produce
```

### Page 140

```
 1          Grant - March 6, 2012
 2  that document.
 3          In terms of flip books, sometimes we
 4  sent flip books to external counsel. If it was a
 5  deal that was different, most of the time, we didn't.
 6  But you know, there was also internal Citi counsel
 7  sometimes that would look at the flip books.
 8      Q.  All right. With respect to the offering
 9  circulars, would Mr. Stoker, as a deal manager, be
10  responsible for providing information on the deals he
11  was working on to outside counsel for inclusion in
12  the offering memorandums?
13          MS. LITTLE: Objection, it's vague.
14      A.  Yes.
15      Q.  And was it Mr. Stoker's responsibility
16  with respect to deals that he was managing to provide
17  information to counsel, outside or inside counsel,
18  concerning any differences in the CDO deals he was
19  working on from the standard provisions in the
20  offering circulars used in previous deals?
21          MS. LITTLE: Objection.
22          MR. COHEN: Objection to form.
23      A.  Yes.
24      Q.  Do you recall if Mr. Stoker ever
25  proposed that he put together a series of documents
```

### Page 141

```
 1          Grant - March 6, 2012
 2  to use as a template for offering circulars?
 3      A.  Yes.
 4      Q.  And was that done?
 5      A.  I recall -- I wouldn't say he was going
 6  to put together offering circulars. I think he
 7  wanted to try and simplify, standardize some of the
 8  provisions of the offering circulars such as the --
 9  well, I don't remember exactly which components of
10  it, but probably the more mathematical pieces.
11      Q.  Sir, was there any formal opinions that
12  the structuring desk received from either inside or
13  outside counsel with respect to any of the offering
14  circulars that they were provided for review or that
15  they created?
16          MR. COHEN: Objection to form.
17          MS. LITTLE: Objection.
18      A.  I'm sorry, can you repeat the question.
19      Q.  Sure. Do you recall whether or
20  not either inside or outside counsel ever issued any
21  type of formal opinion with respect to any offering
22  circulars that they were asked to review or that they
23  created with respect to a particular CDO?
24          MR. COHEN: Objection to form.
25          MS. LITTLE: Objection.
```

36 (Pages 138 to 141)