Page 181

ROBERT M. MacLAVERTY - April 18, 2012

A Yes.

Q And this is, in fact -- You understand this is the offering memorandum or offering circular for the Class V III CDO?

A Yes.

Q And this is the document that you cite in paragraph -- or footnote 21 of your report?

A I can't be sure from the --

Q If you look at the Bates stamp.

A Here we go. 55, yes.

Q And are you -- Can you identify any statement in the Class V III offering memorandum that is rendered false because of the short position held by Citigroup in the Class V III asset names as of January 12th?

MR. INFELISE: Mr. Dooley, are you going to ask him to review all 187, 190 pages as we sit here today?

MR. DOOLEY: No, I'm going to ask him to identify whether any statements that he believes are false.

He's offered the opinion that the fact of the short position was an important change to what was represented in these documents, and I want to know if can tell me whether there is any -- what statement in here is false.

Page 182

ROBERT M. MacLAVERTY - April 18, 2012

THE WITNESS: I don't care -- or I don't recall whether or not anything was represented in here the first time I read it.

And I don't know that I would be able to say now going through it even again for however long it would take that I would be able to find that they acknowledge the possibility that they could be short or were short prior to pricing.

BY MR. DOOLEY:

Q That's not the question I'm asking.

A Well, it's --

Q The question I'm asking is whether you can point to a statement that's made in the offering circular that is false because of -- that is rendered false because of the short position that Citigroup had as of January 12th, 2007?

A Not at this time. I'd have to reread it in that context.

Q Okay. And you don't identify any statement in your report that is rendered false because of Citigroup's short position as of January 12th, 2007, do you?

A Any statement in my report that's false?

Q No, in your report --

Page 183

ROBERT M. MacLAVERTY - April 18, 2012

A Yes.

Q -- you don't identify any statement in the Class V III offering memorandum that you believe is rendered false because of the short position taken by Citigroup, correct?

A That's correct.

Q Okay. So you don't identify in your report any false statement in the offering memorandum, and you can't tell me now that there is any statement in the offering memorandum that's false because of the short position that Citigroup took in Class V III?

MR. INFELISE: Just for the record, he has not reviewed this document. If you want to give him the time, it's your seven hours, Mr. Dooley.

BY MR. DOOLEY:

Q Is that a correct statement?

A Can you repeat your question.

MR. INFELISE: Read that whole thing.

BY MR. DOOLEY:

Q My question is --

MR. DOOLEY: Jeff, if you have an objection, then make an objection.

MR. INFELISE: Objection, you're badgering this witness. You're wasting our time.

Page 184

ROBERT M. MacLAVERTY - April 18, 2012

If you want him to read this, we'll take a recess, take whatever time you need to go through it, that's all.

MR. DOOLEY: That's not an objection, Jeff. You're just arguing.

MR. INFELISE: Oh, okay.

BY MR. DOOLEY:

Q Mr. MacLaverty, we'll move on, actually. We'll move on.

A Can I clarify something?

Q There isn't a question pending right now. If you need to clarify something, you can do it after your break.

A It relates to a question you asked me a moment ago.

Q What's the clarification?

A That my -- when you said what I thought was missing was more of what was omitted as opposed to what was falsely stated anywhere. I wasn't laying claim to any false statement. I was laying claim to something that I thought was omitted and would have been good to know.

Q Okay. That's helpful, and I appreciate it.

So it's not your opinion that there is any --

Page 185

ROBERT M. MacLAVERTY - April 18, 2012

that there is any statement that is in the offering memorandum that is false because -- in light of Citigroup's short position in the Class V III assets, is that right?

A That's correct.

Q Okay. And is it your -- and is it your position that there is any statement that is misleading in light of Citigroup's short position or is it your position that there is information --

A In --

Q -- in the Class V III offering memorandum? Or is it your position that there is information that you think should be included?

A I believe that it is somewhat misleading to say that they may be taking a position counter to what a buyer of the notes would have when, in fact, they already had done so.

Q Okay. That's the misleading statement in the offering memorandum, as far as you're concerned?

A In my view it is.

Q Okay. And that's the -- that's the misleading statement in the offering memorandum as far as you're concerned? There is not another misleading statement in the offering memorandum?

Page 186

ROBERT M. MacLAVERTY - April 18, 2012

MR. INFELISE: Objection, asked and answered.

BY MR. DOOLEY:

Q The one you just identified, that's the misleading statement? I just want to be sure that we're clear on what the misleading statement is.

A It's not the misleading statement. It's a misleading statement. There may be others that I haven't been able to articulate right now because of recollection. But that is one that was meant to answer your question.

Q Okay. That's the one -- Okay.

And there are no misleading statements identified in your -- Let me start again.

There are no misleading statements -- Start that again.

Your report, Mr. MacLaverty, does not identify any misleading statements in the Class V III offering memorandum, does it?

A I don't believe in this report I identify any of those, no.

Q Okay.

MR. DOOLEY: Why don't we take a five-minute break.

THE VIDEOGRAPHER: Going off the record at 2:37

Page 187

ROBERT M. MacLAVERTY - April 18, 2012

p.m.

(a brief recess was taken)

THE VIDEOGRAPHER: We're back on the record at 2:44 p.m.

BY MR. DOOLEY:

Q Mr. MacLaverty, looking at paragraph 19 of your opening report, you write that there are two factors that make Class V III -- the Class V III CDO distinctive.

The first is that, "As demonstrated in Exhibit 2B, there was significant overlap between the 21 names identified by Citigroup on November 1, 2006, and the 25 names on which it sought to purchase protection on January 8th, 2007, all of which were included in Class V III."

First of all, there is a reference to 21 names identified by Citigroup on November 1, 2006. Is that incorrect? Is that supposed to be 25 names?

A No, I think it's the 21 names that they got through -- 21 of the 25 on the November 1 suggestion list. So on 2B --

Q Okay.

A The second -- the third column over, the second one under the shaded heading.

Page 188

ROBERT M. MacLAVERTY - April 18, 2012

Q Uh-huh.

A There were 25 total names, but X'ed out are only 21 of those.

Q I guess I don't understand. What are the 21 names that you're referring to?

A 21 -- it's 21 names that were identified out of -- out of 25 on the November list. So out of this November 1 suggestion list.

Q Which exhibit are you looking at, 2A?

A 2B.

Q 2B. There is 25 names on the November 1 suggestion list?

A Yes, but only 21 of the names actually ended up in the deal.

Q Okay.

A 21 out of 25. And it's -- I think I try to clarify that on the errata sheet that was sent. And that's the rationale for Exhibit 1 of my supplemental report -- or rebuttal report.

Q If you look at Exhibit 2A, Mr. MacLaverty, and you look at the second page of Exhibit 2A, there is a row at the bottom labeled, number of these names on list.

Do you see that?

47 (Pages 185 to 188)

Page 225

ROBERT M. MacLAVERTY - April 18, 2012

A It's not my view. It's a fact in the case.
Q Okay. It's your understanding, I should say --
A It's my understanding.
Q -- that of the 25 asset named listed on the November 1st, 2006 --
A Yes.
Q -- e-mail from Citigroup, 21 of them ended up in the Class V III deal --
A Yes.
Q -- that's your understanding?
And your understanding is that Citigroup took a short position on all 21 of those that ended up in the deal?
A It took a position on 25 of the assets out of the 58.
Q Okay. But of the 21 that ended up in the deal from the November 1 -- on November 21 there was -- on November 1st there was a list of 25 assets that went from Citigroup to CSAC, correct?
A What I was going to --
Q Let me just ask the question.
A Ask it again.
Q On November 21st (sic) there was a list of 25 asset names that went from Citigroup to CSAC, correct?

Page 226

ROBERT M. MacLAVERTY - April 18, 2012

A Correct.
Q And of those, it's your understanding that 21 ended up in the deal?
A Yes.
Q Of those 21, what is your understanding of how many ended up -- Citigroup ended up shorting?
A At least 16, I believe, but I -- I'd have to go back and look.
Q Okay. Is there any other fact or facts that you believe, with respect to the asset selection process, that you believe should have been disclosed by Citigroup but was or were not disclosed by Citigroup?
A Other than the outright number?
Q Than what you just told me about the number, yes.
A Not that I can think of right now.
Q Okay. And what is the basis for your conclusion that Citigroup had an obligation to inform the Class V III investors that of the 25 names it had sent over on November 1st, 21 ended up in the deal?
A I think it's something that investors would have wanted to know.
Q Why?
A Because it's a large number relative to other

Page 227

ROBERT M. MacLAVERTY - April 18, 2012

input from talking with others in the industry and relative to my understanding of what the role of a collateral manager would be and a percentage of assets put up -- or the actual names put up by a collateral manager that were -- originated with an arranging bank that ended up coming back into a deal.
But I did not do the statistical analysis.
Q When you say you did not do the statistical analysis, what do you mean?
A I wasn't asked to identify any statistical results of how and why that is a big or a small number.
Q So you didn't do any statistical analysis regarding the significance of the fact that of the 25 assets that were on the November 20 -- the November 1st list, 21 ended up in the deal, you didn't do any statistical analysis regarding the significance of that percentage?
A No. I don't believe that doing so would change my opinion. I think it's just a relevant fact that an investor in the notes would have wanted to know.
Q And is it your understanding that Citigroup is required to disclose information that investors would consider relevant or would want to know?
A Yes.

Page 228

ROBERT M. MacLAVERTY - April 18, 2012

Q And why would an investor want to know that 21 of the 25 names that Citigroup sent to CSAC on November 1st ended up in the portfolio, why would that be relevant to an investor?
A Well, it might be more relevant to some investors than to others. But I think any number is relevant given that it's a fundamental component of its construction, what's in there and how it got there.
Q So is it your view that regardless of the percentage, if even one name on the November 1 list that Citigroup sent to CSAC had been included in the Class V III portfolio, that's information that Citigroup was required to disclose?
A I think it would be relevant.
Q Okay. Even if it had been one?
A Yes.
It would be more relevant if that one were a bigger number.
Q All right. You also say that, "Citigroup had an obligation to inform the potential Class V III investors that it had taken a naked short position," which I understand you mean proprietary short position with respect to those assets.
And what is the basis for your conclusion that

57 (Pages 225 to 228)

Page 229

ROBERT M. MacLAVERTY - April 18, 2012

Citigroup had an obligation to disclose what you characterize as its proprietary short position?

MR. INFELISE: Objection, asked and answered.

THE WITNESS: Because that runs counter to what would be considered in the interest of a note holder or a note buyer.

BY MR. DOOLEY:

Q All right. Looking at your next opinion, the opinion summarized at paragraph 6, you write that, "Citigroup knew and did not disclose important facts about the construction and execution of the Class V III CDO that an investor would have needed to know in order to make an informed decision before purchasing the notes issued by Class V III."

Are the facts and analysis that support that opinion stated in paragraphs 25 and 26 of your opening report?

A Yes.

Q Okay. And are the important facts about the construction and execution of the Class V III CDO that you believe should have been disclosed, are those the three numbered points in paragraph 25?

A Yes.

Q Are there any other important facts about the

Page 230

ROBERT M. MacLAVERTY - April 18, 2012

construction and execution of the Class V III CDO that you believe were not disclosed other than the three numbered points in paragraph 25 of your opening report?

A Not as it relates to the scope of this engagement for me in these opinions.

Q Okay. So your opinion is that the three numbered points in paragraph 25, those are the three important facts about the construction and execution of the Class V III CDO that should have been disclosed?

A Either in the offering memorandum or the pitch book, yes.

Q Okay. You're not going to testify that there is some other important fact that should have been disclosed other than these three, are you?

A No.

Q Okay. That's what I'm wondering.

You write in paragraph 25, "Stoker functioned as a primary structurer for Citigroup on the Class V III deal as of October, 2006, and through its close February 28th, 2007."

Do you see that?

A Yes.

Q And that's not an opinion, is it, that's a statement from your understanding of the facts?

Page 231

ROBERT M. MacLAVERTY - April 18, 2012

A From the source documents, yes.

Q Okay. But it's a summary of the facts as you understand them from looking at e-mails and other documents?

A Correct.

Q That's not -- the first sentence of paragraph 25, that's not expert analysis?

A No.

Q And the next statement, "As the structurer, Stoker was also given oversight responsibility for the pitch book and offering memorandum." You cite to testimony of Mr. Stoker.

Do you see that?

A Yes.

Q And that's not an expert opinion or analysis that you're offering, is it? That's a summary of Mr. Stoker's testimony?

A That's in -- Yes.

Q In fact, you haven't offered an opinion regarding Mr. Stoker's oversight responsibility for the pitch book and offering memorandum, correct?

A I have not offered an opinion. What's in here is based on what I believe to be factual material.

Q Okay. And you have not offered an opinion

Page 232

ROBERT M. MacLAVERTY - April 18, 2012

regarding the oversight responsibility of a structurer in Mr. Stoker's position for the pitch book and offering memorandum, have you?

A No.

Q All right. Looking at the numbered items in paragraph 25, the first numbered item is -- Well, you write, "In particular, the offering memorandum and pitch book did not disclose that."

And I understand it's your conclusion here that these facts were not stated in the offering memorandum and pitch book. But I'm going to ask you a slightly different question, which is, can you identify, with respect to the first fact, "Prior to ever receiving a proposed list of assets from CSAC, Citigroup had suggested inclusion in Class V III of 16 of the 25 assets on which it purchased protection," can you identify any statement in the pitch book that is false, in your view, in light of the fact that Citigroup suggested inclusion in the Class V III of 16 of the 25 assets on which it purchased protection?

MR. INFELISE: Objection, asked and answered.

THE WITNESS: No.

BY MR. DOOLEY:

Q Okay. And can you identify any statement in the

58 (Pages 229 to 232)

Page 233

ROBERT M. MacLAVERTY - April 18, 2012

pitch book that's rendered misleading because Citigroup -- in light of the fact that Citigroup had suggested inclusion in Class V III of 16 of the 25 assets on which it purchased protection?

A No.

Q The same question for No. 2, can you identify in the pitch book any statement that you believe is rendered false in light of the fact that Citigroup had asked CSAC to include 25 assets in Class V III?

A No.

Q Okay. Can you identify any statement in the pitch book that's rendered misleading in light of the fact that Citigroup had asked CSAC to include 25 assets in Class V III?

A Again, on a stand-alone basis, no.

But the -- taken together and with the omission, as previously stated, that's where I come to the conclusion for this opinion.

Q Okay. Well, let me ask the questions this way and then I'll -- let me ask -- I'll come to that.

The third point is that; "Citigroup took a $500 million proprietary short position on the 25 assets it sought to have included in Class V III."

Can you identify any statement in the pitch

Page 234

ROBERT M. MacLAVERTY - April 18, 2012

book that you believe is false in light of the fact that Citigroup took a $500 million proprietary short position on the 25 assets it sought to have included?

A No.

Q And can you identify any statement in the pitch book that you believe is misleading in light of the fact that Citigroup took a $500 million proprietary short position on the 25 assets it sought to have included?

A No.

Q Okay. Can you identify any statement in the pitch book that you believe is either false or misleading based on any combination of the three elements, the three alleged nondisclosed facts in paragraph 25?

A It's not the combination. It's the omission of what I would have expected to have included given the facts.

Q Okay. I understand you believe --

A It's not what's there. It's what's not there.

Q Okay. And I understand that distinction. I appreciate that.

I guess I'm asking a different question, though, which is, I understand that it's your view that this information should have been included, that they

Page 235

ROBERT M. MacLAVERTY - April 18, 2012

should have said this.

But my question is, is there any statement that you can point to that is rendered false or misleading in light of any combination of these three facts?

A I can't speak to one that I can think of right now.

Q Okay. Then I'll ask sort of the same series of questions about the offering circular.

And can you identify, Mr. MacLaverty, any statement in -- I'll make it easier for you. I'll try to ask one question, we'll see if we can do it.

Can you identify any statement in the offering circular that you believe is false in light of any of the three facts that you identify in paragraph 25?

MR. INFELISE: Objection, asked and answered.

THE WITNESS: My recollection is no.

BY MR. DOOLEY:

Q Okay. Can you identify any statement in the offering circular that you believe is misleading in light of the three allegedly nondisclosed facts in paragraph 25?

A On a stand-alone basis, no.

Q How about in combination, can you identify any statement in the offering circular that you believe is

Page 236

ROBERT M. MacLAVERTY - April 18, 2012

either false or misleading in light of any combination of the three facts that you believe weren't disclosed in paragraph 25?

A No.

Q Paragraph 26, the second sentence you write, "In this case the evidence suggests that CSAC did not perform" -- well, let me -- Why don't you just review paragraph 26.

A Okay.

Q In the second sentence you write, "In this case the evidence suggests that CSAC did not perform that role, i.e., the role of the collateral manager, with respect to the 25 assets Citigroup's secondary desk recommended be included in Class V III but merely acquiesced to Citigroup's request."

Do you see that?

A Yes.

Q Okay. And as an initial matter, not all of the 25 names on Citigroup's November 1, 2006, list ended up in the Class V III portfolio, right, only 21 of the 25?

A Correct.

Q Okay. So whether or not CSAC did or did not perform its role, it didn't acquiesce to 25 assets going into Class V III, right? Only 21 of them ended up in --

Page 237

ROBERT M. MacLAVERTY - April 18, 2012

only 21 of the 25 --
A It doesn't mean CSAC didn't perform their role. It just might mean that they might have had them on a suggested list and they changed their mind and didn't put them into the deal.
Q Okay. Well, I guess -- your statement in paragraph 26 that, "The evidence suggests that CSAC did not perform the role of the collateral manager with respect to the 25 assets Citigroup's secondary desk recommended be included in Class V III but merely acquiesced to Citigroup's request," that statement, that's not an opinion, is it?
A No.
Q That's a summary of what you believe the evidence would show, correct?
A It's a summary of evidence that I found to lead to that, yes.
Q Okay. And you don't cite any evidence in support of this conclusion, do you, in -- Let me back up.
In your report, Mr. MacLaverty, you don't cite any evidence in support of your conclusion that CSAC did not perform its role with respect to the 25 assets that Citigroup's secondary desk recommended be included in

Page 238

ROBERT M. MacLAVERTY - April 18, 2012

Class V III, do you?
A There is nothing footnoted after the sentence, no.
Q Okay. And, in fact, at the time -- Do you know who John Popp is, P-O-P-P?
A Yes.
Q Okay. Who is John Popp?
A I don't know him.
Q But in the context of this case, who is John Popp?
A At Credit Suisse.
Q And who is Michael Shackelford, do you know who he is?
A I don't know him, but --
Q In the context of this case, not in your life outside.
A I can't recall.
Q Okay. How about Samir Bhatt, do you know who Samir Bhatt is?
A Yes.
Q Who is that?
A He is at Credit Suisse.
Q Okay. And do you understand that Mr. Bhatt was the principal asset manager at CSAC involved with Class

Page 239

ROBERT M. MacLAVERTY - April 18, 2012

V III?
A Yes.
Q And prior to the time -- Why don't we go back and look at Appendix B, pages 5 and 6.
A Okay.
Q In pages 5 and 6 of Appendix B you list various investigative testimony and depositions that you've reviewed in preparing your expert report, correct?
A Yes.
Q You indicate that you reviewed Mr. Stoker's testimony, Mr. Quintin's testimony, Mr. Dominguez's testimony, and Mr. Grant's testimony, correct?
A Yes.
Q Prior to the time that you reached the conclusion that CSAC did not perform its role with respect to the 25 assets that Citigroup's secondary desk recommended be included in the Class V III, you had not reviewed the testimony of Samir Bhatt, correct?
A I don't believe I did, no.
Q Did you know -- at the time that you reached the conclusion that CSAC hadn't performed its role, did you know that Samir Bhatt had given testimony?
A I can't recall.
Q Okay. And at the time you reached the

Page 240

ROBERT M. MacLAVERTY - April 18, 2012

conclusion that CSAC didn't perform its role with respect to the 25 assets that Citigroup's secondary desk recommended, you hadn't reviewed Mr. Popp's testimony, either, had you?
A No.
Q And you hadn't reviewed Mr. Shackelford's testimony, had you?
A No.
Q Okay. And, in fact, sitting here, you don't know whether Mr. Shackelford works for CSAC or not, do you?
A I can't recall. What I do know is the substance -- the background for this came from e-mail traffic that's listed in the Bates numbers somewhere on one of these five pages of Bates numbers.
Q Okay. And, Mr. MacLaverty, there is no -- You didn't do any analysis of the steps that CSAC did or didn't take in evaluating the assets that went into Class V III, did you?
A No, nor was I asked to.
Q So without having reviewed the testimony of the three witnesses from CSAC who testified in this investigation and without having conducted any analysis of what steps CSAC did to evaluate the Class V III

those e-mails that he would have had an opportunity to review.

As to whether he reviewed them or not, I don't know.

But he was part of a dialogue involving a larger group than just one-to-one e-mails between others and himself.

Q Okay. But the principal document you rely on is Exhibit 323, is that right?

A Yes.

Q And this, the conclusion here regarding -- the conclusion that Stoker was aware of and involved in higher-level strategic decisions as a member of Citigroup's CDO group, that's not an expert opinion of yours, is it?

A No. It came from source documents in the case.

Q Okay. So the statement that Stoker was aware of and involved in higher-level strategic decisions as a member of Citigroup's CDO group, that's just your summary of the evidence that you reviewed?

A Yes.

Q And you didn't apply any particular methodology or analysis to reach that fact conclusion, you just read the e-mails and drew the conclusion that you drew?

A Yes.

Q Okay. All right. In paragraph 7 about two-thirds of the way down you write, "Investors would expect that the arranging bank may have some input about what assets should be included in the investment vehicle."

Do you see that?

A Paragraph 7 a third of the way down?

Q Two-thirds.

A Two-thirds, oh, yes.

Q "Investors would expect," do you see that?

A Yes.

Q You write, "Investors would expect that the arranging bank would have some input about what assets should be included in the investment vehicle."

What's the basis for that statement? Is that based on your experience?

A Yes.

Q Okay. And --

A It's fairly commonly understood.

Q Okay. It's commonly understood that the arranging bank would have input about what assets should be included in the investment vehicle?

A Yes.

Q Okay. And what kind of input would the arranging bank have?

A Based on inquiry from institutional customers, based on positions on the desk, existing positions on the desk, based on a number of other factors, the arranging bank is in a position to offer up to the collateral manager for any one of a number of reasons what assets that they would want to include in an investment vehicle.

Q Okay. And there is nothing -- there is nothing improper or unusual about an arranging bank offering up the assets that it would like to include in the investment vehicle?

A No.

Q Okay. And then on page 3, the second full sentence, you write, "It is not unusual that Citigroup provide CSAC with a list of names for a deal."

Do you see that?

A Yes.

Q And here you mean it's not unusual that Citigroup provided a list of names to CSAC for names that either it wanted to include in the deal or was willing to source into the deal, that wasn't unusual in your view?

A No.

Q Okay. So there was nothing unusual in your view about the November 1st e-mail that went from Citigroup to CSAC with a list of names?

A No.

Q In the next sentence you write, "Mr. Wormser is not correct when he claims that Citigroup did not play a substantial role in the selection of assets that found their way into Class V III."

And what is the substantial role that you're referring to there? Is that the number of -- is that what we talked about before, is that the number of asset names from the November list that ended up in the deal?

A Yes.

Q Okay. So when you say that Citigroup played a substantial role in the selection of assets that found their way into Class V III, what you mean is of the 25 names that were on the November 1 e-mail list, 21 ended up in the deal?

A Yes.

Q Okay. And when you say -- when you write Citigroup was highly successful in having the assets it wanted included in the deal, again, that's what you're referring to, the fact that of the 25 names on the

Page 253

ROBERT M. MacLAVERTY - April 18, 2012

November 1 list, 21 ended up in the deal?

A Yes.

Q You write, "There was pressure by Citigroup to have the asset names firmed up quickly so they could lock up their capacity."

A Yes.

Q Okay. I see that.

When you say pressure, do you have an understanding that CSAC was somehow -- that Citigroup exercised some kind of threat or coercion over CSAC to include the assets on the November 1 list? I don't understand what you mean by pressure, I guess.

A There was, based on the e-mail -- e-mails that I read, there was an expressed sense of urgency by Citigroup to which CSAC then acquiesced.

Q Okay. So when you say that Citigroup pressured CSAC, what you mean is that Citigroup expressed a time urgency to CSAC about finalizing the portfolio for Class V III?

A Yes.

Q Okay. You don't mean -- you don't have an understanding that Citigroup coerced or threatened CSAC in any way, do you?

A Not that I am aware of, no.

Page 254

ROBERT M. MacLAVERTY - April 18, 2012

Q Okay. All right. In paragraph 8 you write, "Mr. Wormser's suggestion that there was no reason for Stoker to conclude that Citigroup played an unusual role in the asset selection process for Class V III is contrary to the testimony of other individuals in Citigroup's CDO structuring group who were involved in that transaction."

Looking at paragraph 8, Mr. MacLaverty, is paragraph 8 -- paragraph 8 doesn't include any expert opinion from you, does it? Paragraph 8 is a summary of the testimony of other witnesses in the case?

A It does involve some of my own experience.

Q Okay. Where is --

A Really coming out of the testimony.

Q Tell me what part of -- tell me what part of the analysis in paragraph 8 -- Well, let's just go through it.

The next sentence reads -- well, the first sentence reads, "Mr. Wormser's suggestion that there was no reason for Stoker to conclude that Citigroup played an unusual role in the asset selection process is contrary to the testimony of other individuals in Citigroup's CDO structuring group who were involved in the transaction."

Page 255

ROBERT M. MacLAVERTY - April 18, 2012

That's a statement regarding the testimony of other individuals, correct?

A Yes, yes.

Q There is no expert testimony in that sentence, correct?

A That's correct.

Q Okay. In the next sentence you write, "Darius Grant, the managing director of the CDO structuring desk, testified that typically the structuring desk would create a dummy portfolio which listed assets with various characteristics that would be included in the portfolio for a prospective deal."

That sentence is a summary of Mr. Grant's testimony, correct?

A Yes.

Q And there is no expert analysis in that sentence, correct?

A That's correct.

Q In the next sentence you write, "Mr. Grant testified the list of assets that Stoker forwarded to Sohail Khan on November 1, 2006, for inclusion in a CSAC CDO-squared was not in the normal format for a dummy portfolio provided by the structuring desk."

Again, that's a summary of Mr. Grant's

Page 256

ROBERT M. MacLAVERTY - April 18, 2012

testimony, correct?

A Yes.

Q And that's -- There is no expert opinion in that sentence, correct?

A Correct.

Q All right. The next sentence reads, "Donald Quintin, the managing director of the CDO secondary trading desk, testified that in his experience it was atypical for an asset manager to provide a long list of assets to potentially include in a CDO Citigroup was structuring."

Again, that's a summary of Mr. Quintin's testimony, correct?

A Yes.

Q No expert analysis there, right?

A No.

Q No opinion, right?

A Well, in aggregate, all of them come together to help form an opinion, but these on a stand-alone basis are not my opinions. They come from the documents.

Q Okay. And then the last sentence reads, "Finally, Stoker himself testified that it was unusual for him to send a list of suggested deal terms to be included in a CDO and that it was unusual for a

# EXHIBIT 8

Mehrish - March 2, 2012

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

11 Civ. 07388 (JSR)

- - - - - - - - - - - - - - - - - - - - - - -

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

BRIAN H. STOKER,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT of SHALABH MEHRISH in the above-entitled matter, as taken by and before LORRAINE B. ABATE, a Certified Shorthand Reporter and Notary Public of the State of New York and Registered Professional Reporter, held at the offices of The Securities and Exchange Commission, Three World Financial Center, New York, New York, on March 2, 2012, commencing at 8:37 a.m., pursuant to Subpoena.

Shalabh Mehrish March 2, 2012
New York, NY

Page 34

Mehrish - March 2, 2012

A. No. Not all the individuals in the various desks.

Q. Were there meetings of some subset of all the individuals in those various desks?

A. Yes.

Q. And were these meetings that were called by Mr. Dominguez?

A. Yes.

Q. And who would attend those?

A. Generally the structuring and syndicate heads.

Q. The heads of desks?

A. Yeah.

Q. And what was the purpose of those meetings?

A. Just to discuss the transactions we were doing, what was the plan.

Q. And were the discussions during those meetings concerning the market for the CDOs?

MS. BUERGEL: Objection to form.

A. Yes.

Q. Were there any discussions during those meetings concerning specific CDOs that the group was working on?

Page 35

Mehrish - March 2, 2012

A. No. It was just generally market conditions.

Q. Now, as I understand it, you described the fact that all the desks were very close to each other.

How -- what was the normal means of coordinating or communicating between one desk and another?

MS. BUERGER: You are referring to physical proximity when you say close?

MR. INFELISE: Yes, yes.

A. We would -- we would speak verbally.

Q. And was it a common practice to use e-mails to communicate?

A. Yes.

Q. All right. And were those e-mails that were between desks?

A. Yes.

Q. All right. And was it a standard practice to rely on the information received from e-mails from other individuals on other desks in the CDO group in conducting your business?

A. Yes.

Q. Let me go back and go through the

Page 36

Mehrish - March 2, 2012

various types of CDOs.

First, with respect to cash CDOs, did your desk or did you -- did you have any role in selecting assets for cash CDOs?

MS. BUERGEL: Objection to form.

A. No.

Q. Do you know if you -- anyone on your desk had any role in selecting assets for the CDO -- cash CDOs?

MS. BUERGEL: Objection to form.

A. No.

Q. Did you have any role in selecting the assets for synthetic CDOs?

MS. BUERGEL: Objection to form.

A. No.

Q. Did you have any role in selecting the assets for CDOs squared?

MS. BUERGEL: Objection to form.

A. No.

Q. Did you have any input into what assets may be included in any of those types of CDOs?

A. No.

Q. Did you make any recommendations concerning what CDOs should be included or -- excuse

Page 37

Mehrish - March 2, 2012

me, what assets should be included in those types of CDOs?

MS. BUERGEL: Objection to form.

A. No.

Q. Now, to your knowledge, when Citigroup or the CDO group was underwriting the CDO, was there any policy concerning what included assets in it that were owned by Citigroup?

A. No.

Q. None at all?

A. No.

Q. Is that the -- would your answer be the same with respect to CDO squared?

A. Yes.

Q. So there was no policy concerning including in CDO squared assets owned by Citigroup?

A. That's right.

Q. Sir, during the time that you were on the syndicate desk, would you give me an estimate of, if you can, of the number of CDOs that Citigroup underwrote.

A. I don't recall.

MS. BUERGEL: Again, are you referring to the New York area? Just you keep referring

10 (Pages 34 to 37)

Alderson Reporting Company
1-800-FOR-DEPO

Page 38

Mehrish - March 2, 2012

to Citigroup, and I want to make sure.

MR. INFELISE: For the record, when I said Citigroup, I'm referring to the New York desk, okay? CDO group.

Q. Well, was there any period of time when Citigroup was more active in CDOs than in other time periods?

A. Fairly active throughout the time that I was on the syndicate desk.

Q. Did it ever increase during any period of time while you were on the syndicate desk?

A. I'm not sure. But 2006 may have been one of the most active years.

Q. All right. Do you recall was there any period of time when Citigroup was more active with respect to synthetic CDOs then during other periods of time?

A. Don't recall.

Q. Do you have any recollection of when the first time that Citigroup was involved in the synthetic CDO?

A. Don't remember the exact time, no.

Q. Okay. Now, as I understand your testimony, you believe that there was an asset

Page 39

Mehrish - March 2, 2012

manager on every one of the CDOs that Citigroup underwrote?

MR. TAYLOR: Objection. Misstates his testimony.

A. That's my recollection.

Q. That is.

Why was that?

A. Because that's generally what investors wanted.

Q. Why would they want an asset manager, if you know, sir?

A. They would prefer transactions that were monitored by an expert, and selected by an expert.

Q. And -- all right.

When Citigroup worked with an asset manager, was there any agreement that the asset manager would select assets owned by Citigroup to include in the CDO that they were managing?

MS. BUERGEL: Objection to form.

A. No.

Q. I'm going to show you, Mr. Mehrish, a document that was previously marked as 383. Take a minute if you would, look it through.

MR. TAYLOR: And just to be clear, when

Page 40

Mehrish - March 2, 2012

you said previously marked as 383, you are referring to the -- during the investigation, not during the deposition in this case?

MR. INFELISE: That's right.

Q. Have you had a chance to look through it, sir?

A. Yes.

Q. Do you recall this e-mail?

A. No.

Q. I note there is an -- on the bottom, that's -- obviously this is three e-mails, and it's the normal type configuration where the earliest e-mail is on the bottom, so it works reverse chronological order from bottom to top.

A. Right.

Q. And I'm looking at the address. It's from Stoker, Brian to Quintin, Donald and Mehrish, Shalabh.

Do you have any reason to believe that you didn't receive this e-mail?

A. No reason to believe.

Q. Okay. Now, there's a statement by Mr. Stoker in his e-mail, and I think it's the third sentence, CSAC buys no equity but we informally

Page 41

Mehrish - March 2, 2012

expect them to buy single A and BBB from Harding.

First, sir, who or what is Harding?

A. The name of an asset manager.

Q. That's your understanding?

A. Yes.

Q. It sounds like you were sort of questioning. Do you know that for sure?

A. Yes, it's the same of an asset manager.

Q. All right. Do you have any idea or understanding of why Mr. Stoker says that he informally expects CSAC to buy assets from Harding?

MS. BUERGEL: Objection to form.

A. I don't recall.

Q. And there's an intermediate e-mail from a Mr. Khan, and it's to Mr. Stoker, Mr. Quintin and also to you.

But I would like to direct your attention to the top e-mail, and this is from Mehrish Shalabh, and it's -- the e-mail address is 04131@Citigroup.com.

Do you recognize that e-mail address?

A. Yes.

Q. Was that your e-mail address in January of 2007?

Mehrish - March 2, 2012

A. My e-mail address was Shalabh.Mehrish@Citigroup.com.

Q. Do you know what that e-mail address was?

A. That might be my employee ID.

Q. And was that -- would it show up often times on your e-mails, employee ID?

A. Actually, I've never seen that. It's interesting it shows up on this one.

Q. It says -- or you indicate, you say we need a moral commitment.

A. Yes.

Q. Do you have any understanding or recollection of what you meant by that?

A. I meant that I needed them to take a close look at the bonds.

Q. At the Harding bonds?

A. Yes.

Q. Why?

A. We wanted them to look at securities that we were trying to market.

Q. The Harding bonds?

A. Yes.

Q. All right, sir.

Mehrish - March 2, 2012

MR. INFELISE: I'm going to ask the court reporter to mark the next document Exhibit No. 604.

(Exhibit 604, One-page Document Bates numbered CITI 31032150, marked for identification, as of this date.)

MR. INFELISE: 604 is a one-page document Bates numbered CITI 31032150.

Q. Just take a minute, sir, and read through that, please.

A. Yep.

Q. Have you had a chance to read it through, sir?

A. Yes.

Q. I direct your attention to the e-mail at the bottom.

Do you have -- first, do you have any recollection of this e-mail?

A. No.

Q. There is a subject there of Octonion.

Do you recall what that refers to?

A. No.

Q. Do you recall whether or not Citi ever underwrote a CDO called Octonion or Octonion?

Mehrish - March 2, 2012

A. I think we did a CDO called Octonion.

Q. Now, in the e-mail at the bottom from Mr. Khan to you and to Julian Bynum, there is a reference to Wing suggested we do that to spur interest.

Do you know who Wing is or what that refers to?

MS. BUERGEL: Did you -- I apologize, I may have misheard you. Did you suggest that was an e-mail from Mr. Mehrish? That's an e-mail from Mr. Khan.

MR. INFELISE: I think I said from Mr. Khan to Mr. Mehrish. If I didn't, that's what I meant to say. All right.

Q. Do you know -- again, do you know what or who Wing refers to?

A. I believe it's Mr. Wing Chau.

Q. And who is he?

A. He was a portfolio manager at Harding.

Q. Then at that -- if you go to the top e-mail, the one that says it's from Mehrish, Shalabh again, it's now -- this one says SM04131@IMCN, M as in Mike, CN, November, A Mike.SSMB.com.

Do you see that, sir?

Mehrish - March 2, 2012

A. Yes.

Q. All right. Now, that's a little different than the last e-mail address.

Again, is this your e-mail address, to your knowledge?

A. Yes.

Q. Do you have any reason to believe you didn't send this e-mail?

A. I don't.

Q. All right. You say with -- again, with respect to Octonion, are CSAC and Harding comitted to what we discussed. Samir continues to look at other deals.

When you were referring to the name Samir, who is that?

A. Mr. Samir Bhatt.

Q. And who is he?

A. Portfolio manager at CSAC.

Q. All right. And what did you mean by this statement, are CSAC and Harding committed to what we discussed, Samir continues to look at other deals?

A. I believe I wanted to understand if we were interested in buying transactions that we were

reporter to mark the next document I believe as 605.

(Exhibit 605, Two-page Document Bates numbered CITI 0113221617, marked for identification, as of this date.)

Q. If you would just take a minute, Mr. Mehrish, and review that.

A. Yes.

Q. Have you had a chance to read through that, sir?

A. Yes.

MR. INFELISE: And again, this is a two-page document Bates numbered CITI 0113221617.

Q. The bottom e-mail, sir, appears to be from Shalabh Mehrish to Mr. Michael Raynes.

Do you have any recollection of this e-mail?

A. No.

Q. Do you have any reason to believe that you did not send that e-mail?

A. No reason.

Q. Who was Michael Raynes?

A. He ran the global structured credit

group.

Q. And what was his position with respect to Mr. Dominguez?

A. Mr. Dominguez reported to him.

Q. All right. How about a Mr. Mihail Nikolov?

A. He was one of my colleagues.

Q. Did he work on the syndicate desk?

A. He works on both structuring and syndicate. At this particular point in time, I'm not exactly sure. He may have been in the syndicate desk.

Q. I see. How about Chris Carman, do you recall who that was?

A. He was in our London office.

Q. I see. Now, this reference, you say hi, Michael, priced Lacerta ABS CDO 2006-1.

Now, looking at this, sir, does it refresh your recollection whether or not in fact you were involved in a CDO called Lacerta CDO 2006-1?

A. I wasn't involved in structuring that transaction or syndicating it. It was Mr. Raynes had asked me to contact the sales force on that transaction.

Q. And was that -- based on this, does it indicate that this was in fact the CDO that was underwritten by Citigroup?

A. I believe it was done out of our London office.

Q. All right. But you don't recall having any involvement in it at all?

A. I contacted the salespeople.

Q. Were you, sir, in the period of 2006-2007, were you familiar with CDOs that were sponsored by Magnatare?

MS. BUERGEL: Objection to form.

A. Not very.

Q. Were you aware whether or not they had any common features?

A. No.

Q. Was there ever any discussion that you recall between the individuals on your desk or between you and the individuals on the structuring desk concerning Magnatare CDOs?

MS. BUERGEL: Objection to form.

A. I don't recall specifically, but they may have had a discussion with a portfolio manager that we arranged.

Q. All right. And what about do you recall whether or not you had any discussions concerning Magnatare CDOs with anyone on the secondary trading desk?

MS. BUERGEL: Objection to form.

A. No.

Q. Now, you mentioned I think earlier a term triggers.

Do you recall talking about that?

A. Yes.

Q. Now -- well, what is exactly, is a trigger with respect to a CDO?

A. It's a coverage ratio.

Q. What does that mean?

A. It's a ratio of collateral to liabilities. That's called principal coverage ratio. Or collateral interest income to liability interest due. That's called an interest coverage ratio.

Q. And what is the purpose of these triggers with respect to -- in the CDO?

A. The purpose of the triggers is to prioritize cash flows between various tranches.

Q. And now, are you familiar with the term an OC trigger?

Page 54

Mehrish - March 2, 2012
A. It stands for over collateralization.
Q. Is that what you just described?
A. That would be a principal coverage ratio.
Q. And what about an IC trigger?
A. That would be an interest coverage ratio.
Q. And that's what you just described a minute ago?
A. Yes.
Q. Thank you.
Were you aware, or did you have knowledge back in 2006-2007, whether the presence or absence of these triggers was a common feature of Magnatare CDOs?
MS. BUERGEL: Objection to form.
A. I believe some of the transactions didn't have -- some of the transactions that were involved in may not have had these triggers.
Q. And do you recall what your basis of that belief was?
A. Just seeing color in the market, seeing information.
Q. When you say color, do you mean

Page 55

Mehrish - March 2, 2012
information in the market?
A. Information, yes.
Q. Was that something that you monitored on a regular basis, the information in the market about certain CDOs?
A. About CDOs in general. That was part of my job.
Q. Based on that -- well, keeping track of the information in the market, were you aware whether or not it was a standard practice for Magnatare to purchase the equity in the CDOs it sponsored?
MS. BUERGEL: Objection to form.
A. I don't recall.
Q. Based on your maintaining knowledge of what was going on in the market, were you aware that it was a common practice for Magnatare to take a short position on the collateral that included the CDOs it sponsored?
MS. BUERGEL: Objection to form.
A. I believe they took short and long positions.
Q. And what -- do you recall what their long positions were?
A. It might have been on the index. I

Page 56

Mehrish - March 2, 2012
don't recall specifically.
Q. So why do you say you believe they took long and short --
A. Because it -- sorry.
MR. TAYLOR: Objection to form.
A. Because I recall that they had a long/short strategy, but I don't recall the specifics of long/short strategy.
Q. Was that a common knowledge in the industry at the time?
MS. BUERGEL: Objection to form.
A. I don't know.
Q. How is it, then, you believe that they had this long/short strategy?
And again, I'm referring to Magnatare with respect to their own CDOs.
MS. BUERGEL: Objection to form.
A. Because I was involved in discussions with several investors and that was the information we gathered from the marketplace.
Q. I see. Thank you.
MR. INFELISE: I think we probably have to change the tapes and this may be a good time to take about a ten-minute break.

Page 57

Mehrish - March 2, 2012
THE VIDEOGRAPHER: This marks the end of tape No. 1. We are going off the record at 9:32 a.m.
(There was a recess taken.)
THE VIDEOGRAPHER: This marks the start of tape No. 2. We're back on the record at 9:43 a.m.
BY MR. INFELISE:
Q. Mr. Mehrish, let me go back.
You had said that when you were at Carlson Capital, you worked with Mr. Dominguez?
A. Yes.
Q. During that period of time, did you ever discuss the SEC's investigation with Mr. Dominguez?
A. No.
Q. Was there any period of time that you ever worked with Mr. Khan other than at Citigroup?
A. Yes. He was at Storm Harbor.
Q. He was at Storm Harbor?
A. Yes.
Q. And while you were at Storm Harbor with Mr. Khan, did you ever have any discussions concerning the SEC's investigation with respect to Citigroup?

Page 58

Mehrish - March 2, 2012

A. No.

Q. Now, I believe you testified earlier that -- and correct me if I am wrong, that you didn't coordinate with the secondary desk with respect to the CDOs that were being underwritten by Citigroup; is that correct?

A. That's right.

Q. Was there ever a joint venture entered between the syndicate desk and the secondary trading desk with respect to certain CDOs?

MS. BUERGEL: Objection to form.

A. Not that I recall.

Q. You have no recollection of that?

A. No.

Q. Was there any type of agreement entered in between you or your desk and the secondary trading desk with respect to splitting or sharing profits from certain CDOs that were underwritten by Citigroup?

MS. BUERGEL: Objection to form.

A. Not that I recall.

Q. Sir, are you familiar with the term with -- as it applies to CDOs, negative selection?

A. No.

Page 59

Mehrish - March 2, 2012

Q. You don't recall ever --

A. I mean, from an investor standpoint, it would be transactions that are not actively monitored.

Q. That's your --

A. Selected, yeah.

Q. Negative selection means what?

A. Transactions that are not actively monitored or selected by the collateral manager.

Q. Okay. All right.

Do you recall while you were on the syndicate desk ever expressing concern that Magnatare -- let me rephrase that.

Do you recall while you were on the syndicate desk ever expressing concern that someone was attempting to negatively select assets going into CDOs that it sponsored?

MS. BUERGEL: Objection to form.

A. That who sponsored? I'm sorry.

Q. For example, Magnatar sponsored.

A. No.

Q. I'm going to ask -- well, this has already been marked as Plaintiff's -- excuse me, Exhibit 326. I'll give you a copy, Mr. Mehrish, and

Page 60

Mehrish - March 2, 2012

ask you to review it, please.

MR. INFELISE: This is a one-page document Bates No. CITI 20667502.

A. Okay.

Q. Okay, sir. Again, having looked at this, do you recall this e-mail?

A. No.

Q. Do you have any reason to believe that for example, the e-mail at the very bottom from Shalabh Mehrish to Sahail Khan and Brian Carosielli, do you have any reason to believe you didn't see that e-mail?

A. No reason.

Q. Who is Brian Carosielli?

A. He was a trader on the secondary trading desk.

Q. Now, the subject is Abacus CDO-SQ. Is that CDO squared?

A. Yes.

Q. And the statement you have is how is this portfolio selected.

Do you recall what Abacus CDO squared was?

A. It was a CDO squared being in the

Page 61

Mehrish - March 2, 2012

marketplace.

Q. And do you recall whose CDO or who sponsored that CDO?

A. No.

Q. Do you recall why you were asking Mr. Khan and Mr. Carosielli how that portfolio was selected?

A. I believe it was a transaction that may not have had an asset manager, so I was curious as to how the portfolio was selected.

Q. All right. And there is a response from Mr. Khan to you that same date. The response is correlation trade, probably negatively selected.

And what did you -- do you have any understanding as to what Mr. Khan was saying when he said it was a correlation trade, probably negatively selected?

A. Correlation trade may have meant somebody going long and short simultaneously, different parts of the capital structure.

Q. And again, probably negatively selected, what was your understanding?

A. Absence of a manager.

Q. That's all it meant to you?