Shalabh Mehrish                                                                March 2, 2012
New York, NY

| Page 70 | Page 72 |
|---|---|
| 1        Mehrish - March 2, 2012 | 1        Mehrish - March 2, 2012 |
| 2 Abacus transaction being wider. | 2 what sort of transactions would be well received by |
| 3    Q.    All right. And do you recall whether or | 3 the market. |
| 4 not Citigroup did agree to what Mr. Bhatt requested | 4    Q.    Mr. Mehrish, as a general matter, for |
| 5 with respect to the Abacus 2006-HGS1? | 5 CDOs that were underwritten by Citi while you were on |
| 6    MS. BUERGEL: Objection to form. | 6 the syndicate desk, who was responsible for preparing |
| 7    A.    I don't remember. | 7 the offering circular, offering memorandum? |
| 8    Q.    Now, sir, let me specifically address | 8    A.    There wasn't any one specific person. |
| 9 your attention to the Class V III. | 9 It was an entire team of people. The -- for example, |
| 10    Do you recall specifically what your | 10 the offering circular was put together by internal |
| 11 involvement in that CDO was? | 11 and external counsel and reviewed by both, internal |
| 12    A.    I was on the syndicate desk, so I was | 12 and external counsel. |
| 13 trying to distribute the transaction to investors | 13    Q.    Did your desk have any role in preparing |
| 14 globally. | 14 it? |
| 15    Q.    All right. And do you recall what, if | 15    A.    The syndicate desk? |
| 16 any, discussions you had with anyone on the | 16    Q.    Yes. |
| 17 structuring desk about Class V III? | 17    A.    No, not the offering circular, no. |
| 18    A.    Don't recall any specific discussions | 18    Q.    Did you have any role in reviewing it? |
| 19 with any other transaction. | 19    A.    No. |
| 20    Q.    Any specific -- do you recall any | 20    Q.    How about the flip book? |
| 21 specific discussions with Mr. Stoker? | 21    A.    Yeah, sure, we reviewed the flip books, |
| 22    A.    No. | 22 I'm sure. |
| 23    Q.    How about did you recall any specific | 23    Q.    You did review the flip books? |
| 24 discussions about Class V III with Mr. Darius Grant? | 24    A.    Yes. |
| 25    A.    No. | 25    Q.    And do you recall reviewing the flip |

| Page 71 | Page 73 |
|---|---|
| 1        Mehrish - March 2, 2012 | 1        Mehrish - March 2, 2012 |
| 2    Q.    Do you recall whether you had any | 2 book for Class V III? |
| 3 discussions with anyone on the secondary desk about | 3    A.    Not specifically. It would have been me |
| 4 Class V III? | 4 or somebody else on my desk who might have looked |
| 5    A.    No. | 5 through it. |
| 6    Q.    Do you recall any of the details of the | 6    Q.    Do you recall whether or not you |
| 7 Class V III transaction? | 7 reviewed the offering circular for Class V III? |
| 8    A.    I recall it being a CDO of CDOs. | 8    A.    Don't recall reviewing it. |
| 9    Q.    Do you recall -- a CDO of CDOs? | 9    Q.    Do you know who actually prepared the |
| 10    A.    Yes. | 10 offering circular for Class V III? |
| 11    Q.    So that's a CDO squared? | 11    A.    I don't remember. |
| 12    A.    In the jargon, yeah. | 12    Q.    Did you have any discussions with anyone |
| 13    Q.    Do you recall whether it was a synthetic | 13 about what was included in that offering circular? |
| 14 CDO? | 14    A.    I don't recall any discussions. |
| 15    A.    No. It may have been a combination. | 15    Q.    Do you recall any discussion with |
| 16    Q.    Do you recall if there was an asset | 16 Mr. Stoker? |
| 17 manager for the Class V III? | 17    A.    No. |
| 18    A.    Yes. CSAC. | 18    Q.    Was it normally the structuring desk's |
| 19    Q.    And did you have contact with CSAC, | 19 responsibility to put together the offering circular? |
| 20 Credit Swisse, concerning the Class V III? | 20    MS. BUERGEL: Objection to form. |
| 21    A.    Yeah. I'm sure I did. | 21    A.    No. It was generally legal counsel put |
| 22    Q.    Was that a common practice for you to | 22 together the offering circular. |
| 23 talk to the asset manager about a CDO that they were | 23    Q.    All of it? |
| 24 going to manage? | 24    A.    Yeah. They put it together and then it |
| 25    A.    Yeah. We would exchange thoughts as to | 25 was reviewed by the structuring desk. |

19 (Pages 70 to 73)

Shalabh Mehrish                                              March 2, 2012
                          New York, NY

| Page 74 | Page 76 |
|---|---|
| 1          Mehrish - March 2, 2012 | 1          Mehrish - March 2, 2012 |
| 2      Q.    And who provided all the information to | 2      Q.    Do you recall actually receiving them? |
| 3  the legal counsel to put into the offering circular? | 3      A.    I'm sure I have received some e-mails, |
| 4          MS. BUERGEL:  Objection to form. | 4  yeah. |
| 5      A.    It was various sources for the | 5      Q.    Do you recall any e-mails between the |
| 6  information. If it was information describing the | 6  sales coverage for this -- I guess it would have been |
| 7  collateral manager, it was information that came from | 7  Mr. Khan and CSAC, concerning what assets to be |
| 8  the collateral manager. If it was information | 8  placed in Class V III? |
| 9  describing specific structural aspects, it came from | 9      A.    I don't recall. |
| 10 CDO desk. | 10     Q.    Do you recall whether or not you |
| 11     Q.    Which CDO desk? | 11 reviewed or received any copies of e-mails between |
| 12     A.    The structuring desk. | 12 anyone on the secondary trading desk and CSAC or |
| 13     Q.    Structuring desk.  Okay.  Similarly, | 13 Mr. Khan concerning the assets that will be in Class |
| 14 with respect to the pitch book for Class V III, do | 14 V III? |
| 15 you know who specifically put that together, who was | 15     A.    No, I don't recall. |
| 16 responsible for putting that together? | 16     Q.    What was the process by which the assets |
| 17     A.    No. | 17 for Class V III were selected? |
| 18     Q.    Do you know who specifically was | 18     A.    There were several discussions between |
| 19 responsible for drafting it? | 19 the collateral manager and syndicate desk, |
| 20     A.    No. | 20 structuring desk about assets that were -- deals that |
| 21     Q.    Do you have any understanding of how the | 21 were being offered in the marketplace and what sort |
| 22 assets that were included in Class V III were | 22 of deals might work for a CDO squared, and what might |
| 23 selected? | 23 be palatable for investors, what kind of structure. |
| 24     MS. BUERGEL:  Objection to form. | 24 So there were several discussions. |
| 25     A.    They were selected by the collateral | 25     Q.    And how were you aware of those |

| Page 75 | Page 77 |
|---|---|
| 1          Mehrish - March 2, 2012 | 1          Mehrish - March 2, 2012 |
| 2  manager. | 2  discussions? |
| 3      Q.    And how do you know that? | 3      A.    Because that was a typical process in -- |
| 4      A.    Because we were doing an actively | 4  in which CDOs got done in the place. |
| 5  managed CDO transaction.  The collateral manager | 5      Q.    Again, you're talking about what the |
| 6  selected transactions like any other CDOs. | 6  typical process was? |
| 7      Q.    Are you talking about what the normal, | 7      A.    Right. |
| 8  general practice was? | 8      Q.    And your assumption is that in fact, |
| 9      A.    As well as with this transaction. | 9  that's what occurred in Class V III? |
| 10     Q.    And how do you know with respect to this | 10     A.    That's right, because I don't recall |
| 11 transaction that's what happened? | 11 anything out of the ordinary with any transaction. |
| 12     A.    Because all the transactions I worked on | 12     Q.    Were you personally involved in any of |
| 13 that's what happened. | 13 those discussions you just described with respect to |
| 14     Q.    All right.  Specifically with respect to | 14 Class V III? |
| 15 Class V III, what is your basis for saying that's how | 15     A.    Yeah.  I was probably involved in |
| 16 it occurred? | 16 estimating what investor appetite might be for |
| 17     MS. BUERGEL:  Objection. | 17 that -- having that discussion with the CSAC. |
| 18     A.    I generally recall the collateral | 18     Q.    You say probably.  Do you specifically |
| 19 manager asking specific approval for assets to put | 19 recall? |
| 20 into the warehouse and they were selecting the | 20     A.    I don't specifically, because it was |
| 21 assets. | 21 such a long time ago. |
| 22     Q.    Did you receive or you -- did you | 22     Q.    Do you recall whether or not you put |
| 23 receive copies of e-mails between sales and the asset | 23 anything in writing, an e-mail to CSAC, concerning |
| 24 manager concerning Class V III? | 24 your discussions? |
| 25     A.    I might have. | 25     A.    Don't recall. |

Alderson Reporting Company
1-800-FOR-DEPO

# EXHIBIT 9

Robert K. Pinniger                    September 30, 2010

1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:         )

                          )   File No. HO-10740

CITIGROUP, INC.           )


WITNESS: Robert K. Pinniger


PAGES:    1 through 175


PLACE:    Securities and Exchange Commission

          3 World Financial Center

          New York, New York 10281


DATE:     Thursday, September 30, 2010


     The above-entitled matter came on for hearing, pursuant

to notice, at 9:40 a.m.

Robert K. Pinniger                                    September 30, 2010

37

1      Q    Did you have discussions with Samir Bhatt - B-H-A-
2    T-T - in the course of working on the Class V, III deal?
3      A    At various points throughout the transaction I
4    would have talked to Samir.  Yes.
5      Q    Did Samir tell you anything about the process by
6    which the assets were selected for Class V, III?
7      A    I do not recall Samir telling me specifically how
8    the assets were selected.  I don't recall talking to Samir
9    about that.
10     Q    Did he tell you generally?
11     A    Without a specific recollection of conversations,
12   it would have been a normal process for Samir and I to talk
13   at various points of a transaction.  There may have been
14   questions on certain assets, for example, as we're going
15   through a deal.  You know, now we're in the marketing stage
16   and someone asks a question about XYZ bond in the portfolio
17   or position in the portfolio.  And to the extent we needed
18   their assistance in either getting data or however the
19   question came in, we might go to Samir or I might talk to
20   Samir about that.  So it would have been normal practice for
21   me to interact with Samir in various ways.  But I don't -- in
22   terms of early on talking to Samir about portfolio selection
23   and things on that, I don't recall talking to Samir about
24   that.
25     Q    Let me hand you what's been marked as 499.

38

1          THE COURT REPORTER: 498.
2          MR. FELLER: 498.  Thank you.  Perfect.  Thank you.
3              (Commission's Exhibit No. 498 was
4              marked for identification.)
5      Q    Exhibit 498 is a one-page e-mail with a 66 page
6    attachment.  I think that's right.  The Bate range CITI-
7    15905929 through 15905995.  It's an e-mail from Frank Li, L-
8    I, to Samir Bhatt and Todd Kornfeld, copying Mr. Stoker, Mr.
9    Pinniger and Wen Hai Pan.
10     A    Yes.
11     Q    And it's dated January 24, 2007; Subject "Draft of
12   Class V Funding, III (CSAC CDO squared) Debt Book".  And Mr.
13   Li writes "Samir, Todd: Attached please find the draft debt
14   book of the Class V Funding, III CSAC CDO Squared deal.  The
15   book is pretty clean and share the manager and risk factor
16   sections as the book of Adam Square Funding, II CSAC Mezz ADS
17   Deal. As of such, please provide any comments you may have no
18   later than 4 p.m. tomorrow.  The deal has been announced, and
19   we are planning to send the book out by the end of the week".
20         So who put together the -- is this the first draft
21   -- is the attachment to Exhibit 498 the first draft of the
22   marketing book of Class V, III?
23     A    In looking at the attachment I can't tell if this
24   is the first draft or it's sort of further along.  I don't
25   know what stage this was at.

39

1      Q    Well let me go back.  Who put together the first
2    draft of -- whether or not this is the first draft, who put
3    together the first draft of the Class V, III marketing book?
4      A    As a starting point it would have been my team.  So
5    my Structuring Team would have done it.  So it would have
6    been a combination of myself and Frank and Wen Hai, starting
7    with whatever is the most recent book we might have had and
8    trying to do what modifications we could to the book.  And
9    then depending on at what stage it was ready to go out to
10   various folks to begin to add their comments to begin the
11   review.
12     Q    And did you use something -- a template for the
13   first draft of the Class V, III book?
14     A    We would have used a template.  I don't recall what
15   we used.  I'm just reading here in the e-mail, and it sounds
16   like we used a particular template.  I don't recall that that
17   was the case, but I'm just reading this.
18     Q    In putting together the initial draft did anyone
19   explain to you any differences other than the collateral
20   being CDO traunches versus some mix of MBS and CDO traunchoe?
21   Did anyone explain to you any differences between the
22   transactions?
23         MS. BUERGEL:  Which transactions?  I'm sorry.
24         MR. FELLER:  The transaction that served as the
25   template for -- the marketing book of which served as the

40

1    template and then Class V, III.
2      A    I'm not recalling specific conversations with
3    anyone where we discussed the exact differences.  But we
4    would have -- sort of similar to what I was saying before,
5    someone would have at some point probably given me at least a
6    rough outline on what the deal was intended.  You know, just
7    a real high level of general starting point for the
8    transaction.  By that, if I'm looking at Adam Square - and I'm
9    only going off what's in the e-mail.  I don't recall that
10   that was our template.  Adam Squared was a mezzanine deal.
11   Class V ended up being a CDO squared, so I already knew some
12   differences.
13         I forget exactly when I would have come to have
14   known that the portfolio was intended to be certain credit
15   quality or not.  But I would have come to know information at
16   some point.  I just don't -- I can't recall specifically of
17   talking to XYZ about that.
18     Q    Did anyone tell you that the asset selection
19   process was different in any way from the one that took place
20   in the transaction that served as the template for the Class
21   V, III deals?
22     A    I don't recall having discussed with anyone that
23   the asset selection process was different.
24     Q    Who would be responsible for insuring that the
25   description of the asset selection process - you know,

Robert K. Pinniger                                           September 30, 2010

41

1    marketing materials - is accurate?
2        A   It could come from one of two places or both. And
3    by that I mean primarily the manager would be reviewing that
4    to make sure that they are looking through a marketing book
5    and it's describing what they're going to be doing in a
6    transaction. They would be reading the marketing material
7    for making sure that their role is specified correctly. We
8    may also -- "we" meaning the Structuring Desk and it may be
9    in conjunction with our internal or external counsel to make
10   sure descriptions are correct. To the extent we know that
11   something is specific about a manager's role, whether or not
12   there was something different about it, we might also comment
13   on it and then look for the manager to -- we might look for
14   the manager to make sure our way of phrasing or framing it
15   was correct. So it could come from two different places.
16       Q   In the course of -- did you continue to work on the
17   Class V, III marketing book through to completion?
18       A   Yes.
19       Q   In the course of working on it did anyone raise any
20   concerns about the description of the asset selection
21   process?
22       A   I don't recall that anyone raised a concern.
23       Q   Was there any discussion about how it should be
24   described?
25       A   I can't recall that there were any conversations

42

1    around the asset selection description in marketing.
2        Q   In the course of working on the Class V, III
3    marketing materials did you come to have any understanding of
4    any role that the Citi's CDO Trading Desk had in the
5    transaction?
6        A   I got caught up in the -- would you mind repeating
7    the question? I'm sorry.
8        Q   Sure. In the course of working on the marketing
9    materials for Class V, III over the time you worked on them,
10   did you come to have an understanding of any role that Citi's
11   CDO Trading Desk had in the transaction?
12       A   Without knowing the exact time frame, at some point
13   - and again, I forget exactly when I knew that the
14   transaction was going to be a mix of assets in terms of
15   synthetics or cash - but I would have come to know that at
16   some point synthetics were being contemplated in the
17   transaction. And with the underlying collateral being CDO's,
18   the group that would have been involved in the short leg of a
19   CDS trade into a CDO  - the short leg being buying credit
20   protection from the CDO and in turn paying a premium to the
21   CDO for that credit protection - the Secondary Desk as the
22   market maker in CDO traunches would have also on our desk
23   been the desk who would have done CDS on CDO's. But I don't
24   -- and I'm sorry if I'm not answering the question. But at
25   some point I would have know that there would have been

43

1    synthetic assets in there. I knew that the portfolio was a
2    CDO Squared. And as such, my general recollection would have
3    ben okay, the CDO Secondary Desk would be involved just
4    because they make a two-way market. But beyond that I don't
5    recall specifically knowing involvement beyond that.
6        Q   And was there anything you put in the marketing
7    book that specifically addressed that role?
8        A   I can't recall specifically. And to be honest, I
9    haven't looked at the marketing materials for this deal for a
10   long time. But we would have -- I don't recall if we noted
11   their involvement specifically or if we would have noted that
12   Citi would have acted a capacity as a short counterparty.
13       Q   And did you have an understanding of whether the
14   Secondary Desk was acting as an intermediary on those trades?
15   That is, on the short side of the collateral trades into
16   Class V, III. Or whether they were not acting as an
17   intermediary; whether they were the ultimate short
18   counterparty. Do you understand what I mean when I say an
19   intermediary?
20       A   I was just going to ask you to clarify to make
21   sure.
22       Q   Okay. Whether they were standing in the middle of
23   another client who was the ultimate short counterparty on
24   that particular asset or whether they - meaning the CDO
25   Trading Desk - was the ultimate short counterparty. Does

44

1    that clarify --
2        A   -- Yes. I don't -- I can't recall if I would have
3    given consideration to that in terms of whether there was a -
4    - you know, they were facing on the long side a different
5    counterparty or they were just short to the CDO. I don't
6    recall considering that at this time.
7        Q   Would that have made a difference to you in putting
8    together the marketing material?
9        A   For me on the Structuring Desk I don't -- in my
10   capacity on the Structuring Desk I don't know if I would have
11   -- if that would have been a strong consideration. But had -
12   - and I'm not saying this is the arrangement and the deal.
13   But had that been an arrangement where they were -- let's say
14   in whatever capacity they were acting - whether it was an
15   intermediary as you described or they were just short to the
16   CDO - to the extent we became aware of that or when we became
17   aware of that, that would have -- while I might not have
18   considered it from my structuring perspective to be important
19   in terms of what I was doing, I would likely have raised an
20   to either internal or external counsel for their
21   consideration. Not out of any particular concern but just
22   here's another factor or fact in the transaction, and is
23   there anything that they can think that we would need to do
24   in that matter.
25       Q   Let me hand you what's being marked as Exhibit 499.

# EXHIBIT 10

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:              )

                               )  File No. HO-10740-A

CITIGROUP, INC.                )


WITNESS:  Donald J. Quintin

PAGES:    1 through 150

PLACE:    Securities and Exchange Commission

          100 F Street, N.E.

          Washington, D.C.

DATE:     Thursday, February 18, 2010


     The above-entitled matter came on for hearing, pursuant

to notice, at 10:05 a.m.




Diversified Reporting Services, Inc.

(202) 467-9200

Page 42

1  thing that I think might fill out the picture? Could you
2  explain how the use of synthetics helps you to manage the
3  warehouse risk for -- on the syndicate side?
4        THE WITNESS:  Okay.  I mean with the synthetic
5  you -- a manager can identify a name they want to reference
6  for a deal.  The timing of the execution of that contract --
7  because there's no bond you have to go buy, you can
8  effectively set the timing when that happens.  You can make
9  it happen very close to when you're going to price the
10  transaction.
11        You want to be in a position where you can identify
12  a large portion of the collateral prior to pricing because
13  the investors who are buying the CDO are interesting in
14  knowing what's in the collateral pool.
15        So the manager can identify what collateral they
16  want to select for the deal, but you can select when you
17  actually contract on those -- on that risk.  So --
18  BY MR. FELLER:
19    Q   So the part I'm trying to narrow in on is where in
20  the course of the evolution of the deal did -- did the view
21  develop that Citi might -- that the secondary desk might not
22  match some or all of these trades with the Class V III deal?
23  Do you understand the question?
24    A   Yeah.  And I'm suggesting that that was something
25  that evolved later in the process -- the initial cut of names

Page 43

1  that Brian discussed with CSAC --
2    Q   Mr. Carosielli?
3    A   Excuse me, Mr. Carosielli.
4    Q   Well, I just want to -- because there's a Brian
5  Stoker as well.
6    A   Yeah, you're right, yeah -- Mr. Carosielli
7  discussed with CSAC you know included names that we felt very
8  good that we would have an outlet for, meaning that there
9  would be investor interest in covering that position, so we
10  wouldn't be left with this large short position.
11        I mean we were -- at the end of 2006, we were on the
12  secondary desk concerned about the size of the shorts that we
13  had.  We were concerned that the market could turn, the
14  protection bid could go away, and that there would be a cost
15  of carrying those shorts, and we wanted to be very careful
16  about not being in a position where we were adding more names
17  to the short book that potentially we wouldn't have the
18  ability to cover.
19    Q   Sorry, at the end of 2006, you were concerned that
20  the secondary book was too short?
21    A   Yeah.  And by end, third, fourth quarter, yes.
22    Q   By the time you were going into the Class V III
23  transaction?
24    A   Yeah, we had discussions -- we didn't know which
25  direction the market was going to go.  You know the

Page 44

1  underlying market, certainly not.  But even the protection
2  market, you know there were a few investors who wanted to buy
3  protection.
4        But you know we were concerned that -- we had
5  concern that that protection bid may go away.  Guys like
6  Magnetar may not need to buy protection, may not want to buy
7  protection any more, and we'd have this protection sitting on
8  the book.  And that was -- you know that was definitely
9  something that concerned us at the time.
10    Q   So when did you sort of move from that to -- I'm
11  paraphrasing a little, so tell me if I'm mischaracterizing,
12  to a view that a short position in the secondary book could
13  act in some way as a hedge on Citi's long inventory?
14    A   It's hard to pick out points in time because these
15  things don't -- there's no moment or epiphany moment where
16  this is when that did, so it was an evolving process.
17        I think we started to -- management started having
18  a dialogue with us -- management meaning -- when I mean
19  management I mean Nestor, Janice and Michael Raynes -- about
20  kind of the timing.
21        The timing became a question -- when do we cover
22  the shorts, and then it became you know later, after -- later
23  in 2007 it became should we cover them, should they just be a
24  strategic short given that again, we'd have tens of billions
25  of longs.  That's the rough timing that I remember.

Page 45

1    Q   Was in 2007, and you said later in -- but --
2    A   Well, but -- yeah, again, it was an evolving
3  process.  I think that we mentioned as I mentioned about
4  the shorts, but we were also cognizant of the fact that the
5  business was very long.
6        So you know if we were -- if the market did move
7  against us before we could cover the shorts, I guess that
8  would be a good thing for the overall business because the
9  business was a lot longer by many, many multiples than there
10  were short.  Does that make sense?
11    Q   So, okay, so I'm still -- I understand what you're
12  saying.  And that's helpful.  I guess I'm still trying to
13  figure out if entering in to mm-hmm transaction -- if there
14  had been discussions as to that particular portfolio whether
15  it was being selected -- strike that -- whether the reference
16  assets you agreed to trade with CSAC were being selected by
17  you -- the portfolio that you chose to trade, which is to say
18  those assets that you agreed to deal with CSAC on, whether
19  you were doing so with an eye towards holding onto those,
20  holding onto those shorts, or with an eyes towards selling
21  them on to customers.
22    A   Okay, and what I can remember is that there was a
23  list of names that I think we were particularly interested in
24  agreeing to.  The genesis of the names were demand-driven
25  from investors -- Magnetar and others who had similar

Page 46

1  strategies.
2      That's kind of where from our perspective we were
3  cognizant of those names because we'd have an outlet for the
4  protection. If these were names these guys cared on, then we
5  were hopeful that by the time the transaction closed, we
6  could then sell the protection to them.
7      We couldn't do it before closing because of the
8  reasons I mentioned before about minimizing the warehouse
9  risk.
10     Q   Would the deal have happened if Credit Suisse had
11  not wanted to include those names in the portfolio?
12     A   Yes, but we may have agreed to take less risk in
13  the deal. It would have been a function of a syndicate's
14  comfort and placing the transaction -- the investor demand
15  for the deal.
16     You know that's a key driver in these deals is the
17  syndicate responding to the investor interest as they know it
18  to place these transactions -- except for the super seniors
19  that Citi ended up retaining, the goal was to distribute the
20  capital structure.
21     Q   So I'm sorry -- say that again, what's the
22  relationship between placing the risk from the deal versus
23  you --
24     A   What I'm suggesting is that a deal could have still
25  happened. If CSAC had not wanted to select any of the names

Page 47

1  that we were comfortable with, our role as counter-party to
2  the deal would have been potentially something smaller.
3      It could have still happened if the timing of the
4  ramping made sense consistent with -- again, we're
5  speculating about something that didn't happened, so it would
6  have been you know if the transaction could have been -- you
7  know if we got comfortable the transaction was going to
8  placed, we could manage the warehouse risk. I'm assuming
9  that you know they would -- I'm assuming that syndicate and
10  origination would have proceeded with the transaction.
11     Q   Okay, well, that's kind of what I'm asking is was
12  this -- you said hypothetically it could have proceeded with
13  a lesser role for the secondary desk, but was this particular
14  deal predicated -- from your understanding -- on the
15  secondary desk playing a large role in it?
16     A   Take a step back, the reason I'm saying this is
17  because there were other transactions, other CDO^2s that
18  happened almost concurrently but subsequent to this
19  transaction where our role -- and I'm not referring to our
20  role as synthetic counterparty to the transaction where we
21  were --
22     Q   As the initial counterparty?
23     A   As the intermediary, yeah, I'm not referring to
24  that.
25     Q   Okay.

Page 48

1      A   Like I say, that's a separate specified role. I'm
2  saying there were other transactions where we played a much,
3  much smaller role in the collateral. So --
4      Q   Keep going --
5      A   No, I guess in answer to your question, could it
6  have moved forward, conceivably.
7      Q   Well, those other transactions did, but again, I'm
8  asking was this particular transaction -- the CDO^2 with
9  CSAC -- entering into it was the intent for -- I assume the
10  secondary desk makes money -- makes marginally more money as
11  it plays a marginally larger role in the transaction, right?
12     A   Right.
13     Q   So was the intent entering into this deal for the
14  secondary desk to play a large role, for this to be a
15  particularly -- a deal on which the secondary desk played a
16  particularly large role?
17     A   Yeah, okay, see if this answers your question, this
18  transaction as it came to formation contemplated the
19  secondary desk providing risk for a subset of the pool.
20  Could such a transaction have occurred had we not done that?
21      My answer is yes because clearly we did other deals
22  where we didn't provide such a subset with collateral.
23     Q   Right, but was -- to the best of your knowledge,
24  was CSAC approached or -- to do a deal in which the secondary
25  desk would take the short side of a large subset of the

Page 49

1  collateral?
2      A   Okay, I don't want to speak for anyone other than
3  ourselves, but I would speculate that CSAC would still have
4  moved forward with the -- they would have wanted to move
5  forward with the transaction whether we buy the collateral or
6  not to the extent they felt that Citi syndicate, new
7  issue could bring them a transaction.
8      I mean their goal was to do deals. That was their
9  business -- syndicate, if they felt comfortable they could
10  place the debt would want to move forward and certainly
11  structure an origination.
12      So the other parties of the transaction would
13  likely have moved forward.
14     Q   So I understand your answer -- I guess a more
15  specific question is do you know if anyone from the
16  structuring desk in the negotiations with CSAC described this
17  as a deal in which the secondary desk would take a large
18  portion of the short risk?
19     A   I don't know who had the discussion, but clearly
20  there must have been a discussion because there was a
21  subsequent dialogue on a subset of the portfolio. So that
22  dialogue would have come for some reason.
23     Q   Just before we move on -- and I just don't want to
24  forget to follow up on this, you said that Citi had a
25  separate specified role as an intermediary -- an

Page 50

1    intermediation role, can you just describe what that is?
2        A   To the best that I can --
3        Q   Absolutely.
4        A   For a variety of reasons -- I can get into some of
5    them, for a variety of reasons, Citi would sometimes be the
6    counterparty that the CDO faced, and then would face other
7    counterparties.
8            So for example, if a manager was sourcing risk for
9    a deal, put out a BWIC -- a bid wanted in comp -- there were
10   trying to source risk in the market, they would -- they could
11   put out a list of names to other dealers and say your
12   counterparty on this trade is Citi.
13           And so X, Y, Z dealer could show the level, maybe
14   they're winning bidder protection. They would then face
15   Citi, and Citi would face the deal. I believe the -- I think
16   the term was synthetic counterparty -- specified, synthetic
17   counterparty -- I don't remember the term, but it's a defined
18   term in some of the documentation, but it's basically where
19   Citi would act in this intermediary role.
20           And there were different reasons for why that would
21   be -- that would occur.
22       Q   Why?
23       A   Well, some managers wanted to face one
24   counter-party. They didn't want to face the rest of the
25   street. I believe the rating agencies also wanted the deal

Page 51

1    to face a certain type of counter party -- some requirements
2    that they would require as a function of the transaction.
3            And then some street counter parties would not want
4    to face the CDO directly, they'd want to face the dealer who
5    was underwriting the deal. So those are a few of the reasons
6    that come to mind as why that kind of arrangement existed.
7        Q   Would the manager know whether Citi was the final
8    counter party or just playing an intermediary role?
9        A   Well, for collateral where their sourcing for third
10   parties, other dealers, I mean they would know because
11   they're putting out this list, and they're directing the
12   counter party who is -- they're directing the other dealer
13   counter party who they're going to be facing as a counter
14   party.
15           If they're transacting specifically with us, they
16   wouldn't necessarily know whether or not there was another
17   counter party on the other side, but that's -- yeah.
18       Q   So only for collateral sourced away would they know
19   whether Citi had --
20       A   I should step back. I don't know if there was this
21   intermediary function in ever transaction. I don't know if
22   it was on only certain types of synthetics and not others. I
23   just -- I remember that on certain deals where we were being
24   asked to be intermediary, then we'd be aware of that.
25       Q   And Class V III was one of those deals?

Page 52

1        A   Yeah, but there may also have been CDS that faced
2    the CDO directly. I'm not sure. I don't remember that
3    aspect because I remember that within Class V III, there were
4    three -- I would look at three kind of asset pools -- there
5    was the CDS in this subset that CSAC had selected that were
6    versus Citi, and then there was this stuff that they largely
7    sourced through BWIC. And there was a cash component.
8            I don't remember if all of the synthetic collateral
9    was facing the synthetic counter party or only some of it. I
10   just don't remember those details.
11           MR. AUFSES:  And when you said stuff that was
12   sourced through a BWIC, you mean synthetic collateral?
13           THE WITNESS:  Yes, I'm sorry -- I mean -- stuff is
14   not a technical term. The synthetic collateral.
15           BY MR. FELLER:
16       Q   Do you know approximately what percentage of the
17   synthetic collateral was sourced from Citi for Class V III?
18       A   Well, I think it was this subset which is I don't
19   know maybe about 50 percent, roughly. I'm guessing it was
20   about half the synthetic collateral. I may be wrong, but
21   that's what I remember right now. So roughly about half.
22           (SEC Exhibit No. 333 was marked for
23           identification.)
24           BY MR. FELLER:
25       Q   Okay, so -- let me hand you what's being marked as

Page 53

1    Exhibit No. 333, which is a one-page e-mail, Bates
2    CITI18122071, from Mr. Quintin dated October 23, 2006. Do
3    you recognize this e-mail?
4        A   I don't remember sending it, but, yeah, I may have
5    seen this in prep.
6        Q   So you don't remember sending it?
7        A   I don't -- no, but I may have sent it.
8        Q   Do you know what it is?
9        A   Yeah, it's a -- it looks like an e-mail I sent to
10   the structuring desk with some ABS CDO names to use in coming
11   up with a hypothetical capital structure.
12       Q   Okay, the subject line of the e-mail is trade, and
13   it's sent to Brian Stoker and Ilias Islamov?
14       A   That's correct.
15       Q   Do you know what led to you sending this e-mail?
16       A   Well, this list -- well, I don't know specifically
17   but I can -- I mean I can speculate. One is this list is --
18   looks like a list of names that was of particular interest
19   from Magnetar to buy protection on.
20           And what prompted it -- you know it could be any
21   number of reasons. It could be we were starting to look at
22   what capital structures would look like, and so the
23   structuring desk could have asked -- it can just send us a
24   list of names so we can start looking at what a deal looks
25   like.

# EXHIBIT 11

Donald Quintin                                                    March 13, 2012
New York, NY

```
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF NEW YORK

 3                  11 Civ. 07388 (JSR)

 4    - - - - - - - - - - - - - - - - - - - - - - -

 5    SECURITIES AND EXCHANGE COMMISSION,

 6                  Plaintiff,

 7         vs.

 8    BRIAN H. STOKER,

 9                  Defendant.

10    - - - - - - - - - - - - - - - - - - - - - - -

11

12                  TRANSCRIPT of DONALD QUINTIN in the

13    above-entitled matter, as taken by and before

14    LORRAINE B. ABATE, a Certified Shorthand Reporter and

15    Notary Public of the State of New York and Registered

16    Professional Reporter, held at the offices of The

17    Securities and Exchange Commission, Three World

18    Financial Center, New York, New York, on March 13,

19    2012, commencing at 11:17 a.m., pursuant to Subpoena.

20

21

22

23

24

25
```

Donald Quintin                                                      March 13, 2012
                              New York, NY

| Page 50 | Page 52 |
|---|---|

**Page 50**

1              Quintin - March 13, 2012
2        A.    I do not.
3        Q.    All right. Now, I notice there are two
4    e-mails here. The bottom one indicates -- appears
5    it's from Brian Stoker to Donald Quintin and Shalabh
6    Mehrish.
7              Sir, do you have any reason to believe
8    that you didn't receive this e-mail on January the
9    8th of 2007?
10       A.    I do not.
11       Q.    Now, there is an -- if you look down,
12   the subject says CSAC CDO squared.
13             Do you know what the reference CSAC is
14   to?
15       A.    Credit Swisse.
16       Q.    Is that Credit Swisse Alternative
17   Capital?
18       A.    Capital.
19       Q.    All right. Thank you.
20             About the third line down, it says CSAC
21   buys. Do you see that?
22       A.    I see that.
23       Q.    It says buys no equity, but we
24   informally expect them to buy single A and BBB from
25   Harding.

**Page 51**

1              Quintin - March 13, 2012
2              Do you recall having any discussion with
3    Mr. Stoker about this topic back in January of 2007?
4        MR. DOOLEY: Object to the form.
5        A.    I do not.
6        Q.    Do you recall ever questioning
7    Mr. Stoker why he had this informal expectation?
8        A.    I do not.
9              This is a reference to Harding.
10       Q.    Do you know at this time what Harding
11   refers to?
12       A.    Harding -- I believe Harding was an
13   asset manager.
14       Q.    Is that an asset manager that Citigroup
15   used to manage CDOs that it underwrote?
16       A.    I believe so, yes.
17       Q.    Do you recall approximately how much
18   business that Citigroup did with Harding?
19       A.    I do not.
20       Q.    Do you recall whether it was
21   substantial?
22        MR. AUFSES: Objection to the form.
23       A.    I don't know.
24       Q.    Do you recall whether it was more than
25   one deal?

**Page 52**

1              Quintin - March 13, 2012
2        A.    I believe it was more than one deal.
3        Q.    Was it less than ten?
4        A.    Yes, I believe it was less than ten.
5        Q.    All right, sir. Are you -- well, I
6    think we have just about five minutes left on the
7    tape, so let's take a short break here so we can
8    change the tape. Maybe ten minutes.
9              THE VIDEOGRAPHER: This marks the end of
10   tape No. 1. We're going off the record at 12:10
11   p.m.
12             (There was a recess taken.)
13             THE VIDEOGRAPHER: This marks the start
14   of tape No. 2. We're back on the record at
15   12:21 p.m.
16   BY MR. INFELISE:
17       Q.    Mr. Quintin, were you familiar with --
18   in the 2006-2007 time frame, with a hedge fund that
19   was called Magnetar Capital?
20       A.    Yes.
21       Q.    And do you recall whether or not during
22   this time frame, you were ever involved in any way of
23   the Magnetar deals?
24        MR. AUFSES: Object to the form.
25        MR. DOOLEY: Same objection.

**Page 53**

1              Quintin - March 13, 2012
2        A.    Could you describe what you mean by
3    involved.
4        Q.    Do you recall whether or not Citigroup,
5    and I'm specifically talking about the CDO group here
6    in the United States, ever was involved in
7    underwriting a Magnetar CDO?
8         MR. AUFSES: Object to the form. You
9    may answer.
10       A.    I don't believe so.
11       Q.    And do you recall whether or not --
12   well, let me ask you, were you familiar with a group
13   of CDOs that were named after constellations?
14       A.    Yes.
15       Q.    And how is it you were aware of those?
16       A.    They happened to share similar names in
17   the transactions in the market.
18       Q.    And was it -- well, do you know who
19   sponsored those CDOs?
20        MR. AUFSES: Objection.
21        MR. DOOLEY: Object to the form.
22       A.    They were sponsored -- do you mean the
23   underwriter or do you mean -- what's a sponsored
24   role?
25       Q.    That's fair. Let me rephrase the

Alderson Reporting Company
1-800-FOR-DEPO

Donald Quintin                                    March 13, 2012
New York, NY

---

**Page 54**

Quintin - March 13, 2012

1  question.
2
3      With respect to these constellation
4  CDOs, was there any particular hedge fund associated
5  with them?
6      A.  I believe so, yes.
7      Q.  And which one was it?
8      A.  Magnestar.
9      Q.  All right.  And were you aware of that
10  in the 2006-2007 time frame?
11      A.  Yes.
12      Q.  Do you recall whether or not these
13  constellation CDOs had any common characteristics
14  with respect to -- well, strike that.
15      Do you recall during this time frame
16  whether or not the constellation CDOs had any common
17  characteristics?
18      A.  I believe so, yes.
19      Q.  Do you recall what those were?
20      A.  I believe that most of them -- one of
21  the defining characteristics was that they tended not
22  to have what was referred to as O/C and I/C tests, or
23  triggerless deals.
24      Q.  Okay.  And with respect to the
25  constellation deals, do you recall whether -- what,

---

**Page 55**

Quintin - March 13, 2012

1  if any, participation Magnetar had in purchasing any
2  of the tranches of those deals?
3      MR. DOOLEY:  Object to the form.
4      A.  It would be speculation on my part in
5  terms of what their role was.
6      Would you like me to do that?
7      Q.  Please.
8      A.  As I understood it at the time, I
9  believe they took or they invested in the equity
10  tranche of these deals, and often, bought protection
11  on mezzanine tranches.  They may have other
12  involvement in the deals, but you know, I wouldn't be
13  privy to that information.
14      Q.  The understanding you had just
15  explained, what was your basis for that back in 2006
16  and 2007?
17      A.  As best I can recollect, just what I had
18  heard in the market.
19      Q.  Do you recall an individual by the name
20  of -- is it Prusko?
21      A.  Jim Prusko, yes.
22      Q.  Who is he?
23      A.  He was an employee at Magnetar.
24      Q.  Do you recall ever having any dealings

---

**Page 56**

Quintin - March 13, 2012

1  with Mr. Prusko?
2      MR. DOOLEY:  Objection to the form.
3  Vague, ambiguous.
4      A.  I had occasion to speak with him from
5  time to time.
6      Q.  All right.  Back in this time frame,
7  2006-2007 -- well, let me ask you first, sir, are you
8  familiar with the term adverse selection as it
9  applies to CDOs?
10      A.  I think it's a subjective term that's --
11  was used by different counterparties about different
12  transactions.
13      Q.  And again, did you have an understanding
14  of what was meant by that term back in 2006 and 2007?
15      MR. AUFSES:  Objection to the form.
16      A.  I'm not sure by whom that view -- you
17  know, whose view you're referring to.
18      Q.  Well, I'm asking -- let me ask you this;
19  in 2006-2007, what was your understanding of what the
20  term adverse selection meant?
21      MR. AUFSES:  Same objection, but you may
22  answer.
23      A.  I guess from my perspective, the term is
24  something that could have been used by someone who

---

**Page 57**

Quintin - March 13, 2012

1  didn't like various aspects of a transaction.
2      Q.  So your understanding is that adverse
3  selection meant -- was usually used by someone who
4  didn't like aspects of the transaction?
5      A.  I'm saying that from what I recollect,
6  it could have been used in the context of looking at
7  a particular transaction, if somebody looked at a
8  transaction and there was an aspect of the deal,
9  whether it was the collateral of that particular
10  transaction, that they didn't like that collateral,
11  they may have said that it was adversely selected.
12      Q.  And at that time when someone said that
13  the -- said to you after this collateral was
14  adversely selected, what did you understand that to
15  mean, if you had an understanding?
16      MR. DOOLEY:  Object to the form.
17      A.  That whoever was saying that probably
18  had a negative view about the assets that were
19  included in that deal.
20      Q.  And are you familiar with the term
21  negative selection?
22      A.  I don't think I heard it used very
23  often.
24      Q.  Do you recall the context in which you

---

Donald Quintin                                                              March 13, 2012
New York, NY

---

Page 58

Quintin - March 13, 2012
1
2    heard that term used?
3        A.    I'm guessing it may have had similar
4    meaning to adverse selection.
5        Q.    You're guessing or is that your
6    understanding?
7        A.    I don't recall.  You know, it's not a
8    term I have, you know, used frequently in conjunction
9    with CDOs.
10       Q.    Do you recall ever hearing it used by
11   anyone who worked in the CDO group during this time
12   period?
13       A.    I don't have that recollection.
14       Q.    Sir, in 2006 into 2007 when you left,
15   did you ever have any concern that the collateral in
16   the constellation CDOs had been adversely selected?
17           MR. DOOLEY:  Object to the form.
18       A.    I don't recall that I had, you know, any
19   sort of, you know, specific view on the collateral in
20   those transactions.
21      . Q.    So do I understand you that you're
22   saying that during this time period, you didn't have
23   a concern that the assets included in the
24   constellation CDOs had been adversely selected?
25       A.    No.  What I recall about the

---

Page 59

1                Quintin - March 13, 2012
2    constellation deals was, you know, transacting in
3    those deals.  I mean, I think they're relatively new
4    deals done in about that time period.
5        Q.    Do you recall whether or not you ever
6    heard anyone at -- on Citigroup's CDO group voice
7    concerns that the constellation CDOs had been
8    adversely selected?
9            MR. DOOLEY:  Object to the form.  Vague
10   and ambiguous.  Sorry.
11       A.    I don't recall.
12       Q.    Sir, were you familiar with -- during
13   this time period, with CDOs that were named after
14   United States presidents?
15       A.    Yes.  I recall there was a collection of
16   deals I think were loosely referred to that way.
17       Q.    And do you recall whether or not those
18   collection of CDOs had any specific characteristics?
19       A.    As best I recollect, they shared common
20   characteristics of the constellations in that I
21   believe they were triggerless deals, if I remember
22   correctly.
23       Q.    Do you recall whether or not those
24   president CDOs, for lack of a better term, were
25   static CDOs or had managers?

---

Page 60

1                Quintin - March 13, 2012
2            MR. DOOLEY:  Objection to form.
3        A.    I don't remember.
4        Q.    Do you recall during this time period,
5    specifically in -- let's focus first on 2006.
6            Do you recall having any discussions
7    with anyone at Magnetar concerning selling them
8    protection on their constellation CDOs?
9        A.    Yes.
10       Q.    All right.  And do you recall who that
11   was?
12       A.    Excuse me.  May I correct my prior
13   answer?
14       Q.    Oh, please.
15       A.    That communication tended to be through
16   a salesperson.  So the conversation -- I don't recall
17   any direct conversations.  It would have typically
18   come through a salesperson.
19       Q.    Do you have any -- do you recall any
20   direct communications with anyone at Magnetar
21   concerning selling protection on specific
22   constellation CDOs?
23       A.    Again, it may have occurred.  It
24   would -- typically that communication would have gone
25   through a salesperson, but it may have occurred.

---

Page 61

1                Quintin - March 13, 2012
2        Q.    All right.  Okay.
3            MR. INFELISE:  I'm going to ask the
4    court reporter to mark the next document as
5    Exhibit 639.
6            (Exhibit 639, Two-page Document, Bates
7    numbered CITI 19336622 to 23, marked for
8    identification, as of this date.)
9            MR. INFELISE:  For the record, Exhibit
10   639 is a two-page document Bates numbered CITI
11   19336622 to 23.
12       Q.    Just take a few minutes, Mr. Quintin,
13   read through that and let me know when you're
14   finished.
15       A.    Okay.
16       Q.    Have you had a chance to look through
17   that, sir?
18       A.    I have.
19       Q.    And do you have any recollection of this
20   document?
21       A.    I do not.
22       Q.    All right.  Again, there's two e-mails
23   in the first page.  I direct your attention to the
24   one towards the bottom that appears to be from a
25   Quintin, Donald to Prusko, or Prusko, James.

16 (Pages 58 to 61)