Donald Quintin                                                              March 13, 2012
                              New York, NY

## Page 78

1         Quintin - March 13, 2012
2     A.   I do not.
3     Q.   Do you have any reason to believe that
4  you didn't send the e-mail at the top of the page?
5     A.   I do not.
6     Q.   Now, there is a reference to -- subject
7  is a Jackson IV -- excuse me, Jackson 06-IV-AD.
8          Do you have any recollection of what
9  that is a reference to?
10    A.   I believe it's a tranche within the
11 Jackson deal.
12    Q.   Okay. When it says Jackson 06-IV, what
13 is that -- what is the numerical reference to which
14 you recall?
15    A.   It typically refers to the year and
16 potentially the series in the tranche, the class
17 number.
18    Q.   Was it typical during this time period
19 to have more than one series of a specific type of
20 CDOs such as the Jackson CDO?
21    A.   CDOs -- yeah. I mean, CDOs had
22 different series, yes.
23    Q.   And the reference to this A after IV, do
24 you have any idea what that refers to?
25    A.   I think that is a particular Bloomberg

## Page 79

1         Quintin - March 13, 2012
2  pneumonic connoting whether it's a reg S or 144-A
3  issue.
4     Q.   And how about the D, any idea what that
5  is?
6     A.   That I believe -- that would typically
7  stand for a letter representing the tranche in the
8  structure.
9     Q.   Now, do you recall whether or not the
10 Jackson 06-IV was a Magnetar CDO?
11         MR. AUFSES:  Objection.
12         MR. DOOLEY:  Objection.
13    A.   Magnestar CDO meaning?
14    Q.   Similar -- was it a Magnetar CDO in the
15 same sense that the constellation CDOs were Magnetar
16 CDOs?
17         MR. DOOLEY:  Objection to the form.
18    A.   Again, did you mean did Magnetar have
19 the same involvement in the deal?
20    Q.   Yes.
21    A.   I don't know.
22    Q.   Do you have any recollection of why
23 Mr. Prusko, as you said, was desperate to buy
24 protection on the Jackson 06-IV?
25         MR. AUFSES:  Have you finished?

## Page 80

1         Quintin - March 13, 2012
2         MR. INFELISE:  Yes.
3         MR. AUFSES:  Objection to form.
4         MR. DOOLEY:  Same objection,
5  mischaracterizes the document.
6     A.   Could you restate your question.
7     Q.   All right. Do you have any recollection
8  of why it is you described Mr. Prusko's request for
9  protection on the Jackson 06-IV as desperate?
10        MR. AUFSES:  Object to the form. You
11 may answer.
12    A.   I'm not sure of which thing I'm
13 claiming -- actually, it says desperate, and I have
14 sent it to Carosielli.
15    Q.   Yes.
16    A.   I guess I'm not sure -- because I don't
17 recall this e-mail, I'm not sure whom I'm referring
18 to or what I'm referring to here. I just don't
19 remember this e-mail.
20    Q.   All right. Well, looking at that
21 e-mail, do you have any -- sorry. That would call
22 for speculation. I don't want you to speculate. All
23 right. We'll just leave that.
24        Sir, do you recall whether or not during
25 this time frame, and again, I'm referring to 2006 to

## Page 81

1         Quintin - March 13, 2012
2  2007, was there ever any discussions at the secondary
3  trading desk about taking a short position on the CDO
4  squareds?
5         MR. DOOLEY:  Objection to the form,
6  vague and ambiguous.
7     A.   Taking a short position on a CDO
8  squared?
9     Q.   Yes.
10        MR. DOOLEY:  Same objections.
11    A.   I don't recall talking about shorting a
12 CDO squared. We discussed shorting ABS CDOs. Not
13 that I remember.
14    Q.   Okay. All right, sir. If you would
15 look at your transcript of your investigative
16 testimony, and I'm going to direct your attention --
17 these are minuscripts, so there are four pages on
18 each page.
19        I'm going to direct your attention to
20 page 14 of the transcript itself. It would be the
21 fifth page of this. And you can read any portion of
22 the transcript you want, but I'm going to
23 specifically ask you a few questions about the
24 discussions on page 14.
25    A.   Yes.

### Page 82

1      Quintin - March 13, 2012
2  Q. Have you had a chance to read that?
3  A. I have.
4  Q. At line 16 through 21, the question was
5  and all right. When you said there were discussions
6  about doing CDO squareds, were any of those
7  discussions focused, did any of those discussions
8  involve having the secondary desk take a short
9  position in the collateral of the CDO squareds? And
10 answer, potentially.
11     Do you recall that?
12 A. I see it here.
13 Q. Okay. Does that refresh your memory
14 concerning whether or not there was any discussions
15 concerning taking a short position in the CDO
16 squareds during this time period?
17     MR. AUFSES: Object to the form. You
18  may answer.
19     MR. DOOLEY: Same objection.
20 A. We -- again, this is referring to the
21 collateral of a CDO squared.
22 Q. Yes.
23 A. Yes. To the collateral of a CDO
24 squared, which were -- the underlying were ABS, yes,
25 I do recall discussions. I don't remember any

### Page 83

1      Quintin - March 13, 2012
2  specific discussions, but yes.
3  Q. And do you recall who those discussions
4  were with?
5  A. Various members of the CDO business.
6  Q. Did that include Mr. Dominguez?
7  A. I believe so.
8  Q. Did it include anyone from the
9  structuring desk?
10 A. I believe so.
11 Q. Did it include anyone from the syndicate
12 desk?
13 A. I believe so.
14 Q. Now, you can set that aside. Thank you.
15 A. Okay.
16 Q. Based on those discussions, did you ever
17 take any action, to your recollection, to attempt to
18 establish short positions on the collateral on CDO
19 squareds?
20     MR. DOOLEY: Object to the form.
21 A. The desk had been a buyer of protection
22 on the ABS CDO tranches from a variety of sources,
23 deals managers, what have you.
24     Is that your question?
25 Q. My question was you just saw your

### Page 84

1      Quintin - March 13, 2012
2  testimony where you said there was a discussion
3  during this time period about short positions on
4  collateral and CDO squareds.
5  A. Yes.
6  Q. Based on those conversations, what, if
7  anything, did you do to try to implement that plan?
8      MR. AUFSES: Objection.
9      MR. DOOLEY: Objection. Misstates the
10  testimony.
11 Q. Let me go back. As a result of those
12 discussions, was there any decision or plan made to
13 attempt to take short positions on collateral in CDO
14 squareds?
15     MR. DOOLEY: Objection to the form.
16 A. Could you ask me one more time.
17 Q. Sure. As a result of the discussions
18 you talked about in the transcript in your
19 investigative testimony, did you take any action --
20 strike that.
21     As a result of the discussions
22 referenced in the transcript of the investigative
23 testimony, was there any plan established for
24 Citigroup to attempt to take short positions in
25 collateral and CDO squareds?

### Page 85

1      Quintin - March 13, 2012
2      MR. DOOLEY: Objection to the form.
3  A. I think we had general discussions about
4  the secondary desk playing a role acting as a
5  synthetic counterparty for the collateral, some of
6  the collateral of some of those transactions.
7  Q. And did that include taking any short
8  position in the CDO squareds assets in the CDO
9  squared?
10 A. In some of them, yes.
11 Q. And did that include taking a naked
12 short position on the collateral or assets in the CDO
13 squared?
14     MR. DOOLEY: Objection to the form.
15 A. Yes, I believe so.
16 Q. And as a result of that, did you do
17 anything to attempt to have the secondary desk
18 actually take action to obtain the short positions on
19 the assets in the CDO squareds?
20     MR. DOOLEY: Objection to the form.
21 A. I mean, we were -- the trading desk was
22 in a constant dialogue with the various managers to
23 source protection for, you know, the interest we were
24 seeing in the market.
25 Q. Do you recall whether or not you ever

Donald Quintin  
New York, NY  
March 13, 2012

### Page 86

1    Quintin - March 13, 2012
2    told the people who worked for you that there should
3    be a priority in attempting to obtain short positions
4    on CDO squareds --
5        A.   Excuse me, short positions on the
6    underlying of CDO squareds?
7        Q.   Yes, I'm sorry.
8        A.   A priority? I don't know if I recall
9    telling them it's a priority over something else, no.
10       Q.   Okay.
11           MR. INFELISE: I'm going to ask the
12   court reporter to mark the next document as
13   Exhibit 644.
14           (Exhibit 644, One-page Document, Bates
15   numbered CITI 20837238, marked for
16   identification, as of this date.)
17           MR. INFELISE: And Exhibit 644 is a
18   one-page document, Bates numbered CITI 20837238.
19       Q.   Sir, have you had a chance to look at
20   Exhibit 644?
21       A.   I have.
22       Q.   Do you have any recollection of this
23   document?
24       A.   I do not.
25       Q.   Do you have any reason to believe that

### Page 87

1    Quintin - March 13, 2012
2    you did not send the e-mails on this document?
3        A.   I do not.
4        Q.   Now, the bottom one says from D. Quintin
5    at Bloomberg.net.
6            Sir, is that a work e-mail address used
7    or a personal?
8        A.   Work e-mail.
9        Q.   Work e-mail.
10           The bottom e-mail is from you to Brian
11   Carosielli. You say I think there's -- if there's
12   anything in BBB that we remotely like as a short, we
13   should put it on if it is with an A 3 handle.
14           Sir, can you tell me what the reference
15   to an A 3 handle is.
16       A.   By reading this, I'm guessing what I
17   mean is buying protection on BBBs in the 300 spread
18   context.
19       Q.   With a 3 handle?
20       A.   With a 3 handle. So a BBB protection
21   would sell in the 300s, so it would be not something
22   that would cost more than that.
23       Q.   All right. And at the top of the page,
24   again, it's from Donald Quintin. It looks like --
25   well, it's the same e-mail address. It says don't

### Page 88

1    Quintin - March 13, 2012
2    need anything, I think we make a full court press on
3    protection, maybe we work with someone.
4            Sir, does this refresh your recollection
5    whether or not during this time period, you were
6    attempting to have the purchase of protection a
7    priority for the secondary trading desk?
8        A.   I think at this time, we were starting
9    to see more interest in the -- from the market in
10   protection. It looks like it was limited in price
11   based on my prior e-mail saying here, the 300 handle,
12   so my presumption is that at this time, we were
13   probably getting some inquiry for protection.
14       Q.   All right. And when you say full court
15   press, do you understand what your reference was?
16       A.   I can presume to guess that I'm saying
17   we need to try to respond to these protection asks
18   for the market.
19       Q.   Thank you.
20       A.   Yes.
21       Q.   Sir, do you recall whether or not at any
22   time during this time period -- again, I'm talking
23   about 2006 to 2007 time period, whether you gave any
24   consideration to attempt to duplicate the trading
25   strategy of Magnetar on these constellation deals?

### Page 89

1    Quintin - March 13, 2012
2            MR. DOOLEY: Objection to the form.
3        A.   Well, I'm not sure that I knew what
4    specifically their trading strategy was.
5        Q.   Okay. Well, if I recall your testimony
6    earlier, you said you believed at that time period,
7    that Magnetar was -- would purchase the equity in
8    their own CDOs and then purchase protection on its
9    mezzanine tranche; is that accurate?
10       A.   Yes. I speculate that's probably what I
11   believed at some point in time during the time frame.
12       Q.   Was that commonly referred to as a
13   long/short tragedy?
14           MR. DOOLEY: Object to the form.
15       A.   Yes.
16       Q.   Okay. Do you recall ever discussing
17   with anyone at Citigroup about Citigroup engaging in
18   some form of long/short strategy with respect to
19   CDOs -- excuse me, specifically synthetic CDOs?
20       A.   Specifically? I don't remember if it
21   was specifically about any particular type of CDO.
22       Q.   Do you recall whether or not you had any
23   discussions with anyone at Citigroup about engaging
24   in long/short strategy on CDOs in general?
25           MR. DOOLEY: Objection to the form.

23 (Pages 86 to 89)

Donald Quintin                                                                        March 13, 2012
                              New York, NY

Page 90

                Quintin - March 13, 2012
 2    A.    I believe I did. I just don't recall
 3  with whom and when.
 4          MR. INFELISE: Okay. Let's -- we've got
 5  five minutes, so let's just stop here to change
 6  the tape.
 7          THE VIDEOGRAPHER: This marks the end of
 8  tape No. 2. We're going off the record at 1:14
 9  p.m.
10          (There was a recess taken.)
11          THE VIDEOGRAPHER: This marks the start
12  of tape No. 3. We're back on the record at 1:32
13  p.m.
14  BY MR. INFELISE:
15    Q.    All right. Mr. Quintin, I'm going to
16  show you another document.
17          MR. INFELISE: First, I'm going to ask
18  the court reporter to mark this as Exhibit 645.
19          (Exhibit 645, One-page Document, Bates
20  numbered CITI 20845582, marked for
21  identification, as of this date.)
22          MR. INFELISE: Exhibit 645 is a one-page
23  document, Bates numbered CITI 20845582.
24    A.    Okay.
25    Q.    Have you had a chance to read through

Page 91

                Quintin - March 13, 2012
 2  it, Mr. Quintin?
 3    A.    Yes.
 4    Q.    Do you have any recollection of this
 5  document?
 6    A.    I do not.
 7    Q.    Do you have any reason to believe you
 8  didn't send the e-mail at the top of the page?
 9    A.    I do not.
10    Q.    Now, let me ask you, sir, the reference
11  in that e-mail from -- this is from you to Brian
12  Carosielli, a reference to a Mikey.
13          Do you recall, do you know who that is?
14    A.    It could be Mickey. I don't know a
15  Mikey.
16    Q.    Okay. Do you know a Mickey?
17    A.    There's a Mickey Boccia at Citigroup
18  that trades, you know, runs correlation trades or I
19  believe he ran correlation trading.
20    Q.    Okay. It says here we need to get our
21  own long/short on two CDOs for that.
22          In reading through this e-mail, sir, do
23  you -- well, let me ask you this; did Citigroup
24  actually follow through on what you're suggesting
25  here while you were still working at Citigroup?

Page 92

                Quintin - March 13, 2012
 2          MR. DOOLEY: Objection to the form.
 3  Vague and ambiguous.
 4    A.    Which part of that paragraph? There is
 5  a lot going on.
 6    Q.    Let's go through it, then.
 7          In the first e-mail, it says we need to
 8  get our own long/short on two CDOs from them, one
 9  with protection names, one without. I know he's a
10  pain in the ass, but maybe we get Niblo to do the
11  protection trades.
12          First of all, sir, the reference to
13  Niblo, do you know who that is?
14    A.    I'm guessing it's John Niblo.
15    Q.    And who would that be?
16    A.    He was a senior member, UBS principal
17  finance customer of our fixed income franchise.
18    Q.    Okay. And you said but maybe we could
19  get Niblo to do the protection trades (our long
20  equity) with constellation, underlined, no fees for
21  us or him; and then -- let's stop right there.
22          Sir, do you recall whether or not you
23  were -- Citigroup in fact did this trade that you
24  were referring to in that portion of this sentence?
25          MR. AUFSES: Object to the form. You

Page 93

                Quintin - March 13, 2012
 2  may answer.
 3          MR. DOOLEY: Object.
 4    A.    Which part, the transaction with
 5  Mr. Niblo?
 6    Q.    Yes. Our long equity with constellation
 7  underlined.
 8    A.    Not that I recall.
 9    Q.    All right. And then you go on to say
10  and then we do our protection on names we
11  specifically select, including O/C I/C deals, names
12  that trade higher -- excuse me, tighter. And maybe a
13  few constellation at attractive levels, maybe even a
14  president at those levels.
15          All right, sir. With respect to that
16  portion of this reference here, did Citigroup
17  actually follow through on that suggestion that
18  you've made?
19    A.    I don't believe so. I don't believe so.
20    Q.    The description you have there, talking
21  about and then we do our protection on names we
22  specifically select, including O/C I/C deals.
23          Is that understanding a short or a long
24  transaction?
25          MR. DOOLEY: Objection to the form.

                                              24 (Pages 90 to 93)

Page 94

1         Quintin - March 13, 2012
2     A.   It seems to indicate that we're looking
3  to buy protection on these names, so we would be
4  short.
5     Q.   All right. And it's your recollection,
6  sir, that you never did in fact do a deal
7  incorporating what you've suggested here with respect
8  to the short?
9     A.   I'm sorry, but it's with constellation
10 names, no fees for us. We're doing protection names
11 on names we selected. I don't believe so.
12    Q.   All right. All right, sir.
13        At the beginning of your deposition, I
14 asked you if you recalled a CDO known as Class V III.
15        Sir, do you recall what, if any,
16 involvement you had on the secondary desk in the
17 Class V III CDO?
18        MR. DOOLEY: Objection to the form.
19 Vague, ambiguous.
20    A.   As best I recall, the secondary trading
21 desk was a counterparty to the Class V III
22 transaction on certain of the synthetic collateral
23 that ultimately was in the transaction.
24    Q.   Now, when you say they were a
25 counterparty with respect to specific assets,

Page 95

1         Quintin - March 13, 2012
2  specific assets that were part of the collateral, are
3  you referring to their -- your position as the
4  initial swap counterparty in those assets or some
5  other status?
6         MR. DOOLEY: Objection to the form.
7     A.   I believe we were the derivative's
8  intermediary for all of the synthetic collateral.
9     Q.   Okay. Was that a standard practice for
10 Citigroup, to stand between the CDO and the street as
11 the initial swap counterparty?
12    A.   I believe it was pretty typical to act
13 as intermediary on these synthetics.
14    Q.   Do you recall whether or not you had any
15 discussions with anyone on the structuring desk
16 concerning the Class V III CDO?
17        MR. DOOLEY: Objection to the form.
18    A.   I don't recall the specific discussions,
19 but yes, generally there were discussions.
20    Q.   And do you recall whether or not those
21 discussions included the discussions concerning the
22 composition of the collateral for the Class V III
23 CDO?
24        MR. DOOLEY: Objection to the form.
25    A.   I think there was some early discussions

Page 96

1         Quintin - March 13, 2012
2  about composition, I believe.
3     Q.   Do you recall any details in that
4  transaction?
5         MR. DOOLEY: Objection to form.
6     A.   I recall -- yes, I recall some details.
7     Q.   Do you recall if there was an asset
8  manager for the Class V III?
9     A.   Yes.
10    Q.   Do you recall who it was?
11    A.   CSAC.
12    Q.   Again, that's Credit Swisse?
13    A.   Credit Swisse Alternative Capital.
14    Q.   All right. Do you recall when you first
15 became involved in the Class V III CDO?
16        MR. DOOLEY: Objection to form, vague,
17 ambiguous.
18    A.   I do not.
19    Q.   Again, I think you said that you recall
20 having some discussions with individuals in the
21 structuring desk concerning the Class V III.
22        Do you recall what the nature of those
23 discussions were?
24        MR. DOOLEY: Objection to form, vague
25 and ambiguous.

Page 97

1         Quintin - March 13, 2012
2     A.   I don't. I think they were general
3  discussions about collateral.
4     Q.   Do you recall whether any of those
5  discussions or communications involved
6  recommendations as to what collaterals should be
7  included in the Class V III?
8         MR. DOOLEY: Objection to the form.
9  Asked and answered.
10    A.   I'm sorry, just to understand your
11 question, was there a discussion between the trading
12 desk and the -- or between me and the structuring
13 desk about recommendations for what collateral should
14 go into the deal; is that your question?
15    Q.   Yes.
16    A.   I don't recall that. I don't recall
17 that part, no.
18    Q.   Okay. Mr. Quintin, I'm going to show
19 you a document that was previously marked as Exhibit
20 333.
21        MR. INFELISE: It's a single page
22 document Bates numbered CITI 18122071.
23    A.   Okay.
24    Q.   And this appears to be an e-mail dated
25 October 23rd, 2006 from Donald Quintin to Brian

### Page 98

```
 1            Quintin - March 13, 2012
 2   Stoker and another individual named -- I believe it's
 3   Ilias Islamov.
 4       A.    Yes, sir.
 5       Q.    Do you have any recollection of this
 6   document?
 7       A.    I do not.
 8       Q.    Do you have any reason to believe that
 9   you didn't send this e-mail?
10       A.    No.
11       Q.    All right. The e-mail contains a list
12   of names.
13             Do you have any recollection of -- well,
14   let me ask you first, do those names correspond to
15   specific CDOs?
16       A.    Yes.
17       Q.    All right. Do you have any recollection
18   why you sent this to Mr. Stoker?
19             MR. DOOLEY: Objection, vague.
20       A.    I don't recall. I could speculate.
21       Q.    Sir, do you know if this list related to
22   the contemplated Class V III Funding -- excuse me,
23   Class V III CDO?
24             MR. AUFSES: Object to the form. You
25       may answer.
```

### Page 99

```
 1            Quintin - March 13, 2012
 2       A.    I don't know if it was for Class V III
 3   specifically.
 4       Q.    Do you know if it was for any specific
 5   CDO?
 6       A.    No.
 7       Q.    Would there be any other reason why you
 8   would send this list to Mr. Stoker other than for
 9   purposes of identifying assets for inclusion in the
10   CDO?
11             MR. DOOLEY: Objection to the form.
12       Mischaracterizes the document.
13       A.    Yes.
14       Q.    And what would that be?
15       A.    I could be sending them a list of --
16   hypothetical assets for looking at general
17   structures -- first, structures for -- generally
18   speaking, for different -- for more general
19   structures as opposed to for a specific deal.
20       Q.    All right. And when it says here is a
21   first cut of names, we buy protection from the CDO on
22   these names.
23             Was that the -- as you said, a potential
24   general structure for a deal?
25             MR. DOOLEY: Objection to the form.
```

### Page 100

```
 1            Quintin - March 13, 2012
 2       A.    For a synthetic transaction, yes, it
 3   could be.
 4       Q.    All right. Thank you, sir.
 5             Going back to Exhibit 333, do you have
 6   any recollection of whether or not you had any
 7   discussions with Mr. Stoker concerning why he wanted
 8   to purchase the protection on those 21 names?
 9             MR. DOOLEY: Objection to the form.
10       A.    Do I remember why -- I'm sorry, why I
11   was -- could you, please.
12       Q.    Sure. My question was do you recall
13   whether or not you had any discussion with Mr. Stoker
14   concerning why it was that you were suggesting
15   purchasing protection on those 21 names?
16             MR. DOOLEY: Objection to the form.
17       A.    I'm not sure -- I'm not sure I had the
18   conversation with Stoker specifically on why we were
19   interested in these specific names.
20       Q.    Did you have any discussion with
21   Mr. Stoker concerning your interest to purchase
22   protection on any specific names?
23             MR. DOOLEY: Objection to the form.
24       Vague and ambiguous.
25       A.    Do I recall any specific conversations
```

### Page 101

```
 1            Quintin - March 13, 2012
 2   with Mr. Stoker about?
 3       Q.    Why you wanted to purchase protection on
 4   any CDO names. Because I understood your answer to
 5   be that you don't recall discussion with Mr. Stoker
 6   why you wanted to purchase protection on these
 7   specific names.
 8             Was that your answer?
 9       A.    Yeah. I don't remember specific
10   conversation about discussing, you know, why we
11   wanted to buy protection on these names, no.
12       Q.    All right. And having said that, do you
13   recall any conversation with Mr. Stoker concerning
14   why he would want to buy -- Citigroup would want to
15   buy protection on any CDO names?
16             MR. DOOLEY: Same objection to form.
17       A.    Not that I recall. Not with Mr. Stoker,
18   not specifically that I recall, no.
19       Q.    All right. Mr. Quintin, I'm going to
20   show you what was previously marked as Exhibit 322.
21             MR. INFELISE: Exhibit 322 is a two-page
22       document, Bates numbered CITI 18132791, 792.
23       A.    Okay.
24       Q.    All right. Sir, have you had a chance
25   to look at Exhibit 322?
```

Donald Quintin                                                          March 13, 2012
                          New York, NY

Page 114

Quintin - March 13, 2012
2  to an asset manager that it would buy protection on a
3  specific set of assets in a CDO that Citigroup was
4  underwriting?
5          MR. DOOLEY: Objection to the form.
6      A.  I believe so.
7      Q.  And which CDO was that, sir?
8      A.  I mean, to my recollection, we had
9  bought protection on assets included in various CDOs
10 that had been underwritten originated by Citigroup in
11 the past.
12     Q.  And was that, on those occasions, was it
13 a situation in which those assets in which Citigroup
14 purchased the protection were specific assets
15 Citigroup recommended including in the CDO?
16     A.  No.
17         MR. DOOLEY: I'm sorry, objection to the
18     form.
19     A.  I don't think we ever recommended -- I
20 mean, if it was a position that we -- was cash assets
21 that we owned, we'd be showing it to them as an
22 offering on the secondary desk. And if it was a
23 synthetic, we may show it to them as part of our
24 offerings, our offering sheet and inventory of risk.
25 Or if we understood the manager may have interest in

Page 115

Quintin - March 13, 2012
2  selling protection, I'm going long risk on a
3  particular asset, we may approach the manager through
4  the salesperson and say look, I understand you're
5  looking to buy this risk, it's, you know, something
6  we'd be willing to buy protection on in selling you
7  the risk.
8      Q.  All right.
9          Let me ask you this, do you recall
10 whether or not prior to the Class V III there was
11 ever an occasion when Citigroup took a naked short
12 position on a number of assets in a portfolio at the
13 inception of the deal?
14         MR. DOOLEY: Objection to the form,
15     vague and ambiguous.
16     A.  Not that I recall.
17     Q.  Okay. Now, looking at Exhibit 336, do
18 you recall whether or not you had any further
19 discussions with Mr. Stoker about the structuring of
20 a CDO squared of CSAC?
21         MR. DOOLEY: Objection to the form.
22     A.  Discussions about the structuring? I
23 don't think so.
24     Q.  I'm going to show you what's been
25 previously marked as Exhibit 373.

Page 116

Quintin - March 13, 2012
2          MR. INFELISE: Exhibit 373 is a
3  multi-page document, Bates numbered CITI
4  18178869 through 81.
5      A.  Okay.
6      Q.  All right, sir. Have you had a chance
7  to look at Exhibit 373?
8      A.  Yes.
9      Q.  Do you have any recollection of
10 previously seeing this document?
11     A.  No.
12     Q.  All right. The bottom e-mail is from a
13 Mehrish Troszczynski.
14     A.  I think that's right.
15         MR. INFELISE: It's
16     T-R-O-S-Z-C-Z-Y-N-S-K-I.
17     Q.  To Donald Quintin with a copy to Brian
18 Stoker.
19         Mr. Quintin, do you have any reason to
20 believe you didn't receive that e-mail?
21     A.  No.
22     Q.  And the e-mail above that is from
23 Mr. Stoker to several individuals, including Donald
24 Quintin.
25         And Mr. Quintin, do you have any reason

Page 117

Quintin - March 13, 2012
2  to believe you didn't receive this e-mail?
3      A.  No.
4      Q.  And the subject is CSAC CDO squared.
5          You'll see in the first sentence,
6  Mr. Stoker says this assumes all single A CDOs, but
7  I'd recommend more BBBs. BBBs. Triple Bs. I'm
8  thinking the president/constellation deals should be
9  single A and the rest should be BBB.
10         Sir, do you have any understanding why
11 Mr. Stoker was recommending that president or
12 constellation deals be included in this proposed CDO?
13         MR. DOOLEY: Objection, mischaracterizes
14     the document. That's not what the document
15     says.
16     Q.  Do you, sir?
17     A.  I don't know what he was thinking.
18     Q.  Did you have -- do you recall having any
19 further discussions with Mr. Stoker after receiving
20 this e-mail?
21     A.  I don't recall. I might have. I don't
22 recall.
23     Q.  Do you recall whether or not as part of
24 the process of rapping up the CSAC CDO squared, there
25 were discussions between the secondary trading desk

30 (Pages 114 to 117)

Page 118

1          Quintin - March 13, 2012
2     and structuring concerning the composition of the
3     assets for this CDO?
4          MR. DOOLEY: Objection to the form.
5          Vague and ambiguous.
6     A.   I'm not sure. At which point in time?
7     Can you say that again.
8     Q.   We're looking in November of 2006.
9     A.   Yes.
10    Q.   All right. And specifically in this
11    time frame, November to December of 2006, do you
12    recall any discussions on that topic?
13         MR. DOOLEY: Jeff, can you be clear on
14         what topic.
15         MR. INFELISE: The same topic that was
16         the subject of the previous question.
17    Q.   Do you understand it?
18    A.   Yes.
19    Q.   Okay.
20         MR. DOOLEY: I'm sorry, objection to
21         form.
22    A.   I don't remember -- I don't remember
23    myself having conversations, but you know, I'm sure
24    we did in about this time. We were looking at
25    different structures, different collateral pools, so

Page 119

1          Quintin - March 13, 2012
2     it's very likely we could have.
3     Q.   All right. Thank you.
4          Now, do you recall with respect to Class
5     V III whether CSAC proposed any specific assets for
6     possible inclusion in that CDO?
7          MR. DOOLEY: Objection to the form.
8          Vague, ambiguous.
9     A.   Class V III -- CSAC -- they're the ones
10    that selected the portfolio for Class V III. I'm
11    sorry, your question -- but your question was?
12    Q.   Well, do you recall with respect to that
13    process, do you recall whether or not CSAC provided a
14    proposed or candidate list of assets for inclusion in
15    the Class V III to Citigroup?
16         MR. DOOLEY: Same objection, vague and
17         ambiguous.
18    A.   I think they did, yes.
19    Q.   Let me show you what's previously marked
20    as Exhibit 375.
21         MR. INFELISE: And Exhibit 375 is a
22         three-page document, CITI 18233944 through 946.
23    A.   Okay.
24    Q.   All right, sir, have you had a chance to
25    look at Exhibit 375?

Page 120

1          Quintin - March 13, 2012
2     A.   I have.
3     Q.   I note that you are not either a sender
4     or recipient of this e-mail.
5          Sir, do you recall whether you ever saw
6     this e-mail in or about December 21st of 2006?
7     A.   I don't recall seeing it.
8     Q.   Do you recall whether or not you
9     actually were provided any information concerning the
10    e-mail from Mr. Bhatt to Mr. Khan with the list of
11    CDOs dated December 21st, 2006?
12    A.   All I recall was that Samir had sent
13    Sohail a list of names that, you know, he was
14    interested in.
15    Q.   And let me correct this. It appears
16    that the first e-mail at the top says from
17    Sohail Kahn to D. Quintin, Brian Carosielli and
18    Shalabh Mehrish, Brian Stoker.
19         So sir, you did receive a copy of this
20    e-mail?
21    A.   Yes.
22    Q.   I'm sorry. And do you recall seeing
23    this, though?
24    A.   No.
25    Q.   Do you recall having any discussions

Page 121

1          Quintin - March 13, 2012
2     with Mr. Carosielli concerning the list provided by
3     CSAC?
4     A.   I don't remember those conversations.
5     Q.   Do you recall any conversation with
6     Mr. Stoker concerning the list provided by CSAC?
7     A.   I don't recall those conversations
8     either.
9     Q.   Was this a normal process -- let me ask
10    you this, sir, in your experience prior to Class V
11    III, was Mr. Bhatt's providing a list of numerous
12    potential CDOs for inclusion the normal process for
13    determining what assets would go into a CDO?
14         MR. DOOLEY: Objection to the form.
15    A.   Again, this was a slightly different
16    transaction, given the amount of synthetics in the
17    deal, but I don't think it would be -- it was
18    atypical for a manager to send us a list of names
19    that they'd be selling protection on.
20    Q.   Do you recall ever receiving a list of
21    this length of potential candidates for inclusion in
22    a CDO?
23    A.   No.
24         MR. DOOLEY: Can I just make a point on
25         the record. I'm not sure whether Mr. Quintin

Donald Quintin                                                                   March 13, 2012
New York, NY

Page 122

Quintin - March 13, 2012
1  was using the word typical or atypical in that
2  prior answer.
3       MR. INFELISE: I believe you said
4  atypical, did you not?
5       A. Can you just read what's there.
6       (The record was read.)
7       Q. Did you mean to say typical, sir, or
8  atypical?
9       MR. AUFSES: Why don't you just answer
10  the question again, and because it's also a
11  little complicated by the fact that you said I
12  don't think. So there may be two negatives in
13  there. So why don't you just start again.
14       Do you want to hear the question again?
15       MR. INFELISE: That probably would be
16  best. Why don't you read back my question and
17  the answer.
18       (The record was read.)
19       A. Okay. So I think -- well, I don't have
20  to tell you what I think my response was. I can tell
21  you what it is.
22       MR. AUFSES: Yeah.
23       A. This was not a typical transaction given
24  the amount of synthetic collateral in the deal, but

Page 123

Quintin - March 13, 2012
1  it wouldn't be unusual to have received from a
2  manager names that they would be interested in
3  potentially selling protection on in a deal.
4       Is that more clear?
5       Q. Sir, during this process of putting
6  together the assets or selecting assets for a CDO,
7  did Citigroup have any type of veto power over what
8  assets would be included?
9       MR. DOOLEY: Objection to the form.
10       A. There were -- there was typically veto
11  power -- certain veto abilities within the
12  warehousing phase for deals that were ramping up,
13  yes.
14       Q. Could you explain what you mean by that.
15       A. Sure. The veto would typically reside
16  with three different parties; the structuring desk or
17  the banking business, the syndicate desk, and
18  whatever trading desk traded that particular asset
19  that a manager had selected for inclusion in whatever
20  deal. The structuring desk could veto an asset.
21  Largely, for whether or not, you know, it would work
22  or not within the structure and what they were coming
23  up with. Syndicate was primarily focused on short
24  term risk and potential marketing of the deal that

Page 124

Quintin - March 13, 2012
1  included that asset, and the trading desks were
2  particularly focused on whether or not that asset
3  potentially presented any sort of short term risk to
4  the firm in a warehouse.
5       Q. The process you described where this --
6  did that apply to synthetic assets or a synthetic
7  CDO? Excuse me.
8       A. I don't know if it was the same method,
9  but the best I can recall, syndicate and banking
10  would have to know what assets were potentially going
11  into the deal in order to make sure that there were
12  particular investor concerns. The syndicate would
13  make sure that they would voice them or if there were
14  particular issues that could arise from the structure
15  due to over concentration in assets, for example,
16  things like that.
17       Q. All right. With respect to the
18  synthetic CDO, there were no -- Citigroup wouldn't
19  have to actually purchase an asset, would it --
20       MR. DOOLEY: Objection to form.
21       Q. -- for inclusion in a warehouse?
22       A. No. They would -- there would be a risk
23  position, but not necessarily a purchase, if you
24  will.

Page 125

Quintin - March 13, 2012
1       Q. All right. Now, with reference to
2  Exhibit 375, the list that CSAC sent, do you recall
3  what, if any, response Citigroup's was to this list?
4       MR. DOOLEY: Objection to the form.
5       A. I'm guessing the next step was
6  discussions about what names our desk would,
7  secondary desk, would be willing to be a counterparty
8  on.
9       Q. And when you say discussions, with whom
10  would the discussions be or between whom would the
11  discussions be?
12       A. With CSAC.
13       Q. Okay. Do you recall whether or not you
14  had any input into what specific assets you,
15  Citigroup, would be willing to purchase protection on
16  in Class V III?
17       A. Could you just define input. I mean,
18  the direct dialogue or --
19       Q. Well, let's start with that.
20       Did you have any direct dialogue, to
21  your recollection?
22       A. With?
23       Q. CSAC.
24       A. I don't believe so.

32 (Pages 122 to 125)

Donald Quintin                                                                                               March 13, 2012
                                                New York, NY

**Page 130**

1        Quintin - March 13, 2012
2    A.   Yeah, I mean, we -- just as a general
3  practice, the trading desk did try to discuss
4  different trades that were going on with each other,
5  so you know, I don't think anyone -- I don't know if
6  it was a standard practice, per se, but you know, it
7  wouldn't necessarily be unusual for him to ask me if
8  I have any objections.
9    Q.   Do you recall under what situations he
10 would ask for you to see if you had any objections?
11   A.   I don't think this was the only time.
12   Q.   Were there any specific type of
13 situations when he would seek -- see if you had any
14 objections to the list that he -- of candidate assets
15 for inclusion in the CDO?
16   A.   No, not that I could think of.
17   Q.   Okay. Sir, with respect to that list,
18 again, Exhibit 327, do you recall whether or not you
19 had any discussions with anyone on the structuring
20 desk concerning the list that was put together by
21 Mr. Carosielli?
22        MR. DOOLEY: Objection to the form.
23        Vague and ambiguous.
24   A.   No, I don't recall that, no.
25   Q.   Would that have been a standard

**Page 131**

1        Quintin - March 13, 2012
2  practice, to actually discuss with the structuring
3  desk what assets that the secondary desk was
4  recommending or suggesting for inclusion in the CDO?
5        MR. AUFSES: Object to the form.
6        MR. DOOLEY: Objection to form.
7        Mischaracterizes the document.
8    A.   I really don't know. We hadn't done
9  many ABS CDO squared synthetics at that point. It
10 was something -- relatively new effort.
11   Q.   Well, let me ask you this; prior to the
12 Class V III, how many of the ABS CDO squared had you
13 done?
14   A.   I think this was our first.
15   Q.   This was the first one?
16   A.   I believe so, yes.
17   Q.   Okay. Sir, going back again to Exhibit
18 327, if CSAC had rejected the list of assets that
19 Mr. Carosielli put together, was it still possible
20 for Citigroup to actually agree to underwrite that
21 CDO?
22        MR. DOOLEY: Objection to the form.
23   A.   Yes.
24   Q.   All right. And if that occurred, would
25 there have been any difference with respect to

**Page 132**

1        Quintin - March 13, 2012
2  Citigroup's position -- excuse me, if that did occur,
3  if in fact they rejected the list, would there be any
4  difference in -- with respect to Citigroup's risk
5  position on that CDO?
6        MR. DOOLEY: Objection to the form.
7        Vague and ambiguous. Are you referring to this
8  list in 327?
9        MR. INFELISE: Yeah. That's all I've
10 been talking about.
11   A.   I'm not sure. It's hard to know what
12 the deal would have looked like or what kind of risk
13 syndicate would have been left with and so on.
14   Q.   Sir, with respect to the list -- just a
15 second.
16        Sir, with respect to the list on Exhibit
17 327, was that a list of assets that Citigroup
18 indicated would be agreed about purchasing protection
19 on?
20   A.   That's how I read it. It says that,
21 yes.
22   Q.   All right. And if in fact Citigroup did
23 purchase protection on those assets, would its
24 position with respect to its role as a counterparty
25 be different than its normal role as the initial swap

**Page 133**

1        Quintin - March 13, 2012
2  counterparty in a synthetic CDO?
3        MR. DOOLEY: Objection to the form.
4    A.   It's likely we would still have been an
5  initial swap counterparty.
6    Q.   Was -- if Citi took a naked short
7  position by buying protection on those assets, was
8  its position different from its position as just an
9  initial swap counterparty on all the other assets?
10        MR. DOOLEY: Objection to the form.
11   A.   And by position being different, you
12 mean position in terms of the risk, of the exposure
13 or --
14   Q.   Any of the above.
15        MR. DOOLEY: Objection to the form.
16   A.   If we transacted in any manner other
17 than we did, it could have altered the exposures or
18 risks that we had, depending on what we ended up --
19 what role we ended up serving.
20   Q.   Okay. Sir, if you could look at your
21 transcript. I think it's Exhibit 638, and I direct
22 your attention to page -- I guess it starts at the
23 bottom of page 45, line 11, through to page 48, and
24 line 3. And just take a few moments, if you would,
25 to read through that.

Donald Quintin                                                                    March 13, 2012
                              New York, NY

Page 134

Quintin - March 13, 2012
2  A.   45, line?
3  Q.   11.
4       MR. DOOLEY: All the way to 48, 3?
5       MR. INFELISE: Yes.
6  Q.   You can read as much as you want, sir.
7  Let me know when you're finished.
8  A.   Okay.
9  Q.   All right. And my specific question is
10 as I'm looking at page 47, again, line 11, the
11 question there, and then your answer; and sir, could
12 you explain what you meant when you say -- and I'm
13 not referring to our role as a synthetic counterparty
14 to the transaction.
15      Question: As in this counterparty?
16      Answer: As the intermediary, yes. I'm
17 not referring to that.
18      Question: Okay.
19      Like I say, that's a separate specified
20 role. I'm saying there are other transactions where
21 we played a much, much smaller role in the
22 collateral.
23      Sir, were you -- at this point, were you
24 making a distinction between Citigroup's role as a
25 purchaser of protection on the 25 assets versus its

Page 135

Quintin - March 13, 2012
2  other role as the initial swap counterparty for
3  synthetic CDO?
4       MR. DOOLEY: Objection to the form.
5  A.   I think so.
6  Q.   What is the distinction?
7  A.   I think the distinction becomes a bit
8  blurred depending upon whether or not protection gets
9  covered. The deals often -- the deals with synthetic
10 collateral often required an intermediary to stand
11 between the deal and whoever was ultimately buying
12 protection. I think that role was necessitated by
13 the rating agencies.
14 Q.   All right. And you're distinguishing
15 the proposed position of Citigroup with respect to
16 actually purchasing protection on those 25 assets
17 with that initial swap counterparty?
18 A.   I believe in this instance, I'm making a
19 distinction, yes.
20 Q.   All right. Let me ask you this, sir;
21 rather than telling CSAC we were -- we're prepared to
22 purchase protection on these 25 assets, could you
23 just have recommended to CSAC why don't you include
24 these 25 assets in the Class V III?
25      MR. AUFSES: Objection to form.

Page 136

Quintin - March 13, 2012
2       MR. DOOLEY: Objection to form.
3  A.   I don't understand your question.
4  Q.   Well, as part of your -- as I
5  understand, what this list contemplated was Citigroup
6  actually purchasing protection on those 25 assets.
7       Rather than saying that, could you have
8  sent an e-mail to CSAC saying we would recommend
9  inclusion of these 25 assets in Class V III without
10 saying and we'll buy protection on it?
11      MR. DOOLEY: Objection to the form.
12 A.   I mean, I'm sorry, I still don't
13 understand exactly the question, the -- you know,
14 what the distinction you're making. What are you --
15 Q.   Okay. Let me try it again.
16 A.   Yeah.
17 Q.   Could you have just recommended that
18 CSAC include these 25 assets in Class V III without
19 committing to purchase the protection on those
20 assets?
21      MR. DOOLEY: Objection to the form.
22 A.   If we did that, I don't think -- I don't
23 think it would have worked.
24 Q.   Why not?
25 A.   Let me take a step back.

Page 137

Quintin - March 13, 2012
2       The deal was going to go through its
3  marketing phase, its pricing phase and the closing.
4  CSAC was identifying the portfolio risk that, you
5  know, they wanted to be the counterparty on
6  themselves, sell protection on.
7       For a deal to be marketed and priced and
8  get to closing, we would have to know with
9  certainty -- this is the best I recollect -- we would
10 have to know with certainty who is going to be the
11 opposite side of that, who is going to be taking that
12 risk.
13 Q.   Do you recall whether or not there were
14 any CDOs where what you did or what Citigroup did was
15 just do that, just recommend we would recommend you
16 include these assets in the CDO without purchasing
17 protection on them?
18 A.   I don't remember -- no, I don't remember
19 that.
20 Q.   Okay. Now, do you know, sir, whether or
21 not in putting together the list in Exhibit 327, was
22 there any consideration given to what was happening
23 with respect to sub prime mortgages at that time?
24      MR. DOOLEY: Objection to the form.
25 A.   I don't know. I don't recall that.

35 (Pages 134 to 137)

Page 138

1            Quintin - March 13, 2012
2    Yeah, I believe there was attention paid to -- in
3    early discussions, and I don't know what criteria
4    Brian used and how he went about working with Samir
5    on that, but we were cognizant of the market for
6    protection and where it would potentially go with
7    this risk if we ended up owning it.
8        Q.   At the time that this list was forwarded
9    on January 8th, do you recall whether or not you had
10   any information concerning whether there was a higher
11   rate of default on sub prime mortgages?
12           MR. DOOLEY:  Objection to the form.
13       A.   I don't recall if we had, you know, any
14   kind of specific or unique information at that time.
15           MR. INFELISE:  I ask the court reporter
16   to mark the next exhibit as Exhibit 646.
17           (Exhibit 646, E-Mail String, marked for
18   identification, as of this date.)
19       Q.   Have you had a chance to look at that,
20   Mr. Quintin?
21       A.   I have.
22       Q.   Do you recall this -- do you recall ever
23   seeing this document?
24       A.   No.
25       Q.   The top e-mail says it's from Brian

Page 139

1            Quintin - March 13, 2012
2    Carosielli to you.
3            Do you have any reason to believe you
4    didn't receive this e-mail on January 5, 2007?
5        A.   No.
6        Q.   The e-mail below that is from a Jaime
7    Aldana.
8            Do you know who that is?
9        A.   Yes.
10       Q.   Who is that?
11       A.   Jaime is someone who worked on the ABC
12   correlation desk at Citigroup.
13       Q.   All right.  And in his e-mail to
14   Mr. Carosielli, in the -- it looks like the fifth
15   line, it starts here apparently spreads pushed
16   outwards as sub prime suffers high delinquencies in
17   year end approach.
18           What does it mean when he says that
19   spreads pushed outwards, or if you understand that,
20   sir?
21       A.   In this instance, I think he is saying
22   the spreads widened.  Yeah.
23       Q.   Okay.  And I'm always confused.  What
24   does that mean when spreads widen on a specific
25   asset?

Page 140

1            Quintin - March 13, 2012
2        A.   The spread widening would be typically
3    commensurate with -- I think in most instances,
4    spread widening is commensurate with a decline in
5    price.
6        Q.   And is that the price at which you can
7    purchase the asset or the price -- well, I guess it's
8    the price at which you could sell it or purchase it.
9        A.   Yeah, but I don't know in which sense
10   he's referring to here because if it's a purely
11   synthetic index, for instance, there may not be a
12   concept of price.  It may be just a spread.  So...
13       Q.   And do you have any recollection of
14   having a discussion with Mr. Carosielli on or about
15   January 5th concerning this e-mail from Mr. Aldama?
16       A.   Not that I remember, no.
17       Q.   Sir, I'm going to show you what's
18   previously marked as Exhibit 513A.
19           MR. INFELISE:  Exhibit 513A is a
20   two-page document, Bates numbered CS CLV 1223251
21   and 52.
22       A.   Okay.
23       Q.   Sir, have you had a chance to look at
24   Exhibit 513A?
25       A.   Yes.

Page 141

1            Quintin - March 13, 2012
2        Q.   And do you recall whether you've ever
3    seen this exhibit or this document before?
4        A.   No.
5        Q.   Now, the bottom e-mail on the first page
6    starts with Mr. Carosielli to Sohail Kahn.  And the
7    top e-mail is from Mr. Samir Bhatt to Sohail Kahn,
8    January 8th, 2007.
9            Do you recall whether or not you were
10   ever informed by Mr. Khan or anyone else at Citigroup
11   that -- concerning Mr. Bhatt's response?
12       A.   Mr. Bhatt's response?
13       Q.   Yeah.  I'm sorry.  The e-mail from
14   Mr. Bhatt at the top of the page.
15       A.   Yes, sir.
16       Q.   At January 8th, do you recall ever being
17   informed by Mr. Khan or anybody else at Citigroup
18   that they had received that e-mail from Mr. Bhatt?
19       A.   No.  Not specifically, no.
20       Q.   Now, in the middle e-mail from Mr. Khan
21   to Mr. Bhatt, the second paragraph says if we can get
22   this done, we're pretty much done on 50 percent of
23   the portfolio, 250 MM off the bat.
24           Is that 250 million?
25       A.   Yes.

36 (Pages 138 to 141)

# EXHIBIT 12

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )

Citigroup, Inc.              ) File No. HO-10740

                                                  Amended 10/22/2010

WITNESS:   David Salz


PAGES:     1 through 169


PLACE:     Securities and Exchange Commission

           3 World Financial Center

           New York, New York  10281


DATE:      Monday, June 28, 2010


      The above-entitled matter came on for hearing, pursuant to notice, at 9:42 a.m.

## Page 30

1  portfolios and then you just expanded on that to say that
2  some of it was to facilitate hedge fund shorting. Were these
3  managed portfolios? Was there a collateral manager
4  associated with these portfolios?
5      A   In some situations, yes. That was how you can
6  define which portfolio managers you might want to work with
7  or avoid, but a fair number of them were Bespoke also. What
8  I was describing was the general market. There weren't a lot
9  of Bespoke transactions prior to that, prior to the synthetic
10  contract, so this was - it's an evolution in the market so
11  to speak and then more opportunities that were out there.
12      Q   David, can you define what you mean by a Bespoke
13  transaction?
14      A   A Bespoke transaction is generally a static pool
15  that's brought by a dealer. It may have someone who selected
16  collateral associated with it, but it's a static pool and
17  there's basically a AAA class, AA class all the way down to
18  BBB.
19      Q   Was your investment decision different with respect
20  to Bespoke transactions?
21      A   We didn't participate in them.
22      Q   Why is that?
23      A   I wasn't very fond, and the other underwriter
24  wasn't very fond of static transactions, in part because if
25  there was any deterioration it was very difficult to trade

## Page 31

1  out of that position. Also, a lot of those were dealer
2  transactions and we like the discipline of having the third
3  party manager who we could diligence, see how they went
4  through the collateral, have someone else to talk to when
5  things in transaction did not work as well, and to work with
6  - as well as, you know, we felt we were building a
7  structural aspect into the transaction that created some
8  tension with the manager to help them perform.
9      Q   When you evaluated an opportunity, was the
10  motivation for the opportunity relevant for you?
11      A   Yes.
12      Q   When I say motivation, I mean the motivation of the
13  various parties that are involved?
14      A   Yes, it was, it was something that you typically
15  put into the underwriting statement.
16      Q   What do you mean statement, I'm sorry, is that the
17  memo that you prepared?
18      A   The memo, yes.
19      Q   How would you prior to understand the motivation
20  for the transaction?
21      A   You would talk to your counter party, try to
22  understand that. Talk to the manager, see what they knew and
23  where they were - how they were trying to put the
24  transaction together. The CDO market evolved in, you know,
25  managers having certain views or certain approaches to the

## Page 32

1  market, and hopefully were complimentary to their skill
2  sense. So a lot of it focused on the manager, technically
3  the way the market was supposed to work was the manager had a
4  certain view, wanted to build up assets. The underwriter
5  said I think that's a salable view, a salable portfolio and
6  we would be comfortable with that portfolio. So that the
7  underwriter would open a warehouse and take some principle
8  risk at that time and we would work to understand what the
9  manager was trying to achieve and why. We would ask the same
10  questions if they were doing synthetics too and where they
11  were at.
12      Q   As you started to see more synthetic deals, did
13  your understanding of the motivations of the parties change?
14      A   Motivations were different. We were always aware
15  that we were always concerned what could the street be
16  doing to hurt us. We were skeptical, we were supposed to be
17  skeptical. Yes, with synthetic deals we dug deeper in terms
18  of understanding what the motivations were, because it wasn't
19  a classic case of a CDO and for example in the Pascal
20  transaction, we queried, you know, why would RBS create such
21  a transaction. It had different reasons than for example ESP
22  in the second half of 2006.
23      Q   What were the different reasons for those two
24  transactions?
25      A   In Pascal it was that, and I believe that this was

## Page 33

1  the case, they were able to get RBS's balance sheet on a very
2  inexpensive basis and was able to charge a lower fee on
3  holding the assets, or on the exposure. Give me a second to
4  explain this.
5      Q   Sure, of course.
6      A   At the end of the day the CDO arbitrage came down
7  to being able to have an adequate equity return such that you
8  could convince an equity holder to come in and put money
9  down, as well as the junior notes. So it was all about
10  assets and liabilities and trying to create some space
11  between those. The cost of capital, right, I mean if you're
12  a CDO and you fund yourself in the cash market 100 percent
13  you pay libor plus something, some spread. In the case of
14  RBS in the situation that spread the Lipor plus something
15  they were able to get less in the market, and so they were
16  using this to facilitate their banking fees and their growth
17  into the market to be competitive, so that was my
18  understanding of the incentives for them, and in addition
19  they owned 100 percent of the portfolio at the outset of the
20  transaction, which was helpful, not conclusive, but helpful.
21      Q   Of the synthetic portfolio or they owned the cash
22  bonds that were referenced?
23      A   They owned 100 percent of the cash bonds.
24      Q   So they were -
25      A   So this was a synthetic funding vehicle so to

Page 34

1  speak.
2  Q  When you say that was helpful, what do you mean by
3  that?
4  A  From a credit view point we knew that it was a
5  market deal that they had gone out and bought all these
6  securities, that they put it on their balance sheet and that
7  they, you know, yes, they did buy credit protection, or at
8  least 100 percent of it, but initially it is on their balance
9  sheet. It's not conclusive, because they could have sold the
10 portfolio along the way.
11 Q  How did you know they owned?
12 A  They told us. I think it's in the offering
13 documents.
14     MR. SILVERSTEIN: Just so the record is clear,
15 when you say "they?"
16     THE WITNESS: RBS.
17 Q  You said that was different than the ESP deal.
18 A  Well, the ESP deal similar theme, what was
19 happening is again, Ambac was not going to take any liquidity
20 risk. That was my charge to try to develop a structure so
21 that that was addressed. In doing so they were able to get
22 very inexpensive liquidity. In the case of ESP it was called
23 the advance swap and it was also - so running the numbers
24 and this was my understanding in talking to Citigroup, the
25 arbitrage was better than you would have in a cash deal.

Page 35

1  These were higher grade CDS on similar assets that they would
2  have put into the pool otherwise, and it was a portion of the
3  pool. So it wasn't all RMBS or CDOs and ABS, there was also
4  Bespoke corporate transactions in there too. So for that
5  reason it looked like the arbitrage was better in order to
6  generate a greater return to the equity. The equity in that
7  case was owned 100 percent by the hedge fund who was the
8  manager.
9  Q  Which was who?
10 A  Elliott. I'll note on that transaction we - in
11 part because of the synthetics, in part because of the pool
12 balance we required a fairly hefty subordination relative to
13 other transactions at that time.
14     MR. FELLER: Why don't we take a five minute
15 break. We've been going for an hour. We're off the record
16 at 10:45.
17     (Whereupon, a recess was taken.)
18     MR. FELLER: We are back on the record after a short
19 break during which there was no discussion of substance
20 between the staff and Mr. Salz or his counsel. Is that
21 correct?
22     THE WITNESS: Yes.
23 Q  I want to move to talking specifically about the
24 deal that was ultimately known as Class V Funding III, do you
25 remember that deal?

Page 36

1  A  I do.
2  Q  What was the - when were you initially approached
3  about that deal?
4  A  I believe I was approached late 2006. It may have
5  been very early in 2007.
6  Q  By who?
7  A  I received a phone call from Sohail Khan, K-H-A-N
8  at Citigroup.
9  Q  Who is Mr. Khan?
10 A  Mr. Khan was my coverage person at Citigroup.
11 Q  He was in sales?
12 A  He was in the sales side, yes.
13 Q  He called you in your office?
14 A  Yes, he did.
15 Q  Was anyone else on the phone?
16 A  Not at that time.
17 Q  What was the conversation?
18 A  The conversation initially was trying to get my
19 thoughts on working on a CDS grant and when I say my
20 thoughts, the parameters that I as a senior underwriter would
21 start to say well, things make sense to pursue a little bit
22 further. I think the conversation was regarding the
23 collateral and the rating of the collateral, whether it was
24 managed or not managed. Other things that would typically
25 come up are structural features, whether it was static or non

Page 37

1  static, whether there were cash flow triggers or not. I
2  don't remember exactly the specific items that came up, but
3  those were generally the items that we would have discussed
4  in an early conversation like that.
5  Q  What do you recall specifically about the
6  conversation? I mean which of those things do you recall
7  discussing?
8  A  I remember he was treating it as very confidential.
9  He kept saying, you know, this is a really important
10 transaction for us. There's an opportunity here in the
11 market. He asked - I'm pretty sure at that point he asked
12 what type of subordination we would require. I think what I
13 probably answered at that time was - well, I know I answered
14 in this regard that we had done a similar transaction which
15 was the Class V I transaction. I know that I answered at
16 that time that that was predominantly BBB, and that would
17 have gotten 50 percent subordination there. We saw no reason
18 to - that transaction structure, and that we probably would
19 not be interested in the BBB area.
20 Q  What else?
21 A  I believe the question of manager came up and we
22 did want a manager.
23 Q  Did you tell them why you wanted a manager?
24 A  I don't recall.
25 Q  Why did you want a manager?

10 (Pages 34 to 37)