**Page 247**

1  MR. INFALISE: Let's -- why don't we just take
2  about a ten-minute break?
3  THE WITNESS: That's great. Actually if I could
4  grab a piece of my sandwich, it would be great.
5  MR. INFALISE: Okay.
6  (A short recess was taken.)
7  MR. FELLER: We're back on the record after a short
8  break during which there was no discussion of substance between
9  Staff and Mr. Salz or his counsel, other than again Mr.
10  Pickhardt advised that Mr. Salz wanted to clarify something from
11  before the break. Is that correct?
12  THE WITNESS: Yes.
13  MR. FELLER: Oh, and I'm sorry, I should just note
14  that Mr. Muoio has stepped out.
15  THE WITNESS: I want to go back to one of the
16  topics that we had just before the break, and it's really the
17  backdrop to this transaction.
18  And it was my responsibility to find out what the
19  -- the reasons that the transaction were -- for being put
20  together, and to talk to someone at the underwriting, find out
21  why are they doing this, what is happening here?
22  And that was what was expressed in my underwriting,
23  in terms of what was going on in the market. And that this
24  appeared to be more of a flow business, even to the extent that,
25  you know, that it was expected that there would be more deals

**Page 248**

1  like this later in the year. Not necessarily that we would do
2  those deals, but that this was something which they felt was
3  going to be part of the business, the CDO flow business. And
4  not a shorting business, so to speak.
5  BY MR. INFALISE:
6  Q  They being Citigroup?
7  A  Citigroup, yes.
8  Q  And who specifically was -- told you that
9  information?
10  A  That would have been through conversations with Mr.
11  Khan.
12  Q  All right.
13  A  So that was the backdrop to it. In response to your
14  question about 500 million being non-intermediated and the 310
15  being intermediated. If I had known that the 500 that had not
16  been intermediated had been shorted, and the 310 that had been
17  intermediated -- I mean, obviously, that would have been
18  substantial, and would have indicated what was going on at that
19  time. That wasn't the case. There was no explanation of
20  exactly why certain things were not intermediated.
21  And lastly --
22  MR. SILVERSTEIN: I'm sorry. You said that would
23  have been substantial?
24  THE WITNESS: Well, it would have given me
25  substantial pause if I knew that Citi was taking a 500 million

**Page 249**

1  short here.
2  MR. SILVERSTEIN: What do you mean a substantial
3  pause?
4  THE WITNESS: Effectively walk away from the
5  transaction. I would have had to report that to senior
6  management.
7  MR. SILVERSTEIN: Why is that?
8  THE WITNESS: Because the alignment within the CDO
9  had changed. That it was not a flow transaction. Where someone
10  was sourcing differing assets at a wider spread and being able
11  to issue liabilities with it, at this point it became a
12  proprietary vehicle for Citigroup.
13  MR. FELLER: Would you --
14  THE WITNESS: I didn't say Citigroup Funding, I
15  said classified funding.
16  MR. FELLER: Sorry to have almost cut you off.
17  Mr. Infalise asked the question before the break
18  about the 310 million in intermediation and the $500 million
19  short.
20  Would you have wanted to know which assets were in
21  the intermediation pool and which ones were in the shorting
22  pool?
23  THE WITNESS: I would have liked to have known
24  which deals they were shorting.
25  MR. FELLER: And does this tie in to your earlier

**Page 250**

1  answer about dealers -- you know, that you weren't betting
2  against the dealer?
3  THE WITNESS: Yes.
4  MR. FELLER: All right.
5  THE WITNESS: You know, to the extent that I know
6  effectively that house, Citigroup, was taking a position against
7  certain names in that trust, that's -- I would need to dig
8  further into those names. I mean, my capacities to look at each
9  of these individual names was somewhat limited. I trusted that
10  the manager was going to do a more extensive job. We discussed
11  theoretically how they would look at these names and how they
12  would process them, but I by no means had the ability to go
13  asset-by-asset and evaluate it in a way that was fully
14  appropriate.
15  BY MR. INFALISE:
16  Q  And did you believe that CSAC had gone
17  asset-by-asset in evaluating these assets?
18  A  Absolutely.
19  Q  And why is it you believed that?
20  A  That was their role as the manager.
21  Q  Did they specifically tell you that's what they'd
22  done?
23  A  They specifically indicated that they had gone
24  through the portfolio and selected different names. That this
25  was their portfolio, they were putting their name on it.

Page 251

1  Frankly, there had been a relationship there, both with CSAC as
2  well as with Citibank in terms of ongoing business. I mean, to
3  the extent -- to the extent that I got wind that both parties
4  were colluding to get AMBAC, I mean, obviously that was my
5  livelihood. So of course I would stop that.
6       MR. FELLER: Sorry, one question I don't think we
7  asked last time.
8       Did you believe in -- or are we -- (inaudible) --
9  at the time you were looking Class V III, that there was a
10 chance that a single-A CDO traunch -- that is any of the CDOs
11 underlying Class V III -- could experience a credit event?
12      THE WITNESS: Yes.
13      MR. FELLER: Okay.
14      MR. FELLER: So you were concerned about actual
15 defaults rather than just mark-to-market fluctuations of the
16 collateral?
17      THE WITNESS: Two pieces. We were concerned about
18 defaults within the asset pool.
19      MR. FELLER: Uh-huh.
20      THE WITNESS: And that in part is why we attached
21 at the 50 percent level. And the analytics that we ran
22 basically was what -- so I had to figure out, what would it take
23 to knock out 50 percent of the pool and then try to back into
24 that. It was something that we looked at.
25      We did not think that our liability was at risk.

Page 252

1  We would never have entered into the transaction at that time.
2  We felt that our liability would have mark-to-market volatility,
3  and we knew that.
4       MR. FELLER: Okay. But I'm talking about the asset
5  pool.
6       THE WITNESS: We knew that there would be deals
7  that would suffer credit events.
8       MR. FELLER: Okay.
9       THE WITNESS: No, not -- we felt that that was the
10 case.
11      MR. FELLER: Okay.
12      BY MR. INFALISE:
13   Q   Okay. What I'd like to do is, you had talked, I
14 think before we took a break, about a document that you had
15 received from Citi. And I'm going to ask that this be marked as
16 the next document be marked as -- I believe it's Exhibit 584?
17           (Exhibit Number 584 was
18            marked for identification.)
19   Q   All right, Mr. Salz, I'm going to give you what's
20 been marked as Exhibit 584. It is a combination; the first two
21 pages, I believe, are an email. And the Bates numbers are
22 Citi-18461374 to 75. And then a multi-page attachment, numbered
23 Citi-18461388 through 18361427.
24      And just take a few moments and take a look at
25 that, Mr. Salz.

Page 253

1       MR. FELLER: Just so the record's clear, even
2  though the numbering is non-sequential, that's because there
3  were originally multiple attachments to the email, and this is
4  just one of the attachments; is that correct?
5       MR. INFALISE: That's correct.
6       MR. FELLER: Okay.
7       THE WITNESS: (Reviewing the document.) Okay.
8       BY MR. INFALISE:
9    Q  All right, Mr. Salz, the first page is -- appears to
10 be an email from Linda Robinson to multiple addressees. It's
11 dated February 28th, 2007.
12      And I see almost -- probably the fifth from the
13 bottom, there's a to email address, dsalz@ambac.com. Was that
14 your email address during February of 2007?
15   A   Yes, it is.
16   Q   And do you recall receiving this document -- email?
17   A   Vaguely.
18   Q   All right. And do you recall whether or not the
19 document which is attachment, beginning at Bates number 18461388
20 was included with it?
21   A   (Reviewing the document.) To the best of my
22 recollection, yes.
23   Q   And sir, when you received this, do you recall
24 whether or not you actually reviewed it?
25   A   I can't recall whether I reviewed this one, because

Page 254

1  the markup was rather light.
2    Q  When you say the markup was rather light, what do
3  you mean?
4    A  I mean, I would have reviewed what changed in here.
5    Q  I see.
6    A  I believe the day before there was a heavier markup.
7
8       20th I think was the closing date of the
9  transaction?
10   Q   Do you recall whether or not you had any discussions
11 with anyone at Citi concerning this email and the attachments to
12 it?
13   A   I can't recall whether it was specific to this.
14   Q   How about do you recall any discussion with anyone
15 at CSAC concerning this email or any attachments?
16   A   Again, on a specific email, I can't recall.
17   Q   Okay. Now I'm going to direct your attention to the
18 page in the attachment, Bates number at the bottom
19 Citi-11846121.
20   A   118461421?
21   Q   I'm sorry, yeah, 1421.
22   A   Okay.
23   Q   Indicated Annex A?
24   A   Yes.
25   Q   Do you understand what this represents, sir?

# EXHIBIT 13

Case 1:11-cv-07388-JSR   Document 49-10   Filed 05/23/12   Page 4 of 16

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )   File No. HO-10740
CITIGROUP, INC.            )

WITNESS:   Michael R. Shackelford

PAGES:     1 through 190

PLACE:     Securities and Exchange Commission

           100 F Street, N.E.

           Washington, D.C.

DATE:      Tuesday, January 18, 2011

    The above-entitled matter came on for hearing, pursuant to notice, at 9:40 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 34

1  research analyst. I think at JP and later at Credit Suisse,
2  and I could be wrong, but I think that's where he came from.
3  In terms of the shops, I know that's what he did. He was a
4  research analyst.
5      And research analysts, on the sell side, aren't, in
6  my opinion, aren't used to doing the documentation that a
7  buy-side person is used to doing. Like every time you look
8  at a deal on a buy side, you make a record of it, and you
9  keep it somewhere, so that if your boss asks you or an
10 investor asks you, you can pull it and you can talk about it.
11     I think Samir is such a very smart guy and has a
12 very good memory that I think at points he thought, well, you
13 know, I'll remember that. And, of course, he would. But
14 that doesn't really help me or someone else who might have to
15 speak to it. You know, suppose he left to go work somewhere
16 else. You know, how am I or Samir or Judy Sun or Will Nunez
17 going to look at that deal and explain to an investor why we
18 bought it?
19     So that was my issue with him.
20 Q  Was he sloppy?
21 A  He was sloppy, yes.
22     MR. WASHER: Can I just clarify?
23     When you say "sloppy," sloppy about what?
24     THE WITNESS: He was sloppy about record-keeping.
25 Like I say, he didn't settle his trades properly. He didn't

Page 35

1  always do analysis, but that's what Will was for, so we hired
2  Will to help him do that.
3      BY MR. FELLER:
4  Q  You mentioned a couple of the issues you had with
5  Mr. Bhatt.
6      Were there any issues specifically with respect to
7  the Class V III CDO that you had with Mr. Bhatt?
8  A  Only that he didn't come to me first before talking
9  to Popp.
10 Q  So what did you do after you spoke with Mr. Popp?
11 A  I asked Samir about it. He walked me through what
12 the basic parameters of the deal were. And then I contacted
13 I think Keith Pinniger at Citigroup. I asked him to send me
14 over whatever deal documents they were proposing, and then I
15 began working on the deal.
16 Q  Tell me about what Mr. Bhatt told you when he
17 walked you through the transaction?
18 A  As I recall, he said that it was a CDO squared that
19 was to contain single A assets in credit default swap form.
20 I believe it was to be somewhere between $800 million and a
21 billion dollar deal. And I think that's about the basics of
22 it.
23 Q  Did he say anything about the specific type of CDOs
24 that would comprised the collateral?
25 A  I don't know if he told me that at the beginning,

Page 36

1  but I know we had a discussion about since there were going
2  to be simulated CDOs that we could reference with credit
3  default swaps, they basically could be any deals that we
4  wanted, and so at some point he and I discussed just
5  reference deals we already owned, and it'll make our job as a
6  manager easier since we're already monitoring those deals.
7  And we already believed -- presumably believed in those
8  deals, so it would be easier to do that, you know, be a
9  manager on that deal if we were referencing assets we already
10 owned.
11 Q  Did Mr. Bhatt say whether in his initial
12 discussions with Citigroup he had discussed what the
13 portfolio would look like?
14 A  You are talking about that initial conversation I
15 had with him?
16 Q  Yes, as an initial matter.
17 A  Yeah, I don't remember him saying that, but I know
18 we talked about it ultimately over the course.
19 Q  Okay. And tell me about the later discussions you
20 had.
21 A  Just what I said. "Let's reference assets we
22 already own, and it'll be easier to do that." And I think we
23 were all -- me, John Popp, Andy Marshak, and Samir Bhatt --
24 we were all in agreement that that's the best starting point
25 to get the majority of our assets.

Page 37

1  Q  In your initial discussion with Mr. Bhatt, what did
2  he describe as Citi's role in the transaction -- Citigroup's
3  role in the transaction?
4  A  He didn't need to describe that to me. As you
5  already know, I've done multiple CDO deals. I would have
6  known what an underwriter was supposed to do.
7  Q  Okay. And what were the roles of the underwriter?
8  A  To open the warehouse, collect the assets as we
9  purchased them, and do the deal documents. The primary
10 person point people in doing the deal assets and obviously
11 finding investors and selling assets to the investors.
12     BY MR. SILVERSTEIN:
13 Q  Did Mr. Bhatt describe to you what Citigroup's role
14 would be in the transaction?
15 A  He would not have needed to.
16 Q  Apart from whether he would have needed to or did
17 did he --
18 A  I don't recall him telling me that.
19 Q  You don't recall him describing to you what
20 Citigroup's role would be?
21 A  No.
22     BY MR. FELLER:
23 Q  Did he say anything about Citigroup's trading desk
24 having any involvement in the deal?
25 A  Again, initially?

10 (Pages 34 to 37)

### Page 38

1  Q  Yes.
2  A  I don't recall that, but over the course of it,
3  yeah, I'm sure we discussed that we expected them to be on
4  the other side of some of our assets.
5  Q  How did you come -- well, first of all, what do you
6  mean "by the other side of some of the assets"?
7  A  To do a credit default swap, someone has to be long
8  and someone has to be short. The deal Class V Funding III
9  was going to be long the assets.
10 Q  Okay.
11 A  So someone is going to have to take the other side.
12 Q  Okay. So you said over the course of the process
13 you learned that Citigroup's trading desk was the --
14 A  No, I said over the course of the process, we
15 expected that they would take some of the other side of that.
16 Q  Why did you expect that?
17 A  Well, they were the biggest CDO issuer at the time.
18 Q  Okay.
19 A  They had one of the biggest CDO secondary desks at
20 the time. So it would be only logical and our expectation as
21 a manager in one of the most difficult parts of being in a
22 CDO is filling the --
23    So you tend to do a deal with an underwriter who
24 has a large presence in that asset that you're doing, so if
25 you're doing a residential mortgage deal, you would do it

### Page 39

1  with an underwriter that does a lot of resident -- issues a
2  lot of residential mortgage, underwrites a lot of residential
3  mortgages, and has a large presence in the secondary desk.
4     The same thing with a CDO. If you are going to do
5  a CDO squared, that's going to have underlying assets, that
6  are all primarily CDO assets, then you want an underwriter
7  who has a large presence in that market so that you can be
8  assured that a large portion of your transaction you can get
9  executed and you know you're going to get executed.
10 Q  I'm following you right up until how you are using
11 the term "executed" there. What do you mean?
12 A  The CDS. When you do a transaction, that's
13 executing.
14 Q  Which transaction are you talking about? The
15 transaction in the collateral or the actual underwriting of
16 the CDO?
17 A  Well, both, but I was referring to the underlying
18 collateral.
19    I mean if we were doing a deal -- if we were going
20 to do a CDO squared, right, I would not pick, you know, AB &
21 Amero. They didn't do CDOs. That was not -- I mean they did
22 some CDOs but that wasn't their primary business. Right.
23 And their secondary desk wasn't a primary transactor of CDOs.
24 Correct.
25    So if I'm doing a deal with AB & Amero, I am going

### Page 40

1  to have to go to everyone else and find, scrounge together,
2  someone who is going to take the other side of my CDS
3  transaction -- my credit default swaps. Right. Because I'm
4  doing it with someone who is a large issuer and a large
5  presence in the market like Citigroup was, and I at least
6  know that they're probably going to take a decent chunk of
7  the asset. They are either going to take it on their books
8  or they're going to take it for one of their clients.
9     And so I know -- or I had a belief that they would
10 take a decent chunk of our assets.
11 Q  Going back to your initial discussion with Mr.
12 Bhatt, did he say anything about whether Citi had a customer
13 looking to take the short side of any of the trades?
14 A  I don't recall him telling me that.
15    I had had a conversation with Shalabh Mehrish, and
16 he was at Citigroup.
17    MR. ZELENKO:  Can you spell that name?
18    THE WITNESS:  S-h-a-l-a-b.  And his last name,
19 M-e-r-i-s-h.
20    Am I close?
21    MR. FELLER:  Well, I've got it.  Don't worry.
22 S-h-a-l-a-b-h.  M-e-h-r-i-s-h.
23    THE WITNESS:  Okay.
24    MR. ZELENKO:  Close enough. Close enough for
25 government work.

### Page 41

1  BY MR. FELLER:
2  Q  Tell me about your conversation with Mr. Mehrish?
3  A  I had a conversation with him -- I can't recall if
4  it was before this deal got going or just after, but it was
5  sometime in probably late '06. And I had asked him, you
6  know, what's their appetite for CDS and why, for credit
7  default swaps on CDOs and why.
8     And he had told me that he himself had a large
9  appetite because they had so many cash bonds off the deals
10 they were underwriting, and that he was planning to use CDS
11 as a hedge against his position. Because as an underwriter,
12 he didn't want to be at credit risk. He just wanted -- you
13 know, underwriters just want to earn a fee, right. So you
14 want to be credit neutral. So because he had so many cash
15 bonds and he expected to have more cash bonds in the future
16 as more deals were being done, that would be a good way to
17 hedge.
18    He also told me that he had clients that wanted to
19 be short, and he also said that at various times his -- desk
20 may want to be short.
21    So, you know, Samir may or may not have told me
22 that, I don't recall. But, you know, I'm sure at some point
23 during that time I have a memory of my conversation with
24 Shalabh Mehrish.
25 Q  Where was this conversation with Mr. Mehrish?

Page 42

1  A  I seem to remember it being in a car but that may
2  not be correct. But I think I seem to remember it being in a
3  car going to a meeting somewhere, but I may be confusing that
4  with some other instance.
5      Q  Was it in New York City?
6      A  It was in New York, yes. I'm almost certain it was
7  in New York.
8      Q  Was anyone else present?
9      A  I don't recall. I don't think so. I seem to
10 recall it being me and him in a cab and we were going
11 somewhere.
12     Q  And what else did Mr. Mehrish tell you?
13     A  That was basically the gist of it, with regard to
14 this.
15     BY MR. SILVERSTEIN:
16     Q  In what context did that topic come up?
17     A  Well, that's why I think it happened right after
18 they were talking about that, because I don't think I would
19 have really cared about --
20     Q  Right after they were talking about --
21     A  Right after Samir and Citi had discussed doing the
22 deal. I don't think I really cared that much about what they
23 were doing in CDO/CDS-wise.
24         (SEC Exhibit No. 537 was marked
25          for identification.)

Page 43

1      BY MR. FELLER:
2      Q  I hand you what's being marked as Exhibit 537.
3  Exhibit 537 is a one-page e-mail and a one-page attachment,
4  Bates Citi-15952054 and 2055. It's an e-mail from Brian
5  Stoker, S-t-o-k-e-r, at Citigroup to Mr. Shackelford, dated
6  November 14, 2006, subject "Forward CDO squared proposal-
7  portfolio."
8         Mr. Stoker is forwarding an e-mail from Sohail
9  Khan, K-h-a-n, to Mr. Popp, copying Mr. Stoker and Mr.
10 Mehrish, that's from November 1, 2006.
11        Mr. Khan writes, "Thanks for taking the time to
12 talk about the CDO squared proposal earlier today. Given the
13 refreshing experience we've had with your team in both the
14 CLO and ABS CDO space, we're very keen to broaden the
15 relationship to include this asset class.
16        "As discussed, I am attaching herewith a list of
17 about 30 CDOs that are contemplated to be in the portfolio.
18 This is a first cut but should be good enough to give both
19 parties an idea of whether or not a trade is feasible.
20        "Look forward to your early turn around. We'd like
21 to firm things up as soon as feasible."
22        And then two weeks later, Mr. Stoker forwards that
23 e-mail to Mr. Shackelford and writes, "FYI."
24        The attachment is actually a list of 30 buyers of
25 CDOs.

Page 44

1         Do you recognize this document?
2      A  I don't recall it specifically.
3      Q  Do you have any reason to think you didn't receive
4  it?
5      A  No, I'm sure I got it.
6      Q  Do you know why Mr. Stoker forwarded this to you?
7      A  Probably as -- I'm sure, as I said, after I spoke
8  to Samir Bhatt about the deal, I called Keith Pinniger and I
9  asked him to -- Keith worked directly with Brian Stoker. I
10 may have talked to Stoker as well. I don't recall, but I may
11 have. And I asked him to send me all the stuff that they
12 were working on, that they had gotten up to that far. So
13 this was probably one of those things.
14        BY MR. SILVERSTEIN:
15     Q  This was a request you made to Mr. Pinniger?
16     A  I just recall I said to Mr. Pinniger, "Send me any
17 documents regarding the deal." So either he -- I mean,
18 again, Brian Stoker may have been on the phone. I may have
19 spoken to him separately. I don't recall. I remember
20 talking to Pinniger about it. But Stoker may have been on
21 the call or whatever. Even if he wasn't, Pinniger and he sat
22 next to each other, you know. I'm sure he told him and
23 that's how it would have generated this.
24        BY MR. FELLER:
25     Q  Is mid-November around the time you had that

Page 45

1  conversation with Mr. Pinniger?
2      A  I don't recall.
3      Q  Well, let me see if we can do something to place
4  that in time.
5         When Mr. Pinniger responded, did he send you
6  documents?
7      A  Yeah, I think the first document I got was actually
8  an engagement letter. I could be wrong -- the first document
9  I remember was an engagement letter.
10     Q  What other documents do you remember him sending
11 you?
12     A  Later he would have sent me -- I know he sent me
13 the offering memo, a draft of it. That was basically one
14 with, you know, redactions.
15     Q  Okay. But you said that was later.
16     A  Yeah. It was four years ago. I don't remember
17 exactly when --
18     Q  I understand. We can probably try to place it in
19 time if you don't remember.
20     A  I don't remember. So if you can help, that would
21 be great.
22        MR. ZELENKO: Why don't we take a short break when
23 we get a chance.
24        MR. FELLER: Let me finish the question.
25        BY MR. FELLER:

12 (Pages 42 to 45)

# EXHIBIT 14

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           ) File No. HO-10740-A
CITIGROUP, INC.            )

WITNESS: Brian H. Stoker

PAGES:   1 through 178

PLACE:   Securities and Exchange Commission
         100 F Street, N.E.
         Washington, D.C.

DATE:    Thursday, March 4, 2010

The above-entitled matter came on for hearing, pursuant to notice, at 9:57 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 42

1 even though they don't get to pick the assets?
2  A  Yeah, I just don't recall.
3  Q  Did Mr. Quintin tell you that?
4  A  I don't recall. It just doesn't make sense with
5 anything that I remember happening.
6  Q  Have you ever heard of a deal where the manager
7 doesn't get to pick the assets?
8  A  No.
9    BY MS. SILVERSTEIN:
10  Q  In response to your E-mail, Mr. Grant responds, are
11 you involved, hopefully so, we get the revenue, let's chat in
12 Asia, can't discuss over E-mail.
13  A  Yes.
14  Q  Did you go to Asia about or about the time of this
15 E-mail?
16  A  Yes.
17  Q  Okay, was Mr. Grant there?
18  A  Yes.
19  Q  Okay, what was the reason you went to Asia at that
20 time?
21  A  To market the CDOs.
22  Q  Okay, and did you speak with Mr. Grant while you
23 were on that trip?
24  A  Yes.
25  Q  Okay, and did you discuss the topic of this E-mail?

Page 43

1  A  I don't recall.
2  Q  What CDOs were you in Asia to market?
3  A  You know I think -- I actually don't recall the
4 exact purpose. I can't recall if we were -- if this was a
5 Citigroup conference -- if Darius and I were going, it was
6 probably a Citigroup conference, where we had -- where
7 Citigroup had many people from the CDO desk go and call on
8 money managers and investors to market the deals we were
9 working on or might be working on in the future.
10  Q  Do you remember going to go to a Citigroup
11 conference in Asia at this time?
12  A  I do.
13  Q  And did you and Mr. Grant discuss anything related
14 to CSAC?
15  A  I don't recall.
16  Q  What was your understanding, if any, about why Mr.
17 Grant in response to your E-mail said that he couldn't
18 discuss the topic of that E-mail by E-mail with you?
19  A  Well, you know this is -- I just don't remember
20 this E-mail. And frankly, I'm not sure what he meant about
21 can't discuss over E-mail -- reading through this --
22  Q  Well, your response was, got it, is that right?
23  A  Yes, but
24  Q  The top of the E-mail chain?
25  A  Yes, but I also like -- yeah, to respond, got it.

Page 44

1 But I might have been just happy to talk about it in Asia. I
2 wouldn't have to bug my boss about saying, now, you got to
3 tell me right now in E-mail -- you know, again, what I see
4 here is that he's interested in getting the revenue.
5    And Darius as head of the structuring group would
6 be concerned about making sure that his group got credit for
7 the structuring fee. And in a deal where Donald is more
8 involved in taking the risk and warehouse risk or -- if not
9 warehouse, then the risk of being short all the assets
10 initially.
11    And also actually be more involved in kind of
12 syndicating in the sense that he knew many investors -- he
13 would have a good idea who might invest in a CDO^2 because h
14 was just so involved in this product, and he had been
15 involved in CLO^2s. I get the sense that Darius is concerned
16 about who is going to get -- you know would the traders try
17 and get credit for the structuring fee, as opposed to the
18 normal procedure of structure and syndicate getting credit
19 for the structuring fee.
20  Q  Have you seen this document at any time before
21 today?
22    MS. IMES: Outside of preparation?
23    MS. SILVERSTEIN: Just at any time.
24    MS. IMES: Outside of meeting with counsel?
25    THE WITNESS: No.

Page 45

1    MS. IMES: Well, you don't dispute that you got it
2 at the time, right?
3    THE WITNESS: Oh, I'm sure I got it at the time.
4    MS. SILVERSTEIN: Okay. But at any time since you
5 received the E-mail at the time, have you ever seen it?
6    MS. IMES: Again, outside of any meetings with
7 counsel?
8    MS. SILVERSTEIN: At any time.
9    MS. IMES: Well, I would object to that. I don't
10 think you're entitled to ask him what documents we in our as
11 attorney work product decided to show or not show our client.
12    BY MS. SILVERSTEIN:
13  Q  Okay, has this document -- have you used this
14 document at all to refresh your recollection as to any events
15 that took place in or about October 2007?
16    MS. IMES: You can answer that yes or no.
17    THE WITNESS: Yes.
18    BY MS. SILVERSTEIN:
19  Q  Okay, and what recollection has been refreshed by
20 this document?
21  A  Well, frankly, I don't remember any of this -- I
22 don't remember this E-mail at all. So I -- what I've told
23 you so far about why I thought it might have been called a
24 prop trade, or don't tell CSAC, and CSAC agreed to terms even
25 though they didn't pick the assets, you know that's all my

12 (Pages 42 to 45)

Page 46

1  helping -- you know trying to piece that together after
2  reading this E-mail.
3     Because it doesn't make -- I don't remember any of
4  it.
5  Q  Okay, and so that the record is clear, what is it
6  that you now remember about the events that are referred to
7  in this E-mail that you didn't remember before seeing this
8  document?
9  A  Well, I guess I remember Darius having some
10 concerns about who would credit for the structuring fee in
11 this deal. I guess I remember some -- Donald or Brian
12 Carosielli having some interest in the equity in a $CDO^2$
13 transaction. That's all.
14 Q  Anything else?
15 A  No.
16    (SEC Exhibit No. 371 was marked for
17    identification.)
18 BY MR. FELLER:
19 Q  Let me ask you about a couple documents from a
20 couple days before Exhibit No. 370.
21 A  Okay.
22 Q  First is Exhibit No. 371, a one page E-mail, Bates
23 CITI18143140, which is an e-mail from Mr. Stoker to Mr. Khan,
24 copying Mr. Troszczynski on November 1st, 2006, subject, A
25 CDO Names for CSAC $CDO^2$. And Mr. Stoker writes to Mr. Khan

Page 47

1  Here's a first cut of names. And there's a list
2  of -- 21 names -- first of all, do you recognize this
3  document?
4  A  I don't.
5  Q  Do you know where you got that list of names?
6  A  I don't.
7  Q  Why were you sending Mr. Khan a list of names for
8  the CSAC $CDO^2$?
9  A  I don't know.
10 Q  Was that normal procedure in structuring a deal, to
11 send names to the manager?
12 A  I don't know that this is going to the manager. I
13 sent this to Sohail and copied Mare.
14 Q  Okay, sorry.
15 A  I don't know -- I just don't know the purpose or
16 where the list came from or I don't know if that was being
17 modeled in the deal. I just don't know.
18 Q  Well, was it normal procedure to send the sales
19 person who covered the manager a list of potential names for
20 the deal?
21 A  I wouldn't have suggested names. I wouldn't have
22 suggested a list of names, so that would be unusual for me to
23 send a list of suggested names, for me to say, here's -- how
24 many names did you say, 20 names?
25 Q  Twenty-one.

Page 48

1  A  Yeah, yeah. So I don't know if I -- I just don't
2  know where the list came from. You know something that was
3  more common would be you know names that the manager picked
4  right? I would have -- structures would have a list of that,
5  and then we would send that when the deal was further along,
6  send that to the sales force and to investors to see what was
7  in the deal.
8  Q  So what was this list about then?
9  A  I just don't know.
10 Q  Do you recognize the names on this list?
11 A  I recognize some, but you know really -- individual
12 names, as a structurer, individual names are not something
13 that I would focus on. I was more concerned about what's the
14 rating and what's the price of the spread.
15 Q  Are you familiar with the constellation deals?
16 A  Vaguely, yes.
17 Q  Okay, tell me about the constellation deals.
18 A  I think they had no IC or OC triggers.
19 Q  Okay.
20 A  They were Magnetar deal, and that Magnetar bought
21 the equity in those deals.
22 Q  Okay, was Magnetar involved beyond that in those
23 deals?
24 A  I actually don't know. I never worked on one. I
25 think Magnetar either also hedged their equity long by either

Page 49

1  shorting the BBB tranche in the deals, or by shorting assets
2  in the deal.
3  Q  And as of November 1, 2006, did you know what you
4  just described to me?
5  A  Yes.
6  Q  Okay, so are any of these constellation deals?
7  A  Yes.
8  Q  Which ones?
9  A  Well, I don't know my constellations that well, so
10 you're going to embarrass me, but Aquarius, right?
11 Aquarius -- and I don't think Libra is, right? Orion,
12 Pisces, Scorpius -- Virgo.
13    MS. IMES: Do you know those to be constellation
14 names or are you just trying to figure out which ones --
15    THE WITNESS: I'm guessing at ones that might be --
16    MS. IMES: Hold on -- are you just trying to figure
17 out which ones are in fact the names of constellations in the
18 sky?
19    THE WITNESS: That's what I'm -- I'm trying to
20 figure -- that's why I'm --
21    MR. FELLER: No, my question -- thank you -- my
22 question was different.
23 BY MR. FELLER:
24 Q  Which of these were constellation deals that
25 involved Magnetar?

Page 50

1    A   Yeah, that -- well, I'm glad you mentioned that,
2  Linda, because actually -- actually, I don't know. Except --
3  and I'm just trying to recall which of these names look like
4  they might be constellations. Again, I just would not focus
5  on an individual name.
6    Q   Do you know why Magnetar would short mezz tranches
7  of those deals?
8        MS. IMES: Which ones?
9        MR. FELLER: He described the constellation deals
10 that Magnetar would sometimes short the mezz tranches of
11 those.
12        THE WITNESS: I didn't get to talk to Magnetar very
13 much. And I never got to ask them that question, but I was
14 initially actually confused on what their strategy was --
15 actually, it didn't make very much sense to me. And then I'd
16 say finally at some point I decided that it was kind of a
17 high correlation view -- Magnetar had a high correlation
18 view, and that either a deal would perform well -- all right,
19 so let's say the simplest example is they buy all the equity
20 and then short the BBB tranche of the same deal.
21        If the deal performed well, the equity yield would
22 be much higher than the BBB yield, and they would win. And
23 they'd have a positive return.
24        And if the deal performed poorly, that's why they
25 wanted no IC and OC tests, if the deal performed poorly all

Page 51

1  the RBS would perform poorly at the same time, or at least a
2  lot of it, enough to wipe out -- enough to really hurt the
3  equity and the BBB tranche at the same time.
4        So while the deal was performing well, they would
5  have positive carry, and then if the deal went bad, the
6  investors would -- their equity in BBB would go about the
7  same time and they would just kind of like -- their
8  investment would go to zero.
9    Q   And you said Magnetar shorted collateral into those
10 deals?
11       MS. IMES: The constellation deals?
12       MR. FELLER: Well, he said that earlier, yeah.
13       THE WITNESS: I did say that, but I don't -- I
14 actually don't know if they did that. I wasn't involved in
15 those deals, so I really don't know the part about
16 shorting -- to the extent that they shorted BBBs, it just
17 kind of what I heard they were doing. And shorting the
18 assets, I think I might have heard that somewhere along the
19 way, but I just don't know.
20       (SEC Exhibit No. 372 was marked for
21        identification.)
22       BY MR. FELLER:
23   Q   Well, let me continue on, ask you about Exhibit No.
24 372 -- what is being marked as Exhibit No. 372, which is a
25 one-page E-mail -- sorry, let me take that back from you --

Page 52

1  there's a second E-mail stapled to it. With apologies.
2        MS. BUERGEL: Is there -- I just need a ladies room
3  break at some point. Does it make sense to do it before
4  this? Or do you want to this first?
5        MR. FELLER: Can you wait?
6        MS. BUERGEL: Yeah, I can -- I'll do my best.
7        BY MR. FELLER:
8    Q   This is Exhibit No. 372 is a two-page E-mail,
9  Bates CIT14250375 -- a one-page E-mail and a one-page
10 attachment, the attachment is 0376.
11       MS. IMES: Do you have an extra one?
12       MR. FELLER: Yeah, I do.
13       MS. IMES: Oh, thank you.
14       MR. FELLER: Okay, sorry about that.
15       BY MR. FELLER:
16   Q   And Exhibit No. 372 is an e-mail from Mr. Khan to
17 Samir Bhatt and John Popp at Credit Suisse, copying Mr.
18 Stoker and Mr. Mehrish, subject: CDO^2 proposal. It's on
19 November 1, 2006 at 4:46 so about an hour and 15 minutes
20 after Exhibit No. 371. And Mr. Khan writes:
21       Thanks for taking the time to talk about the CDO^2
22 proposal earlier today. Given the refreshing experience
23 we've had with your team in both the CLO and ABS CDO space,
24 we're very keen to broaden the relationship to include this
25 asset class. As discussed I'm attaching herewith a list of

Page 53

1  about 30 CDOs that are contemplated to be in the portfolio.
2  This is a first cut but should be good enough to give both
3  parties an idea of whether or not a trade is feasible. Look
4  forward to your early turnaround. We'd like to firm things
5  up as soon as feasible.
6        Then there's attached a list of 24 CDOs I think --
7  or 24 names, of which I'll represent to you that all or all
8  but one are from Exhibit No. 371 are included.
9    A   Okay.
10   Q   Do you recognize Exhibit No. 372?
11   A   I don't.
12   Q   Who were Mr. Bhatt and Mr. Popp?
13   A   Mr. Bhatt was a portfolio manager at Credit Suisse
14 Asset and John Popp is his boss.
15   Q   Okay, why are you copied on this E-mail?
16   A   Sohail wanted to keep me in the loop -- that's what
17 I guess. I mean I don't know. I was working on this deal
18 and Sohail wanted to keep me in the loop.
19   Q   Okay, so what -- were these the first -- was
20 November 1st, the first time that Mr. Khan had talked to CSA(
21 about doing a CDO^2?
22   A   I just don't know.
23   Q   Were you part of those discussions that Mr. Khan
24 refers to in this E-mail? He says, thanks for taking the
25 time to talk about the CDO^2 proposal earlier today in his

14 (Pages 50 to 53)

Page 54

1  E-mail to Mr. Bhatt and Mr. Popp?
2  A   I just don't remember. I'd say that generally
3  Sohail was leading the charge and having many more
4  discussions with Credit Suisse than I was, so I don't
5  recall -- I could have been on it, but I don't remember.
6  Q   Was it in your experience a common practice for a
7  sales person to send a proposed portfolio to a manager in
8  advance of doing a deal?
9      MS. IMES: In a synthetic or cash or --
10     MR. FELLER: In any deal?
11     THE WITNESS: Yeah, I'd say that's unusual.
12     BY MR. FELLER:
13 Q   Unusual?
14 A   Yeah.
15 Q   Had you ever seen it before?
16 A   Well, I think I mentioned before the case where you
17 have some portfolio that you wanted to say, hey, I have a
18 hundred million of bonds and for whatever reason, would you
19 like to be the manager for this deal, so I guess in those
20 cases.
21 Q   What about in a synthetic deal?
22 A   Well, synthetic was just starting, so I wouldn't
23 have anything to reference, I guess.
24     MR. FELLER: Why don't we take a quick break, go
25 off the record at 11:23 a.m.

Page 55

1  (A brief recess was taken.)
2      MR. FELLER: Okay, we're back on the record at
3  11:38 p.m., after a short break during which there was no
4  discussion of substance between the staff and Mr. Stoker and
5  his counsel, is that correct?
6      MS. IMES: Correct.
7      BY MR. FELLER:
8  Q   Okay. We were talking about these two exhibits --
9  Exhibits. No. 371 and 372 where initially you sent a list of
10 names to Mr. Khan and then Mr. Khan passed on those names
11 with a couple additions, a couple changes to the list, on to
12 Mr. Bhatt and Mr. Popp.
13     If you look back, I had previously given you
14 exhibit -- I want to say Exhibit No. 333 -- yes, Exhibit No.
15 333, right there.
16 A   Yes.
17 Q   Which is Bates 18122071. Looks like a similar if
18 not identical list to Exhibit No. 371, is that correct?
19 A   Yes.
20 Q   Okay, does that refresh your recollection at all as
21 to sending on the list of names to Mr. Khan?
22 A   Not really. You know I guess I can see that now
23 I'm putting together the time, Donald sent them to me, so
24 maybe -- I don't know why -- I don't recall why he would send
25 them to me. I'm trying to recall -- a possibility is that he

Page 56

1  was worried about you know again this risk that he was going
2  to be short a lot of assets, and he wanted to make sure that
3  he wasn't taking out some crazy risk in that where he was
4  going to be short and not be able to cover.
5      Maybe he was concerned about could he -- these are
6  names maybe he felt like he could cover in the market.
7  Q   You keep saying maybe, is that what happened? Is
8  that what he --
9  A   I just don't remember. And again, I wouldn't have
10 been involved in thinking about that part of the deal.
11 Q   Had you done any previous synthetic deals?
12 A   No.
13 Q   Not a CDO^2 but any synthetic deals.
14     MS. BUERGEL: Do you mean any deals that may have
15 had any synthetic collateral I guess to be clear? Or --
16     MR. FELLER: Well, first a primarily synthetic
17 deal --
18     THE WITNESS: No.
19     BY MR. FELLER:
20 Q   What about one with a synthetic bucket?
21 A   No, I think up to this point, the deals -- like we
22 had something called like a deemed floating rate security,
23 which was a -- had to create credit lien note out of it, but
24 I don't think -- I think this was my first synthetic deal,
25 first synthetic and first CDO^2.

Page 57

1  Q   Had Citigroup done -- previously done any primarily
2  synthetic ABS CDO deals?
3  A   I don't know if it was primarily but a deal called
4  Topanga I believe sometime done in maybe early 2006 -- on
5  2006, it was a mezz ABS CDO that I did work on.
6  Q   And that was primarily synthetic?
7  A   I just don't recall how much of it was synthetic,
8  but that was kind of -- I don't remember that was ground
9  breaking on the guy -- the structurer involved in that deal,
10 Scott Surek was very -- working hard to figure out how that
11 deal should work, in the new age of synthetics.
12 Q   Do you know if on the Topanga deal, was any part of
13 Citigroup the initial CDS counter party for the synthetic
14 assets?
15 A   I don't recall.
16 Q   In the same way that you've said Mr. Quintin's desk
17 would be on Class V III?
18 A   I don't recall. I would say generally that it had
19 to be that way. They had to structure the deal that way
20 because no other counter party would face the CDO --
21 Q   Okay, what -- sorry --
22 A   No, the traders -- the trading desk, or Citi as a
23 dealer, it was kind of doing it to accommodate the CDO, and
24 didn't really want to do it. It was a hassle -- the back
25 office systems and work that had to be done for a long period

Page 58

1 of time to match up trades.
2  I forget what I was talking about -- what was the
3 question? Or what was I explaining?
4  Q  Was there an ABS trading desk similar to Mr.
5 Quintin's CDO trading desk?
6  A  Was there a?
7  Q  An ABS trading desk similar to Mr. Quintin's CDO
8 trading desk?
9  A  A mortgage trading desk maybe?
10  Q  A trading desk for mortgage-backed securities?
11  A  Yes.
12  Q  Okay, was that desk involved in the Topanga deal so
13 far as you know?
14  A  I just don't recall.
15  Q  All right let me ask you a slightly bigger picture
16 question, you've said a couple of times you were trying to
17 figure out in this new world of synthetics, you said you
18 hadn't done a synthetic deal, you hadn't done a CDO^2 deal,
19 how did you go about trying to figure out how to do these
20 deals to the extent they were different than deals you'd done
21 before?
22  A  Sure, the CDO^2 part of it wasn't that big a
23 difference. It was -- for me, I guess the analyst assigned
24 to the deal had to get familiar with the CDO^2 -- the rating
25 agency methodology for CDO^2, and then from my perspective,

Page 59

1 guy on my team Keith Pinniger, we had to incorporate the
2 synthetic language from another deal that had been done, so I
3 guess I had spent a lot of time working on documents trying
4 to make them you know easy to use, and things like making the
5 prospectus very similar to the indenture so that when you
6 changed the prospectus you can easily change the indenture.
7  So whoever had worked on the synthetic, if there
8 had been a synthetic deal done before I was involved, or if
9 the lawyers had an example of a synthetic deal that they
10 could take that language and plop it into the new -- or the
11 documents that I'd worked on in the past.
12  Q  Are you familiar with the CMAC process at
13 Citigroup?
14  A  Yes.
15  Q  Okay, what does CMAC stand for first of all?
16  A  Well, I'm not that familiar with it -- CMAC, I'm
17 actually not sure, but it had to do with getting approvals
18 for a new product.
19  Q  Okay, did Class V III have to go through the CMAC
20 process?
21  A  No.
22  Q  Why not?
23  A  It was similar enough and a CDO is a CDO. It's
24 synthetics. I don't know if synthetics went through the CMAC
25 process or not, but Class V III as a stand-alone did not.

Page 60

1  Q  Was there a process for determining whether or not
2 a deal should go through the CMAC process?
3  A  I don't remember the process. I think it was a
4 general sense of whether or not something was different
5 enough, so in my time at Citigroup I was involved in one
6 CMAC -- a leveraged super senior trade, which was you know
7 obviously a different type of trade.
8  But otherwise, a CDO is similar enough. There's
9 Class V III -- you know it seemed similar enough.
10  Q  Who makes the determination whether to take
11 something through the CMAC process?
12  A  I don't know. I suppose anybody could step up and
13 say, wow, you know this is a lot different. We should get
14 approvals from tax and regulatory and these different groups.
15 I guess I don't know whose job that is.
16  Q  Could you have stepped up and said that?
17  A  I could have.
18  Q  Okay, could Mr. Quintin?
19  A  Sure.
20  Q  Mr. Grant -- I'm just trying to get a sense of who
21 is in a position where they can.
22  A  Sure, sure, yeah, they could have said it.
23  Q  Did anyone at any point suggest that Class V III
24 should go through a CMAC process?
25  A  No.

Page 61

1  Q  I think you said earlier that in your experience of
2 doing deals, it was unusual to have a salesperson send a
3 manager a set of names for the portfolio, putting aside a
4 situation where there's a ramped portfolio -- a partially
5 ramped portfolio that they might be asking a manager to
6 adopt. I think you characterized it as unusual.
7  Did that feature -- would that type of unusual
8 feature be something that would be the type of thing a CMAC
9 would look at -- that the CMAC would look at?
10  A  I don't think so. I mean if the manager is
11 managing the deal, selecting the assets, picking the assets,
12 picking the price, agreeing on the price, and it's all -- and
13 it seems like a pretty similar deal to me.
14  I mean I worked on -- I worked on deals backed by
15 emerging market bonds, high yield bonds, leveraged loans. I
16 worked on a deal backed by micro finance -- some very
17 different asset classes, but none of which seemed to me to
18 require a CMAC.
19  Q  And what about the fact that the secondary desk was
20 going to be taking a -- I mean you said this was the first
21 synthetic CDO^2 so this would be the first time where they
22 were the counter party to a CDO for an entire -- or nearly an
23 entire CDO portfolio on the short side. Is the fact that it
24 would be the first time they'd be doing that, was that -- I
25 mean you said there was no CMAC process so obviously it

16 (Pages 58 to 61)

### Page 62

1  didn't go through the CMAC process, but that wasn't something
2  that so unusual as to require the CMAC process?
3  A   No.
4  Q   And why was that? Where did people have -- what
5  was that similar to that -- I might be skewing the answer a
6  little bit, why not?
7  A   Why not -- why not -- could you repeat the
8  question?
9  Q   Why would that not lead to the deal going through
10 the CMAC process?
11 A   Citi being the spot counter party?
12 Q   Yeah.
13 A   I wouldn't have raised it as something to go
14 through the CMAC process because it didn't seem material to
15 me.
16 Q   Did you have any concerns that there could be
17 conflicts between the interests of the CDO and Citigroup --
18 and the secondary desk?
19 A   I wasn't concerned. The manager picks the assets,
20 you know determines every trade. So having Citigroup in the
21 middle on every trade does seem like a concern to me now.
22 Q   So having the manager pick the assets helps
23 ameliorate the potential for that kind of conflict?
24     MS. IMES: Are you asking him now or if he thought
25 about that then?

### Page 63

1      MR. FELLER: I'm asking just -- him to explain the
2  answer he just gave.
3      THE WITNESS: Well, to elaborate, I would say the
4  manager is in charge, right? They -- nothing happens in this
5  portfolio unless they say yes. And Citigroup is -- Citigroup
6  as swap counter party is just the intermediary, kind of a
7  by-product of the deal, and pretty insignificant I'd say to
8  the CDO. It's almost like a -- almost like just an
9  administrator moving cash around.
10 Q   But you said when I asked about potential conflict,
11 the first thing you said was, well, the manager picks the
12 assets.
13 A   That's right.
14 Q   Just explain to me what you meant by -- how that
15 was responsive to my question about conflict, just what you
16 meant by that.
17 A   I'm a little confused, but conflict -- I think
18 about you're suggesting something that Citigroup could do as
19 swap counter party that would hurt the CDO.
20 Q   Well, I was asking if you had any concerns about
21 conflicts, and you said, in the response -- the first thing
22 you said, well, the manager picks that assets.
23 A   Yes, yes, yes, okay.
24     MS. IMES: Well, the first thing he said was I was
25 not concerned, then he said what you said.

### Page 64

1      MR. FELLER: Right, and I'm asking why that led to
2  you not being concerned. Why the manager picking the assets
3  leads to you not being concerned.
4      THE WITNESS: I have to say I'm getting a little
5  confused in the --
6      BY MR. FELLER:
7  Q   Well, let me try this a different way.
8  A   Okay.
9  Q   We looked at Exhibit No. 373 -- maybe --
10 apologize -- your E-mail exchange with Mr. Grant --
11 A   Yes.
12     MS. IMES: Right, Exhibit No. 370 that is.
13     MR. FELLER: Exhibit No. 370, right. And you said
14 you don't remember why you wrote it, but you said CSAC agreed
15 to terms even though they don't get to pick the assets.
16     THE WITNESS: That's right.
17     BY MR. FELLER:
18 Q   So if one of the reasons you wouldn't be concerned
19 about a conflict is that the manager is picking the assets,
20 did you have any concerns about conflicts on Class V III if
21 you thought that CSAC wasn't picking the assets?
22 A   Well, I always thought CSAC was picking the assets.
23 If CSAC was going to be involved in the deal, they were going
24 to pick the assets -- have final approval on every asset and
25 every price.

### Page 65

1  So going back to the E-mail I just don't -- it
2  doesn't make sense to me why I wrote that.
3  Q   What was the purpose of passing on the list of
4  names Mr. Quintin sent you to Mr. Khan to send on to CSAC?
5  What was the purpose of sending that list of names to CSAC?
6  A   Frankly, I just don't remember. I guessed that
7  maybe Donald was worried about you know having to take on a
8  big position as swap counter party, and he was wanting to see
9  if there would be some -- if Credit Suisse would be picking
10 names or names that could be hedged later on, or if Credit
11 Suisse was going to be picking names that would be less
12 liquid and would be harder to hedge later on. But I just
13 don't know. I'm guessing.
14 Q   What kind of names would be more liquid for the
15 secondary desk to cover their shorts?
16 A   Again, I wouldn't know.
17 Q   Do you know what kind of -- strike that. I want to
18 be I guess clear on what you were just telling me. You said
19 you thought it might be that the secondary desk wanted to
20 be -- wanted to have names in the deal where they could cover
21 their shorts? Is that something you remember, or just
22 something you're speculating on?
23 A   Speculating. I remember -- what I do remember is
24 Brian and Donald being concerned about you know covering
25 their shorts. That part I remember. I actually don't

### Page 66

1  remember this list of names.
2  Q  Were they -- did they express to you on whether
3  they had a view on whether they would cover their shorts
4  quickly upon closing the deal?
5  A  No, I don't remember --
6  Q  Did they express to you in or around late October
7  2006 that the secondary desk was looking for opportunities to
8  take short positions?
9  A  Not that I recall.
10  Q  Did they express to you that they had clients who
11  were looking for opportunities to take short positions,
12  customers, apologize?
13  A  No, and I just wouldn't have talked to them about
14  their business -- or their trading or their customers. I
15  wouldn't have known.
16  Q  All right, but you mentioned earlier if it was -- I
17  think the first question I asked and you mentioned some of
18  the things that were in your mind about the course of the
19  Class V III transaction, one of the things you mentioned was
20  the possibility that Magnetar would be involved.
21  A  Yes.
22  Q  Was Magnetar a customer of the secondary desk?
23  A  I actually don't know if they had done any
24  transactions together.
25  Q  Well, would their involvement have been through the

### Page 67

1  secondary desk?
2  A  Oh, if they were involved in the Class V III?
3  Q  Yeah, yeah.
4  A  Yes.
5  Q  Okay, so you said you didn't normally talk to Mr.
6  Quintin and Mr. Carosielli about their customers, but you did
7  have some knowledge that Magnetar might be involved?
8  A  Yes, that's right.
9  Q  Okay, how did that come about that you learned that
10  Magnetar might be involved?
11  A  You know they're a potential equity buyer.
12  Q  Was that going to be their involvement?
13  A  That's how I remember their name coming up, yes.
14  Q  Any other involvement?
15  A  Not that I recall.
16  Q  Who told you that Magnetar might be involved?
17  A  I just don't remember.
18  Q  What do you remember about how the portfolio for
19  Class V III was ultimately selected?
20  A  Generally I remember Credit Suisse picked the
21  portfolio, right? And the way the managers -- you know from
22  a structuring perspective, what the manager would do is have
23  a spreadsheet -- trade log is what it was called -- so when
24  they executed trades, they would send the spreadsheet to the
25  structuring desk, and the structurers would check the trades

### Page 68

1  to see that it's -- or check the average portfolio statistics
2  to make sure they're in line with what was planned.
3  Q  What else?
4  A  That's all.
5  Q  Nothing else about the process? How did CSAC come
6  up with the names? I mean there's a lot of A CDO tranches
7  out there. How did they come up with the list of ones they
8  did put in?
9  A  Actually, I don't know. I wouldn't have been
10  interested in -- again, I wouldn't have been interested in
11  the single names -- individual names. And Credit Suisse as a
12  manager, yeah, I remember they had systems to like check
13  through collateral and then they had several investor
14  meetings where they would talk about their systems and
15  processes.
16     At the end of the day, they came up with a
17  portfolio they liked.
18  Q  Did anyone other than Credit Suisse participate in
19  helping Credit Suisse come up with that portfolio?
20  A  Not that I know of.
21  Q  Did the secondary desk have any role in selecting
22  the assets to go into Class V III?
23  A  I would say -- generally -- generally or always
24  managers -- maybe not always -- managers can talk to the
25  street -- talk to Goldman Sachs, Morgan Stanley and Deutsche

### Page 69

1  Bank and talk about -- and Deutsche Bank salesperson says,
2  hey, Credit Suisse, you should buy these 10 bonds or suggests
3  something you know other than normal sell side interaction,
4  not that I know of.
5  Q  Did they have normal sell side interaction with the
6  secondary desk?
7  A  I just assume so. I mean I wasn't involved. The
8  key for me was that at the end of the day the manager put
9  together a list and sent the structuring desk the list, and
10  that's what we go off of.
11  Q  How did the secondary desk go about mitigating the
12  risks it was taking on the Class V III trade? You've already
13  said this was -- would require the secondary desk to take on
14  a big short position by being the counter party to the CDO,
15  and you've alluded to some conversations where they
16  expressed -- Mr. Carosielli and Mr. Quintin expressed some
17  concern about the risks they'd be taking on, and you've
18  alluded to the possibility that they would look for more
19  liquid names to go in there. Is there anything else they did
20  to mitigate their risks on this deal?
21  A  Not that I know of. But I wasn't involved in their
22  process. I don't know what -- I generally wouldn't know what
23  the trading desk was doing.
24  Q  Let me ask it slightly differently, did -- who
25  drafted the deal documents, the disclosure documents for

18 (Pages 66 to 69)