## Page 70

1  Class V III?
2  A  Who -- that was the structuring team on that deal
3  was me, Keith Pinniger -- I guess Keith Pinniger and I worked
4  together on deal documents.
5  Q  Including the authoring memorandum?
6  A  Yes.
7  Q  Okay, and the authoring memorandum had a section on
8  risk factors, correct?
9  A  Yes.
10  Q  One of those risk factors is conflicts of interest?
11  A  Yes.
12  Q  Was anyone from the secondary desk consulted in
13  putting together the deal documents?
14  A  No.
15      MS. IMES: May I? I think a clarification may be
16  necessary. He said who drafted the deal documents --
17      THE WITNESS: Yeah, I wanted to elaborate --
18      MS. IMES: Hold on -- hold on, let me finish. And
19  you responded that the structuring team, you and Keith
20  Pinniger worked on the deal documents. There's some
21  ambiguity in the -- whether you drafted them. Did you
22  actually draft the documents, put them together, what was
23  your precise role?
24      THE WITNESS: Yeah, I'm glad you asked. I was
25  thinking maybe I should elaborate on that. The deal

## Page 71

1  documents were pretty much the same for years. Say we've had
2  a high grade ABS CDO document that was given to me when I
3  showed up to use for high grade ABS CDOs, and that I spent a
4  lot of time in 2005 to make it -- at that time, it had -- to
5  broaden it so that it could apply to high grade or mezz
6  deals, or any type of CDO.
7      And I'd have to like try to make it easy to -- easy
8  to adapt to a new deal, make it easy to use for a new deal,
9  so really the document was kind of set before I got there --
10  you know modified some in 2005, but really just repeated deal
11  after deal. You know lawyers from -- we use lawyer from
12  Milbank and also lawyers from Clifford Chance on deals.
13  They'd write the documents -- or modify the documents based
14  on comments from the manager, or rating agencies.
15      And the manager would provide the manager's section
16  of the documents. The risk factors were -- I'd say
17  outside -- counsel, like Milbank or Clifford Chance would
18  spent most of the time -- or would spend time on risk
19  factors -- say when legal -- Citi internal counsel whereas, a
20  structurer like Keith and me -- and then this time I was kind
21  of -- I had spent a lot of time in 2005-06 working on deal
22  documents and it had kind of started to migrate out, so Keith
23  was starting to get more involved.
24      But to the extent either of us were involved, we
25  were more focused on economic terms like making sure the

## Page 72

1  waterfall is correct or numbers in the document is correct.
2  Q  Okay, in terms of doing the risk factors, would
3  outside counsel consult with you on whether there was
4  anything different about a deal?
5  A  I don't remember them asking.
6  Q  Whether or not they asked, would you participate in
7  drafting or reviewing the risk factor sections?
8  A  Briefly -- briefly reviewing them.
9  Q  On what basis would you review them? What were you
10  looking for?
11  A  I would -- I might notice a change -- a change if
12  they changed, because I would say generally they were -- my
13  goal was to have -- these deals were very, very similar and
14  so there shouldn't be that many changes.
15      And so when I looked at the black line -- new
16  version comes out, black line, just looked at -- I would just
17  focus on the changes.
18  Q  Was the involvement of the secondary desk as a
19  counter party new for the Class V III deal as far as deals
20  you've worked on?
21  A  I suppose -- well, I suppose it started with deals
22  like Topanga. Any deal where they had synthetics -- but as
23  far as deals that I worked on, I think that might have
24  been -- that was the first synthetic so that was probably the
25  first one where Citi was the swap pick counter party, yeah.

## Page 73

1  Q  And was there anything you put in the -- that you
2  personally recall changing in this fairly standard offering
3  memorandum to reflect that particular aspect of the deal?
4  A  No, I wouldn't have -- I don't think I ever -- I
5  can't remember ever suggesting a change to risk factors in
6  that deal. The other thing is Keith was starting to be more
7  involved with the documents, so I was reviewing it even less.
8  Q  Keith Pinniger?
9  A  Keith Pinniger -- yeah. I was reviewing it less
10  than I otherwise would have at this time. But, no, I don't
11  remember changing the risk factors.
12      MR. FELLER: You know what, why don't we go off the
13  record at 12:20 p.m.?
14      (Whereupon, at 12:20 p.m., a luncheon recess was
15  taken.)
16      AFTERNOON SESSION
17      MR. FELLER: We are back on the record at 1:30 p.m.
18  after a lunch break during which there was no discussion of
19  substance between staff and Mr. Stoker or his counsel, is
20  that correct?
21      MS. IMES: That's correct.
22      THE WITNESS: That's right.
23      BY MR. FELLER:
24  Q  Before we broke for lunch, we looked at a series of
25  E-mails -- first was Exhibit No. 370, I believe where Mr.

Page 74

1  Quintin sent you a list of names and then in subsequent
2  E-mails about a week later, I think you sent the list of
3  names, a substantially identical list of names to Mr. Khan,
4  and then about an hour later, Mr. Khan sent the list of names
5  to CSAC.
6      Do you know if those names ended up in Class V III?
7  A  No idea.
8  Q  Did you ever check to see whether those names ended
9  up in Class V III?
10 A  No, no.
11 Q  Was it Mr. Quintin's intent that those names would
12 end up in Class V III?
13 A  I don't know.
14 Q  On the trade log that you described, would you have
15 been able to figure out if those names were Class V III?
16 A  I could have if I checked it, but I wouldn't have
17 paid attention to -- again, I just wasn't concerned about
18 individual names.
19     And, in fact, personally --
20 Q  Sorry?
21     MS. IMES: Go ahead.
22     THE WITNESS: Personally I almost would never open
23 the trade log. It would be an analyst on my team that would
24 actually be the one to open up the trade log, copy it into a
25 structuring model --

Page 75

1  BY MR. FELLER:
2  Q  But you had access to the final portfolio, right?
3  A  Oh, yes.
4  Q  And you looked at the final portfolio?
5  A  Well --
6  Q  Well, I shouldn't say final -- you looked at the
7  performing as the deal was being put together.
8  A  Actually, I would say that I didn't look at
9  individual names. I would look -- pay attention to
10 averages --
11     BY MS. SILVERSTEIN:
12 Q  What do you mean by averages?
13 A  Well, maybe the average spread or average price or
14 average rating.
15     BY MR. FELLER:
16 Q  But as a structurer, I mean didn't you care about
17 what the product was that Citi was selling?
18 A  Of course.
19 Q  Okay, and wouldn't part of assessing the quality of
20 a CDO be looking at the quality of the underlying portfolio?
21 A  Yes, yes, but --
22 Q  So wouldn't -- go ahead, please --
23 A  As a structurer, my primary goal among others I
24 would have, have a manager picking the assets because I was
25 not an expert in the assets. So I wouldn't know. They key

Page 76

1  was to have the manager be the expert and pick the assets.
2      Other roles would be, I have to tell you we focus a
3  lot on trying to get the first period cash flows right,
4  guessing to make sure that there was enough cash flows in the
5  deal so that the actual first period would actually pay as
6  expected. And there was a lot of actually detailed work in
7  calculating accrued interest and just making sure that it
8  happened properly.
9      As a structurer, I would go crazy keeping a
10 checklist of the 50 things or whatever it was that had to be
11 completed to complete a deal -- what documents had to be
12 done, and what you had to sign, what document, when things
13 had to be done. And I took most of my pride in having a
14 smooth pricing -- particularly a smooth closing.
15     I really did not want to have a surprise that all
16 of a sudden me missed something or miscalculated something.
17 We did not want surprises, and you know surprises were what
18 kept -- you know that's what I viewed as my key job, making a
19 smooth closing process.
20 Q  Who was -- was anyone at Citi responsible for
21 determining whether there would be a market for the CDO
22 liabilities and for the equity?
23 A  Yes, generally it would be syndicate -- or in the
24 case of Class V III, Donald had more input into what -- you
25 know who might buy the liabilities and what spreads.

Page 77

1  Q  Why would that be?
2  A  Just because he had experience with prior CLO^2s,
3  and --
4  Q  But what's the CDO secondary desk's involvement in
5  marketing CDO liabilities underwritten -- syndicate
6  offerings?
7  A  Very small, very small. In the case of a CDO^2
8  they might have some input as to who might be interested, but
9  really it was Shalabh's role -- Shalabh's role to sell new
10 issue -- to market new issue.
11     And it would be Shalabh's -- Shalabh's input on
12 assumed spreads and the liabilities would be critical to the
13 structuring team because you know we took -- models are only
14 based on assumptions, right? So what's the spread on the
15 asset going to be? What's the spread on the liabilities
16 going to be, and you know to get the spread on liabilities,
17 we would get that from Shalabh.
18 Q  Okay, would he provide feedback on the composition
19 of the portfolio -- the names in the portfolio?
20 A  You mean on Class V III now, or just in general?
21 Q  Well, on Class V III?
22 A  Well -- a CDO^2 that's harder to sell, you know he
23 would note that. He wouldn't necessarily have to break it --
24 be specific about you know why he thought the liability
25 spreads would be X. A key thing for a structurer would be to

20 (Pages 74 to 77)

Page 78

1  get his assumptions.
2      So if he thought he could sell A's at 200 or
3  whatever it was, you know whatever he said, he knows what the
4  deal is, what's in there, who the manager is and has an idea
5  of where he could sell it.
6      Q   But did Mr. Mehrish provide any feedback on the
7  actual underlying names?
8      A   Not that I recall.
9      Q   Did you ever ask Mr. Bhatt -- did you ever discuss
10 with Mr. Bhatt his criteria for choosing particular names for
11 Class V III?
12     A   No.
13     Q   Do you know if he had a preference for triggerless
14 versus trigger deals?
15     A   No.
16     Q   You don't know one way or the other?
17     A   I don't -- right.
18     Q   For that deal? Didn't that make a difference for
19 you in terms of structuring or no?
20     A   No.
21     Q   No. So whether -- just so I'm clear, whether the
22 reference assets have triggers or don't have triggers is
23 irrelevant from a structuring perspective for the outer CDO?
24     A   That's right.
25     Q   In a CDO^2?

Page 79

1      A   That's right.
2      Q   Why? Why is that irrelevant? I mean wouldn't it
3  affect the performance of the reference assets in particular
4  scenarios?
5      A   Well, really it boiled down to what the rating on
6  the security was. So if the CDO was a A, whether it's
7  triggerless -- whether it had triggers or not, if they both
8  had a A rating, then the structuring methodology would be the
9  same if they had the same rating, right? And then for the
10 rating agency's perspective, they would have the same rating
11 because if we have a triggerless deal, it probably has more
12 subordination. There has to be some offset. You can't just
13 take out triggers and say, okay, well, that's -- initial
14 reaction is that's riskier, but the offset is there's more
15 subordination, so there's pluses and minuses. There's an
16 offset. And at the end you end up with you know two -- two
17 different securities, one has triggers, one had doesn't. But
18 they're both rated A so they get treated the same.
19     Q   Right, but in terms of modeling how they're going
20 to perform, don't the triggers made a difference?
21     A   Actually not for modeling a structuring CDO. No,
22 it doesn't matter.
23     For example, a CDO was modeled actually the same as
24 a residential mortgage backed-bond. If they had the same
25 rating, pretty much be treated the same.

Page 80

1      Q   All right, give me a moment.
2          (SEC Exhibit No. 373 was marked for
3          identification.)
4      BY MR. FELLER:
5      Q   Let me ask you about a document that's being marked
6  as Exhibit No. 373. Exhibit No. 373 is a one-page E-mail and
7  12-page attachment, Bates ranges CITI18178869 through 8881.
8  It's from Mr. Stoker to Mr. Mehrish, Mr. Khan, Mr. Quintin,
9  Mr. Carosielli on November 22, 2006, subject: CSAC CDO^2.
10 And Mr. Stoker writes:
11     FYI here is a latest structure. This assumes all A
12 CDOs but I'd recommend more BBBs. I'm thinking the
13 president/constellation deals should be A and the rest should
14 be BBB. If okay, we'll restructure it.
15     And then it goes on. Do you recognize this E-mail?
16     A   No, I don't.
17     Q   Any reason to think you didn't write it?
18     A   No.
19     Q   Why -- why are you referring to the
20 president/constellation deals in this E-mail?
21     A   Well, what I wrote was -- and I guess this is the
22 structure that I'm sending over that we'd assumed all A CDOs,
23 that I was recommending more BBBs for some reason. I don't
24 know why I was suggesting that.
25     Then I was making the distinction that the

Page 81

1  president/constellation deals should be A and the rest should
2  be BBB. I don't recall why I wrote that. I would say the
3  president/constellation deals had more spread. They were
4  wider. So there was reason that we could maybe get the same
5  spread on the A tranche as on the BBB, possibly. I don't
6  remember writing this. I'm surprised actually I wrote it
7  because I generally wouldn't pay attention to what specific
8  names are in a deal.
9      Q   So there had been a few E-mails we've looked at or
10 documents we've looked at so far that have elicited from you
11 a response that you're surprised or wouldn't expect that you
12 would have written this, so what was different about this
13 deal that led you to write things or do things that you
14 wouldn't have expected yourself to do in other deals?
15     MS. IMES: Well, I don't know if he's -- he may --
16 I don't know if that's a correct summary of what he said.
17 But carry on.
18     THE WITNESS: Yeah, I'm not sure -- I'd have to
19 talk about what -- the other cases that I did surprising
20 things, but what was the question again? What -- I mean --
21     BY MR. FELLER:
22     Q   What was -- it seems like we've looked at several
23 E-mails where your reaction has been I'm surprised to see
24 this. I wouldn't expect myself to do this, but on this --
25 but the E-mails would appear to indicate that you did do

Page 82

1  that, with respect to Class V III.
2  And I'm wondering what about Class V III was
3  different than other deals where there seemed to have been
4  several steps that you wouldn't have expected yourself to
5  take but did?
6  A  I don't think there was necessarily anything
7  different about Class V III in particular. I mean in this
8  case, highlighting the president/constellations deals --
9  well, I mean maybe that was a broad enough group where --
10  still I wasn't looking at an individual name, but here I
11  guess I looked at a broad enough group and the spreads on
12  the -- is there -- let me look at more -- is there more back
13  here?
14  MS. IMES: The witness is looking at the attachment
15  to the E-mail.
16  (The witness reviewed the document.)
17  THE WITNESS: Well, I have to tell you I just don't
18  know why I necessarily wrote I'm thinking about the president
19  or constellation deals being -- that they should be A versus
20  the rest being BBB. Something I would pay attention to is
21  ratings of assets compared to the spread.
22  And if -- if the president/constellation spreads
23  were wider than say, non, president/constellations I would
24  have noticed that. And so maybe I felt like we could have
25  had a higher rated president or constellation deal -- because

Page 83

1  it's the same spread, that would benefit the structure
2  because we could have a higher rated asset.
3  BY MR. FELLER:
4  Q  Has anyone discussed with you putting -- how did
5  you know there would be president and constellation deals in
6  the portfolio?
7  A  I don't know. I don't know I'm -- I don't know. I
8  don't know. Typically what I would have done is seen it on a
9  trade log of some sort from Credit Suisse. In this
10  particular example, I don't know if -- I just don't know.
11  Q  Well, there wouldn't be a trade log yet, right? I
12  mean in the synthetic deal the trades weren't done until they
13  were all done at one time, essentially, isn't that right?
14  A  Yeah, that's a good point. Yeah, so maybe -- I
15  don't know maybe -- possibly that made it tougher for me in
16  that you know maybe there wasn't a trade log that came over.
17  Maybe -- still I would expect I would rely generally on a
18  credit -- on an e-mail or a spreadsheet from Credit Suisse.
19  Q  Had there been discussions about what the portfolio
20  would look like?
21  MS. IMES: As of November 22nd?
22  MR. FELLER: As of November 22nd?
23  THE WITNESS: Well, the key -- the key here is
24  actually the last page of the exhibit, this is how a
25  structurer like myself would look at it. In the last page of

Page 84

1  the exhibit, it shows a CDO --
2  BY MR. FELLER:
3  Q  This is Bates 18178881, go ahead.
4  A  This shows three different types of CDOs -- one
5  rated -- a CDO rated A-1, one rated A-2, one rated A-3. And
6  it shows the size -- the portion of -- the dollar amount of
7  each that is targeted -- in the spread that's targeted. So
8  really that would be the -- you know that right there is
9  exactly how I would think about it, or a structurer would
10  think about how many assets going into the deal.
11  Q  Right, but you --
12  A  And it might have been -- actually, the beginning
13  of a deal before a manager buys, that's a key discussion to
14  have with the manager, is you know what -- go through the
15  different ratings and what's the manager think is a
16  reasonable spread of where they can acquire assets. So
17  that's a critical, critical assumption in structuring a deal
18  from the very beginning.
19  All right, but it's -- that's the -- right, so in
20  a -- you know this is a CDO^2, but if it was a deal with RMB,
21  we'd have bunch more categories for subprime RBS or midprime
22  or prime -- and the different ratings and the spreads that
23  the manager could acquire assets.
24  And also how much of each asset a manager plans to
25  acquire. Now, actually there's a lot of give and take --

Page 85

1  there's a lot of back and forth on that a lot. I mean
2  maybe -- one natural reaction is manager, you know I could
3  work with a manager and say, hey, let's work on a CDO, you
4  could pick all prime mortgages or pick all Treasury bonds,
5  but that actually just doesn't work in a CDO if you buy all
6  Treasury bonds, right?
7  They're very safe, but where you structure it into
8  a CDO, you can't sell liabilities for a higher price than you
9  brought for the Treasury bonds. It just doesn't work.
10  So the mix of how -- of the assets that you choose
11  are very important. It's a mix as far as type, RBS or CDO
12  and rating.
13  Q  Does that give and take generally include specific
14  names?
15  A  No.
16  Q  For Class V III did it include -- did that give and
17  take include specific names?
18  A  No.
19  Q  All right, so I'm still left with the question of
20  how did you come to be referring to the inclusion of
21  president/constellation deals in modeling the Class V III
22  portfolio?
23  A  Could you repeat the question?
24  Q  The question all along is how did you come to be
25  referring to the president/constellation deals in your E-mail

22  (Pages 82 to 85)

Page 86

1  about the Class V III -- in an e-mail about modeling the CSAC
2  CDO^2?
3      A   Right, right --
4          MS. IMES:  Right, I thought he said he didn't
5  recall the E-mail, and he tried to sort of I guess be helpful
6  by speculating about what it might be, so are you just asking
7  him the same question over again?
8          MR. FELLER:  Well, now we --
9          MS. IMES:  Or does this have a different --
10         MR. FELLER:  We've been talking through some of the
11 process and I'm hoping that might refresh his recollection a
12 little about --
13         MS. IMES:  Okay, fair enough --
14         THE WITNESS:  Yeah, yeah, and by talking about it,
15 I think what I'm suggesting here is that maybe the equity
16 returns aren't good enough, actually and that we need to have
17 more BBB's.  The spreads on the A's that we're assuming
18 aren't enough, all right, so I'm suggesting well, actually
19 maybe we should do -- leave them -- you know we need to
20 get -- I'm thinking we need to add more spread to this
21 deal -- we need to find BBB-rated CDOs.  And if we do that,
22 then we'd have to restructure the deal because it's BBB CDOs
23 are riskier, so we're going to have more subordination in the
24 CDOs we create.  And I'm thinking that that might be a
25 reasonable thing to do to look at a structure like that.

Page 87

1  The question is -- and then -- but the
2  president/constellation deals, they have -- if they have a
3  wider spread, then we don't necessarily need to make them BBB
4  because they already have a wide enough spread.
5          BY MR. FELLER:
6      Q   But how did you know they were going to be in
7  the -- constellations, excuse me -- in the portfolio?
8      A   Right, I suppose I must have seen a list somewhere.
9          BY MS. SILVERSTEIN:
10     Q   What was your understanding of what a president
11 deal was?
12     A   Can I actually say -- I'm actually not even sure
13 like that I know how much is in there.  But to the extent
14 they are, they could be a notch higher in rating because they
15 have more spread.
16         I'm sorry?
17     Q   What was your understanding of what a president's
18 deal was?
19     A   It's just a CDO with no IC or OC triggers.
20     Q   What was the significance of the term president to
21 the deal?
22     A   Oh, well, my understanding is that -- I believe
23 they're both Magnetar deals, or deals where Magnetar bought
24 equity, and they named them.  Magnetar chose the name.  They
25 named them after a president or after a constellation.

Page 88

1      Q   And how did you learn that?
2      A   I don't remember -- I don't remember precisely.
3      Q   Did you learn it from looking at document?
4      A   No, I wouldn't have seen a document on --
5      Q   Did you learn it from someone giving you that
6  information orally?
7      A   I suppose that's the only other way I would have
8  been able to learn it.
9          MS. IMES:  He's asking you if you recall how you
10 learned it, and he's trying to refresh your recollection by
11 suggesting possibilities.  And he's now asking you, did
12 someone tell you that?
13         THE WITNESS:  No, I don't recall that.
14         BY MS. SILVERSTEIN:
15     Q   Do you remember whether any of the president deal
16 ended up in Class V III?
17     A   I don't know.
18     Q   What did you know whether any of the constellation
19 deals ended up in Class V III?
20     A   I don't know
21              (SEC Exhibit No. 374 was marked for
22              identification.)
23         BY MR. FELLER:
24     Q   Let me ask you about another document that's being
25 marked as Exhibit No. 374.  Exhibit No. 374 is a one-page

Page 89

1  E-mail, Bates CITI18194897.  E-mail exchange on December 1,
2  2006 between Mr. Stoker and Mr. Quintin, with others copied,
3  subject, CSAC wants higher fees.  And you write to Mr.
4  Quintin, Mr. Mehrish, Mr. Carosielli and Mr. Troszczynski:
5          They want 20 to 30 bs -- is that basis points?
6      A   BPS -- yes.
7      Q   -- running and 25 bps upfront and 5 percent
8  discount on their equity.
9      A   Yes.
10     Q   They want the fees even if we make the deal static
11 and reduce their equity purchase size.  I don't think we
12 should pay them.  In fact, I think we should just pay them to
13 send bid lists to the street, though maybe Niblo or someone
14 would be better at that, then we market the deal as static.
15 I don't see how having CSAC managing the deal can be worth
16 their fee.
17         Do you recall this E-mail?
18     A   Vaguely.
19     Q   Okay, what do you remember about it?
20     A   Well, I remember this is part of the back and forth
21 and around in circles of do we have a manager, not have a
22 manager, what role does a manager play?  Do they just pick
23 the assets and not manage it going -- and not have the
24 ability to change the portfolio after?  I know that -- and
25 back and forth on what the manager fees should be.

Page 90

1  Q  Okay, what does that mean I think we should just
2  pay them to send bid lists to the street?
3  A  Yeah. Well, if it was a deal where Credit Suisse
4  wasn't involved, it was just a static deal, like a Goldman
5  Sachs abacus deal or something like that, then that would
6  actually help to put the -- to execute the transactions in a
7  bunch assets, Credit Suisse could call around to dealers and
8  execute on behalf of Citigroup.
9  Q  Why would Credit Suisse need to be involved in
10 that? Why couldn't Citigroup do that?
11 A  Dealers would give -- might prefer to work with an
12 investor like Credit Suisse more so than another dealer like
13 Citibank.
14 Q  All right, there was a lot you said that I'm not
15 sure I'm clear on, so I'm going to have to just try to make
16 sure I understand the answer you just gave. You mentioned
17 the abacus deals, the Goldman Sachs abacus deals --
18 A  Right.
19 Q  And I think you said they were -- what did you say
20 about them, that they were static deals? Or --
21 A  I think that's all I said -- I said, yeah, they
22 were static --
23 Q  Okay, what did you mean by that?
24 A  There's no manager on them.
25 Q  Okay, okay, so what would be the role of someone

Page 91

1  like Credit Suisse in a deal with no manager?
2  A  In this case I was suggesting --
3      MS. IMES: Just to clarify, speaking about a static
4  deal?
5      MR. FELLER: Yeah, I mean he analogized it to an
6  abacus deal, and I'm just trying to understand --
7      MS. IMES: Well, I want to make sure he's talking
8  about the same thing you're talking about, okay?
9      MR. FELLER: Sure, sure.
10     BY MR. FELLER:
11 Q  On a static deal, generally, what would be the role
12 of a manager?
13 A  Not -- there is no manager.
14 Q  Okay, or of someone in Credit Suisse's position, an
15 outside -- you've got your underwriter, right? Or --
16 A  Dealer.
17 Q  -- dealer.
18 A  Mm-hmm.
19 Q  And then does the dealer select the portfolio on a
20 static deal?
21 A  Well, I never worked on one.
22 Q  Okay.
23 A  Yeah, in a static deal, there is no manager, so
24 it's some give and take between investors and whoever is on
25 the other side, the dealer.

Page 92

1  Q  On the portfolio?
2  A  That's right.
3  Q  Now, specifically to this E-mail -- you say we
4  could market the deal as static but have CSAC send bid list
5  to the street. What is the role -- I just don't understand,
6  what is the role you're contemplating for CSAC?
7  A  Well, there would actually be two very separate
8  functions --
9  Q  Okay.
10 A  All right, we have a static deal with no manager,
11 marketed as such, and then separately to help get the risk,
12 right? If Donald Quintin or Brian Carosielli calls up Morgan
13 Stanley and Goldman Sachs to execute a trade, you know they
14 don't give him the time of day because he's a competitor,
15 right? But Credit Suisse could help with that.
16 Q  Okay, all right. But you write they want the fees
17 even if we make the deal static, what fees would they be
18 asking for?
19 A  Yeah, I guess there was a distinction in static.
20 Well, they could have a smaller role where they pick the
21 initial portfolio, right, so they're work is done. At
22 closing, they're done. All right, they picked it. They put
23 in the work. They invested the time. The picked the assets
24 they want, and then they can't trade any more. So they
25 actually don't have to monitor it.

Page 93

1  Q  Okay.
2  A  Whereas in a regular, fully managed deal, every day
3  they have to think about their whole portfolio and do you
4  hold it -- you know every single bond, do you hold it, buy
5  it -- hold it, sell it and what -- if you're going to sell
6  it, what are you going to buy to replace it?
7  Q  Okay, so was that what you were -- was that the
8  type of deal you were referring to in this E-mail? On where
9  Credit Suisse would select the portfolio and then it would be
10 static thereafter?
11 A  Well --
12 Q  Strike the question as I asked it. Was that what
13 you were discussing during this time period, early December
14 2006, the possibility that Class V III would look like that,
15 that Credit Suisse would pick the portfolio and then not
16 actively manage the deal after that?
17 A  There were days -- you know maybe this was the day
18 when we considered a smaller role, that's right. I would say
19 it went around in circles from no manager, to full manager --
20 no manager, static portfolio, manager picks the initial
21 assets and it's static thereafter, to just full regular
22 manager for the life of the transaction.
23 Q  And what model did you settle on?
24 A  Full manager.
25 Q  What was the basis of that decision?

24 (Pages 90 to 93)

Page 122

1  Q  Mr. Pinniger worked with you, right?
2  A  Yes.
3     BY MS. SILVERSTEIN:
4  Q  And Samir is Mr. Bhatt?
5  A  Yes.
6  Q  And would people from the structuring group meet
7  with potential investors in CDOs?
8  A  Yes.
9  Q  In particular did people from structuring group
10 meet with potential investors in Class V III?
11 A  Yes, for example, Keith met -- Keith and Samir met
12 with Investech.
13 Q  Mr. Pinniger writes, Samir quoted the real return
14 before adjustments for "fees". And then he says, I must
15 admit a lot of people have quoted what they think is
16 off-market size and return given the spread. Do you know
17 what he's talking about there?
18 A  Actually, well fees could have been structuring
19 fees. I don't know that would -- I don't know why the equity
20 return would ever be shown without a structuring fee.
21 Q  Without you said?
22 A  Without -- without having the structuring fee in.
23 Q  Were you getting investor feedback that the equity
24 appeared generous on Class V III --
25    MS. IMES: On Class V III --

Page 123

1     THE WITNESS: Actually I don't remember that. I
2  don't remember the equity being so easy to sell. Really I
3  just don't remember.
4     BY MR. FELLER:
5  Q  What does that mean a lot of people have quoted
6  what they think is off-market size and return given the
7  spread? Does that refresh your recollection at all as to any
8  feedback you were getting on the Class V III?
9  A  It actually doesn't.
10 Q  Who is the Mike that Mr. Pinniger is referring to,
11 this is starting to leave some questions in Mike's head?
12 A  I don't know there was a Mike at Credit Suisse --
13 Mike Shackleford who worked on -- picking up mortgages. I
14 don't know if Mike was -- I don't know if there was a Mike at
15 Investech or not.
16 Q  When Mr. Mehrish writes, don't they know we have
17 upside here. Do you know what the upside he's referring to
18 is?
19 A  Actually, I don't.
20 Q  Was there any adjustment to the size or return of
21 the Class V III equity on the basis of the amount of money
22 Citi would make as the counter party -- the CDS counter
23 party?
24 A  I don't recall an adjustment. There was a 3 basis
25 point fee for being the spot counter party. It was a range,

Page 124

1  but usually about 3 basis points. That's all I remember.
2  Q  I'm just -- I'm trying to figure out what -- how to
3  tie together what Mr. Pinniger says about people have quoted
4  what they think is off-market size in return.
5     Mr. Mehrish's comment about upside and how --
6  without -- I'm trying to figure out what the upside is --
7  what -- why were -- do you have any insight on why people
8  were suggesting that there was off market size or return on
9  Class V III liabilities or equity? I don't know what's
10 being referred to in this E-mail.
11 A  Actually, I don't.
12    MS. IMES: Do you have any recollection of this
13 E-mail whatsoever?
14    THE WITNESS: No.
15    BY MR. FELLER:
16 Q  Right, no, I'm not necessarily referring to
17 specifically to the E-mail -- I'm just talking about --
18    MS. IMES: Right, I just want that to be clear
19 because I don't think that question was asked, to the extent
20 he's responding and trying to be helpful, it shouldn't be
21 perceived to be a recollection of this E-mail if he doesn't
22 remember the E-mail.
23    BY MR. FELLER:
24 Q  No, I'm trying to just recall the feedback you were
25 getting about the deal you were working on at the time.

Page 125

1  By late January 2007, were you involved in any
2  discussions of whether the secondary desk could make money o
3  the reference assets that it shorted into Class V III.
4  A  If they could make money? I wouldn't have talked
5  about what might have happened or -- you know but to the
6  extent -- to the extent the trading desk had actually
7  realized some money, and that ended up being what I was
8  interested in as far as trying to subsidize the structures --
9  to the extent structuring fees were eroded by selling CDOs at
10 a lower price, and if I had heard that -- you know the market
11 maybe moved in a week, I don't know -- or probably not that
12 much in a week, really, but -- over a period of time, a
13 couple months -- if I heard the trading desk might have made
14 some money, I might have guessed that I'd put together this
15 analysis at some point down the road guessing at how much
16 they might have made.
17 Q  Were you involved at all in the drafting of the
18 flip book for Class V III?
19 A  Not personally.
20 Q  No.
21 A  No, not personally.
22 Q  Okay, who handled that?
23 A  Maybe one of the analysts, either Belal or Marek.
24 Q  I guess when I said flip book, do you refer to --
25 what is the flip book? I used the term but you go ahead --

32 (Pages 122 to 125)

Page 126

1  A  Yeah, I used it -- I use the same term, for
2  marketing materials that are made in PowerPoint, put in PDF
3  form, it's a slide presentation about 20 or 30 pages.
4  Q  Are there separate presentations for equity and
5  debt?
6  A  No.
7  Q  Is there something known as the equity book?
8  A  No.
9  Q  All right, well, let me ask you quickly about a
10 document --
11 A  Okay, say, six years ago there was differences in
12 equity and debt and equity books -- six years ago -- in like
13 say, 2002. But not the years -- not in more recent years.
14         BY MS. SILVERSTEIN:
15 Q  With respect to the flip book, did you review that
16 book or approve that book before it was finalized?
17 A  I did.
18 Q  In other words, did someone have to get your
19 approval before it could be finalized?
20         MS. IMES: For Class V III or in general?
21         MS. SILVERSTEIN: Yes, Class V III.
22         THE WITNESS: Not -- there was no real formal
23 sign-off, where I signed and said, okay, yeah, I checked it.
24 You know but as I guess the head of the structuring team,
25 that was part of my responsibilities.

Page 127

1  BY MS. SILVERSTEIN:
2  Q  Is to review it and make sure it was --
3  A  Yeah, to review the analysts and associates work,
4  working on the deal, whatever work they did, I was
5  responsible for reviewing it.
6  Q  And making sure the information was accurate?
7  A  Yeah.
8  Q  And included all the information that you
9  understood was necessary to be included?
10 A  That's right.
11         (SEC Exhibit No. 379 was marked for
12         identification.)
13         BY MR. FELLER:
14 Q  Well, let me give you Exhibit No. 379. Exhibit No.
15 379 is a two-page E-mail and 17-page attachment, Bates range
16 CITI17296037 through 055. I'll note that you're not copied
17 on the E-mail.
18 A  Okay.
19 Q  The E-mail is an exchange between Todd Kornfeld at
20 Credit Suisse, Frank Li, Samir Bhatt, Keith Pinniger, Wenha
21 Pan, and a couple others.
22 A  Okay.
23 Q  What look to be at least one outside counsel. The
24 subject of the E-mail chain is Class V Funding III equity
25 book. Looking at the attachment, is this the flip book that

Page 128

1  you were talking about?
2  A  Yes.
3         MS. IMES: Well, you mean as being the one that he
4  reviewed or just generally?
5         BY MR. FELLER:
6  Q  Is this in the form that you're talking about -- I
7  don't mean a final version of it. I mean --
8  A  Yeah, this style, yes.
9  Q  This is a flip book?
10 A  Mm-hmm.
11 Q  Okay, why are they referring to it as an equity
12 book? I'm just curious because you said you didn't think
13 they did separate equity and debt books?
14 A  Yeah, yeah, I didn't think so -- I guess -- I think
15 maybe two pages were different. Maybe an equity book has a
16 page that shows equity returns, and the debt book shows kind
17 of yield breaks, how many defaults can you have before the
18 particular tranche loses the dollar principal.
19 Q  Okay, let me direct your attention to Bates 041.
20 A  Yeah.
21 Q  There's some writing here -- it's a page titled
22 indicative transaction structure. And the notes which appear
23 to be from Mr. Kornfeld and Mr. Bhatt, according to the
24 E-mail, say: We don't know what Citi is doing on its side --
25 this implies some kind of hedge -- and they've circled the

Page 129

1  synthetic reference portfolio.
2         Was it ever communicated to you that Credit Suisse
3  had raised an issue with this diagram for the flip book?
4  A  No.
5  Q  Do you know if anyone responded to Credit Suisse's
6  point here?
7  A  I don't know.
8  Q  Do you know if this was changed in the final
9  version of the flip book?
10 A  I don't know.
11 Q  Did anyone from Credit Suisse ask you what Citi wa
12 doing with its short interests in the collateral of Class V
13 III?
14 A  No.
15 Q  Mr. Bhatt never asked you?
16 A  No.
17 Q  Did you ever have discussions about Class V III
18 with anyone else at Credit Suisse?
19 A  During the whole deal process I spoke to John Popp
20 briefly once or twice, and then after the deal was done,
21 actually Andrew Marshak, who was another senior person at
22 Credit Suisse, tended to work on CLOs, called me in to say
23 that, hey, he heard about a Class V IV, a bespoke trade,
24 somehow and that he thought that they should get paid
25 $400,000 for having picked those assets.

33 (Pages 126 to 129)

Page 130

1  Q  Had they picked the assets?
2  A  Well, Class V III and Class V IV were -- well,
3  Class V IV was bespoke, of course, but it was actually pretty
4  much identical portfolios, just a different tranche, right.
5  Instead of A tranche that was in Class V III, it was all the
6  same deals -- whether there was a hundred -- do you know if
7  it was a hundred, I don't know -- the same hundred names, but
8  instead of picking the A tranche, picked the AA tranche.
9      BY MS. SILVERSTEIN:
10 Q  What did you say in response?
11 A  To?
12 Q  Mr. Marshak?
13 A  I said let me check on it. And actually I think my
14 next step was to go get approvals to send them $400,000
15 because they had picked the portfolio.
16 Q  And did you get those approvals?
17 A  Yeah.
18 Q  And Credit Suisse paid that amount?
19 A  Yes.
20 Q  Who gave the approval?
21 A  I don't recall.
22 Q  From whom did you seek the approval?
23 A  I don't recall. It would have been either Darius
24 or Shalabh.
25      BY MR. FELLER:

Page 131

1  Q  Did you have any discussions with Ambac -- anyone
2  at Ambac in connection with Class V III?
3      MS. IMES: III?
4      MR. FELLER: III.
5      THE WITNESS: Yeah, I think so. I spoke to David
6  Salz. I spoke to David Salz at Ambac. More frequently on
7  prior deals I'd worked on in 2006, and I'd built a pretty
8  good relationship and then he probably started to work with
9  Keith more to the extent he had any comments, but sure I
10 spoke with him -- regarding what I can't remember
11 specifically.
12 Q  Did he ask you any questions about -- did you
13 discuss with Mr. Salz how the portfolio was chosen for Class
14 V III?
15 A  No.
16 Q  Not at all?
17 A  Well, I don't think I would have. I don't remember
18 it. If I don't remember it, I don't see why I would have.
19 It was just Credit Suisse is the managers. That's like every
20 other deal I worked on, the manager picked the portfolio. I
21 don't see why it would have come up.
22     They key for investors was to see what's the list,
23 you know so -- Ambac would be very interested to see you know
24 have us send them securities selected, and then lots of great
25 detail on every single security. So Samir was very busy.

Page 132

1  He spent a lot of time sending very detailed
2  analysis and very detailed information about each security he
3  chose.
4      BY MS. SILVERSTEIN:
5  Q  Were you able to provide the list to Mr. Salz?
6  A  I don't think I -- Mr. Salz got whatever
7  information he asked for. I don't remember him specifically
8  asking me for a list so I don't remember sending it, but --
9  Q  You don't remember one way or the other? Or to
10 your recollection, you didn't send it to him?
11 A  I don't remember one way or the other.
12     BY MR. FELLER:
13 Q  Did Mr. Salz ask about the -- ask anything about
14 the trading desk's interest in the collateral in Class V III?
15 A  Not that I remember.
16 Q  Did you have any discussions with him as to whether
17 the trading desk was holding its shorts or intermediating
18 them?
19 A  None.
20 Q  Did you know at the time of your discussions with
21 Mr. Salz whether the trading desk was holding its shorts or
22 had covered them?
23 A  No.
24 Q  And that's -- sorry just to be clear in connection
25 with your discussions with Mr. Salz on Class V III?

Page 133

1  A  Right, I wouldn't know whether the trading desk
2  hedged their shorts -- you know what they had hedged and
3  when. I just wouldn't know.
4  Q  Did the structuring desk end up getting any of
5  the -- of any profit, get a portion of any profits that the
6  secondary desk made by shorting assets into Class V III?
7      MS. IMES: You mean credited to them?
8      MR. FELLER: Yes.
9      MS. IMES: Thank you.
10     THE WITNESS: I actually don't know. I prepared
11 these couple analyses -- capping income at like maximum
12 benefit, but I just sent it out to Darius and that was at his
13 level to talk about that. I don't know what happened.
14     BY MR. FELLER:
15 Q  Put it another way, was there any advantage to the
16 structuring desk to doing a synthetic deal where Citi was the
17 CDS counter party versus doing a cash deal?
18 A  Cash CDO^2 versus a synthetic CDO^2?
19 Q  Sure.
20 A  Pretty much the same. The main difference would be
21 the warehouse risk. Synthetic was -- I viewed them as great.
22 I was -- as the market became more volatile, so I now became
23 very worried about warehouse risk. And you know all our
24 models are based on assumptions of where can we put our
25 assets and where can we sell the CDO liabilities. And as the

34 (Pages 130 to 133)

Page 179

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:         )
                          )  File No. HO-10740
CITIGROUP, INC.           )

WITNESS:  Brian Stoker

PAGES:    179 through 342

PLACE:    Securities and Exchange Commission

          100 F Street, N.E.

          Suite 1590, Room 7

          Washington, D.C. 20549

DATE:     Thursday, February 17, 2011


The above-entitled matter came on for hearing, pursuant to notice, at 9:36 a.m.


Diversified Reporting Services, Inc.

(202) 467-9200

Page 196

1  MR. FELLER: So let me ask you about the next
2  exhibit, which is going to be 563. I should tell you on the
3  record that with respect to this exhibit, I think we have to
4  come an understanding with counsel that no -- that proceeding with
5  questions on this -- by allowing the witness to answer questions
6  with respect to this exhibit, they are not giving any sort of
7  subject matter waiver, does that accurately reflect the
8  discussion?
9  MS. BUERGEL: That is fair, yes. We will allow the
10 exhibit to be used in testimony today with the understanding
11 that there is no subject matter waiver to the extent that this
12 document is under privilege.
13  MS. IMES: So, Ms. Buergel, do you need to see it
14 before we commence the questioning?
15  MS. BUERGEL: No.
16  MS. IMES: You already -- okay.
17  BY MR. FELLER:
18  Q  So, Exhibit 563 is an one page e-mail with a 26-page
19 attachment, Bates range CITI-30445813 through 5839. It is an
20 e-mail from Keith Pinniger to Elizabeth Hardin, copying Mr.
21 Stoker on December 8, 2006 and the subject is "Ridgeway Court
22 II, Citi markup for red."
23  And Mr. Pinniger writes, "Elizabeth, hope all is
24 well on your end. I know you have been waiting for baited
25 breath for us to send you some Ridgeway Court II updates.

Page 197

1  Attached is part one of a markup to the Ridgeway I OM, part two
2  in a separate e-mail. Also, I am attaching certain riders in a
3  Word document. They're about 55 percent ramped now and will
4  likely launch the deal when they are 75 to 80 percent ramped.
5  No need to have the team working all nighters on an update, but
6  we can probably start in a few weeks."
7  Who is Elizabeth Hardin?
8  A  She was deal counsel at Milbank.
9  MS. IMES: Could I just note Mr. Stoker has not read
10 the document. I assume you will direct him if you want him to
11 read it?
12  MR. FELLER: Yes. So, after you have had a chance
13 to just look through it.
14  (The witness examined the document.)
15  BY MR. FELLER:
16  Q  Do you know what this document is?
17  A  Yes, this is -- Keith marked up the Ridgeway I --
18  Q  Okay.
19  A  -- offering circular and was making some changes to
20 get it ready to be the preliminary Ridgeway II offering
21 circular.
22  Q  Do you have any memory of this document?
23  A  No. These markups? No, I don't.
24  Q  Okay, more broadly, did you work with Mr. Pinniger
25 on the Ridgeway Court preliminary offering memorandum, Ridgeway

Page 198

1  Court II?
2  A  I don't recall that I did. Keith was working
3  more -- on this deal, he was working more by himself. I helped at
4  the beginning of Ridgeway II and the signing up Credit Suisse,
5  worked on the engagement letter. Keith started to get more and
6  more involved and like took over as deal manager. I helped, to
7  the extent he had a question or a problem, I would get involved,
8  but he did this on his own.
9  Q  Can you explain to me a little more about the -- I
10 think you said in your last testimony that Mr. Pinniger didn't
11 formally report to you?
12  A  Yes.
13  Q  Specifically on Ridgeway II, what was the
14 relationship between you two in terms of the deal, who was
15 responsible for what? How did your relationship function with
16 respect to this deal?
17  A  I would say, like I just told you, Keith focused on
18 the documents and worked with an analyst to do -- the analyst
19 would use Excel to structure the deal and work with rating
20 agencies. Keith would work with all the different people
21 involved, rating agencies, investors, to the extent they had
22 structuring questions, lawyers like Milbank and internal Citi
23 lawyers and put together the deal documents. I was involved to
24 the extent there was a problem or a question.
25  Q  Would he typically check with you before sending

Page 199

1  something out externally?
2  MS. IMES: You mean on this deal or more broadly?
3  MR. FELLER: On this deal.
4  THE WITNESS: Typically not.
5  BY MR. FELLER:
6  Q  I guess what I am trying to figure out is were you
7  sort of nominally the lead the structurer on this deal and then
8  delegating to him? From your answer last time about the
9  reporting structure, I don't quite understand the relationship.
10  A  Yes, I would say it is fair to say I was nominally
11 the lead structurer because I signed up Credit Suisse and had
12 worked with them on a prior deal, but I was -- day to day, I had
13 very little involvement.
14  Q  So who was responsible for putting together the
15 preliminary offering memorandum in December of 2006?
16  A  Well, Keith worked on it hard. I would say outside
17 counsel, Elizabeth Thesio was heavily involved as the lawyer.
18 Internal Citigroup lawyers would be involved and, in fact, would
19 have comment. Big investors like Ambac would probably have had
20 comments by then. So together all those people were
21 responsible.
22  Q  Anyone else from the structuring team other than Mr.
23 Pinniger and you to some extent?
24  MS. IMES: Well, you said "and you to some extent,"
25 you are now talking about involvement on the preliminary

Page 200

1  offering memorandum, right?
2  MR. FELLER: Yes.
3  THE WITNESS: Yes, I would say to a very small
4  extent, if any, actually. I don't remember looking at that
5  document. To the extent Keith had a question, I would have
6  spoken to him about it. I had a very, very small role.
7  BY MR. FELLER:
8  Q  Okay, so where would Mr. Pinniger have -- well, first
9  of all, do you recognize the handwriting on Exhibit 563?
10  A  No, I don't.
11  Q  Is it your handwriting?
12  A  No.
13  Q  Would you recognize Mr. Pinniger's handwriting?
14  A  No, I would not recognize it.
15  Q  Do you know if it is Mr. Pinniger's handwriting?
16  A  I don't know but I would assume. I would assume
17  that he sent in the e-mail with these comments. That is what he
18  says in the e-mail, so I would assume it is his.
19  Q  Where would Mr. Pinniger have gotten these changes
20  from, the content of his changes?
21  A  Most of these changes I think are he is making this
22  deal, taking out the final numbers from Ridgeway I and putting
23  in brackets other comments. I don't know where he got them.
24  Q  So the just putting in brackets, is that just to
25  make it a blank template for the next deal?

Page 201

1  A  That's right.
2  MS. IMES: Maybe, why don't you reference the pages
3  where you see the brackets so it is clear what you are talking
4  about as an example.
5  THE WITNESS: Sure, on the cover, update in
6  brackets, the notional amounts of each tranche. On page one,
7  the counter-party table, the trustee or issuer name, brackets.
8  BY MR. FELLER:
9  Q  Right, because that hadn't been determined yet, is
10  that right?
11  A  That's right.
12  Q  Okay. All right, so then turn to the Bates number
13  824.
14  A  Okay.
15  Q  Do you see where I'm looking?
16  A  I do.
17  Q  It starts on the prior page, 823. This says -- it is
18  a part of the box labeled, "Eligible Collateral Debt
19  Securities," that's one of the tables you were talking about
20  earlier?
21  A  No, that is not really a table but it is a list that
22  I was talking about, yes.
23  Q  Okay. So, he has got a couple of notes in here or
24  there are a couple of notes in here next to a couple -- so, it
25  looks like this is broken up into lists under sub-B, types of

Page 202

1  securities that are eligible, and sub-C, types of securities
2  that are not eligible, am I reading that right?
3  A  Yes.
4  Q  Okay. And under sub-B, the ones that are eligible,
5  you circled a couple and said, "Moved to excluded." And then in
6  sub-C, the excluded, he has added in a couple of names with a
7  line. One of them is a combination security, so it says, 24, a
8  combination security; 25, an index security; and 26, a corporate
9  synthetic security."
10  Do you know where Mr. Pinniger would have gotten
11  those additional collateral types?
12  A  No, I don't know.
13  Q  Do you know if you previously in your deal documents
14  excluded an index security? Sorry, included as either an
15  eligible or ineligible security what is listed as 25, "an index
16  security"?
17  A  I can't recall.
18  Q  So, would Mr. Pinniger put something -- put this
19  constraint in on his own or would you expect it to be driven by
20  an investor, for instance, or a rating agency?
21  MS. IMES: I feel like we are in the zone of
22  complete speculation here but if he could based on his
23  experience answer that question, if that is what you are asking
24  him?
25  MR. FELLER: That is what I am asking.

Page 203

1  THE WITNESS: I don't know if he got it from an
2  investor or a rating agency or he just decided that it made
3  sense to him.
4  BY MR. FELLER:
5  Q  As a structurer, did you have any incentive to
6  exclude certain types of securities?
7  A  No, but it makes me notice that he wanted to
8  move -- exclude time share security and equipment leasing
9  security, I can't remember anybody asking about those. I don't
10  know if -- I can remember anybody asking about any of these type
11  of securities really. So, I think it is reasonable to think
12  maybe he excluded some just because he thought they made sense
13  it made sense to do that. I don't know that that is what
14  happened.
15  Q  As a structurer, did you ever on your own try to add
16  to the ineligible collateral list because it made sense? I am
17  just not sure as a structure why you would want to make your
18  life harder by excluding securities?
19  A  I can't recall if I added to the not eligible list.
20  It didn't make our life harder at all. I can't recall if I did
21  that.
22  Q  Okay. Let me direct your attention to the very last
23  page of the exhibit.
24  A  Okay.
25  MS. IMES: That is a blank page. What is the Bates?

Page 284

1    A    I don't recall. It just wasn't relevant to my job
2    as a structurer.
3    Q    You didn't have any understanding one way or the
4    other?
5    A    Not that I recall, no.
6         THE WITNESS: Can I have a break for just a moment?
7         MR. FELLER: Yeah, sure.
8         (A brief recess was taken.)
9         MR. FELLER: We are back on the record after a short
10   break, during which there was no discussion of substance between
11   the staff and Mr. Stoker or his counsel.
12   Is that correct?
13        THE WITNESS: Yes.
14        MS. IMES: We just need to correct something for the
15   record. You had asked Mr. Stoker how much Merrill Lynch offered
16   him, and he said 2.5 million.
17   And you have a better recollection of what it was?
18        THE WITNESS: Yeah. Two million, 2.0 million.
19        BY MR. FELLER:
20   Q    So Citigroup, in fact, exceeded the offer?
21   A    They did.
22   Q    What did you tell Citigroup that Merrill Lynch
23   offered you?
24   A    Two and a half million.
25   Q    Who did you tell that to?

Page 285

1    A    Darius Grant.
2    Q    Did you ever tell Mr. Grant that you had told him a
3    higher figure that Merrill had actually offered you?
4    A    No.
5         MR. FELLER: Can we go off the record for a second?
6         (A brief recess was taken.)
7         MR. FELLER: We're back on the record after a short
8    break, during which there was no discussion of substance between the
9    staff and Mr. Stoker or his counsel.
10   Is that correct?
11        MS. IMES: Correct.
12        MR. FELLER: Great. Thanks.
13        BY MR. FELLER:
14   Q    Let me give you what's previously been marked as
15   Exhibit 533, which is the offering memorandum dated February 26,
16   2007 for the Class V Funding III CDO.
17   A    Okay.
18   Q    Let me direct your attention to page 88. And at the
19   top of the page is a paragraph titled, "Initial CDS Agreement."
20   A    Yes.
21   Q    Okay. The first paragraph -- first sentence, I'm
22   sorry -- reads, "On the closing date, the issuer and the initial
23   CDS asset counter party will enter into a master agreement, as
24   supplemented by a schedule and pay-as-you-go confirmations,
25   evidencing CDS assets having a net aggregate adjusted notional

Page 286

1    amount of approximately U.S. $869,256,000, which it calls the
2    initial CDS agreement."
3         Stopping there, who is the issuer under -- in this
4    document?
5    A    Ridgeway II -- I mean, I'm sorry, Class V III.
6    Q    And who's the initial CDS asset counter party?
7    A    Citigroup or some -- Citibank.
8    Q    And then if you skip the next sentence, or the next
9    two sentences, to the sentence that starts, "The initial CDS
10   asset counter party."
11   A    Yes.
12   Q    Do you see that?
13   A    Yes.
14   Q    It says, "The initial CDS asset counter party may
15   provide CDS assets as an intermediary, with matching offsetting
16   positions requested by the manager, or may provide CDS assets
17   alone without any offsetting positions. The initial" -- sorry.
18   I'll just stop there.
19   At the time -- sorry. This covers something from last
20   time. But you worked on the Class V Funding III offering
21   memorandum. Right?
22   A    Yes.
23   Q    Exhibit -- I forget the exhibit number. I'm sorry.
24   It's on yours.
25   A    Yes.

Page 287

1    Q    533.
2    A    Yes.
3    Q    Okay. At the time you were working on the document,
4    did you make any effort to determine the extent to which
5    Citigroup was naked short any of the assets?
6    A    Not that I -- no. Not that I recall.
7    Q    Did you make any effort to determine Citigroup's
8    trading desk's intent with respect to any naked short positions
9    it did have?
10   A    Intent as --
11   Q    As to whether they intended to keep them or act as
12   an intermediary on those assets?
13        MS. IMES: Assuming they had such an intent at this
14   time?
15        MR. FELLER: I'm just asking if he did try to
16   determine whether they had an intent.
17        THE WITNESS: No. No, not that I recall.
18        BY MR. FELLER:
19   Q    So the sentence says that they "may provide CDS
20   assets as an intermediary, with matching offsetting positions
21   ... or may provide CDS assets alone without any offsetting
22   positions."
23        Did you make any effort to determine the mix of
24   those two types of positions?
25   A    Not that I recall.

28 (Pages 284 to 287)

Page 288

1  Q  Did anyone else who was involved in writing the
2  documents?
3  A  Not that I recall.
4     BY MR. SILVERSTEIN:
5  Q  What was the basis for that statement in the
6  offering memo?
7  A  I'm sorry?
8  Q  What was the basis for the statement that: "The
9  initial CDS asset counter party may provide CDS assets as an
10 intermediary, with matching offsetting positions requested by
11 the manager, or may provide CDS assets alone without any
12 offsetting positions"?
13 A  I don't know. I don't recall working on this
14 section. I don't know if this is Milbank's language or internal
15 Citigroup counsel.
16 Q  Okay. Well, did you read it before the document
17 became finalized?
18 A  I'm not -- I don't -- I don't remember reading it.
19 Q  Was one of your responsibilities as the structurer
20 for the Class V Funding III transaction to prepare the offering
21 documents?
22 A  I was involved, involved in preparing them. Was I
23 ultimately responsible? Many people were involved.
24 Q  And what was your responsibility with respect to
25 this document?

Page 289

1  A  The focus of the structurings desk responsibility
2  would be on getting numbers accurate -- for example, this one
3  number, 869 million, making that accurate, with a focus on the
4  table at the beginning, tranche sizes, ratings, spreads,
5  priority payments. This would be more of a legal issue for the
6  lawyers either for Milbank, external lawyers, or internal to
7  work out what language to put in here.
8  Q  And from where would the lawyers get the information
9  to make that statement about what the initial CDS asset counter
10 party might do?
11 A  I don't know where. I don't know.
12 Q  What was your understanding of what your
13 responsibility was, if any, to make certain that the statements
14 made in the offering memorandum were accurate?
15 A  See, a structurer's responsibility is to focus on
16 more economic terms and less so on legal sections such as this.
17 Q  Why did you consider this to be a legal section?
18 A  Well, first, the key is there's no numbers in it. A
19 structurer would definitely focus more on areas where there was
20 a number involved.
21 Q  Including the number that was in the same paragraph
22 that we've been discussing?
23 A  Yes. That number would have been something that
24 maybe a structurer -- a structurer must have given to the
25 lawyers to fill in. And then to the extent a structurer saw

Page 290

1  something that they knew to be incorrect, we would certainly
2  point it out.
3  Q  And from where did you get that number, the
4  $869,256,000?
5  A  I don't recall. I doubt that I provided the number.
6
7  Q  What if anything did you do to find out whether that
8  number was accurate?
9  A  Well, I would have relied on the analyst on the deal
10 to provide that number and see that it was accurate.
11 Q  And in getting that information from the analyst,
12 did you also try to find out whether Citigroup had taken a short
13 position with respect to any of that amount?
14 A  No. I didn't try to find out if Citigroup was
15 short. And I'm not sure the analyst gave me the number as
16 opposed to just giving it to the lawyers, or giving it to Keith
17 to submit in one of his markups for the lawyers.
18 Q  What was your understanding, if any, whether in
19 2007, at the time of the Class V Funding III transaction, you
20 had any responsibility to make certain that the statement that
21 we've been discussing about what the initial CDS asset counter
22 party might provide, whether that statement was accurate? And
23 just so the record's clear, do you understand the sentence to
24 which I'm referring?
25 A  "The initial" --

Page 291

1  Q  The sentence that says, "The initial CDS asset
2  counter party may provide CDS assets as an intermediary, with
3  matching offsetting positions requested by the manager, or may
4  provide CDS assets alone without any offsetting positions."
5  A  I don't remember at the time. But looking at it
6  now, it looks accurate to me.
7  Q  Okay. My question was, what was your understanding
8  at the time about your responsibility for making certain that
9  statement was accurate?
10 A  Well, I would say it was a joint responsibility for
11 many people involved in working on this deal.
12 Q  Including you?
13 A  Including me. And I would focus on certain areas
14 more than others, and other people would focus on areas like
15 this more than me.
16 Q  And who else other than you was responsible for
17 making certain that that statement was accurate?
18 A  Citigroup's internal lawyers.
19 Q  Who were they?
20 A  Anna Jay, for example. Jane Schway, I think.
21 External counsel were Milbank.
22 Q  Who at Milbank?
23 A  Elizabeth Hardin.
24 Q  Anyone else?
25 A  That's it.

Page 292

1  Q  And was there anyone else who was responsible for
2  making certain that that statement was accurate?
3  A  No.
4  MS. IMES: You mean at Citibank?
5  MR. SILVERSTEIN: Anyone else.
6  MS. IMES: Anyone else in the world?
7  THE WITNESS: Not that I can think of.
8  BY MR. SILVERSTEIN:
9  Q  I don't remember whether you answered this before or
10 not, but did you read that statement before this document was
11 finalized?
12 A  I don't recall.
13 Q  Was one of your responsibilities to read the entire
14 document before it was finalized?
15 A  I don't know that it was, actually. Again, my focus
16 -- and I was expected to focus on certain areas more than
17 others.
18 Q  Okay. Who was responsible for reading the entire
19 document before it was finalized?
20 A  I don't think there was any one person. I think it
21 was joint between structurers -- well, regarding this particular
22 issue, like I said, three groups: Citigroup's internal lawyers,
23 structurers, and Milbank, deal counsel.
24 Q  Was there any single individual who was responsible
25 for reading the entire document before it was finalized?

Page 293

1  A  I think probably only external counsel, Milbank,
2  would have -- would have read the whole -- read every single
3  part of the document. They were actually the ones making the
4  changes. They were taking comments from many different parties
5  -- structurers, and possibly investors through structurers, Citi
6  internal counsel, Credit Suisse's counsel.
7  Q  Was Milbank acting as Citigroup's counsel, or was
8  Milbank counsel for Class V Funding III?
9  A  Counsel for Class V Funding III.
10 BY MR. FELLER:
11 Q  The sentence that Tom was asking you about and I
12 started out asking about, that the initial CDS counter party may
13 intermediate or may not, do you know what the purpose of having
14 that in the document was?
15 MS. IMES: I disagree with that characterization.
16 MR. FELLER: I can just read it.
17 MS. IMES: But I think we all know the sentence --
18 MR. FELLER: I can read it again. I just meant to refer
19 to the sentence.
20 MS. IMES: Understood.
21 THE WITNESS: I don't remember thinking about it at the
22 time. Looking at it, reading it today for the first time, that
23 sentence is meant to cover scenarios from -- all scenarios from
24 if the manager were -- if Citigroup had offsetting positions on
25 all the portfolio versus none of the portfolio. Because we

Page 294

1  didn't -- nobody knew.
2  BY MR. FELLER:
3  Q  What do you mean, nobody knew?
4  A  Well, as a structurer, I wouldn't know. And the
5  trading desk wouldn't necessarily lock in for life, you know,
6  whether there would be offsetting positions for only the
7  beginning, or would they be naked short only at the beginning
8  and then cover that. And that would change over time.
9  Q  Were there numbers on the document that got filled
10 in at the last minute?
11 A  Yes.
12 Q  And were those numbers true as of the day that the
13 document was printed?
14 A  Well, it was a lot of numbers, but I expect they
15 would be.
16 Q  I guess that's what I mean. Let me be clear. Was
17 that the purpose of filling them in at the last minute, so that
18 they would be accurate on the day that they were printed?
19 A  Yes.
20 Q  So, I mean, could you have asked the secondary desk
21 to what extent they were naked short versus intermediating as of
22 that day?
23 A  I could have asked. I don't know if they would have
24 told me.
25 BY MR. SILVERSTEIN:

Page 295

1  Q  In connection with Class V Funding III, was there
2  any information that you sought from the trading desk that the
3  trading desk refused to provide to you?
4  A  Not that I recall.
5  BY MR. FELLER:
6  Q  Was there any information they refused to provide to
7  anyone else who was working on the document, the offering
8  memorandum?
9  MS. IMES: I'm sorry. I lost track of the "they." Who's
10 the "they"?
11 MR. FELLER: The trading desk. I'm sorry.
12 MS. IMES: The trading desk? Mr. Quintin's desk?
13 MR. FELLER: Yes.
14 THE WITNESS: No. Not that I recall. What I do recall is
15 that the trading desk was pretty closed and, you know, generally
16 separate from the syndicate and structuring desk. And the
17 trading desk wanted -- was a close-knit team that liked to keep
18 their information to themselves.
19 BY MR. FELLER:
20 Q  Was there any information that the trading desk
21 asked to be kept out of the Class V III offering documents?
22 A  Not that I recall.
23 Q  Or information that they requested not be shared
24 with investors?
25 A  Not that I recall.

30 (Pages 292 to 295)

Page 296

1   (SEC Exhibit No. 570 was marked
2   for identification.)
3   BY MR. FELLER:
4   Q   So just to follow up on the question I was just
5   asking about the trading desk, this is Exhibit 570. Exhibit 570
6   is a one-page e-mail, Bates CITI 15760525. It's an e-mail from
7   Keith Pinniger to Donald Quintin, copying Shalabh Mehrish, Brian
8   Stoker, and Frank Li, on March 27, 2007. And the subject is,
9   "CSAC Class V Funding IV."
10   And Mr. Pinniger writes to Mr. Quintin, "DQ: Not to sound
11   like a broken record again, but CSAC's counsel is reviewing the
12   draft red and is pointing out to us again, per the engagement
13   letter, that we will need to disclose the entire portfolio in
14   the final OM and the underlying spread/premium on each asset.
15   "My read of the letter is that we need to disclose the
16   assets (each position/rating/CUSIP, et cetera, in the closing
17   pool), and the average spread/premium on the portfolio I
18   identified in the OM is 170 basis points."
19   Recognizing this is referring to Class V Funding --
20   seemingly referring to Class V Funding IV, and my previous
21   question was about Class V Funding III, do you know what the --
22   what the context for this e-mail is?
23   A   This is -- the context. This is the very beginning,
24   early stages, I think, of Class V IV. And I'm surprised in the
25   engagement letter -- the engagement letter says that all the

Page 297

1   assets and spreads and rating would have to be disclosed in the
2   -- in the offering circular. I'm surprised that it says that,
3   that it will name.
4   So anyway, Keith is working on this more day-to-day than I
5   am, and CSAC, I guess, wants in on the offering circular, and DQ
6   hasn't quickly responded. I don't know if he had an opinion on
7   this or not, but he hasn't quickly responded to Keith.
8   MS. IMES:   Just to be clear, you're sort of surmising that
9   from reading the e-mail? Or are you having a recollection?
10   THE WITNESS:   No. I don't remember this at all. Not one
11   bit.
12   BY MR. FELLER:
13   Q   Was there information about asset spreads that Mr.
14   Quintin resisted disclosing to investors? I'm sorry, in this
15   case in connection with Class V IV?
16   A   I'm not sure he actually resisted. Maybe he didn't
17   respond to Keith right away. And again, I don't remember. And
18   Class V IV didn't happen.
19   Q   The deal didn't happen?
20   A   That's right. Yeah. Yeah.
21   Q   But there were some drafts of the OM done. Right?
22   A   Apparently. Apparently.
23   Q   Did you work on those?
24   A   Minimally, if at all.
25   Q   And to the extent you did work on it, do you have

Page 298

1   any memory of Mr. Quintin being reluctant to disclose any
2   particular information?
3   A   No, I don't remember.
4   Q   What about with respect to Class V Funding III? Is
5   there any information in connection with Class V Funding III
6   that Mr. Quintin expressed a reluctance to disclose to
7   investors?
8   A   No. Not that I recall.
9   Q   What about Mr. Carosielli?
10   A   Not that I recall. It's hard for me to -- I'd often
11   give them this together. I don't remember either of them not
12   providing something required.
13   Q   Would that be unusual, for an engagement letter to
14   require the disclosure of a portfolio in the OM?
15   A   Yeah. I don't remember that -- I don't remember
16   that in an engagement letter, a generic one. So if it did --
17   well, I don't remember it.
18   Q   You mentioned a couple times working on engagement
19   letters --
20   A   Yeah.
21   Q   -- that that was one of your responsibilities.
22   A   Yeah.
23   Q   Did you work on the engagement letter for the Class
24   V Funding IV?
25   A   I probably did. I don't recall specifically.

Page 299

1   Engagement letters change very, very little from deal to deal.
2   Again, I would focus on the -- most of the words would stay the
3   same, and I would change the numbers and the name of the
4   manager.
5   Q   Hypothetically, if Mr. Pinniger's description is
6   accurate here, that would be a new -- a different term than you
7   were used to in the engagement letter?
8   A   I don't -- I don't remember it. I'm not -- I don't
9   know if it was new or not.
10   Q   It doesn't ring any bells?
11   A   No, it doesn't.
12   (SEC Exhibit No. 571 was marked
13   for identification.)
14   BY MR. FELLER:
15   Q   I'll hand you Exhibit 571. Exhibit 571 is a
16   one-page e-mail, Bates CITI 18376550. It's an e-mail chain.
17   The last e-mail in the chain is from Frank Li to Mr. Mehrish,
18   Mr. Stoker, and Mihail Nikolov, N-i-k-o-l-o-v, copying Mr.
19   Pinniger.
20   Just so we're clear on the record, is Mihail Nikolov the
21   Mihail we were referring to earlier?
22   A   Yes.
23   Q   Subject, "Class V Funding -- Call with SK Life."
24   The e-mail starts out with Mr. Li writing to everyone I
25   just named: "SK Life insists they want see (sic) no static deal