# EXHIBIT 15

0001

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
11 Civ. 07388 (JSR)

----------------------

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

  vs.

BRIAN H. STOKER,

    Defendant.

----------------------

    TRANSCRIPT of BRIAN H. STOKER in the above-entitled matter, as taken by and before LORRAINE B. ABATE, a Certified Shorthand Reporter and Notary Public of the State of New York and Registered Professional Reporter, held at the offices of The Securities and Exchange Commission, Three World Financial Center, New York, New York, on May 3, 2012, commencing at 9:03 a.m., pursuant to Subpoena.

## Page 2

```
 1
 2    APPEARANCES:
 3        SECURITIES AND EXCHANGE COMMISSION
 4        Attorneys for the Plaintiff
 5        100 F Street N.E.
 6        Washington, DC 20549
 7    BY: JANE M.E. PETERSON, ESQ.
 8        JEFFREY T. INFELISE, ESQ.
 9        ANDREW FELLER, ESQ.
10
11        KEKER & VAN NEST, LLP
12        Attorneys for Defendant
13        633 Battery Street
14        San Francisco, CA 94111-1809
15    BY: JOHN W. KEKER, ESQ.
16        JAN NIELSEN LITTLE, ESQ.
17
18
19    ALSO PRESENT:
20        Kevin Marth, Videographer
21
22
23
24
25
```

## Page 3

```
 1
 2                    I N D E X
 3
 4    WITNESS          EXAMINATION BY        PAGE
 5    Brian H. Stoker  Mr. Infelise            4
 6
 7
 8                    E X H I B I T S
 9    EXHIBIT                                 PAGE
10    741  Transcript of Testimony taken
11         On March 4, 2010                    7
12    742  Transcript of Testimony taken
13         On February 17, 2011                8
14    743  E-Mail String Bates numbered
15         CITI 185114856-857                 38
16    744  E-Mail with Attachment Bates Nos.
17         CITI 18416633 to 6669              41
18    745  E-Mail String Bates numbered
19         CITI-STOKER-STIP00000121-123       65
20    746  E-Mail Bates No. CITI 19476072     69
21    747  E-Mail String with attachment     115
22    748  E-Mail String Bates No. CITI 15019692  128
23    749  E-Mail Bates No. CITI 18190520    147
24    750  E-Mail Bates No. CITI 30701251    149
25
```

## Page 4

```
00:00:00:080   1              Stoker - May 3, 2012
00:00:00:964   2         THE VIDEOGRAPHER: Good morning. This
00:00:01:034   3    is the start of the tape labelled No. 1 of the
00:00:04:204   4    videotaped deposition of Mr. Brian Stoker in the
00:00:08:008   5    matter of the Securities & Exchange Commission
00:00:10:677   6    versus Brian H. Stoker in the United States
00:00:13:813   7    District Court for the Southern District of New
00:00:16:249   8    York.
00:00:17:650   9         The deposition today is being held in
00:00:19:185  10    the offices of the Securities and Exhange
00:00:20:987  11    Commission located at 3 World Financial Center
00:00:23:790  12    in New York, New York on May 3rd, 2012 at
00:00:27:494  13    approximately 9:03 a.m.
00:00:30:730  14         My name is Kevin Marth. I'm the legal
00:00:32:532  15    videographer representing Alderson Reporting.
00:00:35:869  16    Our court reporter today is Ms. Lorraine Abate,
00:00:38:405  17    also representing Alderson Reporting.
00:00:41:074  18         At this time, will counsel please
00:00:42:542  19    identify themselves for the record.
00:00:44:611  20         MR. INFELISE: I am Jeffrey Infelise,
00:00:46:613  21    and with me is Jane Peterson, Andrew Feller
00:00:49:282  22    representing the Securities and Exchange
00:00:51:117  23    Commission.
00:00:52:519  24         MR. KEKER: And I'm John Keker, and with
00:00:54:988  25    Jan Little for Keker and Van Nest representing
```

### Page 5

| Timecode | # | |
|---|---|---|
| 00:00:57:824 | 1 | Stoker - May 3, 2012 |
| 00:01:04:864 | 2 | Mr. Stoker. |
| 00:01:05:532 | 3 | THE VIDEOGRAPHER: Will the court |
| 00:01:06:066 | 4 | reporter please swear the witness in, and you |
| 00:01:07:934 | 5 | may proceed. |
| 00:01:08:131 | 6 | B R I A N  H.  S T O K E R, |
| 00:01:08:201 | 7 | Having been first duly sworn by a Notary |
| 00:01:09:302 | 8 | Public of the State of New York, was |
| 00:01:10:570 | 9 | examined and testified as follows: |
| 00:01:13:603 | 10 | EXAMINATION BY MR. INFELISE: |
| 00:01:13:673 | 11 | Q.  Good morning, Mr. Stoker. |
| 00:01:14:541 | 12 | A.  Good morning. |
| 00:01:16:810 | 13 | Q.  Sir, I know you've given testimony to |
| 00:01:18:878 | 14 | the SEC before in this case, but let me go over just |
| 00:01:22:248 | 15 | a few of the ground rules for the deposition. |
| 00:01:25:485 | 16 | As you understand, you are under oath. |
| 00:01:28:555 | 17 | The court reporter is going to take down everything |
| 00:01:30:357 | 18 | you say as well as my questions, and we have a |
| 00:01:32:492 | 19 | videographer.  So to make sure we have a clean |
| 00:01:35:195 | 20 | record, make it easy for the court reporter, I would |
| 00:01:38:298 | 21 | ask that you wait until I finish my question before |
| 00:01:40:233 | 22 | you begin to answer, and I'll try to do the same. |
| 00:01:42:435 | 23 | I'll try not to interrupt you. |
| 00:01:44:104 | 24 | So is that all right with you, sir? |
| 00:01:45:338 | 25 | A.  Yes. |

### Page 6

| Timecode | # | |
|---|---|---|
| 00:01:45:538 | 1 | Stoker - May 3, 2012 |
| 00:01:48:508 | 2 | Q.  During the course of this deposition, |
| 00:01:50:944 | 3 | your counsel or someone else may state an objection. |
| 00:01:54:314 | 4 | That's for the record.  But unless counsel tells you |
| 00:01:57:183 | 5 | you shouldn't answer the question, you have to answer |
| 00:01:59:386 | 6 | anyway. |
| 00:02:01:054 | 7 | Now, we will probably break about every |
| 00:02:03:556 | 8 | hour to change the tape, the videotape, but if you |
| 00:02:07:260 | 9 | need a break at any time in between that, let me know |
| 00:02:10:497 | 10 | and I'll be happy to do so. |
| 00:02:11:798 | 11 | The only thing I would ask is that if |
| 00:02:12:932 | 12 | there is a question pending, you answer the question |
| 00:02:15:301 | 13 | first. |
| 00:02:15:769 | 14 | Is that all right, sir? |
| 00:02:17:137 | 15 | A.  Okay. |
| 00:02:18:038 | 16 | Q.  I'll try to make my questions as direct |
| 00:02:21:608 | 17 | and clear as possible.  That might not be the way you |
| 00:02:24:611 | 18 | see them, but if at any point in time you don't |
| 00:02:27:514 | 19 | understand my question, please feel free to ask me to |
| 00:02:30:383 | 20 | clarify or to try to rephrase, and I'll be happy to |
| 00:02:32:552 | 21 | do that.  If you don't, I'm going to assume you |
| 00:02:35:088 | 22 | understand my question and the answer you give is to |
| 00:02:38:158 | 23 | the question I've asked. |
| 00:02:39:225 | 24 | Is that all right, sir? |
| 00:02:39:826 | 25 | A.  Okay. |

### Page 7

| Timecode | # | |
|---|---|---|
| 00:02:40:326 | 1 | Stoker - May 3, 2012 |
| 00:02:44:097 | 2 | Q.  Sir, are you taking any medication that |
| 00:02:46:099 | 3 | would affect your ability to give full, complete |
| 00:02:49:502 | 4 | answers today? |
| 00:02:50:737 | 5 | A.  No. |
| 00:02:50:970 | 6 | Q.  All right.  Now, as I said, you recall |
| 00:02:55:475 | 7 | giving testimony in this case on two previous |
| 00:02:58:111 | 8 | occasions? |
| 00:02:59:446 | 9 | A.  I do. |
| 00:03:00:213 | 10 | Q.  All right.  And you recall at that time |
| 00:03:02:949 | 11 | you were also sworn to tell the truth? |
| 00:03:04:718 | 12 | A.  Yes. |
| 00:03:06:252 | 13 | Q.  And was your testimony truthful during |
| 00:03:09:189 | 14 | those two occasions? |
| 00:03:10:990 | 15 | A.  Yes. |
| 00:03:11:991 | 16 | Q.  Have you had a chance to review the |
| 00:03:13:093 | 17 | transcripts of those -- that testimony? |
| 00:03:15:295 | 18 | A.  I have. |
| 00:03:16:262 | 19 | Q.  Okay. |
| 00:03:18:098 | 20 | MR. INFELISE:  I would ask the court |
| 00:03:18:798 | 21 | reporter to mark the next exhibit, Exhibit 741. |
| 00:03:28:999 | 22 | (Exhibit 741, Transcript of Testimony |
| 00:03:29:069 | 23 | taken on March 4, 2010, marked for |
| 00:03:29:139 | 24 | identification, as of this date.) |
| 00:03:29:209 | 25 | Q.  All right.  Mr. Stoker, just take a |

### Page 8

| Timecode | # | |
|---|---|---|
| 00:03:32:612 | 1 | Stoker - May 3, 2012 |
| 00:03:53:600 | 2 | moment and take a look at this. |
| 00:03:55:635 | 3 | MR. INFELISE:  For the record, Exhibit |
| 00:03:56:803 | 4 | 741 appears to be a transcript of testimony |
| 00:03:59:873 | 5 | given on March the 4th, 2010. |
| 00:04:07:514 | 6 | Q.  Do you recognize that, sir? |
| 00:04:09:249 | 7 | A.  Sure, yes. |
| 00:04:10:350 | 8 | Q.  And is this -- does this appear to be |
| 00:04:12:485 | 9 | the transcript of testimony that you gave on March |
| 00:04:16:322 | 10 | the 10th, 2010? |
| 00:04:17:490 | 11 | A.  It does. |
| 00:04:18:858 | 12 | Q.  And is this the testimony that you |
| 00:04:20:126 | 13 | reviewed? |
| 00:04:21:361 | 14 | A.  Yes. |
| 00:04:27:967 | 15 | MR. INFELISE:  Okay.  So I'd ask the |
| 00:04:29:436 | 16 | court reporter to mark the next exhibit as |
| 00:04:51:424 | 17 | Exhibit 742. |
| 00:04:55:085 | 18 | (Exhibit 742, Transcript of Testimony |
| 00:04:55:155 | 19 | taken on February 17, 2011, marked for |
| 00:04:55:225 | 20 | identification, as of this date.) |
| 00:04:55:295 | 21 | MR. INFELISE:  And for the record, |
| 00:04:55:962 | 22 | Exhibit 742 is an   appears to be a transcript |
| 00:05:00:400 | 23 | of investigative testimony given on February the |
| 00:05:03:870 | 24 | 17th of 2011. |
| 00:05:05:638 | 25 | Q.  Mr. Stoker, have you had a chance to |

### Page 9

| Time | # | Stoker - May 3, 2012 |
|---|---|---|
| 00:05:06:840 | 1 | Stoker - May 3, 2012 |
| 00:05:08:041 | 2 | look at Exhibit 742? |
| 00:05:09:442 | 3 | A.  I have. |
| 00:05:09:642 | 4 | Q.  And does that appear to be the |
| 00:05:10:944 | 5 | transcript of the testimony you gave on February |
| 00:05:14:714 | 6 | 17th, 2011? |
| 00:05:16:116 | 7 | A.  Yes. |
| 00:05:16:583 | 8 | Q.  And did you review that transcript? |
| 00:05:18:818 | 9 | A.  I did. |
| 00:05:25:892 | 10 | Q.  Mr. Stoker, did you do anything to |
| 00:05:27:527 | 11 | prepare for today's deposition? |
| 00:05:29:696 | 12 | A.  Yes. |
| 00:05:30:630 | 13 | Q.  Other than speaking with your attorney, |
| 00:05:32:766 | 14 | did you speak with any other individuals? |
| 00:05:35:268 | 15 | A.  No. |
| 00:05:36:436 | 16 | Q.  Did you speak with any attorneys for |
| 00:05:38:238 | 17 | Citigroup? |
| 00:05:39:973 | 18 | A.  No. |
| 00:05:43:043 | 19 | Q.  Did you review any documents in |
| 00:05:44:377 | 20 | preparation for today? |
| 00:05:46:713 | 21 | A.  I did. |
| 00:05:48:548 | 22 | Q.  We'll get to those. |
| 00:05:50:984 | 23 | Mr. Stoker, are you presently employed? |
| 00:05:53:553 | 24 | A.  No. |
| 00:05:57:123 | 25 | Q.  Now, Mr. Stoker, were you employed at |

### Page 10

| Time | # | |
|---|---|---|
| 00:05:58:858 | 1 | Stoker - May 3, 2012 |
| 00:05:59:426 | 2 | Citigroup Global Markets Incorporated? |
| 00:06:02:796 | 3 | A.  Yes. |
| 00:06:03:863 | 4 | Q.  Now, throughout the deposition, I'm |
| 00:06:05:365 | 5 | going to refer to that as just Citigroup; is that all |
| 00:06:08:902 | 6 | right? |
| 00:06:09:302 | 7 | A.  That's okay. |
| 00:06:09:936 | 8 | Q.  All right.  And when did you begin work |
| 00:06:11:871 | 9 | at Citigroup? |
| 00:06:13:106 | 10 | A.  March 2005. |
| 00:06:14:908 | 11 | Q.  And what was your position when you |
| 00:06:16:076 | 12 | began work? |
| 00:06:17:043 | 13 | A.  I was a director. |
| 00:06:19:846 | 14 | Q.  You say a director. |
| 00:06:22:282 | 15 | In any particular area? |
| 00:06:24:084 | 16 | A.  Yes.  I was structurer -- director of |
| 00:06:26:052 | 17 | structuring in the CDO group. |
| 00:06:29:923 | 18 | Q.  And in 2006 and 2007, did you occupy |
| 00:06:33:426 | 19 | that same position on the -- is it the structuring |
| 00:06:36:196 | 20 | desk, is that what it's called? |
| 00:06:37:364 | 21 | A.  Yes. |
| 00:06:37:931 | 22 | Q.  Did you occupy the same position in the |
| 00:06:39:265 | 23 | structuring desk during that time period? |
| 00:06:41:001 | 24 | A.  I did. |
| 00:06:41:968 | 25 | Q.  And your title was director? |

### Page 11

| Time | # | |
|---|---|---|
| 00:06:45:538 | 1 | Stoker - May 3, 2012 |
| 00:06:48:241 | 2 | A.  Yes. |
| 00:06:50:010 | 3 | Q.  Who was your immediate supervisor? |
| 00:06:51:811 | 4 | A.  Darius Grant. |
| 00:06:52:779 | 5 | Q.  And was Mr. Grant your supervisor during |
| 00:06:56:716 | 6 | the entire time that you worked on the structuring |
| 00:06:58:351 | 7 | desk in the CDO group? |
| 00:06:58:752 | 8 | A.  Yes.  Until Darius left the firm in late |
| 00:06:59:652 | 9 | 2007. |
| 00:07:03:323 | 10 | Q.  So you were still employed at Citigroup |
| 00:07:05:258 | 11 | at that point? |
| 00:07:06:593 | 12 | A.  Yes. |
| 00:07:07:127 | 13 | Q.  When did you leave Citigroup? |
| 00:07:09:763 | 14 | A.  About June 2008. |
| 00:07:17:737 | 15 | Q.  Sir, prior -- immediately prior to |
| 00:07:19:673 | 16 | beginning work at Citigroup, were you employed |
| 00:07:22:575 | 17 | anywhere else? |
| 00:07:24:544 | 18 | A.  I was employed at Merrill Lynch. |
| 00:07:26:079 | 19 | Q.  And how long were you employed at |
| 00:07:28:314 | 20 | Merrill Lynch? |
| 00:07:30:083 | 21 | A.  I started there after business school in |
| 00:07:31:985 | 22 | 1998. |
| 00:07:34:120 | 23 | Q.  So from 1998 to approximately 2005? |
| 00:07:36:523 | 24 | A.  Yeah.  I did an internship there before |
| 00:07:38:992 | 25 | business school. |

### Page 12

| Time | # | |
|---|---|---|
| 00:07:39:759 | 1 | Stoker - May 3, 2012 |
| 00:07:41:027 | 2 | Q.  Okay.  What was your position at Merrill |
| 00:07:42:295 | 3 | Lynch immediately prior to leaving in 2005? |
| 00:07:46:132 | 4 | A.  I was a vice-president.  I worked on the |
| 00:07:48:101 | 5 | CDO trading desk, ABS CDO trading desk. |
| 00:07:52:005 | 6 | Q.  ABS, asset-backed securities? |
| 00:07:55:342 | 7 | A.  CDO trading.  It wasn't a desk.  It was |
| 00:07:57:444 | 8 | just me. |
| 00:07:57:744 | 9 | Q.  It was just you? |
| 00:07:58:912 | 10 | A.  Yeah. |
| 00:07:59:879 | 11 | Q.  And you said you were a trader? |
| 00:08:01:781 | 12 | A.  Yes. |
| 00:08:02:082 | 13 | Q.  You were trading.  Were you a trader at |
| 00:08:04:484 | 14 | Merrill Lynch the entire time that you worked there? |
| 00:08:07:187 | 15 | A.  No, I wasn't. |
| 00:08:09:289 | 16 | Q.  Okay.  Other than -- well, prior to |
| 00:08:11:491 | 17 | being -- trading on the ABS CDOs, what other position |
| 00:08:15:695 | 18 | did you hold? |
| 00:08:17:697 | 19 | A.  Several.  First the internship.  I was |
| 00:08:21:234 | 20 | an intern.  And after business school, I started as |
| 00:08:26:906 | 21 | an -- I guess a junior trader or assistant trader in |
| 00:08:31:044 | 22 | emerging market credit derivatives.  Then I joined |
| 00:08:34:447 | 23 | the CDO desk.  I was an associate.  I structured high |
| 00:08:40:153 | 24 | yield bond -- high yield bond CDOs and LCOs, and then |
| 00:08:47:727 | 25 | I moved to the -- around 2002, I moved to the |

Page 13

```
00:08:52:032    1              Stoker - May 3, 2012
00:08:54:434    2    mortgage-backed trading desk or asset-backed trading
00:08:56:369    3    desk, worked on -- I backed up the home equity loan
00:09:01:708    4    trader, and I worked in CDO syndicate and CDO
00:09:06:713    5    warehouse, and CDO trading.
00:09:11:251    6         Q.   Well, let me direct your attention, sir,
00:09:12:819    7    to the time that you were working as a director on
00:09:15:355    8    the structuring desk at Citigroup.
00:09:19:092    9              During that period of time, did you ever
00:09:21:194   10    act as a lead structurer on any specific transaction
00:09:24:097   11    or deals?
00:09:26:599   12         A.   Several.
00:09:27:267   13         Q.   Several.
00:09:28:768   14              Was that a position that was -- well,
00:09:31:771   15    strike that.
00:09:32:605   16              When you were lead structurer, is that
00:09:35:709   17    commonly referred to as the deal manager?
00:09:40:046   18         A.   Yes.
00:09:47:153   19         Q.   Okay. And as a lead structurer on a
00:09:48:655   20    specific transaction, what were your
00:09:51:324   21    responsibilities?
00:09:54:661   22         A.   Lead structurer responsibilities were to
00:10:01:368   23    work with the collateral manager, to sign the
00:10:05:872   24    engagement letter, then work with other people, more
00:10:10:276   25    junior people on the structuring desk, to structure
```

Page 14

```
00:10:12:512    1              Stoker - May 3, 2012
00:10:13:413    2    the CDO which was working with other experts,
00:10:18:151    3    lawyers, rating agencies, syndicate, to put together
00:10:25:091    4    all the -- gather all the documents, and perform --
00:10:30:530    5    go through a checklist of things to model the
00:10:36:336    6    transaction according to the rating agency criteria,
00:10:39:239    7    and then move it through closing.
00:10:42:175    8         Q.   All right. And you said syndicate. Was
00:10:44:477    9    that -- are you referring to the syndicate desk in
00:10:46:246   10    the CDO group?
00:10:47:113   11         A.   I am.
00:10:47:914   12         Q.   Did you also coordinate or work with the
00:10:51:284   13    secondary trading desk in the CDO group?
00:10:55:488   14         A.   Sometimes.
00:10:57:057   15         Q.   All right. Did you structure anything
00:10:59:426   16    other than CDOs during the time you were at
00:11:01:194   17    Citigroup?
00:11:07:067   18         A.   Toward the end of my time there, I
00:11:08:868   19    worked on some funds.
00:11:10:937   20         Q.   What do you mean by funds?
00:11:12:305   21         A.   Well, I don't recall. I think it was a
00:11:16:976   22    hedge fund that was raising money to invest in
00:11:19:913   23    mortgage-backed securities.
00:11:21:715   24         Q.   All right. But that was not a CDO?
00:11:24:417   25         A.   That's right.
```

Page 15

```
00:11:25:618    1              Stoker - May 3, 2012
00:11:27:053    2         Q.   Was that a CMO?
00:11:28:855    3         A.   No.
00:11:29:556    4         Q.   It was a CLO?
00:11:30:490    5         A.   No, it was just a fund.
00:11:32:125    6         Q.   Just a fund. All right.
00:11:34:160    7              Do you recall, sir, at the time that you
00:11:35:929    8    worked on the structuring desk at Citigroup, what
00:11:39:265    9    CDOs you actually structured or acted as lead
00:11:42:002   10    structurer on?
00:11:44:904   11         A.   Probably most of them.
00:11:48:475   12         Q.   Do you remember any names?
00:11:51:010   13         A.   Yes. I remember Tierra Alta was the
00:11:53:179   14    first one I worked on.
00:11:54:781   15         Q.   Tierra Alta?
00:11:55:648   16         A.   Tierra Alta.
00:11:56:916   17         Q.   Tierra Alta.
00:11:58:651   18         A.   That was in March 2006, and then after
00:12:01:521   19    that was Diversity managed by Vanderbilt. GIB --
00:12:14:467   20    managed by GIB called FAB, F-A-B. I signed up a deal
00:12:23:343   21    for Elliot -- Elliot Management, but I didn't work on
00:12:25:979   22    the deal afterward.
00:12:26:980   23         Q.   Do you recall the name of that deal?
00:12:29:282   24         A.   I don't.
00:12:29:883   25         Q.   Okay.
```

Page 16

```
00:12:32:285    1              Stoker - May 3, 2012
00:12:34:254    2         A.   I signed up Ridgeway 1 managed by Credit
00:12:36:723    3    Swisse.
00:12:38:892    4         Q.   When you say signed up, does that mean
00:12:40:994    5    you were the structurer or you just made a contact
00:12:43:830    6    for it?
00:12:46:666    7         A.   I was the initial contact, and then when
00:12:48:635    8    I say signed up, I mean probably I worked on it less
00:12:51:004    9    as -- on Ridgeway 1, I worked on it all the way
00:12:53:173   10    through. Excuse me.
00:12:54:374   11         Q.   All right.
00:13:00:680   12         A.   Should I go on?
00:13:01:648   13         Q.   Please.
00:13:01:981   14         A.   I worked on Ridgeway 2.
00:13:04:617   15         Q.   Were you the lead structurer on Ridgeway
00:13:06:186   16    2?
00:13:07:654   17         A.   Ridgeway 2 I signed up and then worked
00:13:09:522   18    on much less going forward. Around fall 2006, I
00:13:18:198   19    started signing up deals and then other people
00:13:20:834   20    started to work on them more than me; whereas in the
00:13:23:703   21    initial -- prior to that, I worked on them very
00:13:26:439   22    heavily. So Ridgeway 2, Class V III, Octonian, 888.
00:13:39:119   23         Q.   I'm sorry, Octonian, were you the lead
00:13:42:222   24    structurer? Is that another one where you just
00:13:43:623   25    signed it up and as you said, other people worked on
```

### Page 17

| Timecode | # | Text |
|---|---|---|
| 00:13:46:092 | 1 | Stoker - May 3, 2012 |
| 00:13:48:528 | 2 | it? |
| 00:13:48:595 | 3 | A.   I signed it up and didn't work on it. |
| 00:13:49:529 | 4 | Q.   Was somebody else assigned to it as the |
| 00:13:50:664 | 5 | lead structurer and manager? |
| 00:13:52:966 | 6 | A.   Yes. |
| 00:13:53:967 | 7 | Q.   What about the 888 Tactical, were you |
| 00:13:57:837 | 8 | the deal manager in that CDO? |
| 00:13:59:673 | 9 | A.   I signed it up.  Then I didn't work on |
| 00:14:01:441 | 10 | it afterward. |
| 00:14:01:708 | 11 | Q.   All right.  Do you recall whether you |
| 00:14:07:047 | 12 | were -- had any involvement in CDOs designated as |
| 00:14:11:618 | 13 | Adams Square? |
| 00:14:13:386 | 14 | A.   I signed it up, and then didn't work on |
| 00:14:15:522 | 15 | it much afterward. |
| 00:14:16:589 | 16 | Q.   Was that Adams Square 1, Adams Square 2? |
| 00:14:19:626 | 17 | A.   Adams Square 2. |
| 00:14:22:328 | 18 | Q.   So you didn't act as the deal manager in |
| 00:14:24:397 | 19 | Adams Square 2? |
| 00:14:25:532 | 20 | A.   As the deal manager, what they would |
| 00:14:27:100 | 21 | call the senior structurer involved, so I signed it |
| 00:14:29:769 | 22 | up, so I might still be called the deal manager even |
| 00:14:32:539 | 23 | though my involvement became much less and less |
| 00:14:35:542 | 24 | compared to what it had been in prior deals. |
| 00:14:37:610 | 25 | Q.   Let me ask you this; were there more |

### Page 18

| Timecode | # | Text |
|---|---|---|
| 00:14:38:611 | 1 | Stoker - May 3, 2012 |
| 00:14:39:412 | 2 | than one director on the structuring desk in |
| 00:14:42:082 | 3 | 2006-2007? |
| 00:14:44:351 | 4 | A.   There were. |
| 00:14:45:285 | 5 | Q.   All right.  And when you talked about |
| 00:14:47:554 | 6 | signing up Adams Square, once you signed it up, was |
| 00:14:51:257 | 7 | it handed off to another director in the structuring |
| 00:14:54:160 | 8 | desk? |
| 00:14:54:661 | 9 | A.   No. |
| 00:14:55:462 | 10 | Q.   So you still were the deal manager, but |
| 00:14:58:164 | 11 | you had people working for you on that deal? |
| 00:15:01:301 | 12 | A.   People working on that deal.  They |
| 00:15:02:502 | 13 | didn't necessarily work for me.  These people didn't |
| 00:15:05:872 | 14 | formally work for me, but they did assist on that |
| 00:15:09:142 | 15 | deal, yes. |
| 00:15:09:809 | 16 | Q.   Were they assigned to those deals to |
| 00:15:11:411 | 17 | work on? |
| 00:15:11:945 | 18 | A.   They were. |
| 00:15:12:245 | 19 | Q.   All right.  So I take it, then, you were |
| 00:15:17:050 | 20 | the deal manager in Adams Square? |
| 00:15:20:320 | 21 | A.   Well, I signed it up and then formally I |
| 00:15:22:555 | 22 | guess you could say I was the deal manager.  I became |
| 00:15:26:626 | 23 | less involved as the deal went on, yes. |
| 00:15:29:062 | 24 | Q.   What about Class V III, were you the |
| 00:15:30:797 | 25 | deal manager on Class V III? |

### Page 19

| Timecode | # | Text |
|---|---|---|
| 00:15:31:297 | 1 | Stoker - May 3, 2012 |
| 00:15:32:032 | 2 | A.   Same as Adams Square.  I signed it up, |
| 00:15:33:333 | 3 | and then became less involved as the deal was signed |
| 00:15:35:435 | 4 | up. |
| 00:15:36:569 | 5 | Q.   When you say became less involved, do |
| 00:15:38:772 | 6 | you mean because the other people assigned to it were |
| 00:15:41:141 | 7 | doing most of the work? |
| 00:15:42:375 | 8 | A.   That's right. |
| 00:15:45:278 | 9 | Q.   Did you still have overall |
| 00:15:47:180 | 10 | responsibility for Class V III on the structuring |
| 00:15:51:317 | 11 | desk? |
| 00:15:52:352 | 12 | A.   To the extent there were any problems |
| 00:15:53:620 | 13 | that people working on it would ask me, yes. |
| 00:15:57:057 | 14 | Q.   All right, sir.  Of the ones that you |
| 00:16:03:563 | 15 | just mentioned that -- the CDOs, do you recall how |
| 00:16:05:598 | 16 | many of them contained at least some synthetic |
| 00:16:09:502 | 17 | assets? |
| 00:16:16:009 | 18 | A.   I don't recall. |
| 00:16:17:110 | 19 | Q.   What about Adams Square, do you recall |
| 00:16:18:845 | 20 | whether or not Adams Square had any synthetic assets? |
| 00:16:21:881 | 21 | A.   I do.  It did. |
| 00:16:23:483 | 22 | Q.   And Class V III, that had synthetic |
| 00:16:25:919 | 23 | assets? |
| 00:16:26:353 | 24 | A.   It did. |
| 00:16:27:787 | 25 | Q.   How about Ridgeway, was it Ridgeway 2 or |

### Page 20

| Timecode | # | Text |
|---|---|---|
| 00:16:31:057 | 1 | Stoker - May 3, 2012 |
| 00:16:31:257 | 2 | both? |
| 00:16:32:359 | 3 | A.   Ridgeway 1, maybe a tiny bit.  But I |
| 00:16:36:930 | 4 | don't remember.  Ridgeway 2 did have synthetic |
| 00:16:39:733 | 5 | assets. |
| 00:16:40:800 | 6 | Q.   All right.  Thank you. |
| 00:16:42:769 | 7 | Do you recall a CDO called Topanga? |
| 00:16:47:007 | 8 | A.   Barely. |
| 00:16:48:274 | 9 | Q.   Do you recall whether you had any |
| 00:16:49:476 | 10 | involvement in Topanga? |
| 00:16:51:444 | 11 | A.   I didn't have any involvement. |
| 00:16:53:046 | 12 | Q.   No, none at all? |
| 00:16:55:949 | 13 | A.   I know it was happening.  No, not |
| 00:16:58:752 | 14 | involvement. |
| 00:16:59:686 | 15 | Q.   So someone other than you was the deal |
| 00:17:01:287 | 16 | manager in Topanga? |
| 00:17:02:489 | 17 | A.   That's right. |
| 00:17:09:262 | 18 | Q.   Sir, as a lead structurer in a |
| 00:17:10:930 | 19 | transaction or as the deal manager, do you have any |
| 00:17:13:400 | 20 | responsibility for reviewing any of the marketing |
| 00:17:16:503 | 21 | materials that were used to market the CDO? |
| 00:17:21:374 | 22 | A.   To the extent people had questions, I |
| 00:17:23:476 | 23 | worked on it and I tried hard to make sure those |
| 00:17:25:512 | 24 | documents were accurate. |
| 00:17:27:881 | 25 | Q.   So that was part of your responsibility |

## Page 21

Stoker - May 3, 2012

```
00:17:29:416   1                  Stoker - May 3, 2012
00:17:30:317   2   as the deal manager, to actually review those for
00:17:31:685   3   accuracy?
00:17:36:322   4       A.   I'm sorry, could you repeat the
00:17:37:057   5   question.
00:17:37:958   6       Q.   Was it part of your responsibilities as
00:17:39:759   7   the deal manager in a specific CDO to review the
00:17:43:363   8   marketing materials to determine their -- if they
00:17:45:765   9   were accurate?
00:17:46:700  10       A.   Well, with a focus in areas that
00:17:48:368  11   structurers were experts in.
00:17:51:671  12       Q.   So you did have responsibility, some
00:17:53:406  13   responsibility for that?
00:17:56:009  14       A.   On the parts that structurers were
00:17:57:911  15   experts in.
00:18:02:148  16       Q.   And did that responsibility include
00:18:04:951  17   reviewing any offering memorandum that was used to
00:18:08:722  18   market the CDO?
00:18:11:891  19       A.   I did review the offering memorandums
00:18:15:328  20   with a focus on the parts that structurers were most
00:18:18:898  21   familiar with.
00:18:19:866  22       Q.   And what parts were those?
00:18:21:901  23       A.   Priority payments, the economic terms
00:18:23:503  24   and priority payments, tranches, the size of the
00:18:26:506  25   tranches, the spreads in those tranches, portfolio
```

## Page 22

```
00:18:30:477   1                  Stoker - May 3, 2012
00:18:31:111   2   profile limits.
00:18:32:679   3       Q.   And did you review any other portions of
00:18:34:914   4   the offering memorandum to determine that they were
00:18:36:783   5   accurate and complete?
00:18:38:752   6       A.   I may have glanced at them, but my goal
00:18:40:286   7   wasn't to determine whether or not other sections
00:18:43:490   8   were -- a tax section and a conflict section was
00:18:47:427   9   accurate and complete.
00:18:49:362  10       Q.   Sir, was it your responsibility as the
00:18:51:231  11   deal manager to review the entire offering
00:18:54:134  12   memorandum?
00:18:57:137  13       A.   To review it, yes, but not -- it wasn't
00:19:00:640  14   my responsibility to ensure that other sections
00:19:03:643  15   were -- that I was not an expert in, were accurate or
00:19:06:546  16   complete.
00:19:07:380  17       Q.   If, in reviewing that offering
00:19:08:948  18   memorandum in its entirety, you recognized that there
00:19:15:155  19   were -- certain things were inaccurate, would you
00:19:18:491  20   take any action to try and get those corrected?
00:19:21:227  21       A.   Of course.
00:19:26:599  22       Q.   And sir, as part of your
00:19:28:301  23   responsibilities as deal manager in a CDO, did you
00:19:32:005  24   have responsibility for actually preparing portions
00:19:34:974  25   of the offering memorandum?
```

## Page 23

```
00:19:37:010   1                  Stoker - May 3, 2012
00:19:39:179   2       A.   No.
00:19:39:346   3       Q.   Not at all?
00:19:42:882   4       A.   For preparing it?
00:19:43:850   5       Q.   Yes, preparing it.
00:19:44:784   6       A.   No.
00:20:23:323   7       Q.   I think you said this, sir, but let me
00:20:24:591   8   make sure.
00:20:24:924   9            Did you say that you did have
00:20:26:393  10   responsibility for ensuring that the offering
00:20:28:161  11   circular, offering memorandum, was accurate?
00:20:30:363  12            MR. KEKER:  Asked and answered.  Object
00:20:32:031  13   on that ground.
00:20:34:200  14       A.   I had responsibility for focusing on the
00:20:36:302  15   sections that I was most familiar with.
00:20:39:472  16       Q.   But my question was did you have
00:20:42:075  17   responsibility as a deal manager to attempt to ensure
00:20:46:179  18   that the information contained in the offering
00:20:47:847  19   memorandum was accurate?
00:20:49:082  20            MR. KEKER:  Asked and answered.
00:20:51:151  21       A.   I was to review the offering circular,
00:20:54:954  22   and if something was not right, I could point it out,
00:20:58:158  23   but my focus and my main responsibility was to focus
00:21:01:227  24   on the sections that I knew most about.
00:21:07:033  25       Q.   Sir, as part of your responsibilities as
```

## Page 24

```
00:21:21:314   1                  Stoker - May 3, 2012
00:21:22:282   2   a deal manager in a CDO, did you coordinate with the
00:21:24:918   3   attorneys, various attorneys who reviewed the
00:21:29:289   4   documents associated with that CDO?
00:21:32:258   5            MR. KEKER:  Objection.  The question is
00:21:35:095   6   vague.  You've asked him about a lot of CDOs and
00:21:37:998   7   he had different responsibilities with respect
00:21:40:000   8   to them, and I would ask you to be more
00:21:41:501   9   specific.
00:21:42:235  10            MR. INFELISE:  Well, I think I qualified
00:21:44:604  11   concerning -- let me restate it.
00:21:47:240  12       Q.   My question was, sir, on those CDOs in
00:21:49:209  13   which you were deal manager, did your
00:21:52:379  14   responsibilities include coordinating with the
00:21:54:414  15   attorneys who reviewed the documents related to that
00:21:57:651  16   specific CDO?
00:21:59:719  17       A.   I coordinated with attorneys on early
00:22:01:688  18   deals that I worked on, where I was really the deal
00:22:05:892  19   manager and it was me and one other person working on
00:22:07:961  20   the deal.  On other deals, I did not coordinate with
00:22:10:597  21   the attorneys.  Somebody else had that role.
00:22:13:867  22       Q.   Somebody else had the role.
00:22:15:468  23            Was that someone who actually was
00:22:17:771  24   working on the CDO and under your supervision?
00:22:22:208  25       A.   They were junior to me, and if they had
```

## Page 25

Stoker - May 3, 2012

1  questions, they would ask me. They could ask me
2  questions, but yeah, that junior person was
3  coordinating with the lawyer.
4  Q. And that junior person who -- was
5  someone who was actually assigned to work on that
6  specific deal?
7  A. That's right.
8  Q. And as the deal manager, you had overall
9  responsibility for that specific CDO, did you not?
10  A. To the extent there were questions,
11  Darius might ask me or to the -- somebody might ask
12  me questions or if they had a question, they would
13  ask me.
14  Q. But my question was with respect to --
15  and I'm not talking about Mr. Grant. I'm talking
16  about the individuals who were actually assigned to
17  work on specific CDOs.
18      Even though there were other people
19  assigned to work on that CDO, as the deal manager,
20  you had overall responsibility for that specific CDO,
21  did you not?
22  A. Well, I had some responsibility and some
23  people might have considered me the deal manager, but
24  I really wasn't that involved after the deal was

## Page 26

Stoker - May 3, 2012

1  signed up. And some people might have considered
2  Keith to be the deal manager.
3  Q. Keith, meaning Mr. Pinniger?
4  A. Yes.
5  Q. And who would have considered
6  Mr. Pinniger to be a deal manager -- well let's be
7  specific. Let's talk about Class V III.
8      Did anyone that you're aware of in the
9  structuring desk consider Mr. Pinniger to be the deal
10  manager in Class V Funding III?
11  A. I think Keith may have.
12  Q. Keith may have?
13  A. Yes.
14  Q. How about Mr. Grant?
15  A. I don't know.
16  Q. All right. How about Mr. -- do you know
17  who Mr. Shalabh Mehrish is?
18  A. I do.
19  Q. Do you know if Mr. Mehrish considered
20  Mr. Pinniger the deal manager?
21  A. I don't know.
22  Q. Was Mr. Pinniger ever designated as the
23  deal manager in Class V Funding III?
24  A. Nobody was ever -- I don't think

## Page 27

Stoker - May 3, 2012

1  designated the deal manager. It was a transition
2  process where Keith was being elevated to a role
3  where he was taking charge of the deals.
4  Q. So had he in fact been -- assumed the
5  duties as deal manager of Class V Funding III?
6  A. Pretty well had.
7  Q. And when did that happen?
8  A. Right around this time.
9  Q. And did Mr. Grant -- was he aware of
10  that fact?
11  A. I don't know.
12  Q. Did you ever tell Mr. Grant Mr. Pinniger
13  is now assuming the responsibility as deal manager in
14  Class V III?
15  A. I can't -- I don't remember.
16  Q. Would that be a normal thing to do, if
17  in fact someone was assuming overall responsibility
18  for a CDO?
19  A. There was no process for promoting
20  people or people's responsibilities increasing
21  gradually over time.
22  Q. Well, but my question is this,
23  Mr. Stoker; if you have a CDO such as Class V Funding
24  III which was going to have a notional value of about

## Page 28

Stoker - May 3, 2012

1  a billion dollars, and there is someone else who was
2  assuming overall responsibility for that deal,
3  wouldn't the normal procedure be to specifically
4  designate or at least, tell Mr. Grant who was head of
5  the structuring desk, that was happening?
6  MR. KEKER: Objection, argumentative.
7  A. There was no normal procedure. I sign
8  up the deal. I was manager, deal manager initially,
9  and transitioned to Keith being more involved in
10  taking on that role, and there was a gradual process
11  as Keith started and worked well on deals and then it
12  was time for him to increase his role.
13  Q. I see. But I take it there was no
14  specific point in time when Mr. Pinniger was
15  designated as the deal manager or lead structurer on
16  Class V Funding III; is that correct?
17  A. I don't think there was any special
18  designations ever.
19  Q. Okay. As a deal manager, you did have
20  responsibility providing information to the attorneys
21  who were reviewing, for example, the offering
22  memorandum; is that accurate?
23  A. Speaking in general or?
24  Q. In general, yes.

## Page 29

Stoker - May 3, 2012

A. If the lawyers had questions, sure, we would -- structurers would, of course, answer them.

Q. All right. Now, but my question was more specific, and that is, did you have responsibility to affirmatively provide information to the attorneys who were reviewing the offering memorandum for a CDO?

MR. KEKER: Objection, vague.

A. Well, if there was something interesting that I thought that I should tell the lawyers about, I would, of course, tell them.

Q. Do you recall whether or not you, with respect to Class V Funding III, specifically provided input to the attorneys reviewing the offering memorandum for Class V Funding III?

A. I don't remember talking to them.

Q. Do you recall having any communications with them?

A. Not particularly, no.

Q. All right. Who would provide the attorneys reviewing an offering memorandum the information about the specific deal that they were reviewing?

A. Whoever is assigned to that role. In

## Page 30

Stoker - May 3, 2012

this case, it was Keith Pinniger who was assigned to that role.

Q. You had no part of that?

A. Minimal, if any.

Q. I see. And did you do anything to attempt to supervise Mr. Pinniger concerning information that was to be provided to the attorneys who were reviewing the offering memorandum for Class V III?

A. Well, I talked to Keith as needed.

Q. Okay. Now, sir, while you were at Citigroup, did you make any effort to try to standardize the documents that were used for each of the various CDOs?

A. I did.

Q. And why did you do that?

A. My goal was to make them as clear and concise as possible so that as they were updated for new deals, investors would be able to see -- would be able to focus on key terms. Not only investors, but every party involved, rating agency, managers, structurers, I wanted everybody to see the key parts of the deal.

Q. All right. And in fact, you spent a lot

## Page 31

Stoker - May 3, 2012

of time trying to modify those documents, didn't you, sir?

A. I did.

Q. What -- specifically, what documents did you attempt to standardize?

A. I tried to standardize the offering memorandum and the indenture.

Q. Indenture. What about -- do you know what I mean when I refer to a flip book?

A. I do.

Q. What exactly do you understand a flip book to mean?

A. It's a Power Point presentation about 40 pages long that described a CDO transaction.

Q. And did you make any effort to attempt to standardize the flip books that were used for various CDOs?

A. I don't think so.

Q. If there was synthetic assets in a CDO, was there something called a CDS agreement?

A. I believe so.

Q. Now, did you make any effort to look at that and attempt to standardize the terms in those CDS agreements for use in any CDO?

## Page 32

Stoker - May 3, 2012

A. No.

Q. And sir, was it your goal to, in fact, have all -- have your deal documents -- strike that.

Sir, was it your goal in 2006 to 2007 to have your deal documents used in all new CDOs at Citigroup?

A. I hoped it would be the base for most documents -- most similar CDOs, yes.

Q. Sir, wouldn't -- when preparing an offering memorandum for a specific CDO, was it a standard practice to use the offering memorandum from a prior deal as a template for the new one?

A. Yes.

Q. Okay. Sir, on the CDOs in which you acted as the deal manager or lead structurer, did any of those CDOs employ an asset manager?

A. Yes.

Q. All right. Do you recall which ones?

A. I think all of them.

Q. Okay. And was the reason that an asset manager was employed was because that was considered important in order to have investors be willing to invest in the CDO?

A. That was one of the considerations.

### Page 33

```
00:30:43:309   1         Stoker - May 3, 2012
00:30:43:910   2      Q.   Well, sir, wasn't it recognized by the
00:30:44:744   3   end of 2006 that investors did not like static deals
00:30:49:282   4   and wanted managers, asset managers?
00:30:51:851   5      A.   Well, it was a balance of I think on a
00:30:55:622   6   static deal, investors would ask for some more spread
00:30:59:192   7   to investment.
00:31:01:795   8      Q.   But specifically, sir, wasn't it true
00:31:03:530   9   that by the end of 2006, investors did not like
00:31:07:333  10   static deals, and in fact, they wanted asset managers
00:31:10:270  11   in the CDOs that they invested in?
00:31:12:839  12           MR. KEKER:  Objection.  Vague, and
00:31:16:242  13       impossible to answer what all investors thought.
00:31:20:847  14      Q.   You can answer.
00:31:22:949  15      A.   Yeah, it is, you know, too general.
00:31:26:019  16   Some investors preferred no manager.  They didn't
00:31:28:555  17   want to -- they didn't think the manager was worth
00:31:30:957  18   the management fee.
00:31:32:692  19      Q.   Well, sir, do you recall whether or not
00:31:34:127  20   there was a belief at Citigroup during this time
00:31:37:130  21   period investors, in general, did not like static
00:31:42:369  22   deals, and they in fact wanted asset managers?
00:31:45:705  23           MR. KEKER:  Same objection.
00:31:47:073  24      A.   Well, this is really Shalabh's area as
00:31:49:209  25   part of the syndicate desk to talk to investors, and
```

### Page 34

```
00:31:51:444   1         Stoker - May 3, 2012
00:31:54:881   2   it would be his opinion on how hard it would be to
00:31:56:416   3   sell where the investors demand more spread, how
00:31:57:684   4   much -- how much more spread, what the investors
00:31:59:352   5   require.
00:32:01:020   6      Q.   You say Shalabh.  Is that Mr. Mehrish?
00:32:03:123   7      A.   Yes.
00:32:03:957   8      Q.   But my question was did you have an
00:32:05:425   9   understanding concerning --
00:32:06:793  10           MR. KEKER:  That wasn't your question.
00:32:07:761  11       I object to the preamble.
00:32:10:163  12      Q.   All right.  Did you have an
00:32:12:966  13   understanding whether or not there was a belief at
00:32:15:568  14   Citigroup by the end of 2006 that investors
00:32:20:307  15   preferred -- did not want static deals, but preferred
00:32:23:810  16   asset managers?
00:32:27:280  17      A.   I recall that some investors would
00:32:29:616  18   require more spread for them to invest in a static
00:32:33:953  19   deal or a deal with no manager.
00:32:41:194  20      Q.   Okay.
00:32:49:469  21           MR. INFELISE:  This has been previously
00:32:51:071  22       marked as Exhibit No. 613, a two-page document
00:32:56:109  23       Bates numbered CITI 14960157-158.
00:33:02:415  24      Q.   I hand this to you, Mr. Stoker, and take
00:33:03:883  25   a moment to read through it.
```

### Page 35

```
00:33:05:118   1         Stoker - May 3, 2012
00:33:22:135   2           Sir, you'll recognize it's an e-mail
00:33:23:870   3   string, and it's in reverse chronological order with
00:33:26:940   4   the earliest e-mail being actually, at the bottom of
00:33:32:312   5   the page.
00:35:16:583   6      A.   Okay.
00:35:17:050   7      Q.   All right, sir.  And you see at the top
00:35:19:853   8   e-mail it appears to be from Grant, Darius, and if
00:35:24:591   9   you look at the addressees, sir, it appears that
00:35:27:127  10   Stoker, Brian, is one of the individuals who received
00:35:30:030  11   this e-mail.
00:35:31:131  12      A.   Yes.
00:35:31:631  13      Q.   Do you have any recollection of
00:35:32:866  14   receiving this e-mail?
00:35:34:000  15      A.   No.
00:35:34:868  16      Q.   Now, the address, the e-mail address
00:35:37:170  17   there, it says BS42208@IMCNAM.SSMB.com.
00:35:45:378  18           Do you recognize that e-mail address?
00:35:48:248  19      A.   Well, I understand the code somewhat.
00:35:51:351  20      Q.   What is the code?
00:35:53:153  21      A.   It was my employee ID at Salomon Smith
00:35:56:222  22   Barney.com.
00:35:59:392  23      Q.   Now, sir, is this an e-mail address that
00:36:02:562  24   you were using during the period December 14 -- or on
00:36:05:966  25   December 14, 2006?
```

### Page 36

```
00:36:08:134   1         Stoker - May 3, 2012
00:36:09:869   2      A.   No.
00:36:10:503   3      Q.   You didn't use it at all?
00:36:11:771   4      A.   No.
00:36:12:472   5      Q.   Did you receive e-mails at this address?
00:36:15:542   6      A.   No.  This is a code generated by
00:36:18:044   7   internal Citigroup computer system.  If you send me
00:36:20:980   8   an e-mail at B.Stoker@Citi.com, it may show up like
00:36:25:752   9   this.
00:36:26:453  10      Q.   I see.  Do you have any reason to
00:36:27:954  11   believe you didn't receive this e-mail?
00:36:29:789  12      A.   No.
00:36:29:989  13      Q.   All right.  If you would look at the
00:36:32:259  14   bottom of the first page, the e-mail.  It says to be
00:36:35:528  15   from a Ratul, Roy, and again, this is addressed to
00:36:39:799  16   several individuals, including Stoker, Brian.  And on
00:36:45:405  17   the second page, his next point, more static deals
00:36:50:110  18   often out of "corroboration" desk.
00:36:53:213  19           Do you see that, sir?
00:36:54:180  20      A.   I do.
00:36:54:714  21      Q.   What is a correlation desk?
00:36:59:052  22      A.   Well, for example, at Citigroup, there
00:37:00:954  23   is another desk and not in the CDO group that was --
00:37:05:191  24   put together correlation trades where all synthetic
00:37:08:628  25   trades and the -- it was kind of a trading desk, and
```

## Page 37

Stoker - May 3, 2012

```
00:37:13:666   1              Stoker - May 3, 2012
00:37:14:801   2    the desk would be long and short various assets, and
00:37:17:470   3    what they were left with was what they called
00:37:19:506   4    correlation, the correlations among the assets.
00:37:21:941   5        Q.    I see. Now, looking at the very first
00:37:23:943   6    page of -- the first e-mail from Darius Grant to
00:37:27:414   7    several individuals, including you, No. 6 appears is
00:37:33:386   8    sent by Mr. Grant.
00:37:34:621   9              Do you see that, sir?
00:37:36:222  10        A.    I do.
00:37:37:157  11        Q.    Do you have any reason to disagree with
00:37:39:359  12    what Mr. Grant is saying there?
00:37:59:079  13        A.    Darius is -- I don't think he speaks for
00:38:00:947  14    all investors.
00:38:02:882  15        Q.    My question was do you disagree with
00:38:06:019  16    what he said there?
00:38:08:254  17              MR. KEKER:  Now, today or then or what?
00:38:11:524  18              MR. INFELISE:  Let's -- thank you.
00:38:12:692  19    Let's say during this period of time.  This
00:38:14:761  20    would have been December 14, 2006.
00:38:17:430  21        Q.    Did you -- did you disagree with what
00:38:19:866  22    Mr. Grant was saying?
00:38:23:470  23        A.    I recall for static deals that investors
00:38:25:338  24    required more --
00:38:25:939  25              MR. KEKER:  Why don't you put it down.
```

## Page 38

```
00:38:26:706   1              Stoker - May 3, 2012
00:38:27:073   2        A.    -- more spread.  For auto reinvestment
00:38:29:242   3    deals, I don't recall their opinion of them.  I don't
00:38:39:285   4    require them valuing, particularly, say, a manager,
00:38:43:356   5    that they could sell deteriorating assets.  I don't
00:38:46:526   6    remember investors' opinions on that.
00:38:49:462   7        Q.    Do you recall having any conversation
00:38:51:731   8    with Mr. Grant on or about -- on or around December
00:38:54:567   9    14th, 2006 and voicing those statements to him?
00:38:59:372  10        A.    No.
00:39:06:146  11              MR. INFELISE:  I would ask the court
00:39:06:813  12    reporter to mark the next exhibit, Exhibit 743.
00:39:36:032  13              (Exhibit 743, E-Mail String Bates
00:39:36:103  14    numbered CITI 185114856-857, marked for
00:39:36:172  15    identification, as of this date.)
00:39:36:242  16        Q.    Just take a moment, Mr. Stoker, and read
00:39:38:645  17    through that.
00:39:42:115  18              MR. INFELISE:  For the record, Exhibit
00:39:48:755  19    743 is a two-page document Bates numbered CITI
00:39:54:160  20    185114856-857.
00:40:06:306  21        A.    Okay.
00:40:06:473  22        Q.    All right, sir.  Have you had a chance
00:40:07:974  23    to look at this e-mail?
00:40:09:242  24        A.    I have.
00:40:09:943  25        Q.    You will see in the first page, the
```

## Page 39

```
00:40:11:711   1              Stoker - May 3, 2012
00:40:13:480   2    first e-mail is from Shalabh Mehrish to several
00:40:15:482   3    individuals, including Brian Stoker.
00:40:17:717   4              Do you recall, sir, receiving this
00:40:19:419   5    e-mail?
00:40:20:253   6        A.    No.
00:40:20:687   7        Q.    Do you have any reason to believe you
00:40:21:821   8    did not?
00:40:23:353   9        A.    No.
00:40:23:423  10        Q.    All right.  And sir, you will see a
00:40:26:559  11    statement there concerning -- by Mr. Mehrish that
00:40:33:300  12    yes, that was my feeling on a static deal without a
00:40:35:702  13    manager.  It would be very hard to sell and most of
00:40:38:505  14    our investors will not even look at it.
00:40:42:442  15              Sir, at the time you received this, did
00:40:44:577  16    you have any reason or did you disagree with
00:40:47:947  17    Mr. Mehrish's assessment?
00:40:54:154  18        A.    No.  He was -- he talked to investors,
00:40:56:723  19    not me, so it's his assessment that mattered, not
00:41:00:060  20    mine.
00:41:00:527  21        Q.    Okay.  As I understood, sir, did you say
00:41:02:629  22    that -- did you testify that on all the CDOs you
00:41:05:966  23    worked on there was an asset manager?
00:41:08:902  24        A.    Yes.
00:41:13:139  25        Q.    For any of the CDOs in which you were
```

## Page 40

```
00:41:14:941   1              Stoker - May 3, 2012
00:41:16:042   2    the deal manager, was the asset manager, to your
00:41:17:877   3    recollection, ever Credit Swisse?
00:41:20:013   4        A.    Yes.
00:41:20:680   5        Q.    And how many deals, do you recall?
00:41:25:185   6        A.    For deals Ridgeway 1, Ridgeway 2, Class
00:41:27:687   7    V III and Adams Square 2.
00:41:43:370   8        Q.    Okay.  Now, when the structuring desk
00:41:46:506   9    was preparing the offering memorandum for Class V
00:41:50:376  10    Funding III, did you use any other offering
00:41:54:481  11    memorandum as a template, to your recollection?
00:41:57:750  12        A.    I believe the template was Adams Square
00:41:59:486  13    2.
00:42:04:090  14        Q.    All right.  And do you recall whether or
00:42:06:760  15    not during this time period -- strike that.
00:42:09:796  16              Do you recall whether or not during the
00:42:11:898  17    period of time that you were working on preparing the
00:42:15:402  18    marketing materials for Class V Funding III, whether
00:42:18:638  19    you provided, personally provided, specific input to
00:42:22:175  20    the attorneys reviewing the offering memorandum for
00:42:26:579  21    Class V Funding III?
00:42:28:148  22              MR. KEKER:  Asked and answered.
00:42:31:551  23        A.    I think -- I don't remember if I spoke
00:42:33:520  24    to the attorneys.  I did review the offering
00:42:35:588  25    memorandum and the sections in particular that I was
```

## Page 41

```
00:42:37:590    1           Stoker - May 3, 2012
00:42:38:592    2    most -- most involved in, like the priority payments.
00:42:42:562    3        Q.   All right. Did you provide specific
00:42:44:731    4    input, then, to the attorneys reviewing the offering
00:42:47:200    5    memorandum for Class V Funding III concerning that
00:42:50:103    6    offering memorandum?
00:42:51:304    7        A.   I may have talked to Keith about it.
00:42:53:106    8        Q.   Do you recall if you personally provided
00:42:55:342    9    information directly to the attorneys?
00:42:57:677   10           MR. KEKER: Asked and answered.
00:42:59:012   11        A.   I don't recall.
00:43:03:516   12           MR. INFELISE: I ask the court reporter
00:43:07:387   13    to mark the next document. This will be Exhibit
00:43:18:231   14    744.
00:43:24:828   15           (Exhibit 744, E-Mail with Attachment,
00:43:24:898   16    Bates Nos. CITI 18416633 to 6669, marked for
00:43:24:968   17    identification, as of this date.)
00:43:25:038   18           MR. INFELISE: For the record, Exhibit
00:43:54:801   19    744, multi-page documents, the Bates Nos. are
00:43:59:673   20    CITI 18416633 to 6669.
00:46:15:241   21        A.   Okay.
00:46:15:909   22        Q.   Have you had a chance look through this
00:46:17:310   23    exhibit, sir?
00:46:18:745   24        A.   I have.
00:46:19:112   25        Q.   The first page appears to be an e-mail
```

## Page 42

```
00:46:20:346    1           Stoker - May 3, 2012
00:46:21:014    2    from Brian Stoker, and here, sir, the address, e-mail
00:46:26:152    3    address, is Brian.Stoker@Citigroup.com.
00:46:29:456    4        Is that your normal -- was that your
00:46:31:057    5    normal e-mail address?
00:46:32:592    6        A.   I actually don't recall.
00:46:34:260    7        Q.   Do you have any reason to believe you
00:46:35:495    8    didn't send this e-mail?
00:46:36:663    9        A.   No.
00:46:38:298   10        Q.   Sir, it's to several individuals. One
00:46:40:567   11    of them is Elizabeth Besio Harden.
00:46:43:336   12        Do you know who that is?
00:46:44:504   13        A.   Yes.
00:46:45:038   14        Q.   Who is that?
00:46:46:473   15        A.   She was an attorney working on Class V
00:46:49:743   16    III at Milbank.
00:46:51:711   17        Q.   Is that Milbank Tweed?
00:46:53:012   18        A.   Yes.
00:46:53:813   19        Q.   And what was Milbank Tweed's role with
00:46:56:449   20    respect to the Class V III?
00:46:58:985   21        A.   They were counsel. They led the -- they
00:47:03:356   22    worked on the deal documents. They were counsel for
00:47:05:225   23    Class V III.
00:47:06:092   24        Q.   Were they outside counsel?
00:47:07:427   25        A.   Yes.
```

## Page 43

```
00:47:07:694    1           Stoker - May 3, 2012
00:47:08:928    2        Q.   How about to Mr. David Impastato,
00:47:12:932    3    I-M-P-A-S-T-A-T-O?
00:47:15:101    4        A.   I don't know him.
00:47:16:236    5        Q.   How about Talius Sega, S-E-G-A?
00:47:21:341    6        A.   I don't know him.
00:47:22:876    7        Q.   Do you recall why you addressed it to
00:47:24:277    8    them?
00:47:26:713    9        A.   I guess they were assigned to the deal.
00:47:29:082   10        Q.   Okay. Now, in this e-mail, you say
00:47:32:552   11    let's discuss tomorrow with Keith and Chaka,
00:47:35:221   12    C-H-A-K-A.
00:47:37:090   13        Does Keith refer to Keith Pinniger?
00:47:39:192   14        A.   Yes.
00:47:40:060   15        Q.   And who is Chaka?
00:47:41:161   16        A.   Chaka Wade.
00:47:41:761   17        Q.   Who was that?
00:47:42:562   18        A    He was a vice president in the
00:47:44:297   19    structuring group.
00:47:45:565   20        Q.   All right, sir. Now, you've had a
00:47:46:699   21    chance to look through the attachment to this e-mail?
00:47:50:336   22        A.   I have.
00:47:51:871   23        Q.   Do you recognize that, sir?
00:47:55:375   24        A.   I do.
00:47:56:109   25        Q.   What is it?
```

## Page 44

```
00:47:57:043    1           Stoker - May 3, 2012
00:47:57:477    2        A.   It's my comments I made to the draft
00:47:59:846    3    offering -- Class V III offering circular.
00:48:02:582    4        Q.   All right. Are your comments here
00:48:04:751    5    annotated in any way?
00:48:07:654    6        A.   Annotated? What do you mean?
00:48:10:490    7        Q.   Well, how do you know which of the
00:48:11:725    8    comments are yours? Are yours the --
00:48:13:426    9        A.   They're all mine.
00:48:15:362   10        Q.   Let me ask you this; the handwritten
00:48:16:830   11    notes in the margin, are these yours?
00:48:18:932   12        A.   Yeah, the handwritten notes are mine.
00:48:20:233   13        Q.   All right. Thank you.
00:48:23:670   14        Now, I see, sir, in looking at this,
00:48:26:039   15    this isn't all the pages for the offering memorandum
00:48:30:143   16    for Class V Funding III, is it?
00:48:32:479   17        A.   It's not.
00:48:33:413   18        Q.   All right. Are these the only pages in
00:48:35:081   19    which you made any comments?
00:48:39:519   20        A.   It looks that way.
00:48:40:654   21        Q.   To your recollection, were there any
00:48:42:289   22    other pages that you made comments on?
00:48:44:791   23        A.   Not to my recollection.
00:48:46:226   24        Q.   So all the areas in which you made
00:48:47:794   25    comments were areas you felt that you had information
```

## Page 45

Stoker - May 3, 2012

```
00:48:51:598   1              that could be helpful to the attorneys reviewing
00:48:52:299   2    that could be helpful to the attorneys reviewing
00:48:55:402   3    this; is that accurate?
00:48:56:469   4         A.   On this date, these are the comments I
00:48:57:770   5    made -- to my best efforts, to make the documents
00:49:01:541   6    accurate.
00:49:01:975   7         Q.   All right. And do you recall whether or
00:49:03:276   8    not you ever provided a similarly-annotated copy of
00:49:07:614   9    the offering circular to the attorneys reviewing the
00:49:10:750   10   documents?
00:49:12:852   11             MR. KEKER: You mean something other
00:49:13:586   12   than this?
00:49:14:087   13             MR. INFELISE: Yes. Something other
00:49:14:754   14   than this. Thank you.
00:49:16:589   15        A.   Did I ever make other comments?
00:49:18:191   16        Q.   Yes.
00:49:19:359   17        A.   Not that I recall.
00:49:25:065   18        Q.   Thank you, sir. It appears, and looking
00:49:27:968   19   at the very -- the second page of the document, it
00:49:32:072   20   appears this originally was an offering memorandum
00:49:36:743   21   for Adams Square 2; is that accurate?
00:49:41:548   22        A.   Yes.
00:49:42:082   23        Q.   All right. And I think you said you
00:49:43:583   24   were the lead structurer in Adams Square 2?
00:49:46:119   25        A.   Just like Class V III, yes, I worked on
```

## Page 46

Stoker - May 3, 2012

```
00:49:48:354   1              
00:49:49:756   2    the engagement letter and then didn't work on it much
00:49:53:260   3    afterward.
00:49:53:893   4         Q.   But you were the lead structurer,
00:49:55:395   5    weren't you?
00:49:55:795   6         A.   No, there was no formal definition of a
00:49:56:830   7    senior structurer --
00:49:57:764   8         Q.   Excuse me, I'm sorry.
00:49:58:965   9              Were you taking credit for it with your
00:50:00:166   10   boss?
00:50:00:800   11        A.   I did.
00:50:02:235   12        Q.   All right. Let me ask you, I think you
00:50:04:504   13   said on Adams Square 2, Credit Swisse was also the
00:50:08:208   14   asset manager?
00:50:10:010   15        A.   Yes.
00:50:10:543   16        Q.   All right. And sir, did you testify
00:50:17:750   17   that Adams Square 2 did contain some synthetic
00:50:21:020   18   assets?
00:50:21:955   19        A.   It did.
00:50:22:656   20        Q.   Do you recall what type of synthetic
00:50:24:391   21   assets were in it?
00:50:25:725   22        A.   Mostly mortgage-backed securities with
00:50:28:228   23   less -- maybe less than 10 percent CDO.
00:50:30:597   24        Q.   So there were some CDOs too?
00:50:33:400   25        A.   I believe so.
```

## Page 47

Stoker - May 3, 2012

```
00:50:34:033   1              
00:50:35:769   2         Q.   All right. How were the assets in Adams
00:50:37:570   3    Square 2 selected?
00:50:42:342   4         A.   Credit Swisse selected them using their
00:50:44:477   5    process.
00:50:45:812   6         Q.   And with respect to Adams Square 2,
00:50:48:181   7    before Credit Swisse ever selected them, did
00:50:50:450   8    Citigroup provide a list of potential candidates for
00:50:54:854   9    inclusion in Adams Square 2?
00:50:56:990   10        A.   I don't recall.
00:50:58:858   11        Q.   In Adams Square 2, do you recall if Citi
00:51:01:061   12   suggested, Citigroup, ever suggested inclusion of any
00:51:04:230   13   assets in Adams Square 2?
00:51:06:699   14        A.   I don't know. I wasn't involved in that
00:51:08:068   15   process.
00:51:09:402   16        Q.   You weren't involved in it at all?
00:51:12:672   17        A.   I was not involved in talking to
00:51:14:474   18   managers about which assets they picked. Traders and
00:51:17:077   19   salespeople talked to them.
00:51:18:712   20        Q.   So it's standard and normal practice for
00:51:21:381   21   you not to talk to the asset manager concerning
00:51:26:386   22   specific assets; is that what you're saying?
00:51:28:088   23        A.   That's typical.
00:51:29:022   24        Q.   Okay. Do you recall whether or not in
00:51:32:792   25   Adams Square 2, Citigroup ever offered to purchase
```

## Page 48

Stoker - May 3, 2012

```
00:51:35:795   1              
00:51:36:863   2    protection on any of the assets included?
00:51:38:765   3         A.   In which deal? I'm sorry.
00:51:39:833   4         Q.   Adams Square 2.
00:51:41:401   5         A.   I don't know.
00:51:42:635   6         Q.   Do you recall whether or not with
00:51:43:970   7    respect to Adams Square 2, Citi ever engaged in
00:51:46:906   8    proprietary trades with respect to any of the assets
00:51:49:809   9    included in that CDO?
00:51:52:345   10        A.   I don't know.
00:51:53:880   11        Q.   Do you recall or do you know whether or
00:51:56:282   12   not with respect to Adams Square 2, Citigroup ever
00:51:59:352   13   took a naked short position in any of the assets,
00:52:02:422   14   synthetic assets, included in that CDO?
00:52:05:692   15        A.   I don't know.
00:52:08:261   16        Q.   During the time that you were acting as
00:52:10:563   17   the lead structurer in Adams Square 2, did you ever
00:52:13:333   18   have any discussion with anyone on the secondary
00:52:16:036   19   trading desk at Citigroup concerning what assets they
00:52:19:673   20   believed should be included?
00:52:21:574   21        A.   Not that I remember.
00:52:22:709   22        Q.   Do you recall any discussions with
00:52:25:078   23   anybody on the secondary trading desk with respect to
00:52:27:680   24   Adams Square 2 concerning what assets the secondary
00:52:31:818   25   trading desk liked to purchase protection on?
```


## Page 49

Stoker - May 3, 2012

```
00:52:34:521   1    Stoker - May 3, 2012
00:52:35:355   2    A.  Not that I remember.
00:52:37:924   3    Q.  Okay. Sir, let's direct your attention
00:52:42:262   4    to the Class V III.
00:52:44:998   5        Do you recall when consideration was
00:52:49:002   6    first given at Citigroup to entering or -- enter or
00:52:53:373   7    having a CDO squared with Credit Swisse?
00:53:02:315   8    A.  Yeah. I have an idea of that, yes.
00:53:04:250   9    Q.  Approximately when did that occur, sir?
00:53:06:987   10   A.  My first involvement was late October.
00:53:09:189   11   Q.  And what was your first involvement?
00:53:12:592   12   A.  I was asked -- Donald and Sohail and
00:53:17:998   13   maybe Shalabh asked me to structure a CDO that was
00:53:23:503   14   going to be a prop trade where Donald was going to
00:53:26:306   15   take some sort of position in a CDO.
00:53:29:209   16   Q.  You said Donald. Would that be
00:53:31:010   17   Donald Quintin?
00:53:31:811   18   A.  Yes.
00:53:32:612   19   Q.  Sohail, who is that?
00:53:33:646   20   A.  Sohail Kahn and the sales desk.
00:53:35:949   21   Q.  And who was the other individual?
00:53:38:652   22   A.  Shalabh Mehrish.
00:53:39:619   23   Q.  Shalabh Mehrish. And they approached
00:53:41:421   24   you in, you believe, October?
00:53:44:357   25   A.  Yeah.
```

## Page 50

```
00:53:45:291   1    Stoker - May 3, 2012
00:53:47:861   2    Q.  And do you recall which of those
00:53:49:562   3    individuals first approached you?
00:53:51:131   4    A.  I don't.
00:53:52:599   5    Q.  And you said that you were told it was
00:53:54:501   6    going to be a -- you said a prop trade, the secondary
00:53:58:705   7    desk?
00:53:59:272   8    A.  Yes.
00:54:00:006   9    Q.  And when you say prop, what do you
00:54:01:407   10   mean -- is that a short for proprietary?
00:54:03:643   11   A.  Yes.
00:54:04:210   12   Q.  All right. And what was your
00:54:05:312   13   understanding of what a proprietary trade was at that
00:54:07:580   14   time?
00:54:08:314   15   A.  A trade where the trading desk was going
00:54:09:883   16   to take some sort of position in the trade, in the
00:54:12:118   17   CDO.
00:54:12:485   18   Q.  All right.
00:54:19:192   19       MR. INFELISE: We have five minutes left
00:54:20:460   20   on the tape, so let's go ahead and take a break
00:54:21:961   21   here.
00:54:23:330   22       THE VIDEOGRAPHER: This marks the end of
00:54:23:997   23   tape No. 1. We're going off the record at 9:57,
00:54:27:133   24   a.m.
00:54:29:162   25       (There was a recess taken.)
```

## Page 51

```
00:54:29:232   1    Stoker - May 3, 2012
00:54:29:302   2        THE VIDEOGRAPHER: This marks the start
00:54:29:803   3    of tape No. 2. We're back on the record at
00:54:31:371   4    10:05 a.m.
00:54:32:505   5    BY MR. INFELISE:
00:54:33:440   6    Q.  All right, Mr. Stoker, when we broke, I
00:54:35:909   7    was asking about when you recalled discussions about
00:54:41:648   8    the CDO squared with Credit Swisse.
00:54:44:551   9        Let me show you what's been previously
00:54:46:286   10   marked as Exhibit 333. And have you had a chance to
00:55:10:810   11   look at Exhibit 333, Mr. Stoker?
00:55:13:012   12   A.  I have.
00:55:13:913   13   Q.  And it appears to be an e-mail from
00:55:15:749   14   Donald Quintin to Brian Stoker and an Ilias -- is
00:55:23:123   15   that Islamov?
00:55:24:190   16   A.  Yes.
00:55:25:191   17   Q.  And who is Mr. Islamov?
00:55:26:927   18   A.  He was an associate in the structuring
00:55:29:262   19   desk.
00:55:31:564   20   Q.  I see. Okay.
00:55:31:698   21       And this is an e-mail dated October
00:55:33:266   22   23rd, 2006.
00:55:34:601   23       Sir, do you recall receiving this
00:55:36:136   24   e-mail?
00:55:36:633   25   A.  No.
```

## Page 52

```
00:55:36:703   1    Stoker - May 3, 2012
00:55:38:104   2    Q.  Do you have any reason to believe that
00:55:39:406   3    you did not receive it?
00:55:41:875   4    A.  No.
00:55:42:041   5    Q.  All right. Now, do you recall the
00:55:47:313   6    circumstances leading up to Mr. Quintin sending you
00:55:50:416   7    this e-mail?
00:55:56:222   8    A.  Leading up to?
00:55:57:323   9    Q.  Yes.
00:56:00:160   10   A.  No.
00:56:00:927   11   Q.  Well, you had mentioned earlier that
00:56:02:095   12   there had been some discussions in October concerning
00:56:06:633   13   the possibility of Mr. Grant taking an -- I think you
00:56:10:904   14   said a prop, doing a prop trade.
00:56:13:740   15       Was this e-mail, to your recollection --
00:56:16:576   16       MR. KEKER: Not Mr. Grant.
00:56:17:477   17       MR. INFELISE: Excuse me, I'm sorry.
00:56:18:945   18   Q.  Was this e-mail, Mr. Quintin, before or
00:56:21:581   19   after those discussions?
00:56:24:951   20   A.  Around that time.
00:56:25:852   21   Q.  All right. Did you understand this
00:56:27:520   22   e-mail to be part of Mr. Quintin's attempt to do this
00:56:32:926   23   prop trade that you had talked about?
00:56:35:462   24   A.  Yes.
00:56:37:597   25   Q.  Okay. And why is it that Mr. Quintin
```

0053

## Page 53

```
00:56:40:100   1            Stoker - May 3, 2012
00:56:41:267   2   sent this to you, do you recall?
00:56:43:803   3        A.    Structurers model deals and to help
00:56:46:506   4   structurers model deals, structurers can put in names
00:56:49:943   5   into the deal, into our models.
00:56:52:712   6        Q.    I see. And prior to this occasion,
00:56:54:981   7   October 23rd, 2006, did Mr. Quintin ever send you a
00:56:59:152   8   list of assets stating that these were assets in
00:57:04:023   9   which he wished to purchase protection?
00:57:07:594  10        A.    Prior to this, he wrote we buy
00:57:09:295  11   protection. I don't know if it was his intention or
00:57:12:265  12   that's what he wrote here.
00:57:12:932  13        Q.    All right. But what I guess -- my
00:57:15:035  14   question was prior to this e-mail, October 23rd,
00:57:18:371  15   2006, did Mr. Quintin ever send you an e-mail in
00:57:22:175  16   which he indicated his desire to buy protection on
00:57:25:445  17   specific assets?
00:57:26:813  18        A.    I don't remember.
00:57:28:448  19        Q.    You don't remember it happened or you
00:57:30:050  20   don't -- it didn't happen?
00:57:31:685  21        A.    I don't remember this e-mail. I don't
00:57:32:886  22   remember, you know, what happened before this.
00:57:36:456  23        Q.    Okay. Do you recall any other occasion
00:57:38:324  24   in which there was any discussions between you and
00:57:41:027  25   Mr. Quintin concerning his desire to do a prop trade
```

## Page 54

```
00:57:46:566   1            Stoker - May 3, 2012
00:57:47:367   2   with respect to specific assets?
00:57:50:036   3        A.    I never -- I was -- I wouldn't speak to
00:57:52:305   4   him about specific assets. I spoke to him. I knew
00:57:54:507   5   he wanted to do -- was interested in doing a sort of
00:57:56:743   6   prop trade, but what he was going to do as far as
00:58:02:015   7   what position he was going to take, was unclear.
00:58:04:284   8        Q.    All right. And prior to the discussion
00:58:07:787   9   in October of 2006, do you recall Mr. Quintin
00:58:10:323  10   specifically talking to you about doing a prop trade
00:58:13:827  11   and -- with respect to any specific assets or any
00:58:17:197  12   CDO?
00:58:19:332  13        A.    Prior to this?
00:58:20:100  14        Q.    Yes.
00:58:20:533  15        A.    Not particularly, no.
00:58:40:954  16        Q.    All right. The discussion with
00:58:42:589  17   Mr. Quintin, and I think you said Mr. Mehrish and
00:58:46:026  18   Mr. Khan, concerning the prop trade, did you tell
00:58:49:729  19   Mr. Pinniger about that?
00:58:53:833  20        A.    Well, in October, I was working with
00:58:55:101  21   Ilias Islamov on the deal, so I did not talk with
00:58:59:506  22   Keith.
00:59:00:240  23        Q.    Did you speak with Mr. Islamov about it?
00:59:03:143  24        A.    Yes.
00:59:04:110  25        Q.    And what did you tell him?
```

## Page 55

```
00:59:04:911   1            Stoker - May 3, 2012
00:59:07:947   2        A.    I don't recall.
00:59:13:687   3        Q.    When you were -- strike that. We'll
00:59:16:589   4   come back to that.
00:59:24:764   5            Did you have any understanding what
00:59:26:533   6   Mr. Quintin wanted you to do with this list other
00:59:30:336   7   than, as you said, to use them for purposes of
00:59:34:607   8   structuring a deal?
00:59:37:110   9            MR. KEKER: Objection. Misstates his
00:59:39:212  10   testimony. That's not what he said.
00:59:40:914  11        Q.    I'm sorry if I misstated your testimony.
00:59:43:183  12   Let's go back.
00:59:44:117  13            What was your understanding of what it
00:59:46:286  14   was Mr. Quintin wanted you to do with this list of
00:59:50:356  15   assets?
00:59:52:692  16        A.    Structurers put these assets into a
00:59:54:928  17   model and model a CDO to see what the equity returns
00:59:58:765  18   would be.
00:59:59:866  19        Q.    All right. And was your understanding
01:00:02:001  20   that Mr. Quintin wanted you to do anything else other
01:00:05:472  21   than that with this list of assets?
01:00:10:143  22        A.    No.
01:00:29:062  23        Q.    Sir, you had indicated at the time you
01:00:31:564  24   received this e-mail, October 23rd, 2006,
01:00:34:301  25   Mr. Pinniger was not working with you.
```

## Page 56

```
01:00:38:405   1            Stoker - May 3, 2012
01:00:40:607   2            When you said that Mr. Pinniger began to
01:00:43:376   3   assume more responsibility for Class V Funding III,
01:00:46:913   4   did you tell him about this e-mail that you received
01:00:49:416   5   back in October 23rd, 2006 from Mr. Quintin?
01:00:52:385   6        A.    No.
01:00:55:021   7        Q.    Do you recall whether or not there was
01:01:00:326   8   any discussions at or near the time you received that
01:01:04:164   9   list on October 23rd, with Mr. Grant concerning a
01:01:09:002  10   prop trade?
01:01:13:306  11        A.    Around this time, I was informing -- I
01:01:15:642  12   tried to keep Darius up to date on deals I was
01:01:17:811  13   working on.
01:01:23:350  14        Q.    I'm going to show you what was
01:01:25:085  15   previously marked as Exhibit 335.
01:01:32:759  16            MR. INFELISE: And Exhibit 335 is Bates
01:01:54:814  17   numbered CITI 18130043.
01:02:01:688  18        A.    Okay.
01:02:06:793  19        Q.    Have you had a chance to read through
01:03:07:020  20   Exhibit 335, sir?
01:03:08:488  21        A.    I have.
01:03:09:522  22        Q.    And your top e-mail appears to be from
01:03:12:459  23   Darius Grant to several addressees, one of them being
01:03:15:996  24   Brian Stoker.
01:03:16:763  25            Sir, do you have any recollection of
```

### Page 69

Stoker - May 3, 2012

1  
2  Q. All right, sir. I showed you Exhibit
3  322 which was the e-mail on October 26th when you
4  talked about doing some modeling or looking at
5  different structures.
6      It should probably be very close to the
7  top of your list.
8  A. Yes.
9  Q. There it is.
10     Do you recall after this e-mail having
11 any further communications with Mr. Quintin
12 concerning taking a short position on specific assets
13 for that proprietary trade?
14 A. No.
15 Q. Do you recall having any discussions
16 with Mr. Grant on that issue?
17 A. No.
18     MR. INFELISE: I ask the court reporter
19 to mark the next exhibit as Exhibit 746.
20     (Exhibit 746, E-Mail, Bates No. CITI
21 19476072, marked for identification, as of this
22 date.)
23     MR. INFELISE: And for the record,
24 Exhibit 746 is a one-page document, Bates
25 numbered CITI 19476072.

### Page 70

Stoker - May 3, 2012

1  
2  A. Okay.
3  Q. All right, sir. And this appears to be
4  an e-mail from Brian Stoker on October 27th to Brian
5  Carosielli, Donald Quintin and Shalabh Mehrish.
6      Sir, do you recall sending this e-mail?
7  A. It rings a bell.
8  Q. So you have no reason to believe you
9  didn't send it?
10 A. No.
11 Q. And also copied on this is Mr. Grant,
12 Darius Grant.
13     Sir, the attachment says some --
14 subject, CDO squared deal summary.XLS.
15     Sir, was the purpose of this to provide
16 these individuals to which this e-mail is addressed,
17 information concerning what your modeling showed?
18 A. I'm sorry, I apologize. Could you
19 repeat the question, please.
20 Q. Okay. Sir, was the purpose of this
21 e-mail to provide information to the individuals
22 addressed -- to which it was addressed, concerning
23 what your modeling of the CDO squared deal showed?
24 A. Yes.
25 Q. And one of the assumptions were that you

### Page 71

Stoker - May 3, 2012

1  
2  were making -- shorting single A assets into the
3  deal; is that accurate?
4  A. Yes.
5  Q. And does that mean actually purchase
6  protection on the synthetic single A assets that were
7  going to go into this deal?
8  A. Yes.
9  Q. Okay. Sir, take a look again back at
10 Exhibit 333. It's the October 20 -- I think third
11 e-mail from Mr. Quintin to you.
12     Do you recall, sir, what, if anything,
13 you did with this list?
14     MR. KEKER: Asked and answered.
15 A. I think a few days later, I was asked to
16 send it to Sohail, or I sent it to Sohail.
17 Q. Who was it that asked you to send it to
18 Sohail -- Mr. Khan, correct?
19 A. Yes.
20 Q. Who was it who asked you to send it to
21 Mr. Khan?
22 A. I don't recall.
23 Q. And I'm going to show you what's been
24 previously marked as Exhibit 371.
25     Sir, have you had a chance to look at

### Page 72

Stoker - May 3, 2012

1  
2  Exhibit 371?
3  A. I have.
4  Q. And it's from -- appears to be from
5  Brian Stoker to Sohail Kahn copied to a Marek -- I'll
6  try this, Troszczynski?
7  A. Troszczynski.
8  Q. Who is Mr. Troszczynski?
9  A. He was an analyst or associate in the
10 structuring group.
11 Q. All right. And sir, do you recall
12 sending this e-mail?
13 A. No, I don't.
14 Q. Do you have any reason to believe you
15 did not?
16 A. No, I don't.
17 Q. All right. And you had said you recall
18 that someone had told you to forward the list,
19 Exhibit 333, to Mr. Khan.
20 A. Well, I don't remember -- I must have --
21 somebody must have asked me, but I don't remember
22 who. I don't know if somebody asked me, but somebody
23 must have.
24 Q. If you would look, compare 371 to 333,
25 the list of names on both exhibits. Are these