0073

Page 73

01:26:49:375 Stoker - May 3, 2012

01:26:53:880 identical?

01:26:55:515 A. I think so.

01:26:55:782 Q. Take a moment and make sure.

01:27:06:125 A. Yes.

01:27:06:893 Q. All right, sir. Is it accurate to say,
01:27:18:471 as a general matter, you did not normally suggest
01:27:23:276 specific assets for inclusion in a deal, in a CDO
01:27:26:413 that you were structuring?

01:27:27:614 A. That's right.

01:27:34:054 Q. Prior to the date when you forwarded the
01:27:37:991 list, Exhibit 371, to Mr. Khan, had you ever
01:27:42:229 previously done this, forwarded a list of names for a
01:27:45:699 specific CDO?

01:27:59:012 A. Not particularly.

01:28:00:280 Q. And do you recall whether or not after
01:28:02:048 this date, did you ever forward a list such as this
01:28:04:884 to sales concerning specific names for a CDO?

01:28:11:925 A. Sales, not that I remember.

01:28:13:593 Q. How about to an asset manager?

01:28:18:865 A. I might have sent a list to asset
01:28:20:300 managers along the way.

01:28:22:802 Q. Do you recall which CDO that was?

01:28:25:505 A. I don't.

01:28:30:043 Q. Sir, isn't it the fact that the normal

Page 74

01:28:31:311 Stoker - May 3, 2012

01:28:31:812 procedure was for the manager to send you a list that
01:28:34:915 the manager had already picked when the deal was much
01:28:37:450 farther along in the process?

01:28:41:254 A. Right. Once we have a signed engagement
01:28:42:822 letter, the manager has entered the trades. The
01:28:45:191 managers entered those trades into a trade log and
01:28:47:761 sends that to the structuring team.

01:28:49:696 Q. I see. So did you ever learn whether or
01:28:52:966 not Mr. Khan ever forwarded the list, Exhibit 371, to
01:28:56:236 anyone else?

01:28:59:206 A. I understand he forwarded it to Credit
01:29:00:607 Swisse.

01:29:01:641 Q. And how did you learn that?

01:29:10:550 A. I'm not --

01:29:11:484 Q. If you recall.

01:29:12:218 A. Yeah. I'm not sure.

01:29:13:219 Q. Okay.

01:29:16:056 MR. KEKER: You're saying you knew it at
01:29:16:756 the time or you knew it now?

01:29:23:096 THE WITNESS: I'm not sure.

01:29:24:464 Q. All right. Well, let's try and refresh
01:29:25:732 your memory, because I know this is several years
01:29:27:834 ago.

01:29:27:934 I would like to have you look at what

Page 75

01:29:30:003 Stoker - May 3, 2012

01:29:30:770 has been previously marked as 372.

01:29:40:847 MR. INFELISE: For the record, Exhibit
01:29:45:318 372 is a two-page document Bates numbered CITI
01:29:49:322 14250375 and 376.

01:29:58:131 Q. All right, sir. Have you had a chance
01:29:59:132 to look at Exhibit 372?

01:30:00:934 A. I have.

01:30:01:668 Q. And it appears to be an e-mail from
01:30:03:103 Mr. Khan to a Samir Bhatt, a John Popp, copies to
01:30:10:844 Brian Stoker and Shalabh Mehrish.

01:30:13:313 Do you recall, sir, receiving this
01:30:14:714 e-mail?

01:30:16:249 A. I don't recall it, but I'm sure I
01:30:17:650 received it.

01:30:18:185 Q. All right. And having looked at this,
01:30:20:086 does this refresh your memory concerning how you
01:30:22:522 learned that the list that you had provided Mr. Khan
01:30:27:227 had been forwarded to Credit Swisse?

01:30:30:864 MR. KEKER: Objection. Assumes facts
01:30:32:132 not in evidence. This is not the same list.

01:30:34:868 MR. INFELISE: We'll get there.

01:30:36:369 MR. KEKER: Well, I object on that
01:30:38:071 ground. The question was you forwarded the
01:30:40:040 list, and you are referring to an earlier list.

Page 76

01:30:41:374 Stoker - May 3, 2012

01:30:42:275 MR. INFELISE: All right.

01:30:44:478 A. I probably noticed that -- I'm sure I
01:30:46:513 noticed Samir sent this -- not Samir, Sohail sent
01:30:49:583 this to Credit Swisse.

01:30:51:584 Q. All right. And if you look at the
01:30:53:653 second page, there are a list of -- I guess what was
01:31:01:094 called -- let's call them collateral. If you compare
01:31:03:930 that to Exhibit -- I think it was 371, which you
01:31:06:800 should have, the list that you provided.

01:31:11:271 Would you compare that, sir, and could
01:31:12:539 you tell me whether or not they are identical.

01:31:37:397 A. No, they're not identical. The order
01:31:40:667 has changed. And it looks like Cetus 4 is new, Cert
01:31:52:045 is new, Octans 3 is new, the Topanga 2 is new.
01:32:09:929 That's what I see.

01:32:10:563 Q. All right. So except for those four
01:32:15:001 specific names that you identified, the rest of the
01:32:19:039 list is identical to the one that you sent to
01:32:21:875 Mr. Khan?

01:32:22:475 A. I think they were on there.

01:32:25:245 Q. All right. And do you have any
01:32:26:446 understanding of who added those additional names in
01:32:29:516 the list that was forwarded from Mr. Khan to
01:32:31:017 Mr. Bhatt?

Stoker - May 3, 2012

Q. And it appears to be two e-mails on the first page.

The second one, there's a -- is from -- appears -- appears to be from Donald Quintin to Brian Stoker on November the 2nd, 2006.

Sir, do you have any recollection of receiving this e-mail?

A. No, not particularly, though I'm sure I received it.

Q. All right. And in this, Mr. Quintin states apparently Samir is amenable to the portfolio. It sounds like Popp was receptive to the concept yesterday.

First, sir, do you know the reference -- what the reference to Popp is?

A. It's John Popp. He was Samir's boss at Credit Swisse.

Q. All right. And sir, does this refresh your recollection concerning whether or not you learned after the list was sent to Credit Swisse whether they were willing to include those assets in a CDO squared?

A. I see that it says they're minimal to the portfolio, but I have no understanding as to what

Stoker - May 3, 2012

assets or what they were going to do with those assets.

Q. All right. Well, when you were talking about amenable portfolio, do you have any understanding of specifically what portfolio of assets Mr. Quintin was referring to?

A. I knew the list that I forwarded to Sohail. I know there was a list.

Q. All right. And you were aware of the day before Mr. Khan forwarded that list to Credit Swisse?

A. I probably saw that e-mail.

Q. Right.

MR. KEKER: I object to that list. It's a different list.

MR. INFELISE: Okay.

Q. You were aware that on November the 1st, Mr. Khan forwarded a list of assets to Credit Swisse?

A. Probably I didn't realize it was a different list at the time, probably.

Q. All right. So the list which you had forwarded four additional assets from, the list that you provided to Mr. Khan, that's the one we are talking about. You understand that, sir?

Stoker - May 3, 2012

A. Yes.

Q. So on November the 2nd when you received this e-mail from Mr. Quintin, did you have an understanding when he referred to the assets of the portfolio, he was referring to the list of assets that Mr. Khan forwarded the day before?

A. Yes.

Q. All right. Sir, do you recall during this time period -- again, I'm referring to the October and November of 2006 time period, whether you were keeping Mr. Grant informed of what was happening with respect to the proposed CDO squared with Credit Swisse?

A. I tried to keep Darius up to date, yes.

Q. Okay. I'm going to show you, sir, what was previously marked as Exhibit 615.

MR. INFELISE: For the record, Exhibit 615 is a multi -- five-page document, but it does not bear any Bates numbers.

A. Is there a certain part of this e-mail?

Q. Well, I'm just going to direct your attention to the first e-mail on the very first page. You can obviously take your time to review the entirety, if you wish.

Stoker - May 3, 2012

A. Okay.

Q. All right, sir. And I'm going to direct your attention again to the first e-mail on the top of this page.

It appears to be from Brian Stoker to Darius Grant on November the 9th, 2006.

Sir, do you have any recollection of sending this e-mail to Mr. Grant?

A. Yeah, I remember it.

Q. All right. You say let's let Jim into DQ CDO squared with CSAC.

When you say Jim, who are you referring to?

A. Jim Prusko at Magnatar Capital.

Q. And why is it you were suggesting to allow Mr. Prusko to be involved in this CDO squared?

A. Well, the salesperson, Bob Stevenish, Robert Stevenish as written in, in Boston, he was -- he covered Magnatar. And he was pressuring Darius and me to get -- work out some trade with Magnatar. And we hadn't been able to work one out. He covered Magnatar and Magnatar was giving him a lot of trades with other dealers. He was frustrated that Citigroup hadn't done -- at least our structuring or CDO group,

01:44:12:052 Stoker - May 3, 2012

01:44:13:620 hadn't done a deal with Magnatar.

01:44:14:654 Q. All right. Now, if I direct your
01:44:18:725 attention to the sentence in the third line that
01:44:22:195 starts CDO. It says CDO squared can print one Q
01:44:26:366 because DQ and Jim will short assets into the deal.
01:44:30:336 Sir, could you explain to me what you
01:44:31:504 mean by CDO can print one Q.

01:44:36:810 A. They could price or close in the first
01:44:39:812 quarter of the next year, 2007.

01:44:43:183 Q. All right. And because DQ and Jim will
01:44:45:819 short all assets into the deal.
01:44:48:488 Sir, does that mean that either
01:44:49:723 Mr. Quintin or Mr. Prusko would purchase protections
01:44:53:093 on all the assets in the deal?

01:44:55:128 A. Yeah. That will guarantee that the deal
01:44:56:329 will get done because -- at least be executed,
01:44:59:532 because these guys were willing to provide liquidity.

01:45:05:972 Q. So does that -- again, does that mean --
01:45:09:309 make sure I understand, does that mean that when they
01:45:12:946 say they will short all assets into the deal, that
01:45:15:749 Mr. Quintin and Mr. -- it's your expectation that
01:45:18:751 Mr. Quintin and Mr. Prusko would purchase the
01:45:21:288 protection on all the assets?

01:45:23:223 A. At least initially, yes.

01:45:24:758 Stoker - May 3, 2012

01:45:29:362 Q. All right. With respect to the list of
01:45:32:198 assets that Mr. Khan sent to Credit Swisse back on
01:45:37:704 November 1st, do you recall whether or not you
01:45:40:940 personally had any communications with anyone at
01:45:43:843 Credit Swisse concerning that list?

01:45:46:145 A. I didn't.

01:45:47:146 Q. Are you sure?

01:45:48:748 A. Pretty sure. I don't remember it.

01:45:56:422 Q. I'm going to show you what's been
01:45:57:824 previously marked as Exhibit 537, a two-page
01:46:01:861 document, CITI 15952054 and 055.

01:46:36:196 A. Okay.

01:46:36:863 Q. Sir, have you had a chance to look at
01:46:38:064 Exhibit 557?

01:46:39:432 A. I have.

01:46:40:633 Q. And the first e-mail at the top appears
01:46:43:403 to be from Brian Stoker to a Michael Shackelford and
01:46:47:073 dated November 14, 2006.
01:46:49:876 Sir, do you have any recollection of
01:46:51:478 sending this e-mail?

01:46:55:515 A. Vague recollection.

01:46:57:017 Q. So you don't have reason to believe you
01:46:58:251 didn't send it, do you?

01:46:59:352 A. No.

01:46:59:752 Stoker - May 3, 2012

01:47:02:489 Q. Who is Michael Shackelford?

01:47:03:823 A. Michael Shackelford was Samir Bhatt's
01:47:07:761 new boss. He had started I don't know how many
01:47:09:529 months before. So he was junior to John Popp and
01:47:13:133 senior to Samir Bhatt.

01:47:14:868 Q. Okay. And if you notice the attachments
01:47:17:937 to this, the second page of it.
01:47:21:508 Does that appear to be the list of
01:47:22:842 assets that Mr. Khan forwarded Mr. Bhatt on November
01:47:26:846 the 1st?

01:47:27:514 A. Yes.

01:47:28:181 Q. All right. And why is it, then, you
01:47:30:750 were forwarding a copy of this same list to
01:47:33:386 Mr. Shackelford?

01:47:36:156 A. Maybe he asked. I don't remember.

01:47:37:290 Q. All right. So in fact, you did have
01:47:40:327 direct communication with someone at Credit Swisse
01:47:42:762 concerning the list, didn't you?

01:47:44:664 A. I sent this e-mail, but I don't remember
01:47:47:834 talking to him about it.

01:47:48:735 Q. Do you have any recollection of why you
01:47:50:270 did it?

01:47:50:804 A. No.

01:48:11:791 Q. Sir, after you sent that list to

01:48:14:794 Stoker - May 3, 2012

01:48:15:729 Mr. Shackelford on November 14th, do you recall
01:48:18:565 whether or not you engaged in any discussions or
01:48:21:000 communications with other individuals in Citigroup's
01:48:25:805 CDO desk concerning what assets should be included in
01:48:31:377 the CDO squared with Credit Swisse?

01:48:37:517 A. Would you repeat the question. I
01:48:38:418 apologize.

01:48:38:952 Q. Sure. After you sent the e-mail to
01:48:41:154 Mr. Shackelford on November the 14th, do you recall
01:48:43:990 whether or not you had any communications or
01:48:45:792 discussions with any of the individuals in
01:48:48:695 Citigroup's CDO group concerning what assets should
01:48:54:134 be included in the CDO squared that was being
01:48:56:870 contemplated with Credit Swisse?

01:49:00:440 A. I don't remember talking about any
01:49:01:408 particular names, no.

01:49:02:909 Q. Do you recall aside from oral
01:49:04:911 communications, any written communications?

01:49:07:514 A. No.

01:49:09:749 Q. Okay.

01:49:12:318 MR. INFELISE: I think we have to change
01:49:13:553 the tape. So let's take a break here.

01:49:15:688 THE VIDEOGRAPHER: This marks the end of
01:49:16:322 tape No. 2. We're going off the record at 11

Stoker - May 3, 2012

a.m.

(There was a recess taken.)

THE VIDEOGRAPHER: This marks the start of tape No. 3. We're back on the record at 11:08 a.m.

BY MR. INFELISE:

Q. All right, sir. And just before we broke, I was asking whether you recalled if you had any further discussions with anyone in Citigroup's CDO group about the specific assets for inclusion in the proposed CDO squared with Credit Swisse.

And I'd like to show you, sir, what was previously marked as Exhibit 373.

MR. INFELISE: And Exhibit 373 is a multi-page document Bates numbered CITI 18178869 through 81.

A. Okay.

Q. Sir, have you had a chance to look at Exhibit 373? Just take a moment and take a look at it.

A. Okay.

Q. All right. And sir, Exhibit 373, the first page, appears to be an e-mail from Brian Stoker on November 22nd, 2006 to Shalabh Mehrish,

Stoker - May 3, 2012

Sohail Kahn, Donald Quintin, Brian Carosielli, and with a copy to Mr. Darius Grant.

Sir, looking at this e-mail, do you have any recollection of actually sending this e-mail?

A. I do.

Q. All right. And sir, the subject is the CSAC CDO squared. Sir, CSAC, is that an acronym for Credit Swisse?

A. It is.

Q. All right. And sir, does this refresh your recollection concerning whether or not after the November 14th e-mail, you actually had further communications with individuals on the CDO -- or excuse me, in the CDO group, concerning specific assets to include in the CDO squared with Credit Swisse?

A. Well, this is exactly the kind of -- this refreshes my recollection that this is exactly the kind of conversation I would have with assets -- types of assets and spreads, and ratings as opposed to particular names.

Q. All right. Well, in the body of the e-mail, it's the third sentence, you say I'm thinking the president constellation deal should be single A,

Stoker - May 3, 2012

and the rest should be triple B.

Do you see that, sir?

A. I do.

Q. And were you referring specifically to the CDOs we discussed earlier, the CDOs that were named after presidents and constellations?

A. I don't -- I was referring to the president and constellations and I don't know if that list was still relevant or just generally, the president and constellation deals had a wider spread, so if they were going to be included, it was -- I felt there was no need to buy the triple B, because the single A had enough spread all ready.

Q. But you were specifically saying or suggesting here president/constellation deals, correct?

A. I did.

Q. All right. And that wasn't your normal practice, was it, to suggest specific assets for inclusion in a CDO?

A. That was exactly what I did in many, many CDOs.

Q. Well, sir, isn't it true that generally, you didn't pay attention to what specific assets were

Stoker - May 3, 2012

in the deal?

A. That's right, I did not pay attention to particular names. I paid attention to asset types, ratings, types, mortgage-backed security versus CDO, spreads.

Q. Okay. Now, after this e-mail, what we've just referred to as Exhibit 373, do you recall whether there was any further discussions with CSAC or -- excuse me, Credit Swisse, about that CDO squared?

A. I'm sorry?

MR. KEKER: About what CDO squared?

Q. The one that was the topic of the November 22nd e-mail -- 21st e-mail I just showed you. Excuse me.

MR. KEKER: 22nd. November 22nd. Kennedy's death day.

MR. INFELISE: 22nd.

A. I don't know if this was discussed with Credit Swisse.

Q. Do you know what response, if any, Citigroup received from Credit Swisse about potential assets for inclusion in that CDO squared that's referenced in the November 22nd e-mail?

Stoker - May 3, 2012

Mr. Bhatt and Mr. Khan on January the 8th, 2007?

MR. KEKER: Ever being at the time or?

MR. INFELISE: Fair enough.

Q. Sir, at or near January 8th, 2007, do you recall whether or not you were ever made aware of this communication -- these communications between Mr. Bhatt and Mr. Khan?

A. No, I don't know about these particular communications.

Q. Were you aware at or near January 8th that Citigroup had proposed a list of specific assets to Credit Swisse?

A. No.

Q. Were you aware at or near January 8th whether or not Credit Swisse ever accepted that proposal?

A. I wasn't aware of the proposal.

Q. So you were not aware of whether or not they accepted it; is that accurate?

A. I was aware soon after that there was a trade executed, but I was not aware of these discussions.

Q. Were you aware of -- you said soon after that a trade was executed.

Stoker - May 3, 2012

Were you aware of whether or not that trade that was executed was on each of the assets listed on Exhibit 513-A?

A. No. I don't know the names involved.

Q. Did you learn names involved?

A. I've seen some lists since then in preparing for testimony.

Q. No, sir, I'm going to direct your attention to this time frame, at or near January the 8th.

Were you aware of the specific names on which -- excuse me, strike that.

Were you aware of the specific assets which were proposed that Citigroup purchase protection on?

A. No.

Q. If you look at Exhibit 513-A, the second e-mail from Mr. Khan, the second line says if we can get this done, we're pretty much done on 50 percent of the portfolio, 250 MM off the bat.

Sir, my understanding is 250 MM refers to 250 million.

A. Yes.

Q. Okay. Thank you.

Stoker - May 3, 2012

All right, sir. I'm going show you, sir, what has been previously marked as Exhibit 514-A.

A. Okay.

Q. All right, sir. Now, looking back at Exhibit 513-A, at the top you can see that the date and time was January 2007 at 10:12 a.m.

Do you see that, sir?

A. Yes.

Q. And if you look at Exhibit 514-A, this again is from Mr. Khan to Mr. Bhatt. Sir, you are not the sender or recipient of this.

Do you have any recollection of being informed that on January 2007 at 10:57 a.m., this e-mail was sent?

A. No.

Q. And were you aware that on January 8th, 2007, that Citigroup and Credit Swisse had agreed to trades and specific assets in the attachments to Exhibit 514-A?

A. I understood soon after. I don't know if it was that day or the next day, but soon after that, that there was a trade executed. I didn't know which names and I didn't pay attention to the names.

Stoker - May 3, 2012

Q. And you were aware of the amount of that trade?

A. Yes.

Q. I'm going to show you, sir, what's been previously marked as Exhibit 617.

MR. INFELISE: And for the record, Exhibit 617 is a one-page document, CITI 18249474.

A. Yes.

Q. All right, sir. And this appears to be an e-mail from Brian Stoker to Darius Grant on January the 8th, 2007 at 11:55 a.m.

Sir, looking at this e-mail, do you recall sending this e-mail?

A. I don't recall, but I'm sure I sent it.

Q. All right. And about midway down the e-mail, there is a reference to CDO squared.

Do you see that?

A. I do.

Q. And there is reference to CSAC, BSAM and Dillon Read, parens UBS. Then it says CSAC is buying 250 million -- or excuse me, 250 MM from DQ.

Sir, is this the e-mail indicating that you learned on January 8th, 2007 that Credit Swisse

Page 105

02:13:27:507 Stoker - May 3, 2012
02:13:28:575 had agreed to sell protection to Donald Quintin for
02:13:32:679 $250 million?
02:13:34:247 A. It indicates I had some idea. Is buy,
02:13:36:549 as opposed to bought. I don't know if the trade was
02:13:38:318 done or where that trade stood necessarily, but I had
02:13:41:721 some idea.
02:13:42:989 Q. And how did you learn that?
02:13:44:891 A. I don't know.
02:13:46:626 Q. Is that information that you would have
02:13:48:027 been provided by Mr. Khan?
02:13:50:864 A. I might have overheard Mr. Khan or
02:13:53:466 Mr. Carosielli or Mr. Quintin or maybe --
02:13:57:837 MR. KEKER: Don't guess if you don't
02:13:58:771 remember.
02:13:59:005 A. I don't remember.
02:13:59:439 Q. You don't recall?
02:14:00:240 A. I don't.
02:14:00:907 Q. Was it a common practice for the
02:14:02:475 structurers to be kept up to date on the status of a
02:14:07:046 CDO that you may be structuring?
02:14:12:152 A. Trades -- if a manager agreed to a
02:14:14:120 trade, they would fill out the trade log, and send it
02:14:16:022 to the structuring team.
02:14:17:457 Q. So you would get a copy of the trade log

Page 106

02:14:18:525 Stoker - May 3, 2012
02:14:19:059 indicating exactly what the trades were?
02:14:20:627 A. Yes.
02:14:21:628 Q. And how long after the trade did that
02:14:23:897 occur?
02:14:24:564 A. It's supposed to be the same day.
02:14:39:312 Q. Okay. Sir, after January the 8th, do
02:14:42:815 you recall whether or not there was any discussion
02:14:45:885 between you and Mr. Grant concerning -- strike that.
02:14:50:523 After January 8th, 2007, do you recall
02:14:52:759 whether or not Mr. Grant gave you any guidance or
02:14:55:695 direction on the structuring of this CDO squared with
02:14:59:566 Credit Swisse?
02:15:03:903 A. I don't remember any in particular, no.
02:15:06:406 Q. Do you recall whether he voiced any
02:15:07:807 concerns about the structuring of it?
02:15:12:979 A. I vaguely remember he wanted to make
02:15:15:115 sure we get the modeling right, because we
02:15:17:317 hadn't worked on a -- I hadn't worked on a CDO
02:15:18:985 squared before.
02:15:20:153 Q. And the reason he wanted to get the
02:15:21:121 modeling right was because it was a proprietary
02:15:23:256 trade, is that accurate?
02:15:25:258 A. No.
02:15:26:025 Q. It's not?

Page 107

02:15:26:459 Stoker - May 3, 2012
02:15:28:094 A. It's not.
02:15:30:697 Q. Are you saying that the purchase of
02:15:32:699 protection by Mr. Quintin in the -- that CDO squared
02:15:39:906 which became Class V III, wasn't a proprietary trade?
02:15:45:545 A. Donald did end up having some position
02:15:47:046 in it, but from my perspective, it was not the ideas
02:15:50:617 discussed, and it was not the -- in October-November,
02:15:54:020 it was a trade where Donald had some position in it,
02:15:56:823 so if you want to call it a prop trade, okay, but it
02:15:59:959 was a different deal where Credit Swisse picked the
02:16:01:728 assets, and Donald's position was uncertain.
02:16:13:339 Q. Well, do you know whether or not other
02:16:15:575 people in the structuring desk considered the
02:16:18:345 position Mr. Quintin was taking as a prop trade?
02:16:22:449 A. I think the term prop trade was left
02:16:23:917 over from the ideas of October-November. It just
02:16:26:853 didn't fade. If anybody called it that afterward, it
02:16:30:390 was just a left over term and not accurate.
02:16:33:893 Q. Why wasn't it accurate?
02:16:35:862 A. Because I don't -- because it wasn't a
02:16:37:197 prop -- it became not a prop trade at that point. It
02:16:39:232 became just what I called a regular trade where
02:16:41:735 Credit Swisse was picking the assets, and Donald's
02:16:45:271 position was secondary. Nobody knew what he was

Page 108

02:16:49:642 Stoker - May 3, 2012
02:16:50:443 going to do. He didn't know what he was going to do.
02:16:54:347 Q. So you're saying at some point in time,
02:16:56:850 the plan to do a prop trade changed; is that
02:17:01:855 accurate, between October discussions and January of
02:17:05:826 2007?
02:17:07:360 A. In my view it did.
02:17:08:628 Q. In your view. All right.
02:17:10:497 How about Mr. Grant, do you know what
02:17:12:699 his view was?
02:17:14:868 A. I don't know.
02:17:18:905 Q. Let me show you, sir, what has been
02:17:20:506 previously marked as Exhibit 618.
02:17:34:321 MR. INFELISE: And 618 is a one-page
02:17:36:323 document Bates numbered CITI 18277265.
02:17:46:199 A. Okay.
02:17:46:366 Q. All right, sir. And this appears to be
02:17:49:135 an e-mail from Darius Grant to Brian Stoker and
02:17:52:305 Mr. Maneesh Awasthi.
02:17:55:141 A. Yes.
02:17:55:875 Q. Dated January 16, 2007.
02:17:58:778 Sir, do you recall receiving this
02:17:59:913 e-mail?
02:18:01:648 A. I don't.
02:18:02:215 Q. Do you have any reason to believe you

0121

Page 121

Stoker - May 3, 2012

receiving this e-mail?

A. No, but I'm sure I received it.

Q. All right. And at the bottom of the e-mail, there is a -- bottom of the page, there is an e-mail from Mr. Li on February the 5th to Shalabh Mehrish, and copies to you and Mr. Pinniger and Mr. -- I guess himself, in which he says SK Life insists they want to see no static deal in the Class V portfolio unless CSAC can convince him each of the static deals has value added, which is hard to prove.

Do you recall any discussion with Mr. Li or any of the other individuals in this e-mail about that request from I guess what's referred to as SK Life?

A. No.

Q. Do you have any idea why it would be hard to prove that the specific static deals selected by CSAC didn't add any value to the portfolio?

A. I think it's always hard to prove that an investment -- one investment is better than the other. You can't prove it, right? There are different assets, different prices. You can't prove it. And if an investor has a view that something is -- that they don't like static deals, then I think

Page 122

Stoker - May 3, 2012

it's going to be hard to prove -- certainly prove it, much less convince them that you know, to change their mind.

Q. All right. Now, there is an e-mail below the first one from Mr. Mehrish to you and Mr. Li, copy to Mr. Pinniger, which says Samir bought these static bonds and he should have a rationale as to why he found them attractive.

And the response from Mr. Li at the top which was sent to you and Mr. Mehrish, says yes, he could come up with some stories for some of the static deals in the Class V pool, but not all of them.

Sir, did it give you any concern when you read this e-mail that Mr. Li was saying that Credit Swisse could not come up with a rationale for why to include all the deals that it did in Class V?

A. No.

Q. Not at all?

A. Not at all.

Q. Thank you.

Sir, I'm going to show you what's previously marked as Exhibit 380.

A. Okay.

Page 123

Stoker - May 3, 2012

Q. Have you had a chance to look at Exhibit 380, sir?

A. I have.

Q. It appears to be an e-mail from a Brian Herr to several individuals. One of those indicates is Brian Stoker, dated February 28, 2007.

Sir, do you recall receiving this e-mail?

A. No.

Q. Now, I think you testified earlier that February 28th, 2007 was the date that the Class V III closed; is that right?

A. Yes.

Q. Now, the subject of this is Credit Swisse's CDO trade log, Class V Funding III.

Sir, do you recall whether or not you actually reviewed the attachments to this e-mail?

A. I don't recall.

Q. Would it be common practice for you to do so?

A. No.

Q. Why not?

A. Because I didn't have a view on individual assets. This was -- I don't know why he

Page 124

Stoker - May 3, 2012

was sending this on the closing date. Usually, on this deal, Frank Li would look at the assets chosen and update his models with those assets. And then it looks like -- otherwise, this information might be for potential investors or somebody, not for me.

Q. All right. If you would look at the third page of the attachment, so it's actually the -- since it's copied on two sides. Okay? It's the third page on the second piece of paper there, which is the third page of the attachment. And there is a column that says broker.

Do you see that?

A. Yes.

Q. All right. And at least on this page, there is a -- well, the first -- several of those indicates the broker is Citigroup.

A. Yes.

Q. And does that indicate that in fact, with respect to that asset, that Citigroup was the purchaser uncovered of that asset?

A. No. It just means the initial trade was with Citigroup. No telling what Citigroup traders did after that initial trade date.

Q. Well, does -- but on this trade date

02:39:09:950 Stoker - May 3, 2012
02:39:10:951 which is February 28th, 2007 --
02:39:14:854 A. Right.
02:39:15:322 Q. -- right? Well, doesn't this show that
02:39:17:457 the entries which say Citigroup is a broker mean that
02:39:20:560 Credit Swisse did the trade with Citigroup uncovered?
02:39:24:498 A. No, it doesn't.
02:40:09:609 Q. All right, sir. If you would look at
02:40:13:613 Exhibit -- I believe it's 741. It would be your
02:40:17:350 testimony on March the 4th, 2010.
02:40:28:061 All right, sir. And if you look at the
02:40:30:930 page which is 141 of the transcript.
02:40:39:606 A. Okay.
02:40:42:342 Q. All right. And I'm going to direct your
02:40:43:176 attention to the question and answers beginning on
02:40:46:479 line 18 on that page through line 6 on page 142, but
02:40:57:390 take the time, the time that you think is necessary,
02:40:59:826 to read as much of that as you would like.
02:41:29:589 MR. KEKER: I object to using this for
02:41:32:025 impeachment, because it's not impeaching.
02:43:06:486 A. Okay.
02:43:07:120 Q. Have you had a chance to read that, sir?
02:43:08:321 A. Yes.
02:43:09:055 Q. And having read that, sir, were your
02:43:10:256 answers to those questions accurate?

02:43:11:825 Stoker - May 3, 2012
02:43:13:026 A. Absolutely.
02:43:13:459 Q. All right. Let me ask you this again
02:43:17:430 with respect to Exhibit 380. And I'm again going to
02:43:24:404 direct your attention to the third page of the
02:43:29:076 attachment.
02:43:33:647 A. Okay.
02:43:34:481 Q. And in the column which says broker,
02:43:36:250 where someone other than Citigroup is listed, doesn't
02:43:40:553 that indicate that with respect to that asset, that
02:43:44:691 Citigroup just intermediated the trade?
02:43:50:998 A. I'm sorry, could you repeat the
02:43:51:999 question.
02:43:52:399 Q. Sure. In the column that says broker,
02:43:54:500 and for the assets where it shows someone other than
02:43:58:038 Citigroup, does that indicate that that person listed
02:44:02:576 as broker or -- let me say this -- strike that.
02:44:05:011 Does that entry of a name other than
02:44:07:414 Citigroup indicate for that asset Citigroup actually
02:44:10:517 just intermediated the trade for Credit Swisse?
02:44:13:419 A. Yes.
02:44:14:454 Q. And that would be a trade in which
02:44:17:457 Citigroup would charge its what, 3 basis points?
02:44:20:793 A. Yes.
02:44:21:594 MR. INFELISE: I think it's time to

02:44:24:764 Stoker - May 3, 2012
02:44:26:299 change the tape.
02:44:31:471 THE VIDEOGRAPHER: This marks the end of
02:44:32:072 tape No. 3. We're going off the record at 12:04,
02:44:34:808 p.m.
02:44:37:674 (There was a recess taken.)
02:44:37:744 THE VIDEOGRAPHER: This marks the start
02:44:38:311 of tape No. 4. We're back on the record at
02:44:40:313 12:15 p.m.
02:44:42:812 BY MR. INFELISE:
02:44:42:882 Q. Mr. Stoker, based on your experience at
02:44:45:551 Citigroup, when Citigroup acted as an arranging bank
02:44:50:590 for a CDO, how was it compensated?
02:44:54:761 A. How was Citigroup compensated?
02:44:55:962 Q. Yes.
02:44:58:332 A. Structuring fees.
02:45:00:433 Q. And the structuring fees, who paid
02:45:01:935 those?
02:45:05:638 A. That's hard to say who paid them. It
02:45:07:474 was kind of really the structuring fees were whatever
02:45:11:244 dollars were left over after buying the assets and
02:45:14:147 selling all the notes.
02:45:15:515 Q. So ultimately, the money that was paid
02:45:17:083 to pay that structuring fee came from investors in
02:45:19:653 the CDO, didn't it?

02:45:21:421 Stoker - May 3, 2012
02:45:22:489 A. You could say that.
02:45:23:323 Q. Okay. Do you recall how much Citi
02:45:27:527 actually made or do you recall how much Citi charged
02:45:31:431 for the structuring fees on a Class V III?
02:45:37:237 A. Not precisely.
02:45:38:972 Q. Okay.
02:45:48:782 MR. INFELISE: I'm going to ask the
02:45:49:282 court reporter to mark the next exhibit as
02:45:52:819 Exhibit 748.
02:45:55:112 (Exhibit 748, E-Mail String, Bates No.
02:45:55:181 CITI 15019692, marked for identification, as of
02:45:55:251 this date.)
02:45:55:322 MR. INFELISE: For the record, Exhibit
02:46:17:310 748 is a one-page document CITI -- Bates No.
02:46:20:814 CITI 15019692.
02:46:29:389 A. Okay.
02:46:30:256 Q. Sir, have you had a chance to look at
02:46:31:358 Exhibit 748?
02:46:33:760 A. I have.
02:46:34:961 Q. And the top e-mail appears to be from
02:46:37:331 Brian Stoker on March 1st, 2007 to several
02:46:43:069 individuals; Frank Li, and -- excuse me, Frank Li and
02:46:47:640 Darius Grant.
02:46:48:942 Sir, looking at this e-mail, do you have

02:46:50:343 Stoker - May 3, 2012
02:46:51:210 any recollection of sending it?
02:46:54:013 A. I don't.
02:46:54:380 Q. All right. Do you have any reason to
02:46:55:882 believe you didn't?
02:46:56:950 A. No.
02:46:58:351 Q. Looking at the bottom e-mail on this
02:47:00:420 page, which appears to be from Frank Li to several
02:47:03:523 individuals including Brian Stoker on February 28th,
02:47:08:028 2007, sir, do you have any reason to believe you
02:47:11:231 didn't receive this e-mail?
02:47:12:765 A. No.
02:47:13:233 Q. Do you have any recollection of actually
02:47:14:500 receiving it?
02:47:15:635 A. No.
02:47:16:436 Q. Now, on this -- the subject is Class V
02:47:20:207 Funding III final P&L. There is a listing of total
02:47:25:111 gross fee of 34 million. Is that $34 million, sir?
02:47:31:985 A. Yes.
02:47:33:954 Q. Does this refresh your recollection
02:47:36:456 concerning how much Citigroup charged for structuring
02:47:40:293 fees in the Class V III?
02:47:42:195 A. Yes.
02:47:42:795 Q. Would this be an accurate statement of
02:47:45:031 that amount?

02:47:45:899 Stoker - May 3, 2012
02:47:47:868 A. Yes.
02:47:48:201 Q. At the top of the page, an e-mail that
02:47:49:736 you sent on March 1st, 2007, you said that was a
02:47:54:541 guess. Then DQ made lots of money being short the
02:47:58:111 market that we can't take credit for.
02:48:00:880 DQ again, is that referring to
02:48:02:583 Donald Quintin?
02:48:03:316 A. Yes.
02:48:04:184 Q. And when you say being short the market,
02:48:06:352 are you referring to the fact that Mr. Quintin took a
02:48:09:556 short position on synthetic assets in the Class V
02:48:13:660 Funding III?
02:48:15:461 A. For some time, yes, I had -- yes.
02:48:18:431 Q. All right. So as of March 1st, 2007,
02:48:21:568 you say he's made lots of money -- by March 1st, 2007
02:48:25:638 by being short?
02:48:26:773 A. Yes.
02:48:27:474 Q. Do you know or have any idea how much
02:48:29:809 money was made as a result of short positions on all
02:48:33:346 those assets after March 1st, 2007?
02:48:38:618 A. Well, even at that time, I had -- it was
02:48:39:919 just a guess. I didn't have any insight into the
02:48:42:289 trading desk confidential trades or trading strategy.
02:48:47:160 Q. Well, but you said DQ made lots of

02:48:50:163 Stoker - May 3, 2012
02:48:51:564 money; is that right?
02:48:51:931 A. Generically, yes, I had some idea.
02:48:53:600 Q. And what was the basis of that idea?
02:48:55:301 A. I don't remember.
02:48:56:370 Q. All right. And how about after March
02:48:57:804 1st, do you have any idea of how much, if any, more,
02:49:01:674 was made as a result of those short positions that
02:49:03:643 were taken in the assets in Class V Funding III?
02:49:08:848 A. In the months -- in the time after, I
02:49:10:850 thought he made more money, but -- right? I thought
02:49:14:788 he had made more money.
02:49:16:189 Q. All right, sir.
02:49:47:654 In the time frame the end of 2006
02:49:49:823 through early 2007, did you have a view concerning
02:49:54:528 Citi's role as a swap counterparty for synthetic
02:49:59:566 assets in the CDO?
02:50:01:935 A. Did I have a view?
02:50:05:071 Q. A view.
02:50:05:338 A. A view?
02:50:05:671 Q. Yeah.
02:50:07:507 A. I'm not sure what you mean by view.
02:50:09:409 Q. Well, how did you -- you were aware that
02:50:11:344 for synthetic assets in a CDO, Citi as arranging bank
02:50:16:950 would be what we called the initial swap

02:50:18:518 Stoker - May 3, 2012
02:50:19:185 counterparty; isn't that correct?
02:50:19:819 A. Yes.
02:50:20:954 Q. How did you view that role?
02:50:26:392 A. A necessary role to create a CDO.
02:50:28:561 Q. Okay. And in that role, they were just
02:50:30:463 the -- Citi was just acting as the intermediary; is
02:50:33:333 that accurate?
02:50:34:801 A. It could have been an intermediary or
02:50:35:935 not.
02:50:37:571 Q. Well, did you view it, then, as an
02:50:39:172 intermediary?
02:50:42:542 A. I viewed it as they had to be involved
02:50:44:210 to structure the CDO. And that they may or may not
02:50:51:184 be intermediating.
02:50:53:787 Q. Well, did you consider that role pretty
02:50:55:622 insignificant with respect to the CDO squared --
02:50:59:326 excuse me, a synthetic CDO? I'm sorry.
02:51:04:797 A. Insignificant?
02:51:05:431 MR. KEKER: Objection to the form pretty
02:51:06:632 insignificant.
02:51:08:935 A. It was necessary. You had to have it.
02:51:14:340 Q. Sir, did you view that role Citi played
02:51:17:343 as initial swap counterparty as a basic
02:51:20:080 administrative one, moving cash around?

Stoker - May 3, 2012

A. If they were intermediating or moving cash around, I guess that wasn't the primary -- most important thing in the CDO.

Q. Okay. If you would look again at Exhibit 471, which is your testimony on March 4th, 2010.

A. Yes.

Q. All right. I'm going to direct your attention to page 62 and 63 of that testimony. And you can read any portion you want. I was going to direct your attention to the lines beginning on lines 16 of page 62 through line 9 of page 63.

A. Okay.

MR. KEKER: Jeff, I thought Ms. Imes made a correction to this answer on the transcript, or some place. I've seen it.

MR. INFELISE: Well, if you provide it to us, I'll be happy to add it in.

A. I do not have it.

MR. INFELISE: Let's go off the record.

THE VIDEOGRAPHER: We are going --

MR. KEKER: No, we don't need to go off the record.

MR. INFELISE: Yes, we do.

Stoker - May 3, 2012

MR. KEKER: No, we don't.

MR. INFELISE: We do. We are not going to waste time arguing on my time.

MR. KEKER: Okay. Well, I won't charge you for the time, but I just assume stay on the record. I thought she said there should be a not in here.

MR. INFELISE: Where?

MR. KEKER: Right where it's -- having Citigroup in the middle of every trade does not seem like a concern to me. Now, I thought that's in the transcript. In the 2011, maybe. Anyway. We'll look. He can testify and we'll look for it.

MR. INFELISE: Sure. All right.

MR. KEKER: It's in the 2011.

MR. INFELISE: If it helps, I wasn't focusing on that answer anyway. But I'll be happy if you find the correction, we can put it in.

Q. All right, Mr. Stoker.

Again, take your time and read through whatever you --

MR. KEKER: Here. I'm sorry, it's page

Stoker - May 3, 2012

337 of Exhibit 742. And Ms. Imes says -- refers to line 19. Mr. Stoker answers I wasn't concerned. The manager picks the assets, you know, determines every trade, so having Citigroup in the middle of every trade does not seem concern now. She said there is a not missing. There should be a not after does there. I think in the context it's obvious that is correct, but I wanted to be sure that you knew that error was there, and she offered you the tape or offered Mr. Feller to go look at the tape.

MR. INFELISE: All right. Thank you.

Q. Sir, have you had a chance to read that?

A. I have.

Q. Now, you look on page 63, start on line there 3 where you describe -- you say well, to elaborate, I would say the manager is in charge. Right, do you see that?

A. I do.

Q. And then you go on to say and Citigroup is -- Citigroup as swap counterparty, is just the intermediary, kind of a bi-product of the deal and pretty insignificant, I would say, to the CDO. It's

Stoker - May 3, 2012

almost like a -- almost like just an administrator moving cash around.

Sir, when you gave that testimony, was that accurate and correct?

A. Yes.

Q. Thank you. Now, with respect to Class V Funding III, sir, wasn't Citigroup's role different from the role as initial swap counterparty that you just described?

A. Different, no. They were the initial swap counterparty.

Q. Well, didn't they have another role in that besides being initial swap counterparty?

A. As what?

Q. I don't know. I'm asking you. Do you know if they had another role?

A. No.

Q. If Citigroup took a naked -- excuse me, a short position in specific assets which it held, isn't that different than being initial swap counterparty that just intermediates trades?

A. No, it's not different.

Q. It's not at all different?

A. It's the exact same as being the initial

02:55:58:191 Stoker - May 3, 2012

02:56:01:361 swap counterparty. It's different than
02:56:02:228 intermediating trades, but it's the same as being the
02:56:03:563 initial swap counterparty.
02:56:05:065 Q. So when you say they were almost an
02:56:06:632 administrator moving cash around, you say that's
02:56:09:703 exactly the same as what Citigroup did with respect
02:56:13:506 to the 25 assets on which it took a short position;
02:56:17:043 is that correct?
02:56:22:983 MR. KEKER: I object to the form of the
02:56:24:117 question.
02:56:29:422 A. Could you repeat the question, please.
02:56:30:690 Q. Sure. I just referred to the statement
02:56:34:561 you made that Citigroup's role as a swap counterparty
02:56:38:665 was almost just as an administrator moving cash
02:56:42:569 around; and I'm asking you with respect to the 25
02:56:46:306 assets on which Citigroup took a short position, are
02:56:49:542 you saying that that describes what Citigroup did?
02:56:52:946 A. Yes.
02:56:53:847 Q. So they moved cash around from the
02:56:55:214 investors to Citigroup?
02:56:59:352 A. From themselves to -- from the trading
02:57:03:056 desk to the CDO.
02:57:07:494 Q. The trading desk did?
02:57:09:663 A. The trading desk was the initial swap

02:57:10:930 Stoker - May 3, 2012

02:57:11:564 counterparty. They moved cash around from
02:57:12:465 themselves, right? They made premium payments to the
02:57:15:001 CDO.
02:57:16:203 Q. And when, as you described, Mr. Quintin
02:57:20:073 made a lot of profits on those short positions, then
02:57:23:777 you're moving cash from the investors to Citigroup,
02:57:26:312 right?
02:57:29:682 A. There was no cash flows for that.
02:57:32:251 Q. What do you mean there was no cash
02:57:33:120 flows?
02:57:35:155 A. Well, in any profits that Donald had
02:57:37:190 made, and I didn't have much insight into his
02:57:40:694 strategy or his trading book, any profits he made in
02:57:43:897 January, February, that is just a -- you know, mark
02:57:47:634 to market or realized gain on trades he had offset at
02:57:50:002 the time, and there is no cash movement facing the
02:57:56:342 CDO at the time.
02:57:57:543 Q. Well, let me ask you this; if you buy
02:57:59:579 protection on specific assets in a synthetic CDO, the
02:58:05:718 person who purchased the protection pays a certain
02:58:08:989 premium; is that accurate?
02:58:11:057 A. Yes.
02:58:12:025 Q. And the reason they pay that premium,
02:58:13:860 that is if, for some reason, that asset has an event

02:58:17:831 Stoker - May 3, 2012

02:58:20:633 of default, then the CDO has to pay the person
02:58:23:169 purchasing the protection the value of the amount of
02:58:28:909 insurance they purchased, right?
02:58:31:511 A. Okay.
02:58:31:711 Q. All right. So if in fact, assets -- the
02:58:34:748 25 assets or some of the 25 assets which Citigroup
02:58:39:319 took a naked or short position on, they kept them
02:58:43:857 until they defaulted, Citigroup would be entitled to
02:58:47:927 a payment of the entire amount that they purchased
02:58:50:963 protection on; is that accurate?
02:58:54:201 A. Yes.
02:58:54:834 Q. All right. So if that occurred, then in
02:58:58:405 the moving cash around that you described, would be
02:59:02:442 from the investors directly to Citigroup, correct?
02:59:06:079 A. Yes.
02:59:15:054 Q. Do you have any idea approximately how
02:59:18:892 much profit Citigroup realized as a result of the
02:59:23:063 naked positions or the short positions they took on
02:59:26:599 the 25 assets in Class V III?
02:59:30:237 A. No, I don't know.
02:59:31:337 Q. Do you recall ever trying to estimate
02:59:33:005 that?
02:59:34:041 A. I did try to estimate.
02:59:35:174 Q. All right. I'm going to show you, sir,

02:59:38:445 Stoker - May 3, 2012

02:59:41:681 what was previously marked as Exhibit 377.
03:00:06:306 Sir, have you had a chance to look at
03:00:07:607 Exhibit 377? And take your time. There is a fairly
03:00:15:082 lengthy attachment to it.
03:00:17:317 A. I have.
03:00:18:151 Q. All right.
03:00:19:752 MR. INFELISE: And for the record,
03:00:20:720 Exhibit 377 is a multi-page document Bates
03:00:24:791 numbered CITI 15025665 through 676.
03:00:33:099 Q. Sir, the first page of this document
03:00:35:001 appears to be an e-mail from Brian Stoker to Darius
03:00:38:972 Grant on June 27, 2007.
03:00:45:245 Subject, savings by selling to CSAC
03:00:48:181 Vandy and Harding.
03:00:50:317 Sir, do you recall why you sent this --
03:00:53:052 well, first off, do you recall sending this e-mail to
03:00:54:955 Mr. Grant?
03:00:57:357 A. I do.
03:00:57:958 Q. All right. And why is it you sent this
03:00:59:993 e-mail?
03:01:01:127 A. I don't recall.
03:01:04:030 Q. And there's a list of deals there, these
03:01:06:566 deals were. Do you see that, sir?
03:01:07:734 A. I do.

03:01:07:901 Stoker - May 3, 2012

03:01:09:202 Q. One of those is Class V III?

03:01:12:572 A. Yes.

03:01:13:040 Q. And then down in the body of the e-mail, 03:01:15:875 you say, the third line, Class V III made us $250 03:01:20:346 million in profits, correct?

03:01:23:483 A. Yes.

03:01:24:050 Q. All right. And if I recall your 03:01:25:518 testimony, the structuring fee that Citigroup made as 03:01:28:888 a result of Class V Funding III was $34 million.

03:01:34:561 A. Yes.

03:01:36:530 Q. All right. That was the fee. Okay. 03:01:37:263 Now, where did the other profits that you've listed 03:01:43:336 there come from, to your knowledge?

03:01:46:206 A. All right. This analysis was based off 03:01:50:110 of what I wrote here. This wasn't about structuring 03:01:52:011 fees. This was from three -- from the three sources.

03:02:00:887 Q. I see.

03:02:02:623 A. The trading desk, where I assume that 03:02:04:858 trading desk shorted assets, from assets that Chris 03:02:10:397 Carman's desk sold in CDOs, and I assumed that these 03:02:14:734 assets that hadn't been sold would be -- Citi would 03:02:18:304 have retained them and realized a loss on those, and 03:02:21:742 the third source is Shalabh's sales, so any issued 03:02:25:511 CDOs that these seven CDOs bought, I assumed that

03:02:29:015 Stoker - May 3, 2012

03:02:30:416 Citigroup would not have sold those and instead, 03:02:32:185 would have held those through this date and would 03:02:34:587 have incurred a loss of those. Those were three 03:02:36:389 sources of losses.

03:02:38:892 Q. All right. Did you say that this does 03:02:40:560 not include structuring fees, this is separate and 03:02:42:462 apart?

03:02:43:063 A. It does.

03:02:44:531 Q. Then I guess my question was with 03:02:46:299 respect to Class V Funding III specifically, you talk 03:02:49:669 about a profit of $250 million.

03:02:51:971 A. Yes.

03:02:52:972 Q. What was your basis for concluding on 03:02:55:842 June the 27th, 2007, that Citigroup made a profit of 03:03:00:880 $250 million in Class V III?

03:03:03:516 A. Well, I didn't have good information. I 03:03:05:718 didn't have access to the trading desk confidential 03:03:09:623 trades -- any trades that they had done since. Other 03:03:12:592 than besides the one that had been done with the CDO 03:03:16:196 initially. But I went and looked at the seven trade 03:03:19:533 logs for these seven deals, and I looked for these 03:03:23:636 three sources of trades. One where the initial 03:03:26:639 broker was Citigroup, and I assumed that Citigroup 03:03:31:844 had stayed short on all these seven deals, and then

03:03:35:515 Stoker - May 3, 2012

03:03:39:819 Chris Carman -- any CDOs that Chris Carman had made 03:03:44:590 and was purchased by these seven deals, I assumed 03:03:47:960 that those would take a loss and also, the same thing 03:03:50:363 for Shalabh's deals.

03:03:52:499 Q. Okay. So as I understand, with respect 03:03:54:401 to Class V III, you said you had access to a -- some 03:03:59:906 trading logs for those specific assets in Class V 03:04:03:543 III; is that right?

03:04:05:378 A. I had a trade log for each of these 03:04:06:346 seven deals.

03:04:07:447 Q. And is that the same information you had 03:04:09:082 in February of 2007?

03:04:12:986 A. Yes.

03:04:14:288 Q. All right. So your estimate, based on 03:04:18:158 your review of those logs, was that Class V III or 03:04:22:929 Citigroup made about $250 million in profits on Class 03:04:26:933 V III as of June 27, 2007?

03:04:30:970 A. Profits or losses avoided.

03:04:33:773 Q. Well, it says profits, sir. Does it say 03:04:35:541 losses avoided in Class V Funding III?

03:04:37:844 A. Below I did. My next question.

03:04:43:116 Q. Which part?

03:04:45:786 A. The last sentence of the e-mail. Where 03:04:48:822 I wrote even if you care to cut my estimates of

03:04:50:323 Stoker - May 3, 2012

03:04:53:059 profits or losses avoided.

03:04:58:965 Q. But above it when you talk about -- 03:05:01:201 obviously, the paragraph contains reference to both 03:05:04:905 profits and losses avoided; is that accurate?

03:05:10:110 A. Can you repeat the question, please.

03:05:11:210 Q. Sure. The paragraph starting Citi sold 03:05:13:179 $2 billion, 2 BB, of Citi CDOs, that paragraph 03:05:18:384 contains references to both profits made and losses 03:05:22:388 avoided; is that accurate?

03:05:40:741 A. Yes.

03:05:41:541 Q. All right. So when you say Class V III 03:05:44:444 made us 250 million, you specifically refer to 03:05:48:548 profits?

03:05:50:517 A. I did.

03:05:50:984 Q. Okay. Now, this was as of June 27th, 03:05:55:355 2007, your estimate?

03:05:58:692 A. Yes.

03:05:59:192 Q. All right. Do you know or are you aware 03:06:02:262 of whether Citigroup retained any of the short 03:06:06:599 positions on those 25 assets in Class V III until 03:06:11:471 such time as there was an event of default in that 03:06:14:340 asset?

03:06:16:810 MR. KEKER: Did he know at the time or 03:06:18:011 does he know now?

Page 145

03:06:18:745 Stoker - May 3, 2012
03:06:20:581 MR. INFELISE: Yes. Did he know at the
03:06:21:147 time. Thank you.
03:06:22:515 A. I wasn't aware in June, I wasn't aware
03:06:23:784 when there was a default. I wasn't aware until my
03:06:25:952 first investigative testimony.
03:06:27:687 Q. All right. Do you have any recollection
03:06:29:556 of when Class V III was declared to be in default?
03:06:37:197 A. I've since learned that it was in
03:06:40:534 2000 -- end of 2007.
03:06:42:736 Q. But you since learned that, you mean
03:06:44:003 during this litigation?
03:06:44:971 A. That's right.
03:06:45:939 Q. Were you still working at Citi in
03:06:47:875 November 2007?
03:06:49:375 A. I was.
03:06:50:209 Q. Did you receive any information then
03:06:51:945 whether Class V III was the date it was declared to
03:06:56:850 be in default?
03:06:59:185 A. Maybe. I don't remember.
03:07:00:753 Q. So you have no knowledge concerning
03:07:03:223 what, if any, of the assets, 25 assets in which it
03:07:06:493 took a short position, it still held on the day that
03:07:11:130 Class V III was declared to be in default?
03:07:12:866 A. No, I don't know. I don't know if it

Page 146

03:07:14:701 Stoker - May 3, 2012
03:07:15:535 was held or not. I don't know when it defaulted.
03:07:18:605 Q. All right.
03:07:42:863 Mr. Stoker, in the -- near the end of
03:07:47:734 2006, would it be fair to say you were seeking more
03:07:51:804 responsibility on the structuring desk in the CDO
03:07:55:875 group?
03:07:56:610 A. Yes.
03:07:57:710 Q. And why was that?
03:08:02:715 A. I wanted to be promoted to managing
03:08:04:284 director. I wanted -- I wanted to grow in my career.
03:08:11:090 Q. Okay. And to whom did you make that, or
03:08:19:699 did you make that desire known to anybody at
03:08:23:103 Citigroup?
03:08:24:738 A. I spoke to Nestor about it and probably
03:08:27:507 Darius.
03:08:28:641 Q. Do you recall specific conversations
03:08:30:143 with them?
03:08:31:511 A. I remember I spoke with Nestor one time.
03:08:34:581 Q. Okay. And this was -- was this in the
03:08:36:015 time frame of November or December of 2006?
03:08:39:653 A. Yes.
03:08:40:253 Q. Okay.
03:08:51:999 MR. INFELISE: I'm going to ask the
03:08:52:866 court reporter to mark the next exhibit as

Page 147

03:08:55:501 Stoker - May 3, 2012
03:08:55:802 Exhibit 749.
03:09:18:815 (Exhibit 749, E-Mail Bates No. CITI
03:09:18:885 18190520, marked for identification, as of this
03:09:18:956 date.)
03:09:19:025 MR. INFELISE: For the record, the Bates
03:09:21:094 number is partially cut off, but it's CITI
03:09:24:164 18190520, a one-page document.
03:09:39:679 Q. Okay. Mr. Stoker, have you had a chance
03:09:40:947 to look at Exhibit 749?
03:09:42:816 A. I have.
03:09:44:017 Q. And it appears to be an e-mail from
03:09:45:585 Brian Stoker to Nestor Dominguez on November 29,
03:09:48:721 2006.
03:09:50:223 Sir, do you have any recollection of
03:09:51:391 sending this e-mail?
03:09:54:194 A. No.
03:09:55:228 Q. Do you have any reason to believe you
03:09:56:163 didn't send it?
03:09:57:230 A. No.
03:09:58:131 Q. And what was Mr. Dominguez's position on
03:10:00:800 November 29, 2006?
03:10:03:002 A. He was the managing director of the CDO
03:10:04:938 group.
03:10:08:341 Q. It indicates -- it says that I can now

Page 148

03:10:13:747 Stoker - May 3, 2012
03:10:14:681 be in charge of the CDO squared business.
03:10:18:318 At this time, on the structuring desk,
03:10:22:022 were there more than one director who could be in
03:10:25:358 charge of CDO squareds?
03:10:31:264 A. Darius was in charge of the structuring
03:10:32:732 desk and the other groups. I guess Michael Salius
03:10:36:870 was in charge of commercial real estate CDOs, and the
03:10:39:839 other directors were not in charge of any particular
03:10:42:342 deal type.
03:10:44:310 Q. So with respect to those other
03:10:46:112 directors, they could be assigned as deal manager on
03:10:48:916 the CDO squared or you could be assigned as asset
03:10:51:651 manager of the CDO squared?
03:10:53:019 A. Yes.
03:10:53:787 Q. And you were asking to be in charge of
03:10:55:722 all CDO squared business?
03:10:56:957 A. Yes.
03:10:57:691 Q. Did you tell Mr. Grant that you had sent
03:10:59:425 this to Mr. Dominguez?
03:11:01:227 A. Probably.
03:11:02:795 Q. Are you sure?
03:11:03:864 A. I'm not sure.
03:11:09:802 MR. INFELISE: I ask the court reporter
03:11:10:537 to mark the next exhibit as Exhibit 750.

03:11:29:756 Stoker - May 3, 2012
03:11:36:286 (Exhibit 750, E-Mail Bates No. CITI 30701251, marked for identification, as of this date.)
03:11:36:496 MR. INFELISE: For the record, Exhibit 750 is a one-page document, Bates numbered CITI 30701251.
03:11:52:011 A. Okay.
03:11:52:245 Q. All right, sir.
03:11:53:280 And this appears to be an e-mail from Brian Stoker to Nestor Dominguez, also on November 29, 2006.
03:12:02:456 Looking at this document, sir, do you have any recollection of sending it to Mr. Dominguez?
03:12:06:226 A. No.
03:12:07:194 Q. Do you have any reason to believe you didn't?
03:12:08:829 A. No.
03:12:10:129 Q. Now, in the first sentence, you say if you want to make more money and win the league tables, give me more responsibility.
03:12:17:103 My first question, sir, is what are the league tables?
03:12:20:673 A. That is just the ranking of how many total deals and total volume that a deal does.

03:12:31:918 Stoker - May 3, 2012
03:12:33:320 Q. And why is it that you wanted -- you said that, why would Mr. Dominguez want to win the league tables?
03:12:39:258 A. It was prestigious to be number 1 in the league tables.
03:12:42:262 Q. Does that affect your compensation?
03:12:46:500 A. Not particularly.
03:12:47:701 Q. It doesn't?
03:12:51:337 A. It's unclear how I was paid.
03:12:54:574 Q. Did you believe at this time that you were paid based upon the number of CDOs that you actually were responsible for structuring?
03:13:03:049 A. At this time, this is when I had my guarantee -- excuse me, it's not. Did I believe? I tried to do my best and I wasn't sure how I was compensated.
03:13:15:495 Q. Did you ever ask?
03:13:19:199 A. Actually, I did ask. I spoke to Darius about it one time, and he was -- told me I was not compensated based on the number of deals I did.
03:13:26:039 Q. Were you pushing during this time period to try and do more deals?
03:13:30:977 A. I always pushed to do more deals.
03:13:32:645 Q. Okay. Now, you go on in this e-mail to

03:13:36:883 Stoker - May 3, 2012
03:13:38:485 say also, HG CDOs and CDO squared.
03:13:41:154 What is an HG CDO?
03:13:42:823 A. It's a high grade CDO.
03:13:44:724 Q. So in this e-mail which was sent the same day, it looks like maybe an hour and a half later, if you look at 749, you're now asking Mr. Dominguez for responsibility both for CDO squared and the high grade CDOs?
03:13:59:105 A. Yes.
03:14:08:348 Q. Sir, in the time frame of October of 2006 through February 2007, was there any concern on your part with respect to synthetic assets that assets were being adversely selected?
03:14:31:204 A. Not something that I was worried about, no.
03:14:34:041 Q. When I say adversely selected, do you understand that term?
03:14:38:211 A. Yes.
03:14:38:612 Q. What is your understanding of adverse selection?
03:14:42:348 A. Whoever is picking the assets wants them to perform poorly.
03:14:45:585 Q. So if you were picking assets for a synthetic CDO, and you're going to purchase

03:14:51:291 Stoker - May 3, 2012
03:14:52:892 protection on them, you would want them to perform poorly, correct?
03:14:55:329 A. Could you repeat the question.
03:14:56:462 Q. Sure. If you were picking the assets for inclusion in a synthetic CDO and you intended to purchase the protection on those assets, you would want them to perform poorly?
03:15:06:439 A. I apologize. Could you repeat one more time.
03:15:08:541 Q. I'll try.
03:15:10:543 So if you were picking the assets to be put into a synthetic CDO, the referenced assets --
03:15:17:117 A. Yes?
03:15:18:051 Q. -- and you were going to purchase the protection on them, you would want the assets you picked to perform poorly?
03:15:26:026 A. Likely.
03:15:26:827 Q. Okay. Do you recall ever having any discussions with anyone in the CDO group about assets that were being considered for CDOs that may have been adversely selected?
03:15:44:043 A. Could you repeat the question. I apologize.
03:15:45:678 Q. Sure. And I'm referring, again, to the

0153

Stoker - May 3, 2012

time period of, let's say, October 2006 to about February 2007.

Do you recall ever having any conversations with anyone in the CDO group concerning specific assets that were being considered for inclusion of CDOs that may have been adversely selected?

A. I don't remember, no.

Q. Okay. Sir, I'm going to give you a copy of what was previously marked as Exhibit 606.

MR. INFELISE: Exhibit 606 is a two-page document, Bates numbered CITI 18142457-458.

A. Okay.

Q. Sir, the top e-mail appears to be from Brian Stoker to Shalabh Mehrish on October the 31st, 2006.

Sir, do you have any recollection of sending this e-mail?

A. No.

Q. Do you have any reason to believe you didn't?

A. No.

Q. Do you recall whether you received the e-mail just below it from Mr. Mehrish?

Stoker - May 3, 2012

A. No, but I'm sure I received it.

Q. All right. And in that e-mail, Mr. Mehrish references -- the subject is Credit Swisse high grade ABS CDO where else approvals, CDO squareds. We are concerned about potential negative selection of the portfolio. What do you think?

Do you recall him, Mr. Mehrish, making that inquiry to you?

A. No. He wouldn't inquire to me.

Q. Well, he copied you on it, did he not?

A. He did copy me.

Q. And you responded, did you not?

A. I responded.

Q. All right. And your response was pick your poisons, assets you don't like or lower equity returns; is that right?

A. Yes.

Q. Thank you.

MR. INFELISE: Why don't we just take a short break, and I think we are ready to wrap up.

THE VIDEOGRAPHER: We are going off the record at 12:49 p.m.

(Discussion off the record.)

Stoker - May 3, 2012

THE VIDEOGRAPHER: And we're back on the record at 12:50 p.m.

MR. INFELISE: And at this point, I have no further questions. Thank you, Mr. Stoker.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Counsel?

MR. KEKER: No questions.

THE VIDEOGRAPHER: This concludes the deposition. We're going back off the record at 12:51 p.m.

(Time noted: 12:51 p.m.)

Stoker - May 3, 2012

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

________________________

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of ____________, 2012, and executed the above certificate in my presence.

________________________

NOTARY PUBLIC IN AND FOR

________________________

County Name

MY COMMISSION EXPIRES:

# EXHIBIT 16