# Risk Factors *(continued)*

**Redemption of Securities; Potential Illiquidity and Volatility of Valuations.** An optional redemption, tax redemption or mandatory redemption is a potential source of liquidity for the Securities. There can be no assurance, however, that the Issuer's rights to an optional redemption or a tax redemption will be exercised or that the conditions for any redemption, including mandatory redemption, will be met.

An optional redemption, tax redemption or mandatory redemption would result in a termination and valuation of the CDS Assets. The amount payable to or by the Issuer with respect to the termination of the CDS Assets will depend in part on the value of the reference obligations for such CDS Assets ("CDS Reference Obligations"), which in turn will generally fluctuate with, among other things, changes in prevailing interest rates, general economic conditions, the condition of certain financial markets, U.S. and international political events, developments or trends in any particular industry and the financial condition of the issuers of the CDS Reference Obligations. A decrease in the market value of the CDS Reference Obligations could increase the amount of any swap termination payment owed by the Issuer or reduce the amount of any termination payment owed to the Issuer, which could adversely affect the Issuer's ability to make payments or distributions on the Securities. The termination value of the CDS Assets may also be affected by the condition of the market (including the liquidity of the market) for credit default swaps on asset-backed securities generally.

**Principal Prepayment of Notes.** The failure to meet any coverage test applicable to a Class of Notes could result in the application of amounts to the early prepayment of principal in the Notes and to reserve amounts and reduce the notional amount of the Class A1A Swap Agreement at a time when such amounts would otherwise be used to make (i) interest payments on the Class A2, Class A3, Class B, and Class C Notes and (ii) distributions to the holders of the Income Notes.

**Nature of the Collateral Securities and Inherent Risks.** All of the Collateral Securities will consist of cash asset-backed securities or CDS Assets referencing asset-backed securities, which will be predominantly collateralized debt obligations. These obligations are subject to a number of risks, including prepayment risk, credit risk, liquidity risk, structural risk, legal risk and interest rate risk, which may be different from those of other types of debt obligations. The performance of an asset-backed security may be affected by a variety of factors, including the amount and timing of payments and recoveries on the underlying assets.

29

Confidential Treatment Requested by Citi

CITI 09570374

# Risk Factors *(continued)*

**Nature of CDS Assets Generally.** Approximately [90]% of the Collateral Securities included in the Collateral is expected to consist of synthetic assets (referred to in these Risk Factors as "CDS Assets"), all of which will be in the form of credit default swaps documented on pay-as-you-go confirmations or any permitted alternative form of confirmation. The reference obligations defined above in respect of CDS Assets must satisfy the eligibility criteria for the Collateral Securities to be held by the Issuer. Investments in such types of assets through the purchase or acquisition of synthetic assets present risks in addition to those resulting from holding or selling the CDS Reference Obligations directly. CDS Assets are expected to be structured in such a way that the Issuer will receive periodic premium payments and will be required to make payments, from time to time in accordance with the terms thereof, to the synthetic asset counterparty in respect of any floating payments ("Floating Payments") and credit events ("Credit Events"). The obligation of the Issuer to make such payments at any time will result in a reduction in the amount that the Issuer has available to make distributions to the Securities at such time and may result in a lower yield for the Notes and in the Income Notes receiving a lower IRR through their date of final redemption. The requirement of the synthetic asset counterparty to make payments in accordance with the CDS Assets will expose the Issuer to the default risk on the CDS Reference Obligation on an ongoing basis (in addition to the default risk of the synthetic asset Counterparty).

There is no central source for relevant data or a standardized method for measuring the likelihood of the occurrence Floating Payments or Credit Events. Furthermore, the historical experience of other asset-backed securities comparable to the CDS Assets that will comprise a substantial portion of the Collateral Securities is not necessarily indicative of the risk of Floating Payments and Credit Events occurring with respect to the CDS Assets. Accordingly, it is difficult to predict with any certainty the likely level and timing of a Floating Payments or Credit Events that may occur with respect to the CDS Assets.

Neither the Class A1A Swap Counterparty, the Manager nor any if their affiliates should be construed as making any representation with respect to the possibility of the Issuer having to make payments to a synthetic asset counterparty in respect of a Floating Payment or Credit Event occurring with respect to any of the Collateral Securities.

**New and Developing Structure of CDS Assets.** The CDS Assets are expected to be structured as credit default swaps and documented pursuant to one or more master agreements and one or more pay-as-you-go confirmations. Forms of pay-as-you-go confirmations were recently developed to accommodate the unique features of asset-backed and other structured finance securities. The standardized terms for these types of transactions are still evolving. Accordingly, the terms that ultimately become the standard for the market may be significantly different than the terms of the CDS Assets which will be established on the closing date (the "Closing Date") for the issuance of the Securities. Any difference between the Issuer's then existing CDS Assets and the evolving market standard documentation may have a negative impact on the liquidity and market value of any such CDS Assets. In addition, because of such potential differences, there can be no assurance that the Issuer will be able to acquire CDS Assets to the extent or in the manner anticipated on the Closing Date. The Collateral may therefore be less diversified than would otherwise be the case.

30

Confidential Treatment Requested by Citi

CITI 09570375

citigroup

# Risk Factors *(continued)*

**Termination of CDS Assets.** CDS Assets may provide for termination or liquidation based upon the occurrence of various events (including events related to collateral maintained by the Issuer for payments to the counterparties or CDS Assets) that would not apply if the Issuer had invested directly in the CDS Reference Obligations underlying the CDS Assets. The Issuer may be obligated to make payments to the counterparties on the CDS Assets upon termination of CDS Assets. The amount of termination payments owing by the Issuer or the related counterparty, as the case may be, would generally be determined as the replacement cost to the counterparty or the Issuer, as the case may be, for each terminated CDS Asset. The illiquidity and restrictions on transfer and termination of the CDS Assets also may affect the amount and the timing of receipt of proceeds from the termination of CDS Assets in connection with the acceleration of the Notes following an Event of Default or upon a redemption of the Securities. The amount, if any, receivable by the Issuer upon any such termination or liquidation may be significantly less than the amount that the Issuer would have received upon the contemporaneous sale of the CDS Reference Obligation. In addition, the Issuer may not be able to terminate CDS Assets as easily as it would be able to buy and sell the related CDS Reference Obligations, and, in particular, may not be able to terminate such CDS Assets without the consent of the related counterparty for the CDS Asset, and the such counterparty may have the ability to terminate the related CDS Reference Obligations without the consent of the Issuer. Accordingly, the Issuer may not be able to manage its exposure to the related CDS Reference Obligations as efficiently or as economically as it would if it had purchased such CDS Reference Obligations directly. Following a termination, the Issuer may not be able to enter into a replacement CDS Asset or may not be able to negotiate terms of a replacement that are substantially similar to the terminated CDS Asset or at an acceptable cost.

**Reliance on the Creditworthiness of the Class A1A Swap Counterparty and Counterparties to the CDS Assets.** The ability of the Issuer to make payments and distributions on the Securities will depend, in part, on the receipt of payments from the (i) Class A1A Swap Counterparty under the Class A1A Swap Agreement and (ii) counterparties on the CDS Assets. As a result, the Issuer will be relying not only on the credit quality of the Collateral Securities but also on the creditworthiness of the Class A1A Swap Counterparty. In addition, an adverse change in the rating of the Class A1A Swap Counterparty or the counterparty in a material portion of the CDS Assets could adversely affect the rating of the Notes; for example, there may be practical impediments or timing delays associated with enforcement of the Issuer's rights against a the Class A1A Swap Counterparty or any counterparty of a CDS Asset in the case of an insolvency of either such counterparty.

31

Confidential Treatment Requested by Citi

CITI 09570376

# Risk Factors *(continued)*

**Management of the Collateral Securities; Reliance on the Manager.** The Issuer has no employees and will be dependent on the employees of the Manager to make decisions on its behalf in accordance with the terms of the Indenture and a management agreement, which will be executed on the Closing Date and will outline the Manager's responsibilities acting on behalf of the Issuer in managing the Collateral Securities. Because the composition of the Collateral Securities will vary over time, the performance of the Collateral Securities depends on the investment strategy and investment process of the Manager in analyzing, selecting and managing the Collateral Securities. As a result, the performance of the Issuer will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Manager. There can be no assurance that the Manager's current investment professionals will continue to be affiliated with the Manager or actively involved in the management and administration of the Collateral for the Issuer. In the event that one or more of the investment professionals of the Manager were to cease to be affiliated with the Manager or actively involved in the management and administration of the Collateral for the Issuer, the Manager would have to re-assign responsibilities internally and/or hire one or more replacement individuals and such a loss could have a material adverse effect on the performance of the Issuer.

**Potential Conflicts of Interest with the Manager.** Various potential and actual conflicts of interest may arise from the overall investment activities of the Manager and certain parties related to the Manager. The Manager and certain parties related to the Manager may have economic interests in or other relationships with issuers whose obligations are Collateral Securities. In particular, such persons may make and/or hold an investment in an issuer's securities that may be pari passu, senior or junior in ranking to a CDS Reference Obligation. In addition, partners, security holders, officers, directors, agents or employees of the Manager and its affiliates may serve on boards of directors or otherwise have ongoing relationships with issuers of Collateral Securities. The Manager and its affiliates may act as collateral or Manager for other entities and may make different decisions with respect to those entities than with respect to the Collateral Securities. Each of such ownership and other relationships may affect the ability of the Manager to advise the Issuer with respect to such Collateral Securities. The Manager will receive senior and subordinate fees, which may create incentives for it to make decisions that conflict with the interests of a particular Class of Securities.

**Potential Conflicts of Interest with the Trustee.** In certain circumstances, the trustee or its affiliates may receive compensation in connection with the trustee's (or such affiliate's) investment in certain eligible investments from the managers of such eligible investments.

**Ratings.** Credit ratings of debt securities similar to the Notes represent the opinions of the rating agencies regarding their credit quality and are not guarantees of quality. Rating agencies attempt to evaluate the likelihood of contractual principal and interest payments and do not evaluate the risks of fluctuations in market value; therefore, they may not fully reflect the true risks of an investment. In addition, rating agencies may fail to make timely changes in credit ratings in response to subsequent events.

A rating is not a recommendation to purchase, hold or sell securities, and may be subject to revision or withdrawal at any time by the assigning rating agency. In the event that a rating initially assigned to any Class of Notes is subsequently lowered, qualified or withdrawn for any reason, no person or entity will be obligated to provide any additional support or credit enhancement with respect to such Notes, and the market value of such Notes will likely be adversely affected.

32

Confidential Treatment Requested by Citi

CITI 09570377

# Risk Factors *(continued)*

**Tax Treatment of the Issuer.** The Issuer will adopt certain operating procedures designed to reduce the risk that the Issuer will be deemed to have engaged in a trade or business in the United States. As long as the Issuer is not engaged in a United States trade or business, the Issuer will not be subject to United States Federal income tax on its net income. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is not entirely clear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being treated as engaged in a trade or business within the United States. If the Issuer were found to be engaged in a United States trade or business, it could be subject to substantial United States Federal income taxes whose imposition would materially impair its ability to pay interest on and principal of the Notes and make distributions with respect to the Income Notes. In addition, in that event payments in respect of the Notes may be treated as United States source income and could be subject to withholding.

**Withholding Taxes.** The Issuer expects that payments received on the Collateral Securities and the Eligible Investments generally will not be subject to withholding tax imposed by the United States or reduced by withholding taxes imposed by any other country. The Indenture will require that the Collateral Securities not be subject to withholding tax at the time of purchase thereof by the Issuer unless the issuer of the Collateral Security is required to make "gross-up" payments to cover the full amount of such withholding tax. There can be no assurance, however, that payments on the Collateral Securities and the Eligible Investments will not become subject to withholding as a result of any change in any applicable law, treaty, rule or regulation or contrary interpretation thereof or other causes. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is not entirely clear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being subject to excise or withholding taxes on payments in respect of such derivatives. The imposition of unanticipated withholding taxes could materially impair the Issuer's ability to make payments on the Notes and make distributions with respect to the Income Notes.

**Tax Treatment of holders of Income Notes.** Because the Issuer will be a passive foreign investment company, a U.S. person holding Income Notes may be subject to additional taxes unless it elects to treat the Issuer as a qualified electing fund and to recognize currently its proportionate share of the Issuer's income. A holder that makes a qualified electing fund election may recognize income in amounts significantly greater than the distributions received from the Issuer. A holder that makes the election will be required to include in current income its pro rata share of the earnings or discount whether or not the Issuer actually makes distributions. In this regard, prospective purchasers of the Income Notes should be aware that it is possible that a significant amount of the Issuer's income, as determined for U.S. federal income tax purposes, will not be distributed on a current basis for a number of potential reasons, including the investment by the Issuer in instruments that bear original issue discount or market discount, and the retirement of all or a portion of certain classes of Notes. Thus U.S. holders of the Income Notes that make a qualified electing fund election may owe tax on a significant amount of "phantom income". The holder may be able to elect to defer payment, subject to an interest charge for the deferral period, of the tax on income recognized on account of the qualified electing fund election. The Issuer also may be a controlled foreign corporation, in which case U.S. persons holding Income Notes could be subjected to different tax treatments.

**Investment Company Act Considerations.** While the Issuer may be considered similar in some ways to an investment company, it is not required and does not intend to register as such under the Investment Company Act of 1940, and, accordingly, investors in the Securities are not afforded the protections of that Act.

33

*citigroup*

Confidential Treatment Requested by Citi

CITI 09570378

# Risk Factors *(continued)*

**Certain ERISA Considerations.** The Securities will be subject to restrictions on transfers to investors subject to ERISA and certain other laws. In this regard, each purchaser and transferee of an Income Note or any interest therein will be deemed to have represented and agreed (or required to represent and agree in writing in the event such purchaser or transferee is purchasing a physical form of Income Note) at the time of its purchase or acquisition and throughout the period of its holding and disposition of such Income Notes that it is not, and is not acting on behalf of or using the assets of, a Benefit Plan Investor (including, without limitation, an insurance company general account). A Benefit Plan Investor is any employee benefit plan (as defined in section 3(42) of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, any plan to which Section 4975 of the Code applies and any entity whose underlying assets include plan assets by reason of such employee benefit plan's or plan's investment in the entity.

**Money Laundering Prevention.** The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), signed into law on and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "Treasury") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that Treasury will promulgate regulations requiring the Issuer or CSAC or other service providers to the Issuer, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Income Notes. Such legislation and/or regulations could require the Issuer to implement additional restrictions on the transfer of the Income Notes. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

The Administrator is also subject to anti-money laundering laws and regulations in the Cayman Islands which impose specific requirements with respect to the obligation "to know your client". Except in relation to certain categories of institutional investors, the Administrator will require a detailed verification of each initial investor's identity and the source of the payment used by such initial investor for purchasing the Income Notes in a manner similar to the obligations imposed under the laws of other major financial centers. If the Cayman Islands government determined the Administrator was in violation of the anti-money laundering provisions, the Issuer could be subject to substantial criminal penalties. Payment of any such penalties could materially adversely affect the timing and amount of distributions on the Income Notes.

34

Confidential Treatment Requested by Citi

CITI 09570379

# Risk Factors *(continued)*

**Potential Conflicts of Interest with Citigroup and its Affiliates.** Citigroup will act as the initial purchaser of the Notes and as placement agent for the Income Notes and has also previously provided the Issuer with financing and hedging arrangements under a warehouse facility (the "Warehouse Facility"). Citibank N.A., an affiliate of Citigroup, will be the initial Class A1A Swap Counterparty, and in such capacity (together with certain circumstances specified in the definition of "Requisite Noteholders"), will have certain voting and consent rights and other similar rights under the Indenture and certain other Transaction Documents. For purposes of the Indenture, Citigroup and its affiliates will be the Requisite Noteholder on the Closing Date by reason of its role as Class A1A Swap Counterparty. In its role as Class A1A Swap Counterparty, Citibank, N.A. will have the ability to control whether the CDS Assets are required to contain the CDS Counterparty Forbearance and whether certain mandatory funding requirements under the Class A1A Swap will be applicable to Citibank, N.A. The interests of Citibank, N.A. as Class A1A Swap Counterparty may conflict with the interests of the Holders of the Securities in respect of any matter requiring consent or any other matter subject to the discretion of Citibank, N.A. None of Citibank, N.A., Citigroup or any other affiliate of Citigroup will be required to consider the interests of the holders of the Securities in exercising such rights. As the Requisite Noteholder, Citibank, N.A. may (and currently expects to) delegate or assign certain of its rights to one or more third parties in connection with a hedging of its position.

Citigroup or its affiliates may have had in the past and may in the future have business relationships and dealings with one or more issuers of Collateral Securities and their affiliates and may own equity or debt securities issued by issuers of Collateral Securities or their affiliates. Citigroup or its affiliates may have provided and may in the future provide investment banking services and other services to an issuer or sponsor of Collateral Securities or its affiliates and may have received or may receive compensation for such services. Citigroup or its affiliates may buy securities from and sell securities to an issuer of Collateral Securities included in the Collateral or its affiliates for their own account or for the accounts of their customers.

In addition, Citigroup or an Affiliate thereof is expected to act as the initial CDS Asset counterparty pursuant to certain CDS Assets acquired by the Issuer on the Closing Date and may act as the swap counterparty under other derivative agreements entered into by the Issuer itself. In such capacity as swap counterparty, Citigroup (or such affiliate) may be expected to have interests that are adverse to the interests of the holders of Securities. Typically, such a swap counterparty would act as calculation agent pursuant to the derivative agreement and, in such capacity, have broad authorization to perform actions, such as calculations of payment amounts, that involve the exercise of judgment and discretion. As such a swap counterparty, Citigroup will have no duty to act on behalf of the holders of Securities, and, directly or indirectly, may act in ways adverse to them.

Some of the Collateral Securities included in the Collateral may be obligations of issuers or obligors, or obligations sponsored or serviced by companies, for which Citigroup or one of its affiliates may have acted as underwriter, agent, placement agent or dealer or for which an affiliate of Citigroup has acted as lender or provided other commercial or investment banking services. The Issuer will purchase Collateral Securities from Citigroup or its affiliates only to the extent that such Collateral Securities have been selected by the Manager for inclusion under the Warehouse Facility and the purchase of such Collateral Securities is consistent with the investment guidelines described in the Warehouse Facility.

35

citigroup

Confidential Treatment Requested by Citi

CITI 09570380

# B. CREDIT DEFAULT SWAP OVERVIEW

citigroup

Confidential Treatment Requested by Citi

CITI 09570381

# Pay-As-You-Go Credit Default Swaps

- ▲ In 2005, ISDA began to adopt Pay-As-You-Go mechanics
- ▲ Pay-As-You-Go CDS involves a monthly exchange of cashflows that closely match the cashflows of the underlying Reference Obligations
- The protection buyer ("Swap Counterparty") will pay the CDO a specified fixed premium amount (the "Fixed Amount")
- The CDO, as protection seller, will pay the Swap Counterparty an amount (the "Floating Amount") equal to the sum of:
  - The relevant principal shortfall amount (if any)
  - The relevant write down amount (if any)
  - The relevant interest shortfall payment amount (if any)
- Physical Settlement – Following the occurrence of a Credit Event, the protection buyer may deliver all or a portion of the relevant Reference Obligation only
- Credit Events:
  - Failure to pay principal
  - Writedown
  - Distressed rating downgrade
- Credit Events do not include Bankruptcy or Restructuring

citigroup

36

Confidential Treatment Requested by Citi

CITI 09570382

# Credit Events[1]

- ▶ **Failure to Pay Principal**: Occurs when a Reference Obligation fails to make a scheduled principal payment or fails to pay the expected principal amount at maturity
  - The Swap Counterparty may choose to deliver the Reference Obligation to the CDO, in which case the Swap Counterparty will receive an amount equal to the current face amount of the delivered obligation times the Reference Price.[2]
  - In the event that the Swap Counterparty chooses not to deliver the Reference Obligation, it will receive the amount of the principal shortfall times the Reference Price from the CDO. The swap notional will be reduced by the amount paid

- ▶ **Writedown**: Occurs when the principal constituent of a Reference Obligation is written down and cannot be recovered
  - As with the "Failure to Pay Principal" credit event, the Swap Counterparty may choose to deliver the Reference Obligation to the CDO, in which case the Swap Counterparty will receive an amount equal to the current face amount of the delivered obligation times the Reference Price
  - In the event that the Swap Counterparty chooses not to deliver the Reference Obligation, it will receive the amount of the writedown times the Reference Price from the CDO. The swap notional will be reduced by the amount paid

- ▶ **Distressed Rating Downgrade**: Occurs when a Reference Obligation is downgraded to CCC by S&P and Caa2 by Moody's
  - As with the previous credit events, the Swap Counterparty may choose to deliver the Reference Obligation to the CDO, in which case the Counterparty will receive an amount equal to the notional amount of the delivered obligation times the Reference Price. In this case, however, no protection payments will be made if the Swap Counterparty chooses not to deliver the Reference Obligation

---

[1] The terms outlined below are a summary only and will be superseded by the governing terms and conditions of the notes.
[2] The Reference Price need not be equal to the market price.

37

Confidential Treatment Requested by Citi

CITI 09570383

citigroup

citigroup

## Contractual Terms

- Pay-As-You-Go allows for multiple physical settlements for each Reference Obligation. If a Reference Obligation is delivered to the Issuer under physical settlement, the Issuer has the option to hold the security or sell the security as a credit risk security. Any principal collection or sales proceeds will be reinvested in the Eligible Investments until the Class A1A Swap is fully amortized

- If one of the three credit events has taken place, the Swap Counterparty has the right to request physical settlement on all or parts of the CDS contract

38

Confidential Treatment Requested by Citi

CITI 09570384

## C. BIOGRAPHIES

*Information related to CSAC, its personnel (and those of its affiliates), organization, processes and historical performance information has been provided by CSAC. Citigroup is not responsible for the content of the following section and has not independently verified any such information.*

citigroup

Confidential Treatment Requested by Citi

CITI 09570385

# Biographies

▶ **John G. Popp** – *Managing Director and Head of The Leveraged Investments Group*

Mr. Popp is Global Head of the Leveraged Investments Group, with primary responsibility for directing the investment decision and monitoring processes and managing/overseeing LIG's global investment strategy. Mr. Popp chairs the LIG ABS Credit Committee. Prior to joining LIG, Mr. Popp was a founding partner and head of asset management of First Dominion Capital, LLC, overseeing the management of $2.5 billion in CDO Vehicles. From 1992 through 1997, Mr. Popp was a Managing Director of Indosuez Capital and also served as President of Indosuez Capital Asset Advisors, Inc., and President of 1211 Investors, Inc. While at Indosuez, Mr. Popp was responsible for building that firm's asset management business, including the development of three CDO Vehicles aggregating $1.3 billion. Prior thereto, Mr. Popp was a Senior Vice President in the Corporate Finance Department of Kidder Peabody & Co., Inc., which he joined in 1989. Mr. Popp had previously been a Vice President in the Mergers and Acquisitions Department of Drexel Burnham Lambert. Mr. Popp is a council member of The Brookings Institution and a member of The Juilliard School Council. He holds a B.A. from Pomona College and a M.B.A. from the Wharton Graduate Division of the University of Pennsylvania.

▶ **Andrew H. Marshak** – *Managing Director*

Mr. Marshak has global responsibility for overseeing LIG's portfolio management and trading. Mr. Marshak is a member of the LIG ABS Credit Committee. Prior to joining LIG, Mr. Marshak was a Managing Director and a founding partner of First Dominion Capital, LLC, which he joined in 1997 from Indosuez Capital, where he served as a Vice President. Prior to joining Indosuez Capital in 1992, Mr. Marshak was an Analyst in the Investment Banking Department of Donaldson, Lufkin & Jenrette. He holds a B.S., Summa Cum Laude, from the Wharton School of The University of Pennsylvania.

citigroup

39

Confidential Treatment Requested by Citi

CITI 09570386

# Biographies (continued)

▲ **David H. Lerner** – *Managing Director*

Mr. Lerner is a portfolio manager and trader for LIG. Prior to joining LIG, Mr. Lerner served as Senior Vice President of First Dominion Capital, LLC, which he joined in 1998 from The Mitsubishi Trust and Banking Corporation where he was a Vice President in the Leveraged Finance Group. Prior thereto, Mr. Lerner was in the Corporate Finance Group at Banque Francaise where he also served as Vice President. Mr. Lerner began his career as an Associate at The Chase Manhattan Bank, and holds a B.B.A. from the George Washington University.

▲ **Samir Bhatt** – *Director*

Mr. Bhatt joined LIG in 2004 and is a member of the LIG ABS Credit Committee. Mr. Bhatt is lead ABS credit analyst and currently covers CDO's, RMBS and ABS. Prior to joining LIG, Mr. Bhatt worked in the structured finance markets for seven years, the first five in the Structured Products Research group at Credit Suisse First Boston and the previous two as an ABS research analyst and structurer at JP Morgan Chase. Mr. Bhatt holds a B.S. in Computer Science from Cornell University.

▲ **Glenn Clarke** – *Director*

Mr. Clarke joined LIG in 2005 and is resident in London. Mr. Clarke is the European portfolio manager and trader for LIG. Prior to joining LIG, Mr. Clarke was an Associate Director with AIB Capital Markets European Leveraged Finance team, which he joined in 2000. At AIB, he was responsible for sourcing and executing leveraged transactions for both the Bank's balance sheet and CDO's. Mr. Clarke began his career as an Assistant Manager at the Commonwealth Bank of Australia in 1997, and holds a B.Comm from the Murdoch University, Western Australia.

40

citigroup

Confidential Treatment Requested by Citi

CITI 09570387

# Biographies (continued)

▶ **Thomas J. Flannery** – *Director*

Mr. Flannery joined LIG from First Dominion Capital, LLC, where he served as an Associate. Mr. Flannery joined First Dominion Capital, LLC in 1998 from Houlihan Lokey Howard & Zukin, Inc., where he served as an analyst in the Financial Restructuring Group, working on a variety of debtor and creditor representation assignments. Mr. Flannery is a member of the LIG ABS Credit Committee and currently is a credit analyst covering the leisure and entertainment industries and a high yield bond trader. Mr. Flannery holds a B.S. from Georgetown University.

▶ **Linda R. Karn** – *Director*

Ms. Karn is a member of the European LIG Credit Committee and currently covers the media, telecommunications and publishing sectors. Prior to joining LIG as a credit analyst, Ms. Karn served as a Vice President of First Dominion Capital, LLC, which she joined in 1998 from TD Securities (USA) Inc. where she served as a Vice President in the Media and Telecommunications Institutional Equity Research Group. Prior thereto, Ms. Karn was an Analyst in the High Yield Research Group at NationsBanc Capital Markets, Inc. Ms. Karn holds a B.S. from Babson College.

▶ **Michael Shackelford** – *Director*

Mr. Shackelford is a member of the LIG ABS Credit Committee. He joined LIG in 2006 and is primarily responsible for overseeing LIG's ABS investments. Prior to joining LIG, Mr. Shackelford was a portfolio manager and trader with INVESCO Institutional (N.A.) Inc. responsible for managing their ABS CDO portfolios. Prior to that Mr. Shackelford was a portfolio manager and trader with AEGON USA Investment Management, LLC. He was also with Credit-Based Asset Servicing and Securitization LLC (C-BASS) in their capital markets group. Mr. Shackelford began his investment career with The Money Store Inc. as a credit analyst and later traded whole loan portfolios. He holds a B.A. in Economics from the University of Texas at Austin and a M.A. in Economics from California State University, Sacramento.

41

citigroup

Confidential Treatment Requested by Citi

CITI 09570388

# Biographies (continued)

▶ **James M. Potesky –** *Director*

Mr. Potesky joined LIG in 2001 as a credit analyst from the Global High Yield Research group at Morgan Stanley where he served as a Vice President and senior chemical industry analyst. From 1998 to 2000, he was a Vice President and chemical industry analyst for the high yield department of Schroeder & Company. From 1990 to 1998, Mr. Potesky was a Director and senior credit analyst at the Standard and Poor's Ratings Group. He began his career as a corporate loan officer at Morgan Guaranty Trust Company in the early 1980s. Mr. Potesky currently covers automotive and chemical industries. Mr. Potesky holds a B.A. in Political Science from Washington University.

▶ **Vance P. Shaw, CFA –** *Director*

Mr. Shaw joined Credit Suisse Group in 1998 as a senior high yield credit analyst. Mr. Shaw joined LIG in 1998 and currently covers the energy and utility industries. From 1995 to January 1998, Mr. Shaw was Director of High Yield Bond Research at Scotia Capital Markets in New York. Prior to joining Scotia, Mr. Shaw was a Senior Analyst - High Yield Industrials at Lehman Brothers Inc. Mr. Shaw served as a high yield analyst at Kidder Peabody & Co. from 1989 to 1991 and as a senior high yield research analyst at Prudential Capital Management from 1986 to 1989. Mr. Shaw covered U.S. and foreign banks as an analyst at the Federal Reserve Bank of New York from 1982 to 1985. He received his B.S. in Accounting and Finance from New York University and is a Chartered Financial Analyst.

▶ **Lauri Whitlock –** *Director*

Ms. Whitlock joined CS in 2000 as manager of Post Venture Distribution Management Operations. She joined LIG as Middle Office Manager in 2001. From 1997 to 2000, Ms. Whitlock served as manager of Financial and Regulatory Reporting at Salomon Smith Barney. Prior to joining Salomon Smith Barney, Ms Whitlock served as Assistant Controller at Raymond James and Associates. Ms. Whitlock began her career at Price Waterhouse auditing financial services companies. Ms. Whitlock holds a B.S. in Accounting from the University of Maryland.

42

Confidential Treatment Requested by Citi

citigroup

CITI 09570389