seeking to purchase or sell the same or similar investments for the Issuer and another client for which any of them serves as investment adviser or manager, or for themselves. Likewise, the Manager may on behalf of the Issuer make an investment in an issuer or obligor in which another account, client or affiliate is already invested or has co-invested. Making such an investment (on an initial or follow on basis) may result in a direct or indirect benefit to the Manager or its affiliates. Likewise, the Issuer may not be able to invest in opportunities where other clients have invested. The Manager and members of the LIG team performing services for the Manager may, in their discretion, give priority over the Issuer in the allocation of investment opportunities to certain accounts or clients designated by the Manager or members of the LIG team in their discretion and to other accounts or clients of the Manager or its affiliates to the extent obligated or permitted by the application of regulatory requirements, internal policy and client guidelines and/or principles of fiduciary duty. Although the Manager expects to allocate its investment opportunities among the clients of the Manager and of its affiliates in a manner which it believes to be fair and equitable over time, neither the Manager nor any of its affiliates has any obligation to obtain for the Issuer any particular investment opportunity, and the Manager may be precluded from offering to the Issuer particular securities in certain situations including, without limitation, where the Manager or its affiliates may have a prior contractual commitment with other accounts or clients or as to which the Manager or any of its affiliates possesses material, non-public information. The Manager may decline to make a particular investment for the Issuer in view of such relationships. There is no assurance that the Issuer will hold the same investments or perform in a substantially similar manner as other funds with similar strategies under the management of the Manager. There is also a possibility that the Issuer will invest in opportunities declined by the Manager or its affiliates for the accounts of others or for their own accounts. This may result in disparate performance results among funds or client accounts managed by the Manager. In making investments on behalf of accounts or clients that the Manager or its affiliates manage or advise either now or in the future, the Manager in its discretion may aggregate orders for the Issuer with orders for such other accounts, notwithstanding that depending upon market conditions, aggregated orders can result in a higher or lower average price.

    The Manager and its officers, directors, agents and affiliates, including the Bank and CSS and their respective affiliates, may also have ongoing relationships with, provide services to and receive compensation from the issuers and/or the portfolio managers for the issuers, of Collateral Obligations and CDS Reference Obligations and the issuers of obligations backing or securing such Collateral Obligations and CDS Reference Obligations and they or their clients may own equity or other securities or obligations issued by issuers of Collateral Obligations and CDS Reference Obligations and other issuers of such other obligations. In addition, the Manager, its officers and affiliates (including the Bank and CSS and their respective affiliates) and their employees, either for their own accounts or for the accounts of others, may invest in securities or obligations that are senior or junior to, or have interests different from or adverse to, the securities or obligations that are acquired by the Issuer.

    The Manager and its affiliates, including the Bank and CSS and their respective affiliates, may or will own as principals and/or may have structured and originated an initial issuance of Collateral Obligations purchased by the Issuer or the high-yield bonds, loans or other obligations that back such Collateral Obligations and/or have investments (including equity investments) in the issuers of such Collateral Obligations, high-yield bonds, loans and other obligations. The Manager and its affiliates, including the Bank and CSS, are active participants in the market for underwriting, placement, structuring and trading of Asset Backed Securities, high yield bonds and loans and also may, for a negotiated fee, perform advisory or other services or may engage in a variety of other transactions with companies who are current or prospective obligors or issuers of Collateral Obligations or obligations securing such Collateral Obligations. The Management Agreement sets forth certain restrictions on the Manager's ability to purchase for the Issuer certain securities and other obligations owned or originated by the Manager or its affiliates, and any purchases of any such securities or other obligations, when permitted, must be on terms prevailing in the market, and are subject, in certain cases, to consent by the Conflicts Review Board described below. Accordingly, there may be circumstances when the Issuer may be prevented from purchasing or selling Collateral Obligations or from taking other actions that the Manager might consider in the best interest of the Issuer when the Manager or an affiliate thereof has been involved in the underwriting or placement of, or has provided advisory services in connection with, the related transaction.

    The Manager and its officers, agents and affiliates, including CSS, and their employees, may serve on creditor or equity committees or advise companies, potentially including companies that have issued securities or obligations owned by the Issuer or that back securities or obligations owned by the Issuer, subject to bankruptcy or insolvency proceedings or otherwise be engaged in financial restructuring activities in a variety of capacities. Such

Confidential Treatment Requested by Ambac

AMB-V_00045203

activities may result in the Manager receiving confidential information and may reduce the Manager's flexibility in purchasing or selling securities or other obligations on behalf of the Issuer. At times, the Manager and the members of the LIG team performing services for the Manager, in an effort to avoid restrictions for the Issuer and its other clients, may elect not to receive information that other market participants or counterparties are eligible to receive or have received.

Affiliates of the Manager, including the Bank and CSS and their respective affiliates, may act as a Hedge Counterparty or a CDS Asset Counterparty which may create certain conflicts of interest.

Affiliates of the Manager, including CSS, also maintain research departments with professional staffs of portfolio managers and/or securities analysts who will provide research services for the Manager as well as for other funds and investment advisory clients advised by the Manager and its affiliates.

Under the Management Agreement, the Manager is permitted to effect or recommend transactions between the Issuer and any of the Manager and its affiliates, acting as principal or on behalf of any account or portfolio for which the Manager or any of its affiliates serves as investment advisor, only upon disclosure to and with the prior consent of an institution unaffiliated with the Manager that has been appointed from time to time by the Issuer as its agent for such purpose (the "Conflicts Review Board"). The Conflicts Review Board will also be authorized by the Issuer to approve or decline to approve on the Issuer's behalf matters that the Manager has determined should be presented to the Issuer for its approval either for the purpose of compliance with the Advisers Act, or otherwise where a potential conflict of interest may arise by reason of the involvement of an affiliate of the Manager (including, without limitation, in the case of a purchase or sale of assets between the Issuer and another account or portfolio for which the Manager or an affiliate thereof serves as investment advisor). In addition, the Manager and its affiliates, including the Bank and CSS, will be authorized to engage in cross transactions, including "agency cross" transactions (i.e., transactions in which either CSS or one of its affiliates or another person acts as a broker for both the Issuer and another person on the other side of the same transaction, which person may be an account or client for which the Manager or any affiliate serves as investment adviser). The Issuer has agreed to permit cross transactions; *provided*, that such consent can be revoked at any time by the Issuer or the Conflicts Review Board, and to the extent that the Issuer's consent with respect to any particular cross transaction is required by law, such cross transaction will be reviewed by and subject to the consent of the Conflicts Review Board. By purchasing a Note, a holder shall be deemed to have consented to the procedures described herein relating to cross transactions and principal transactions and, to the general authorization of the Conflicts Review Board described above. CSS or its affiliates may receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding, both parties to any such principal transaction or cross transactions or other matter presented to the Conflicts Review Board for its approval on the Issuer's behalf.

The Conflicts Review Board or an affiliate may purchase Notes. The Issuer has appointed Wilmington Trust Company to be the initial Conflicts Review Board. The fees and expenses of the Conflicts Review Board will be payable by the Issuer as part of its expenses in accordance with the Priority of Payments (or, with respect to amounts due on the Closing Date, from the gross proceeds of the sale of the Notes). The Conflicts Review Board is also entitled to indemnification from the Issuer in relation to its performance of its services, which will be payable as part of the Issuer's expenses in accordance with the Priority of Payments. The Conflicts Review Board was not engaged to perform any services with respect to the Eligible Collateral Debt Securities to be purchased on the Closing Date. Certain Eligible Collateral Debt Securities will be acquired prior to the Closing Date from Affiliates of the Manager by the Initial CDS Asset Counterparty on behalf of the Issuer. Such acquisitions will not be reviewed by the Conflicts Review Board. By purchasing a Note, a Holder is deemed to have consented for purposes of the Advisers Act to the acquisition of such Eligible Collateral Debt Securities.

Each order for the acquisition or sale of a security or other obligation will be placed with a specific broker-dealer (which can include the Initial Purchaser or an affiliate of the Manager) selected by the Manager with the objective of receiving "best execution". "Best execution" essentially means that the trading process employed seeks to maximize value of the client's portfolio. In seeking best execution, the Manager considers the full range and quality of a counterparty's services including, among other things, the value of research provided, execution and operational capability, integrity and sound financial practices within stated objectives and constraints. Determining the quality of trade execution requires the evaluation, over time, of subjective, objective and complex qualitative and quantitative factors. In making this determination the Manager examines whether a client's assets would be exposed

44

Confidential Treatment Requested by Ambac

AMB-V_00045204

to non-operational counterparty related risk, whether value would be added by reducing trading costs and whether operational risk would be incurred. When selecting a counterparty, it is not the Manager's practice to negotiate "execution only" commission rates. The determinative factor is not necessarily the lowest possible commission or best possible price, but whether the transaction represents the best qualitative and quantitative execution for the client. The Manager may receive brokerage or research services in connection with the acquisition or sale of a security or other obligation that are consistent with the "safe harbor" provisions of Section 28(e) of the Exchange Act, although it receives no such services as of the date of this Offering Circular. While the Manager generally seeks reasonably competitive pricing, markups, commissions and spreads, the Issuer will not necessarily pay the lowest pricing, markup, commission or spread available with respect to any particular transaction. In the event the Manager effects transactions through an affiliate of the Manager, including CSS, the Manager may have potentially conflicting division of loyalties and responsibilities regarding both parties to such transactions.

Although certain personnel providing services to the Manager will devote as much time to the management of the Collateral Obligations of the Issuer as the Manager deems appropriate, none of such personnel is expected to devote substantially all of his or her working time to the management of the investments of the Issuer and such personnel may have conflicts in allocating their time and service among the Issuer and the other accounts or clients now or hereafter advised by the Manager and other functions they perform as part of the LIG team of CSS.

The Manager has agreed that a fund managed by the Manager will purchase U.S.$2,000,000 of the Income Notes on the Closing Date at a negotiated price that may be less than the par amount thereof. Affiliates of the Manager (including CSS) may, but are not required to, purchase Income Notes subject to applicable restrictions on beneficial ownership described herein. Neither the Manager nor any of its affiliates is under any obligation to hold any Notes so purchased for any period of time. There will be no restriction on the ability of the Manager, CSS or any of their respective affiliates to purchase the Notes (either upon initial issuance or through secondary transfers) and to exercise any voting rights to which such Notes are entitled (except that Notes held by the Manager and certain of its affiliates shall be disregarded with respect to voting rights under certain circumstances as described in the Indenture and the Management Agreement, in relation to the removal of the Manager). The Notes may also be purchased (either upon initial issuance or through secondary transfers) by investment funds or other accounts for which the Manager serves as investment advisor and there are only limited restrictions on the exercise by such funds or accounts of any voting rights to which such Notes are entitled. Any votes cast in relation to Income Notes held by the Manager or its affiliates will not be counted for any purposes. If CSS holds any Notes, it will have no obligation to exercise any voting rights associated with such Notes in any manner and, at any applicable time, may exercise such voting rights in a manner adverse to some or all of the other holders of Notes.

Although the Manager or its affiliates or its clients may at times be a holder of Notes, its interests and incentives will not necessarily be completely aligned with those of the other holders of the Notes (or of the holders of any particular Class of the Secured Notes or the Income Notes). The ownership of Income Notes by it and its affiliates may give the Manager an incentive to take actions that vary from the interests of the holders of the Secured Notes.

On the Closing Date, the Manager will be reimbursed for certain of its expenses by the Issuer.

CSS or its affiliates may act as a placement agent and/or initial purchaser in other transactions involving issues of collateralized debt obligations and other similar portfolios managed by other investment managers, and may provide financing for the accumulation of leveraged loans and high yield bonds that serve as collateral for such transactions. CSS is not obligated to pursue any particular investment opportunities available to the Issuer or the Manager, and may allocate investment opportunities among their various customer relationships, including the Issuer and the Manager, at its discretion. Such activities may have an adverse effect on the availability of Collateral Obligations for the Issuer.

The Manager and its affiliates may enter into, for their own account, or for other accounts for which they have investment discretion, credit swap agreements relating to entities that are issuers of Collateral Obligations held by the Issuer. The Manager and its affiliates and clients may also have equity and other investments in and may be lenders to, and may have other ongoing relationships with such entities. As a result, officers, key professionals and other employees of the Manager and its affiliates may possess information relating to the Collateral Obligations held by the Issuer that is not known to the individuals at the Manager responsible for monitoring the Collateral

45

Confidential Treatment Requested by Ambac

AMB-V_00045205

Obligations held by the Issuer and performing other obligations under the Management Agreement. In addition, the Manager, its affiliates and their respective clients may invest in securities (or make loans) that are included among, rank *pari passu* with or senior or junior to Collateral Obligations held by the Issuer, or have interests different from or adverse to those of the Issuer.

     29.    Potential Conflicts of Interest with Citigroup Global Markets Inc. Citigroup will act as the Initial Purchaser of the Secured Notes and as Placement Agent for the Class Q Combination Notes and the Income Notes and has also previously provided financing and hedging arrangements under the Warehousing Facility. CGML, an Affiliate of Citigroup, will be the initial Class A1 Swap Counterparty, and in such capacity will as the Requisite Noteholder have certain voting and consent rights and other similar rights under the Indenture and certain other Transaction Documents. For purposes of the Indenture, CGML will be the Requisite Noteholder on the Closing Date by reason of its role as Class A1 Swap Counterparty. In its role as Class A1 Swap Counterparty, CGML will have the ability to control whether the CDS Assets are required to contain the CDS Asset Counterparty Forbearance and whether certain mandatory funding requirements under the Class A1 Swap will be applicable to CGML. The interests of CGML as Class A1 Swap Counterparty may conflict with the interests of the Holders of the Notes in respect of any matter requiring consent or any other matter subject to the discretion of CGML. None of CGML, Citigroup or any other Affiliate of Citigroup will be required to consider the interests of Noteholders in exercising such rights. As the Requisite Noteholder, CGML may (and currently expects to) delegate or assign certain of its rights to one or more third parties in connection with a hedging of its position.

The Class A1 Swap Counterparty expects to enter into a credit derivative contract with a back-to-back counterparty (the "BTB Counterparty") that will reference the Class A1 Swap. Such contract may give the right to such BTB Counterparty in effect to control the exercise of the voting rights and remedies held by the Class A1 Swap Counterparty, which include the rights and remedies given the Class A1 Swap Counterparty in its role as the Requisite Noteholder. Thus the BTB Counterparty may have the ability, among other voting rights allocated to the Requisite Noteholder, to direct the acceleration of the Secured Notes and to direct the liquidation of the Collateral, even if the anticipated net proceeds of such liquidation would not be sufficient to pay all the Secured Notes in full. Furthermore, the BTB Counterparty may control the ability of the Issuer to acquire CDS Assets by virtue of its consent rights relating to modifications to the Form-Approved ABS Asset Agreement or the Form-Approved CDO Asset Agreement. In addition, the BTB Counterparty will be provided access to Monthly Reports, Payment Reports and other information regarding the Issuer and the Collateral.

An Affiliate of Citigroup is expected to act as the Initial CDS Asset Counterparty under CDS Assets with a Net Aggregate Adjusted Notional Amount of approximately U.S.$869,256,000 as of the Closing Date, will act as the swap counterparty under the CDS Collateral Agreement to be executed on the Closing Date and may act as the swap counterparty under other derivative agreements entered into by the Issuer. In such capacity as swap counterparty, Citigroup (or such Affiliate) may be expected to have interests that are adverse to the interests of the Noteholders. Typically, such a swap counterparty would act as calculation agent pursuant to the derivative agreement and, in such capacity, have broad authorization to perform actions, such as calculations of payment amounts, that involve the exercise of judgment and discretion. As such a swap counterparty, Citigroup will have no duty to act on behalf of the Noteholders and, directly or indirectly, may act in ways adverse to them.

In addition, Citigroup or its Affiliates may have had in the past and may in the future have business relationships and dealings with one or more issuers of Eligible Collateral Debt Securities and their Affiliates and may own equity or debt securities issued by issuers of Eligible Collateral Debt Securities or their Affiliates. Citigroup or its Affiliates may have provided and may in the future provide investment banking services and other services to an issuer or sponsor of Eligible Collateral Debt Securities or its Affiliates and may have received or may receive compensation for such services. Citigroup or its Affiliates may buy securities from and sell securities to an issuer of Eligible Collateral Debt Securities included in the Collateral or its Affiliates for their own account or for the accounts of their customers.

Some of the Eligible Collateral Debt Securities included in the Collateral may be obligations of issuers or obligors, or obligations sponsored or serviced by companies, for which Citigroup or one of its Affiliates may have acted as underwriter, agent, placement agent or dealer or for which an Affiliate of Citigroup has acted as lender or provided other commercial or investment banking services. The Issuer will purchase Eligible Collateral Debt Securities from Citigroup or its Affiliates only to the extent that such Eligible Collateral Debt Securities have been

Confidential Treatment Requested by Ambac

AMB-V_00045206

selected by the Manager for inclusion under the Warehousing Facility and the purchase of such Eligible Collateral Debt Securities is consistent with the investment guidelines described in the Warehousing Facility.

30.  **Potential Conflicts of Interest Involving the Trustee.** LaSalle will act as Trustee, Secured Note Paying Agent, Income Note Paying Agent, Collateral Administrator, Secured Note Transfer Agent, Income Note Registrar and Indenture Registrar. In addition, it is likely that the Trustee will act as trustee with respect to a portion of the aggregate principal amount of Eligible Collateral Debt Securities that, as of the date of this Offering Circular (subject to change prior to the Closing Date), are expected to be acquired by the Issuer on the Closing Date or are acquired in the future. Nevertheless, the Trustee and any of its affiliates providing services in connection with the contemplated transactions will have only the duties and responsibilities expressly provided in each capacity and will not, by virtue of its or any affiliate acting in any other capacity, be deemed to have duties or responsibilities or be deemed to be held to a standard of care other than as expressly provided with respect to each such capacity.

In certain circumstances, the Trustee or an affiliate may receive compensation in connection with the Trustee's (or such affiliate's) investment in certain Eligible Investments on behalf of the Issuer from the managers of such Eligible Investments.

31.  **Insolvency Considerations With Respect to Issuers of Eligible Collateral Debt Securities.** The Eligible Collateral Debt Securities consisting of obligations of non-U.S. issuers ("Non-U.S. Issuers") may be subject to various laws enacted in the home countries of such issuers for the protection of creditors. These insolvency considerations will differ depending on the country in which each issuer is located and may differ depending on whether the issuer is a non-sovereign or a sovereign entity. Various laws enacted for the protection of creditors may apply to the Eligible Collateral Debt Securities issued by U.S. issuers (each, a "U.S. Collateral Debt Security"). If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an issuer of a U.S. Collateral Debt Security, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the U.S. Collateral Debt Security and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the issuer or to recover amounts previously paid by the issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an issuer would be considered insolvent at a particular time if the sum of its debts were greater than all of its property at a fair valuation or if the present fair saleable value of its assets were less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the issuer was "insolvent" after giving effect to the incurrence of the indebtedness constituting the U.S. Collateral Debt Security or that, regardless of the method of valuation, a court would not determine that the issuer was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an issuer of a U.S. Collateral Debt Security, payments made on such U.S. Collateral Debt Security could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year and one day) before insolvency.

In general, if payments on a U.S. Collateral Debt Security are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of such payments (such as the Holders of the Notes). To the extent that any such payments are recaptured from the Issuer, the resulting loss will be borne by the Notes, in reverse order of seniority. However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Holder of Notes only to the extent that such court has jurisdiction over such Holder or its assets. It is unlikely that avoidable payments could be recaptured directly from a Holder that has given value in exchange for its Note in good faith and without knowledge that the payments were avoidable. Since there is no judicial precedent of which the Issuer is aware relating to structured securities such as the Notes, there can be no assurance that a Holder of the Notes will be able to avoid recapture on this basis.

In addition, if an issuer of a U.S. Collateral Debt Security is the subject of a bankruptcy proceeding, payments to the Issuer with respect to such U.S. Collateral Debt Security may be delayed or diminished as a result of the exercise of various powers of the bankruptcy court including the following: (i) an "automatic stay", under

47

Confidential Treatment Requested by Ambac

AMB-V_00045207

which the Issuer will not be able to institute proceedings or otherwise enforce its rights against the issuer or obligor with respect to such U.S. Collateral Debt Security without permission from the court, (ii) conversion by the bankruptcy court of such U.S. Collateral Debt Security into more junior debt or into an equity obligation of the issuer thereof or obligor thereon, (iii) modification of the terms of the U.S. Collateral Debt Security by the bankruptcy court, including reduction or delay of the interest or principal payments thereon and (iv) grant of a priority lien to a new money lender to the issuer of, or obligor on, the U.S. Collateral Debt Security.

32.  Tax Treatment of the Issuer. The Issuer will adopt certain operating procedures designed to reduce the risk that the Issuer will be deemed to have engaged in a trade or business in the United States. The Issuer will receive an opinion of Milbank, Tweed, Hadley & McCloy LLP subject to customary assumptions and qualifications to the effect that, assuming the Issuer and Manager comply with these procedures, the Issuer will not be engaged in a trade or business in the United States. As long as the Issuer is not engaged in a United States trade or business, the Issuer will not be subject to United States Federal income tax on its net income. However, an opinion of counsel is not binding on the IRS or any court and there can be no assurance that positions contrary to those stated in such opinions may not be asserted successfully by the IRS. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is not entirely clear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being treated as engaged in a trade or business within the United States. If the Issuer were found to be engaged in a United States trade or business, it could be subject to substantial United States Federal income taxes whose imposition would materially impair its ability to pay interest on and principal of the Secured Notes and make distributions with respect to the Income Notes. In addition, in that event payments in respect of the Secured Notes may be treated as United States source income and could be subject to withholding. See "Certain Tax Considerations".

33.  Tax Treatment of United States Holders of CDO Equity. The federal income tax consequences for United States taxpayers who invest in the Issuer's equity are complex and may be adverse to these investors in some circumstances.

*Passive foreign investment company-overview.* The Issuer will be a passive foreign investment company. A United States taxpayer generally must choose either (1) to elect to treat the Issuer as a qualified electing fund ("QEF") and to pay income tax on its *pro rata* share of the Issuer's income on a current basis whether or not that income is distributed to the investor or (2) to pay income taxes when cash distributions are actually received or gains are realized upon disposition of the equity, but subject to a potentially punitive additional tax.

*Treatment as a qualified electing fund.* A United States taxpayer making the QEF election is required to report its *pro rata* share of the Issuer's income and capital gains even if the Issuer does not make corresponding cash distributions during the period. The Issuer typically will have lower taxable income than the amount of cash it distributes, after the initial year, as the Issuer amortizes certain issuance expenses. However, it is possible that a significant amount of the Issuer's income will not be distributed on a current basis even if the investor is currently taxed on the income (termed "phantom income"). Although there are many possible causes of phantom income not all of which may be described here, phantom income may arise, for example (1) if there are gains on the sale of securities and the sale proceeds are reinvested in additional collateral rather than being distributed;(2) if income is earned by the Issuer (and it receives corresponding amounts of cash), but the corresponding cash is diverted to pay principal of senior notes when certain compliance tests are not satisfied; (3) if accrual basis tax accounting causes the Issuer to accrue income for tax purposes from particular positions in its portfolio that does not correspond to the timing of cash received by the Issuer from those positions or (4) if the Issuer is unable to repay all of the outstanding principal of its debt and therefore is deemed to receive "cancellation of debt" income. A holder that makes a QEF election therefore may be required to recognize phantom income in amounts significantly greater than the distributions it receives or will receive from the Issuer. An electing United States investor generally has the ability to defer paying the tax on the phantom income until the cash is received, subject to an interest charge at a statutory rate (which may be non-deductible for a non-corporate holder). A taxpayer can make the QEF election at any time during the term of its investment in the Issuer's equity, but once the election is made, it is binding on that taxpayer for the remaining term of the investment. However, if the election is not made effective for the first taxable year that the investor owns the Issuer's equity, although the investor will be taxed currently on its *pro rata* share of the Issuer's income following the election, it also may remain subject to the regime below unless a special election is

48

made to recognize any unrealized gain (which may be subject to the additional tax described below) at the time the election is made.

*Not treating as a qualified electing fund.* A United States holder that makes no QEF election generally will pay income tax on the amount of cash actually received in any year. Any gains upon disposition of the equity and "excess distributions" received (i.e., distributions commencing in the second year of the investment, to the extent that they exceed 125% of the average distributions for the shorter of the prior 3 years or the taxpayer's holding period), are subject to a special additional tax. These gains and excess distributions are effectively treated as having accrued on a straight line basis over the investor's entire holding period and as having attracted tax at the highest marginal rate in effect for the year of accrual, and an interest charge (which generally is non-deductible for a non-corporate holder) is imposed at a statutory rate on that tax from the year in which tax is deemed to have accrued through the year in which the tax is actually paid. This effectively precludes an individual investor from benefiting from reduced rates generally applicable to capital gains. Moreover, the effective rate of tax may exceed the rate that would have applied if the taxpayer had included income currently under the QEF election and deferred the tax subject to the non-deductible interest charge.

*Possible application of controlled foreign corporation rules.* Depending on the ultimate composition of the equity investor group, the Issuer also may be classified as a controlled foreign corporation in which case United States taxpayers may be required to pay income tax based its *pro rata* share of the Issuer's income on a current basis at ordinary income rates.

The above discussion is a very general discussion of the tax treatment of an equity investment by a United States taxpayer. All taxpayers should review the discussion under the heading "Certain Tax Considerations" and consult with their tax advisor to the extent necessary to determine the appropriate tax treatment and to assist them with the proper filings.

34.     Withholding Taxes. The Issuer expects that payments received on the Eligible Collateral Debt Securities, the Eligible Investments, the Cashflow Swap Agreement and the Hedge Agreements generally will not be subject to withholding tax imposed by the United States or reduced by withholding taxes imposed by any other country. The Indenture will require that the Eligible Collateral Debt Securities not be subject to withholding tax at the time of purchase thereof by the Issuer unless the issuer of the Eligible Collateral Debt Security is required to make "gross-up" payments to cover the full amount of such withholding tax. There can be no assurance, however, that payments on the Eligible Collateral Debt Securities, the Eligible Investments, the Cashflow Swap Agreement or the Hedge Agreements will not become subject to withholding as a result of any change in any applicable law, treaty, rule or regulation or contrary interpretation thereof or other causes. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is not entirely clear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being subject to excise or withholding taxes on payments in respect of such derivatives. The imposition of unanticipated withholding taxes could materially impair the Issuer's ability to make payments on the Secured Notes and make distributions with respect to the Income Notes. See "Certain Tax Considerations".

Although no withholding tax is currently imposed on payments on the Notes, there can be no assurance that the payments on the Notes will not in the future become subject to withholding tax as a result of any change in any applicable law, treaty, rule, regulation or interpretation thereof or other causes. The Issuer will not "gross-up" payments to the holders of the Notes. Upon the occurrence of a Tax Event, the Issuer will be required, if so directed by a Majority of the Income Notes, to redeem the Secured Notes in accordance with the procedures described under "Description of the Notes—Redemption" herein.

35.     Absence of Other Regulatory Oversight; Investment Company Act Considerations. While the Issuer is similar in some ways to an investment company within the meaning of the Investment Company Act, it is not required and does not intend to register as such, and, accordingly, investors in the Notes will not be afforded the protections of the Investment Company Act. Counsel for the Co-Issuers will opine in connection with the sale of the Notes, that none of the Issuer, the Co-Issuer and the pool of Collateral is on the Closing Date an investment company required to be registered under the Investment Company Act assuming, for the purposes of such opinion,

Confidential Treatment Requested by Ambac

AMB-V_00045209

that the Notes are being offered by or through the Initial Purchaser and Placement Agent in the manner contemplated by this Offering Circular. No opinion or no-action position has been or will be requested of the SEC with respect to the foregoing matters.

If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but failed, to register as an investment company in violation of the Investment Company Act, possible consequences include, but are not limited to, the following: (i) the SEC could apply to a district court to enjoin the violation; (ii) investors in the Issuer or the Co-Issuer could sue the Issuer or the Co-Issuer, as the case may be, and recover any damages caused by the violation; and (iii) any contract to which the Issuer or the Co-Issuer, as the case may be, is a party that is made in, or whose performance involves a violation of the Investment Company Act would be unenforceable by any party to the contract unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act. Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer or the Co-Issuer, as the case may be, and the Holders of the Notes would be materially and adversely affected.

36. **ERISA Considerations**. The Issuer intends to restrict ownership (through the use of written and deemed representations) of the Class Q Combination Notes and the Income Notes so that no assets of the Issuer will be deemed to be "plan assets" subject to Title I of ERISA or Section 4975 of the Code as such term is defined in Section 3(42) of ERISA and the Plan Asset Regulation.

In particular, with respect to the Class Q Combination Notes and the Income Notes, each purchaser and transferee will be required to acknowledge, represent and agree, or in the case of a Class Q Combination Note or Income Note represented by a Global Note, will be deemed to have acknowledged, represented and agreed, that it is not, and is not acting on behalf of or using the assets of, a Benefit Plan Investor (including, without limitation, an insurance company general account). "Benefit Plan Investor" is defined in Section 3(42) of ERISA to mean (a) any "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to the fiduciary responsibility requirements of Title I of ERISA (b) any "plan" to which Section 4975 of the Code applies and (c) any entity whose underlying assets include plan assets by reason of such an employee benefit plan's or plan's investment in such entity.

Notwithstanding these restrictions, there can be no assurance that plans that are subject to Title I of ERISA and/or Section 4975 of the Code will not acquire Class Q Combination Notes, Income Notes or any other class of equity interests in the Issuer, and thus no assurance that the assets of the Issuer will not be deemed to be "plan assets" of plans that are subject to Title I of ERISA and/or Section 4975 of the Code. If the assets of the Issuer were deemed to be "plan assets", certain transactions that the Issuer might enter into, or may have entered into, in the ordinary course of business might constitute non-exempt prohibited transactions under ERISA and/or Section 4975 of the Code and might have to be rescinded, at significant cost to the Issuer. Additionally, the Issuer or one or more of the persons who participated in any such non-exempt prohibited transaction may be subject to other liabilities or penalties with respect to such transaction.

See "Certain ERISA Considerations" herein for a more detailed discussion of certain ERISA and related considerations with respect to an investment in the Notes.

37. **Anti-Money Laundering Provisions**. The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), signed into law on and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "Treasury") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that Treasury will promulgate regulations requiring the Co-Issuers or the Manager or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Notes. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Notes. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

Confidential Treatment Requested by Ambac

AMB-V_00045210

The Administrator is also subject to anti-money laundering laws and regulations in the Cayman Islands which impose specific requirements with respect to the obligation "to know your client". Except in relation to certain categories of institutional investors, the Administrator will require a detailed verification of each initial investor's identity and the source of the payment used by such initial investor for purchasing the Notes in a manner similar to the obligations imposed under the laws of other major financial centers. If the Cayman Islands government determined the Administrator was in violation of the anti-money laundering provisions, the Issuer could be subject to substantial criminal penalties. Payment of any such penalties could materially adversely affect the timing and amount of payments to the Holders of the Notes.

38.  **German Tax Treatment of German Investors.** The German Investment Tax Act (*Investmentsteuergesetz*) ("Investment Tax Act") applies (i) to "shares" (*Investmentanteile*) in investment funds held by German tax resident investors, (ii) to an investor holding shares in an investment fund as business assets of a German permanent establishment maintained in Germany or carried on through a permanent representative in Germany, or as business assets of a fixed base in Germany or (iii) if an investor physically presents shares in an investment fund at the office of a German credit institution or financial services institution (over-the-counter transaction (*Tafelgeschäft*)) (collectively, "German Investors"). The Issuer believes that the Investment Tax Act should not be applicable to Holders of the Notes. However, if any German Investor notifies the Issuer that it is subject to the Investment Tax Act, the Indenture and the Income Note Paying Agency Agreement, respectively, provide that the Issuer will agree, if the expense is not material, to comply with the minimum statutory reporting and publication requirements (the "Minimum Reporting Requirements") set forth in paragraph 1 of Section 5 of the Investment Tax Act for so-called "semi-transparent funds" for so long as such German Investor holds any Notes or Income Notes, as applicable. There can be no assurance that the Issuer's compliance with the Minimum Reporting Requirements will not result in material expenses to the Issuer. Due to the fact that the Investment Tax Act has only recently been enacted and so far no court decisions or tax circulars are available in this respect, there are a number of uncertainties regarding the interpretation of the tax provisions contained in the Investment Tax Act (including Minimum Reporting Requirements). This risk factor should be read in conjunction with the information provided in "Certain Tax Considerations—German Tax Considerations".

39.  **Emerging Requirements of the European Union.** As part of the harmonization of securities markets in Europe, the European Union (the "E.U.") has adopted a directive known as the "Prospectus Directive" (which provided for mandatory implementation by E.U. member states by July 1, 2005) that regulates offers of securities to the public in E.U. member states and admissions to trading to E.U. regulated markets. The E.U. has also adopted a directive known as the Transparency Directive (which provides that it must be implemented by E.U. member states by January 20, 2007) that will among other things, impose continuing financial reporting obligations on issuers that have certain types of securities admitted to trading on an E.U. regulated market. In addition, the Market Abuse Directive (which provided for mandatory implementation by E.U. member states by October 12, 2004) harmonizes the rules on insider trading and market manipulation in respect of securities admitted to trading on an E.U. regulated market and requires issuers of such securities to disclose any non public price sensitive information as soon as possible, subject to certain limited exemptions. The listing of Notes on the Irish Stock Exchange would subject the Co-Issuers to regulation under these directives, although the requirements applicable to the Co-Issuers are not yet fully clarified. The Indenture will not require the Co-Issuers to maintain a listing for any Class of Notes on an E.U. regulated market if compliance with these directives (or other requirements adopted by the European Commission or a relevant E.U. member state) becomes burdensome in the sole judgment of the Manager.

Confidential Treatment Requested by Ambac

AMB-V_00045211

## THE ISSUER AND THE CO-ISSUER

**The Issuer**

The Issuer, a special purpose vehicle, has no prior operating history, prior business or employees. Clause 3 of the Issuer's Amended and Restated Memorandum of Association sets out the objects of the Issuer, which include the business to be carried out by the Issuer in connection with the issuance of the Notes. The activities of the Issuer will be limited to (i) issuance of the Ordinary Shares, (ii) issuance of the Secured Notes which, together with the other Secured Obligations, will be secured by the Eligible Collateral Debt Securities and the other Collateral pledged by the Issuer under the Indenture, (iii) issuance of the Income Notes, (iv) purchase of the Eligible Collateral Debt Securities and Eligible Investments as permitted by the Indenture, (v) entering into the Transaction Documents and (vi) engaging in other activities incidental to the foregoing and permitted by the Transaction Documents. Cash flow derived from the Collateral securing the Secured Notes and the other Secured Obligations will be the Issuer's only source of cash. The Issuer will not be permitted to have any indebtedness for borrowed money other than indebtedness to be incurred pursuant to the Indenture and the other Transaction Documents as described herein. The Issuer may incur debt in the future only in compliance with and pursuant to the terms of the Indenture.

The authorized share capital of the Issuer consists of the aggregate of 250 voting Ordinary Shares (the "Ordinary Shares"), par value U.S.$1.00 per share, all of which authorized Ordinary Shares have been issued prior to the Closing Date.

All of the Issuer's Ordinary Shares are legally owned by the Share Trustee and will be held on the terms of a charitable trust for the benefit of one or more charitable organizations in the Cayman Islands under the terms of a declaration of trust. Under the terms of such declaration of trust, the Share Trustee will, among other things, agree not to dispose of or otherwise deal with such Ordinary Shares. The Share Trustee will have no beneficial interest in and derive no benefit other than its fees from its holding of the Ordinary Shares.

The Issuer's Amended and Restated Articles of Association and the Amended and Restated Memorandum of Association (collectively, the "Articles") provide that the board of directors of the Issuer will consist of at least one and not more than 10 directors. The directors of the Issuer are as follows:

| **Name** | **Address** | **Occupation** |
| --- | --- | --- |
| Steven O'Connor | P.O. Box 1093 GT, George Town, Grand Cayman, Cayman Islands | Vice President, Maples Finance Limited |
| Richard Ellison | P.O. Box 1093 GT, George Town, Grand Cayman, Cayman Islands | Vice President, Maples Finance Limited |

**The Co-Issuer**

The Co-Issuer, a special purpose vehicle, will not have any substantial assets and will not pledge any assets to secure the Secured Notes or the other Secured Obligation. Article 3 of the Co-Issuer's Certificate of Incorporation sets out the objectives of the Co-Issuer, which include the business to be carried out by the Co-Issuer in connection with the issuance of the Co-Issued Notes.

The Co-Issuer has no prior operating history, prior business or employees. The activities of the Co-Issuer will be limited to (i) issuance of its common stock, (ii) co-issuance of the Co-Issued Notes and (iii) other activities incidental to the foregoing and permitted by the Indenture.

The sole director of the Co-Issuer is Donald Puglisi who is also the President, Secretary and Treasurer of the Co-Issuer. Donald Puglisi may be contacted at the address of the Co-Issuer.

Confidential Treatment Requested by Ambac

AMB-V_00045212

**Initial Capitalization of the Issuer**

The Issuer's expected initial capitalization and indebtedness on the Closing Date, after giving effect to the issuance of the Notes and the Ordinary Shares (before deducting issuance expenses paid by the Issuer on the Closing Date) is set forth below:

| Type | | Amount (U.S.) |
|---|---|---|
| Class S Notes | $ | 39,200,000 |
| Class A1 Notes | $ | 500,000,000[1] |
| Class A2 Notes | $ | 200,000,000 |
| Class A3 Notes | $ | 120,000,000 |
| Class A4 Notes | $ | 75,000,000 |
| Class B Notes | $ | 50,000,000 |
| Class C Notes | $ | 35,000,000 |
| Class Q Combination Notes | $ | 5,000,000[2] |
| Total Debt | $ | 1,019,200,000 |
| | | |
| Income Notes | $ | 22,000,000 |
| Ordinary Shares | $ | 250 |
| Total Equity | $ | 22,000,250 |
| | | |
| Total Capitalization | $ | 1,041,200,250 |

1   Represents full funding of the Class A1 Swap Notional Amount

2   The amount of Class Q Combination Notes shown is also included in the amounts of the underlying Class of Notes that comprise the Class Q Combination Notes; therefore, such amount is not included in the calculation of the Total Debt or Total Capitalization of the Issuer.

**Capitalization of the Co-Issuer**

The Co-Issuer will be capitalized only to the extent of its common equity of U.S.$100 which will be legally owned by the Issuer and held in charitable trust by Maples Finance Limited as the Share Trustee, together with the Issuer's Ordinary Shares under the terms of the declaration of trust described above. The Co-Issuer will have no assets other than its equity capital and will have no debt other than as co-issuer of the Co-Issued Notes. The Non-Co-Issued Notes will not be obligations of the Co-Issuer. The Co-Issuer has no indebtedness for borrowed money other than indebtedness incurred pursuant to the Indenture and described herein. The Co-Issuer may incur debt in the future only in compliance with and pursuant to the terms of the Indenture.

**The Administrator**

Certain administrative functions in the Cayman Islands will be performed on behalf of the Issuer by the Administrator. The office of the Administrator will serve as the registered office and the general business office of the Issuer. Through this office and pursuant to the terms of an agreement by and between the Administrator and the Issuer (the "Administration Agreement"), the Administrator will perform various management functions on behalf of the Issuer, including communications with the holders of the Ordinary Shares and the general public and other services. In addition to the functions listed above, the Administrator will be the Share Registrar and maintain the Share Register. The Administrator provides similar services to various other Cayman Islands entities. In consideration of the foregoing, the Administrator will receive various fees and other charges payable by the Issuer at rates agreed upon from time to time plus expenses.

Confidential Treatment Requested by Ambac

AMB-V_00045213

The Administrator will be subject to the overview of the Issuer's board of directors; however, the Issuer's directors are and are expected to be employees of the Administrator and its affiliates. The Administrator may resign or be terminated upon 30 days' prior written notice to the Issuer, in the case of resignation, or to the Administrator, in the case of termination. Upon the occurrence of either such event, the Issuer will promptly appoint a successor administrator.

Confidential Treatment Requested by Ambac

AMB-V_00045214

## DESCRIPTION OF THE NOTES

### General

*The Secured Notes will be issued by the Issuer and the Co-Issued Notes will be co-issued by the Co-Issuers pursuant to, have the benefit of and will be secured pursuant to the Indenture. The Income Notes will be issued by the Issuer pursuant to the Income Note Paying Agency Agreement. The following summary describes certain provisions of the Notes, the Indenture and the Income Note Paying Agency Agreement. This summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture and the Income Note Paying Agency Agreement.*

### Status and Security

All Classes of Notes will be subordinated to certain other payments under the Priority of Payments and certain amounts due to any Hedge Counterparty and the Cashflow Swap Counterparty, and certain other amounts will be senior in right of payment under the Priority of Payments on each Payment Date to the Notes. In addition, to the extent set forth in the Priority of Payments, each Junior Class of Notes will be subordinated to the respective Senior Classes of Notes (as specified in the Principal Terms Table).

For purposes of determining seniority, the Class Q Combination Notes shall not be treated as a separate Class, but the Class C Component and the Income Note Component, as applicable, shall have the same ranking as the Class C Notes and the Income Notes, respectively.

Payments of interest on and principal of the Secured Notes and of distributions on the Income Notes, will be made solely from the proceeds of the Collateral in accordance with the Priority of Payments. The aggregate amount that will be available for payment on the Secured Notes and for distributions on the Income Notes and for payments under the Hedge Agreements and the Cashflow Swap Agreements and of fees and expenses of the Co-Issuers on any Payment Date generally will be an amount equal to the sum of (i) the total amount of payments and collections in respect of the Eligible Collateral Debt Securities (including any payment received under the CDS Assets and the proceeds of the sale of any Eligible Collateral Debt Securities) received during the preceding Period and not reinvested in Eligible Collateral Debt Securities (subject to the limitations set forth herein) paid to a CDS Asset Counterparty as a CDS Asset Payment and (ii) any such amounts received in prior Periods that are not disbursed prior to such Payment Date.

### Income Notes

The Income Notes will not be secured under the Indenture and will be issued pursuant to the Income Note Paying Agency Agreement dated as of the Closing Date (the "Income Note Paying Agency Agreement"), among the Issuer, the Income Note Paying Agent and the Income Note Registrar.

The Income Notes represent a residual interest in the assets of the Issuer, and, as such, their entitlement will be limited to the assets of the Issuer remaining after payment of all of the liabilities of the Co-Issuers that rank ahead of the Income Notes pursuant to the Indenture and the Income Note Paying Agency Agreement.

Accordingly, the Income Notes will be subordinated in right of payment to the Secured Notes and to the payments of all other amounts due under the Indenture on each Payment Date, including expenses of the Co-Issuers, payments due to any Hedge Counterparty and the Cashflow Swap Counterparty, and fees, indemnities and expenses of the Trustee, the Collateral Administrator, the Income Note Paying Agent and the Manager. See "Summary of Terms—Priority of Payments".

### Class Q Combination Notes

The Class Q Combination Notes will consist of the Class C Component and the Income Note Component.

For purposes of the transfer restrictions, the Class Q Combination Notes are a single security, and the Components are not separately transferable. However, a Holder of such Class Q Combination Note may exchange all or a portion of its Class Q Combination Note with the Trustee for proportional interests in the underlying Class C

Confidential Treatment Requested by Ambac

AMB-V_00045215

Notes and the Income Notes represented by such Components, subject to the minimum denomination requirements applicable to the underlying Class C Notes and the Income Notes. A Class Q Combination Note, once exchanged for its Components, may not be reformed or combined again subsequently as a Class Q Combination Note. A Holder of Class C Notes and Income Notes will not have the right to exchange such Class C Notes and Income Notes for a Class Q Combination Note.

Upon redemption of the Notes, the Class Q Combination Notes will be redeemed with respect to their Class C Component and their Income Note Component by allocation of payments in respect of the Class C Notes and Income Notes to such Components.

All references in this Offering Circular to the Class C Notes and Income Notes and payments thereon, or amounts to be added to the principal thereof, or to votes or consents to be given by the Holders of the Class C Notes and Income Notes, include the Class C Component and Income Note Component, as applicable, (whether or not explicitly mentioned).

On each date on which payments, whether from Interest Collections, Principal Collections or redemption or otherwise, are made on any Class of Notes to which one of the Components of the Class Q Combination Notes relates, a portion of such payment will be allocated to such Component in the proportion that the principal amount or number of shares of such Component bears to the principal amount or number of shares of the related Class (including such Component). No other payments will be made on the Class Q Combination Notes.

Under the Indenture, the Holders of Class Q Combination Notes will be entitled to voting rights in the Class C Notes and Income Notes related to the applicable Class C Component and Income Note Component, respectively, in the proportion that the Components bear to the principal amount of the Notes in which they represent an interest. Under the Indenture, Holders of the Class Q Combination Notes will not be entitled to vote as a separate Class unless a supplemental indenture directly and adversely affects only the terms of the Class Q Combination Notes as a Class, in which case the Holders of the Class Q Combination Notes will be entitled to vote as a separate Class in respect of such matter.

**Interest on Secured Notes**

The Secured Notes (other than the Class A1 Notes) will bear interest from the Closing Date at their respective Periodic Interest Rates. Each Class A1 Note will bear interest from the Class A1 Note Funding Date on which it is issued at the Periodic Interest Rate applicable to the Class A1 Notes. The interest that will be payable on the Secured Notes of each Class on each Payment Date will be the interest that has accrued during the related Periodic Interest Accrual Period on the Outstanding principal balance of such Class of Secured Notes after giving effect to the aggregate payments of principal made on all previous Payment Dates in accordance with the Priority of Payments.

Periodic Interest on the Secured Notes will be calculated using the day count convention specified in the Principal Terms Table.

If any interest payable on any Class of non-Deferrable Interest Notes is not paid on the applicable Payment Date, such nonpayment will constitute an Event of Default and such interest will be considered Defaulted Interest payable in accordance with the Priority of Payments and will not be added to the principal amount of such Junior Class. To the extent lawful and enforceable, interest on Defaulted Interest with respect to any Note of any Class will accrue at the Periodic Interest Rate for such Class until paid as described herein. However, Defaulted Interest (and interest accruing thereon) will not be included in the computation of the denominator of any of the Principal Coverage Ratios or the Interest Coverage Ratios.

If any interest is not paid on any Class of Deferrable Interest Notes on any Payment Date on which any Secured Note of a Class that constitutes a Senior Class with respect to such Class of Deferrable Interest Notes remains Outstanding, the amount of such shortfall will not be deemed due and payable under the Indenture (and the failure to pay such amount will not constitute an Event of Default), but the Periodic Interest Cumulative Shortfall Amount for such Class of Deferrable Interest Notes will be increased by the amount of such interest shortfall, which will not be payable as Periodic Interest on any subsequent Payment Date. The Periodic Interest Cumulative Shortfall Amount for each Class of Deferrable Interest Notes as of any Payment Date will be added to the principal

Confidential Treatment Requested by Ambac

AMB-V_00045216

amount of such Class of Deferrable Interest Notes and will accrue interest for each subsequent Periodic Interest Accrual Period at the Periodic Interest Rate for such Class, and such accrued interest will be payable on any subsequent Payment Date pursuant to the Priority of Payments as interest on such Class of Deferrable Interest Notes or added to the Periodic Interest Cumulative Shortfall Amount as aforesaid.

To the extent amounts are available in accordance with the Priority of Payments, amounts representing the payment of Periodic Interest Cumulative Shortfall Amounts of any Class of Deferrable Interest Notes will be distributed to the holders thereof and the amount of any such distribution will be subtracted from the Outstanding Principal Balance—Aggregate of the applicable Class of Deferrable Interest Notes.

Interest will cease to accrue on each Class of Secured Notes or, in the case of a partial repayment, on such part, from the date of repayment or the Maturity Date—Stated of each Secured Note unless payment of principal is improperly withheld or unless default otherwise occurs with respect to such payments of principal. See "—Principal of Secured Notes". To the extent lawful and enforceable, interest on Defaulted Interest with respect to any Secured Note will accrue at the interest rate applicable to such Secured Note until paid as provided herein.

*Determination of LIBOR*

For purposes of calculating the Periodic Interest Rate for the Secured Notes, the Co-Issuers will appoint the Note Calculation Agent. "LIBOR" will be determined by the Note Calculation Agent in accordance with the following provisions:

(i)    On the second London Business Day prior to the commencement of the applicable Periodic Interest Accrual Period (each such day, a "LIBOR Determination Date"), LIBOR will be determined for such Periodic Interest Accrual Period as the rate, as obtained by the Note Calculation Agent, for three-month dollar deposits (or for deposits for such periods described in paragraph (iii) below) (each, a "Designated Maturity"), which appears on Telerate Page 3750 (as defined in the 2000 ISDA Definitions published by the International Swaps and Derivatives Association, Inc.) as reported by Bloomberg Financial Markets Commodities News or which appears in such other page as may replace Telerate Page 3750, in each case, as of 11:00 a.m. (London time) on such LIBOR Determination Date. "London Business Day" means a Business Day on which banks in London, England and New York, New York are not required or authorized by law to be closed.

(ii)    If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 or such page as may replace such Telerate Page 3750, the Note Calculation Agent will determine the arithmetic mean of the offered quotations of the Reference Banks (as defined below) to leading banks in the London interbank market for dollar deposits of the Designated Maturity (or such other deposits, as applicable) in an amount determined by the Note Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Note Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR will equal such arithmetic mean of such quotations. If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR will be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Note Calculation Agent (after consultation with the Manager) are quoting on the relevant LIBOR Determination Date for dollar deposits of the Designated Maturity (or such other deposits specified above, as applicable) in an amount determined by the Note Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; *provided*, that if the Note Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR will be LIBOR as determined on the previous LIBOR Determination Date that relates to a Periodic Interest Accrual Period of similar length. As used herein, "Reference Banks" means four major banks in the London interbank market selected by the Note Calculation Agent.

(iii)    With respect to the Periodic Interest Accrual Period related to the first Payment Date and each Class A1 Note Funding, LIBOR will be determined through the use of a discrete straight-line interpolation by reference to two rates calculated in accordance with paragraphs (i) and (ii) above, one of which will be determined as if the maturity of the dollar deposits referred to therein were the next shorter

57

period of time for which rates are available than such Periodic Interest Accrual Period and the other of which will be determined as if the maturity were the next longer period of time for which rates are available than such Periodic Interest Accrual Period.

(iv) If the Note Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR with respect to such Periodic Interest Accrual Period will be the arithmetic mean of the Base Rate for each day during such Periodic Interest Accrual Period during which such situation continues.

The Note Calculation Agent will cause the Periodic Interest Rate and the Payment Amount applicable for each Class of Secured Notes and Class Q Notes to be communicated to the Issuer, the Co-Issuer, the Secured Note Paying Agent, the Manager, the Trustee, DTC, Euroclear, Clearstream, the Irish Note Paying Agent and the Irish Listing Agent (who will in turn notify the Irish Stock Exchange if and for so long as any Class of Listed Notes is listed thereon) by the Business Day immediately following each LIBOR Determination Date. The determination of the Periodic Interest Rate and the Payment Amount applicable for each Class of Secured Notes and the Class Q Notes by the Note Calculation Agent will (in the absence of manifest error) be final and binding upon all parties.

The Note Calculation Agent may be removed at the direction of the Manager, or a Majority of the Income Notes, or by the Co-Issuers at any time; *provided* that, for so long as LaSalle is the Trustee, it will also be the Note Calculation Agent. If the Note Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, the Co-Issuers will promptly appoint a replacement note calculation agent that is a leading bank or financial institution engaged in accepting Eurodollar deposits in the international Eurodollar market and does not control or is not controlled by or under common control with the Co-Issuers or their Affiliates. The Note Calculation Agent may not resign its duties without a successor having been duly appointed.

**Principal of Secured Notes**

Each Class of Secured Notes will mature on the Maturity Date—Stated. The average lives of the Secured Notes are expected to be shorter, in each case, than the number of years until the Maturity Date—Stated for such Notes. See "Risk Factors—Average Lives, Redemption and Prepayment Considerations; Distributions on the Income Notes" and "Certain Maturity and Prepayment Considerations". Principal of the Secured Notes, including mandatory principal prepayments, will be paid in accordance with the Priority of Payments.

All outstanding principal of the Secured Notes will be payable on the Maturity Date—Stated.

**Payments on Income Notes**

On each Payment Date, to the extent funds are available therefor, Interest Collections will be released from the lien of the Indenture for payment to the Income Note Paying Agent only after the payment of interest on the Secured Notes and, in certain circumstances, principal due in respect of the Secured Notes and the payment of certain other amounts in accordance with the Priority of Payments. The Income Notes may be paid in full prior to the Maturity Date—Stated in the event of a Redemption, out of proceeds of the liquidation of the pool of Collateral. Until the Secured Notes and certain other amounts have been paid in full, Principal Collections are not permitted to be released from the lien of the Indenture and will not be available to make distributions on the Income Notes.

**Dissolution; Liquidating Distributions**

The Articles provide that the Issuer will be wound up on the earliest to occur of (i) at any time on or after the date that is one year and two days after the Maturity Date—Stated, upon the determination of the Issuer's board of directors to dissolve the Issuer, (ii) at any time after the sale or other disposition of all of the Issuer's assets, upon the determination of the Issuer's board of directors to dissolve the Issuer, (iii) at any time after the Secured Notes are paid in full, upon the direction of the Holders of not less than 66⅔% of the Principal Balance—Aggregate of the Outstanding Income Notes, and (iv) on the date of a winding up pursuant to the provisions of or as contemplated by the Companies Law (2004 Revision) of the Cayman Islands as then in effect. The Issuer's board of directors currently intend, in the event that the Income Notes are not redeemed following the repayment in full of the Secured Notes, to liquidate all of the Issuer's remaining investments in an orderly manner and distribute the proceeds of such

Confidential Treatment Requested by Ambac

AMB-V_00045218