Until the third anniversary of the Closing Date, the Manager may transfer Sale Proceeds to the CDS Asset Collateral Account in order to provide a CDS Asset Capacity Amount that is sufficient to permit acquisitions of additional CDS Assets. On each applicable Payment Date after the third anniversary of the Closing Date, subject to making any other payments required to be made pursuant to the Priority of Payments after payment of any amounts owing to the Class A1 Swap Counterparty under the Class A1 Swap, Principal Collections will be paid into the Capacity Subaccount of the Reserve Account until the Class A1 Swap Notional Amount has been reduced to zero, and then the CDS Asset Collateral Account. Any such payments into the Capacity Subaccount of the Reserve Account or the CDS Asset Collateral Account pursuant to the previous sentence will reduce the Class A1 Swap Notional Amount to the extent of the amounts deposited.

Until the third anniversary of the Closing Date, to the extent that on any Business Day any reduction in the CDS Reference Obligation Notional Amounts under one or more CDS Assets, after giving effect to any required payments in respect of CDS Assets, shall have resulted in a positive CDS Asset Capacity Amount, the Manager may, to the extent of such positive amount:

(A) cause the liquidation of CDS Collateral Eligible Securities at the direction of the CDS Collateral Securities Counterparty pursuant to the terms under the CDS Collateral Agreement and transfer the proceeds thereof to the Collection Account to be treated as Principal Collections for application to the purchase of one or more Cash Assets selected by the Manager; *provided* that such liquidations and transfers shall be limited to not more than U.S.$100,000,000 on a cumulative basis over such three-year period;

(B) acquire one or more additional CDS Assets having an aggregate notional amount up to such positive amount of CDS Asset Capacity Amount; or

(C) cause the liquidation of CDS Collateral Eligible Securities pursuant to the terms under the CDS Collateral Agreement and transfer the proceeds thereof to the Collection Account for the purpose of making payments in accordance with the Priority of Payments.

After the third anniversary of the Closing Date, to the extent that on the last day of the Period preceding any Payment Date there has occurred any reduction in the CDS Reference Obligation Notional Amount under CDS Assets that (after giving effect to any required payments in respect of CDS Assets) increases the CDS Asset Capacity Amount to an amount greater than zero, the Issuer or the Manager on behalf of the Issuer will instruct the Trustee to liquidate Reserve Investments in the Reserve Account and cause the liquidation of CDS Collateral Eligible Securities pursuant to the terms under the CDS Collateral Agreement and transfer proceeds thereof, in an aggregate amount equal to the amount by which the CDS Asset Capacity Amount is greater than zero, to the Collection Account as Principal Collections for application in accordance with the Priority of Payments on the next succeeding Payment Date.

**CDS Asset Issuer Account**

If the terms of any CDS Asset require the CDS Asset Counterparty to secure its obligations with respect to such CDS Asset, the Trustee will establish a segregated trust account in the United States which will be designated as the CDS Asset Issuer Account ("CDS Asset Issuer Account") in the name of the Trustee for the benefit and on behalf of the Secured Parties. The Trustee will deposit into any such CDS Asset Issuer Account all amounts that are received from the applicable CDS Asset Counterparty to secure the obligations of such CDS Asset Counterparty in accordance with the terms of such CDS Asset. Amounts contained in any CDS Asset Issuer Account will be withdrawn by the Trustee and applied to the payment of any amount due and owing by the related CDS Asset Counterparty to the Issuer in accordance with the Indenture.

**Reserve Account**

The Trustee will establish the Reserve Account for the benefit of the Secured Parties. Simultaneously with the establishment of the Reserve Account, the Trustee shall establish the following three segregated subaccounts of the Reserve Account: "Class A1 Note Funding Subaccount", "Capacity Subaccount" and "Posted Collateral Subaccount". The Trustee will deposit (i) the proceeds of all Class A1 Note Fundings (other than a Class A1 Mandatory Note Funding and any Class A1 Note Funding following the occurrence of a Class A1 Mandatory Note Funding) into the Class A1 Note Funding Subaccount, (ii) transfers made to the Reserve Account pursuant to the

Confidential Treatment Requested by Ambac

AMB-V_00045251

Priority of Payments into the Capacity Subaccount and (iii) any and all collateral that the CDS Collateral Securities Counterparty is required to post upon the occurrence of a CDS Collateral Ratings Event into the Posted Collateral Subaccount.

The Manager may, at its discretion with prior notice to the Trustee and with the prior consent of the CDS Collateral Securities Counterparty, at any time transfer amounts on deposit in the Capacity Subaccount of the Reserve Account to the CDS Asset Collateral Account.

**Covered Short CDS Asset Collateral Account**

The Trustee shall, prior to the Closing Date, cause to be established the Covered Short CDS Asset Collateral Account, which shall be held in the name of the Trustee in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Covered Short CDS Asset Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. The Covered Short CDS Asset Collateral Account shall have no amounts on deposit on the Closing Date. On or prior to the Maturity Date—Stated, the Manager on behalf of the Issuer may direct the Trustee to, and upon such direction the Trustee shall, apply funds in the Covered Short CDS Asset Collateral Account to (i) enter into additional Covered Short CDS Assets (and, pending such investment, such funds will be invested in Eligible Investments with stated maturities no later than the Business Day immediately preceding the next Payment Date), (ii) make initial up-front payments with respect to such Covered Short CDS Assets, (iii) at the discretion of the Manager, make periodic premium payments with respect to the Covered Short CDS Assets and (iv) pay any reimbursement amounts owed by the Issuer in respect of any Covered Short CDS Asset. No amounts held in the Covered Short CDS Asset Collateral Account shall be transferred to the Collection Account, unless directed by the Manager. Thereafter, the Trustee shall transfer to the Covered Short CDS Asset Collateral Account any proceeds resulting from the unwinding of a Covered Short CDS Asset or other payments received upon a Credit Event unless the Manager directs the Trustee to transfer such proceeds to the Collection Account as Interest Collections or Principal Collections to be applied in accordance with the Priority of Payments.

**Class A1 Mandatory Note Funding Reserve Account**

If the Class A1 Swap Counterparty is required to fund a Class A1 Mandatory Note Funding, the Trustee shall cause to be established an account (the "Class A1 Mandatory Note Funding Reserve Account"). The Trustee shall deposit into the Class A1 Mandatory Note Funding Reserve Account all amounts that are received from or on behalf of the Class A1 Swap Counterparty to secure the obligations of the Class A1 Swap Counterparty in accordance with the terms of the Class A1 Swap. Thereafter, upon any future Class A1 Note Fundings, the Trustee, at the direction of the Manager, shall withdraw the amount of such Class A1 Note Funding from the Class A1 Mandatory Note Funding Reserve Account. All payments of principal with respect to such Class A1 Note Funding will be deposited into the Class A1 Mandatory Note Funding Reserve Account.

The Trustee will invest any amounts on deposit in each Class A1 Mandatory Note Funding Reserve Account in Class A1 Eligible Investments. The Class A1 Swap Counterparty may from time to time direct such investment in Class A1 Eligible Investments. Investment earnings received during each Period in respect of Class A1 Eligible Investments in the Class A1 Mandatory Note Funding Reserve Account will be paid directly to the Class A1 Swap Counterparty on the related Payment Date (unless applied to fund a shortfall in the Class A1 Swap Counterparty's obligation to fund a Class A1 Note Funding).

Amounts on deposit in the Class A1 Mandatory Note Funding Reserve Account shall be returned to the Class A1 Swap Counterparty upon receipt by the Trustee of instruction from the Issuer (or the Manager on behalf of the Issuer) stating that the conditions precedent for such return have been met in accordance with the Class A1 Swap.

**Hedge Agreements**

*General*

The Issuer will be authorized to enter into Hedge Agreements with such Hedge Counterparties as it may elect in its sole discretion, in each case subject to Rating Agency Confirmation, for the purpose of managing the

92

Issuer's interest rate and other risks in connection with the Issuer's issuance of, and payments on, the Notes and the Issuer's ownership and disposition of the Eligible Collateral Debt Securities. The Issuer does not intend to enter into any Hedge Agreements on or prior to the Closing Date.

Subject to certain conditions specified in the Indenture, the Issuer will be permitted to increase the notional amount of a Hedge Agreement, sell all or a portion of any Hedge Agreement, terminate such Hedge Agreement or reduce the notional amounts of any Hedge Agreement; *provided* that Rating Agency Confirmation has been received. Depending on prevailing interest rates at the time of any such termination or notional amount reduction, the Issuer could be required to make substantial payments to Hedge Counterparties. The amounts payable to the Hedge Counterparties will be limited to the amounts payable under the Priority of Payments and the claims of each Hedge Counterparty (if there is more than one) will rank equally. The Hedge Agreements will provide that the Hedge Counterparty must post collateral as specified in and in accordance with the Hedge Agreements.

*Termination Events*

Each Hedge Agreement will be terminable by its terms, whether or not all the Notes have been paid in full prior to such termination, upon the earliest to occur of (i) an S&P First Rating Trigger Event, (ii) a Moody's First Rating Trigger Event, (iii) a Second Rating Trigger Event and (iv) any additional termination events specified in the Hedge Agreement. Each Hedge Agreement will provide that upon occurrence of a termination event the Issuer and the related Hedge Counterparty will settle their payment obligations in accordance with the Hedge Agreement and a termination payment may be payable by the Issuer to the related Hedge Counterparty or by the related Hedge Counterparty to the Issuer.

If a Moody's Second Trigger Ratings Event or an S&P Required Ratings Downgrade Event occurs, then the Hedge Counterparty will be required, as soon as reasonably practicable and so long as such event is in effect, at its own expense, use commercially reasonable efforts to attempt to, procure (A) a transfer of such Hedge Counterparty's rights, liabilities, duties and obligations under the related Hedge Agreement in accordance with the related Hedge Agreement or, (B) in the case of a Moody's Second Trigger Ratings Event, an Eligible Guarantee from an Eligible Guarantor.

The Manager and the Rating Agencies will be notified by the Issuer of any amendments, assignments, modifications to or termination of the Hedge Agreements (including any reduction of the notional amount thereof) and the Issuer will not permit any such amendment, assignment, modification of termination unless Rating Agency Confirmation shall have been received with respect thereto (subject to certain exceptions).

In the event that any Hedge Counterparty defaults in the payment of its obligations to the Issuer under a Hedge Agreement on any date when such amount was due and payable, the Trustee will (upon notice from the Issuer or the Manager on the Issuer's behalf) make a demand on such Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date. The Trustee will give notice to the Manager upon the continuing failure by any Hedge Counterparty to perform its obligations during the same Business Day following a demand made by the Trustee on such Hedge Counterparty, and will take such action with respect to such continuing failure directed to be taken by the Trustee. If such failure will be continuing two (2) Business Days after demand has been made on such Hedge Counterparty by the Trustee, the Trustee will deliver notice of such failure to pay to the Holders of the Notes.

**Cashflow Swap Agreement**

The Issuer will enter into an agreement with IXIS Financial Products Inc. (such counterparty and any substitute therefor, the "Cashflow Swap Counterparty") on or prior to the Closing Date (such agreement, together with related schedules, confirmations and credit support documents, and any replacement therefor, the "Cashflow Swap Agreement"). IXIS Financial Products Inc. satisfies the Cashflow Swap Counterparty Ratings Requirement described below.

IXIS Capital Markets North America Inc. will provide without charge a copy of the most recent publicly available annual report of IXIS Capital Markets North America Inc., IXIS Corporate & Investment Bank and NATIXIS. Written requests should be directed to David L. Askren, Corporate Secretary, IXIS Capital Markets North America Inc., 9 West 57th Street, New York, New York 10019; telephone (212) 891 6152.

Confidential Treatment Requested by Ambac        AMB-V_00045253

The Cashflow Swap Agreement will be entered into for purposes of managing the Issuer's risk exposure from possible shortfalls in payments of interest on the Class S Notes and the Class A Notes relating to the presence of PIK Bonds in the Collateral. The amounts payable to the Cashflow Swap Counterparty will be limited to the amounts payable under the Priority of Payments. The Cashflow Swap Agreement shall remain in effect only for so long as any Class S Notes or Class A Notes are Outstanding.

On the Closing Date (or any date on which the Issuer enters into a replacement Cashflow Swap Agreement), (i) the Cashflow Swap Counterparty entering into such Cashflow Swap Agreement shall satisfy the Cashflow Swap Counterparty Ratings Requirement and (ii) the Issuer shall assign such Cashflow Swap Agreement to the Trustee pursuant to the Indenture.

The Cashflow Swap Agreement will provide that (i) the Issuer will pay a fee to the Cashflow Swap Counterparty on each Payment Date until the Class S Notes and the Class A Notes and any accrued interest thereon are paid in full or the principal amounts thereof has been reduced to zero, and (ii) so long as no Cashflow Swap—Suspension Event has occurred and is continuing, the Cashflow Swap Counterparty will make payments to the Issuer in the amount equal to the Cashflow Swap—Shortfall Amount for such Payment Date. The Cashflow Swap Agreement will further provide that any Cashflow Swap—Shortfall Amounts paid under the Cashflow Swap Agreement by the Cashflow Swap Counterparty to the Issuer will accrue interest at the Cashflow Swap—Interest Rate and be repaid to the Cashflow Swap Counterparty in accordance with the Priority of Payments. The Cashflow Swap Agreement will also provide that the Trustee will be responsible for notifying the Cashflow Swap Counterparty (which notice must be delivered at least two (2) Business Days prior to the applicable succeeding Payment Date) of the Cashflow Swap—Shortfall Amount due on the immediately succeeding Payment Date.

If at any time, *provided* that no Cashflow Swap—Substitution Event has occurred, (i) the short-term rating of the Cashflow Swap Ratings Determining Party from Moody's is lower than "P-1" or is "P-1" and has been placed on and is remaining on credit watch with negative implications by Moody's or the long-term rating of the Cashflow Swap Ratings Determining Party from Moody's is withdrawn suspended or downgraded below "A1" or is "A1" and has been placed on and is remaining on credit watch with negative implications by Moody's, (ii) if no short-term rating is available from Moody's, the long-term rating of the Cashflow Swap Ratings Determining Party from Moody's is withdrawn, suspended or downgraded below "Aa3" or is "Aa3" and has been placed on and is remaining on credit watch with negative implications by Moody's or (iii) the short-term rating of the Cashflow Swap Ratings Determining Party from S&P is lower than "A-1" or, if the Cashflow Swap Ratings Determining Party does not have a short-term rating from S&P, the long-term rating of such Cashflow Swap Ratings Determining Party from S&P is lower than "AA-" (each, a "Cashflow Swap—Collateralization Event"), the Cashflow Swap Counterparty will, within thirty (30) days of the occurrence of such Cashflow Swap—Collateralization Event (at no cost to the Issuer), either (i) enter into the Credit Support Annex in relation to which Rating Agency Confirmation from S&P has been received, furnish a legal opinion to the Rating Agencies as to the enforceability of such Credit Support Annex in the case of bankruptcy of the Cashflow Swap Counterparty and, pursuant to such Credit Support Annex, deliver to the Trustee collateral of such types, in such amounts and at such times as are sufficient to maintain the then current rating of each Class of Notes by each Rating Agency, (ii) find a replacement Cashflow Swap Counterparty as permitted under the Cashflow Swap Agreement (at no cost to the Issuer and with no adverse tax consequences to the Issuer) that satisfies the Cashflow Swap Counterparty Ratings Requirement and in relation to which Rating Agency Confirmation has been received, (iii) obtain a guarantor for the obligations of the Cashflow Swap Counterparty under the Cashflow Swap Agreement with a short term issuer credit rating from S&P of at least "A-1+" or if a short term credit rating from S&P is not available a long-term issuer credit rating from S&P of at least "AA-" and with a long-term unsecured debt rating from Moody's of at least "Aa3" and a short-term unsecured debt rating from Moody's of at least "P-1" or (iv) take such other steps as each Rating Agency that has downgraded the Cashflow Swap Counterparty may require (as confirmed to the Manager in writing) to ensure that the then-current ratings on the Secured Notes by either Rating Agency is not reduced or withdrawn. If the Cashflow Swap Counterparty has not, within thirty (30) days of the occurrence of such Cashflow Swap—Collateralization Event, taken any of the actions required above, the Issuer will have the right to terminate the Cashflow Swap Agreement with all costs of such termination to be paid by the Cashflow Swap Counterparty. Concurrently, a Cashflow Swap—Substitution Event will be deemed to have occurred and the Cashflow Swap Counterparty will be required to take the remedial action specified below.

In the event that (i) so long as any Secured Notes are Outstanding and rated by S&P, the long-term rating of the Cashflow Swap Ratings Determining Party from S&P is withdrawn, suspended or downgraded below "BBB-"

94

Confidential Treatment Requested by Ambac

AMB-V_00045254

or, if no long-term rating is available, the short-term rating of the Cashflow Swap Ratings Determining Party from S&P is withdrawn, suspended or downgraded below "A-3", (ii) the short-term rating of the Cashflow Swap Ratings Determining Party from Moody's is "P-3" or lower or the long-term rating of the Cashflow Swap Ratings Determining Party from Moody's is withdrawn, suspended or downgraded to "A3" or lower or, if the related Cashflow Swap Ratings Determining Party does not have a short-term rating, the long-term rating of the related Cashflow Swap Ratings Determining Party from Moody's is withdrawn, suspended or falls to "A2" or lower, or (iii) the failure by the Cashflow Swap Counterparty to take any of the actions specified in the paragraph above within thirty (30) days of the occurrence of a Cashflow Swap—Collateralization Event (each, a "Cashflow Swap—Substitution Event"), then the Cashflow Swap Counterparty will, (x) in the case of a Cashflow Swap—Substitution Event referred to in sub-clause (ii) of the definition thereof, within thirty (30) days following such Cashflow Swap—Substitution Event or (y) in the case of a Cashflow Swap—Substitution Event referred to in sub-clause (i) of the definition thereof, within ten (10) days following such Cashflow Swap—Substitution Event, assign its rights and obligations under the Cashflow Swap Agreement at no cost to the Issuer to a party (the "Cashflow Swap—Substitute Party") selected by the Cashflow Swap Counterparty that (i) satisfies the Cashflow Swap Counterparty Ratings Requirement, (ii) with respect to which a Rating Agency Confirmation has been obtained and (iii) that assumes all of the Cashflow Swap Counterparty's obligations under the Cashflow Swap Agreement pursuant to an agreement satisfactory to the Issuer (at no cost to the Issuer and with no adverse tax consequences to the Issuer) and in relation to which Rating Agency Confirmation from S&P has been received. If the Cashflow Swap Counterparty fails to assign its rights and obligations under the Cashflow Swap Agreement to a Cashflow Swap—Substitute Party within thirty (30) days following such Cashflow Swap—Substitution Event (in the case of a Cashflow Swap—Substitution Event referred to in sub-clause (ii) of the definition thereof) or within ten (10) days following such Cashflow Swap—Substitution Event (in the case of a Cashflow Swap—Substitution Event referred to in sub-clause (i) of the definition thereof above), then (a) the Cashflow Swap Counterparty will, while it continues in good faith to search for an eligible Cashflow Swap—Substitute Party, post and maintain, or continue to maintain, as the case may be, collateral in accordance with the Credit Support Annex and (b) the Issuer will have the right to terminate the Cashflow Swap Agreement with all costs of such termination to be paid by the Cashflow Swap Counterparty.

   The Trustee will deposit all collateral received from such Cashflow Swap Counterparty under the Cashflow Swap Agreement in such Cashflow Swap Collateral Account. Any and all funds at any time on deposit in, or otherwise standing to the credit of, each Cashflow Swap Collateral Account will be held in trust by the Trustee for the benefit of the Secured Parties. The only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, each Cashflow Swap Collateral Account will be (i) for application to obligations of the Cashflow Swap Counterparty to the Issuer under the Cashflow Swap Agreement that are not paid when due (whether when scheduled or upon early termination) or (ii) to return collateral to the Cashflow Swap Counterparty when and as required by the Cashflow Swap Agreement in each case upon the direction of the Issuer pursuant to an order of the Issuer. No assets credited to any Cashflow Swap Collateral Account will be considered an asset of the Issuer for purposes of any of the Coverage Tests unless and until the Issuer or the Trustee on its behalf is entitled to foreclose on such assets in accordance with the terms of the Cashflow Swap Agreement.

   Upon its receipt of notice that the Cashflow Swap Counterparty has defaulted in the payment when due of its obligations to the Issuer under any Cashflow Swap Agreement (or, if earlier, when the Trustee becomes aware of such default) the Trustee will make a demand on such Cashflow Swap Counterparty, or any guarantor, if applicable, demanding payment forthwith. The Trustee will give notice to the Secured Parties and each Rating Agency upon the continuance of the failure by such Cashflow Swap Counterparty to perform its obligations for two Business Days following a demand made by the Trustee on such Cashflow Swap Counterparty.

   If at any time the Cashflow Swap Agreement becomes subject to early termination due to the occurrence of an "event of default" or a "termination event" (each as defined in the Cashflow Swap Agreement) solely attributable to the Cashflow Swap Counterparty or other comparable event, the Issuer and the Trustee will take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee thereunder as may be permitted by the terms of such Cashflow Swap Agreement and consistent with the terms of the Indenture, and will apply any proceeds of any such actions (including the proceeds of the liquidation of any collateral pledged by the Cashflow Swap Counterparty) to enter into a replacement Cashflow Swap Agreement on substantially identical terms or on such other terms as to which each Rating Agency will have provided a Rating Agency Confirmation with a Cashflow Swap—Substitute Party with respect to which the Cashflow Swap Counterparty Ratings Requirement is satisfied and each Rating Agency will have provided a Rating Agency Confirmation. If the Issuer is the sole "non-affected party" or the sole "non-defaulting party" with respect to such

95

Confidential Treatment Requested by Ambac

AMB-V_00045255

"event of default" or "termination event", the Issuer will (with the assistance of the Manager) in a commercially reasonable manner determine its loss as a result of an early termination of the Cashflow Swap Agreement caused by the Cashflow Swap Counterparty which will include the cost of entering into a replacement Cashflow Swap Agreement with a prospective counterparty independent from the Issuer, the Manager and each other that satisfies the Cashflow Swap Counterparty Ratings Requirement and with respect to which a Rating Agency Confirmation will have been obtained and enter into a replacement Cashflow Swap Agreement with such prospective counterparty.

The Issuer will notify each Rating Agency if at any time the Cashflow Swap Counterparty is required to post collateral or assign its rights and obligations in and under the Cashflow Swap Agreement.

The Cashflow Swap Agreement may not be amended or modified at any time other than to effect the appointment of a substitute Cashflow Swap Counterparty or to effect a modification which is of a formal, minor or technical nature or is to correct a manifest error and which, in the opinion of the Trustee (based upon an opinion of counsel) would not have a material adverse effect on the interests of Holders of the Secured Notes or of Holders of any Class or Classes of Secured Notes or the Holders of the Income Notes; *provided* that the Issuer has obtained Rating Agency Confirmation with respect to any such modification. The Trustee will provide the Manager and the Rating Agencies with a copy of any such modification at least ten (10) Business Days prior to effecting such modification.

The Issuer will not terminate or amend any Cashflow Swap Agreement without receiving Rating Agency Confirmation from each Rating Agency with respect to such termination or amendment.

**CDS Collateral Agreement**

On the Closing Date, the Issuer will enter into the CDS Collateral Agreement with the CDS Collateral Securities Counterparty, pursuant to which the CDS Collateral Securities Counterparty will agree (i) to purchase the CDS Collateral Eligible Securities from the Issuer at par or otherwise to cover any loss and receive any gains on the sale of CDS Collateral Eligible Securities and (ii) to provide a return on the CDS Collateral Required Amount equal to LIBOR. The Issuer will pay to the CDS Collateral Securities Counterparty (i) any gains on the CDS Collateral Eligible Securities in excess of par (in the aggregate) upon the termination of one or more transactions according to the terms of the CDS Collateral Agreement and (ii) any interest from the CDS Collateral Eligible Securities credited to the CDS Asset Collateral Account. Any amounts received by the Issuer pursuant to the CDS Collateral Agreement shall be deposited into the Capacity Subaccount of the Reserve Account.

If on any date a CDS Collateral Shortfall occurs, then either of the Issuer or the CDS Collateral Securities Counterparty may propose to the other that the Principal Balance of one or more CDS Collateral Eligible Securities be increased or that all or a portion of one or more CDS Collateral Eligible Securities be replaced by one or more replacement CDS Collateral Eligible Securities, so that after giving effect to such increase or replacement, the aggregate Principal Balance of the CDS Collateral Eligible Securities (other than any Floating Balance Transaction, as that term is defined in the CDS Collateral Agreement) is equal to the CDS Collateral Required Amount as of such date. If no agreement as to such increase or replacement is reached within three Business Days after a CDS Collateral Shortfall has occurred, the CDS Collateral Securities Counterparty shall have the right to designate an early termination date in respect of all or part of one or more CDS Collateral Eligible Securities, for an aggregate Principal Amount at least equal to the CDS Collateral Shortfall. Upon such early termination, no amount shall be due by either party.

If on any Payment Date a CDS Collateral Excess occurs, or if on any date a CDS Collateral Intraperiod Excess occurs, then either of the Issuer or the CDS Collateral Securities Counterparty may propose to the other that the Principal Balance of one or more CDS Collateral Eligible Securities be reduced or that all or a portion of one or more CDS Collateral Eligible Securities be replaced by one or more replacement CDS Collateral Eligible Securities, so that after giving effect to such reduction or replacement, the aggregate Principal Balance of the CDS Collateral Eligible Securities (other than any Floating Balance Transaction, as that term is defined in the CDS Collateral Agreement) is equal to the CDS Collateral Required Amount as of such date. If no agreement as to such reduction or replacement is reached within the period of days set forth in the CDS Collateral Agreement, the CDS Collateral

Confidential Treatment Requested by Ambac

AMB-V_00045256

Securities Counterparty or the Issuer shall have the right to designate an early termination date in respect of all or part of one or more CDS Collateral Eligible Securities, for an aggregate Principal Amount of the CDS Collateral Excess or the CDS Collateral Intraperiod Excess.

If at any time a CDS Collateral Investment Downgrade occurs with respect to any CDS Collateral Eligible Security, then either the Issuer or the CDS Collateral Securities Counterparty may propose to the other that either such CDS Collateral Eligible Security be replaced by a replacement CDS Collateral Eligible Security that has an outstanding Principal Balance equal to the outstanding Principal Balance of the CDS Collateral Eligible Security being replaced, or that the Principal Balance of one or more other CDS Collateral Eligible Securities with respect to which a CDS Collateral Investment Downgrade has not occurred be increased; *provided* that if there is no agreement as to such a replacement or increase within 30 Business Days following the occurrence of CDS Collateral Investment Downgrade, an early termination date shall occur on the 30th Business Day in respect of such CDS Collateral Eligible Security.

In addition to the replacement provisions set forth above, (i) the CDS Collateral Securities Counterparty may terminate any transaction under the CDS Collateral Agreement upon the occurrence of a CDS Collateral Voting Rights Event, a CDS Collateral Credit Enhancement Event or a CDS Collateral Withholding Event (*provided* that, in the event of a CDS Collateral Withholding Event, (A) such termination would apply only with respect to the notional amount of the applicable CDS Collateral Eligible Security and (B) the Issuer shall not be obligated to pay any breakage costs or make any termination payment that would reduce its receipt of the aggregate par value of the CDS Collateral Eligible Securities subject to the CDS Collateral Agreement plus the LIBOR-based payment thereon) and (ii) at any time and subject to the requirements of the CDS Collateral Agreement, the CDS Collateral Securities Counterparty may, on at least two Business Days' prior written notice to the Issuer, at its election replace one or more CDS Collateral Eligible Securities by proposing one or more replacement CDS Collateral Eligible Securities with an aggregate Principal Balance equal to the CDS Collateral Eligible Securities being replaced.

The Issuer may accomplish a CDS Collateral Elective Withdrawal at any time until the third anniversary of the Closing Date by submitting a written request to the CDS Collateral Securities Counterparty not less than five Business Days prior to the CDS Collateral Elective Withdrawal Effective Date; *provided* that the aggregate amount of CDS Collateral Elective Withdrawal Amounts since the Closing Date shall not exceed U.S.$100,000,000 on a cumulative basis during such three-year period. If the CDS Collateral Elective Withdrawal is approved by the CDS Collateral Securities Counterparty, the Issuer may effect such CDS Collateral Elective Withdrawal by withdrawing the applicable amount from the CDS Asset Collateral Account in accordance with the terms of the CDS Collateral Agreement. The proceeds of each CDS Collateral Elective Withdrawal shall be used in accordance with the requirements set forth in the Indenture.

If a CDS Collateral Ratings Event occurs and is continuing, the CDS Collateral Securities Counterparty will be required, within thirty days of the occurrence of such CDS Collateral Ratings Event, take one of the following actions at its own expense and while continuing to perform its obligations under the CDS Collateral Agreement: (i) transfer all of its rights and obligations under the CDS Collateral Agreement and all related transactions to another entity with ratings of its short-term and long-term senior unsecured debt or deposits (or financial strength or counterparty rating) by Moody's and S&P at least equal to the thresholds set forth in the definition of "CDS Collateral Ratings Event" (provided that as of the date of such transfer, neither the Issuer nor any such transferee will be required to withhold or deduct on account of any tax from any payments under the CDS Collateral Agreement in excess of what would have been required to be withheld or deducted in the absence of such transfer); (ii) cause an entity with ratings of its short-term and long-term senior unsecured debt or deposits (or financial strength or counterparty rating) by Moody's and S&P at least equal to the thresholds set forth in the definition of "CDS Collateral Ratings Event" to guarantee or provide an indemnity or letter of credit in respect of the obligations of the CDS Collateral Securities Counterparty pursuant to the CDS Collateral Agreement; or (iii) post collateral from time to time (in the form of cash or U.S. treasury obligations), but no less frequently than biweekly, in an amount equal to the Collateral Requirement (as defined in the CDS Collateral Agreement), pursuant to a collateral agreement to be entered into at the time of any such rating downgrade, in form and substance (other than any terms regarding the determination of the Collateral Requirement) reasonably satisfactory to each of the Rating Agencies (which may be in the form of a Credit Support Annex). The form and substance of (a) any agreement transferring the rights and obligations of the CDS Collateral Securities Counterparty under clause (i) above, (b) any guarantee, indemnity or letter of credit under clause (ii) above and (c) subject to the limitation set forth in clause (iii) above, any collateral agreement under clause (iii) above shall be subject to Rating Agency Confirmation. If the

97

CDS Collateral Securities Counterparty has not, within thirty days of the occurrence of such CDS Collateral Ratings Event, taken any of the actions required above, the Issuer shall have the right to terminate the CDS Collateral Agreement with all costs of such termination to be paid by the CDS Collateral Securities Counterparty.

If a CDS Collateral Replacement Event occurs, then by the first Business Day following the date that is five Local Business Days (as defined in the CDS Collateral Agreement) after the occurrence of such CDS Collateral Replacement Event, the CDS Collateral Securities Counterparty will be required, at its own expense and while continuing to perform its obligations pursuant to the CDS Collateral Agreement, transfer all of its rights and obligations under the CDS Collateral Agreement and the related transactions to another entity with ratings of its short-term and long-term senior unsecured debt or deposits (or financial strength or counterparty rating) by Moody's and S&P at least equal to the thresholds set forth in the definition of "CDS Collateral Replacement Event"; *provided* that as of the date of such transfer, neither the Issuer nor such transferee will be required to withhold or deduct on account of any tax from any payments under the CDS Collateral Agreement in excess of what would have been required to be withheld or deducted in the absence of such transfer. The form and substance of any agreement transferring the rights and obligations of the CDS Collateral Agreement shall be subject to Rating Agency Confirmation. If the CDS Collateral Securities Counterparty has not taken any of the actions required above within the timeframe prescribed above, the Issuer shall have the right to terminate the CDS Collateral Agreement with all costs of such termination to be paid by the CDS Collateral Securities Counterparty.

The CDS Collateral Agreement will provide that no consent, waiver or amendment to any Transaction Document shall be made without the prior written consent of the CDS Collateral Securities Counterparty if, in the good faith, commercially reasonable determination of the CDS Collateral Securities Counterparty, such consent, waiver or amendment would have a material adverse effect on the interests of the CDS Collateral Securities Counterparty. Notwithstanding the foregoing, any consent, waiver or amendment related to payments to be made under the CDS Collateral Agreement, any consent, waiver or amendment related to the amount, timing and purpose of withdrawals from, or deposits to, the CDS Asset Collateral Account or the Reserve Account and any amendment related to the definition of "CDS Collateral Eligible Securities" shall not be made without the prior written consent of CDS Collateral Securities Counterparty.

The Issuer will not cause the liquidation of CDS Collateral Eligible Securities in any manner other than pursuant to terms under the CDS Collateral Agreement.

**Covered Short CDS Assets**

At any time that the Issuer would be entitled to terminate all or any portion of any CDS Asset, the Manager may instead cause the Issuer to enter into one or more Covered Short CDS Assets, each of which will provide for physical settlement at the option of the Issuer. The Issuer will only enter into a Covered Short CDS Asset with a Covered Short CDS Asset Counterparty with respect to a notional amount up to the CDS Reference Obligation Notional Amount of the related CDS Asset.

The entry into or purchase of a Covered Short CDS Asset by the Issuer will not be subject to satisfaction of the Portfolio Limitations or the Coverage Tests but will be subject to satisfaction of the Covered Short CDS Criteria as of the date on which the Issuer makes a binding commitment to enter into or purchase the Covered Short CDS Asset. In the event that proceeds from the sales of any Covered Short CDS Assets are used to enter into or purchase Covered Short CDS Assets, the Covered Short CDS Asset Additional Criteria shall also be satisfied as of the date of entry into or purchase of such Covered Short CDS Asset. Upon any unwinding of a Covered Short CDS Asset, the related Covered Short Matching Long Position shall satisfy the Investment Criteria.

Any Covered Short CDS Asset will be documented under the same form of Master Agreement as the related CDS Asset; *provided*, in each case, that the Covered Short CDS Asset will have a separate confirmation, which shall be the same form of confirmation as the related CDS Asset referencing the same CDS Reference Obligation or CDS Reference Obligations. The confirmation for the Covered Short CDS Asset will provide that:

(i) the premium (which may be different from the premium on the related Covered Short Matching Long Position) payable by the Issuer will be fixed by the Covered Short CDS Asset Counterparty under the Covered Short CDS Asset, and the Issuer must satisfy the Covered Short CDS Asset Premium Test at the time that it enters into the Covered Short CDS Asset;

Confidential Treatment Requested by Ambac

AMB-V_00045258

(ii) the effective date of the Covered Short CDS Asset may be different than the effective date of the related CDS Asset;

(iii) the Covered Short CDS Asset will not affect the obligations of the CDS Asset Counterparty to pay to the Issuer any reimbursement amounts that become payable to the Issuer with respect to any credit protection payments made by the Issuer to the CDS Asset Counterparty under the CDS Asset prior to the effective date of the Covered Short CDS Asset;

(iv) if the CDS Asset Counterparty declares a credit event under the CDS Asset, the Issuer will declare a credit event under the Covered Short CDS Asset;

(v) to the extent that the Covered Short CDS Asset Counterparty is the CDS Asset Counterparty, the Covered Short CDS Asset will be structured so that, other than amounts payable in accordance with clause (iv) above, payments by or to the Issuer as buyer of credit protection under the Covered Short CDS Asset will be netted against payments to or from the Issuer as the seller of credit protection under the related CDS Asset; and

(vi) if the CDS Asset Counterparty elects physical delivery of the CDS Reference Obligation under the related CDS Asset, the Issuer will be able to elect physical delivery of such CDS Reference Obligation to the Covered Short CDS Asset Counterparty under the Covered Short CDS Asset.

The Issuer's obligations under a Covered Short CDS Asset may include an up-front payment, periodic premium payments, reimbursement payments and termination payments, including any termination payment payable by the Issuer as a result of assigning or terminating the Covered Short CDS Asset. Any amounts will be payable by the Issuer in accordance with the terms of the Indenture. All amounts paid to the Issuer by a Covered Short CDS Asset Counterparty, including any early termination payment received by the Issuer as a result of assigning or terminating a Covered Short CDS Asset, will be deposited into the Collection Account for application as Interest Collections, except to the extent that the Issuer is required to retain amounts related to the Issuer's reimbursement obligations under the related Covered Short CDS Asset.

Subject to the following sentence, the Issuer may terminate any Covered Short CDS Asset at any time; *provided* that at the time of such termination either (i) the Issuer terminates the related CDS Asset at least to the extent of the notional amount of such Covered Short CDS Asset or (ii) the related CDS Asset meets the requirements of the definition of "Eligible Collateral Debt Securities" as if the Issuer acquired such CDS Asset as of the date of the termination of the Covered Short CDS Asset and the Issuer has a CDS Asset Capacity Amount at least equal to the CDS Reference Obligation Notional Amount of the terminated Covered Short CDS Asset immediately prior to such termination; and *provided, further* that the Issuer shall not terminate any Covered Short CDS Asset if such termination would result in an Event of Default. The Manager may not direct the addition or removal of any Covered Short CDS Asset unless there are sufficient amounts available to pay any up-front payment or termination payment, as applicable.

99

Confidential Treatment Requested by Ambac

AMB-V_00045259

## THE MANAGER

*The information appearing in this section has been prepared by the Manager and has not been independently verified by the Co-Issuers, the Initial Purchaser, the Placement Agent, the Trustee or any other person. Accordingly, the Manager assumes the responsibility for the accuracy, completeness or applicability of such information appearing under such subheading.*

**General**

Certain advisory and administrative functions with respect to the Collateral will be performed by the Manager under the agreement to be entered into between the Issuer and the Manager (the "Management Agreement"). In accordance with the Portfolio Quality Tests and the Coverage Tests and other requirements set forth in the Indenture, and in accordance with the provisions of the Management Agreement, the Manager will select the portfolio of Eligible Collateral Debt Securities. Pursuant to the terms of the Management Agreement and the Indenture, the Manager will monitor the Eligible Collateral Debt Securities and provide the Issuer with advice with respect to the composition and characteristics of the Eligible Collateral Debt Securities, and with respect to any disposition or tender of Eligible Collateral Debt Securities and the application of the proceeds thereof. The Manager will also advise the Issuer with respect to CDS Assets, entering into Hedge Agreements, the Cashflow Swap Agreement and securities lending agreements, and will instruct the Trustee from time to time with respect to the investment of retained funds in Eligible Investments. The collateral management activities of the Manager on behalf of the Issuer will be subject to certain restrictions contained in the Indenture.

Credit Suisse Alternative Capital, Inc. ("ACI"), located at Eleven Madison Avenue, New York, New York 10010, will serve as the Investment Manager. Prior to January 16, 2006, ACI was known as CSFB Alternative Capital, Inc. ACI is registered as an investment adviser pursuant to the U.S. Investment Advisers Act of 1940, as amended, and is an indirect subsidiary of Credit Suisse Group. Credit Suisse Group is a leading global financial services company headquartered in Zurich, whose primary subsidary Credit Suisse, a Swiss bank, was founded in 1856. Credit Suisse Group provides its clients with investment banking, private banking and asset management services worldwide. Credit Suisse Group offers advisory services, comprehensive solutions and innovative products to companies, institutional clients and high-net-worth private clients globally, as well as retail clients in Switzerland. Credit Suisse Group's registered shares (CSGN) are listed in Switzerland and, in the form of American Depositary Shares (CS), in New York. ACI is an Affiliate of Credit Suisse Securities (USA) LLC ("CSS").

CSS has entered into a services agreement, dated as of July 1, 2004, with ACI (the "Employee Services Agreement") to make available to ACI certain of CSS's employees to enable ACI to perform its obligations under the Management Agreement. These employees of CSS are members of its Leveraged Investment Group ("LIG"). Certain members of the LIG team are also officers of ACI.

ACI currently serves as collateral manager for twenty-four collateralized debt obligation vehicles (the "CDO Vehicles"). Twenty of the CDO Vehicles invest in high yield loans and bonds and the remaining four CDO Vehicles invest in securities issued by other collateralized debt obligation vehicles and in asset backed securities. The initial aggregate capitalization of these CDO Vehicles at the time of issuance was in excess of $16 billion. Each of the CDO Vehicles is managed by the LIG team for ACI under the Employee Services Agreement. Three additional collateralized debt obligation vehicles are managed by LIG for Credit Suisse International, the manager for those vehicles.

In addition to the CDO Vehicles, LIG also acts as advisor or sub-advisor to approximately ten separate accounts that invest primarily in various mixtures of leveraged loans and high yield bonds. ACI and its affiliates currently advise and may in the future sponsor or advise other investment vehicles or portfolios with investment objectives, policies and restrictions similar or identical to those of the Issuer.

Various potential and actual conflicts of interest may exist from the overall investment activities of the Manager, its officers and its affiliates and their respective employees investing for their own accounts or for the accounts of others. See "Risk Factors—Potential Conflicts of Interest Involving the Manager".

Confidential Treatment Requested by Ambac

AMB-V_00045260

### Investment Approach and Analysis

The Manager's objective in investing in Eligible Collateral Debt Securities on behalf of the Issuer is to minimize the possibility of principal loss while enhancing return through limited portfolio management, subject to the limitations in the Indenture. The Manager's selection of Eligible Collateral Debt Securities is based primarily on structural and credit analysis as well as technical factors which may influence trading levels and pricing. The Manager will invest in assets that it believes are appropriately priced, properly structured and able to be adequately serviced. The Manager believes its relationships with leading investment and commercial banks as well as other financial intermediaries allow it to review a number of potential investment opportunities from which to select Eligible Collateral Debt Securities. In evaluating the worthiness of potential investments, the Manager focuses on, among other things, the transaction structure, the underlying collateral, and the capabilities of the collateral manager and/or servicer.

### Personnel

Set forth below is information regarding certain persons who currently hold positions within LIG and perform services for the Manager under the Employee Services Agreement, although such persons may not necessarily continue to hold such positions or be involved in the performance of asset management services for the Issuer during the entire term of the Management Agreement. Additional personnel may be retained by the Manager or CSS and made available to the Manager without notice to the Issuer or the holders of the Notes.

In the following biographies, "CS" refers to Credit Suisse Group, its affiliates and their predecessors. Messrs. Popp, Marshak, Lerner, Flannery and Milovich and Ms. Karn joined CS as a group in 2000. Unless otherwise specified, members of LIG are resident in New York (members of LIG not resident in New York are not subject to the Employee Services Agreement).

**John G. Popp**
*Managing Director*
*Head of LIG*

Mr. Popp is Head of the Leveraged Investments Group, with primary responsibility for directing the investment decision and monitoring processes and managing/overseeing LIG's global investment strategy. Mr. Popp chairs the LIG ABS Credit Committee. Prior to joining LIG, Mr. Popp was a founding partner and head of asset management of First Dominion Capital, LLC, overseeing the management of $2.5 billion in CDO Vehicles. From 1992 through 1997, Mr. Popp was a Managing Director of Indosuez Capital and also served as President of Indosuez Capital Asset Advisors, Inc., and President of 1211 Investors, Inc. While at Indosuez, Mr. Popp was responsible for building that firm's asset management business, including the development of three CDO Vehicles aggregating $1.3 billion. Prior thereto, Mr. Popp was a Senior Vice President in the Corporate Finance Department of Kidder Peabody & Co., Inc., which he joined in 1989. Mr. Popp had previously been a Vice President in the Mergers and Acquisitions Department of Drexel Burnham Lambert. Mr. Popp is a council member of The Brookings Institution and a member of The Juilliard School Council. He holds a B.A. from Pomona College and a M.B.A. from the Wharton Graduate Division of the University of Pennsylvania.

**Andrew H. Marshak**
*Managing Director*

Mr. Marshak has global responsibility for overseeing LIG's portfolio management and trading. Mr. Marshak is a member of the LIG ABS Credit Committee. Prior to joining LIG, Mr. Marshak was a Managing Director and a founding partner of First Dominion Capital, LLC, which he joined in 1997 from Indosuez Capital, where he served as a Vice President. Prior to joining Indosuez Capital in 1992, Mr. Marshak was an Analyst in the Investment Banking Department of Donaldson, Lufkin & Jenrette. He holds a B.S., Summa Cum Laude, from the Wharton School of The University of Pennsylvania.

Confidential Treatment Requested by Ambac

AMB-V_00045261

**David H. Lerner**
*Managing Director*

Mr. Lerner is a portfolio manager and trader for LIG. Prior to joining LIG, Mr. Lerner served as Senior Vice President of First Dominion Capital, LLC, which he joined in 1998 from The Mitsubishi Trust and Banking Corporation where he was a Vice President in the Leveraged Finance Group. Prior thereto, Mr. Lerner was in the Corporate Finance Group at Banque Française where he also served as Vice President. Mr. Lerner began his career as an Associate at The Chase Manhattan Bank, and holds a B.B.A. from the George Washington University.

**Samir Bhatt**
*Director*

Mr. Bhatt joined LIG in 2004 and is a member of the LIG ABS Credit Committee. Mr. Bhatt is lead ABS credit analyst and currently covers CDOs, RMBS and ABS. Prior to joining LIG, Mr. Bhatt worked in the structured finance markets for seven years, the first five in the Structured Products Research group at Credit Suisse First Boston and the previous two as an ABS research analyst and structurer at JP Morgan Chase. Mr. Bhatt holds a B.S. in Computer Science from Cornell University.

**Glenn Clarke**
*Director*

Mr. Clarke joined LIG in 2005 and is resident in London. Mr. Clarke is the European portfolio manager and trader for LIG. Prior to joining LIG, Mr. Clarke was an Associate Director with AIB Capital Markets European Leveraged Finance team, which he joined in 2000. At AIB, he was responsible for sourcing and executing leveraged transactions for both the Bank's balance sheet and CDOs. Mr. Clarke began his career as an Assistant Manager at the Commonwealth Bank of Australia in 1997, and holds a B.Comm from the Murdoch University, Western Australia.

**Thomas J. Flannery**
*Director*

Mr. Flannery is a member of the LIG Credit Committee and is currently the high yield bond trader and a portfolio manager for LIG. Prior to joining LIG, Mr. Flannery served as an Associate at First Dominion Capital, LLC. Mr. Flannery is a member of the LIG ABS Credit Committee. Prior to that Mr. Flannery worked at Houlihan Lokey Howard & Zukin, Inc., as an analyst in the Financial Restructuring Group, working on a variety of debtor and creditor representation assignments. Mr. Flannery holds a B.S. from Georgetown University.

**Linda R. Karn**
*Director*

Ms. Karn is a member of the LIG European Credit Committee and currently covers the media, telecommunications and publishing sectors. Prior to joining LIG as a credit analyst, Ms. Karn served as a Vice President of First Dominion Capital, LLC, which she joined in 1998 from TD Securities (USA) Inc. where she served as a Vice President in the Media and Telecommunications Institutional Equity Research Group. Prior thereto, Ms. Karn was an Analyst in the High Yield Research Group at NationsBanc Capital Markets, Inc. Ms. Karn currently covers the media, telecommunications and publishing sector. Ms. Karn holds a B.S. from Babson College.

**James M. Potesky**
*Director*

Mr. Potesky joined LIG in 2001 as a credit analyst from the Global High Yield Research group at Morgan Stanley where he served as a Vice President and senior chemical industry analyst. From 1998 to 2000, he was a Vice President and chemical industry analyst for the high yield department of Schroder & Company. From 1990 to 1998, Mr. Potesky was a Director and senior credit analyst at Standard & Poor's Ratings Group, a Division of the McGraw-Hill Companies. He began his career as a corporate loan officer at Morgan Guaranty Trust Company in the early 1980s. Mr. Potesky currently covers the diversified industrial and chemical industries. Mr. Potesky holds a B.A. in Political Science from Washington University.

Confidential Treatment Requested by Ambac

AMB-V_00045262

**Richard Quin**
*Director*

Mr. Quin is the Asia Pacific portfolio manager, debt and derivatives trader. He moved to LIG in July 2006 after nine years with the Asset Management division's Fixed Income Investment Team in Australia. Mr. Quin has been a member of the Asset Management division's Global Credit Investment Committee and chair of the division's Global Swaps Derivative Investment Committee. Prior to joining Credit Suisse, Mr. Quin was a liability consultant to the South Australian Finance Authority. Prior to that, he worked for the SBSA for four years as a bond options trader. Mr. Quin holds a Bachelor of Business from the University of South Australia and a Masters of Applied Finance from Macquarie University.

**Michael Shackelford**
*Director*

Mr. Shackelford is a member of the LIG ABS Credit Committee. He joined LIG in 2006 and is primarily responsible for overseeing LIG's ABS investments. Prior to joining LIG, Mr. Shackelford was a portfolio manager and trader with INVESCO Institutional (N.A.) Inc. responsible for managing their ABS CDO portfolios. Prior to that Mr. Shackelford was a portfolio manager and trader with AEGON USA Investment Management, LLC. He was also with Credit-Based Asset Servicing and Securitization LLC (C-BASS) in their capital markets group. Mr. Shackelford began his investment career with The Money Store Inc. as a credit analyst and later traded whole loan portfolios. He holds a B.A. in Economics from the University of Texas at Austin and a M.A. in Economics from California State University, Sacramento.

**Vance P. Shaw, CFA**
*Director*

Mr. Shaw joined CS in 1998 as a senior high yield credit analyst. Mr. Shaw joined LIG in 1998 and currently covers the energy and utility industries. From 1995 to January 1998, Mr. Shaw was Director of High Yield Bond Research at Scotia Capital Markets in New York. Prior to joining Scotia, Mr. Shaw was a Senior Analyst - High Yield Industrials at Lehman Brothers Inc. from 1991 to 1995. Mr. Shaw served as a high yield analyst at Kidder Peabody & Co. from 1989 to 1991 and as a senior high yield research analyst at Prudential Capital Management from 1986 to 1989. Mr. Shaw covered U.S. and foreign banks as an analyst at the Federal Reserve Bank of New York from 1982 to 1985. He received his B.S. in Accounting and Finance from New York University.

**Lauri Whitlock**
*Director*

Ms. Whitlock joined CS in 2000 and is currently chief operating officer for LIG. She joined LIG as Middle Office Manager in 2001. From 1997 to 2000, Ms. Whitlock served as manager of Financial and Regulatory Reporting at Salomon Smith Barney. Prior to joining Salomon Smith Barney, Ms Whitlock served as Assistant Controller at Raymond James and Associates. Ms. Whitlock began her career at Price Waterhouse auditing financial services companies. Ms. Whitlock holds a B.S. in Accounting from the University of Maryland.

**Adrienne Dale**
*Vice President*

Ms. Dale joined LIG in 2005 as a credit analyst and currently covers the automotive, retail and restaurant sections. Prior to joining the group, Ms. Dale worked at CIBC World Markets as a credit analyst in the High Yield Research Group, where she covered the automotive supplier and retailer sectors. Ms. Dale joined CIBC World Markets in 2000, earned her B.A. from the University of Pennsylvania and is completing her M.B.A. at the Stern Business School of New York University.

103

Confidential Treatment Requested by Ambac

AMB-V_00045263

**Edward DeBruyn**
*Vice President*

Mr. DeBruyn joined LIG in 2002 as a credit analyst and currently covers the paper/packaging and diversified manufacturing sectors. Prior to joining LIG, Mr. DeBruyn worked at Morgan Stanley, where he was a credit analyst in the Global High Yield research department covering primarily paper and packaging high yield debt issuers located in North America, South America and Asia. Before joining the research department at Morgan Stanley, Mr. DeBruyn spent two years working on Morgan Stanley's Global High Yield Sales desk. Mr. DeBruyn holds a B.S. in Business Management with a concentration in finance from Merrimack College.

**Louis I. Farano**
*Vice President*

Mr. Farano joined LIG as a credit analyst in 2006 and currently covers the consumer products, food and tobacco sectors. Prior to joining the group, Mr. Farano served as a Vice President in the High Yield department at SG America Securities Inc. Mr. Farano holds a B.B.A. in Accounting from James Madison University and an M.B.A. in Finance from UCLA's Anderson School.

**Regan Hoult**
*Vice President*

Mr. Hoult joined LIG in 2006 and is resident in London. Prior to joining LIG, Mr. Hoult worked for two years at HSBC's Financial Sponsor Coverage Group. Prior to HSBC, he worked as an analyst within PriceWaterhouse Coopers' M&A Advisory division. Mr. Hoult holds a BCom and MBus from Otago University, Dunedin, and is a CFA charterholder.

**Todd Kornfeld**
*Vice President and Counsel*

Mr. Kornfeld joined the legal department of CS in 2005. From 2000 to 2005, Mr. Kornfeld was an associate at Cleary Gottlieb Steen & Hamilton LLP in New York, concentrating in securities, capital markets, structured finance and derivatives. From 1998 to 2000, Mr. Kornfeld was an associate at Cadwalader Wickersham & Taft in New York, concentrating in structured finance and derivatives. Mr. Kornfeld currently is the counsel to LIG. Mr. Kornfeld holds a B.S. in Computer Science from the State University of New York at Albany, a J.D. from Boston University and an L.L.M. from New York University. Mr. Kornfeld is a member of the bar in New York, Massachusetts and Connecticut.

**Nicholas Milovich**
*Vice President*

Mr. Milovich joined LIG as a credit analyst from First Dominion Capital, LLC, where he served as an Associate. Mr. Milovich joined First Dominion Capital, LLC in 1999 from Bear, Stearns & Co., where he served as an Associate in the High Yield Research Group. Prior to joining Bear Stearns, Mr. Milovich served in the Equity Capital Markets Group at Lehman Brothers. Mr. Milovich currently is an analyst covering the healthcare, transportation and aerospace and defense industries. Mr. Milovich holds a B.S.M.E. from the General Motors Institute and an M.B.A. from the University of Chicago.

**Daragh Murphy, CFA**
*Vice President*

Mr. Murphy joined LIG in 2005 and is resident in London. Prior to joining LIG, Mr. Murphy worked at Fitch Ratings, where he was an Associate Director in the European Leveraged Finance Group. Prior to Fitch Ratings, Mr. Murphy was a credit analyst in the Corporate Finance Group at Naspa Dublin. Mr. Murphy is a credit analyst covering European credits. Mr. Murphy holds a B. Comm. (International) from University College Dublin.

Confidential Treatment Requested by Ambac

AMB-V_00045264

**William Nunez**
*Vice President*

  Mr. Nunez joined LIG in 2006 as a credit analyst and currently covers structured products, primarily RMBS and ABS. Prior to joining LIG, Mr. Nunez worked in the fixed income research department of Merrill Lynch Investment Managers for two years, where he was responsible for analyzing structure finance securities including consumer and mortgage ABS products, structure finance CDOs and foreign RMBS. Previously, Mr. Nunez spent five years at Fitch Ratings in the ABS Consumer Group where his primary responsibilities included rating and monitoring of asset backed transactions. Mr. Nunez holds a B.S. in Business Administration from the Bernard Baruch College (CUNY) and an M.B.A. degree in Finance from Fordham University.

**Raphael Savitz**
*Vice President*

  Mr. Savitz joined LIG in 2006. Prior to joining LIG, Mr. Savitz was a credit analyst at Pinewood Capital Partners, LLC. Prior to joining Pinewood in 2004, Mr. Savitz spent two years in Citigroup's High Yield Research Group, focusing on the retail, food & drug retail and consumer products sectors. Mr. Savitz began his career in 2000 as an analyst in Salomon Smith Barney's International Debt Capital Markets Group. Mr. Savitz holds a B.S. in Finance from Yeshiva University.

**Judy Sun**
*Vice President*

  Ms. Sun joined LIG in 2005 as a credit analyst and currently covers structured products, primarily RMBS and ABS. Previously, Ms. Sun worked in the fixed-income research department of Freddie Mac for six years, where she developed prepayment, default and pricing models for mortgage-backed securities. Ms. Sun holds a M.S. in Statistics from the University of Maryland and a B.A. in Mathematics from Randolph Macon Women's College.

**Nik Persic**
*Assistant Vice President*

  Mr. Persic moved to LIG in July 2006 from the Australian Fixed Interest team in asset management, which he joined in January 2005. Prior to joining Credit Suisse, Mr. Persic worked for the Commonwealth Bank of Australia for six years where he held analytical roles in Corporate Finance, Equity Capital Markets and Institutional Research. Mr. Persic's hybrid securities research was rated No. 1 in both the 2003 and 2004 Greenwich/Peter Lee survey of institutional fund managers. Mr. Persic holds a Bachelor of Commerce (Hons)/Bachelor of Economics from the Australian National University.

**Ayesha Chenoy**
*Associate*

  Ms. Chenoy joined LIG in 2005 as a credit analyst and is resident in London. Prior to joining LIG, Ms. Chenoy served as a Manager in the Global Loan Syndication group in Barclays Capital which she joined from UBS Global Asset Management, where she served as an Associate Director in the Credit Research Group covering real estate, consumer products and industrials. Ms. Chenoy is a credit analyst covering European credits. Ms. Chenoy holds a MSc. in Accounting and Finance from the London School of Economics and a B.A. in Economics from Cambridge.

**Ilan Freidman**
*Associate*

  Mr. Friedman joined LIG in 2006 as a trader. Prior to joining the group, Mr. Friedman served on the Loan Sales and Trading Desk at SG Americas Securities Inc. Mr. Friedman holds a B.A. in Finance from The Pennsylvania State University and is completing his M.B.A. at the Stern Business School of New York University.

Confidential Treatment Requested by Ambac

AMB-V_00045265

**Roberta Girard**
*Associate*

Ms. Girard joined LIG in 2006 as a credit analyst and is resident in London. Prior to joining LIG, Ms. Girard was an Associate in CS's European Mergers & Acquisitions Group and was previously an Analyst in CS's Global Industrial and Services Group. Ms. Girard joined CS in 2002 and is currently a credit analyst covering European credits. Ms. Girard holds a B.A. in Economics from Bocconi University in Milan.

**Brian Herr**
*Associate*

Mr. Herr joined LIG in 2006 as a trader and credit analyst for structured products. Prior to joining LIG, Mr. Herr worked in the structured products department of Brown Brothers Harriman and Co. for two years, where his primary responsibilities included trading and sector management for the ABS, RMBS, and CMBS sectors. Prior to that, Mr. Herr was employed at Brown Brothers Harriman and Co. in a variety of positions within their institutional fixed income division. Mr. Herr holds a B.A. in Economics from Boston University.

**Ramin Kamali**
*Associate*

Mr. Kamali joined LIG in 2005 as a credit analyst and currently covers the real estate, homebuilding and financial services sectors. Prior to joining the group, Mr. Kamali was in CSS's Investment Banking Division in the Global Industrial and Services Group. Mr. Kamali joined CS in July 2001 as an analyst and was promoted to Associate in July 2004. He holds a B.S. in Economics from The Wharton School of the University of Pennsylvania.

**Adam Kaplan**
*Associate*

Mr. Kaplan joined LIG in 2006 as a credit analyst and currently covers structured products, primarily RMBS and ABS. Prior to joining LIG, Mr. Kaplan worked in the asset backed securities department of Fitch Ratings for six years, where his primary responsibilities included rating and monitoring of asset backed transactions across a wide range of asset classes. Mr. Kaplan holds a B.A. in Economics from Queens College (CUNY) and is currently pursuing a M.B.A. degree in Finance from New York University.

**Ryan Lim**
*Associate*

Mr. Lim joined LIG in 2004 and is a credit analyst currently covering the building products, metals/mining, equipment rental and environmental industries. Before joining LIG, Mr. Lim served as an Associate in the Investment and Corporate Banking Division of Harris Nesbitt. Previously, Mr. Lim was an analyst at Goldman Sachs in the Leveraged Finance Bank Debt Portfolio Group, covering primarily industrial credits. Mr. Lim holds a B.A. in Environmental Science and Public Policy from Harvard University.

**Jakob von Kalckreuth**
*Associate*

Mr. von Kalckreuth joined LIG in 2005 and is resident in London. Prior to joining LIG, Mr. von Kalckreuth worked at CIBC World Markets, where he was an Analyst in the European Leveraged Finance Group involved in origination and execution. Mr. von Kalckreuth is a credit analyst covering European credits. Mr. von Kalckreuth holds a BSc (Hon) from the University of Bath in Economics and International Development.

**Wendy Hanson**
*Analyst*

Ms. Hanson joined LIG in 2007 as a credit analyst and is resident in London. Prior to joining LIG, Ms. Hanson was an Analyst in CS's European Leveraged Finance Group. Ms. Hanson is a credit analyst covering European credits. Ms. Hanson holds a B.A. in English Literature from Oxford University and a Postgraduate Diploma in Finance and Economics from Columbia University in New York.

Confidential Treatment Requested by Ambac

AMB-V_00045266