UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF INCOME NOTES REPRESENTED HEREBY, REPRESENTS THAT IT HAS OBTAINED THESE INCOME NOTES IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER JURISDICTION. AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INCOME NOTE PAYING AGENCY AGREEMENT AND IN THE AMENDED AND RESTATED ARTICLES OF ASSOCIATION AND THE AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION (COLLECTIVELY, THE "ARTICLES") OF THE ISSUER. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE INCOME NOTES, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THESE INCOME NOTES (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INCOME NOTE PAYING AGENCY AGREEMENT AND THE ARTICLES REFERRED TO HEREIN (a) TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED PURCHASER, (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER), (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (iv) IS NOT A PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, AND IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (3) THAT (i) IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OR (ii) IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT (PROVIDED THAT IN THE CASE OF ANY TRANSFER PURSUANT TO THIS SUBCLAUSE (ii), THE TRANSFEROR OR THE TRANSFEREE HAS PROVIDED SUCH CERTIFICATIONS, LEGAL OPINIONS OR OTHER INFORMATION AS THE ISSUER, THE INCOME NOTE REGISTRAR AND THE INCOME NOTE PAYING AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH TRANSFER IS BEING MADE PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT) OR (b) TO A TRANSFEREE (1) THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S OF THE SECURITIES ACT) AND IS ACQUIRING THESE INCOME NOTES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT AND (2) THAT IS NOT A U.S. RESIDENT WITHIN THE MEANING OF THE INVESTMENT COMPANY ACT; AND IN THE CASE OF BOTH CLAUSE (a) AND (b), (1) IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$250,000 FOR THE PURCHASER AND FOR EACH ACCOUNT FOR WHICH IT IS ACTING AND (2) TO A TRANSFEREE THAT AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND. EACH PURCHASER OR TRANSFEREE OF THESE INCOME NOTES WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN SECTION 1 OF ANNEX A TO THE INCOME NOTE PAYING AGENCY AGREEMENT.

THESE INCOME NOTES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE INCOME NOTE PAYING AGENT OR ANY INTERMEDIARY. EACH TRANSFEROR OF THESE INCOME NOTES AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INCOME NOTE PAYING AGENCY AGREEMENT TO THE TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ANY INTEREST IN THESE INCOME NOTES PREVIOUSLY TRANSFERRED TO

Confidential Treatment Requested by Ambac

AMB-V_00045283

NON-PERMITTED HOLDERS (AS DEFINED IN THE INCOME NOTE PAYING AGENCY AGREEMENT) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INCOME NOTE PAYING AGENCY AGREEMENT.

In addition, each Income Note that is a Certificated Note will bear an additional legend to the following effect unless the Issuer determines otherwise in compliance with applicable law:

THE ACQUISITION OF THIS NOTE BY, OR ON BEHALF OF OR USING THE ASSETS OF, A BENEFIT PLAN INVESTOR (INCLUDING, WITHOUT LIMITATION, AN INSURANCE COMPANY GENERAL ACCOUNT) IS PROHIBITED. EACH PURCHASER OR TRANSFEREE OF THIS NOTE (OR ANY INTEREST HEREIN) WILL BE REQUIRED TO REPRESENT AND AGREE AT THE TIME OF ITS PURCHASE OR ACQUISITION AND THROUGHOUT THE PERIOD OF ITS HOLDING AND DISPOSITION OF THIS NOTE (OR ANY INTEREST HEREIN) THAT (1) IT IS NOT, AND IS NOT ACTING ON BEHALF OF OR USING THE ASSETS OF, A BENEFIT PLAN INVESTOR (INCLUDING, WITHOUT LIMITATION, AN INSURANCE COMPANY GENERAL ACCOUNT) AND (2) IF IT IS A GOVERNMENTAL, CHURCH, FOREIGN OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), ITS ACQUISITION, HOLDING AND DISPOSITION OF THIS NOTE (OR ANY INTEREST HEREIN) WILL NOT CONSTITUTE OR RESULT IN A VIOLATION OF ANY SUCH SUBSTANTIALLY SIMILAR LAW. NO TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND NEITHER THE ISSUER, THE INCOME NOTE PAYING AGENT NOR THE INCOME NOTE REGISTRAR WILL RECOGNIZE ANY SUCH TRANSFER) IF, AFTER GIVING EFFECT TO SUCH TRANSFER, THIS NOTE (OR ANY INTEREST HEREIN) WOULD BE HELD BY A BENEFIT PLAN INVESTOR (INCLUDING, WITHOUT LIMITATION, AN INSURANCE COMPANY GENERAL ACCOUNT). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

"BENEFIT PLAN INVESTOR" IS DEFINED IN SECTION 3(42) OF ERISA TO MEAN (I) ANY "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF ERISA) THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, (II) ANY "PLAN" TO WHICH SECTION 4975 OF THE CODE APPLIES AND (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE PLAN ASSETS BY REASON OF SUCH AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN SUCH ENTITY.

In addition, each Income Note represented by a Global Note will bear an additional legend to the following effect unless the Issuer determines otherwise in compliance with applicable law:

THE ACQUISITION OF THIS NOTE BY, OR ON BEHALF OF OR USING THE ASSETS OF, A BENEFIT PLAN INVESTOR (INCLUDING, WITHOUT LIMITATION, AN INSURANCE COMPANY GENERAL ACCOUNT) IS PROHIBITED. EACH PURCHASER OR TRANSFEREE OF THIS NOTE (OR ANY INTEREST HEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED AT THE TIME OF ITS PURCHASE OR ACQUISITION AND THROUGHOUT THE PERIOD OF ITS HOLDING AND DISPOSITION OF THIS NOTE (OR ANY INTEREST HEREIN) THAT IT (1) IS NOT, AND IS NOT ACTING ON BEHALF OF OR USING THE ASSETS OF, A BENEFIT PLAN INVESTOR (INCLUDING, WITHOUT LIMITATION, AN INSURANCE COMPANY GENERAL ACCOUNT) AND (2) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN THAT IS SUBJECT TO ANY NON-U.S., FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), ITS ACQUISITION, HOLDING AND DISPOSITION OF THIS NOTE (OR ANY INTEREST HEREIN) WILL NOT CONSTITUTE OR RESULT IN A VIOLATION OF ANY SUCH SUBSTANTIALLY SIMILAR LAW. NO TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND NEITHER THE ISSUER, THE INCOME NOTE PAYING AGENT NOR THE INCOME NOTE REGISTRAR WILL RECOGNIZE ANY SUCH TRANSFER) IF, AFTER GIVING EFFECT TO SUCH TRANSFER, THIS NOTE (OR ANY INTEREST HEREIN) WOULD BE HELD BY A BENEFIT PLAN INVESTOR (INCLUDING, WITHOUT LIMITATION,

Confidential Treatment Requested by Ambac

AMB-V_00045284

AN INSURANCE COMPANY GENERAL ACCOUNT). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

"BENEFIT PLAN INVESTOR" IS DEFINED IN SECTION 3(42) OF ERISA TO MEAN (I) ANY "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF ERISA) THAT IS SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF ERISA, (II) ANY "PLAN" TO WHICH SECTION 4975 OF THE CODE APPLIES AND (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE PLAN ASSETS BY REASON OF SUCH AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN SUCH ENTITY.

*Initial Purchasers and Transferees of Income Notes*

Each initial investor in, and subsequent transferee of, (i) the Income Notes that are Certificated Notes will be required to provide to the Issuer and the Income Note Paying Agent in connection with any transfer of such Income Notes a written certification substantially in the form provided in the Income Note Paying Agency Agreement and (ii) the Income Notes that are Global Notes will be deemed to have represented and agreed, the following representations:

(i) It is (a) a QP and a QIB purchasing for its own account or for the accounts of one or more QPs who are QIBs for which it is acting as fiduciary or agent with sole investment discretion and is acquiring the Income Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (b) a QP and an Accredited Investor purchasing for its own account (*provided* that in the case of any transfer pursuant to this subclause (b), the transferor or the transferee has provided an opinion of counsel to each of the Income Note Paying Agent and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act) or (c) a Non-U.S. Person who is acquiring the Income Notes in an offshore transaction in accordance with Regulation S. In addition, it represents and warrants that it (1) was not formed for the purpose of investing in the Issuer (except when each beneficial owner of the purchaser is a QP), (2) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (3) is not a broker-dealer that owns and invests on a discretionary basis less than U.S.$25,000,000 in securities of unaffiliated issuers, (4) is not a pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (5) will provide notice to any subsequent transferee of the transfer restrictions provided in the legend, (6) will hold and transfer a principal amount of not less than U.S.$250,000 for it or for each account for which it is acting and (7) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (i).

(ii) It understands that the Income Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Income Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Income Notes, such Income Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Income Note Paying Agency Agreement and the legend on such Income Notes. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Income Notes.

(iii) It understands that an investment in the Income Notes involves certain risks, including the risk of loss of a substantial part of its investment under certain circumstances. It has had access to such financial and other information concerning the Issuer and the Income Notes as it deemed necessary or appropriate in order to make an informed investment decision with respect to its acquisition of the Income Notes, including an opportunity to ask questions of and request information from the Issuer.

(iv) In connection with the purchase of the Income Notes (*provided* that no such representations are made with respect to the Manager or by any Affiliate of the Manager or any account advised or managed by the Manager): (a) none of the Co-Issuers is acting as a fiduciary or financial or investment advisor for it; (b) it is not relying (for purposes of making any investment decision or otherwise)

125

upon any advice, counsel or representations (whether written or oral) of the Issuer, the Manager or the Initial Purchaser and the Placement Agent or any of their agents other than any statements in a current offering circular for such Income Notes and any representations expressly set forth in a written agreement with such party; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Manager or the Initial Purchaser and the Placement Agent; (d) its purchase of the Income Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Income Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Income Notes; (g) it is not a (1) partnership, (2) common trust fund or (3) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (h) it may not hold any Income Notes for the benefit of any other Person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Income Notes or enter into any other arrangement pursuant to which any other Person will be entitled to a beneficial interest in the distributions on the Income Notes; (i) all Notes and other investment securities (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by such beneficial owner have a value in the aggregate of no more than 40% of its total assets or capital (exclusive of government securities and cash items) on an unconsolidated basis; and (j) it is a sophisticated investor and is purchasing the Income Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(v)     For Income Notes which are Certificated Notes, it has made the representations, warranties and agreements required by the applicable purchase agreement or applicable transfer certificate.

(vi)    (1) It is not, and is not acting on behalf of, or using the assets of a Benefit Plan Investor (including, without limitation, an insurance company general account) and (2) if it is a governmental, church, foreign or other plan that is subject to any non-U.S., Federal, state or local law that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Note (or any interest therein) will not constitute or result in a violation of any such substantially similar law. It understands that no transfer of any Income Notes may be made (and none of the Issuer or the Trustee will recognize any such transfer) if, after giving effect to such transfer, such Income Note would be held by a Benefit Plan Investor (including, without limitation, an insurance company general account). Accordingly, it understands that an investor in the Income Notes must be prepared to bear the economic risk of the investment for an indefinite period of time. "Benefit Plan Investor" is defined in Section 3(42) of ERISA to mean (a) any "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to the fiduciary responsibility requirements of Title I of ERISA (b) any "plan" to which Section 4975 of the Code applies and (c) any entity whose underlying assets include plan assets by reason of such an employee benefit plan's or plan's investment in such entity.

(vii)   It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of United States Federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Secured Notes will be treated as indebtedness of the Issuer, and the Income Notes will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

(viii)  It understands that the Co-Issuers, the Income Note Paying Agent, the Initial Purchaser, the Placement Agent, the Manager and their counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(ix)    It understands that the Income Note Paying Agency Agreement permits the Issuer to demand that any Holder of Income Notes who is determined not to be either (A) both (x) a QIB or an Accredited Investor and (y) a QP or (B) a Person who is not a U.S. Person at the time of acquisition of such Income Notes to sell the Income Notes (a) to a person who is both (I) a QIB or an Accredited Investor and (II) a QP in a transaction meeting the requirements of Rule 144A or another applicable exemption from the

126

Confidential Treatment Requested by Ambac

AMB-V_00045286

registration requirements of the Securities Act or (b) to a person who is not a U.S. Person in a transaction meeting the requirements of Regulation S and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may sell such Holder's Income Notes on such terms as the Issuer may choose.

(x)  It agrees that it will not offer or sell, transfer, assign, or otherwise dispose of any Income Notes or any interest therein except (i) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state securities laws or the applicable laws of any other jurisdiction and (ii) in accordance with the provisions of the Income Note Paying Agency Agreement and the Income Notes.

(xi)  The purchaser, if it is not a "U.S. person" as defined in Section 7701(a)(30) of the Code, is not acquiring any Income Notes as part of a plan to reduce, avoid or evade United States Federal income taxes owed, owing or potentially owed or owing and further, if it is acquiring, directly or in conjunction with affiliates, more than 33⅓% of the aggregate outstanding amount of the Income Notes it is not an Affected Bank. "Affected Bank" means a "bank" for purposes of Section 881 of the Code (including an entity controlled by such bank or acting on behalf of such bank) where such bank neither (x) meets the definition of a U.S. person (under Section 7701(a)(30) of the Code nor (y) is entitled to the benefits of an income tax treaty with the United States under which withholding taxes on interest payments made by obligors resident in the United States to such bank are reduced to 0%.

(xii)  It acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for United States Federal income tax purposes and agrees that it will report its investment in the Income Notes in a manner consistent with such limitation, and in particular, will not treat the Issuer as an "eligible foreign corporation" for purposes of Section 954(h) of the Code.

Confidential Treatment Requested by Ambac

AMB-V_00045287

## CERTAIN TAX CONSIDERATIONS

The following is a general discussion based upon present law of certain United States Federal income tax considerations for prospective purchasers of the Notes. The discussion addresses only Persons that purchase Notes in the original offering, hold the Notes as capital assets, and use the United States dollar as their functional currency. The discussion does not consider the circumstances of particular purchasers, some of which (such as financial institutions, insurance companies, regulated investment companies, tax exempt organizations, dealers, traders who elect to mark their investment to market and Persons holding the Notes as part of a hedge, straddle, conversion, constructive sale or integrated transaction) are subject to special tax regimes. The discussion does not address any state, local or foreign taxes or the United States Federal alternative minimum tax. Special rules also apply to individuals, certain of which may not be discussed below. EACH PROSPECTIVE PURCHASER IS URGED TO CONSULT ITS OWN TAX ADVISOR ABOUT THE TAX CONSEQUENCES OF AN INVESTMENT IN THE NOTES UNDER THE FEDERAL, STATE AND LOCAL LAWS OF THE UNITED STATES AND THE LAWS OF THE CAYMAN ISLANDS AND ANY OTHER JURISDICTION WHERE THE PURCHASER MAY BE SUBJECT TO TAXATION.

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN BY US TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

For purposes of this discussion, "U.S. Holder" means the beneficial owner of a Note that is (i) a citizen or resident of the United States, (ii) a corporation organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) a trust subject to the control of one or more U.S. persons and the primary supervision of a United States court or (iv) an estate the income of which is subject to United States Federal income taxation regardless of its source. "Non-U.S. Holder" means a Person other than a U.S. Holder. The treatment of partners in a partnership that owns Notes may depend on the status of such partners and the status and activities of the partnership and such Persons should consult their own tax advisors about the consequences of an investment in the Notes.

### United States Federal Income Tax Treatment of the Issuer

The Issuer will adopt certain operating procedures designed to reduce the risk that the Issuer will be deemed to be engaged in the conduct of a trade or business in the United States. The Issuer will receive an opinion of Milbank, Tweed, Hadley & McCloy LLP subject to customary assumptions and qualifications to the effect that, assuming the Issuer and Manager comply with the Issuer's operating procedures, the Issuer will not be engaged in a trade or business in the United States. As long as the Issuer is not engaged in a United States trade or business, the Issuer will not be subject to United States Federal income tax on its net income. However, an opinion of counsel is not binding on the IRS or any court and there can be no assurance that positions contrary to those stated in such opinions may not be asserted successfully by the IRS. In particular, prospective investors should note that the U.S. federal income tax treatment of derivative contracts in the form of credit default swaps is unclear. The IRS has announced that it is reviewing the treatment of such derivative contracts, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being treated as engaged in a trade or business within the United States. If the Issuer were found to be engaged in a United States trade or business, it could be subject to substantial United States Federal income taxes the imposition of which would materially impair its ability to pay interest on and principal of the Secured Notes and make distributions on the Income Notes. In addition, if the Issuer is found to be engaged in a United States trade or business, payments in respect of the Secured Notes may be treated as United States source income and could be subject to withholding unless an applicable exemption is available.

The Issuer generally expects that substantially all of its income and gain from the Eligible Collateral Debt Securities, the Eligible Investments, the Cashflow Swap Agreement and the Hedge Agreements will be exempt from United States withholding tax. The extent to which other source country withholding taxes may apply to the Issuer's

128

Confidential Treatment Requested by Ambac

AMB-V_00045288

income will depend on the actual composition of its assets. There can be no assurance that payments on the Eligible Collateral Debt Securities, the Eligible Investments, the Cashflow Swap Agreement or the Hedge Agreements will not become subject to withholding as a result of any change in any applicable law, treaty, rule or regulation or contrary interpretation thereof or other causes. In particular, as noted above, the IRS has announced that it is reviewing the treatment of derivative contracts in the form of credit default swaps, and it is possible that, as a result of such review, the IRS could adopt a tax characterization that results in parties entering into such contracts, including the Issuer, being subject to excise or withholding tax in respect of payments on such derivatives contracts. The imposition of unanticipated withholding taxes could materially impair the Issuer's ability to make payments on the Secured Notes and make distributions on the Income Notes.

**United States Federal Income Taxation of the Holders**

*U.S. Holders of Secured Notes.* The Secured Notes will be treated as debt for United States Federal income tax purposes. The Internal Revenue Service (the "IRS") may, however, take the position that one or more classes of Secured Notes represent equity interests in the Issuer for United States Federal income tax purposes. If that position were sustained, a U.S. Holder of a Non-Co-Issued Note that is a Secured Note generally would be treated like a holder of Income Notes. Each Holder of Secured Notes should discuss with its own tax advisor whether it is possible or advisable to make a protective election to treat the Issuer as a qualified electing fund (as discussed more fully below).

The Issuer, and not the Co-Issuer, will be treated as having issued the Secured Notes for United States Federal income tax purposes. Subject to the discussion of original issue discount below, interest paid on Secured Notes treated as debt generally will be includible in the gross income of a U.S. Holder in accordance with its regular method of tax accounting. Interest on such a Secured Note will be treated as ordinary income from sources outside the United States.

In general, if the issue price of a Secured Note (the first price at which a substantial amount of the relevant class of Secured Notes is sold to investors) is less than its principal amount by more than a statutory *de minimis* amount, the Secured Note will be considered to have original issue discount ("OID"). If a U.S. Holder acquires a Secured Note with OID, then regardless of such Holder's method of accounting, the U.S. Holder will be required to include such OID in income on a yield to maturity basis whether or not it receives a cash payment on any Payment Date.

Holders of any Junior Classes of Secured Notes Outstanding will not be permitted to exercise typical creditor remedies in the event of a failure to pay interest on such Notes when due, such as the right to accelerate such Notes, and (except in the case of the Class S Notes and the Class A Notes) nonpayment of interest on such Junior Classes of Notes will not constitute an Event of Default while a more Senior Class of Secured Notes is Outstanding. Interest payable on a Class of Secured Notes that effectively permits interest to be deferred without legal remedy to compel payment will be treated as OID if there is more than a remote likelihood, within the meaning of the applicable regulations, that the Issuer will defer interest payments. A U.S. Holder must include OID in ordinary income on a constant yield basis, whether or not it receives a cash payment on any payment date. The Issuer has determined that the likelihood of interest being deferred on the Secured Notes that are not OID Notes is, solely for this purpose of the applicable regulations, remote. If the Issuer defers an interest payment on the Secured Notes that are not OID Notes, the Holder must thereafter accrue OID on the principal amount of undistributed OID accrued on that Class of Secured Notes.

However, in the case of the OID Notes, the Issuer is taking the position that, solely for this purpose of the applicable regulations, there is more than a remote likelihood that interest on such Class of Notes will be deferred, and therefore such Notes will likely be treated for United States Federal income tax purposes as having OID. A U.S. Holder of an OID Note therefore will be required to include such OID in ordinary income on a constant yield basis. The Issuer intends to treat the OID Notes as subject to a special rule for debt instruments with OID that have a fixed yield regardless of the timing of principal payments. Based on these rules, the amount of OID accrued on an OID Note would be equal to the interest accrued on the note for such period. However, it is also possible that the OID Notes that permit the deferral of interest would be subject to an income accrual method analogous to the methods applicable to debt instruments whose payments are subject to acceleration (under section 1272(a)(6) of the Code). Alternatively, it is also possible that such OID Notes could be treated as subject to special rules applicable to contingent payment debt instruments. In either case, the timing of income and the character of gain or loss on those

Confidential Treatment Requested by Ambac

AMB-V_00045289

OID Notes could be different from those described herein. A U.S. Holder of OID Notes that permit deferral of interest should consult its own tax advisor about the possible application of these rules.

A U.S. Holder generally will recognize a gain or loss on the disposition of a Secured Note in an amount equal to the difference between the amount realized (other than with respect to accrued and unpaid interest, which will be treated as a payment of interest) and the holder's adjusted tax basis in the Secured Note. The gain or loss generally will be capital gain or loss. Gain and loss (other than loss attributable to accrued but unpaid interest) recognized by a U.S. Holder generally will be treated as being from sources within the United States.

*U.S. Holders of Income Notes.* Income Notes will likely be treated as equity. Subject to the passive foreign investment company rules and the controlled foreign corporation rules discussed below, a U.S. Holder of Income Notes generally must treat distributions received with respect to such Income Notes as dividend income. These distributions will not be eligible for the corporate dividends received deduction or the reduced tax rate applicable to the qualified dividend income of individuals. For purposes of determining a U.S. Holder's foreign tax credit limitation, dividends received from a foreign corporation generally are treated as income from sources outside the United States. If U.S. Holders together hold at least half (by vote or value) of the Income Notes and other interests treated as equity in the Issuer, however, a percentage of the dividend income equal to the proportion of the Issuer's income that comes from United States sources will be treated as income from sources within the United States. Except as otherwise required by the rules discussed below, gain or loss on the sale or other disposition of the Income Notes will be capital gain or loss. Gain and loss realized by a U.S. Holder generally will be from United States sources.

The Issuer will be a passive foreign investment company (a "PFIC") for United States Federal income tax purposes. A U.S. Holder of Income Notes therefore will be subject to additional tax on excess distributions received with respect to the Income Notes or gains realized on the disposition of such Income Notes. A U.S. Holder will have an excess distribution if distributions during any tax year exceed 125% of the average amount received during the three preceding tax years (or, if shorter, the U.S. Holder's holding period). A U.S. Holder may realize gain on an Income Note not only through a sale or other disposition, but also by pledging the Income Note as security for a loan or entering into certain constructive disposition transactions. To compute the tax on an excess distribution or any gain, (i) the excess distribution or gain is allocated ratably over the U.S. Holder's holding period, (ii) the amount allocated to the current tax year is taxed as ordinary income and (iii) the amount allocated to each previous tax year is taxed at the highest applicable marginal rate in effect for that year and an interest charge (which for non-corporate holders may be non-deductible) is imposed to recover the deemed benefit from the deferred payment of the tax. These rules effectively prevent a U.S. Holder from treating the gain realized on the disposition of the Income Notes as capital gain.

A U.S. Holder of Income Notes may wish to avoid the PFIC treatment just described by electing to treat the Issuer as a QEF. If the U.S. Holder makes a QEF election, the holder will be required to include in gross income each year (i) as ordinary income, its *pro rata* share of the Issuer's earnings and profits in excess of net capital gains and (ii) as long-term capital gains, its *pro rata* share of the Issuer's net capital gains, in each case, whether or not the Issuer actually makes any distribution. The amounts recognized by a U.S. Holder making a QEF election generally are treated as income from sources outside the United States. If, however, U.S. Holders hold at least half (by vote or value) of the Income Notes and other interests treated as equity in the Issuer, a percentage of those amounts equal to the proportion of its income that the Issuer receives from United States sources will be United States source income for U.S. Holders for purposes of computing a U.S. Holder's foreign tax credit limitation. Because such amounts are subject to tax currently as income of the U.S. Holder, the amounts recognized will not be subject to tax when they are distributed to a U.S. Holder. An electing U.S. Holder's basis in the Income Notes will be increased by any amounts included in income currently as described above and decreased by any amounts not subjected to tax at the time of distribution. The Issuer will endeavor to provide U.S. Holders on request with the information they will need to make a QEF election but cannot provide any absolute assurance that it will be able to do so in a timely manner.

As discussed above, a U.S. Holder that makes a QEF election will be required to include in income currently its *pro rata* share of the Issuer's earnings and profits (computed based on United States Federal income tax principles) whether or not the Issuer actually distributes earnings and may therefore recognize taxable income in excess of cash it actually receives. For example, the use of investment proceeds to fund reserves or pay down debt could cause a U.S. Holder to recognize income in excess of amounts it actually receives. In addition, the Issuer's

130

income from an investment or other transaction for United States Federal income tax purposes may exceed the amount it actually receives. In particular, the manner in which income is required to be taken into account with respect to credit default swaps and other derivatives for such purposes is not entirely clear and may in many circumstances not correspond to cash payments received. The U.S. Holder may be able to elect to defer payment, subject to an interest charge for the deferral period (which for non-corporate holders may be non-deductible), of the tax on income recognized on account of the QEF election. Prospective purchasers should consult their tax advisors about the advisability of making the QEF election and deferred payment election.

The Issuer also may be a controlled foreign corporation (a "CFC") if U.S. Holders that each own (directly, indirectly, or by attribution) at least 10% of the Income Notes and any other interests treated as voting equity in the Issuer (each such U.S. Holder, a "U.S. 10% Shareholder") together own more than half (by vote or value) of the Income Notes and any other interests treated as equity in the Issuer. If the Issuer is a CFC for at least 30 consecutive days during its taxable year, a U.S. Holder that is a U.S. 10% Shareholder on the last day of the Issuer's taxable year must recognize ordinary income equal to its *pro rata* share of the Issuer's earnings (including both ordinary earnings and capital gains) for the tax year, whether or not the Issuer makes a distribution. The income will be treated as income from sources within the United States to the extent derived by the Issuer from United States sources for purposes of computing a U.S. Holder's foreign tax credit limitation. Earnings subjected to tax currently as income of the U.S. Holder will not be taxed again when they are distributed to the U.S. Holder. A U.S. Holder's basis in its interest in the Issuer will increase by any amounts such Holder includes in income currently as described above and decrease by any amounts not subject to tax at the time of distribution. If the Issuer is a CFC, (i) the Issuer would incur United States withholding tax on interest received from a related U.S. Person and (ii) special reporting rules would apply to directors of the Issuer and certain other persons and (iii) certain other restrictions may apply. Subject to a special limitation in the case of individual U.S. Holders that have held the Income Notes for more than one year, gain from disposition of Income Notes recognized by a U.S. Holder that is or recently has been a U.S. 10% Shareholder will be treated as dividend income to the extent the Issuer has accumulated earnings and profits attributable to the Income Notes while it is held by that holder that have not previously been included in income.

The relationship among the PFIC and CFC rules and the possible consequences of those rules for a particular U.S. Holder depend upon the circumstances of the Issuer and the U.S. Holder. If the Issuer is both a CFC and a PFIC, a U.S. Holder subject to the CFC rules will not be subject to the PFIC rules. Each prospective purchaser should consult its tax advisor about the possible application of the PFIC and CFC rules to its particular situation.

U.S. Holders generally must report, with their tax return for the tax year that includes the Closing Date, certain information relating to their purchase of the Income Notes. A U.S. Holder may be required specifically to disclose any loss on the Income Notes on its tax return under regulations on tax shelter transactions. When the U.S. Holder holds 10% of the shares in a CFC or QEF, the U.S. Holder also must disclose any Issuer transactions reportable under those regulations, which require disclosure of certain types of transactions whether or not they were undertaken for tax reasons. The Issuer will endeavor to provide U.S. Holders of the Income Notes with the information about Issuer transactions reportable under those regulations. U.S. Holders are urged to consult their tax advisors about these and all other specific reporting requirements.

*Non-U.S. Holders.* Provided that the Issuer is not treated as engaged in a United States trade or business, interest on a Secured Note paid to a Non-U.S. Holder and distributions on an Income Note to such a holder generally will not be subject to United States Federal income tax if the income is not effectively connected with the holder's conduct of a trade or business in the United States. Gain realized by a Non-U.S. Holder on the disposition of a Secured Note or Income Note generally will not be subject to United States Federal income tax unless (i) the gain is effectively connected with the holder's conduct of a United States trade or business or (ii) the holder is an individual present in the United States for at least 183 days during the taxable year of disposition and certain other conditions are met.

**Information Reporting and Backup Withholding**

Information reporting to the IRS may be required with respect to payments of principal or interest (including any OID) on the Secured Notes, distributions on the Income Notes and payments of proceeds of the disposition of Secured Notes or Income Notes to holders other than corporations and other exempt recipients. A "backup" withholding tax may apply to those payments that are subject to information reporting if the holder fails

Confidential Treatment Requested by Ambac

AMB-V_00045291

to provide certain required documentation to the payor. Non-U.S. Holders may be required to comply with certification procedures to establish that they are not U.S. Holders in order to avoid information reporting and backup withholding. Holders should consult their tax advisors about the procedures for obtaining an exemption from backup withholding. Amounts withheld under the backup withholding rules will be refunded or allowed as a credit against a holder's United States Federal income tax liabilities if the required information is furnished to the IRS.

**Treatment of the Class Q Combination Notes**

Although each will be evidenced by a single instrument, under United States Federal income tax principles, a strong likelihood exists that a U.S. Holder of Class Q Combination Notes will be treated as if such U.S. Holder directly owned the underlying separate classes of securities corresponding to the Components of such Class Q Combination Note. The Issuer and each U.S. Holder of a Class Q Combination Note, by acquiring such Class Q Combination Note or an interest therein, will agree to treat such Class Q Combination Note as consisting of separate classes of securities corresponding to the Components of such Class Q Combination Notes for United States Federal income tax purposes. In accordance with such treatment of the Class Q Combination Notes, in calculating its tax basis in each of the Components comprising a Class Q Combination Note, a U.S. Holder will allocate the purchase price paid for such Class Q Combination Note among the Components in proportion to their relative fair market values at the time of purchase. A similar principle will apply in determining the amount allocable to each Component upon a sale of a Class Q Combination Note. The exchange of a Class Q Combination Note for the separate underlying securities corresponding to each Component should not be a taxable event. A U.S. Holder of a Class Q Combination Note should review the relevant portions of this summary discussing the United States Federal income tax consequences of the purchase, ownership and disposition of the relevant classes of securities corresponding to the Components of the Class Q Combination Notes.

**Disclosure of Reportable Transactions and Maintenance of Participants List**

Under Treasury regulations, any person that files a U.S. federal income tax return or U.S. federal information return and participates in a "reportable transaction" in a taxable year is required to disclose certain information on IRS Form 8886 (or its successor form) attached to such person's U.S. federal tax return for such taxable year (and also file a copy of such form with the IRS's Office of Tax Shelter Analysis) and to retain certain documents related to the transaction. In addition, under these regulations, under certain circumstances, certain organizers and sellers of a "reportable transaction" will be required to maintain lists of participants in the transaction containing identifying information, retain certain documents related to the transaction, and furnish those lists and documents to the IRS upon request. The definition of "reportable transaction" is highly technical. However, in very general terms, a transaction may be a "reportable transaction" if, among other things, it is offered under conditions of confidentiality or it results in the claiming of a loss or losses for U.S. federal income tax purposes in excess of certain threshold amounts.

**Foreign, State and Local Taxes**

Holders of Notes may be liable for foreign, state and local taxes in the country, state, or locality in which they are resident or doing business. Since the tax laws of each country, state, and locality may differ, each prospective investor should consult its own tax counsel with respect to any taxes other than United States Federal income taxes that may be payable as a result of an investment in the Notes.

**Cayman Islands Tax Considerations**

The following is a general summary of Cayman Islands taxation in relation to the Notes.

Under existing Cayman Islands laws:

(i) payments of principal and interest in respect of, or distributions on, the Notes will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any Holder of a Secured Note and gains derived from the sale of Notes will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax; and

132

Confidential Treatment Requested by Ambac

AMB-V_00045292

(ii) certificates evidencing the Notes, in registered form, to which title is not transferable by delivery, will not attract Cayman Islands stamp duty. However, an instrument transferring title to a Secured Note, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has obtained an undertaking from the Governor in Cabinet of the Cayman Islands substantially in the following form:

<div style="text-align:center">

"THE TAX CONCESSIONS LAW
(1999 REVISION)
UNDERTAKING AS TO TAX CONCESSIONS

</div>

In accordance with Section 6 of the Tax Concessions Law (1999 Revision), the Governor in Cabinet undertakes with:

<div style="text-align:center">Class V Funding III, Ltd. (the "Company")</div>

(a) that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations will apply to the Company or its operations; and

(b) in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable:

(i) on or in respect of the shares debentures or other obligations of the Company; or

(ii) by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of TWENTY years from the 6th day of February 2007.

<div style="text-align:right">GOVERNOR IN CABINET"</div>

The Cayman Islands does not have an income tax treaty arrangement with the United States or any other country.

**German Tax Considerations**

The German Investment Tax Act (*Investmentsteuergesetz*) ("Investment Tax Act") applies (i) to "shares" (*Investmentanteile*) in investment funds held by German tax resident investors, (ii) to an investor holding shares in an investment fund as business assets of a German permanent establishment maintained in Germany or carried on through a permanent representative in Germany, or as business assets of a fixed base in Germany or (iii) if an investor physically presents shares in an investment fund at the office of a German credit institution or financial services institution (over-the-counter transaction (*Tafelgeschäft*)) (collectively, "German Investors"). The Issuer believes that the Investment Tax Act should not be applicable to the Holders of the Notes. However, if any German Investor notifies the Issuer that it is subject to the Investment Tax Act, the Indenture and the Income Note Paying Agency Agreement, respectively, provide that the Issuer will agree, if the expense is not material, to comply with the Minimum Reporting Requirements for so-called "semi-transparent funds" for so long as such German Investor holds any Secured Notes or Income Notes, as applicable.

The information contained in this section "German Tax Considerations" is not intended as tax advice and does not purport to describe the tax considerations that may be relevant to a prospective purchaser of the Notes. It is based upon German tax laws (including tax treaties) in effect and applied as of the date hereof, which are subject to change, potentially with retroactive effect.

Confidential Treatment Requested by Ambac

AMB-V_00045293

Prospective purchasers of the Notes are advised to consult their own tax advisors as to the possible application of the Investment Tax Act to the acquisition and holding of the Notes.

**THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN NOTES. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF EACH SUCH INVESTOR'S PARTICULAR CIRCUMSTANCES.**

Confidential Treatment Requested by Ambac

AMB-V_00045294

## CERTAIN ERISA CONSIDERATIONS

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN BY US TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to the fiduciary responsibility provisions of Title I of ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "ERISA Plans") and on those Persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirements of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Risk Factors" and the fact that in the future there may be no market in which such fiduciary will be able to sell or otherwise dispose of any Notes it may purchase.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those pension, profit-sharing and other retirement plans and accounts that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts, and by entities that are deemed to hold assets of any of the foregoing) and certain Persons (referred to as "parties in interest" for purposes of ERISA or "disqualified persons" for purposes of the Code (collectively, "Parties in Interest")) having certain relationships to such plans, unless a statutory or administrative exemption is applicable to the transaction. A Party in Interest who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code.

Non-U.S. plans, governmental plans and certain church plans not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code may nevertheless be subject to non-U.S., Federal, state or local laws that are substantially similar to the foregoing provisions of ERISA and the Code (any such law, a "Similar Law," and such plans, collectively with ERISA Plans and plans subject to Section 4975 of the Code, "Plans"). Fiduciaries of any such plans should consult with their counsel before purchasing any Notes.

Section 3(42) of ERISA and a regulation promulgated by the United States Department of Labor at 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") describe what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility provisions of Title I of ERISA, and Section 4975 of the Code. Under the Plan Asset Regulation, if a Plan invests in an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or that equity participation in the entity by "benefit plan investors" (as defined in Section 3(42) of ERISA to be any employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, any plan to which Section 4975 of the Code applies and any entity whose underlying assets include plan assets by reason of such employee benefit plan's or plan's investment in the entity (each, a "Benefit Plan Investor")) is not "significant". Under the Plan Asset Regulation, equity participation by Benefit Plan Investors in an entity (including the Issuer) is significant if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity (excluding the value of any interests held by certain Persons, other than Benefit Plan Investors, having authority or control over the assets of the entity (such as the Manager) or providing investment advice for a direct or indirect fee with respect to such assets or any Affiliates of any such Person is held by Benefit Plan Investors.

135

Although the issue is not free from doubt, the Co-Issuers believe that, at the time of their issuance, the Co-Issued Notes should not be considered to be "equity interests" in the Co-Issuers for purposes of the Plan Asset Regulation. However, the Class Q Combination Note and the Income Notes will constitute "equity interests" in the Issuer for purposes of the Plan Asset Regulation, and the Class Q Combination Note and the Income Notes will not constitute "publicly-traded securities" for purposes of the Plan Asset Regulation. In addition, the Issuer will not be registered under the Investment Company Act and it is not likely that the Issuer will qualify as an "operating company" for purposes of the Plan Asset Regulation. Therefore, if equity participation in the Issuer by Benefit Plan Investors is "significant" within the meaning of the Plan Asset Regulation, the assets of the Issuer would be considered to be the assets of any Plans that purchase or hold Class Q Combination Notes or Income Notes, and the Manager will be subject to the fiduciary responsibility provisions of ERISA and the prohibited transaction rules of ERISA and Section 4975 of the Code.

Accordingly, the Class Q Combination Note and the Income Notes may not be acquired by, or on behalf of or using the assets of, a Benefit Plan Investor (including, without limitation, an insurance company general account). In this regard, each purchaser and transferee of a Class Q Combination Note or an Income Note that is a Certificated Note or any interest therein will be required to represent and agree in writing (or, in the case of the Class Q Combination Note or the Income Notes represented by Global Notes, will be deemed to have represented and agreed) at the time of its purchase or acquisition and throughout the period of its holding and disposition of such Notes that it is not, and is not acting on behalf of or using the assets of, a Benefit Plan Investor (including, without limitation, an insurance company general account) (the "Benefit Plan Investor Limitation"). Neither the Issuer, the Trustee nor the Income Note Paying Agent will register the transfer of a Class Q Combination Note or an Income Note if, after giving effect to such transfer, the Benefit Plan Investor Limitation set forth above is not satisfied.

There can be no assurance that, despite the requirements noted above, Benefit Plan Investors will not own any of the outstanding Class Q Combination Notes, Income Notes or any other class of equity interest in the Issuer.

In addition, each purchaser or transferee of a Class Q Combination Note or an Income Note that is a Certificated Note (or any interest therein) will be required to represent and agree in writing (or, in the case of Class Q Combination Notes or Income Notes represented by Global Notes, will be deemed to have represented and agreed) at the time of its purchase or acquisition and throughout the period of its holding and disposition of such Note that if it is governmental, church, non-U.S. or other plan that is subject to any non-U.S., Federal, state or local law that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Note (or any interest therein) will not constitute or result in a violation of any such substantially similar law.

Additionally, even if the assets of the Issuer do not constitute Plan assets, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if Notes are acquired by a Plan with respect to which the Co-Issuers, the Manager, the Placement Agent or the Initial Purchaser, or any of their respective Affiliates, is a Party in Interest. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire a Note and the circumstances under which such decision is made. Included among these exemptions are Prohibited Transaction Class Exemption ("PTCE") 96-23 (relating to transactions directed by certain "in-house asset managers"); PTCE 95-60 (relating to transactions involving insurance company general accounts); PTCE 91-38 (relating to investments by bank collective investment funds), PTCE 84-14 (relating to transactions effected by independent "qualified professional asset managers") and PTCE 90-1 (relating to investments by insurance company pooled separate accounts). There can be no assurance that any of these class exemptions or any other exemption will be available with respect to any particular transaction involving the Notes.

Each purchaser or transferee of a Co-Issued Note (or any interest therein) will be deemed to have represented and agreed, on each day from the date on which such purchaser or transferee acquires such Note (or any interest therein) through and including the date on which such purchaser or transferee disposes of such Note (or any interest therein), that either (A) it is not, and is not acting on behalf of, or using the assets of, an employee benefit plan (as defined in Section 3(3) of ERISA) subject to the fiduciary responsibility provisions of Title I of ERISA or a plan subject to Section 4975 of the Code or an entity whose underlying assets include assets of any such employee benefit plan or plan or a governmental or other plan subject to any Similar Law or (B) its acquisition, holding (including, without limitation, the exercise of rights thereunder) and disposition of such Note (or any interest

136

therein) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or other plan, a violation of any Similar Law).

Any insurance company proposing to invest assets of its general account in Co-Issued Notes should consider the implications of the United States Supreme Court's decision in John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank, 510 U.S. 86, 114 S. Ct. 517 (1993), which in certain circumstances treats such general account assets as assets of a Plan that owns a policy or other contract with such insurance company, as well as the effect of Section 401(c) of ERISA as interpreted by regulations issued by the United States Department of Labor in January, 2000.

Any Plan fiduciary which proposes to cause a Plan to purchase any Co-Issued Notes should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment, and to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA or the Code.

The sale of any Notes to a Plan is in no respect a representation by the Applicable Issuers, the Manager, the Placement Agent or the Initial Purchaser that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

Confidential Treatment Requested by Ambac

AMB-V_00045297

## CERTAIN LEGAL INVESTMENT CONSIDERATIONS

Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to restrictions on investments in the Notes. Any such institution should consult its legal advisers in determining whether and to what extent there may be restrictions on its ability to invest in the Notes. Without limiting the foregoing, any financial institution that is subject to the jurisdiction of the Comptroller of the Currency, the FRB, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, any state insurance commission, or any other Federal or state agencies with similar authority should review any applicable rules, guidelines and regulations prior to purchasing the Notes. Depository institutions should review and consider the applicability of the Federal Financial Institutions Examination Council ("FFIEC") Supervisory Policy Statement on Securities Activities, which has been adopted by the respective Federal regulators comprising the FFIEC.

None of the Issuer, the Co-Issuer, the Initial Purchaser, the Placement Agent or the Manager makes any representation as to the proper characterization of the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes under applicable investment restrictions. Without limiting the generality of the foregoing, none of the Issuer, the Co-Issuer, the Initial Purchaser, the Placement Agent and the Manager make any representation as to the characterization of the Notes as a U.S.-domestic or foreign (non-U.S.) investment under any state insurance code or related regulations, and they are not aware of any published precedent that addresses such characterization. Although they are not making any such representation, the Co-Issuers understand that the New York State Insurance Department, in response to a request for guidance, may be considering the characterization (as U.S.-domestic or foreign (non-U.S.)) of certain collateralized debt obligation securities co-issued by a non-U.S. issuer and a U.S. co-issuer. There can be no assurance as to the nature of any advice or other action that may result from such consideration. The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Notes) may affect the liquidity of the Notes. Accordingly, all institutions whose activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisers in determining whether and to what extent the Notes are subject to investment, capital or other restrictions.

Confidential Treatment Requested by Ambac

AMB-V_00045298