UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
UNITED STATES SECURITIES AND EXCHANGE :
COMMISSION

        Plaintiff,

      -v-

BRIAN STOKER,

        Defendant.
-------------------------------------x

11 Civ. 7388 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.

    The Complaint in this securities fraud action alleges that

defendant Brian Stoker negligently violated Section 17(a)(2) & (3)

of the Securities Act of 1933, 15 U.S.C. 77q(a)(2) & (3), in

connection with his role in structuring and marketing a largely

synthetic collateralized debt obligation ("CDO") called Class V

Funding III ("Class V III").[1]  On December 16, 2011, Stoker moved to

dismiss all counts of the Complaint on three grounds: first, that

the claim under Section 17(a)(2) fails to allege that Stoker

personally obtained money or property by means of the alleged

misleading statements or omissions; second, that that same claim

fails to plausibly allege that Stoker had ultimate authority over,

---

[1] This case is related to SEC v. Citigroup Global Mkts. Inc., 11 Civ.
7387 (JSR).  Although the Second Circuit has granted a stay of the
Citigroup case pending the appeal of this Court's denial of the
parties' proposed consent judgment, see SEC v. Citigroup Global
Mkts. Inc., 673 F.3d 158 (2d Cir. 2012) (per curiam), the stay
affects only the Citigroup case and does not affect this related
case.

or was personally and primarily responsible for, the alleged misleading statements or omissions; and third, that the claim under Section 17(a)(3) fails to plausibly allege a fraudulent or deceptive scheme distinct from the misstatements and omissions alleged in the Section 17(a)(2) claim.  On February 14, 2012, this Court issued a "bottom-line" order denying Stoker's motion.  This Opinion explains the reasons for that ruling.

A motion to dismiss tests, not the truth of the Complaint's allegations, but simply whether the allegations state a legal cause of action.  The allegations here pertinent are the following.

Citigroup Global Markets Inc. (hereinafter "Citigroup") is the principal U.S. broker-dealer of Citigroup Inc.  Compl. ¶ 10.  Credit Suisse Alternative Capital, LLC ("CSAC") is a registered investment adviser.[2]  Id. ¶ 11.  From March 2005 to August 2008, defendant Stoker was a director in a division of Citigroup that structured and marketed collateralized debt obligations ("CDOs").  Id. ¶ 9.

CDOs are debt securities collateralized by fixed income obligations, such as residential mortgage-backed securities.  Id. ¶ 12.  A CDO collateralized by other CDOs is called a "CDO squared."  Id.  One such CDO squared portfolio was a fund called "Class V III" (the "Fund").[3]  Id. ¶ 9.  Under the terms of the Fund and similar

---

[2] In December 2010, CSAC became Credit Suisse Asset Management, LLC. For the sake of consistency, this Opinion will refer to this entity as CSAC throughout.

[3] The SEC alternates between labeling the Fund as a "CDO squared," Compl. ¶ 1, and a "hybrid CDO."  Id. ¶ 14.  A hybrid CDO is a CDO

instruments, a "protection buyer" makes periodic premium payments to a "protection seller."  In return, the protection seller agrees to pay the protection buyer if the CDO experiences a default.  Piercing through the jargon, the protection seller is effectively taking a long position on the CDO, while the protection buyer is effectively taking a short position.  Id. ¶ 13.

During late 2006 and early 2007, certain hedge funds "came to believe that mezzanine CDOs (CDOs whose assets consisted primarily of BBB-rated subprime residential mortgage-backed securities) would experience significant losses, leading even the A-rated tranches of mezzanine CDOs to potentially become worthless."  Id. ¶ 20.  By late October 2006, Citigroup's CDO trading desk had a large number of hedge fund customers seeking to buy protection on CDO tranches, particularly on mezzanine CDOs originated in 2006.  Citigroup knew that there was significant demand from these hedge funds to short certain CDOs that were part of a series of transactions that were named after constellations (the "Constellation CDOs").  Id. ¶ 21.  Moreover, "as Citigroup knew, a significant portion of the market interest in shorting the Constellation CDOs came from the very hedge fund that helped create those CDOs."  Id.  There was also significant market interest in shorting a similar group of CDOs, known as "President" deals.  Id.

_____

collateralized by both cash assets and synthetic assets.  Id.  The Fund was both a hybrid CDO and a CDO squared.

In late 2006, "internal discussions began at Citigroup" about the possibility of creating a CDO squared collateralized by some of the riskier CDOs. A "significant part" of Citigroup's rationale for creating such a fund was that it would enable Citigroup's trading desk to take a "naked short" position on those CDOs -- in other words to buy protection on those CDOs for its own account -- without an offsetting long trade with a customer. Id. ¶ 23. However, Citigroup "knew it would be difficult to place the liabilities of a CDO squared if it disclosed to investors its intention to use the vehicle to short a hand-picked set of CDOs and to buy Citigroup's hard-to-sell cash CDOs." Id. ¶ 25. [4] On the other hand, "Citigroup knew that representing to investors that an experienced, third-party investment adviser [like CSAC] had selected the investment portfolio would facilitate the placement of the notes that the CDO squared would issue." Id.

Beginning in October 2006, personnel from Citigroup's CDO trading desk discussed with Stoker and others on Citigroup's CDO structuring desk the possibility that Citigroup would take short positions on a specific group of assets, including several Constellation and President deals. Id. ¶ 24. Stoker and other

---

[4] For reasons unknown, this key allegation of fraudulent knowledge on the part of Citigroup is omitted from the parallel Complaint against Citigroup itself. See Complaint, SEC v. Citigroup, 11 Civ. 7387, Dkt. 1 ("Citigroup Compl."). Additionally, the Citigroup Complaint does not include such related allegations of the instant Complaint as that Citigroup knew that the hedge fund that created the Constellation CDO also wanted to bet against it. See id.

4

Citigroup employees also discussed the possibility of having the

Fund purchase unsold tranches from CDOs that remained on Citigroup's

books.  Id.  Stoker engaged in internal discussions about potential

structures for the CDO squared, including the possibility that

Citigroup would short assets into the CDO squared.  Id. ¶ 28.

Stoker prepared and distributed models showing the potential profits

for Citigroup from shorting assets into the Fund.  Id.  On October

23, 2006, Citigroup's trading desk sent Stoker a list of 21 CDOs

that it wished to short into the CDO squared; eighteen of those CDOs

were Constellation or President deals.  Id. ¶ 27.  Stoker sent that

list to a salesperson who sent it to CSAC; on November 2, 2006, the

Managing Director on the CDO trading desk informed Stoker that CSAC

appeared "amenable to the portfolio" and "receptive to the concept,"

and asked Stoker to draft an engagement letter for CSAC.  Id. ¶ 31.

Stoker did so, and on November 3, 2006, Stoker was asked by his

supervisor if the deal was going through.  He replied, "I hope so.

This is [Trading Desk Head]'s prop trade (don't tell CSAC).  CSAC

agreed to terms even though they don't get to pick the assets."

Id. ¶32.  "Prop trade" stands for "proprietary trade," which means

"a trade undertaken for a firm's own account, rather than on behalf

of the firm's customer(s)."  Id.

On November 14, 2006, Stoker's supervisor told Stoker that

Stoker should ensure that the structuring desk received "credit for

profits" on the Fund.  Id. ¶ 33.  A week later, Stoker circulated

the "latest structure" of the Fund, which included his

recommendations about which assets to include in the final deal.
Id. ¶ 34.   In December 2006, CSAC and Citigroup agreed to go forward
with the Fund.   CSAC sent the Citigroup salesperson a list of 127
potential assets to include in the Fund; the salesperson forwarded
the list to Stoker.   The list included 19 of the original 25 names
Citigroup had provided to CSAC.   Id. ¶ 36.   Citigroup selected 25 of
the assets on CSAC's list and simultaneously told CSAC that it
wanted to short those assets; 16 of the assets were Constellation or
President deals, and all but one were 2006 mezzanine CDOs of the
type that Citigroup's hedge fund clients had been eager to short.
Id. ¶ 37.   "Within an hour, CSAC agreed to include those 25 CDOs in
the investment portfolio by selling protection to Citigroup" on
those CDOs.   Id.

On January 8, 2007, Citigroup and CSAC entered into an
engagement letter, drafted by Stoker, pursuant to which Citigroup
agreed to serve as "Placement Agent" and CSAC agreed to serve as
"Manager" for the Fund.   Id. ¶ 39.   Two days later, with little or
no involvement from Citigroup, CSAC selected 18 additional assets to
include in the Fund.   Citigroup did not take a short position on any
of these assets.   In fact, Citigroup only took a short position on
the assets it itself chose for inclusion in the Fund. Id. ¶ 59.

On January 12, 2007, Citigroup and CSAC agreed that Citigroup
would double its investment in the Fund by doubling the amount that
it had shorted each CDO in the Fund.   Id. ¶ 42.   This increased
Citigroup's short position to approximately $500 million, including

$490 million in "naked" (i.e. unprotected) shorts; this $500 million bet represented half of the Fund's investment portfolio. Id.

The two primary marketing documents for the Fund were "the offering circular (similar to a prospectus) and the pitch book (a PowerPoint presentation used in discussions with potential investors). Id. ¶ 47. According to the Complaint, "[a]s lead structurer for Class V III, Stoker was responsible for ensuring the accuracy and completeness of the offering circular and the pitch book." Id. Both documents were adapted from documents used by Citigroup for earlier transactions. Id.

The Transaction Overview of the pitch book stated that CSAC was the "Manager" and that CSAC had selected the collateral for the Fund. Id. ¶ 49. The Manager Section, a 20-page section originally provided by CSAC, included a detailed, nine-page section titled "Portfolio Construction and Management," which described CSAC's purportedly rigorous approach to selecting each asset it included in the investment portfolio of its CDOs. Id. ¶ 49. This section stated that a key element of CSAC's "process" was "bottom-up fundamental security selection." Id. The offering circular identified as a risk factor the fact that the performance of the Fund's investment portfolio "depends on the investment strategy and investment process of the Manager in analyzing, selecting and managing the [portfolio]." Id. ¶ 54.

Page 88 of the 192-page offering circular included a generic disclosure that Citigroup "may provide CDS Assets as an intermediary

with matching off-setting positions requested by [Credit Suisse] or
may provide CDS Assets alone without any off-setting positions."
Id. ¶ 56.  The materials did not mention, however, that Citigroup,
already had a $500 million short position on the collateral, or that
the Fund was structured as a "prop trade," whose purpose was to
allow Citigroup to short the assets for its own account.  Id. ¶ 58-
59. The marketing materials also did not disclose Citigroup's
"substantial role" in selecting the assets for the Fund, or that
Citigroup's proprietary short position was comprised of the CDOs it
had been allowed to select, while Citigroup did not short those CDOs
which it had no role in selecting. Id. ¶ 59.

On February 6, 2007 Stoker personally sent a copy of the pitch
book to a prospective investor, along with a note declaring that the
Fund was a "top of-the-line CDO squared."  Id. ¶ 62.  Later, when a
potential investor raised questions about the Fund, the head of
Citigroup's CDO syndicate desk sent an email to Citigroup employees,
including Stoker, with the following instruction: "[CSAC] bought
these static bonds and . . . should have a rationale as to why [CSAC
found them attractive."  Id. ¶ 63.  Another Citigroup employee
replied to everyone on the email and said that CSAC could "come up
with stories for some" of the assets in the Fund, "but not all of
them."  Id.

The largest investor and long buyer in the Fund was Ambac
Credit Products ("Ambac").  In January and February 2007, Stoker
participated in "extensive discussions" with Ambac about the terms

of Ambac's investment in the Fund, and in mid-February, Stoker personally provided a copy of the offering circular to Ambac.  Id. ¶¶ 66, 68.  Ambac's internal documents approving the investment in the Fund contained extensive discussion of CSAC's purported expertise and asset selection process and noted the importance of CSAC's disciplined approach to the selection of securities.  Id. ¶ 67.

The 25 CDOs selected by Citigroup for inclusion in the Fund performed significantly worse than other CDOs in the Fund and other comparable CDOs.  Id. ¶ 76.  Nine months after the transaction closed, the Fund experienced an event of default.  Id. ¶ 77.

Citigroup was paid approximately $34 million in fees for structuring and marketing the Fund and, as a result of those fees and Citigroup's short position on the $500 million in assets in the Fund, Citigroup realized net profits of approximately $160 million. Id. ¶ 79.

In 2006, Citigroup paid Stoker a salary of $150,000 and a bonus of $1,050,000.  In February 2007, Stoker negotiated a salary of $150,000 and a guaranteed bonus of $2.25 million for 2007.  Id. ¶ 80.

Given the foregoing allegations, the Complaint appears to describe a rather straightforward fraud, facilitated and marketed in significant part by Stoker, by which Citigroup was able to dump some of its worse CDOs on investors by misrepresenting that the CDOs had been selected by CSAC when for all practical purposes many had been

9

selected by Citigroup, which was betting on the failure of those CDOs that it had selected.  On this basis, the Complaint charges Stoker with violations of the antifraud section of the 1933 Act, § 17(a), which makes it:

> unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  More specifically, the Complaint alleges that Stoker violated subsections (2) and (3) of Section 17(a).[5]

Stoker makes two arguments why the Section 17(a)(2) claim against him fails.  First, Stoker argues that the Complaint fails to allege that Stoker was able "to obtain money or property" by means of the fraud.  He concedes that the Complaint alleges that Citigroup made money from the fraud, but argues that this cannot be imputed to Stoker personally.  He also concedes that the Complaint alleges that his own compensation dramatically increased around the time of the

---

[5] For reasons unknown, the SEC chose not to allege violations of subsection (1).

fraud but argues that the Complaint does not link this to the fraud in a sufficiently direct way to qualify as "obtain[ing] money or property by means of" the fraud.

The case law addressing these points is surprisingly sparse, and inconclusive.  The only case from any court in this Circuit is SEC v. Glantz, No. 94 Civ. 5737, 1995 WL 562180 (S.D.N.Y. Sept. 20, 1995).  There, the defendant, Block, argued that the SEC failed to state a claim under Section 17(a)(2) because the Complaint did not allege that he profited from the alleged fraud.  Judge Haight found that the defendant was not required to profit from the misstatements because "[t]he plain language of the statute specifically imposes liability on all those who 'obtain money or property through fraud,' not only on those who 'profit' from such activity."  Id. at *5. Thus, Glantz does not directly address the question here presented of what relationship between the defendant and the money or property fraudulently obtained is sufficient to satisfy Section 17(a)(2).[6]

Although a few cases from district courts outside this Circuit have addressed the issue, their holdings are split and their analysis meager.  Compare SEC v. Delphi Corp., No. 06-14891, 2008 WL

---

[6]    While Stoker argues that Glantz impliedly assumes that the defendant must personally obtain money or property for himself, Judge Haight made no such finding and the thrust of Glantz is actually to the contrary.  In Glantz, the Complaint alleged that Block's co-defendant had personally pocketed $400,000 of the funds obtained by the fraud, but that other funds were obtained by the company for which Block served as counsel.  Glantz, 1995 WL 562180, at *5.  Thus, Judge Haight's rejection of Block's motion to dismiss necessarily rested on the assumption that Block's obtaining money for the company for which he was counsel was within the scope of the statute.

4539519, at *30 (E.D. Mich. Oct. 8, 2008) (Section 17(a)(2) "does not require that the person alleged to have made the false or misleading statement . . . obtain money or property for [him]self;" it is sufficient that the defendant obtained the money for his employer) with SEC v. Daifotis, No. C 11-00137 WHA, 2011 WL 2183314, at *10 (N.D. Cal. June 6, 2011) ("[t]he parties cite opposed out-of-circuit district court decisions on this question; this order finds those requiring the defendant's [personal] receipt of money or property to be consistent with the statutory language and thus more persuasive"); SEC v. Burns, No. 84-0454, 1986 WL 36318, at *3-4 (S.D. Cal. Feb 19, 1986) (the defendant must "personally acquire[] money or property").

The Court concludes that it is sufficient under Section 17(a)(2) for the SEC to allege that Stoker obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that Stoker personally obtained money indirectly from the fraud.

To begin with, the statute, on its face, does not state that a defendant must obtain the funds personally or directly. On the contrary, all three prongs of liability under Section 17(a) are preceded by the common modifier "directly or indirectly." It would be contrary to this language, and to the very purpose of Section 17(a), to allow a corporate employee who facilitated a fraud that netted his company millions of dollars to escape liability for the fraud by reading into the statute a narrowing requirement not found

12

in the statutory language itself.  As the Supreme Court has
repeatedly stated, "Congress intended securities legislation enacted
for the purpose of avoiding frauds to be construed 'not technically
and restrictively, but flexibly to effectuate its remedial
purpose.'" Affiliated Ute Citizens of Utah v. United States, 406
U.S. 128, 151 (1972) (quoting SEC v. Capital Gains Research Bureau,
375 U.S. 180, 195 (1963)).[7]

The SEC has plausibly alleged that Stoker, acting as
Citigroup's agent, facilitated a fraud by which Citigroup obtained
millions of dollars by means of material misstatements and
omissions.  For example, the Complaint alleges in detail that
investors would not have invested in the Fund if they had known that
it was actually Citigroup that had effectively chosen many of the
Fund's assets while maintaining a short position in those assets.
Compl. ¶¶ 67, 69.  Moreover, Stoker and Citigroup "knew it would be
difficult to place the liabilities of a CDO squared if [Citigroup]
disclosed to investors its intention to use the vehicle to short a
hand-picked set of CDOs and to buy Citigroup's hard-to-sell cash
CDOs."  Id.  ¶ 25.  Stoker and Citigroup also knew that
"representing to investors that an experienced, third-party

---

[7] It is also worth noting that Section 17(a) is modeled on the
federal mail fraud statute, 18 U.S.C. § 1341 (enacted 1872).  See
Robert A. Prentice, Scheme Liability: Does it Have a Future After
Stoneridge?, 2009 Wisc. L. Rev. 351, 365 n. 77.  Applying language
in that statute similar to Section 17(a), the Second Circuit has
held that the statute does not require that "the defendant must
receive the same money or property that the deceived party lost, but
only that the party deceived must lose money or property."  United
States v. Evans, 844 F.2d 36 (2d Cir. 1988).

investment adviser had selected the investment portfolio would

facilitate the placement of the CDO squared's liabilities." Id.

Without multiplying examples, it is clear that such allegations are,

in the Court's reading of Section 17(a)(2), more than sufficient to

impose liability on Stoker.

Alternatively, it is likewise sufficient that the Complaint

alleges that Stoker, personally, though indirectly, profited from

the fraud through increased compensation from Citigroup.

Specifically, the Complaint alleges that in February 2007, Stoker

successfully negotiated a doubling of his yearly bonus (from a

little over $1 million to $2.25 million). Compl. ¶ 80. Although

Stoker argues that his "salary and bonus could not have been tied to

the alleged omissions from the pitch book and offering circular"

because the Fund did not close until February 28, 2007, see

Memorandum in Support of Brian H. Stoker's Motion to Dismiss ("Def.

Mem.") at 12, CSAC and Citigroup agreed to the deal in December,

2006 and the negotiations about Stoker's bonus occurred after

Stoker's supervisor told him to make sure that his desk got credit

for the profits earned by the Fund. Id. at ¶¶ 33, 35. Reading

these allegations most favorably to plaintiff, they permit the

plausible inference that Stoker's compensation increase was at least

partly the fruit of his fraud.

As a second reason for dismissing the Section 17(a)(2) claim,

Stoker asserts that "the Complaint fails to allege facts sufficient

to support the conclusion that Stoker should be the one individual

14

at Citigroup held legally responsible for the alleged omissions from the pitch book and offering circular." Def. Mem. at 1.  As defendant's papers make clear, the assertion here is not that Stoker has been wrongfully singled out among several persons who hypothetically could have been sued for facilitating the alleged fraud, but rather that the Complaint fails to adequately allege that Stoker was the person who "made" or was responsible for the alleged false statements in the pitch book and offering circular.  But while there is much case law analyzing the requirements for "making" a statement under Rule 10b-5, and while Stoker argues that all of this case law likewise applies to a claim brought under Section 17(a), this argument is misplaced.

It is true, of course, that much of the wording of Section 17(a) of the Securities Act of 1933 is similar to the wording of Rule 10b-5 promulgated under Section 10(b) of the Securities and Exchange Act of 1934, leading the Second Circuit in a case that did not present the instant issue to note that "*[e]ssentially* the same elements [as those required to show a violation of section 10(b) and Rule 10b-5] are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security." See <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999) (emphasis added).  But when it comes to the issue here presented, there are significant difference between the language of 17(a) and the language of 10b-5 that dictate different results.  See <u>Aaron v. SEC</u>, 446 U.S. 680, 695-97 (1980).  Specifically, Section 17(a)(2), unlike Rule 10b-5,

15

prohibits a defendant from obtaining money "by means of" an untrue statement.  Accordingly, Stoker may be held liable under 17(a)(2), though not under 10b-5, if, he obtains money or property by use of a false statement, whether prepared by himself or by another.  SEC v. Tambone, 550 F.3d 106, 127 (1st Cir. 2008) reh'g en banc granted, opinion withdrawn, 573 F.3d 54 (1st Cir. 2009) and opinion reinstated in relevant part on reh'g, 597 F.3d 436 (1st Cir. 2010) (en banc).  As the First Circuit held in Tambone, the text of Section 17(a)(2) makes clear that "[l]iability attaches so long as the statement is used 'to obtain money or property,' regardless of its source." Id.; see also SEC v. Radius Capital Corp., 2:11-CV-116-FTM-29, 2012 WL 695668 (M.D. Fla. Mar. 1, 2012) (adopting the Tambone rule).

This conclusion is implicitly strengthened by a close reading of the Supreme Court's recent decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011), on which, ironically, Stoker purports to rely.  Janus was a private action brought under Rule 10b-5, which extends liability to a defendant who "make[s] any untrue statement of a material fact."  In Janus, Justice Thomas undertook a textual analysis of the word "make," explaining:

> One 'makes' a statement by stating it.  When 'make' is paired with a noun expressing the action of a verb, the resulting phrase is 'approximately equivalent in sense' to that verb. For instance, 'to make a proclamation' is the approximate equivalent  of 'to proclaim,' and 'to make a promise' approximates 'to promise.'  The  phrase at issue in Rule 10b-5,

16

> "[t]o make any . . . statement," is thus the approximate
> equivalent of "to state.""

Id. at 2303 (citing 6 Oxford English Dictionary 66; Webster's New
International Dictionary 1485).

By contrast, Section 17(a), as noted, prohibits a defendant
from obtaining money "by means of" an untrue statement.  Although
"to make a statement" is the equivalent of "to state," to obtain
money "by means of" a statement plainly covers a broader range of
activity.  Thus, the emphasis of the Janus Court on the word "make"
serves, if anything, to highlight the importance of the difference
in language between the two provisions.

The Court in Janus was also concerned with the fact that, since
a private right of action is implied under section 10(b) of the 1934
Act, Rule 10b-5 should be read narrowly, since "concerns with the
judicial creation of a private cause of action caution against its
expansion."  Id. at 2302 (quoting Stoneridge Investment Partners,
LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 165 (2008)).  By
contrast, there is no need to read Section 17(a) narrowly in light
of concerns about the implied private cause of action, because there
is no private right of action -- implied or explicit -- under
Section 17(a).  See Finkel v. Stratton Corp., 962 F.2d 169, 174 (2d
Cir. 1992).

Accordingly, the Court concludes that Janus implicitly suggests
that Section 17(a)(2) should be read differently from, and more

17

broadly than, Section 10(b).[8]  See also SEC v. Pentagon Capital Mgmt.

PLC, 08 CIV. 3324, 2012 WL 479576 (S.D.N.Y. Feb. 14, 2012) ("Nor

does Janus apply to SEC enforcement claims brought pursuant to

Section 17(a) of the Securities Act."); SEC v. Sentinel Management

Group, Inc., No. 07 C 4684, 2012 WL 1079961, at *15 (N.D. Ill. Mar.

30, 2012) (Janus is inapplicable to Section 17(a) claims because the

wording of Rule 10b-5 and Section 17(a) are different, and the

policy concerns applicable in Janus do not apply to Section 17(a)

claims); SEC v. Mercury Interactive, LLC, No. 5:07-cv-02822, 2011 WL

5871020, at *3 (N.D. Cal. Nov. 22, 2011) ("Janus may not be extended

to statutes lacking the very language that Janus construed");

Daifotis, 2011 WL 3295139, at *5 (declining to apply Janus to

Section 17(a) claims because the word "make" does not appear in the

language of Section 17(a)); SEC v. Geswein, No. 10-cv-1235, 2011 WL

4565861, at *2 (N.D. Ohio Sept. 29, 20011) (same); but see SEC v.

Kelly, No. 08 civ. 4612, 2011 WL 4431161, at *5 (S.D.N.Y. Sep. 22,

2011) (holding that Janus does apply to a case brought under Section

17(a)(2)).

---

[8] At oral argument, Stoker stated that a "very lengthy" decision by
Judge Murray, an SEC Administrative Law Judge, had held that Janus
applied to Section 17 cases and was "worthy of consideration."  See
Transcript of Oral Argument, Jan. 25, 2012 ("Tr.") at 14.  While the
opinion as a whole was lengthy, Judge Murray's analysis of the issue
here presented was quite limited.  She cited two district court
cases that came out on opposite sides of the question, and then she
simply stated, "[t]his case involves allegations of materially false
or misleading statements or omissions, and I find the Janus test to
be the appropriate standard to apply in evaluating the extent of
Respondents' conduct." In the Matter of Flannery, SEC Release No.
438, 2011 WL 5130058, at *34 (ALJ Oct. 28, 2011).

Although the Court adopts the Tambone standard and finds it fully consistent with Janus, it is worth noting that the Complaint also meets one of the higher standards sought by Stoker. Specifically, Stoker argues that if the 10b-5 standard set forth in Janus does not apply to the instant case, the Court should adopt the standard set forth by Judge Cote in a case that predates both Janus and Tambone. In that case, Judge Cote held that the SEC must allege that Stoker was "sufficiently responsible for the statement -- in effect, caused the statement to be made -- and knew or had reason to know that the statement would be disseminated to investors." See SEC v. KPMG LLP, 412 F. Supp. 2d 349 (S.D.N.Y. 2006).

Here, the Complaint meets the KPMG standard.  To begin with, Stoker did know that the statements would be disseminated to investors, because the statements were made in the marketing materials specifically prepared to send to investors to encourage them to invest in the Fund.  Compl. ¶ 4, 47, 62.  As for the sections of the pitch book originally written by Citigroup, and specifically the Risk Factors section, the Complaint adequately alleges that Stoker and his team chose language from a previous Citigroup document, copied this language into a new document, and made edits to some of the language.  Compl. ¶ 48.[9]  The portions of

---

[9] The Risk Factors section stated that CSAC had "selected" the collateral for the Fund.  Compl. ¶ 49.  Moreover, the statute covers both misstatements and material omissions, and the pitch book omitted any reference to Citigroup's role in the selection of the assets as well as the fact that it already had a naked short position in the assets that it helped to select.

19

the offering circular originally written by Citigroup were also drafted by Stoker and his team.  Id. ¶ 50.  Although Stoker used an offering circular from a previous transaction as a template, he made "substantial edits" to the offering circular to reflect the terms of the Fund.  Id. at ¶¶ 50-51.  A defendant cannot evade liability by copying and pasting inapplicable or inaccurate information from other documents into sections of a document that he is responsible for, editing some parts of the old language, and leaving other inaccurate language in place.[10]

The more difficult question, if the KPMG standard were to apply, is whether Stoker can also be held liable for statements made in the "Manager" sections of the pitch book and offering circular, which were the portions originally drafted by CSAC.  See Compl. ¶ 49, 54.[11]  Standing alone, the allegation in the Complaint that Stoker was "responsible for ensuring the accuracy and completeness

---

[10] Stoker asserts that "the fact that Stoker did not edit or change the sections of the offering circular that the SEC contends were misleading strongly suggests that he was *not* responsible for those sections."  Def. Mem. at 18 (emphasis in original).  Stoker's assertion is one plausible inference that one could draw from the Complaint, but it is far from the only plausible inference.  At least as plausible is that Stoker took language that was arguably not misleading in other contexts and adapted it to a context in which it became materially misleading.

[11] That section also continued a disclaimer that "[i]nformation related to CSAC . . . has been provided by CSAC.  Citigroup is not responsible for the content of the following section and has not independently verified any such information."  Little Decl. Ex. A at CITI 09570344.  But in fact, according to the Complaint, Stoker was responsible for ensuring the accuracy of the entire pitch book. Compl. ¶ 47.

of the offering circular and pitch book," Compl. ¶ 47, which the SEC
calls a factual allegation, Plaintiff's Memorandum of Law in
Opposition to Motion to Dismiss ("Pl. Mem.") at 22, might well be
too conclusory to survive the motion to dismiss.  But, in light of
the other factual allegations in the Complaint related to Stoker's
role in marketing the Fund, and specifically his role in drafting
and editing significant portions of the pitch book and offering
circular, see, e.g., Compl. ¶ 47, 50, 51, the Court finds that the
SEC has plausibly alleged that Stoker was responsible for all of the
misstatements and omissions in the pitch book and offering circular.

Turning to the claim under Section 17(a)(3), that section
prohibits a defendant from engaging "in any transaction, practice,
or course of business which operates . . . as a fraud or deceit upon
the purchaser" of any security.  15 U.S.C. § 77q(a)(3).  Although
Stoker argues that the Section 17(a)(3) claim alleged in the
Complaint is duplicative of the Section 17(a)(2) claim, a defendant
may be liable under both Section 17(a)(2) and Section 17(a)(3) based
on allegations stemming from the same set of facts as long as the
SEC alleges that the defendants "undertook a deceptive scheme or
course of conduct that went beyond the misrepresentations." In re
Alstom SA, Sec. Litig., 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).
Here, the Complaint plausibly alleges a course of conduct beyond the
misrepresentations that are covered by Section 17(a)(2).  The
misrepresentations and omissions were part of that conduct, but they
were not the entirety of it.  In particular, the Complaint alleges

that Citigroup knew that certain hedge funds, including the hedge fund that created one of the CDOs, thought that particular CDOs (President and Constellation CDOs) were going to perform poorly. Id. ¶ 20.  The Complaint further alleges that Citigroup sought to include as many of those CDOs as possible in the Fund, id. ¶ 27, and that, indeed, a significant part of the rationale for Citigroup's creation of the Fund was to short certain mezzanine CDOs for its own account.  Id. ¶ 23.  Stoker himself recommended the inclusion of President and Constellation deals in the Fund, id. ¶ 32, and discussed the possibility of including in the Fund CDO tranches that were unsold and still on Citigroup's books.  Id. ¶ 24.

Furthermore, Citigroup engaged CSAC as a collateral manager because it knew that it would not be able to sell the assets in the Fund unless investors thought they were chosen by a reputable outside entity.  Id. ¶¶ 25-26.  Then Citigroup worked to get CSAC to include particular assets, so that Citigroup could short them.  Id. ¶¶ 27-30.  Stoker was involved in the discussions of which assets to include in the Fund and which assets to short; he prepared models showing the potential profits to Citigroup from shorting specific assets into the CDO squared. Id. ¶¶ 24, 28.  Stoker was aware that the Fund was designed as a proprietary trade, and he ensured that CSAC did not know about this arrangement by telling his supervisor not to tell CSAC that Citigroup had designed the Fund as a proprietary trade.  Id. ¶ 32.  Stoker actively encouraged particular investors to invest in the Fund, and when he sent the pitch book to

one prospective investor, he said that the Fund was a "top-of-the-line CDO squared," id. ¶ 62, even though he knew that Citigroup had chosen assets for the Fund that it believed were likely to perform poorly.  In the end, Citigroup induced CSAC to include 25 assets in the Fund, on which it took a $500 million short position. Id. ¶¶ 36-38, 41-43. These assets performed significantly worse than the other assets in the Fund.  Id. ¶ 76.

Although these allegations are more than sufficient to state a claim under Section 17(a)(3), the SEC also asserts that "the factual allegations in the Complaint depict [the Fund] as a transaction that was intended by Citigroup as a vehicle to position it to profit from the downturn in the United States housing market by buying protection through CDS on A-rated tranches of mezzanine CDOs."  Pl. Mem. at 24 (citing Compl. ¶ 20).[12]  It is true that paragraph 20 of the Complaint does not specifically mention Stoker or Citigroup; that paragraph alleges only that market participants sought to benefit from the downturn in the housing markets.  The succeeding paragraphs, however, state that Citigroup knew that there was significant market demand to short certain assets because market participants believed they would perform poorly, that Citigroup

---

[12] Stoker argues that these assertions would describe an intentional fraud, but that the SEC has only pled negligence.  Def. Reply Mem. at 9.  It is true that the SEC's decision to only charge negligence seems inconsistent with many of its allegations in the Complaint that so plainly imply intentional fraud.  Nonetheless, these allegations may also be read to allege that Stoker was at least negligent, and there is no further scienter required under Section 17(a).

discussed how it would profit from shorting those assets, and that Citigroup chose assets that it knew other market participants had already bet were going to fail.  Compl. ¶¶ 21-27.  Therefore, a more than plausible inference from the Complaint is that Citigroup also sought to benefit from a downturn in the housing market by selecting and shorting these particular assets.

Together, all of these allegations, especially when combined with the misstatements and/or omissions in the marketing materials, are more than sufficient to state a claim under Section 17(a)(3).

For the foregoing reasons, the Court reaffirms its Order dated February 14, 2012 denying Stoker's motion to dismiss.

Dated: New York, NY
June 6, 2012
_____
JED S. RAKOFF, U.S.D.J.

24