C7GVSTO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   U.S. SECURITIES AND EXCHANGE
    COMMISSION,
4
                    Plaintiff,
5
            v.                          11 CV 7388 (JSR)
6
    BRIAN H. STOKER,
7
                    Defendant.          JURY TRIAL
8
    ------------------------------x
9                                       New York, N.Y.
                                        July 16, 2012
10                                      10:20 a.m.

11  Before:

12                  HON. JED S. RAKOFF,

13                                      District Judge

14                      APPEARANCES

15  SECURITIES AND EXCHANGE COMMISSION
        Attorneys for Plaintiff
16  BY:  JEFFREY T. INFELISE
        JANE M. E. PETERSON
17      ANDREW H. FELLER

18  KEKER & VAN NEST
        Attorneys for Defendant
19  BY:  JOHN W. KEKER
        JAN N. LITTLE
20      STEVEN K. TAYLOR
        BROOK DOOLEY
21
    ALSO PRESENT:   ROY CAMPOS, Technician
22                  CHRIS INNIS, Paralegal
                    JACQUELINE HARTMANN, Paralegal
23                  JEFF DAHM, Technician

24

25

C7GVSTO1

1          (In open court)

2          (Case called)

3          THE DEPUTY CLERK:  Will everyone please be seated who

4   has a seat.  And will the parties please identify themselves

5   for the record.

6          MR. INFELISE:  Good morning, your Honor.  Jeffrey

7   Infelise and Jane Peterson and Andrew Feller for the Securities

8   and Exchange Commission.

9          THE COURT:  Good morning.

10         MS. KEKER:  Good morning, your Honor.

11         John Keker, Jan Little, Steve Taylor, and Brook Dooley

12  for Mr. Stoker, who's present.

13         THE COURT:  Good morning.

14         All right.  The bad news is that we're still having

15  computer problems, so you probably won't have LiveNote.  So

16  you'll probably have to rely on something you may not have

17  heard of that's called pencil and paper.  But if you don't

18  happen to have one of those, we can supply that to you.

19         The good news is the jury panel should be here in five

20  minutes.

21         So is there anything else we need to take up?

22         MS. KEKER:  Yes, your Honor.

23         There are a couple of matters before the opening

24  statement.  We have exchanged objections to graphics that are

25  going to be used during opening.  And we would like those to be

C7GVSTO1

1   heard before the opening statement.

2          There was also hanging fire the issue of compensation

3   and Mr. Martens, which I don't think need to be resolved; we

4   just need to agree that these won't be mentioned in the opening

5   statement.

6          THE COURT:  I had ruled on the Martens matter.  I gave

7   you permission to put in a brief motion citing any case law you

8   had.  I've looked at that over the weekend; I found it totally

9   unpersuasive.  I'll give you my reasons later; I don't want to

10  take the time now.  But his statement will not be admitted in

11  evidence and, therefore, cannot be referred to.

12         MS. KEKER:  Then Mr. Stoker's conversation --

13         THE COURT:  And that can be referred to.  Thank you

14  very much for raising that.

15         MS. KEKER:  We refer to it -- we were raising the

16  issue of whether or not the amount -- we understand

17  compensation, but not the amount.

18         THE COURT:  Yes.  No, the amount can be referred to.

19         So I'll give you all my rulings in more detail later,

20  so you'll have a record for purposes of any potential appeal,

21  but those are my rulings.

22         MS. KEKER:  And can we at some point before the SEC's

23  opening object to some of their slides that they intend to --

24         THE COURT:  Yes.  Let me see them now.

25         MS. KEKER:  Slide No. 8, if we could -- do you want to

C7GVSTO1

1    put them up?

2            The protection seller's piece is argumentative.  It

3    implies that these are retail customers, mom-and-pop.  It's

4    ridiculous.  These are firms, they are qualified institutional

5    investors.  The whole point is that they are supposed to be

6    able to fend for themselves.

7            We object to this description of them as real people.

8    These are huge qualified institutional --

9            THE COURT:  I don't see any description of them as

10   real people.  What you're referring to is the graphic there of

11   the three blank-face human names?

12           MS. KEKER:  That's correct, your Honor.

13           It clearly is meant to imply in an argumentative

14   fashion the protection sellers --

15           THE COURT:  All right.

16           Of course that's the view apparently held by the

17   Supreme Court which defines corporations as persons for all

18   purposes.  And I think a blank-face human is probably a good

19   substitute for a corporation.  But, nevertheless, I agree with

20   your point.  So we should take that out.

21           MS. KEKER:  And then the second one is on Slide 9.  It

22   appears several times throughout this bill, it's a chronology,

23   but my point is the second one.  October 26, 2006, it purports

24   to describe in an argument Stoker model CDO Citigroup surety

25   assets.  Stoker model were CDOs with various possibilities,

C7GVSTO1

1  including keeping the equity, which would be a long position

2  without any shorts; keeping the equity, a long position, with

3  50 percent shorts.  In short, it's much more complicated than

4  that.  That's argumentative and we object to that, as a

5  description of -- the piece of evidence --

6          THE COURT:  When you say it's argumentative, inherent

7  in any opening statement is the notion that where a party says,

8  Here's what we're going to prove, they are going to be taking a

9  position on disputed matters as to what they expect the proof

10  to show.  You're going to be taking a different position.

11          But let me hear from the SEC on this.

12          MR. INFELISE:  Yes, your Honor.

13          The term "short assets" is actually included in that

14  email.  In terms, the email talks about Mr. Stoker's calculated

15  profits from shorting zero, 50, and 100 percent of the assets

16  in the CDO.  So that isn't inaccurate.  It's accurate.

17          Sounds like Mr. Keker's objection is that we haven't

18  tried to put in the whole email.  But I believe that is an

19  accurate representation of the portions which we believe is

20  relevant.

21          THE COURT:  All right.

22          On that representation I'll accept it.

23          MS. KEKER:  That's it, your Honor.

24          THE COURT:  Okay.

25          MR. INFELISE:  Your Honor --

C7GVSTO1

```
1              THE COURT:  The jury is here.  Unless it's something

2    that has to be taken up before the jury is chosen, we'll take

3    it up after the jury is chosen.

4              MR. INFELISE:  All right.

5              It is our objection with respect to one of the

6    graphics that --

7              THE COURT:  We'll take that -- after we choose the

8    jury, we're going to give them a ten-minute break, we'll take

9    it up then.

10             MR. INFELISE:  Thank you.

11             THE COURT:  Let's bring the jury in.

12             MS. KEKER:  We had a preliminary instruction on using

13   the Internet, social media, and so on, that we submitted to the

14   Court.

15             THE COURT:  When did you submit it to the Court, as

16   part of your request to charge?

17             MS. KEKER:  Yes, your Honor.  I have a copy.

18             THE DEPUTY CLERK:  Jury entering the courtroom.

19             THE COURT:  Bring it up to my law clerk.

20             (Jury panel present)

21             THE COURT:  Good morning, ladies and gentlemen.

22             My name is Judge Rakoff, and we are about to pick a

23   jury in a civil case.

24             This case is going to last approximately three weeks.

25   Now, as federal cases go, that's not a particularly long case.
```

C7GVSTO1                          Voir Dire

1    But counsel and I completely realize that it is a major

2    inconvenience to anyone to have to serve on a jury for three

3    weeks.

4            But those of you who have been on juries before will,

5    I think, know what I say when I report that after a trial is

6    over, always the jurors come to me and tell me what an

7    inspiring experience it has been.  And the reason for that is

8    the tremendous responsibility and, if you will, power, that our

9    Constitution gives to juries.

10           In most countries in the world, civil cases are

11   decided by judges or, of course, in some countries, by

12   dictators.  But under our Constitution, we think that the

13   determination of justice, the determination of the truth, the

14   determination of what is the fair and just result in any given

15   case, is too important to be left to anyone but citizens like

16   yourselves drawn from all walks of life who come together, who

17   reason together, and who decide, if they can, on a verdict.

18           Now, in a minute we're going to call up nine of you to

19   the jury box there, and I will ask some questions of those nine

20   persons.  But I want all of you, if you would, to listen to my

21   questions, because some of those nine will be excused.  And

22   when we call up the rest of you or some of you, I don't have to

23   repeat all these questions; I'll just ask you did you hear my

24   questions and do you have any questions you need to respond to.

25           So before we call you first up though, we will swear

C7GVSTO1                          Voir Dire

1    you in.

2              (Jury panel sworn)

3              THE DEPUTY CLERK:  As your name is called, please take

4    your place in the jury box as indicated.

5              Juror No. 1 is Thomas Vidmar.  Last name, V-I-D-M-A-R.

6              Please take the first seat in the first row of the

7    jury box closest to the judge.

8              Juror No. 2 is Beau Brendler.  Last name,

9    B-R-E-N-D-L-E-R; first name, B-E-A-U.

10             Mr. Brendler, please come and take the second seat in

11   the first row of the jury box.

12             Juror No. 3 is now Hallie Rouse.  Last name,

13   R-O-U-S-E; first name, H-A-L-L-I-E.

14             Mr. Rouse, if you would take the third seat in the

15   front row of the jury box.

16             Juror No. 4 is Anacleto Lucas.  Last name, L-U-C-A-S;

17   first name, A-N-A-C-L-E-T-O.

18             Juror No. 5 is now Stevan Urbach.  Last name,

19   U-R-B-A-C-H; first name, S-T-E-V-A-N.

20             Mr. Urbach, if you would come through that entrance

21   and go into the first seat of the second row of the jury box

22   please.  Thank you.

23             Juror No. 6 is now Beverly Bassoff.  Last name,

24   B-A-S-S-O-F-F.

25             Ms. Bassoff, if you would take the second seat in the

C7GVSTO1                         Voir Dire

1   second row of the jury box.

2           Juror No. 7 is Ruperto Cordero.  Last name,

3   C-O-R-D-E-R-O; first name, R-U-P-E-R-T-O.

4           Mr. Cordero, if you would take the third seat in the

5   second row of the jury box.

6           Juror No. 8 is now Jennifer Odeh.  Last name, O-D-E-H.

7           Ms. Odeh, if you would please come and take the fourth

8   seat in the second row of the jury box.

9           And Juror No. 9 is now Suzanne Roscio.  Last name,

10  R-O-S-C-I-O.

11          Ms. Roscio, if you would take the fifth seat in the

12  second row of the jury box, please.

13          THE COURT:  Ladies and gentlemen, let me tell you a

14  little bit more about this case.

15          This is a civil case, as I mentioned.  It's what's

16  called a securities case.

17          And specifically, the SEC, the Securities and Exchange

18  Commission, is the plaintiff.  And they allege that the

19  defendant, whose name is Brian Stoker, negligently misled some

20  investors in connection with a particular investment that

21  you'll hear more about.

22          But let me just ask you, is there anything about the

23  general nature of this case that makes anyone think that they

24  can't serve as a fair and impartial juror?

25          Very good.

C7GVSTO1                          Voir Dire

1           Now, the case is going to last, worst case, I think

2    three weeks.  I'm actually going to try to ask the lawyers to

3    do better than that, but I think you should assume on a

4    worst-case basis that it would go three weeks, which would be,

5    I think, Friday, August 3rd.

6           I should tell you we normally sit 9 to 5; we never go

7    later than 5.  There are some days when we'll stop sooner or

8    start later because of other matters I have.  We'll, of course,

9    take an hour for lunch, and we'll take short 15-minute

10   mid-morning and mid-afternoon breaks.

11          But is there anything about the schedule that presents

12   an insuperable problem for anyone?

13          Yes, sir.  I can't hear you.

14          JUROR:  I made travel plans.

15          THE COURT:  To where?

16          JUROR:  To Europe.

17          THE COURT:  Starting when?

18          JUROR:  30th.

19          THE COURT:  You knew you had jury duty though?

20          JUROR:  No.

21          THE COURT:  You didn't receive a jury notice?

22          JUROR:  Not at the time, no.

23          THE COURT:  Excuse me?

24          JUROR:  I have a large financial commitment.

25          THE COURT:  That's not my question.

C7GVSTO1                          Voir Dire

1               When did you receive your jury notice?

2               JUROR:  I don't recall.

3               THE COURT:  And had you previously postponed your jury

4       service?

5               JUROR:  I had an operation to my knee, yes.

6               THE COURT:  So you had postponed it, so you knew that

7       this time you wouldn't be able to get a further postponement,

8       so you needed to put some time aside to serve.

9               JUROR:  At the time it wasn't known.

10              THE COURT:  What's the nature of this trip?

11              JUROR:  It's a family vacation.

12              THE COURT:  And it starts on the 30th?

13              JUROR:  Yes.

14              THE COURT:  And where is it, it's to Europe?

15              JUROR:  It's to my wife's country, yes, Ireland.

16              THE COURT:  Let me think about this for a few minutes.

17              Anyone else?

18              Yes.

19              JUROR:  I just have some scans that I have to go to

20      for my head and brain for a potential ailment on Thursday.

21              THE COURT:  What time?

22              JUROR:  Nine a.m.

23              THE COURT:  We're not going to be sitting on Friday

24      morning of this week because I have to perform a wedding.

25              Would you be available if I was able to move it from

C7GVSTO1                          Voir Dire

1   Thursday to Friday?

2              JUROR:  I could check.  I would need to call and see

3   if they have any availability, because I'm having two scans

4   back-to-back.

5              THE COURT:  Where is it?

6              JUROR:  It's at East River Imaging uptown.

7              THE COURT:  I'd be happy to call on your behalf, as

8   well, to explain the situation.

9              JUROR:  Sure.

10             THE COURT:  I think we can probably work that out.

11             JUROR:  Okay.  That's fine.

12             THE COURT:  Anyone else?

13             All right.  Since you're the only one, we will excuse

14   Juror No. 5, Mr. Urbach.  You are excused.

15             THE DEPUTY CLERK:  Please come up, get your card, and

16   return to the main jury room.

17             Juror No. 5 is now Kelly Golden.  Last name,

18   G-O-L-D-E-N.

19             Ms. Golden, you can come along the front and take the

20   second seat in -- the first seat in the second row.

21             THE COURT:  Ms. Golden, you heard my couple questions

22   so far.  Any of those you need to respond to?

23             JUROR:  Not at this time, no.

24             THE COURT:  Okay.

25             So, ladies and gentlemen, my job as the judge will be

C7GVSTO1                        Voir Dire

1      to give you the instructions of law, and your job will be to

2      determine what the facts are, what the truth is, and then to

3      apply the instructions of law to those facts.

4              Is there anyone who feels they wouldn't be able to do

5      that?

6              Very good.

7              I'm going to ask counsel for both sides to introduce

8      themselves and introduce their clients.  And as they do that,

9      I'm going to have some more questions.

10             And we'll start with plaintiff's counsel.

11             MR. INFELISE:  Yes, your Honor.  Thank you.

12             I'm Jeffrey Infelise, representing the Securities and

13     Exchange Commission.

14             MS. PETERSON:  I'm Jane Peterson, representing the

15     Securities and Exchange Commission.

16             MR. FELLER:  I'm Andrew Feller, representing the

17     Securities and Exchange Commission.

18             THE COURT:  Sir?

19             MR. INFELISE:  Excuse me, your Honor.

20             This is Chris Innis he's a paralegal.

21             THE COURT:  He still needs to be introduced, as does

22     the other gentleman.

23             MR. INNIS:  Chris Innis, representing the Securities

24     and Exchange Commission.

25             MR. CAMPOS:  Roy Campos for the SEC.

C7GVSTO1                          Voir Dire

1              THE COURT:  So does any member of the panel know any

2    of those folks?

3              Does any member of the panel work for the Securities

4    and Exchange Commission?

5              Does any member of your immediate family work for the

6    Securities and Exchange Commission?

7              Let me tell you what I mean by "immediate family."  I

8    mean your parents; your spouse, if you're married; your

9    significant other; your brothers and sisters; and your

10   children.  I'm not interested in more distant relatives, second

11   cousins or whatever.

12             Any member of your immediate family work for the

13   Securities and Exchange Commission?

14             Does any member of the panel work for any agency of

15   the federal government?

16             Does any member of the panel work for -- any member of

17   your immediate family work for any agency of the federal

18   government?

19             Very good.

20             Let's turn to counsel for the defense.

21             MS. KEKER:  Thank you, your Honor.

22             I'm John Keker, representing Brian Stoker.

23             Mr. Stoker is right here.

24             MS. LITTLE:  I'm Jan Little.

25             MR. TAYLOR:  Steve Taylor for Mr. Stoker.

1              MR. DOOLEY:  Brook Dooley, also for Mr. Stoker.

2

3              MS. HARTMANN:  I'm Jackie Hartmann for Mr. Stoker.

4              MR. DAHM:  Jeff Dahm for Mr. Stoker.

5              THE COURT:  Does any member of the panel know any of

6      the folks who were just introduced at the defense team?

7              Mr. Stoker was previously employed at Citigroup, and

8      Citigroup will come up in the course of the evidence.

9              Does any member of the panel work for or have stock in

10     Citigroup?  Does any member of your immediate family work for

11     or, to your knowledge, have stock in Citigroup?

12             Yes, ma'am.

13             JUROR:  My sister-in-law used to be an executive at

14     Citigroup.

15             THE COURT:  And what kind of executive was she?

16             JUROR:  She was -- I can't even think of the term.

17     She handled big accounts and all that, whatever was up there.

18             THE COURT:  When did she leave?

19             JUROR:  She left about nine years ago to have

20     children.

21             THE COURT:  Is there anything about that that would

22     prevent you from being a fair and impartial juror in this case?

23             JUROR:  No.

24             THE COURT:  Very good.

25             There's another banking institution whose name may

C7GVSTO1                         Voir Dire

1    also come up in the course of the testimony, Credit Suisse.

2              Does any member of the panel work for or have stock in

3    Credit Suisse?

4              Does any member of the panel -- excuse me.  Does any

5    member of your immediate family work for, have, to your

6    knowledge, stock in Credit Suisse?

7              Very good.

8              Now I'm going to read you a long list of names.  Some

9    of these names will be witnesses, others will just be names

10   that come up in the course of the testimony.  And then I want

11   you to tell me whether you personally know any of these folks:

12             Nestor Dominguez, Professor Dwight Jaffee, Donald

13   Quintin, Brian Carosielli, Muhammed Sohail Khan, Shalabh

14   Mehrish, Darius Grant, Robert Pinniger, Illias Islamov, Robert

15   MacLaverty, Murray Barnes, David Salz, Elizabeth Besio Hardin,

16   Jonathan Neuberger, John Popp, Samir Bhatt, Michael

17   Shackelford, Gene Deetz, Denise Crowley, Josh Greenwald,

18   Kenneth Wormser.

19             Anyone on the panel know any of those folks?

20             Yes.

21             JUROR:  I know a Barbara Barnes, has a sister by the

22   name of Mary Bonds.

23             THE COURT:  I'm sorry, which name was this?

24             JUROR:  Bonds.

25             THE COURT:  No, there was no one -- I must have

C7GVSTO1                        Voir Dire

1  mispronounced it.  There's no one named Bonds on that list.

2          JUROR:  Oh.

3          THE COURT:  Oh, Barnes, I'm sorry, B-A-R-N-E-S.

4          JUROR:  Yes.

5          THE COURT:  Oh, I'm sorry.  I thought you said

6  "Bonds."

7          JUROR:  I'm sorry.

8          THE COURT:  Barnes.

9          So this is Murray Barnes.  Do you know Mr. Murray

10 Barnes?

11         JUROR:  No, but I know a Barbara Barnes that has a

12 sister Mary Barnes.

13         THE COURT:  Okay.  But this is Murray, M-U-R-R-A-Y.

14         JUROR:  Oh, I'm sorry.  I thought you said Mary.

15         THE COURT:  Very good.  Thanks very much.

16         Does any member of the panel have any problem with

17 your eyesight or with your hearing that you would have any

18 difficulty seeing and hearing the witnesses who will be

19 testifying from this little stand next to me?

20         Does any member of the panel have any problem

21 speaking, reading, or understanding English?

22         Very good.

23         Has any member of the panel ever been a party to a

24 lawsuit, meaning either you sued someone as a plaintiff or you

25 personally were sued as a defendant?  I only mean you

C7GVSTO1                        Voir Dire

1   personally; I'm not interested in your immediate family right

2   at the moment, just you personally.

3              Anyone been a party to a lawsuit?

4              Very good.

5              We're going to ask you later your occupation, but just

6   generally, does anyone have any professional experience in the

7   finance industry?

8              Yes, ma'am.

9              JUROR:  I spent 14 years working for Bankers Trust;

10  several of those would be securities, so I have a securities

11  background.

12             THE COURT:  Okay.  And so we'll talk when we get to

13  you.  We'll follow up on that.  But thank you for letting me

14  know that.

15             Yes, sir.

16             JUROR:  I worked -- I'm retired.  Employee of New York

17  Life.  And we do financial services.  And part of my job was to

18  print statements that the company needed about certain people

19  when it came up, financial statements.

20             THE COURT:  Okay.  So, again, we're going to follow up

21  some more in a minute, but thank you for letting me know.

22             As I mentioned, the defendant worked during the

23  relevant time for this case at Citigroup.  This was during the

24  years 2005 to 2008.  And the investments that he was involved

25  in are what they call structuring, related to the housing

C7GVSTO1                          Voir Dire

1   market.

2           Does anyone have any views about the role of banks in

3   connection with downtown, the housing markets, that would

4   prevent you from being, in your view, a fair and impartial

5   juror?

6           Very good.

7           Has anyone seen or heard anything in the media or

8   anywhere else about this case?

9           Yes.  Come to the side bar.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C7GVSTO1                          Voir Dire

 1          (At the side bar)

 2          JUROR:  I'm going to tend to follow the financial

 3     services industry closely.  I think I may have read about this

 4     in *The Wall Street Journal*.

 5          THE COURT:  Is there anything about that that would

 6     prevent you from being a fair and impartial juror?

 7          JUROR:  My tendency -- my recollection was feeling

 8     negatively towards the defendant in this, just coming up

 9     with -- just feeling that there was good evidence.

10          THE COURT:  Well, let me put it to you a different

11     way.

12          Obviously it's critical that any juror only decide the

13     case based on the evidence presented here in court, not on

14     anything you've read or heard beforehand or in the media or

15     anything else.  So lots of people come in, and they've heard

16     this or that or whatever.

17          The real question is can you put that aside and be

18     fair and impartial by judging this case purely on the evidence

19     in this case?

20          JUROR:  I think it would be somewhat difficult.

21          THE COURT:  Okay.  We'll excuse you then.

22          JUROR:  Thank you.

23          (Continued on next page)

24

25

C7GVSTO1                          Voir Dire

1              (In open court)

2              THE DEPUTY CLERK:  Juror No. 7 is now -- Juror No. 6

3    is now Susan O'Hara, last name O-H-A-R-A.

4              Ms. O'Hara, please take the second seat in the second

5    row of the jury box.

6              THE COURT:  So, Ms. O'Hara, you heard my questions so

7    far.  Any of those you need to respond to?

8              JUROR:  My job is financially-related.  I work for a

9    retail company as a director of finance, responsible for

10   expenses.

11             THE COURT:  Okay.  When we get to you individually,

12   we'll take that up.

13             Now, I mentioned before the plaintiff in this case is

14   the SEC, the Securities and Exchange Commission.  Is there any

15   member of the panel who has any views about the Securities and

16   Exchange Commission that would prevent them from being a fair

17   and impartial juror in this case?

18             Very good.

19             All right.  Let's talk individually.

20             I'm going to ask each of you to tell me the county or

21   borough in which you live -- I don't need to have your address,

22   just the county or borough -- what you do for a living, if you

23   have a spouse or a significant other, what that person does for

24   a living.

25             And I think we'll just start with those questions.

C7GVSTO1                              Voir Dire

1                    So Mr. Vidmar, is it?

2            JUROR:  Yes.

3            THE COURT:  So tell us about yourself.

4            JUROR:  I'm a retired employee of New York Life

5    Insurance Company.

6            I currently have a hobby of autograph collecting that

7    I do in my time.

8            I share an apartment with my brother, who's also a

9    retired employee of New York Life Insurance Company; was a

10   financial analyst when he was active.

11           And we both live in Tarrytown, New York, which is in

12   Westchester.

13           THE COURT:  Okay.

14           Just out of my curiosity, what kind of autographs?

15           JUROR:  Celebrities.  The ones that you see on TMZ

16   that hound you.  Celebrities.

17           THE COURT:  So I have in my chambers an autographed

18   baseball from Mariano Rivera.  So should I consider myself a

19   rich man now?

20           JUROR:  You can consider yourself a lucky man, because

21   a lot of the Yankees are tied into a company that they'll only

22   sign for them.

23           THE COURT:  Okay.  Well, I'll take it to be lucky is

24   better than to be rich.

25           So you heard me generally describe the case.  You have

C7GVSTO1                        Voir Dire

1    a little background.  And certainly we don't excuse jurors

2    because they know something about finance or anything like

3    that.  But is there anything about your background or your

4    former occupation that makes you think you could not be fair

5    and impartial in this case?

6              JUROR:  No.

7              THE COURT:  Very good.

8              All right.  Mr. Brendler.

9              JUROR:  Yes.

10             THE COURT:  Tell us about yourself.

11             JUROR:  I live in Putnam County, in Patterson, New

12   York.  I'm a writer and consultant.

13             My wife -- I live in a house with my wife and two

14   children.  My wife works as executive director of a museum,

15   support organization in Tarrytown.

16             THE COURT:  And what kind of writing do you do?

17             JUROR:  Right now it's about the future of the

18   Internet and technology and things like that.  I have in the

19   past written about financial issues, and in some circumstances

20   financial crime.

21             THE COURT:  Okay.  Anything about that that would

22   prevent you from being a fair and impartial juror in this case?

23             JUROR:  No, sir.

24             THE COURT:  Very good.

25             Mr. Rouse, is it?

C7GVSTO1                        Voir Dire

 1              JUROR:  Yes.

 2              THE COURT:  Tell us about yourself.

 3              JUROR:  I'm a Manhattan resident.  I currently work

 4    with the Harlem Children's Zone Practitioners Institute,

 5    sharing in philosophies and ways of doing things with

 6    organizations that's looking to replicate our works in their

 7    communities around the country.  Also serve as a liaison for

 8    organizations planning for different federal grants.

 9              My girlfriend, she's a supervisor for a group of

10    social workers for a nonprofit organization called Children's

11    Village.

12              THE COURT:  Very good.

13              Mr. Lucas, is it?

14              JUROR:  Yes.

15              I currently live in Westchester.  I'm from Yonkers.

16              I'm a rehabilitation specialist for the mentally

17    challenged.  I structure them to go back out to the community

18    to work and build self-esteem for themselves.

19              I currently live by myself.

20              THE COURT:  Okay.  Ms. Golden.

21              JUROR:  I'm from Westchester County, Peekskill.

22              I'm a payroll accountant for an investment and real

23    estate firm, real estate investment firm.

24              I live in Peekskill by myself.

25              THE COURT:  Anything about your background and

C7GVSTO1                          Voir Dire

1    occupation that would prevent you from being a fair and

2    impartial juror?

3              JUROR:  I don't think so.

4              THE COURT:  Okay.

5              Ms. O'Hara.

6              JUROR:  I live in Westchester County, as well.

7              I work for the Jones Group, and I manage all expenses

8    for their retail stores that have any of our brand names on

9    them.

10             I do live with my husband.  He is a director of

11   special ed. for the Board of Ed.  And we have a little girl.

12             THE COURT:  And anything about your background that

13   would prevent you from being a fair and impartial juror in this

14   case?

15             JUROR:  No.

16             THE COURT:  Mr. Cordero.

17             JUROR:  Yes.

18             I live in Manhattan, and I'm security officer in New

19   York INE Infirmary.

20             My wife retired there.  She stays home.  She used to

21   work in medics.  That's about it.

22             THE COURT:  I'm sorry.

23             Do you live in Manhattan did you say?

24             JUROR:  Yes.

25             THE COURT:  Very good.

C7GVSTO1                          Voir Dire

 1              Ms. Odeh, is it?

 2              JUROR:  Odeh.

 3              THE COURT:  Odeh.  Thank you.

 4              JUROR:  You're welcome.

 5              Currently I live in Westchester.  I'm married.

 6              I work at Home Depot as a sales specialist; so I

 7    design window treatment.  And my husband work for Miracle

 8    Security.

 9              THE COURT:  Very good.

10              And Ms. Roscio.

11              JUROR:  Very good.

12              THE COURT:  Lucky.

13              JUROR:  You know, my occupation is registered medical

14    assistant.  But I'm also a caterer.  And I'm in school for my

15    dietician and nutrition degree.

16              I live at home with, actually, my wife.  Go New York.

17              She is an executive director at City Harvest, you

18    know, managing many different aspects of interdepartments,

19    including nutrition education programs and agency relations.

20              THE COURT:  Did you say where you lived?

21              JUROR:  Oh, Tarrytown, New York.

22              THE COURT:  Tarrytown.  Thank you very much.

23              All right.

24              So, ladies and gentlemen, at this point counsel get to

25    exercise what are called peremptories challenges.  That means

C7GVSTO1                          Voir Dire

1    they can remove from the jury three persons per side for any of

2    a very wide variety of reasons.  And you should not speculate

3    as to why counsel excuses one person or another.

4              We do this in rounds.  So in each round, counsel has

5    one peremptory challenge, so we'll start with the first round,

6    one challenge for each side.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C7gesecv2                          Voir dire

| 1 | THE DEPUTY CLERK:  Your Honor, Jurors 5, Kelly Golden,

2  and 1, Thomas Vidmar, are excused.  Please come up, get your

3  cards and return to the main jury room.

4          Juror No. 1 is now Travis Dawson, last name

5  D-A-W-S-O-N.  Mr. Dawson, please come up and take the first

6  seat in the front row of the jury box.

7          And Juror No. 5 is now Maureen Dillon, last name

8  D-I-L-L-O-N.  Ms. Dillon, first seat in the second row, please.

9          THE COURT:  Mr. Dawson, you heard my general questions

10  before.  Any of those that you need to answer?

11          JUROR:  No, sir.

12          THE COURT:  Then tell us about yourself.

13          JUROR:  I'm from the Bronx.  I live at home with my

14  mom, my grand mom, my uncle.  I'm a stylist at Clamont Cove

15  (phonetic) retail store.  I sell clothes and currently go to

16  Baruch College, studying corporate communications.  And that's

17  it.

18          THE COURT:  Good.  Ms. Dillon, you heard my general

19  questions.  Any of those you need to respond to?

20          JUROR:  No.

21          THE COURT:  Tell us about yourself.

22          JUROR:  I live in Westchester County.  I teach math

23  and science to fifth grade students.  I live with my husband,

24  who is an attorney.

25          THE COURT:  What kind of law does he practice?

C7gesecv2                        Voir dire

1          JUROR:  He does international maritime.

2          THE COURT:  Okay.  Counsel, exercise their second

3     round of challenges, one challenge per side.

4          (Pause)

5          THE DEPUTY CLERK:  Your Honor, Jurors 5 and 8.  5 is

6     Maureen Dillon and 8 is Ms. O'Dey, are excused.  Please come

7     up, get your cards and return to the main jury room.

8          Juror No. 5 is now Aaron Katz, last name K-A-T-Z.

9     Mr. Katz, please come up and take the first seat in the second

10    row.  Might be easier if you walk along the front of the jury

11    box.

12         And number 8 is Anthony Rondinone, R-O-N-D-I-N-O-N-E.

13    Please come up and take the fourth seat in the second row.

14         THE COURT:  Mr. Katz, you heard my general questions.

15    Any of those you need to respond to?

16         JUROR:  Yes, your Honor.  I used to work for the

17    federal government and the Assistant United States Attorney in

18    this district.

19         THE COURT:  Well, you have my condolences.

20         And when did you leave?

21         JUROR:  2000.

22         THE COURT:  And what do you do now?

23         JUROR:  Now I run a small investment fund, but until

24    January 1st of this year, this is the second responsive

25    question, I worked at Credit Suisee.

C7gesecv2                        Voir dire

1            MR. KEKER:  I couldn't hear that.

2            THE COURT:  He worked for Credit Suisse until six

3    months ago.  So I think on that ground we need to excuse you.

4    Thank you very much.

5            THE DEPUTY CLERK:  Juror No. 5 is now Susan Bowers,

6    B-O-W-E-R-S.  Ms. Bowers, please come and take the first seat

7    in the second row.  I'm sure there must be a seat or two

8    available now, if people would move closer together so other

9    people could sit down.

10           THE COURT:  So, Ms. Bowers, you heard my general

11   question.  Any of those you need to respond to?

12           JUROR:  No.

13           THE COURT:  Tell us about yourself.

14           JUROR:  I own a small business in Bedford.  I live in

15   Westchester with my husband.

16           MR. KEKER:  Sorry, your Honor?

17           THE COURT:  Can you speak a little louder.

18           She said she owns a small business in Westchester

19   where she lives with her husband.

20           JUROR:  My husband worked for Merrill Lynch for 23

21   years as an investment banker and currently works at Bethly

22   Associates.

23           THE COURT:  And is there anything about his occupation

24   that makes you think you could not serve as a fair, impartial

25   juror?

C7gesecv2                    Voir dire

1              JUROR:  No.

2              THE COURT:  Okay.  And what kind of small business do

3    you run?

4              JUROR:  It's a retail firm called Ozienty (phonetic).

5              THE COURT:  What does it sell?

6              JUROR:  Clothing, jewelry accessories.

7              THE COURT:  Okay.  Probably going to get this wrong.

8    Mr. Rondinone?

9              JUROR:  Yeah.  Good.

10             THE COURT:  So you heard my general questions.  Any of

11   those you need to respond to?

12             JUROR:  Nope.

13             THE COURT:  Tell us about yourself.

14             JUROR:  I live in the Bronx, and I'm a musician.

15             THE COURT:  And what do you play?

16             JUROR:  I play guitar and I sing.

17             THE COURT:  Are you single or married?

18             JUROR:  Single.

19             THE COURT:  And do you have a significant other?

20             JUROR:  Nope.

21             THE COURT:  Very good.  Okay.  Counsel, exercise their

22   final round of challenges, one challenge per side.

23             (Pause)

24             THE DEPUTY CLERK:  Your Honor, Jurors No. 9, Susan

25   Rotio, and 5, Susan Bowers, are excused.  Please come up, get

C7gesecv2                           Voir dire

1    your cards.  You will be returning to the main jury room.

2              No. 5 is now Colleen Laware, L-A-W-A-R-E.  Please come

3    up and take the first seat in the second row of the jury box.

4              No. 9 is now Beverly Criner, last name C-R-I-N-E-R.

5    Ms. Criner, if you will come up and take the fifth seat in the

6    second row of the jury box.

7              THE COURT:  Ms. Laware, you heard my general questions

8    before.  Any of those you need to respond to?

9              JUROR:  Just one to let you know my position in the

10   financial services industry.  I'm a CPA.  I work for

11   PriceWaterhouseCoopers as a manager in their financial

12   instrument and structure products and real estate group.  I do

13   valuation services and structuring for fixing home products,

14   primarily mortgage backed securities, CDOs and CLOs.

15             THE COURT:  Come to the side bar with counsel.

16             (At side bar)

17             THE COURT:  So, the evidence in this case is going to

18   involve evidence about the structuring of CDOs and how they

19   were represented then to investors.  So obviously you have some

20   knowledge that is relevant, but if you're a juror on this case,

21   you'll have to judge this case just on what's presented here in

22   court.

23             So with that introduction, so to speak, are you

24   confident that you can be a fair and impartial juror?

25             JUROR:  Definitely be fair and impartial.

C7gesecv2                    Voir dire

1              MR. KEKER:  Your Honor, I couldn't hear where she

2       works.

3              THE COURT:  PriceWaterhouse.

4              MR. KEKER:  I heard CPA, just didn't get the first

5       part.

6              THE COURT:  So anything else counsel want to ask this

7       juror?

8              MR. KEKER:  And I didn't hear if you worked in

9       structured products.  Did you work with CDOs, with

10      collateralized --

11             JUROR:  Yes.

12             MR. KEKER:  And have you participated in reviewing

13      offering memoranda?

14             JUROR:  Yes.  I've worked in structuring them as the

15      accountant side, and I also do valuation work for them, which

16      includes reading offering memorandums and indentures and

17      modeling services.

18             THE COURT:  All right.  Go back to your seat, and I

19      need to talk to counsel just for a minute.

20             (Juror excused)

21             MR. KEKER:  She's fine with us.

22             MR. INFELISE:  No, your Honor.  I think what we have

23      is an expert in the jury box.  She said --

24             THE COURT:  I'm sorry?

25             MR. INFELISE:  I know what she said, she'd be able to

C7gesecv2                         Voir dire

1    set aside and listen to evidence, but I think it would be

2    impossible for her to divorce what she's done and knows about

3    from what she hears.  And I'm really concerned that what we've

4    done is we've put into the jury box an expert who the other

5    jurors would look to for guidance on these matters.

6            THE COURT:  Well, I don't see that it's any different

7    from -- you get attorneys all the time who are in one sense

8    experts on the law, but the jury always is able -- after the

9    lawyer has said that he understands he has to follow the

10   Court's instructions of the law, the jury is always able to

11   deal with the Court's instructions of law without deferring to

12   the attorney.

13           So I don't see why that's any different in the case of

14   an accountant.  Particularly because you don't have any

15   peremptory challenges left, I do want to give you both the

16   opportunity to question her.  But she is confident she can be a

17   fair and impartial juror.  She told me she fully understood the

18   need to put aside her prior experiences and judge this case

19   purely on what's presented.  The law does not say that to be a

20   fair and impartial juror you have to be an ignoramus.  So --

21           MR. INFELISE:  I understand that, your Honor.  And I

22   think it's different with lawyers, too, because lawyers

23   understand their role and what they can't do.  But you have a

24   person here who's -- she said, looking off of circulars,

25   analyzing these very instruments.  I think it difficult, if

C7gesecv2                    Voir dire

1   almost impossible, regardless of her best intentions, to set

2   that aside.

3           THE COURT:  Well, if your case is what you allege it

4   to be, she should be the first one to recognize the problems

5   that you're alleging.  I'm going to keep her.

6           MR. INFELISE:  All right, Judge.  Thank you.

7           (In open court).

8           THE COURT:  So, Ms. Laware, tell us the rest about

9   yourself.

10          JUROR:  I live in Westchester County with my husband.

11  And he runs the operations for a small investment management

12  firm in White Plains.

13          THE COURT:  And is there anything about his occupation

14  that would prevent you from being a fair and impartial juror in

15  this case?

16          JUROR:  I don't think so.

17          THE COURT:  Okay.  Ms. Criner, is it?

18          JUROR:  Criner.

19          THE COURT:  Criner, thank you very much.

20          You heard my general questions.  Any of those "you

21  need to respond to?

22          JUROR:  No.

23          THE COURT:  Tell us about yourself.

24          JUROR:  I live in Harlem, Manhattan.  I work at Harlem

25  hospital as a clinical X-ray technologist.  And I'm divorced.

C7gesecv2                        Voir dire

1          THE COURT:  Okay.  Very good.  So, ladies and

2     gentlemen, you are our jury to try this case.  Now we're going

3     to swear you in in a minute.  But before we do that, let me

4     give you some housekeeping instructions.

5          First, you should not discuss this case in any way,

6     shape or form with anyone outside of this courtroom, other than

7     if you have to tell an employer or a spouse, I'm going to be on

8     jury duty for three weeks.  That's fine.  But when they

9     inevitably say to you, gee, what's the case about, you have to

10    say to them, I'm sorry but I can't discuss the case with you.

11         The reason for that is obvious.  We want you to decide

12    this case solely and wholly on the evidence you hear right here

13    in court, not on the views that someone who hasn't been here

14    might have about the case.

15         So don't discuss the case.  Don't try to find out

16    anything about the case by Googling or anything else.  We want

17    you to address this case solely and wholly on the evidence

18    heard here in court.

19         The second housekeeping rule is maybe not so obvious.

20    You should not discuss the case even among yourselves until the

21    close of all the evidence, until you've heard my instructions

22    of law, and then the case will be given to you for your

23    decision.  And the reason for that is the evidence is going to

24    come in one little bit at a time.  And we want you to have the

25    whole picture before you start making up any opinions about the

C7gesecv2                        Voir dire

1   case.  So one way to help you keep an open mind, so to speak,

2   until the close of all the evidence is to ask you not to

3   discuss the case even among yourselves.

4         And the third rule is really more for the lawyers and

5   witnesses than for you, but just to make you aware of it, they

6   are under very strict instructions to have absolutely no

7   contact with you.  So if you are in the elevator and one of the

8   lawyers happens to be there and he or she doesn't even smile or

9   say hello, they're not being rude.  They're under very strict

10  instructions to have no contact with you whatsoever.

11        And finally, every once in a while a case comes along

12  that is the subject of commentary in the press or something

13  like that.  I don't know if that will be true in this case or

14  not, but if by any chance you're looking at a newspaper on the

15  web or something and you see something about the case,

16  immediately turn away, turn the page, turn to another program,

17  whatever it is, because, again, we want you to judge this case

18  solely and wholly on what you hear right here in court.

19        So we're going to swear you in.  We're going to take

20  you back to the jury room so you become familiar with it.

21  That's where you'll come in each morning and each afternoon,

22  and then we're going to bring you back in about ten minutes to

23  hear opening statement of counsel before we break for lunch.

24  So we'll swear the jury.

25        (Jury sworn)

C7gesecv2                          Voir dire

1            THE DEPUTY CLERK:  Please follow me into your jury
2      room.
3            (Jury excused)
4            THE COURT:  All right.  Please be seated, if there is
5      a seat available.  Counsel, please be seated.
6            So to the members of the jury panel who were not
7      chosen, first of all, my congratulations on dodging a bullet.
8      But you're not totally off the hook yet.  You should go down to
9      the same room you came, up from on the first floor.  And we'll
10     send your cards along with one of you.  And, of course, there's
11     still a possibility you may be chosen for another jury.
12           But I want to thank you all for being available for
13     jury service.  We never know how many prospective jurors we
14     will need, so you have the gratitude of the Court, and you are
15     excused at this time.
16           (Jury panel excused)
17           THE COURT:  All right.  I know we have some summer
18     interns here from Fried Frank.  Welcome, and I'll have an
19     opportunity to talk briefly with you in a minute.
20           Since we're right on schedule, I will allow, for
21     opening statements, counsel to have up to 40 minutes, if they
22     want it, but not 41.
23           Now, there was one other matter concerning opening
24     statements that the SEC wanted to voice.
25           MR. INFELISE:  Yes, your Honor.  We have one objection

C7gesecv2                    Voir dire

1    to one of the demonstratives that Mr. Stoker indicates he's

2    going to --

3              THE COURT:  Yes.  Can we put it on the screen?

4              MR. INFELISE:  Please.  And specifically, we are

5    objecting to the left box, which identifies a various army of

6    lawyers.  As Mr. Stoker has admitted, and conceded, we are not

7    raising advice of counsel and, in fact, have conceded that

8    there was no opinion upon which he could have relied.  And I

9    raised this during the motions hearing, your Honor.

10             But having said that, I don't understand the relevance

11   of identifying seven different law firms on this demonstrative.

12   Certainly they were not investors.  Certainly they're not the

13   individuals buying the protection on CDOs.  The only thing this

14   does, your Honor, is, again, raise the very specter that I was

15   concerned with.

16             THE COURT:  I agree.  Let me hear from your adversary.

17             MR. KEKER:  Your Honor, this is a negligence case.

18   You said last week that custom and practice was important.  One

19   of the ways you determine negligence and custom and practice is

20   to look at the context in which work is being done.  The point

21   of this slide, and this is the only point of the slide, is that

22   this was a transaction in which many, many people and their

23   lawyers were looking, studying, asking questions, doing due

24   diligence.  And when you think from the point of view --

25             THE COURT:  Unless your client had any reason to

C7gesecv2                    Voir dire

1   believe that the specific acts that he took and the specific

2   communications that he made were shown to lawyers for their

3   opinion, and I've seen no evidence of that --

4           MR. KEKER:  That's just not the point.

5           THE COURT:  I understand it's not the point, and

6   that's why we're excluding this.  That whole box will be

7   removed.

8           Anything else?

9           MR. INFELISE:  And one other matter, your Honor,

10  before we begin examination.  Since the Court ruled that we

11  will be allowed to lead the witnesses we call, at least the

12  ones we've identified as identified with an adverse party, is

13  Mr. Keker then restricted to doing direct examination during

14  his what otherwise would be cross-examination?

15          THE COURT:  No.

16          MR. INFELISE:  All right.  Thank you.

17          THE COURT:  He can lead as well, those witnesses we're

18  talking about.

19          All right.  So if counsel wants to take a five-minute

20  break while I talk to the summer interns from Fried Frank,

21  you're welcome to.  And just be back here in five minutes.

22          (Recess)

23          (Continued on next page)

24

25

C7gesto3

 1              (In open court; jury present)

 2              THE COURT:  So ladies and gentlemen, we're about to

 3     hear the opening statements of counsel.

 4              Now, I want to caution you that nothing that counsel

 5     says is evidence.  The evidence is going to come from just

 6     three sources:  There will be witnesses who will testify; there

 7     will be exhibits, mostly documents that will be received in

 8     evidence; and every once in a while the parties may have what

 9     they call a stipulation, where they agree that a particular

10     fact is true and you can consider that as evidence.  Those are

11     the only sources of evidence.

12              So why do we even have opening statements?  Well, as I

13     mentioned when you were being chosen, the evidence comes in one

14     little bit at a time.  And so it may be useful for you to hear

15     the views of counsel as to what they believe the evidence will

16     prove or not prove, as the case may be.  This is just their

17     prediction and may turn out to be wrong.  They will both, of

18     course, have very different views as to what they expect the

19     evidence to show.  But it still may be useful for you to have

20     this kind of road map as to what each side thinks they will

21     show or will not show, as the case may be.

22              So, the party that bears what is called the burden of

23     proof -- and I'll explain that to you later, but basically it

24     means that the party that has to show that it's more likely

25     than not that the facts that they assert are true are true --

C7gesto3

1     is the SEC.  So we will begin with the counsel for the SEC.

2              MR. INFELISE:  Thank you, your Honor.

3              Ladies and gentlemen, this case is about how this

4     defendant, Brian Stoker, misled investors when he encouraged

5     them to put their money into an investment that he and his

6     employer, Citigroup, intended for Citigroup to be able to make

7     a profit at the expense of those same investors.

8              You'll see evidence that on February the 28th of 2007

9     a security that was called Class V Funding III came into

10    existence.  Class V Funding III, or Class V III, was what was

11    known as a collateralized debt obligation, CDO for short.  And

12    you'll see evidence that that CDO had assets that were valued

13    at over $1 billion.

14             You'll also see evidence that several investors put

15    money into that investment, approximately $850 million.  And

16    the evidence will also show, ladies and gentlemen, that on

17    November 19, 2007, barely nine months after it came into

18    existence, Class V III was declared in default and the

19    investors lost almost every penny they put into it.

20             We will demonstrate, ladies and gentlemen, that the

21    defendant, Brian Stoker, deceived and defrauded investors to

22    put their money in a Class V III.  We'll show that in three

23    ways:  First, we'll present evidence that Mr. Stoker helped

24    devise Class V III, and he did that knowing, or he reasonably

25    should have known, that it was intended by Citigroup as a means

C7gesto3

1    of profiting at the expense of the very investors who they were

2    soliciting put money into it.

3              We will also show that Mr. Stoker, the defendant,

4    participated in preparation of the offering materials for

5    Class V Funding III, and that at the time he did that, he knew

6    or reasonably should have known --

7              THE DEPUTY CLERK:  Is someone standing on a wire

8    maybe?

9              MR. INFELISE:  That he knew or reasonably should have

10   known that it contained untrue statements of fact and omissions

11   of material fact about two critical items.  The first was that

12   Citigroup had a significant role in selecting assets for

13   Class V III.

14             THE DEPUTY CLERK:  I think I'm going to have to turn

15   off the wireless mic.

16             THE COURT:  It typically is someone at the first table

17   who -- there are wires, unfortunately, going under your feet,

18   so just be careful.  Let's try it one more time.

19             MR. INFELISE:  Okay.  From the top, as I said, we will

20   show that there were two things that Mr. Stoker did not -- was

21   not disclosed about Class V Funding III:  The first was that

22   Citigroup played a significant role in selecting the assets

23   that went into Class V III; and second, that Citigroup then

24   placed a $500 million bet that those very assets would not

25   perform well, they would perform poorly; in fact, that they

C7gesto3

1    would default.

2            And third, you're going to see evidence or hear

3    testimony and see evidence that the defendant then used those

4    marketing materials that he knew or reasonably should have

5    known contained untrue statements and omissions of fact to

6    solicit investors for Class VIII.

7            As I said, the investors in Class V III lost almost

8    everything they put into it, but there were some winners.  One

9    of those winners was Citigroup, defendant's employers.  And

10   they won in two ways:  First, they were paid a fee for putting

11   the deal together, and in marketing, that fee was approximately

12   $34 million.

13           But Citigroup was a big winner for another reason.

14   And even though the investors who put their money in

15   Class V III lost every penny, Citigroup made hundreds of

16   millions of dollars, because they made a bet against the

17   performance of the very assets that they asked to be included

18   in that security.

19           And Citigroup made this bet by taking what was known

20   as a short position on those assets.  And that short position

21   basically meant that if the assets at Citigroup recommended for

22   inclusion performed poorly, that they defaulted, they could

23   make $500 million.

24           And Citigroup didn't make a $500 million bet on just

25   any assets.  They didn't pick those assets randomly from the

C7gesto3

1    ones that went into Class V III.  What they did was they made

2    that bet against the very assets that they recommended for

3    including.  Those are the assets they bet against.

4           And you'll hear evidence, ladies and gentlemen, that

5    the assets that Citigroup selected defaulted at a higher rate

6    than the other assets they could have selected.  And they

7    defaulted faster than the other assets it could have selected

8    and the other assets in Class V III.  The result was that

9    Citigroup made hundreds of millions of dollars and the

10   investors lost almost everything.

11          Now, you are not being asked to determine Citigroup's

12   liability for their role in Class V III, and you're not being

13   asked to determine whether anybody else is liable for their

14   role in Class V III.  The question to you, ladies and

15   gentlemen, is if Brian Stoker violated security laws because of

16   his role in Class V III.

17          This case is about Brian Stoker.  This case is about

18   how the defendant helped put together, helped structure

19   Class V III, even though he knew or reasonably should have that

20   it was intended by his employer, Citigroup, to profit at the

21   expense of the investors who would invest in that security.

22   And this is about how Brian Stoker as the deal manager for

23   Class V III did not ensure that the offering materials, the

24   materials used to market the CDO to investors, adequately

25   explained the two facts that I have stated before:  First, that

C7gesto3

1    Citigroup had a significant role in selecting assets for this

2    security; and second, that they then took, placed a

3    $500 million bet against the performance of those very assets.

4    The result, ladies and gentlemen, is that Class V III operated

5    as a fraud on investors.  And we're asking you to hold the

6    defendant responsible for that.

7           Now, if we could, Ms. Peterson, Mr. Feller and I would

8    put one witness on that witness stand and they'd tell you the

9    story of this case from the beginning to the end.

10   Unfortunately, we can't do that for several reasons.  The first

11   is the law requires that a person can only testify from their

12   own personal knowledge.  And second, some of the evidence that

13   you're going to receive is not in the form of testimony.  It's

14   contained in documents.  And third, because of the availability

15   of witnesses, the evidence might not be presented to you in the

16   most logical order.

17          But we will prove our case, ladies and gentlemen,

18   first from the testimony of live witnesses who will take the

19   stand, and they will testify to you from their personal

20   knowledge and their involvement in Class V III.

21          We will also produce documents, including e-mails,

22   about Class V III.

23          And third, we're going to present the testimony of

24   three experts:  The first of those is Professor Dwight Jaffee.

25   Professor Jaffee is presently a professor of finance and real

C7gesto3

estate at the University of California at Berkley.

Then we will present testimony from Mr. Robert MacLaverty.  Mr. MacLaverty has 19 years of Wall Street experience.

And finally, you're going to hear from Dr. Jonathan Neuberger.  Dr. Neuberger is an economist who has spent 20 years analyzing and modeling financial instruments.

As I said, Brian Stoker was an employee of Citigroup. And in 2006/2007 he was assigned to what was known as the CDO group.  Now, the CDO group had two coheads.  And one of those was Mr. Nestor Dominguez.  You're going to hear testimony from Mr. Dominguez in this case.  And under Mr. Dominguez are three sections, or what they call three desks.

The first desk is called the syndicate desk.  The head of that desk was Mr. Shalabh Mehrish.  Mr. Mehrish will also be a witness in this case.

The second desk in the CDO group was what was known as secondary trading desk.  The head of that desk was Mr. Donald Quintin, often referred to as DQ.  And one of the individuals that worked for Mr. Quintin was an individual by the name of Brian Carosielli.  Both Mr. Quintin and Mr. Carosielli will testify in this case.

And the third desk was the structuring desk.  The structuring desk was headed up by Mr. Darius Grant.  Mr. Grant will also be a witness in this case.  And he was immediate

C7gesto3

1    supervisor of the defendant, Brian Stoker.

2           Brian Stoker was a director at the structuring desk,

3    and he was assigned as what was known as the deal manager for

4    various CDOs that CDO group was putting together.  And as the

5    deal manager, he had overall responsibility for that particular

6    CDO.  So even though other individuals who worked on the

7    structuring desk may have been assigned to work on it,

8    ultimately the responsibility for that CDO was Mr. Stoker's.

9           And included in his responsibilities as a deal

10   manager, Mr. Stoker was responsible for executing the deal and

11   also the preparation of the offering materials, the documents

12   that were actually used to market the CDO to investors.  And

13   you're going to hear testimony that they used primarily two

14   documents to do that:  One what was known as a flip book and

15   the other was called the offering circular.

16          Ladies and gentlemen, as it's clear at the heart of

17   this case is a CDO called Class V III.  As I said, it was what

18   was known as the CDO.  And in very simple terms, CDO is simply

19   a security that contains other assets.  You could think of it

20   as a bucket.  CDO is a bucket, and other assets are put into

21   it.

22          Now I'm not going to try to explain it to you.  CDOs,

23   I will leave that to Professor Jaffee.  He will explain what a

24   CDO is and how it works in clear, simple terms.  But I'd like

25   to take this opportunity to just give you a brief overview of

C7gesto3

1    the CDO that's at issue in this case, Class V III.

2              Over $869 million of the assets in Class V III were

3    what were called synthetic assets.  That simply means that the

4    CDO didn't own them.  They had a pool of what was known as

5    referenced assets.

6              Now, in a synthetic CDO, such as Class V III, there's

7    two major parties.  The first is what's known as the protection

8    buyer.  And the protection buyer basically places a bet that

9    certain assets in a referenced pool won't perform very well; in

10   fact, bets that they will default.  And they do that by paying

11   a premium to the CDO.  And in return, the CDO agrees that the

12   protection, what's known as the protection seller agrees that

13   it will pay to the protection buyer the total amount of

14   protection they purchased if, in fact, the CDO defaults.  And

15   since ultimately the investors' money is used to make that

16   payment, actually then the investors are the protection

17   sellers.

18             The evidence will show, ladies and gentlemen, that, as

19   I said, the defendant helped devise Class V III when he knew or

20   should have known that, in fact, it was going to be used by

21   Citigroup as a means of profiting at the expense of investors.

22             You're going to hear evidence that in the fall of

23   2006, Citigroup began to see an increased demand for protection

24   on CDOs.  There were a lot of protection buyers out there.  But

25   they weren't interested in buying protection for just any CDO.

C7gesto3

These protection buyers for the most part were looking for

particular groups of CDOs.  And one of those groups was known

as constellation CDOs.  They were called that because they were

named after the constellations, like Virgo or Orion.

          Another group for which there was a strong demand were

what was known as president CDOs, or president deals,

particular three names:  With Jackson, Buchanan and Baldwin.  I

don't know who Baldwin was; I didn't know that was a president.

But those are the three names:  Jackson, Buchanan and Baldwin.

          And as a result of the demand that Citigroup received,

the CDO group decided they were going to structure, put

together a CDO for two reasons.  The first reason was to meet

that demand, to put together a CDO, for investors to market it.

That was their role.

          They had another reason.  The reason was Citigroup

wanted to put this together so it could purchase protection on

some assets, so Citigroup could place a bet against the

performance of those assets.

          And you're going to hear evidence, ladies and

gentlemen, that the defendant, Brian Stoker, knew that or was

negligent in not knowing that.  In fact, you're going to hear

evidence that in early October the defendant was approached by

Donald Quintin from the secondary trading desk and asked to

structure a CDO for the specific purpose of allowing

Mr. Quintin to buy protection on certain assets.

C7gesto3

1          Then you're going to see evidence that Mr. Stoker

2     began to act on that request almost immediately.  You'll see

3     evidence that on October the 23rd of 2006 Mr. Stoker put

4     together an analysis showing what profits Citigroup could make

5     from shorting, or taking a short position, or buying protection

6     on zero, 50 and 100 percent of the assets in the CDO.

7          You're also going to see evidence that on -- before

8     that on October 23rd Mr. Quintin actually sent a wish list of

9     assets, 21 names, to Mr. Stoker indicating he wanted to buy

10    protection on these assets.

11         And on November the 1st, 2006, you'll see evidence

12    that that -- Mr. Quintin's wish list was forwarded from the

13    defendant to an individual by the name of Sohail Khan.

14    Mr. Khan will testify.  He was a salesperson at Citigroup who

15    actually covered certain clients.  And on that same day, the

16    evidence will show Mr. Khan forwarded that list to Credit

17    Suisse, and Credit Suisse referred to it in this case as CSAC.

18    And the reason Mr. Khan sent that to Credit Suisse was because

19    Citigroup wanted CSAC to act as the asset manager for the CDO.

20         And the reason they wanted that is because they knew,

21    they knew that it would be easier to market this to investors

22    if they said they had an asset manager, because investors

23    wanted an asset manager in the CDOs.  They wanted someone

24    independent who actually picked the assets.  They wanted

25    someone who didn't have a stake in whether those assets

C7gesto3

performed well or poorly to pick them for them.  In fact, you

could say that perhaps the most important role of the asset

manager was to select the assets that were going into a CDO.

        You'll hear evidence, ladies and gentlemen, that at

this time frame defendant knew or reasonably should have known

that Citigroup didn't want CSAC to pick all the assets.  And

you'll see evidence that Stoker believed, in fact, that CSAC

would not pick all the evidence.  And some of that evidence is

from the very procedures that were used to get that wish list

from Donald Quintin to their potential asset manager, CSAC.

        You'll hear evidence that it was not the normal

procedure for Mr. Stoker to send a list of potential assets to

someone in sales.  You'll hear evidence that it was not the

normal procedure for Mr. Stoker to make recommendations of

specific names that would go into a CDO.  In fact, you'll hear

evidence that Mr. Stoker normally did not really have any

concern with the specific names that went into an asset.

        But more than that, ladies and gentlemen, you'll hear

that two days after Mr. Stoker -- that list was sent by

Mr. Stoker to Mr. Khan, November the 1st, and forwarded to

CSAC, Mr. Stoker stated expressly that he didn't believe CSAC

would pick all the assets.  Because you'll see, ladies and

gentlemen, an e-mail dated November 3, 2006.  And in that in

response to an inquiry from his supervisor, Darius Grant, who

asked the defendant whether or not this CDO was going to get

C7gesto3

1    done, defendant said this:  I hope so.  This is DQ's prop

2    trade.  Don't tell CSAC.  CSAC agreed to terms, even though

3    they don't get to pick the assets.

4            Now, you'll hear further evidence on December the

5    21st, 2006, CSAC responded or sent a list of approximately 127

6    potential assets back to Citigroup.  And you'll have a chance

7    to look at that list and see what type of assets are included

8    and the names of those assets.

9            You'll hear further evidence, ladies and gentlemen,

10   that on January the 8th, 2007, Citigroup responded to CSAC and

11   said, here's 25 names that we want to purchase $250 million of

12   protection on.  On that same date, in fact, within hours, CSAC

13   acquiesced, and those 25 assets ended up in a portfolio of

14   Class V III.

15           You'll also see evidence that on January the 12th,

16   2007, Citigroup told CSAC we want to purchase another

17   $250 million for protection on those same 25 assets.  And it

18   was done.

19           (Continued on next page)

20

21

22

23

24

25

1          MR. INFELISE:   Now, Mr. Stoker's involvement in Class

2     V III didn't end when Citigroup had finished its $500 million

3     bail.  You'll see evidence that as the deal manager for Class V

4     III, Mr. Stoker participated in preparation of the marketing

5     materials.  In fact, the evidence will show that he was

6     basically the focal point for that information.

7          And you'll hear evidence that the standard practice at

8     this time, early 2007, when Citigroup was putting together one

9     of these CDOs, and it would kind of put together the offering

10    materials, they would look to a deal that they had already

11    done, take those documents, and use them as a format or a

12    template for the new deal.  But someone had to make sure that

13    if there was any differences in the deal, it would be noted.

14    So if the new deal wasn't the same as the old deal, then the

15    offering materials should reflect that.  That was the

16    defendant's responsibility.  The evidence will show that, in

17    fact, he was tasked with that.

18          You'll have a chance, ladies and gentlemen, to look at

19    the new documents that were used to market Class V III, the

20    flip book, the offerings circular.  And you'll see what they do

21    say is that CSAC was the asset manager.  And they say

22    repeatedly that the asset manager selected the assets for its

23    CDO.  What they don't say is that Citigroup played any role in

24    selection of any assets.  And they don't say that Citigroup

25    then bought $500 million protection on those same assets.

1        When you're looking at the offering circular in the

2   flip book during your deliberations, we'd ask you to think

3   about the statement that Mr. Stoker made back on November the

4   3rd, and compare what he said with what was in the offering

5   circular.  And as you'll recall, what he said about this was

6   CSAC agreed to the terms, even though they don't get to pick

7   the assets.

8        Then look at the offering circular.  For example, Page

9   108, where there's a description of what is being said about

10  selection of assets.  And it says the manager will select the

11  portfolio of eligible collateral debt securities to be acquired

12  by the issuer.

13       And you'll also see evidence, ladies and gentlemen, or

14  hear testimony, that the defendant actually did make some edits

15  or proposed changes to the offering circular for Class V III.

16  He made no changes to reflect that Citigroup had a role in

17  selecting assets.  And he recommended no changes to reflect

18  that Citigroup had, in fact, taken a $500 million position, a

19  short position, on those very assets.

20       The result, ladies and gentlemen, was that the flip

21  book and the offering circular did not disclose information

22  that any reasonable investor would want to know before they

23  invested in this security, or at least how much they were going

24  to invest.

25       Again, Mr. Stoker's involvement didn't end there.

1          You will hear evidence that in addition to his work on

2     putting together Class V III, creating it, and his role in

3     preparing the documents, the offering materials for Class V

4     III, he also had a role in marketing.  And even though he had

5     information that Citigroup participated in selection of the

6     assets, and even though he knew that Citigroup -- or reasonably

7     should have known that Citigroup had made a bet against those

8     assets, and even though he knew those offering circulars didn't

9     disclose that, the evidence will show that the defendant

10    actively marketed this CDO to investors.

11          You'll see evidence that on February the 6th, 2007, he

12    sent an email to potential investors, along with the flip book

13    for Class V III.  And in it he said:  Here's a top-of-the-line

14    CDO squared for you.

15          You'll also hear evidence that on February the 12th,

16    2007, the defendant sent a draft of the offering circular to

17    David Salz at Ambac Financial.  Ambac ultimately became the

18    largest investor of Class V III, to the tune of $500 million.

19          Ladies and gentlemen, we're confident that when you've

20    had a chance to hear all the testimony, had a chance to look at

21    all the evidence, you will find by a preponderance of the

22    evidence that we have proven that Brian Stoker made untrue

23    statements and material omissions to investors; and that he

24    knew it was negligent not knowing that those statements were

25    untrue; and that there were omissions of material fact; and

C7GVSTO3                         Opening - Mr. Infelise

1    that he obtained money or property by using those statements.

2           We're also confident you'll find by a preponderance of

3    the evidence that Defendant Stoker played a central role in the

4    creation and marketing of Class V III; and that he knew, was

5    negligent in not knowing, that that security, Class V III,

6    would operate as a fraud upon investors.

7           Thank you.

8           THE COURT:  Thank you very much.

9           Now we'll hear from counsel for the defendant.

10          MS. KEKER:  Good morning again, ladies and gentlemen.

11          The SEC showed you one email twice.  Their entire case

12   depends on that email.  That's the CSAC agreed, even though

13   they didn't pick the assets.  It's dated November 3rd, 2006.

14          The evidence will show that at that time at Citigroup

15   and outside of Citigroup, a lot of ideas were being explored

16   about putting together a deal to take advantage of all the

17   demand for buying and selling in this CDO market.  Those ideas

18   in November, the evidence is going to show, came to nothing.

19   Absolutely nothing.  Later -- the deal fell apart.  All those

20   deals fell apart.

21          Later, in December, another deal did come together,

22   and that's the deal between Credit Suisse Alternative Capital,

23   which we're calling CSAC, as the manager, and Citigroup, the

24   bank.  That deal was for Citigroup to pick the assets of a CDO

25   squared.  We'll get into what the difference between that is,

1    of a CDO squared.  And on December 21st, 2006, that's what

2    happened.

3           CSAC sent over a list of 125 CDOs, because a CDO goes

4    into the -- what goes into that bucket in a CDO squared or

5    other CDOs, said we can work with any of these; we're willing

6    to manage any of these.  They are all CDOs that we worked with

7    before, that we know, that we've analyzed.  We'll do that.  And

8    later, that became Class V III.  The deal was signed up finally

9    on January 10, 2007.

10          Nothing emphasizes more Judge Rakoff's admonition to

11   keep an open mind until you've heard all the evidence than what

12   I just told you about that email and CSAC picking the assets.

13   Because the SEC is not going to call the people at CSAC, the

14   three CDO managers that picked the assets.  They are not going

15   to call them in their case.  You're going to have to wait for

16   our case to hear from the people who actually did that work

17   which they say didn't happen.

18          That's not the only conflict between what they think

19   the evidence will show and what we think the evidence will

20   show.

21          And finally, you're going to decide what the evidence

22   shows.

23          But one of the things is the evidence is going to show

24   that Class V III was not set up to take advantage of a short

25   position or protection buyer position in the housing market or

C7GVSTO3                      Opening – Mr. Keker

1    to bet on defaults or to bet against the housing market because

2    people thought it would fail.  Instead, it was set up to take

3    advantage of tremendous demand at that time to be on either

4    side of these bets where there was great risk and great reward

5    for Citigroup customers who wanted to buy one side or other

6    side.

7            Second, Ambac and the other investors were not misled.

8            You're going to hear one of the witnesses will be an

9    Ambac person who put together this deal.  They have as much

10   access to and they knew as much about these assets as Citigroup

11   did.  In fact, a lot of the investors, most of the investors in

12   Class V III, were other CDO managers, like CSAC.  The people

13   who were buying and selling for their own account or to put

14   CDOs into their CDO squareds, they owned a lot of them already;

15   they traded in them.  There's nothing here about secret or

16   inside information.

17           And then third, these investors knew that if they sold

18   protection to the CDO, betting that the price would rise,

19   taking what we're going to call the long position, you'll hear

20   this from Professor Jaffee, they knew that Citigroup was on the

21   other side of the bet, in the short position.  They also knew

22   that it was customary for the arranging bank to have

23   conversations with the manager about what the market condition

24   was and what we could put into this so that we could sell both

25   sides.

C7GVSTO3                          Opening - Mr. Keker

1            Now, I'm talking about Citigroup.  There's a lot of

2      conversation here about Citigroup.  But we do agree with the

3      SEC that this is not a case about where you have to decide

4      whether or not you approve or disapprove of Citigroup, whether

5      or not you approve or disapprove of this kind of transaction,

6      Class V III.  It's not the bank or the transaction that's on

7      trial here, it is Brian Stoker, this man right here, who, when

8      the events occurred in this case, late 2006, early 2007, Brian

9      Stoker was 35 years old, married with three kids, and he worked

10     on the structuring desk at Citigroup.

11           You'll hear a lot of evidence in this case about other

12     people, and you'll hear -- and we've already heard some words

13     thrown around like "fraud."  But the SEC has brought a

14     negligence case.  And the issue in the case is whether or not

15     Brian Stoker did what a reasonable man working in his position

16     with his job, performing his duties in 2007.  That's the

17     question you're going -- some form of that question as the

18     judge will give to you at the end.

19           To understand the case, then, you're going to have to

20     put yourself back to more than five years, to early 2007, late

21     2006, before the housing meltdown, before anyone knew what was

22     going to happen later, before the financial crisis of 2008.  To

23     judge this case, you're going to have to evaluate the world as

24     it was then, and determine whether or not Brian Stoker was

25     reasonable in the way he did his job and understood his

C7GVSTO3                    Opening – Mr. Keker

1    responsibilities and performed them.

2            If you do that, the evidence is going to show that

3    Brian Stoker acted reasonably; that what the investors knew,

4    what he knew, and they didn't expect to know more about the

5    trading desk's intentions with various positions.  His bosses

6    and his colleagues at Citigroup all thought his conduct and

7    their own conduct with respect to this was reasonable and

8    proper.

9            So going back there, to early 2007, the demand for

10   these synthetic CDOs was increasing, because people had

11   different investors on both sides, had different ideas about

12   what was going to happen to housing.  Some people thought the

13   market was going to go up, some people thought the market was

14   going to go down.  Brian Stoker didn't know.  He bought a house

15   in 2005 which lost money later.  Certainly Citigroup didn't

16   know.  When the market collapsed, Citigroup was out, lost 40

17   billion dollars, because they didn't think the housing bubble

18   was going to blow up.

19           As I said, in 2007, the market for synthetic CDOs was

20   booming.  We agree with the SEC about this.  The synthetic CDO

21   market is high stakes, high-level gambling.  Investors were so

22   anxious to gamble about whether or not the housing market was

23   going to go up or down, that they made up bets.  That's what

24   investing in synthetic assets means.  You pick a reference

25   asset, and you say, let's bet on it.  You take one side, I'll

C7GVSTO3                      Opening – Mr. Keker

1    take the other side.  One side bets it will go up, the other

2    side bets it will go down.  The side that bets it's going to go

3    up is sometimes called long, or in the lingo of this case, the

4    protection seller position; the side that bets it's going to go

5    down is short, and in the lingo of this case, protection buyer

6    position.  They're buying insurance against it falling, the

7    other guy is selling insurance believing that he'll never have

8    to pay off the insurance policy.

9         When the bets are large, like it was in this case, a

10   billion dollars, a small change in prices can make one side or

11   the other of the bet a lot of money.  Banks, the biggest banks

12   on Wall Street, all the household names, arranged these bets

13   for their customers.  And they -- for a fee, they got a fee for

14   that.  And they participated in this betting.

15        Now, however you feel about gambling, and some of you

16   may hate it, this was legal gambling.  It was known to the SEC;

17   it was known to our Congress.

18        The evidence will show that there are two sides to

19   every bet.  In the synthetic CDO market, for every bet an

20   investor makes, someone has to be on the other side.  If

21   there's nobody on the other side, there's no deal.  So that

22   someone on the other side -- and this is, I think, an important

23   part of what the evidence is going to show.  For a synthetic

24   CDO, the someone on the other side is always, always, always

25   100 percent the arranging bank, the person -- the bank that's

C7GVSTO3                        Opening – Mr. Keker

1   putting this together.  They are on the buying protection side.

2   The reason that it always is the arranging bank is because the

3   investor putting money in to bet the other side wants a

4   creditworthy somebody there.  They don't want to have this

5   position turned over to somebody who might not be able to pay.

6   So from the beginning of the CDO to the end of the CDO, the

7   arranging bank is the one that writes those protection payment

8   checks every quarter and sends them to the CDO.

9           The evidence is going to show now that what the bank

10  does, the arranging bank does with that, bet that it's bought

11  into, protection buying side, the side that has to pay

12  quarterly into the synthetic CDO, that what it does with that

13  bet is its own business.  It can do a lot of things.  It can

14  offset all or part of the bet so that it's not in the game

15  anymore; it can keep all or part of the bet; it can treat its

16  position as a hedge.  The investors don't know and they don't

17  ask and they don't think it's their business what the bank does

18  to keep or sell its protection buying position.

19          The point is that there's always two sides to the bet,

20  and there's always sophisticated knowledgeable money in the

21  form of banks and their hedge fund customers on the other side

22  of the bet.  The investors in this market know that.

23          Now, why would an investor want to make this bet?  The

24  evidence will show that very sophisticated investors in this

25  very sophisticated market believe that there's no such thing as

C7GVSTO3                    Opening - Mr. Keker

a bad bet, there's just a bad price.

        Think about betting on football.  Last winter, for the
Giants-Patriots Superbowl, if somebody had offered you even
odds, you might say, No, I don't want to take that bet.  But as
the point spread changes, there may come a point where you say,
That sounds better; I'll take that bet.

        That's the way it is here.

        Some people like to bet on sure things; some people
like -- there's no such thing as a sure thing.  Everybody knows
about that, about gambling.  Some people like to bet on long
shots.

        But what the evidence is going to show in the
synthetic CDO market is that the bettors looked at the price --
they called it the spread, the risk versus the reward -- to
make their decisions.  They weren't betting that these CDOs
would default or fail; they were betting on whether or not the
price spread could go up or down.  And you could then change
that position.

        What will the evidence show us about who placed these
bets in the CDO market, who were the investors?  This is not
mom and pop or unknowledgeable people or retail customers.
These are the most sophisticated bettors on Wall Street.  A
firm couldn't invest on CDOs unless they are what the
Securities and Exchange Commission calls qualified
institutional buyers who control at least $100 million and are

1   deemed to be capable of making their own decisions.

2           And here, the specific bettors, buying these notes

3   from the CDO, taking the long position, included Ambac.  You're

4   going to hear from a witness from Ambac who billed itself as

5   the global leader in this business with unmatched knowledge of

6   CDOs.

7           As I've already told you, other CDO dealers who

8   already owned these, owned a lot of them, were putting together

9   their own CDOs.  And then finally, most ironically, investors

10  who waited until the market really did seem it was collapsing

11  so that they could get even a better price, some of the

12  investors bought in at when it was 57 cents on the dollar

13  rather than pay par for the notes, waited for them to go down

14  five months or so.

15          All of them were betting on price.  They thought this

16  is a good bet.  Every one of these investors and everyone on

17  Wall Street and everybody in this business knew that at this

18  point that the house -- including Brian and people at

19  Citigroup, knew that the housing market had risks.  But there

20  was a huge difference of opinion in early 2007 about what would

21  actually happen.

22          The investors, including Ambac, knew that the hedge

23  funds out there wanted to bet against them.  They knew that

24  there were a lot of smart money wanting to take the other side

25  of the bet.  They knew that the bank and the manager, in this

C7GVSTO3                        Opening - Mr. Keker

1    instance, Ambac, was told specifically that the manager has

2    consulted with Citigroup and talked about assets to go into the

3    deal and so on.  They knew that there was conversation, because

4    you can't do this without that kind of conversation.  They knew

5    that Citigroup was the counterparty, and could still be holding

6    a huge position on the other side of the bet.

7          And Ambac, the biggest investor, doubled down its bet

8    because it waited five months when there was terrible news

9    about what was going to happen, as there was a problem with

10   HSBC, and there's all this bad publicity.  In July of 2007 it

11   doubled down, insisting that Citi take the short position so

12   that it could take the long position on these exact same assets

13   for another billion dollars.

14         That's one side of the bet.

15         And the investors in this instance, and investors in

16   most CDOs around this time, and all CDOs eventually, ended up

17   losing.  They were betting on the spreads.

18         No one who makes a bet, the evidence will show, thinks

19   that they are going to lose.

20         Ambac and the other investors made their own

21   investigations, they made their own decisions.  They did know

22   that the other side of the bet was equally sophisticated

23   investors, big banks who were putting these things together so

24   that they could make a fee and were going to be the arranging

25   bank on the other side of the bet.

1          And again, back to football.  You can think that

2    you're a diehard sports fan and know a lot, but you got to know

3    on the other side of the bet that you're making there could be

4    another diehard sports fan that's just as smart and

5    knowledgeable as you.

6          The key thing that the evidence is going to show that

7    the SEC is wrong about and the witnesses are going to tell you

8    that the SEC is wrong about is that when Citi bought

9    protection, it was not betting that the CDO would fail or

10   betting that the housing market would collapse.

11         Witnesses will explain to you many reasons that you

12   buy protection.  You might buy protection if you're an entity

13   like Citigroup because your customers are demanding it; they

14   want you to sell it onto them.  Or you think there's going to

15   be a market for it down the road, or you want to make a deal

16   come together so that your bank can get a fee, or to balance

17   another position where you're long.

18         Everyone in the market knew that all of these trading

19   positions on a trading desk were fluid; that decisions were

20   made on that trading desk day-by-day, week-by-week.  Positions

21   might be kept, they might be sold, they might be a hedge

22   against other trading.  The investors knew that, Brian Stoker

23   knew that, Brian's bosses knew that.  Everyone knew that.  The

24   trading desk, thinking and planning about what it was going to

25   do, was neither fixed nor was it public.  Trading is

1    fast-moving.  There's jokes about make a decision, and then six

2    seconds later you might change the decision, because the

3    markets move fast.  An offer to buy protection today may not

4    hold tomorrow.  Every witness in the case is going to tell you

5    that.

6            The witnesses will also tell you that the SEC, when

7    they talk about this $500 million short position, is -- well, I

8    won't characterize.  They are going tell you about this $500

9    million short position.

10           In early January, after CSAC selected the assets, Citi

11   said, We'll buy protection on 25 of these assets.

12           Now, in fact, that trade was a contingent trade,

13   meaningless and valueless if the deal didn't close.  And you

14   heard the deal didn't close; the thing came into existence on

15   February 28, two months later.

16           So what Citi is in is -- they are not in any position

17   because the deal didn't close; you just rip up that position.

18   It didn't become effective until the CDO closes on February 28

19   and when the CDO gets priced.

20           And on February 28, when this deal came together, Citi

21   was, in fact, in a long position, not a short position.  It

22   still owned $500 million of certain part of the CDO.  It hadn't

23   sold another $200 million worth of bonds.  So it was 700

24   million long.  And on the day it closed, it was $500 million

25   short.  So its net was $200 million long.  And starting on that

1    day and going forward, it traded at various times out of both

2    positions.  It was trying to sell the notes to get out of that

3    side.  And it was selling the short position on into the

4    summer.  So there's nothing static or fixed about the trading

5    desk position.

6              So let me get back to Brian Stoker.

7              Where is he in this CDO world?  He's on the CDO

8    structuring desk.  His boss is Darius Grant.  He doesn't sit

9    next to Darius Grant.  He's one of four directors below Darius

10   Grant.  And in this group there's probably about 30 people.

11   They report to Ms. Warne and Nestor Dominguez.  Mr. Dominguez

12   will be a witness in the case.

13             In the CDO group there's hundreds of people.

14             And then in the bank, they report up -- you'll hear

15   about Michael Raynes, who's head of global structured credit

16   products.  And he reports to global credit markets, fixed

17   income, all the way to the top, to the CEO of the bank.

18             Now, in the CDO group it's not just the structuring

19   desk.  There's two other desks that you've heard about.

20   Mr. Mehrish is head of the CDO syndicate desk.  They are the

21   ones who are trying to find out where the market is going, what

22   people are interested in, what investors want.  There's the CDO

23   trading desk, which is the day-to-day operation that

24   Mr. Quintin runs and Mr. Carosielli works in.  And then not

25   part of the CDO group -- or at least reporting separately -- is

C7GVSTO3                    Opening – Mr. Keker

1   the sales desk which goes out and sells notes.

2          So the structuring desk makes deals work in the sense

3   that it's their job to make the pieces fit together.  These are

4   very complicated deals, and they make the deals work.  The

5   syndicate desk checks market interest and gets investors.  The

6   CDO trading desk trades day-to-day for customers buying and

7   selling.  And the sales desk is the one that goes out and sells

8   the notes that are generated by these CDO squares.

9          Brian's job, Brian Stoker's job -- excuse me, we're

10  not there yet.

11         But there's a lot more going on.

12         There's the investors.  I've told you about Ambac.

13  These investors are, as I've said, CDO managers, and they are

14  some of the biggest names on Wall Street; all of them highly

15  sophisticated.  There's the asset manager who picks the assets

16  and then manages them during the course of the CDO in case they

17  have to be traded or changed.  That was Credit Suisse

18  Alternative Capital, CSAC.  And then there are protection

19  buyers.

20         Remember I said in every instance the arranging bank

21  does 100 percent of the protection buying; but the arranging

22  bank doesn't have to, although it can, keep its position.  It

23  can go out on the street and say, Would you like to take my

24  position?  And in this case, the people who took some of the

25  position include, as I said, all the biggest names on Wall

C7GVSTO3                          Opening — Mr. Keker

1   Street, other banks.

2              And then there's the protection seller, who is the CDO

3   squared itself.

4              So Mr. Stoker's job was to work with others to make

5   these pieces come together, to make the cash flow work, to get

6   the rating agencies like Moody's and Fitch to tell you what

7   they wanted.  That's where the SEC says he was unreasonable.

8   They say he was unreasonable when it came to his work on the

9   paperwork.

10             So let's look at the paperwork.

11             You're going to see the offering memorandum and other

12  marketing materials.  The offering memorandum is this big fat

13  document that was worked on, the evidence will show, over two

14  months.  And it only was finalized two days —— on February 26,

15  two days before the deal closed.  It was reviewed and edited in

16  various parts by the manager, CSAC; by one of the investors,

17  Ambac, got early drafts of this and suggested changes; by

18  Mr. Stoker, to some extent, particularly in the part that

19  describes how the money will get paid out; and by people

20  working for him; and by other professionals looking at it.

21             The evidence will show that no one, no one, not the

22  investors, not Mr. Stoker's colleagues, and certainly not

23  Mr. Stoker expected this offering memorandum to provide the

24  confidential trading information that the SEC insists should be

25  in here.  The offering memorandum is only supposed to put the

C7GVSTO3                    Opening – Mr. Keker

1     investor on notice of the terms of the deal and generally tell

2     them what the risks are.  It doesn't include -- they don't even

3     put the assets in here.  They don't list what the assets are.

4     They don't list what the prices of the assets are.  They don't

5     list who the investors are.  They don't talk in there about who

6     the trading desk went out to and tried to sell it to, and that

7     people said, Oh, I don't like that deal.  They don't talk about

8     people who snapped up the deal, or how the market is perceiving

9     the deal.  Nobody expected that kind of information to be in

10    this document.

11            Later, after this -- while it's being prepared, the

12    investors did get a list of assets before the deal closed.

13    Ambac asked all the questions it wanted; other investors did,

14    too.  They asked them of CSAC, the manager; they came to Citi

15    and they asked questions.  They found out what they wanted to

16    know, including the price of every asset.  Brian Stoker, you'll

17    see an email, instructed his colleagues, give Ambac whatever

18    they want; tell them anything that they want to know.

19            That's what's not in here.

20            Let's look at what is in here.

21            Does this document include the fact that the bettor on

22    the short side, on the protection buying side, will be Brian

23    Stoker's firm, Citigroup.  This is something you don't have to

24    tell these people; they already know.  But does it include it?

25    Yes.

1        On the offering memorandum, Page 46, you'll find the

2   statement an affiliate of Citigroup is expected to act as the

3   initial CDS asset counterparty for the entire synthetic side of

4   this thing, $869 million, protection buyer.  Does it say that

5   Citi's position as the protection buyer might be adverse to the

6   people on the other side of the bet, the investors?  In such

7   capacity as swap counterparty, Citigroup may be expected to

8   have interests that are adverse to the interests of the

9   noteholders.  What they are saying is they are just on the

10  other side of the bet.

11       And then they go on to say, as such, a swap

12  counterparty, Citigroup will have no duty to act on behalf of

13  the noteholders, and directly or indirectly may act in ways

14  adverse to them.

15       Does it say that Citigroup will offset all of its

16  position or keep some of it?  Well, yes.  Page 88 of this

17  offering memorandum.  The initial CDS asset counterparty may

18  provide CDS assets as an intermediary with matching offsetting

19  positions requested by the manager.  That happened here with

20  some of it.  Or may provide CDS assets alone without any

21  offsetting positions.  That happened here with some of it.

22       Does the offering memorandum say anything definitive

23  about the trading desk's intentions?  No.

24       Will the evidence show that there was nothing

25  definitive about the evidence about the trading desk's

1    intentions?  The evidence will show that.

2          Nobody expected information about what the trading

3    desk was going to do with its position, who it was going to

4    offset it to, who else was in the market, what it was, how much

5    it was going to keep, when it was going to sell, how long it

6    was going to hold.  Nobody expected that information to be in

7    here.  In fact, I think I expect the Ambac witnesses to say we

8    didn't ask that; we asked every other question under the sun,

9    but we did not ask that question.

10          In early 2007, no reasonable person working in this

11    world believed that what the arranging bank CDO trading desk

12    did with its initial position was public information or

13    something that ought to go into this offering memorandum.

14    There's no reason, the evidence will show, that Brian Stoker

15    should have thought otherwise.  The evidence is going to show

16    that what the SEC is attempting -- is simply attempting to

17    ignore what was reasonable back then and get you to judge

18    somehow in different light of today.

19          Another area that I mentioned a little bit at the

20    beginning, let me quickly go through that.

21          Where the evidence will conflict with what the SEC

22    told you is who picked the assets.

23          The SEC claims that this offering memorandum is false

24    because it says CSAC is the manager and picked the assets in

25    Class V III.  The offering memorandum does say that, because

1    it's true; manager will select the portfolio.  The manager in

2    that sentence is defined clearly as CSAC.

3            The SEC has pointed to these emails -- or, excuse me,

4    let me show you who actually wrote this.  The manager, who is

5    CSAC, wrote the section about the manager, and says the

6    information appearing in this section has been prepared by the

7    manager, CSAC; it has not been independently verified, da, da,

8    da, da, da, da.  That's from Brian Stoker's point of view

9    working on this.  He gets the manager section from CSAC; they

10   wrote it.  And they, you'll find out when you hear from the

11   witnesses, stand by it.  They selected the assets.

12           The SEC has pointed to and will continue to point to

13   emails back in October and November of 2006 to support its

14   position.  But as I told you, the evidence will show that what

15   was discussed then was not what actually happened in this case.

16   In the fall, there's no deals; there were ideas.  A lot of

17   terms were uncertain, including, very importantly, what role,

18   if any, CSAC would have.  Was this going to be a managed deal,

19   or was this going to be some kind of deal where CSAC would come

20   along after Citi picked some assets and then manage the assets

21   after that, or would CSAC have no role.  All of those were

22   ideas simply being explored.

23           When Class V III came together in very late 2006, it

24   was agreed that CSAC would act as manager and pick the assets,

25   and they did.

C7GVSTO3                        Opening – Mr. Keker

1          And suffice it to say that when CSAC, which was at the

2     time a very respected CDO manager who Brian Stoker had worked

3     with before, and had a reputation, CSAC had a reputation on the

4     street, when CSAC said that we picked these assets, Brian

5     Stoker didn't have any reason to doubt it.

6          So, in closing, over the next couple of weeks you're

7     going to be hearing a lot of evidence about the CDO market and

8     how it works.  I hope you'll find it interesting.  I beg you to

9     follow the admonition to keep an open mind until you've heard

10    all of the evidence, because our case comes last.

11         And please keep in mind also the question -- and Judge

12    Rakoff will give the instructions -- but generally the question

13    that you'll be ultimately asked to answer, as I said, was not

14    how do you feel about Citigroup, how do you feel about this

15    kind of high-level stakes gambling.  Instead, the question is

16    whether or not Brian Stoker acted reasonably in the performance

17    of his duties as things were back there in January/February

18    2007.

19         Thank you very much for your attention, ladies and

20    gentlemen.

21         THE COURT:  Thank you very much.

22         All right.  Ladies and gentlemen, we're going to give

23    you your lunch break at this time.  And why don't you be back

24    hear, say, ten minutes before 2 o'clock.  And we will then have

25    our first live witness.

C7GVSTO3

```
1              Remember not to talk about the case.

2              Have a very good lunch.

3              We'll see you at ten minutes to two.

4              (Jury excused)

5              THE COURT:  Let's take up some matters.

6              Let me first say, just by way of comment, that I

7    thought those were excellent opening statements by both

8    counsel.  I never cease to be thrilled by the process known as

9    a trial where instead of allegations, posturings, public

10   relations, or what have you, we finally get a chance, through

11   the marvelous institution of the jury trial, to find out what

12   the truth is in any given controversy.

13             So we're off to a good start.

14             I note for the record that counsel for the defendant

15   had handed up from their proposed instruction a preliminary

16   instruction on the jury use of electronic technology.  And I

17   gave, in substance, that instruction.  I didn't give it in the

18   words that defense counsel had requested, because that proposed

19   instruction, which comes from a volume I'm not familiar with,

20   *O'Malley's Federal Jury Practice*, basically says:  Whatever you

21   do, don't go looking for information outside.  Now, I tell you

22   again, whatever you do, don't ever go looking for information

23   from outside sources.  Ladies and gentlemen of the jury, please

24   don't go looking for certain information from outside sources.

25   I'm telling you, please, please don't go looking for
```

C7GVSTO3

information from outside sources.

I'm sorry — Human nature suggests that that instruction is a
guarantee that the jury will go looking for information from
outside sources.  So I prefer to give them a more low-key
version, but I did give the substance of the requested
instruction.

I also take the very great liberty of mentioning to
defense counsel, for what it's worth, that while, of course,
I'm happy to get proposed instructions from any source, the
preferred instructions in this district, more often than not,
come from the *Sand Book*, Judge Sand being one of the very great
judges of this Court.  And you'll see that there are also some
coauthors on that book.

So, anyway, in terms of the three submissions that
were filed by the defense over the weekend, all ones that I had
permitted, I saw two of them when I came in over the weekend; I
didn't see the third till this morning.  So it would be helpful
in the future for both sides, if you're filing something, to
also send a courtesy copy to chambers by fax, or you can email
it.  My law clerk will give you his email address.  That way I
won't have to go look and see if something has been filed.

With respect to the first of those submissions, which
was the election now made by the defense that, in consideration
of the fact that the plaintiff will not be permitted to put
Mr. Stoker's deposition and other admissions on its direct

C7GVSTO3

case, because Mr. Stoker will be taking the stand as part of

the defense case and could be confronted with those admissions

then, Mr. Stoker has agreed to withhold the filing of any

motion for judgment as a matter of law until the close of the

defense case, close of all the evidence, in effect.  So I thank

defense counsel for making that clear on the record.

          With respect to the statements by Mr. Martens, I asked

defense counsel, having preliminarily viewed that those

statements would not come in, just so the record is clear, I

allowed the plaintiff to put in evidence of intentional acts by

Mr. Stoker, even though this is a negligence case, because, in

the Court's view, if one intentionally disregards one's duty of

care, then *a fortiori* one is at least negligently disregarding

his duty of care.  So I don't see any reason why that shouldn't

come in as proof of negligence.

          The defense thinks, Well, if that proof comes in, we

should be able to introduce Mr. Martens' statement to the Court

in connection with the Citigroup parallel proceeding to the

effect that he had reviewed tons of evidence and believed that

the commission believed that there was no evidence -- that they

could not bring a case for intentional misconduct, but only for

negligent misconduct.  And I ruled that out on a number of

grounds:

          First, it was not judicial estoppel, because the Court

didn't rely on it; second, it didn't purport to be a statement

C7GVSTO3

about each and every item of evidence in the case as an overall

statement of what Mr. Martens believed the overall charge could

support; third, Mr. Martens had subsequently changed his mind

and now believed that a case could be brought for intentional

misconduct; but, fourth, it seems to me and still seems to me

totally irrelevant.

The charge here is negligence.  Mr. Martens said the

charge, in his view, should be negligence, in his initial

statement.  As I say, he didn't make any comment about any

given item of evidence or how that could be proved.  And it

does not follow from an allegation or from a summary statement

that overall the commission believes it only charged

negligence, that the commission is then a straightjacketed

against putting in evidence of intentional misconduct on any

particular item that may bear on the overall determination of

negligence.

Nevertheless, I allowed defense counsel to put in a

brief, and I asked them if they could find a case in which

evidence of this kind had been admitted.  I carefully reviewed

their submission.  They did not find a case exactly on point,

but they found some in the kind of general area.  But I think a

close reading of those cases, particularly the Second Circuit's

cases, if anything, is more supportive of the SEC than of the

defense.

The gist of almost all the cases cited by the defense

C7GVSTO3

1     in the memorandum was that the statement of Mr. Martens

2     constitutes the hearsay exception under Rule 801, and,

3     therefore, cannot be excluded as hearsay.  And as we discussed

4     on Friday, that only gets them partway.  The fact that

5     something is not hearsay doesn't mean it's admissible, if, for

6     example, it's not relevant.  So many of the cases that they

7     relied on were, in the Court's view, beside the point.

8             I thought the most interesting decision, the one that

9     was only cited in passing in the defense case, was *United*

10    *States v. McKeon*, 738 F.2d 26 (2d Cir. 1984).

11            The issue in that case was whether an opening

12    statement made by defense counsel at defendant's second trial

13    was admissible in defendant's third trial of the same charges

14    as an admission of a party.  I think that's a long way from the

15    situation we have here, as was true of most of the cases cited

16    by the defense submission.

17            But what the Court there held was, quote, We believe

18    that prior opening statements are not per se inadmissible in

19    criminal cases, but, quote, we are not willing, however, to

20    subject such statements to the more expansive practices

21    sometimes permitted under the rule allowing use of admissions

22    by a party opponent, closed quote.

23            And it goes on at great length in the very learned

24    opinion by Judge Winter to explain why the kind of automatic --

25    well, statement, like a statement of a co-conspirator in a

C7GVSTO3

1     criminal case, it's not hearsay, it comes in if it's even

2     tangentially relevant, so forth, that that very broad view is

3     not, in the Second Circuit's view, to be taken on these kinds

4     of statements made by counsel either in the *McKeon* case in

5     opening statement or in our own case in a hearing before the

6     Court concerning another party.

7            So without belaboring the point further, the Court

8     adheres to its previous determination.

9            The final submission by the defense was in support of

10    their motion to exclude evidence of Mr. Stoker's compensation.

11           What had emerged on Friday was that the SEC maintained

12    that Stoker's -- that the scheme could be said to have obtained

13    money or property either because Mr. Stoker, as a Citigroup

14    employee, made money by fraud for Citigroup, or made money by

15    fraud all of these -- just the allegations, of course -- made

16    money by fraud through increased compensation.  We had a little

17    debate about whether the compensation was fixed or not, and its

18    state and so forth.

19           But then the defense said that even if it comes in for

20    that purpose, the amount should not come in.  And his general

21    compensation level should not come in because we're talking

22    about a million or $2 million of that level, and that could be

23    prejudicial.

24           So I considered further briefing on that.

25           I adhere to the ruling stated earlier this morning

C7GVSTO3

1    that that is allowed; his compensation can come in.

2             I think, first of all, the magnitude itself, it's

3    relevant.  And the jury can well appreciate that one would be

4    tempted to be less careful, or, in effect, more negligent, in

5    taking actions where one was motivated to get increased

6    compensation by forging ahead with the carefulness required by

7    law.  And the amount really bears on how strong that motivation

8    is.

9             And, on the other hand, I did not find it to be

10   prejudicial.

11            We have an excellent jury.  The jury clearly has

12   people who have a wide range of general life experience,

13   including a juror with rather direct experience that the Court

14   allowed to remain on the jury over plaintiff's objection.  And

15   those folks, if they think about it at all, will have no

16   problem placing this compensation in the context of the much

17   larger figures involved in the deal in the compensation of

18   other people and so forth.

19            So I do not see any prejudice from this, and I think

20   it is directly relevant.

21            That's all that I had.

22            Is there anything either counsel wishes to raise?

23            MS. KEKER:  Yes, your Honor.

24            We haven't done exhibit objections, the 902

25   certifications, and we have objections to Professor Jaffee's

C7GVSTO3

1    slides.  Of those, Professor Jaffee's slides, maybe the most

2    immediate, I suppose, he's going to be the second witness --

3              THE COURT:  We will take that up this evening.

4              From all your predictions, we're not going to get to

5    him, but we will complete the first witness, if everyone's --

6              MS. KEKER:  I think we'll get to Jaffee today.  If you

7    start at 2, I think Mr. Dominguez will be done by 4 probably.

8              THE COURT:  Okay.  Well, if that's true, then we'll

9    take this up -- do you want to come back -- I mean it's your

10   lunch.  If you want to come back at 1:30, we can take it up

11   then; but, alternatively, we can take it up at the

12   mid-afternoon break, which typically comes at 3:30.

13             MS. KEKER:  Mid-afternoon break is perfect.  That's

14   fine.

15             Thank you.

16             THE COURT:  All right.

17             MS. KEKER:  And then the other -- I mean at some

18   point --

19             THE COURT:  We can take the rest of them this evening.

20             MS. KEKER:  Fine.

21             THE COURT:  Anything from plaintiff's counsel?

22             MR. INFELISE:  No, your Honor.

23             THE COURT:  All right.

24             (Luncheon recess)

25             (Continued on next page)

C7GVSTO3

AFTERNOON SESSION

2:10 p.m.

(In open court; jury not present)

THE COURT:  Before we bring in the jury, let me just mention our technical people have determined that the reason we had all that interference this morning had nothing to do with anyone stomping on any wires.  It was because at least one person at counsel table had their cell phone on.  So if there is anyone who has a cell phone, and I believe you all do -- at least I signed lots of orders to allow you to -- make sure they're off.  That doesn't mean on silence; that means off, totally off.

All right.  Let's bring in the jury.  Let's get the first witness on the stand, please.

MR. KEKER:  Can we have an instruction like in the theater, please turn off all your cell phones?

THE COURT:  That's always an invitation for someone to keep it on, right?

Let's get the witness on the stand, please.  Counsel, let's get the witness.

MS. PETERSON:  Yes, sir.

(Continued on next page)

C7GVSTO3

1              (In open court; jury present)

2      NESTOR DOMINGUEZ,

3          called as a witness by the Plaintiff,

4          having been duly sworn, testified as follows:

5      DIRECT EXAMINATION

6      BY MS. PETERSON:

7      Q.  Good afternoon, Mr. Dominguez.

8              Can you please tell us where you are currently

9      employed.

10     A.  I'm currently employed at Carlson Capital, LLP.

11     Q.  And what is your position at Carlson Capital?

12     A.  I'm the head of the credit investments business there.

13     Q.  And what is a credit investment?

14     A.  We invest in bonds and credit sensitive instruments; so

15     bonds, stocks in some cases, options on bonds and stocks,

16     convertibles for pensions and endowments and private

17     individuals.

18     Q.  All right.  Thank you.  Prior to Carlson Capital, where did

19     you work?

20     A.  I worked at Citigroup.

21     Q.  And when did you begin working at Citigroup?

22     A.  1993 I joined Solomon Brothers, which then merged with

23     Citigroup.  So from 1993 into successor organizations, I

24     believe that merger was in 1999.

25     Q.  And in the 2006 to 2007 time frame you were an employee of

1    Citigroup, is that right?

2    A.   That's right.

3    Q.   What position did you hold at that time?

4    A.   I was the cohead of the global CDO business.

5    Q.   And in this same time period, 2006 to 2007, Citigroup was

6    one of the leading global originators and traders of CDOs, is

7    that right?

8    A.   That's correct.

9    Q.   Are you familiar with the term league tables?

10   A.   I am.

11   Q.   Can you tell us what league tables are?

12   A.   League tables are a tabulation of origination activity

13   among the major dealers.  It's a score card to see how much

14   volume certain institutions have -- certain institutions have

15   originated in the course of the year.

16   Q.   And in the fall of 2006 do you recall what Citigroup's

17   position in the league tables was for CDOs?

18   A.   I don't.

19   Q.   Now, as cohead of Citigroup's global CDO business, what

20   were your duties and responsibilities?

21   A.   My duties were overall management.  That included risk

22   management of trading positions, personnel issues, strategic

23   initiatives, overall business development.

24   Q.   Were you responsible for hiring and firing within this CDO

25   business?

C7gesto5                          Dominguez - direct

1   A.  I was.

2   Q.  And now when you say Citigroup's global CDO business, what

3   does that consist of?

4   A.  We had people to work for us in Hong Kong, London and

5   New York, probably totaling -- approximately 100 people between

6   those three centers, with New York being the largest, then

7   London, then Hong Kong was primarily a marketing arm.

8   Q.  And what did the global CDO business focused on the US

9   New York office, what did it do?

10  A.  Well, our business model was a originate and distribute

11  model, meaning we had individuals who spoke to investors,

12  determined what types of CDOs they would like to buy, they

13  would buy, at what prices they would buy those, and then

14  originated those transactions for distribution.  That was

15  basically the business.

16  Q.  How was Citigroup's CDO business organized in the US?

17  A.  There was three sub-business units within the business in

18  the US.  There was the structuring desk.  There was the primary

19  syndication desk.  And there was the secondary trading desk.

20  Those were within the three big sub-business units.

21  Q.  And the structuring desk managed the deal execution and

22  marketing process of CDOs, is that right?

23  A.  It's primarily a deal execution process.  They were

24  involved in marketing, but that was not their primary

25  responsibility either.  It was really managing the entire deal

1   execution process from really soup to nuts.

2   Q.  All right.  And part of the structuring desk's

3   responsibility was to determine the feasibility of a deal, is

4   that right?

5   A.  That's correct.

6   Q.  And part of the structuring desk's responsibility was the

7   document production process for a deal, is that right?

8   A.  That's correct.

9   Q.  And part of the structuring desk's responsibility was

10  answering specific questions from investors who called in with

11  questions about a deal, is that right?

12  A.  That's correct.

13  Q.  Now, in the 2006 to 2007 time period, who was the head of

14  the structuring desk?

15  A.  Well, the structuring desk in New York was split into two

16  groups:  The corporate side, which focused on CDOs, where they

17  had corporate credit risk; and the asset back group, which

18  focused on CDOs that were populated with noncorporate credit

19  risks, so RNBS, CDO squareds, not corporate.  And the head of

20  that latter part of the desk, that is, the ABS part of the

21  desk, was Darius Grant.

22  Q.  And did you supervise Mr. Grant?

23  A.  I did.

24  Q.  Are you familiar with an individual named Brian Stoker?

25  A.  I am.

C7gesto5                          Dominguez - direct

1    Q.   Who is Mr. Stoker?

2    A.   You want me to point him out or --

3    Q.   No, I just want you to tell us how you know Mr. Stoker.

4    A.   Brian Stoker was a -- say senior structuring person on the

5    ABS side of the desk reporting to Darius, directly reporting to

6    Darius Grant.

7    Q.   Did you have any supervisory responsibilities with respect

8    to Mr. Stoker?

9    A.   Well, I did, only in the sense -- in the sense that I had

10   supervisory -- indirect supervisory responsibility for everyone

11   globally at some level.  And, you know, I spoke to Brian

12   from -- frequently enough.

13   Q.   When did you leave Citigroup?

14   A.   November 1, 19 -- 2007.

15   Q.   And Mr. Stoker continued to work with you after you left

16   Citigroup, is that right?

17   A.   Yes.

18   Q.   In fact, you hired him as an analyst at Carlson Capital,

19   right?

20   A.   That's right.

21   Q.   Now, are you familiar with an individual named Keith

22   Pinniger?

23   A.   Less familiar.  I recognize the name.

24   Q.   And who is Mr. Pinniger?

25   A.   Keith Pinniger was a more junior analyst on the ABS part of

C7gesto5                              Dominguez - direct

1   the desk.

2   Q.  And did you have indirect supervisory responsibility for

3   Mr. Pinniger?

4   A.  Very indirect.

5   Q.  Who supervised Mr. Pinniger?

6   A.  Really Darius Grant.

7   Q.  Now, Mr. Pinniger was junior to Mr. Stoker on the

8   structuring desk, is that right?

9   A.  That's right.

10  Q.  Now, another of the desks that you mentioned in the CDO

11  business was the primary syndication desk, is that --

12  A.  That's right.

13  Q.  And the syndication desk focused more on developing

14  investor interest for transactions, is that right?

15  A.  That's right.

16  Q.  And the syndication folks would speak to potential

17  investors about an upcoming deal, is that right?

18  A.  That's right.

19  Q.  And investors would relay what types of risk exposures they

20  were willing to take and tell that to the syndication desk?

21  A.  That's right.

22  Q.  And the syndication desk would bring that type of

23  information back to the structuring desk, so together they

24  could see if a deal was feasible, is that right?

25  A.  That's right.

C7gesto5                          Dominguez - direct

1    Q.  In 2006 to 2007 time period, who was the head of the
2    syndication desk?
3    A.  Again, that desk was split into a corporate side and a
4    noncorporate side.  And on the ABS side, the noncorporate
5    credit risk side was Shalabh Mehrish.
6    Q.  Did you supervise Mr. Mehrish?
7    A.  I did.
8    Q.  And the third desk you mentioned in the global CDO business
9    was the secondary trading desk, is that correct?
10   A.  That's correct.
11   Q.  And the secondary trading desk was a market maker for CDOs,
12   is that right?
13   A.  That's correct.
14   Q.  If the secondary trading desk wanted to make a trade in a
15   CDO, did they have the authority to do that?
16   A.  Yes.
17   Q.  Did they need to seek permission from you each time they
18   did something like that?
19   A.  No.
20   Q.  In the 2006/2007 time period, who was the head of the
21   secondary trading desk?
22   A.  Donald Quintin.
23   Q.  Did you supervise Mr. Quintin?
24   A.  I did.
25   Q.  Are you familiar with an individual named Brian Carosielli?

C7gesto5                          Dominguez - direct

1   A.  I am.

2   Q.  Who is Mr. Carosielli?

3   A.  Brian Carosielli is a senior trader on that desk reporting

4   directly to Donald Quintin.

5   Q.  And did you have supervisory responsibility over

6   Mr. Carosielli?

7   A.  Again, to the extent that I had indirect supervisory

8   responsibility for everyone.

9   Q.  Did the secondary trading desk have any role with respect

10  to the CDO products that Citigroup structured?

11  A.  Can you repeat that, please.

12  Q.  Certainly.  Did the secondary trading desk have any role

13  with respect to the CDO products that Citigroup structured?

14  A.  In that feasibility study of whether a deal was feasible,

15  getting color or information from the secondary desk where they

16  were seeing actual transactions was valuable.

17        And then in the case of CDO squareds, that was the

18  principal trading desk for CDOs.  And so they were the -- a

19  sourcing agent for that, very much the same way the RNBS desk

20  was a sourcing agent for ABS deals.  And the loan desk was a

21  sourcing agent for loan deals.

22  Q.  All right.  Now, you used the terminology "getting color."

23  What does that mean?

24  A.  General market information; you know, this being an

25  over-the-counter market, where there's no organized exchange,

1   getting information about where transactions had actually taken

2   place, it would be a process of, you know, talking to the

3   people who were actually transacting, because it wasn't --

4   there wasn't a public quotation system.

5   Q.  All right.  And now you indicated that the structuring desk

6   had a role in marketing transactions.  Is that right?

7   A.  Yes.

8   Q.  And did that apply to CDOs and CDO squareds?

9   A.  Yes.  They assisted in -- in any transaction that the desk

10  was originating, since they were the most knowledgable really

11  about the details.

12  Q.  And now, when preparing to market a CDO, the structuring

13  desk would prepare what's called a flip book, is that correct?

14  A.  That's correct.

15  Q.  And a flip book is basically a PowerPoint presentation that

16  would describe the deal, right?

17  A.  That's correct.

18  Q.  And it would describe the collateral to be included in the

19  deal, correct?

20  A.  That's correct.

21  Q.  And it would describe the asset manager and the asset

22  manager's performance, is that right?

23  A.  Asset manager's performance in prior transactions or

24  related portfolios, yes.

25  Q.  And it would state basically the economic thesis on why the

1    deal would make sense in the current market, is that right?

2    A.   That's correct.

3    Q.   And the flip book was a marketing tool to be used with

4    investors, right?

5    A.   That's correct.

6    Q.   And potential investors could call the structuring desk to

7    get answers to very detailed questions on the terms of the

8    transaction, correct?

9    A.   That's correct.

10   Q.   Are you familiar with the term offering memorandum or

11   offering circular?

12   A.   I am.

13   Q.   Can you tell us what an offering circular is?

14   A.   I'm sure I'm not going to do justice to it.

15   Q.   In general.

16   A.   Offering circular is the legal document stating the terms

17   of the transaction, no marketing elements in it at all, just

18   the pure facts of the terms of the trade, very dry facts of,

19   this is the deal.

20   Q.   All right.  And now each deal or CDO would have a deal

21   manager, is that right?

22   A.   A collateral manager, yes.

23   Q.   In Citigroup's global CDO business, each CDO that was being

24   structured would have a deal manager there, is that right?

25   A.   Okay.  Let me just clarify.

C7gesto5                         Dominguez - direct

1    Q.   Certainly.

2    A.   I used the word deal manager as the structuring person.

3    Each deal would also have a collateral manager that was a

4    third-party asset manager.  Which one do you want me to --

5    Q.   Correct.  And I'm talking about the structuring person who

6    was the deal manager.

7    A.   Okay.  Great.

8    Q.   And the deal manager was essentially the lead structurer

9    for that CDO, is that right?

10   A.   That's correct.

11   Q.   And the lead structurer would have the overall

12   responsibility for getting the deal documents done, is that

13   right?

14   A.   That's correct.

15   Q.   Now, are you familiar with the concept of shorting

16   collateral?

17   A.   I am.

18   Q.   What does it mean to short collateral?

19   A.   Well, to short collateral is -- you borrow a bond and you

20   sell it to someone else; or in the case of a CDO, you're

21   borrowing a bond from one investor and shorting it into -- and

22   selling it to the special purpose vehicle or the warehouse that

23   is set up for the ultimate execution of the CDO.

24   Q.   When a party shorts collateral, they're hoping that the

25   value of that asset declines, is that right?

C7gesto5                              Dominguez - direct

1   A.   Generally, yes.

2   Q.   And are you familiar with the term shorting collateral as

3   it relates to the CDO products?

4   A.   Yes.

5   Q.   And are you familiar with the concept of shorting into a

6   deal?

7   A.   Yes.

8   Q.   What does that mean, shorting into a deal?

9   A.   Well, often not every piece of collateral was available in

10  the market that day.  And so what the trading desk would do,

11  whether it was RNBS desk or the corporate bond desk or the CDO

12  secondary desk, is short into the SPV and take the risk that

13  they would cover later, because by and large -- again, the

14  collateral was by and large illiquid, might not trade that day,

15  might not trade that week.  And so in order to acquire the

16  collateral, somebody had to take that mismatch.  So quite often

17  you found trading desks shorting at a price and taking the risk

18  that they could cover later.

19  Q.   All right.  Are you familiar with the term buying

20  protection with respect to a synthetic CDO?

21  A.   I am.  I just want to clarify --

22  Q.   Certainly.

23  A.   Are we talking about the individual collateral or are we

24  talking in one of the tranches?

25  Q.   We can be talking about either.  I'm just trying to get the

C7gesto5                           Dominguez - direct

1    general concept of what buying protection means.

2    A.   Okay.

3    Q.   And can you tell us what that means.

4    A.   So buying protection is entering into a credit default

5    swap.  Where you buy protection in the event of a default, the

6    credit default swap counterparty will compensate you in the

7    event of a default.  And for that privilege or for that

8    benefit, you agree to pay an ongoing amount every quarter or

9    every semiannual period.  And that ongoing amount will be

10   dependent on the credit risk of the -- on what's called a

11   referenced security, the underlying of the credit default swap.

12   Q.   And when you buy protection, you are considered being short

13   a collateral, is that right?

14   A.   It's economically equivalent to shorting, yes.

15   Q.   And so if you buy protection on a credit default swap, you

16   anticipate that the value of the underlying collateral will

17   decline, is that right?

18   A.   You benefit if the underlying -- if the underlying

19   referenced securities decline, yes.

20   Q.   And that's because if the underlying reference asset

21   declines, the protection will pay off or become more valuable,

22   right?

23   A.   That's right.

24   Q.   And now, are you familiar with the function of an asset

25   manager as it relates to a CDO squared?

C7gesto5                          Dominguez - direct

1  A.  Yes.

2  Q.  And asset managers manage the collateral pool for the

3  benefit of the investors, is that right?

4  A.  That's correct.

5  Q.  And when structuring a synthetic CDO, did you ever give

6  consideration to whether the asset manager wanted to short

7  collateral into the deal?

8  A.  I did.

9  Q.  And that would -- would you have done a deal where the

10  asset manager wanted to short collateral into the deal?

11  A.  No.

12  Q.  And why is that?

13  A.  As far as the asset manager is concerned, their -- it's

14  inconsistent with an asset manager who has an ongoing

15  responsibility to manage the deal.  To be short in one

16  portfolio outside the CDO and long within the CDO, those two

17  situations just don't make sense together.  So we -- it didn't

18  come up very often, because collateral managers recognized

19  that.  But the time there was discussion, we said no.

20  Q.  And in addition to an asset manager managing the assets for

21  the collateral pool, they select the assets for the collateral,

22  is that right?

23  A.  That's right.  Within the guidelines that are preagreed on

24  by the arranger, the rating agencies and the asset managers.

25  Q.  So you wouldn't want the party who's selecting the assets

1   for the CDO also shorting them, correct?

2   A.  That's correct.

3   Q.  Now, are you familiar with the term adverse selection?

4   A.  I am.

5   Q.  And adverse selection means choosing the worst collateral

6   for a deal, is that right?

7   A.  I wouldn't -- I wouldn't phrase it as the worst, or

8   choosing -- the goal, of course, was to choose the best

9   collateral that met the criteria.  Anything other than that was

10  adverse selection.

11  Q.  So would adverse selection be choosing less favorable

12  assets or poor assets for the deal?

13  A.  Yes.

14  Q.  With respect to the CDO transactions that were structured

15  in Citigroup's global CDO business, was adverse selection a

16  concern of yours?

17  A.  It was, on a general -- it was over the years.  I wanted to

18  make sure that the collateral managers that were originating

19  the collateral were doing their absolute best to choose assets

20  for the benefit of the transaction in every respect.  So I --

21  you know, from time to time, you know, that was a -- you know,

22  I reminded people that we need to doublecheck those decisions.

23  Even though we weren't choosing the assets, we should have an

24  independent eye and ask any questions, if anything unusual

25  happened.  We didn't -- you know, that we thought wasn't

C7gesto5                          Dominguez - direct

1    appropriate or wasn't the absolute best assets that were then

2    available in the market.

3    Q.  And you were concerned about monitoring the credits that

4    were in the deals that Citigroup structured, is that right?

5    A.  That's right.

6    Q.  And part of that concern was that you didn't want the worst

7    deals going in, because it would make Citigroup's ultimate

8    takeout more difficult, is that right?

9    A.  Well, that was certainly a part of it.  It actually goes

10   beyond that.  We had a process, a second-look process.  Again,

11   as I just said, the asset managers chose assets, and -- but I

12   think it was incumbent on us to have an independent view,

13   whether from our desk or secondary RNBS desk or secondary loan

14   desk, whoever was the expert in the collateral, to have an

15   independent view is, yeah, this makes sense.  So every piece of

16   collateral went through a quick review in that regard.

17          But certainly because at the end of the day, investors

18   would be doing that same analysis themselves and that affected

19   our takeout.

20   Q.  And which of the three desks on -- in the CDO business did

21   that second look?

22   A.  Well, for CDOs, there was the secondary trading desk.  For

23   ABS, collateral.  It was the RNBS desk in the mortgage

24   department.  And for corporates, it was their respective desk.

25   Q.  All right.  Now, earlier you indicated that one of your

C7gesto5                    Dominguez - direct

1    responsibilities as the cohead of Citigroup's global CDO

2    business was overall risk management.  How did you manage the

3    risk of the global CDO business?

4    A.  Well, the risks were what we call market risks primarily.

5    Our longs and -- long and short positions.  I would get daily

6    reports about our positions in New York and London.  It was

7    also -- expected and did receive from time to time, whenever we

8    were doing something different or outsized or unusual, such

9    that it created a different risk than we were normally taking,

10   I wanted to be and was notified of that.  And if they were

11   sufficiently outsized, for example, I would then alert my

12   superiors.  So that was the primary risk management methodology

13   reports.

14          And then if there were subtleties or deviations from

15   what we've done in the past or any unusual risks, people knew

16   to notify me.

17   Q.  And were there limits imposed upon the CDO business due to

18   the risk issue?

19   A.  There were.  Every trading desk at Citigroup had risk

20   limits.  And those were a framework, an umbrella under which

21   our desk and every other desk could transact user discretion to

22   transact within their limit structure.

23   Q.  And was that limit a dollar figure of how much trading they

24   could do?

25   A.  In part.  There were -- the limits had multiple dimensions.

C7gesto5                          Dominguez - direct

1    Clearly a total dollar was one of them, but not the only one.

2    There were a number of adjustments, reweightings of positions,

3    some often dependent on ratings that gave you a weighted --

4    more of a weighted number.  You know, there were a number of

5    dimensions to the risk limits.  I can go into more detail if

6    you like.

7    Q.  No, that's fine.  Thank you.

8         Are you familiar with an individual named Murray

9    Barnes?

10   A.  I am.

11   Q.  Who is Mr. Barnes?

12   A.  Mr. Barnes is a -- part of what's called independent risk

13   management, which is a chain that reports into corporate, the

14   corporation, outside of trading.

15   Q.  And did Mr. Barnes have any role with respect to the risk

16   limits of the CDO business?

17   A.  Yes, he did.

18   Q.  And what was his role?

19   A.  Well, his -- he was our risk manager, meaning that he

20   oversaw the risk.  And again, if there was anything unusual

21   that he saw, he would call me right away.  If we wanted --

22   conversely, if we wanted exceptions to the risk limits, he

23   would be our point of contact.  And then he would -- his job

24   was to understand our business, create these weighted dollar

25   numbers, depending on his perception of the risk, and establish

C7gesto5                          Dominguez – direct

1    limits along with discussions with, you know, senior corporate

2    officers.

3    Q.  And now what does it mean to ramp a deal?

4    A.  So ramping a transaction is really an accumulation of

5    collateral.  Again, not every piece of collateral trades in the

6    market every day.  So you're naturally limited -- when you're

7    acquiring collateral, you're naturally limited to what's

8    trading that day.  And so the process around which collateral

9    was accumulated was called ramp.

10   Q.  All right.  And now do you recall a CDO squared called the

11   Class V III?

12   A.  I've heard the name.

13   Q.  And that was a CDO that was structured in your CDO

14   business, is that right?

15   A.  Yes.

16   Q.  And in January '07 you made a request to Mr. Barnes for a

17   temporary exception to the warehouse risk limitations because

18   you were ramping to billion-dollar CDOs, is that right?

19   A.  That's right.

20   Q.  And one of those deals was the Class V III, correct?

21   A.  Yeah.  I don't recall for which specific deal it was.  We

22   had a number of deals going on at the same time, roughly half a

23   dozen.  I don't recall which deal was -- would cause an

24   exception.

25   Q.  All right.  And the independent risk management section

1    granted the exception to the risk limitations at that time, is

2    that correct?

3    A.  I don't recall exactly but --

4    Q.  All right.  Can we please show Exhibit 127 to the witness,

5    Mr. Campos.  Just the witness, yes.

6    A.  Okay.

7    Q.  Mr. Dominguez, did you have an opportunity to review

8    Exhibit 127?

9    A.  I did.

10   Q.  And did that refresh your recollection as to whether the

11   temporary exception to the risk limitation was granted?

12   A.  It says approved.

13   Q.  All right.  Now -- and did that refresh your recollection

14   that it was improved or --

15   A.  No, but I'm happy to assume it was.

16   Q.  All right.  Did you have a role in determining the job

17   position for the people who sat on the CDO desk?

18   A.  I did.

19   Q.  And, for example, did you have a role in determining the

20   scope of Mr. Stoker's job on the structuring desk?

21   A.  I did.

22   Q.  What role did Mr. Grant have in determining the scope or

23   role of the people assigned to the structuring desk?

24   A.  Well, he had -- he had significant latitude, but he would

25   check with me first.  He would often -- I mean, I really -- I

C7gesto5                          Dominguez - direct

1    wasn't that interested in the more junior people.  He could

2    shift those around, you know, as to where the resources were

3    best used.  But the more midlevel the senior people, we would

4    have a discussion.

5    Q.  All right.  And individuals would come to you asking for

6    more responsibility in the CDO business, is that right?

7    A.  From time to time.

8    Q.  In fact, Mr. Stoker asked you to give him more

9    responsibility in the CDO business, is that right?

10   A.  That's right.

11   Q.  Mr. Campos, could you show Exhibit 73 to the witness,

12   please.

13           Mr. Dominguez, do you recognize Exhibit 73?

14   A.  Yes, I do.

15   Q.  And is that an e-mail that you received while you were

16   working at Citigroup?

17   A.  Yes.

18           MS. PETERSON:  Your Honor, we would offer Exhibit 73

19   into evidence.

20           MR. TAYLOR:  No objection.

21           THE COURT:  Received.

22           (Plaintiff's Exhibit 73 received in evidence)

23           MS. PETERSON:  Could you please publish that to the

24   jury, Mr. Campos.

25                          - - - - -

C7gesto5                    Dominguez – direct

1    BY MS. PETERSON:

2    Q.  Now, Mr. Dominguez, this was an e-mail that Mr. Stoker sent

3    to you, is that right?

4    A.  That's correct.

5    Q.  And he was asking to be put in charge of the CDO squared

6    business, correct?

7    A.  Correct.

8    Q.  Now, in November of 2006, when Mr. Stoker sent you this

9    e-mail asking to be in charge of the CDO squared business,

10   Mr. Grant was his supervisor, is that right?

11   A.  That's right.

12   Q.  And the CDO squared business fell under Mr. Grant at the

13   time, is that right?

14   A.  That's right.

15   Q.  Now, thanks.  You can take that down.

16            Mr. Campos, if you would please show Exhibit 74 to the

17   witness.

18            Mr. Dominguez, do you recognize Exhibit 74?

19   A.  I do.

20   Q.  Is that an e-mail you received while you worked at

21   Citigroup?

22   A.  I do.

23            MS. PETERSON:  And, your Honor, I would offer

24   Exhibit 74 into evidence.

25            MR. TAYLOR:  No objection.

C7gesto5                          Dominguez - direct

1            THE COURT:  Received.

2            (Plaintiff's Exhibit 74 received in evidence)

3            MS. PETERSON:  Please publish that to the jury.

4    BY MS. PETERSON:

5    Q.  And, in fact, shortly after Mr. Stoker sent you the other

6    e-mail we looked at, he asked for you to give him more

7    responsibility so Citigroup could make more money and win the

8    league tables, is that right?

9    A.  That's what the e-mail says.

10   Q.  And he stated at the time that he wanted to be in charge of

11   the high grade CDOs and the CDO squared, right?

12   A.  That's the request.

13   Q.  Now, are you familiar with the term key man risk?

14   A.  Yes.

15   Q.  What does key man risk mean to you?

16   A.  Well, typically it's an individual in a key position,

17   important position, the loss of which would be problematic.  It

18   might cost money.  It may take -- because it takes time to

19   replace people, etc., etc.

20   Q.  And in February of 2007 you considered Mr. Stoker to be a

21   key man on the structuring desk, is that right?

22   A.  He was one of several, yes.

23   Q.  And now you had a role in setting Mr. Stoker's

24   compensation, is that correct?

25   A.  That's correct.

C7gesto5                          Dominguez – direct

1   Q.  And compensation was based in part on how well the employee

2   did their job, is that right?

3   A.  That is correct.

4   Q.  And typically compensation was made up of a basic

5   compensation or salary and a bonus, is that right?

6   A.  Discretionary bonus, that's right.

7   Q.  And did you have concerns in early 2007 that other Wall

8   Street firms would lure your employees away with higher

9   compensation?

10  A.  That was an ongoing concern for years.

11  Q.  And did that factor into how compensation was set for the

12  Citigroup employees?

13  A.  Yes, it did.

14  Q.  Now, at some point you learned or heard that Mr. Stoker had

15  been offered a higher compensation somewhere outside Citigroup,

16  is that right?

17  A.  That's correct.

18  Q.  And that offer you learned had come from Merrill Lynch, is

19  that right?

20  A.  That's correct.

21  Q.  And you understood that that offer had been for

22  approximately 2.5 million in compensation, is that right?

23  A.  Vaguely.  I don't remember the exact number, but that's the

24  order of magnitude, yes.

25  Q.  All right.  And now because of that you supported a

1    guaranteed compensation for Mr. Stoker, is that right?

2    A.   That's correct.

3    Q.   And you didn't really like guaranteed compensation, did

4    you?

5    A.   I didn't.

6    Q.   And why is that?

7    A.   It just put us in a, you know, very bad situation.  And it

8    just made things inflexible, because then at the end of the

9    year, you know, I would have to -- that would be a limiting

10   factor on how everybody else could be compensated.  And, jeez,

11   what happened -- what happens if you compensate someone -- if

12   you guarantee someone and they don't have a good year?  You're

13   still stuck with the guarantee.

14            So, I just -- the only time we did that was either

15   when we were -- like this situation, when we were trying to

16   prevent a competitor from poaching someone, or we ourselves

17   were trying to poach someone from a competitor.  Those are

18   really the only two circumstances.

19   Q.   All right.  And you supported one for Mr. Stoker in this

20   instance, is that right?

21   A.   That's correct.

22   Q.   And you supported it because you couldn't afford to lose a

23   key person on the structuring desk, is that right?

24   A.   Yes.  We'd already lost two people in previous months, and

25   we were -- we couldn't lose another midlevel to senior guy on

C7gesto5                      Dominguez – direct

1   the desk.

2   Q.  And if Mr. Stoker's job performance in the CDO business

3   prior to this point had been below Citigroup's standards, would

4   you have agreed to a guarantee?

5   A.  No.

6   Q.  Now, if you had known at the time that Mr. Stoker lied

7   about the Merrill offer to get more money from Citigroup, would

8   you have agreed to the guarantee?

9   A.  If I knew he lied, no, I wouldn't have agreed to the

10  guarantee.

11          MS. PETERSON:  All right.  Thank you.  I have no

12  further questions, your Honor.

13          THE COURT:  Cross-examination?

14          MR. TAYLOR:  Thank you, your Honor.

15          Could our paralegal approach with the binder for the

16  Court, please, and for the witness.

17          THE COURT:  Yes.

18  CROSS EXAMINATION

19  BY MR. TAYLOR:

20  Q.  Good afternoon, Mr. Dominguez.

21  A.  Good afternoon.

22  Q.  I'm Steve Taylor.  I represent Mr. Stoker.

23          I want to follow up on a couple questions that were

24  asked to you by counsel for the SEC.  First question, do you

25  have any degrees?

C7gesto5                          Dominguez - cross

1   A.   I have a PhD in economics and a master's in economics,

2   Master of Science in economics and a college degree in

3   economics.

4   Q.   And do you have any professional licenses?

5   A.   They've lapsed.  I have one from the CFTC.  I don't recall

6   the number.  I just recently took the exam.

7   Q.   Back in 2006/2007 did you have any professional licenses?

8   A.   I did.  You know, the usual Series 63, Series 7, and then

9   the principal's license, I believe it's called the 24.

10   Q.   When you were talking about the various structures in this

11   CDO group, I don't believe you mentioned who your superior was

12   at that time in 2006 and early 2007.  Who was that?

13   A.   My superior was Michael Raynes.

14   Q.   What was Mr. Raynes' position?

15   A.   He ran what was called global structured credit products,

16   which included the CDO business.  But what's -- was much

17   broader, other structured product businesses.

18   Q.   Was he your direct supervisor?

19   A.   Yes.

20   Q.   And you knew who he reported to?

21   A.   He reported to the coheads of credit, global credit, Chad

22   Leat and Mark Watson.

23   Q.   And the global heads of credit, do you know who they

24   reported to?

25   A.   I do.  Mark Watson and Chad Leat reported to the global

C7gesto5                          Dominguez – cross

1    heads of fixed income.  That's Randy Barker and Jeff Coley.

2    Q.  Were there levels at Citigroup group above that?

3    A.  Several.

4    Q.  What are those?

5    A.  There was Tom Harris, who ran the global investment bank.

6    And then of course Chuck Prince, who ran all of Citigroup.

7    Above him.

8    Q.  Focusing on your group, the global CDO group, was that all

9    your group or did you have a cohead?

10   A.  I was cohead with Janice Warren.

11   Q.  And how did you divide responsibilities between the two.

12   A.  We -- I was more the markets guy and Janice was more the

13   internal operations chief financial officer, more internal

14   issues.  And I was more external issues.

15   Q.  You were asked some questions about the responsibilities

16   and duties of the various desks in your group.  Do you remember

17   those questions?

18   A.  Yes.

19   Q.  And when you responded regarding the duties of the

20   structuring desk, you were asked specifically about feasibility

21   analyses and models.  Do you remember that?

22   A.  That's right.

23   Q.  Were there other responsibilities that the structuring desk

24   had, other than feasibility analyses and models?

25   A.  Well, there was the document production, obtaining the

C7gesto5                          Dominguez - cross

1   ratings from the rating agencies, managing that process.  Also

2   to assist the sales people and the syndicate desk in marketing

3   a transaction.  In certain instances where we -- we were

4   obtaining a surety contract from one of the bond insurers, they

5   negotiated -- they were very heavily involved in negotiating

6   those terms.  That was it.

7   Q.  Was structuring responsibility for marketing products, were

8   they primarily responsible for marketing products?

9   A.  No.  The primary marketer was really the sales person.

10  Q.  Was there any other desk involved in marketing as well?

11  A.  Well, the primary syndication desk was very focused on

12  marketing and -- but the account manager and the responsible

13  party was really the sales person.  But, you know, with a lot

14  of large institutions, they have relationships throughout the

15  firm and they like talk directly to either the syndication

16  person or the structuring person away from the sales person.

17  Q.  So then what was structuring's role in the marketing

18  process?

19  A.  Really to respond to investor questions, and those

20  questions might be scenario analyses we would get from

21  institutions.  We would get, well how does this deal look under

22  these economic conditions?  Can you run the cash flows and

23  calculate an internal rate of return?  Further details or

24  stratifications of a collateral pool.  And, you know, any

25  question really they wanted to ask.

C7gesto5                        Dominguez - cross

Q.  Let's talk about the syndicate desk now for a second.  You
testified about the syndicate test being involved in gauging
investor interest regarding deals.  Were there other
responsibilities of the syndicate desk?
A.  Well, the syndicate desk was a combination marketing and
risk taking desk in the sense that they had to make a decision
on when the appropriate time would be to underwrite the
transaction.  And by that I mean not every -- not every
tranche -- the deals generally speaking were not 100 percent
sold at pricing.  And so judging when there was enough investor
interest to price a transaction, knowing you were going to end
up with unsold inventory, was -- was the risk-taking function
of the syndicate desk.  And that was a judgment call, based on
who were the investors looking at the deal, what stage of the
analysis were they at, what would market conditions and factors
like that.
Q.  So was syndicate then responsible for that unsold inventory
at the time of pricing a deal?
A.  Yes.
Q.  And prior to a deal closing, I believe you testified to the
process of obtaining your sourcing collateral.  Is that called
a warehouse?
A.  Warehousing, yes.
Q.  When you're warehousing collateral, is the syndicate
responsible for the risk that something might happen and you

C7gesto5                         Dominguez - cross

1   wouldn't be able to close the deal?

2   A.  That's right.

3   Q.  So if a deal doesn't close, the risk to Citigroup is what?

4   A.  Well, we have -- we have all this collateral that's ramped

5   and no deal.

6   Q.  And what is the effect of that on Citigroup?

7   A.  Well, that -- it could be that markets have moved against

8   us during the intervening period.  And that's really a big

9   risk.

10  Q.  Is that risk the same for synthetic deals or cash deals?

11  A.  It's -- it's slightly different in the sense that if we're

12  the swap counterparty on a synthetic deal, then there's really

13  no net -- no net exposure at the firm.  We have one desk that's

14  short and one desk that's long.  It nets the zero.  So if the

15  deal doesn't happen, it just rip -- you know, you would just

16  rip up the pieces of paper documenting the transaction.  In the

17  case of cash, you actually have to go out and sell the bond.

18  So they are slightly different.

19  Q.  So then in your synthetic example, where you said you were

20  both buying protection and selling protection, which parts of

21  Citigroup were the parties in that example?

22  A.  Well, in the case of when we're doing an asset backed deal,

23  the counterparty was the asset backed desk and was the asset

24  backed desk facing the warehouse in the CDO desk.  In the case

25  of a CDO squared, it was the secondary desk versus -- facing

C7gesto5                        Dominguez – cross

1       the warehouse.  So it was all within the same business unit.

2                  (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C7GVSTO5                          Dominguez - cross

1   Q.  And why is it that then if the deal doesn't close, that you

2   could just rip up the contracts?

3   A.  I'm sorry, can you repeat that?  Can you rephrase that?

4   Q.  Sure.

5           In the example you gave, where you had the warehouse

6   and the trading desk in the CDO deal, if the deal didn't close,

7   I believe you said you could just rip up the contracts; is that

8   right?

9   A.  That's right.

10  Q.  And why could you just do that?

11  A.  Well, it's the same business; it's just -- it's two

12  accounts in the same businesses.  It's just internal.

13  Q.  So in that example, during a synthetic deal, if the deal

14  doesn't close and the syndicate desk -- I mean the warehouse

15  and the trading desk simply rip up the contracts, there's no

16  net loss to Citi then; is that correct?

17  A.  That's right.

18  Q.  But if there had been, say, contracts with other parties,

19  there would be loss to Citi; correct?

20  A.  That's right.

21  Q.  So in that example, a more conservative strategy for Citi

22  to hold the risk just within itself, would you agree?

23  A.  Along that dimension, yes.

24  Q.  Was that common at Citigroup for Citi to provide assets,

25  synthetic assets, to warehouse themselves by buying protection?

C7GVSTO5                         Dominguez – cross

1   A.  For CDS squared?

2   Q.  For CDS squared, yes.

3   A.  Well, for CDS squared, since it was the secondary desk

4   versus the primary desk, I mean that was common.  You always

5   sourced assets from the desk that traded the underlying.  So if

6   we were to do a loan transaction, just to use a slight

7   different example, we would be sourcing from the loan desk.

8   And if we're doing CDO squared, we're sourcing from the

9   secondary desk, which happens to be within our business stream.

10  Q.  So it's common in CDO squared, synthetic CDO squared, for

11  the trading desk to be sourcing assets for the deal?

12  A.  That's right, yes.

13  Q.  And is sourcing assets different than selecting assets?

14  A.  Yes, it is.

15  Q.  What's the difference?

16  A.  Selecting assets is the function of the collateral manager,

17  which is the third-party agent that has agreed to select and

18  manage the transaction for the benefit of the debt and equity.

19  Q.  In your experience at Citigroup, did Citigroup require

20  asset managers to select particular assets?

21  A.  No.

22  Q.  At Citigroup, did Citi -- in your experience at Citigroup,

23  did Citigroup require asset managers to buy particular assets?

24  A.  No.

25  Q.  Did they ever, in your experience at Citigroup, require

C7GVSTO5                         Dominguez - cross

1   asset managers to take only Citi bonds?

2   A.  No.

3   Q.  If a trading desk is sourcing an asset, does that mean that

4   they select the asset?

5   A.  No.

6   Q.  I had a few questions about the offering memorandum.

7          THE COURT:  I'm sorry, I'm not sure we ever got an

8   answer to the question.

9          What is the difference between selecting assets and

10  sourcing assets?  That was the question you forgot.

11  A.  Do you want me to deal with that now?

12  Q.  I think you should always answer --

13         THE COURT:  Why don't you give the other half.

14  A.  Sourcing assets would be to -- is the process of going out

15  in the market and finding assets that have been selected by the

16  manager.

17         So you go out; manager says, I like this bond.  Well,

18  you have to go out and find that bond, right.  And there may be

19  specific criteria; that bond needs to be a single A, that bond

20  needs to be most senior piece.  There are a number of criteria

21  that are listed in the -- what are called the percentage

22  limitations in the deal description.  And somebody has got to

23  go out and find it.  And typically, that was the arranger's

24  job.

25         Now, often the manager would find it at Merrill Lynch,

C7GVSTO5                              Dominguez – cross

1   at Goldman Sachs, at one of our competitors; and they would put

2   it in the warehouse; so they bought it from someone else.

3   Q.  Thank you.

4            I want to move, if we could, to the offering

5   memorandum you had a few questions from counsel about.

6            And I believe you had some requests there about the

7   structuring's role in the offering memorandum.

8            Do you remember those requests?

9   A.  Yes.

10  Q.  Who's responsible for the offering memorandum?

11  A.  Well, there were a lot of people involved.  There were

12  internal counsel, external deal counsel, collateral managers

13  counsel, trustees counsel, our structuring desk, the rating

14  agencies.  So there was –– you know, there was a lot of people

15  involved in different parts of the offering circular.

16  Q.  What part of the offering circular was structuring involved

17  in?

18  A.  Well, that was really the economics, is description of the

19  deal, the waterfall, description of the waterfall, the size of

20  the tranches, the economic components of the deal.

21  Q.  What about the manager in a managed deal, did they have any

22  responsibility in the offering circular?

23  A.  Well, typically, there's a section in the offering circular

24  that's a description of the manager.  And they would provide

25  that, typically, to external counsel who would incorporate it

C7GVSTO5                         Dominguez - cross

1   into the document.

2   Q.  I believe you testified that structuring was responsible

3   for producing the document, getting the document together; is

4   that right?

5   A.  Yes.

6   Q.  And that process, would you expect structuring to consult

7   with the trading desk with what their positions would be with

8   respect to any particular deal?

9   A.  No.

10  Q.  Would you expect the structuring desk to ask what was in

11  the trading desk book?

12  A.  No.

13  Q.  Or what position they held in the various assets that might

14  be in the deal?

15  A.  No.

16  Q.  Is that part of structuring's job description?

17  A.  No.

18  Q.  I'd like to focus you a little bit on 2006 and 2007.

19        At that time, did you, as head of the global CDO desk,

20  have a view as to where the market was going?

21  A.  Guessing the direction of the market is generally a losing

22  proposition.  The market seemed to be pretty strong in 2006.

23  Got soft again in the first quarter, got strong again, and then

24  there was a fairly substantial collapse in the second half of

25  the year, 2007.

C7GVSTO5                          Dominguez - cross

1    Q.  And can you put any more specifics on when the collapse

2    happened after it got strong again in 2007?

3    A.  Mid summer.

4    Q.  And prior to that time, mid summer of 2007, did you have

5    any view that this major collapse was coming?

6    A.  No.

7    Q.  Were you at Citigroup structuring products to take

8    advantage of any major collapse?

9    A.  That's hard to do with CDOs, to structure, to take

10   advantage of major collapses.  That's hard to do with an

11   illiquid complex product like CDOs.

12   Q.  Why is that?

13   A.  The lead time is just too long.  You have to ramp a

14   transaction, and there's document production, and there's

15   rating agencies involved.  And lead time is approximately six

16   months.  So that requires really knowing where you're going to

17   be six months from now.

18        We did, from time to time, accelerate or decelerate

19   the rate of ramp on existing deals to capture a little bit more

20   of the market, either the market -- of the market downturn.  I

21   remember us doing that in the first quarter on the deal we had

22   for Trust Company of the West.  We accelerated the ramp because

23   the market had traded off.  But that was really the extent of

24   it.

25   Q.  Decelerating the Trust Company of the West was the extent

C7GVSTO5                          Dominguez - cross

1   of it; is that what your testimony was?

2   A.  Accelerated.

3   Q.  You're accelerating, I'm sorry, Trust Company of the West.

4           In early 2007, did Citigroup have what are known as

5   super senior tranches and CDOs?

6   A.  Yes.

7   Q.  And without going into a whole history of CDOs that we may

8   get into, can you explain generally what the super senior

9   tranche CDO is?

10  A.  The super senior tranche was the most senior tranche in the

11  hierarchy of tranches.  And below the most senior tranche was a

12  tranche of roughly at least two percent, also rated AAA.  And

13  so it was senior to a layer that was also rated AAA.  And so

14  the probability of default of a AAA was viewed to be so small;

15  but this was, in fact, senior to it, it was called super

16  senior.

17  Q.  And would you consider that by holding the super senior

18  tranche in CDOs, that Citigroup was aligning itself with the

19  long performance of the CDO?

20  A.  Yes.

21  Q.  So if there was -- the CDO performed well, Citigroup would

22  benefit; correct?

23  A.  Yes.

24  Q.  And if the CDO defaulted, Citigroup -- that risk would be

25  on Citigroup, and they would experience the losses, right?

1    A.  Yes.

2              I mean it had to be a pretty cataclysmic event to eat

3    all the way through the subordinate tranches into the super

4    senior.  And that was the theory.

5    Q.  Did it eventually, with that theory, Citigroup experience

6    some pretty cataclysmic losses, as you say?

7    A.  We did.

8    Q.  As a result of these super senior positions?

9    A.  We did.

10   Q.  By mid 2007, do you know how much exposure Citigroup had on

11   the long side of CDO deals?

12   A.  Are you talking about super senior or primary or secondary?

13   Q.  Well, let's start this way:  How many different varieties

14   of exposure to the long side did Citi have in mid 2007?

15   A.  Well, we had loan positions in the primary book, unsold, so

16   these are unsold positions.  We had the super senior book.  And

17   then we had positions on the secondary book.  And I don't

18   recall -- on the secondary book, since that business could be

19   long and short.  I don't recall whether we were net long or net

20   short.

21   Q.  Is there any other form of long exposure that Citi had

22   around that time of CDOs?

23   A.  Well, there were warehouses.  There were warehouses in

24   process of ramping for other deals.

25   Q.  And so those warehouses, those are collateral ramp deals

C7GVSTO5                        Dominguez - cross

1   that had not yet closed, but where Citi is holding the long

2   position because they had sourced that out; is that right?

3   A.   That's right.

4            MR. TAYLOR:   I'd like to show the witness Exhibit

5   1126.

6            THE COURT:   Before you do that, we're going to give

7   the jury their mid-afternoon break.

8            Ladies and gentlemen, we'll take a 15-minute break at

9   this time, and then we'll resume at 3:30.

10           (Jury excused)

11           THE COURT:   The witness may step down.

12           We'll see you in 15 minutes.

13           (Witness excused)

14           THE COURT:   Please be seated.

15           Now I recognize that as an accommodation to this

16   witness's counsel, this witness, who was supposed to be the

17   second witness, was taken first.  But that still is no excuse

18   for what I have just seen over the last hour and-a-quarter,

19   which is counsel for both sides putting questions to the

20   witness in language the jury does not understand, accepting

21   answers in language the jury does not understand, and then

22   going on to put an even more un-understandable question to the

23   witness.

24           I defy either counsel to go through the transcript of

25   the last hour and-a-quarter and find more than one percent of

C7GVSTO5                          Dominguez – cross

1     the questions and answers that were in simple English.

2                 You folks are so into the terminology, that you forget

3     that this is not everyday language.  So we have terms like

4     "waterfall," we have terms like "warehousing," we have terms

5     like "Series 7," we have terms like "AAA."  We have one term

6     after another being foisted upon this jury without any attempt

7     to explain it.

8                 It's not the witness's fault.  He speaks this language

9     every day.  He is under the illusion that this is how human

10    beings speak.

11                But you folks, armed with permission of this Court to

12    ask leading questions so that you could easily say, by this do

13    you mean such and such, by that do you mean such and such, you

14    wouldn't even need him to put it in simple language, you could

15    do it, have colossally failed on both sides.  And I will not

16    allow this jury to continue to be confused in this way.

17                If I hear another term that is not defined in simple

18    language, we will end for the day and maybe pick up two months

19    from now.

20                See you in a few minutes.

21                (Recess)

22                THE COURT:  Please be seated.

23                Let's get the witness back on the stand.

24                THE DEPUTY CLERK:  May I bring in the jury?

25                THE COURT:  Yes.

C7GVSTO5                        Dominguez – cross

1            MS. KEKER:  Your Honor, after this witness, may we

2    approach to talk --

3            THE COURT:  Yes, I haven't forgotten.

4            (Jury present)

5            THE COURT:  Counsel.

6            MR. TAYLOR:  Thank you, your Honor.

7    BY MR. TAYLOR:

8    Q.  Good afternoon, Mr. Dominguez.

9            Could you provide us a description of who investors

10   are in CDOs that your CDO group put together?

11   A.  Broadly speaking, in the gamut of global insurance

12   companies, global banks, there were, from time to time, private

13   individuals, there were some specialized investment pools that

14   were set up to invest in CDOs.  And each investor class tended

15   to focus on different tranches of the deal.

16   Q.  How about CDO managers, other managers of deals, did they

17   invest in some of your deals?

18   A.  From -- yes.  So typically or often an asset-backed CDO

19   would have a bucket for other CDOs which would range in size.

20   And then, of course, the CDO squared was 100 percent other

21   CDOs.

22   Q.  So some of these other CDO managers, their business is to

23   manage CDOs themselves, right?

24   A.  That's right.

25   Q.  And they're taking part of your product, your CDOs, and

C7GVSTO5                          Dominguez - cross

1   putting them into their own deals; is that right?

2   A.  That's right.

3   Q.  And in your experience, were these investors sophisticated?

4   A.  I would say -- well, they were all large -- very large

5   institutions, global institutions.  And the thing -- the thing

6   about CDO product, it's very specialized and very technical.

7   So you tend to find specialists at the institutions, so I would

8   say yes.

9   Q.  And in your experience, they know a lot about CDOs?

10  A.  Yes, especially the ones who had, as a business, matured.

11  And there were more CDOs.  Over the years, as the CDO business

12  matured, these institutions, whether it's insurance company or

13  bank, developed departments and pools of CDOs; and so they

14  actually got to be pretty good, because they saw many, many

15  transactions over the years.

16  Q.  And regarding those CDO managers, did Citigroup have

17  relationships with many of those CDO managers?

18  A.  We did.  As a large fixed income operation, we had

19  relationships with the great majority of large fixed income

20  managers who, of course, were the funds managing CDOs.

21  Q.  And the large fixed income managers, you're saying those

22  included CDO managers investing in some of your deals?

23  A.  That's right.

24  Q.  And you thought they knew a lot about the CDOs they were

25  buying?

C7GVSTO5                         Dominguez – cross

1   A.  Yes.

2            MR. TAYLOR:  I don't have any further questions.

3            Thank you.

4            THE COURT:  All right.  Redirect.

5            MS. PETERSON:  Very briefly, your Honor.

6   REDIRECT EXAMINATION

7   BY MS. PETERSON:

8   Q.  Mr. Dominguez, Mr. Taylor asked you a series of questions

9   about your supervisor and on up the chain in Citigroup.  Do you

10  remember that?

11  A.  Yes.

12  Q.  If the CDO group wanted to structure a CDO, were you

13  required to seek permission above your position?

14  A.  No.

15           MS. PETERSON:  Thank you.

16           No further questions.

17           THE COURT:  All right.

18           Anything else?

19           MR. TAYLOR:  No, your Honor.

20           THE COURT:  Thank you very much.

21           You may step down.

22           (Witness excused)

23           THE COURT:  Please call your next witness.

24           And while the witness is coming in, counsel, please

25  approach the sidebar.

C7GVSTO5

1          (At the side bar)

2          THE COURT:  Mr. Keker, there was some exhibit you

3     wanted to make --

4          MS. PETERSON:  These are our demonstratives for Dr.

5     Jaffee.  And they object to the first seven.

6          THE COURT:  I'm sorry, I can't hear you.

7          MS. PETERSON:  The first seven, we walked through

8     mortgages, to mortgage-backed securities, to CDOs, to CDO

9     squared, and they are objecting claiming --

10          MS. KEKER:  How about if I object?  Can I make the

11     objection?

12          Your Honor, he said he could testify to the basics of

13     CDOs and CDOs squared.  You said it a couple times.  And the

14     first seven slides don't have to do with the basics; they have

15     to do with the precursors, the history that you said you

16     weren't going to let.  That's my first objection.

17          The second objection is No. 17, you can show the judge

18     that.  No. 17 is the unusual risk sensitivity of synthetic

19     CDOs.  It's not relevant to anything in this case.  This ten

20     percent and eight percent numbers are without proper

21     foundation.  You said that you didn't see any basis for it.

22          But the point is this is not a trial about whether or

23     not these synthetic CDO squares were a good idea or whether or

24     not they are unreasonable risks meant that the SEC should have

25     done something about it ten years ago.  It's about whether or

C7GVSTO5

1    not the structurer working in this business acted unreasonably

2    in 2007.  This slide shouldn't be shown and he shouldn't be

3    able to talk about unreasonable risk sensitivities.

4              MS. PETERSON:  May I respond?

5              The first seven slides we have that they are claiming

6    is the history that you disallowed isn't -- it's the basic

7    building blocks to get to a CDO.  Today if you create a --

8              THE COURT:  Yes, okay.  So I agree that's the

9    distinction.  And as we go through, we'll take it one at a

10   time.  And if it's just the basic building blocks, it will be

11   allowed; if it's the history, it may not be allowed.

12             Given what happened with the previous witness, who I

13   now very much regret having allowed to testify out of turn, I

14   think the jury very much needs a basic grounding in the basics

15   of these instruments.

16             Now, what about Exhibit 17?

17             MS. PETERSON:  We believe that Professor Jaffee does

18   have a foundation and a basis for the information that's on

19   here, including the eight percent and the unusual risk

20   sensitivity.  His opinion about the eight percent is based on a

21   published, well-regarded, well-reputed study out of the

22   Philadelphia federal research where they have studied data.

23             THE COURT:  Approximately how long into his testimony

24   do you expect to get today?

25             MS. PETERSON:  This is the very last slide.

C7GVSTO5

1          THE COURT:  And how long do you think his testimony

2     will be altogether?

3          MS. PETERSON:  We tried to get it to an hour, like you

4     said.

5          MR. INFELISE:  You said an hour.

6          THE COURT:  Yes.

7          MS. KEKER:  You said an hour.

8          MS. PETERSON:  If we have to define a few more terms,

9     it might take a little bit longer, but I tried very hard to get

10     it to an hour.

11          THE COURT:  It's now quarter of four.  So when we get

12     down to this exhibit, maybe we will excuse the jury and I'll

13     question the witness out of the presence of the jury to see if

14     it's admissible or not.

15          MS. PETERSON:  Okay.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

C7GVSTO5

1              (In open court)

2       DWIGHT JAFFEE,

3           called as a witness by the Plaintiff,

4           having been duly sworn, testified as follows:

5              THE DEPUTY CLERK:  Please state your name and then

6       spell it slowly for the record.

7              THE WITNESS:  Dwight Jaffee.  First name is

8       D-W-I-G-H-T; last name is Jaffee, J-A-F-F-E-E.

9              THE COURT:  Counsel.

10             MS. PETERSON:  Thank you, your Honor.

11      DIRECT EXAMINATION

12      BY MS. PETERSON:

13      Q.  Good afternoon, Professor Jaffee.

14             MS. PETERSON:  Mr. Campos, can you please show

15      Professor Jaffee Plaintiff's Exhibit 419.

16      Q.  Professor Jaffee, do you see Plaintiff Exhibit 419?

17      A.  I can.  It's my curriculum vitae.

18      Q.  Can you tell us what a curriculum vitae is?

19      A.  It's a listing of all my academic achievements, all of my

20      publications sort of from the get-go till today.

21      Q.  All right.

22             I'd like for you to please explain for us your

23      educational background.

24      A.  So I have a bachelors degree in economics from Northwestern

25      University in Chicago, and a Ph.D. in economics from the

1   Massachusetts Institute of Technology, M.I.T., up in Cambridge,

2   Mass.

3   Q.  And after obtaining your Ph.D. in economics, what has your

4   work experience been?

5   A.  So I've had basically two teaching positions my entire

6   career.  I taught for over 20 years in the economics department

7   at Princeton University, and then I moved west and I have been

8   teaching in the Haas School of Business at the University of

9   California-Berkeley for another more than 20 years.

10  Q.  And what department are you in at Berkeley?

11  A.  So in the business school there, I am joint between the

12  finance group and the real estate group.

13  Q.  And what types of courses have you taught there?

14  A.  So I have taught courses in banking, in finance, in

15  mortgage markets.  And then most recently, over the last ten

16  years, I have focused on a major course on asset-backed

17  securitization, which is a form of mortgage market activity.

18  Q.  All right.

19         And when you say asset-backed securitization, what

20  does that mean?

21  A.  It's going to describe a process in which mortgages -- it's

22  really mortgage-backed securitization in which mortgages have

23  been consolidated into a pool and made into a security that

24  individual investors can purchase.

25  Q.  All right.

C7GVSTO5                              Jaffee – direct

1      And have you heard the term "structured finance"

2    before?

3    A.   Yes.

4    Q.   What does "structured finance" mean?

5    A.   Well, structured finance is a particular format of

6    securitization in which the securities that are created are

7    going to be -- have different risk characteristics; and that

8    structure allows the sales of these securities to be done more

9    easily and maybe more efficiently.

10   Q.   And the courses that you have taught, have they included

11   segments on mortgage-backed securities?

12   A.   Yes.  I would say that's been a major focus of those

13   courses.

14   Q.   And have they included topics related to collateralized

15   debt obligations?

16   A.   Absolutely.

17   Q.   Now, over the course of your career, have you published any

18   written materials?

19   A.   Yes.  I think -- as the curriculum vitae would show, I

20   think my total publications of books and papers is probably

21   just short of 150 items today.

22   Q.   Is that published books?

23   A.   Mm-hmm.

24   Q.   And articles?

25        And have any of those published works dealt with

1    mortgage-backed securities?

2    A.  Yes, any large number of them have.

3    Q.  And did your publications, have they dealt with

4    collateralized debt obligations?

5    A.  Absolutely.

6    Q.  And now, have you done any testimony or consulting?

7    A.  So in recent years, I've both given testimony and consulted

8    with a number of government agencies.

9         I recently testified in front of the Senate Banking

10   Committee of the U.S. Congress; I testified in front of the

11   Financial Crisis Inquiry Commission, which was a commission

12   created by the U.S. Congress; I've given presentations and

13   talks recently at the U.S. Treasury, at the Housing and Urban

14   Development Agency, at the Federal Reserve, and so on, frankly.

15   Q.  All right.

16        Now, Professor Jaffee, we're going to have you walk

17   through and explain some mortgage-backed securitization and

18   things.

19        Have you prepared some demonstrative exhibits to

20   assist in explaining your testimony?

21   A.  I have.

22   Q.  All right.

23        MS. PETERSON:  Roy, would you please bring up the

24   slides.

25   Q.  Now, Professor Jaffee, what were the basic building blocks

C7GVSTO5                          Jaffee – direct

1   for securities like mortgage-backed securities and CDOs?

2   A.  So absolutely the first step is a standard home mortgage.

3   That is the atom of the whole process.  You start with a home

4   mortgage.

5   Q.  All right.

6         MS. PETERSON:  Let's bring up the next slide please.

7   Q.  Now, can you please explain very briefly the concept of a

8   mortgage?

9   A.  Yes.

10        So a home mortgage is created when a family has

11   decided that they have an opportunity to buy a house.  And they

12   go to the bank and they want to take out a loan.  And that loan

13   is going to be called a mortgage.  And the bank provides them

14   with the funding, in addition to their down payment, to buy the

15   house.

16        And in the graphic, that's what the gray loan is;

17   that's the loan money being provided by the bank to the

18   borrower.

19        And then in exchange for that, of course, the

20   borrowing family has to make payments back to the bank.  And

21   that's what's written here as the principal and interest; that

22   the loan payments that the borrowers make are going to consist

23   of interest payments on the loan, and then the repayment of the

24   loan balance, that's called the principal.  And those payments

25   will be made monthly over the whole length of the loan.

1          So that's just one mortgage.

2          But, of course, the banks that are making these

3     mortgages are going to be making many of them.  And so what's

4     shown in the graphic here by the little houses is simply the

5     accumulation of many individual mortgages that are being held

6     in the portfolio of this one bank.

7          And then, of course, there's many banks doing the

8     process, as well.  But that's the basic of mortgage

9     origination, and that's the starting point for securitization.

10    Q.  All right.

11         And why don't you just slow down a little bit in your

12    explanation so that we can all understand what you're saying.

13         Now, you indicated earlier that mortgages were the

14    basic building block for a security like a mortgage-backed

15    security.

16         Can you explain to us what a mortgage-backed security

17    is?

18    A.  Yes.

19         And I think if we could go to the next graphic, it

20    might help me here.  Great.

21         So what you can see on the far left here is that same

22    bank that we were using in the first example, with all these

23    mortgages that it's made.  And what banks have faced is an

24    issue that the amount of mortgages that they can continue to

25    make depends on the amount of deposits they have.

1          And so it was not infrequent and it is not infrequent

2     that banks get filled up in the sense they've used all of their

3     available deposits to make mortgages.  And you have to have

4     more customers at the door who are creditworthy.  And they

5     would like to make them loans.

6          And so the banks came up with an instrument, a device,

7     that would allow them to sell their mortgages to other

8     investors.  And those investors in this graphic are shown at

9     the far right.  And these could be typically kind of mutual

10     funds, pension funds, or any kind of large investor who might

11     be willing to buy some of these mortgages from the bank.

12          And the benefit to the bank is shown at the very

13     bottom of the graphic, that when these investors buy the

14     mortgages from the bank, they, of course, pay for them, and

15     that money gets recycled into the bank, which then allows the

16     bank to make more mortgages and fulfills that function.

17          So mortgage-backed securitization has been very

18     important in providing a continuing volume of mortgage lending

19     to the borrowers, because the banks were limited in the amount

20     of their proceeds.

21          So that's the basic idea.

22          But there's, of course, plumbing here, if you'd like

23     me to go on.

24     Q.  Let me just ask you a few questions.

25          In the middle of your slide it states mortgages are

C7GVSTO5                         Jaffee - direct

1   transferred to SPV.

2   A.   Right.

3   Q.   What is an SPV?

4   A.   So this is the part of the plumbing of creating a

5   mortgage-backed security.

6        And so the way technically it occurs is that the bank

7   first takes this group of mortgages that it's made, which we

8   would now called a mortgage pool, simply meaning it's a bunch,

9   maybe 1,000, individual mortgages, and they are going to treat

10  them as a whole.  You can think of them as packaging them.

11       And then they are going to move them into an entity

12  that's called a special purpose vehicle.  This is just a

13  conceptual, it's a legal entity; technically, it's actually a

14  trust.  But just think of it as an entity that the bank creates

15  to hold the mortgages.

16       And now what happens is this SPV becomes a standalone

17  entity; it has a trustee who's the titular head of it, it may

18  have -- it will have a few staff people that run it.  And it

19  sells these participations to the investors so the investors

20  are really buying a share of the SPV.  And what that entitles

21  them to, the key feature here, is that all of the payments that

22  are being made by the mortgage borrowers, these monthly

23  payments, now get mailed not to the bank, because the bank has

24  sold the mortgage, the payments get mailed to the SPV; the SPV

25  collects all of these, and then pays them out to the investors.

1   And that's sort of the plumbing transmission of a

2   mortgage-backed security.  It's called a pass-through security,

3   because all of the payments made by the borrowers at the far

4   left are simply being passed through the SPV and they end up in

5   the hands of the investors.  So this SPV in the middle is just

6   an intermediary; it's just a channel or a conduit, as it's

7   sometimes called, to let the monies flow in an efficient way.

8   Q.  All right.

9        And now at the very top of your slide it states single

10  class mortgage pass-through security.

11       What does "single class" refer to?

12  A.  Single class refers to the investors at the far side that

13  although there may be any number, even a large number, of

14  investors who are buying a participation in this particular

15  mortgage-backed security, they are all equal.

16       If there's two separate investors, they each have the

17  same priority, and they just each get their proportionate share

18  of all the payments that are being passed through.

19       So there's no attempt to distinguish one investor from

20  another; they are all treated equally, and that's called a

21  single class MBS.

22  Q.  Is there another type of mortgage-backed security?

23  A.  Yes, there is a second form, which is called a multi-class

24  mortgage-backed security.

25       MS. PETERSON:  All right.  Can you bring up the next

1   slide?  There you have it.

2   Q.  And can you please explain to us the structural features of

3   a multi-class mortgage-backed security.

4   A.  And this slide sort of follows on directly from the first

5   in the sense that at the far left you have the same bank, just

6   another example, but think of it as the same bank that made

7   those same mortgages.  And you can even think of it as we have

8   the same SPV, the same special purpose vehicle that's holding

9   those same mortgages.

10          So the only distinguishing feature of the multi-class

11  MBS is on the far right side in which you see listed tranches,

12  Tranche AAA, BBB, CCC, and equity tranche.  And this is a

13  technical term in this business.  "Tranche" I think is actually

14  a French term that means "slice."

15          And what they've literally done, instead of having a

16  single class, where everybody shared equally, they slice the

17  payments that go into the investors into different seniorities

18  or different priorities.  And the priorities are based on how

19  high up you are in the stack.

20          The AAA is called the most senior tranche; and they

21  have first priority on any money that's paid by the mortgage

22  borrowers.  Any principal payments by the mortgage borrowers

23  goes first to the AAA tranche, until they get fully paid off.

24  And once they've been satisfied, then the money starts to flow

25  to the BBB, and so on down the process.

C7GVSTO5                              Jaffee - direct

1           This is sometimes called a waterfall process.  And you

2      can see what happened there is the money, the green, if you

3      like, actually starts at the top and then gradually falls all

4      the way down to the bottom.

5           So when a mortgage-backed security is working well,

6      that's all there is to the story.  The AAA tranche gets paid

7      off first, and they go home; and then the next one in order

8      gets paid, and so on down the pecking order, in effect.

9           These tranches have names in the sense that they are

10     actually in the technical transaction are going to be labeled

11     A, B, C, and so on.  But they'll also get credit ratings,

12     that's where the AAA or the BBB referred to how highly-rated

13     are the securities.

14          The AAA tranche will effectively be risk-free.  The

15     rating agency that has rated it will have said there's almost

16     no chance that an investor is going to lose their money on the

17     AAA tranche.

18          As you work your way down, the amount of possible risk

19     rises.  And if you get to the very bottom at the equity

20     tranche, that is sort of the last in line, and so they, of

21     course, run the greatest risk.  If there were any defaults at

22     all, it's likely to come out of their pocket in terms of not

23     getting paid what they expected.

24          Between those two, there's two other tranche names

25     that are sometimes used and you may hear.

C7GVSTO5                          Jaffee - direct

1          There's something called a mezzanine tranche.  And the

2     name "mezzanine" simply refers to any tranche that's just above

3     the equity tranche.  So in this example, maybe the CCC might be

4     thought of as the equity tranche.

5          And there's also something called an investment grade

6     tranche, which is something less than the AAA, but it's still

7     really pretty good quality, and this example might be the BBB.

8          So there's various terms, but they all have the

9     feature we're talking about, how sure the investor is to get

10    back their money, and that's the purpose of the multi-class

11    securitization.

12    Q.  All right.

13         So which of these four tranches that are depicted on

14    your slide is the riskiest?

15    A.  Definitely would be the equity tranche.

16    Q.  And which is the so-called safest?

17    A.  AAA.

18    Q.  All right.

19         And, again, how do the investors make money on an

20    investment like this?

21    A.  Well, all of these investors are going to basically be

22    receiving interest payments.  And that's what induces them to

23    want to take the investment.  But, of course, in all finance

24    markets there's going to be a trade-off between the higher the

25    return, you have to take a greater risk.  And that shows up

C7GVSTO5                          Jaffee - direct

1     very clearly here.

2              The AAA tranche, while it's the least risky, it's the

3     safest one, is also going to get the lowest rate of return,

4     whereas as you go down the order, and you're willing to take on

5     more risk, you will be promised a higher return, but, of

6     course, you're taking on a greater risk.  So there's a

7     trade-off.

8     Q.  You've explained to us how the payments are made from the

9     AAA tranche down to the equity tranche.

10             What happens if the security suffers losses or

11    declines in value?

12    A.  So -- and that's going to occur if some of these borrowers

13    on the very far left start to fail to make their mortgage

14    payments.  And that means the SPV, the trustee, or the servicer

15    that's running the SPV isn't going to have the money expected.

16    And that means that some of the money is not going to end up in

17    the hands of the investors.

18             And you can see here in the graphic we've added that,

19    we sometimes call this an act of default, but it simply means

20    the borrowers are not making their proper payments.  And

21    eventually this has to have an effect on the investors on the

22    far right.  And you can sort of see here, filling up.  And the

23    idea of the graphic is that this is sometimes called a sinking

24    ship in the sense that as there's more and more losses, it

25    starts at the various lowest level, the equity tranche suffers

C7GVSTO5                              Jaffee - direct

1    the losses first, but if there's still more, it might reach

2    this CCC tranche and gradually it could work up.  And in a very

3    extreme case, even the AAA tranche might fail to get the

4    payments that were promised it.

5    Q.  And I apologize for doing this, but you used the term

6    "waterfall" earlier.

7         Can you tell us what "waterfall" means with respect to

8    a multi-class mortgage-backed security?

9    A.  Yes.

10        So both the term "waterfall" and the "sinking ship"

11   are sort of two sides of the coin.

12        The waterfall refers to the fact that when things are

13   going well, and the money is properly coming through this

14   channel, it starts at the top and then filters its way down

15   from the top tranche all the way to the bottom.  And

16   "waterfall" is a pretty nice description of that.

17        The sinking ship is just the opposite.  It's the idea

18   when things are going badly and the money isn't coming through,

19   the losses start at the bottom, and then they work their way up

20   the priority.

21   Q.  All right.

22        Now, we've been discussing mortgages and these

23   mortgage-backed securities.  Are there different classes of

24   mortgages?

25   A.  Yes, there are.

C7GVSTO5                        Jaffee - direct

 1          There are going to be prime and subprime mortgages are

 2     probably the two primary differential types of mortgages.

 3     Q.  All right.

 4          And can you tell us what a subprime mortgage is?

 5     A.  Yes.

 6          Well, so let me start even with a prime mortgage is

 7     your standard mortgage.  And it's going to be called "prime"

 8     based on the fact that it meets the standards that the banker

 9     or lender has imposed.  And these will be things like you must

10     have a certain level of creditworthiness in terms of your

11     credit rating, you must have steady employment, you have to

12     have various features that the bank deems to be prime, and then

13     you become a standard mortgage.  And that goes into one

14     category.

15          But the markets have evolved, and banks have been

16     making or did make large numbers of subprime mortgages.  And

17     what that meant is that the borrower failed to qualify on one

18     or more of these criteria.  They didn't have a prime credit

19     rating, or they didn't have a steady or dependable job, or

20     there was something in their credit history that was a little

21     bit questionable, so they didn't meet the standards for being a

22     prime borrower, but they still were sufficient that the bank

23     was willing to make them a mortgage, but this would be called a

24     subprime mortgage based on the fact that they were less than

25     prime.  And these two categories simply existed in the market

C7GVSTO5                        Jaffee - direct

1    side by side.

2    Q.  And, Professor Jaffee, do you have a slide that lays out

3    some of these subprime mortgage issues?

4    A.  Yes, and gives some facts about them.

5              So as you can see here, the first bullet is just to

6    say what I just noted, that a subprime mortgage differs from a

7    prime mortgage in the feature that it doesn't have the full

8    creditworthiness of a prime mortgage.

9              Both prime mortgages and subprime mortgages are

10   readily securitized; so everything that I just described about

11   mortgage-backed securitization could be done -- was always done

12   with prime mortgages, but equally well was done with subprime

13   mortgages.

14             In fact, most of the subprime mortgages that were made

15   in the last ten years were securitized.  They went through

16   exactly the process of mortgage-backed securitization that I

17   just described.

18             Subprime mortgage lending became a very big part of

19   the mortgage market as a result of the big housing boom that we

20   had in the United States in 2005 and 2006 and going into the

21   very beginning of 2007.  As much as $600 billion of subprime

22   mortgages were made in 2005 and 2006.  And this represented

23   approximately 20 percent of the total mortgage market activity

24   in those particular years.

25             (Continued on next page)

C7gesto7                          Jaffee - direct

1   BY MS. PETERSON:

2   Q.  Now, I'm sorry.  I didn't mean to interrupt, but before you

3   go to your last point, when you used the term securitized, is

4   that simply the process of turning mortgages into a mortgage

5   backed security?

6   A.  Exactly.

7   Q.  All right.  Thank you.  And now your last bullet here makes

8   a reference to collateralized debt obligations.  How did that

9   relate to the subprime mortgage issue?

10  A.  So as I've just indicated, many of these subprime

11  mortgages -- in fact, virtually all of the subprime mortgages

12  were transformed into mortgage backed securities.  But for many

13  of them that was not the end of the story.  Many of these

14  mortgage backed securities went through a further process of

15  securitization.  They were securitized a second time, and the

16  instrument that is -- that was used to create this second round

17  of securitization was called a collateralized debt obligation

18  or CDO.

19  Q.  All right.  Now, Professor Jaffee, I'd like to have you

20  explain to us how a collateralized debt obligation is created.

21  And do you have a slide which will help explain that?

22  A.  I do.

23  Q.  If you could bring up the next slide, please.

24  A.  So the starting point for a CDO is that you need to have

25  some underlying assets.  And remember, we just talked about a

C7gesto7                          Jaffee - direct

1    mortgage backed security where the underlying assets were

2    individual mortgages.  In a CDO, the underlying assets are

3    tranches from a mortgage backed security.  So you've got to

4    think of the case -- we started with mortgages.  We made some

5    mortgage backed securities, and we're now going to acquire --

6    and in this example we're going to focus on the triple B

7    tranche, from say 15, but it could even be 50 different

8    mortgage backed securities.  And we're going to take these

9    tranches, which are securities themselves, and they're going to

10   become the building block for a second round of securitization.

11            And so that's the key concept of how the subprime

12   mortgages and subprime mortgage backed securities are linked to

13   CDOs, that the mortgages became mortgage backed securities and

14   then parts of these mortgage backed securities are going to

15   become the building blocks of a CDO.

16   Q.  All right.  If you could take this to the next slide.

17   A.  Yeah.  And then we go on with the process.  And so this

18   graphic is an attempt to show you more fully how this all

19   happened.  So we're starting here with these mortgages on the

20   far left side.  And they're now going to be securitized into

21   these tranches, into these 15 mortgage backed security

22   tranches, and then we're going to go on to a third stage, which

23   may be on the next graph -- no, it's here.  Good.  Which shows

24   you the tranche -- the investors, what the investors are buying

25   in a CDO.  And these investors are going to be buying

C7gesto7                         Jaffee - direct

securities that in some sense by name look very much like the

securities we already talked about in the mortgage backed

security.  They're going to be tranches -- we can use that term

again -- and they're going to be rated triple A, double A and

so on all the way down to an equity tranche.

But the key thing here is that what they're going to

be paved by is not the original mortgage borrower per se but by

the triple B tranches that were created out of those original

mortgages.  And perhaps the most interesting economic feature

of this transaction is that you've been able to create a triple

A CDO tranche at the very top here, even though the underlying

assets, the things that are building into it are all triple B

securities.

So there is a very interesting financial engineering

economic benefit of this process which comes out of

diversification, which is you can take these triple B tranches,

resecuritize them into a CDO and end up with some more, some

new triple A tranche in the CDO structure.

Q.  So just to make sure we have this, we start with a

mortgage.  It's securitized into a mortgage backed security,

and then you take a pool of mortgage backed securities and

securitize them into a CDO.  Is that --

A.  Right.  A portfolio of tranches, of specific tranches.  And

then you securitize them again, same process applied a second

time to create the final structure you see on the right.

C7gesto7                          Jaffee - direct

1    Q.  All right.  And now the CDO that you have just explained,

2    does that have a name?

3    A.  So this specific CDO that we're illustrating here would be

4    called a cash CDO.  And the reason that it's called a cash CDO

5    is that it's based on these triple B MBS tranches.  And the way

6    the investors in this cash CDO are getting paid is that the

7    money is actually coming out of -- is coming originally from

8    the mortgage borrowers, but it gets paid into the triple B

9    tranches at the MBS level.  And then that money, that real

10   cash, is transferred on to the CDO investors.  And so it's

11   called a cash CDO because they are getting paid cash from the

12   original triple B tranches directly.  So it makes sense, and

13   it's -- the obvious form is a cash CDO.

14   Q.  And now is there another kind of CDO?

15   A.  But there is a second kind of CDO, which is called a

16   synthetic CDO.

17   Q.  What is a synthetic CDO?

18   A.  So a synthetic CDO is going to have the same economic

19   purpose as the cash CDO, but instead of being based on actual

20   triple B mortgage backed security tranches, as shown here, it's

21   going to be based on credit default swaps or what are called

22   CDS.  And that, unfortunately, introduces a new layer of

23   complexity, but that's what it is.  It's a portfolio of credit

24   default swaps.

25   Q.  All right.  I would like to have you explain what a credit

C7gesto7                          Jaffee - direct

1   default swap is.  Do you have a slide that will assist in that

2   explanation?

3   A.  I do.

4   Q.  All right.  Can you tell us what a credit default swap is

5   and how it works.

6   A.  Right.  So a credit default swap is a -- it's a financial

7   contract entered into between two parties.  And in this diagram

8   here at the highest level, you can see one of the parties is

9   called a protection buyer.  And the other party on the

10  right-hand side is called a protection seller.  And what

11  they're going to be transferring, or what one is selling and

12  the other one is buying, is risk protection.

13        Now, it's a financial contract.  A good analogy that

14  may be sort of more accessible to many people in understanding

15  this is it serves an insurance kind of function.  In other

16  words, you can think of it that the protection buyer in this

17  financial contract would sort of be like a policyholder buying

18  fire insurance against their home.  That's -- you're buying

19  protection against some risk.  And the protection seller on

20  this financial contract, the analogy to insurance would be it's

21  an insurance company, the company that's selling you fire

22  insurance against your home.

23        So it's, I think, useful to think of it as an

24  insurance-like contract, but one has to be clear:  This is a

25  financial instrument.  Only registered insurance companies can

C7gesto7                         Jaffee - direct

sell insurance contracts.  This is being sold by financial

entities as a financial contract, but that's the fundamental

economic purpose:  A risk transfer.

        The next feature that you have to understand is what

is the insurance being written on?  If we were doing an example

with fire insurance on a home, the referenced item shown here

at the bottom would be your home, and the risk would be that it

might have a fire.  In this particular credit default swap

example, what's being referenced is a financial instrument.

And the specific financial instrument in this example is going

to be the triple B tranche from one of these mortgage backed

securities.  And the risk that people would be concerned about,

participants in the financial markets would be concerned about

is, are the borrowers underlying this MBS tranche going to fail

to make their payments or not?  It's a credit risk, and that's

why the instrument is called a credit default swap.  The idea

is that what's being insured, referenced is -- the word in this

diagram is this risk of default.

        And so with those three building blocks, understanding

that there's two participants, what the diagram shows is it

really does function like an insurance contract.  The

protection buyer, which is like the policyholder, is going to

make payments to the protection seller, the insurance company.

And if all goes well, then of course the -- that's all you do.

You pay your insurance premiums and you're actually glad

C7gesto7                          Jaffee - direct

nothing bad happened.  It's like paying insurance on your home

and being happy it didn't burn down.  That's good news.  But,

of course, if the bad news occurs and the risk element

occurs -- in this case that the borrowers do default on the

mortgages and on the triple B tranche -- then the top line

becomes relevant and the insurance company or the protection

sellers have to make the payments to the protection buyer in

order to satisfy the claim in effect.  So it's a device that's

become very important in the financial markets for transferring

risk.

         One other thing I should explain, when you use the

analogy to fire insurance on your home, while an insurance

company would generally sell insurance to you against fire on

your own home, they really would not sell you insurance against

fire on somebody else's home.  The insurance company might

worry about, you know, why are you buying insurance on that

house?  And maybe you're going to do something bad to that

house or something.  So insurance companies will generally only

sell insurance if you own the asset, whereas in these financial

markets that isn't a requirement.

         So the protection buyer might very well have held the

triple B tranche in their own portfolio and were buying

protection against it.  That would be the fire insurance

analogy.  But equally well, they could be just thinking that

things are going to go very bad in this market, and we can make

C7gesto7                          Jaffee - direct

```
1    a profit by buying insurance, which will pay off if the event

2    occurs.

3           And so that's what in the bottom it says that this

4    protection buyer need not actually own the asset.  It could be

5    either way.  And that can play an important role in these

6    markets, knowing whether or not the borrower, the protection

7    buyer is holding the actual asset.

8    Q.  All right.  Earlier you explained that a synthetic CDO was

9    a portfolio of credit default swaps.  You've now explained a

10   credit default swap.  How does a portfolio of credit default

11   swaps get securitized into a synthetic CDO?

12   A.  I think my next slide will help a little bit with that.

13          So this is a graphic of a synthetic CDO, and the parts

14   in a way that are very much the same as a cash CDO is we have

15   the investors on the far right side.  And they're all going to

16   be paid by the assets that are held by the special purpose

17   vehicle.  And they have the same ordering of triple A and so

18   on.  So the far right side is the same.

19          One difference is in the middle, as you may recall,

20   when we did a cash CDO, the assets that were being held by the

21   special purpose vehicle were the triple B tranches.  They were

22   holding those directly.  That's where they were getting their

23   payments, and that's how the thing worked.

24          In this case the difference is that what's being held

25   by the special purpose vehicle here are really these credit
```

C7gesto7                              Jaffee - direct

1   default swaps based on these referenced MBS.  And the

2   difference is that instead of getting paid -- the investors are

3   paid not by the borrowers under the triple B tranche; they're

4   paid by the policyholders that are making the insurance

5   payments on them.

6          Now, from the standpoint of the final investors, they

7   may not care very much.  It's the same money in effect, and

8   it's coming because of a triple B tranche.  But the difference

9   is that this is only a reference.  It's an insurance policy

10  that's making the payments rather than the actual cash.  And

11  that has one other difference in the diagram, is therefore we

12  need to have in this diagram the protection buyers.  These are

13  the policyholders on the far left, because they are the ones

14  that are making the insurance premiums that are going through

15  the SPV and eventually creating the money to the investors.

16         So, again, from the investors' standpoint, it may look

17  very similar.  You're getting paid and you're taking a very

18  similar risk.  But from the standpoint of the design of the

19  security, it's fundamentally different in that you've got a

20  referenced security, and you have an insurance or risk transfer

21  device rather than the direct cash instrument.

22  Q.  All right.  And the protection buyer of a synthetic CDO,

23  what position are they holding in the security?  Is that a long

24  or a short position?

25  A.  So in general the security has -- the two sides of the

C7gesto7                          Jaffee - direct

security, the investors on the right side and the protection

buyer on the left side, have very different hopes or

aspirations for what's going to happen here to these

securities.  The investors hope that it's going to perform

really well, and they're going to get paid all the money that

they've been promised, and that's called in financial market

jargon the long position.  They're hoping it will be very

successful.

          Whereas the protection buyer in this is actually going

to receive payments only if the security fails.  And, again, in

financial market jargon that sometimes is called the short

position.  And so you'll see people referring to the investors

as the long position and the protection buyers as the short

position on the CDO -- on the synthetic CDO.

Q.  All right.  And now earlier you explained the waterfall

payment structure in a mortgage backed security.  Do we have

that same type of payment structure in a synthetic CDO?

A.  Yes, exactly; that as long as things are going well, the

money flows first to the triple A tranche and then down through

the tranches as in a waterfall.  And if things go poorly, it's

going to be just the opposite; that if the default starts to

occur, it's going to hit the bottom tranche first and then

start to go back up through the sequence.  So when you have

that, then you have the sinking ship analogy.

          So these basic features of all these securitizations,

1    mortgage backed securities and collateralized debt obligations

2    have the same fundamental structure.  The big differences are

3    the underlying assets can be different, and they may have this

4    insurance policy dimension of a synthetic.

5    Q.  In a synthetic CDO that is a portfolio of credit default

6    swaps, what is defaulting?

7    A.  So the ultimate problem is that some borrower and, much

8    more relevantly, many borrowers are failing to make their

9    payments on the underlying mortgages.  That's the starting

10   point.  When they fail to make their payments, it's the

11   mortgage backed security.  This SPV is not receiving the money

12   that it was expected to from the borrowers.  And so they have

13   to start to hand out losses.

14        And that's where this reverse waterfall comes in at

15   the MBS level; that first the equity tranche on the mortgage

16   backed security is -- loses its credit and defaults, and then

17   it starts to work its way up.  So -- and that's what eventually

18   occurs here, is that those losses start to accumulate among the

19   CDO investors.  But the true starting point of the problem is

20   at the original borrower level, but then it goes through the

21   transmission system here through the mortgage backed security.

22   Q.  All right.  And if we move to the next slide, here you

23   show -- can we go back?  Here I just wanted to have you explain

24   that bottom arrow, the protection payment for defaults.

25   A.  Yes.  So -- yes, that's important actually.  So when you do

C7gesto7                          Jaffee - direct

1    have a substantial default on one of these CDOs, in a sense two

2    things are happening.  There's very bad news for the protection

3    providers or the investors in the CDO, because they're no

4    longer going to receive the money they were expecting.  And

5    they're going to have to declare it a loss.

6              On the other hand, what happens is they have to make

7    payments to the protection buyers, these policyholders.  And so

8    it's those folks, what we called the short position, that are

9    doing very well.  So it's really like a teeter-totter.  One

10   side or the other of the transaction is going to be doing well.

11   That means the other side is not and in default.  It's the

12   investors that do badly and the protection buyers that are

13   actually benefiting.

14   Q.  All right.  Now, you've just explained a synthetic CDO.  Is

15   there a security that is called a CDO squared?

16   A.  There is.

17   Q.  Can you please tell us what a CDO squared is.

18   A.  Yes.  And, again, I think I have a graphic, maybe a series

19   of graphics that will help.

20             So this is a third type of securitization, and it's

21   basically the last one, is the good news.  And so we've gone

22   through the chain where we started with a mortgage backed

23   security based on mortgages, and then we had a CDO based on

24   tranches from a mortgage backed security.  And now a CDO

25   squared, the assets that drive it are going to be tranches from

C7gesto7                          Jaffee - direct

1   a CDO.  So it's a logical progression.

2          And each case you create a new security.  You take

3   some of those elements of that new security and you

4   resecuritize them.  And it's literally, in the CDO squared

5   case, being resecuritized a third time.  And so what you see

6   here is on the graphic, on the far left is the existing CDO

7   that we've just created, say.  And in a typical case, what you

8   would be selecting from that CDO is a number; let's say 50

9   single A tranches from 50 different CDOs that you've already

10  created.  So they go into the SPV and the portfolio manager in

11  the middle.

12         And then those -- the income generated by those CDO

13  positions is in turn going to be distributed among a new set of

14  investors who are the investors in the CDO squared.  And again,

15  the key feature here is that even though you started with say

16  50 different A rated CDO tranches, you end up with a

17  significant amount of triple A tranche.  And that's the

18  economic benefit of doing it a third time, is you keep getting

19  a benefit from diversification.  And it allows the entity

20  that's creating these to be able to sell more of the triple A

21  tranche.  And at this period they were having a large number of

22  investors who wanted to buy it.  And this was a very useful way

23  of satisfying that.

24         I should also add that this is a synthetic CDO

25  squared.  And it's because the instruments that created it were

C7gesto7                          Jaffee - direct

1    a -- were -- was a synthetic CDO.  That's important because

2    what was going on in the marketplace say in 2006 or 2007 was

3    there were not that many new mortgages being made.  The number

4    of mortgages was starting to become limited certainly by late

5    2006, but by using a synthetic CDO, they were able to keep

6    creating new instruments, even though there were not all that

7    many real mortgages, because they could base it on CDOs that

8    they had already created it.

9             MS. PETERSON:  All right.  Now, your Honor, we are at

10   the point where we would be going into the last slide where you

11   wanted us to stop for a moment.

12            THE COURT:  Come to the side bar.

13            (Continued on next page)

C7gesto7                              Jaffee - direct

1           (At side bar)

2           THE COURT:  So we have moved much more rapidly than

3    was anticipated.  So that's good.  But it means we need to take

4    this up without excusing the jury, so let me see that slide.

5           MR. KEKER:  And, your Honor, could I make my objection

6    when she shows it to you?

7           THE COURT:  Sure.  Hang on just a second.

8           (Pause)

9           THE COURT:  Okay.  So I'll hear from defense counsel

10   in a minute.

11          This slide shows two different things, as near as I

12   can tell.  It shows the fact that because of a leveraging

13   that's occurred, a small default gets leveraged into a much

14   bigger impact on the CDO squared tranches.  That seems to me to

15   be relevant and permissible.

16          There is, however, a second aspect to this, which is

17   it puts a specific figure on it which is that all mortgage

18   pools -- I'm sorry, down here, as little as 8 percent could

19   create total CDO loss.  So, in the --

20          MR. KEKER:  Up here 10 percent.

21          THE COURT:  Well, the 10 percent is given as an

22   example.  So, I mean, I could see him testifying to all but

23   this footnote as an example of what happens to show the effect

24   of the leveraging.

25          Now, when in his report the reference to 8 percent was

1    a footnote that gave no explanation other than -- a citation?

2            MS. PETERSON:  Right.  It cited to that study from the

3    Philadelphia reserve, federal reserve.

4            THE COURT:  Right.  So that part of his testimony is

5    only as good or bad as that study.

6            So now let me hear from defense counsel.

7            MR. KEKER:  Well, first of all, your Honor, with

8    permission, I'd like to go back to the basic relevance of this.

9    The fact that these are wildly risky and wildly leveraged

10   instruments, securitized three, four, five times is not

11   relevant to anything in this case -- in this negligence case

12   against Mr. Stoker.

13           THE COURT:  On the contrary, I think it has formed

14   part of what you've already argued on your opening statement.

15   Your opening statement was all about how this is a form of

16   gambling.  And that's why, if it is a form of gambling, that's

17   why it is a form of gambling, so far removed from the

18   underlying economic security.  So that objection is overruled.

19           MR. KEKER:  Could I just clarify, your Honor, because,

20   I mean, the fact that it's gambling, it's legal gambling -- we

21   are not trying whether or not this kind of security was proper

22   or legal or whatever.  I mean, it was legal.  And the question

23   about Mr. Stoker's negligence doesn't depend on whether or not

24   he was dealing with an instrument that's basically gambling.

25   It depends on whether or not he was acting as a reasonable

C7gesto7                          Jaffee - direct

1    structurer of such an instrument at that time.

2              THE COURT:  No, I don't agree with that.  As a matter

3    of fact, I mean, I was surprised there was no objection to your

4    opening, but the essence of this -- of the claim here is that

5    it may be a form of gambling, but it's still illegal to run a

6    rigged table.  And the reason, the motive for rigging the table

7    is the fact that it's so highly leveraged.  And that cuts both

8    ways.  So I don't accept that objection.

9              I do have doubts about this footnote.  You object to

10   that as well?

11             MR. KEKER:  Yes, certainly.  I thought you had

12   decided, basically decided that last week, but --

13             THE COURT:  Yes.

14             MS. PETERSON:  I think we can take that footnote off.

15             THE COURT:  That's what I think you should do.  Thank

16   you.

17             (Continued on next page)

18

19

20

21

22

23

24

25

C7gesto7                        Jaffee - direct

1              (In open court; jury present)

2    BY MS. PETERSON:

3    Q.  All right.  Professor Jaffee, we were discussing this CDO

4    squared and the different levels of securitization that we have

5    been through.  Does the multiple levels of securitization

6    create any particular risk issues with respect to the multiple

7    levels and the CDO squared?

8    A.  Yes, it does.  I mean, we've seen already in any of these

9    securities, on an individual mortgage or a mortgage backed

10   security or a CDO or CDO squared, that there's a potential for

11   loss.  But what's a special feature of a CDO squared is that

12   this potential for losses or the size of the potential loss

13   gets magnified because of the series.  The three-way

14   securitization actually magnifies the potential losses.

15   Q.  All right.  If we'll go to the next slide.  Can you please

16   explain what this is showing us.

17   A.  Yes.  And so what this graphic shows is that you start with

18   a relatively small loss in some mortgage securities.  It

19   doesn't matter what the number is, but it's going to be a

20   relatively small number.  So that's the beginning point.  And

21   we know that's going to have some ramifications for the

22   mortgage backed security, that some of the investors in the MBS

23   are, therefore, not going to get paid.  And in the particular

24   example I have here, it's going to be there's enough losses on

25   the underlying mortgages so that all of the tranches up through

C7gesto7                        Jaffee - direct

1    the triple B tranche get wiped out in all of the mortgage

2    backed securities, but none of the triple A tranche holders are

3    affected.  So they're still above the water line in the sinking

4    ship analogy.

5            So that's the kind of an experiment that I have in

6    mind where the loss rate is sufficiently low that it affects up

7    to the triple B tranche in the mortgage backed security but no

8    higher.

9    Q.  And how does that affect the next level of securitization?

10   A.  So then we can start to look at the next -- at what's

11   currently as the yellow box, which would be the CDO level.  And

12   if we go to the next step, we'll see that the effect of all of

13   the triple B tranches losing their money means that the CDO is

14   a complete loss.  And the reason is that, remember, the CDO was

15   based only on triple B tranches.  And so if all of the mortgage

16   backed security triple B tranches are wiped out, then the

17   entire CDO, including the triple A tranche of the CDO, is wiped

18   out.  And that's the magnification effect, is at that stage.

19           And then it goes, if you just go one further stage, a

20   CDO squared only makes it one more extreme; that because the

21   CDO squared is based on the CDO tranche, and since the entire

22   CDO has been wiped out, so is the entire CDO squared.  And so

23   this is the fundamental economics of this process of

24   resecuritizing the instruments, the underlying mortgages means

25   that there is a potential for this extreme loss at the far end

C7gesto7                          Jaffee - direct

1    of the CDO squared for all of the tranches, including the

2    triple A tranche.

3    Q.  All right.  Thank you very much, Professor Jaffee.

4           MS. PETERSON:  Your Honor, I have no further

5    questions.

6           THE COURT:  All right.  Cross-examination?

7    CROSS EXAMINATION

8    BY MR. KEKER:

9    Q.  Would I be correct in assuming, Mr. Jaffee, that you

10   believe the CDO squared business was very, very risky?

11   A.  Risky from -- as an instrument for investors?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And did people in 2006 and 2007 that were in this business

15   know that?

16   A.  So you're talking about those that are creating the

17   instruments or those that are -- or everybody?

18   Q.  I'm talking about anybody in the CDO business that knows

19   enough of the process.

20   A.  Well, it's -- you really need to get more specific,

21   because, for example, the triple A tranches of the CDOs are

22   being rated by the rating agencies as triple A.  And so to that

23   level, and in that sense, they're saying to the world in their

24   opinion these things were basically risk-free.

25           As you go down the structure of the risk is more

C7gesto7                          Jaffee - cross

1    evident and more stated.  And as I've just said, the potential

2    even for a complete wipeout on the triple A tranche is there.

3    But it wasn't stated very explicitly in many cases.

4    Q.  The people who bought the triple A tranche didn't know that

5    what your numbers -- 10 percent subprime mortgages going bad

6    could affect everything they were doing in the CDO squareds

7    four times doubling the bet, bet, bet, bet, bet, bet?

8            THE COURT:  Sustained.  Argumentative.  Calls for

9    speculation.  Beyond the scope.  And numerous other objections

10   on the sort that we discussed when we were having our

11   conference on Friday, counsel.

12           MR. KEKER:  Your Honor, could I ask to see Professor

13   Jaffee's slide 12 that he prepared and was just put up?  I have

14   to ask --

15           THE COURT:  Sure.

16           MR. KEKER:  -- SEC counsel.

17   BY MR. KEKER:

18   Q.  I want to go back to this credit default swap which you

19   explained to the jury that's the basis -- that is part of the

20   basis of how we get to CDO squareds.

21           You talked about insurance, but this is a financial --

22   a credit default swap is a financial contract where the

23   protection buyer says, I'll pay you a regular amount of money,

24   and the protection seller says, I'll take your money; and if

25   something goes bad with whatever we're betting on, then I'll

C7gesto7                              Jaffee - cross

1   pay you back something.  Right?

2   A.  That's the characteristic of a credit default swap.  That's

3   true.

4   Q.  And a synthetic credit default swap is a situation where

5   you just -- they just agree on what they're going to bet on.

6   They don't own it.  Nobody owns it.  They're just -- they find

7   a reference asset and bet on it?

8   A.  That's right.  They are taking -- it's -- you're using the

9   word bet.  I would say they're taking positions, but I agree

10  with the concept.

11  Q.  Okay.  And now in -- for credit default swaps, is the only

12  way the protection buyer can make any money is if there's a

13  total default, or is there a market for the protection buyer

14  position?

15  A.  So you're saying once they've created the credit default

16  swap, and this buyer owns it, can they now sell it in a

17  marketplace?

18  Q.  Yes.

19  A.  So there is all kinds of different credit default swaps in

20  different markets.  Some of them are markets that actually

21  exist and were active trading.  In other cases you would have

22  to go back to the exact party that sold you the insurance and

23  you would have to try to ask them, would they be willing to

24  renegotiate or would they be willing to buy it back?  And they

25  may say no.  So it's not a simple answer to that, but --

C7gesto7                    Jaffee - cross

1   Q.  In terms of the areas where there is a market and credit

2   default swaps, did people -- where they're trading them, did

3   some protection buyers take a position and then go out and say,

4   my position is that I have to pay 2 percent, or I have to pay

5   some amount of money every quarter for the life of this

6   contract, would you like to buy my position?  And was there a

7   market that way, where the price would change?

8   A.  So there were markets that were trading credit default

9   swaps.  One should understand that it depends on how well that

10  market would -- whether it would exist and how well it would

11  work would depend on the security that's being referenced.

12          Some of these credit default swaps were based on bonds

13  by AT&T.  So the referenced security on some credit default

14  swaps, not the ones we're discussing here, were AT&T bonds.

15  Those probably had a pretty -- you know, readily available

16  mark.

17          But if you're talking about a tranche on some specific

18  mortgage backed security, and I've bought an insurance policy

19  and now I want to sell it to somebody else, it's not going to

20  be a very good market.  You could try and you could go to some

21  investment bank and -- hoping they would make you an offer, but

22  it's not going to be a marketplace in the normal sense.

23  Q.  In 2006 and 2007 was there a considerable demand to buy the

24  protection seller side of CDOs and CDO squareds?

25  A.  Yes.  I mean, that -- there were an audience of potential

C7gesto7                         Jaffee - cross

1    protection buyers who were interested.  That's why they were

2    able to create these instruments.

3    Q.  And if you had a protection buyer position -- or I was

4    talking about protection.  Did I say buyer or seller?

5    A.  I think you said buyer.

6    Q.  I beg your pardon.  Let's stick with buyer.

7           What was there, considerable demand in the market

8    place, lots of people who wanted to buy the protection buying

9    side of these transactions?

10   A.  Mm-mm, yes.

11   Q.  And was there a price that would move day to day, week to

12   week, about how much you could either sell or buy that position

13   for?

14   A.  You could call up an investment bank and say, if I wanted

15   to try to buy this, what might be the price at which you could

16   sell it to me; but it's -- I think -- this is -- the market in

17   which these traded, the instruments you're now talking about

18   was an over-the-counter market in which you had to have two

19   parties call each other and actually talk about it.  And I

20   would say that you could get a quote but it might not be a

21   reasonable quote.

22   Q.  Okay.  And then on the protection seller side, same thing.

23   Was there a market where you could buy -- where you could find

24   out what the price -- you'd have a position, that price might

25   change.  You might find somebody to sell it to, make a profit

C7gesto7                          Jaffee - cross

1    or take a loss?

2    A.   If you're -- if you're talking now still at the level of

3    the credit default swap, I would say the same applies.  But, of

4    course, once you put these credit default swaps into a CDO --

5    CDO, you've changed the nature of that answer.  But if we're

6    still focusing only at the credit default swap level, both

7    sides of the transaction are going to be over-the-counter

8    transactions.

9    Q.   Let me move up to the different level, the CDO squared

10   level, which is what we're going to be dealing with in this

11   case.  You said -- I think you said someone does well and the

12   other side doesn't.  That's the nature of the business, right?

13   A.   Of a -- that's the nature of a credit default swap and a --

14   it's the nature of a synthetic CDO or synthetic CDO squared.

15   Q.   All right.  And to have a synthetic CDO squared that's made

16   up of a lot of credit default swaps, you need to have a

17   situation where there's somebody to bet both sides; somebody

18   who wants to bet the long side, somebody who wants to bet the

19   short side, don't you?

20   A.   Yes.  Or the way I would put it, you need investors who are

21   willing to become the protection sellers on the right side, and

22   you need other participate -- market participants who want to

23   buy the protection, and they become the protection buyers, and

24   you need both parties.  Absolutely.

25   Q.   Okay.  Thank you.  And sticking with CDO squareds then, in

C7gesto7                     Jaffee - cross

1    a CDO squared, is there something called the -- I think you

2    called the dealer or the arranger?

3    A.  So there are a large number actually of entities that

4    helped create a CDO squared.  One of them would be an -- is

5    what I've called an arranging bank or an arranging dealer.

6    Let's call it an arranging bank because that's probably what's

7    relevant to this case.

8    Q.  Okay.  And so the arranging bank is the --

9              MS. PETERSON:  Your Honor, I'm just going to object

10   that this is beyond the scope of Professor Jaffee's direct

11   testimony.

12             THE COURT:  I'll allow it.  Thank you.

13   Q.  The arranging bank is the entity that has the idea for

14   putting together a CDO squared in the first place, is that

15   right?

16   A.  That's generally the case.

17   Q.  And it figures out what the shape of the deal would be, the

18   parameters of the deal?

19   A.  That's true.

20   Q.  And it figures out how it's to describe the deal to the

21   market?

22   A.  Yes.

23   Q.  And it figures out the size of the deal; is this going to

24   be a $250 million deal or $500 million deal or something else,

25   right?

C7gesto7                          Jaffee - cross

1   A.  Yes.

2   Q.  And the arranging bank, in fact, hires the asset manager,

3   right?

4   A.  Yes -- well, in the name of the securitization, but they're

5   going to be -- they choose them.

6   Q.  Okay.  But they go out and there are managers throughout, I

7   guess, the country, but certainly here in New York, managers

8   whose reputation is built around being a good asset selection

9   manager for these CDOs and CDO squareds, right?

10  A.  That's right.

11  Q.  And one of the -- you happen to know this one -- the Credit

12  Suisse Alternative Capital is one such manager that has a good

13  reputation?

14  A.  At that time they had a good reputation.

15  Q.  And the arranging bank, once they put together the

16  securitization -- let's just talk about what the risks are.

17  They run a risk that at the end they don't find investors to

18  buy the notes that they're creating.  Right?

19  A.  That's one risk they would run.

20  Q.  They have this warehouse, and we're talking about synthetic

21  CDOs?

22  A.  Mm-mm.

23  Q.  So, if they can't sell -- if they can't find investors to

24  buy what they're selling, then they're going to get stuck with

25  it, right?

C7gesto7                         Jaffee - cross

A.  It's on both sides.  I mean, they have to find the
investors who want to be the protection buyer -- sellers, who
are in the right side of that figure, then they need to find
the protection buyers on the other side, if they're going to be
sell -- sell out the deals on both sides.  It is a case where
they have to deal with both sides of the transaction.

Q.  And I believe you've expressed -- if they don't sell out
the long side of the transaction, they're left holding the bag,
are your words, right?

A.  Yes, I would say that's right.

Q.  Now, as you just said, the arranging bank has also
responsibility for the other side of the transaction, which is
essentially this bet between two sides?

A.  Mm-mm.

Q.  And that's the -- what we call the protection buyer -- or
trying to figure out how -- what to call it, the protection
buyer side?

A.  Yes.

Q.  It's what you described as the short side of the
transaction?

A.  Yes.

Q.  Right?  And now this is a transaction where somebody is
going to win and somebody is going to lose by definition,
right?

A.  Right.

C7gesto7                          Jaffee - cross

Q.  Okay.  And at the start, when the CDO closing, who is

100 percent for all time the protection buyer in a CDO squared?

A.  For all time?

Q.  Yeah.  Who is responsible for writing the checks that the

protection buyer has to put in to the special purpose vehicle,

into the CDO, for the life of the CDO?

A.  So, this would be -- the arranging bank takes on the legal

responsibility for making those payments, because the

investors, of course, are not going to know who actually are

the potentially dozens of different protection buyers.  And so

they look to the arranging bank, who then is supposed to in

principle sell those positions to others.  But I do believe

it's the case that the arranging bank becomes -- remains --

retains the legal liability to make those payments.

Q.  And, in fact, does make the payments; the checks come from,

in this case, from Citi as the protection buyer for the life of

the --

A.  As long as -- until an event of default occurs or

something, yes.

Q.  Now, the protection buyer, the bank, can then offset its

position, if it wants to, correct?

A.  Yes.

Q.  But there's nothing that requires it to offset its bank --

offset its position, is there?

A.  I mean, technically, no.  In principle it could not do

C7gesto7                    Jaffee - cross

1    that.  It depends on what it's told people it will or will not

2    do, but I would say it need not do anything.

3    Q.  It depends on what it's told people it will or will not do

4    or may or may not do, correct?

5    A.  Right.

6    Q.  I think you've expressed the arranging bank's task is to

7    take that protection buyer position, so they hold 100 percent

8    when the thing closes.  And if they wish to sell it, they could

9    sell it, right?

10   A.  Right.

11   Q.  And you also recognize that maybe they won't sell that

12   short position or all of it, right?

13   A.  It's certainly possible.

14   Q.  And investors know that, don't they?

15   A.  That's a difficult question, what an investor in any

16   particular CDO squared or in this one, what they were actually

17   anticipating.  This gets to the question of what they were

18   expecting.

19           MR. KEKER:  Okay.  Could we give Professor Jaffee his

20   deposition, please.

21           MS. PETERSON:  I'm going to object that the question

22   calls for speculation.

23           THE COURT:  Sustained.

24           MR. KEKER:  Could we approach the side bar, your

25   Honor.

C7gesto7                          Jaffee - cross

1          THE COURT:  Sure.

2          (At side bar)

3          THE COURT:  So I'm assuming he said something along

4    these lines at his deposition, but that's not the issue.  The

5    question was -- there was -- the predicate to showing him his

6    deposition or something was so investors would know X.  I've

7    been sitting here all afternoon wondering when someone would

8    object to that question because he's not an expert in what

9    investors knew.  He's not proffered as that.  No witness can

10   testify as to what someone else did or did not know.  There

11   were questions along these lines actually put to the prior

12   witness which were even more objectionable, but I didn't

13   intervene because no objection was raised.  But now an

14   objection has been raised, and I sustained the objection.

15         So the fact that he said it at his deposition is

16   neither here nor there.  All objections are preserved to what

17   was said in a deposition except objections to form.

18         MR. KEKER:  Your Honor, for the record, at least, the

19   witness said in his deposition, so I would say the investor --

20   first of all, it's well within the scope of what he's

21   testifying about, which is the way CDOs and CDO squareds work.

22   And the questions that were asked to him --

23         THE COURT:  No, no, no.  It's not a question about how

24   they work.  It's a question about what someone else, in fact,

25   what a whole class of people knew.  That was the vice.  That

C7gesto7                           Jaffee - cross

1    was the question you put.  And there may be a way to rephrase

2    it, but in its present form, the objection is sustained.

3              MR. KEKER:  Just for the record, at page 144, 3

4    through 6 of his deposition, he said, I would say the investor

5    clearly knows that initially, the full responsibilities with

6    the arranging bank.  It can't be otherwise.  That's how it

7    starts.  I think the presumption would be that the arranging

8    bank would be selling those positions, but there's nothing in

9    the law that says they can't.

10             THE COURT:  And I don't know who asked the question

11   and if that was responsive to it, but in either way, it's not

12   coming into evidence because he's not proffered as an expert,

13   and he could not be proffered as an expert as to what someone

14   else knew.

15             MR. KEKER:  Okay.

16             (Continued on next page)

C7gesto7                          Jaffee - cross

1            (In open court; jury present)

2   BY MR. KEKER:

3   Q.  You were asked questions about what long means and what

4   short means.  Does long or short have a time component to it in

5   the sense that if you say long, it means you're going to be

6   long for one day, one week, three weeks or something like that?

7   A.  I would say not necessarily.

8   Q.  And if you say you're short, does that have a time

9   commitment?  Is that a commitment for where you're going to be

10  the next day or week or whatever?

11  A.  Not necessarily.

12  Q.  It only describes a moment in time, not what a trader has

13  done in the past or what he'll do in the future, is that

14  correct?

15  A.  Well, or actually, the way I was using it was using it to

16  refer to the nature of the two sides of a transaction, not to

17  individual investors.  But I would agree that generally, when

18  we say long or short, it's at a moment of time, not a

19  decision-making process.

20  Q.  And it wouldn't necessarily tell you at all what the trader

21  did in the past or is about to do in the future, is that right?

22  A.  That's true.

23  Q.  Now, let me ask questions about another part of the CDO,

24  the asset selection side.  The assets are normally selected by

25  a manager?

C7gesto7                          Jaffee - cross

1   A.  Yes, that's an asset manager.

2   Q.  And in the case of Class V III, that was Credit Suisse

3   Alternative Capital, CSAC?

4             MS. PETERSON:  Your Honor, I'm going to object that

5   this is beyond the scope.

6             THE COURT:  Well, it is beyond the scope, but I will

7   allow that as a predicate to whatever follows.  We'll see

8   whether what follows is within the limits or not.

9             But let me ask Mr. Keker, do you have more than five

10  minutes left with this witness?

11            MR. KEKER:  I think I do, your Honor.

12            THE COURT:  All right.  So find a spot somewhere in

13  the next five minutes to stop, because we have to let the jury

14  go for today.  Then we'll bring him back tomorrow.

15            MR. KEKER:  Well, anytime.  Right now is fine.

16            THE COURT:  That's fine.  Okay.

17            So, ladies and gentlemen, we're off to a good start.

18  We will see you tomorrow at 9:00.  That means you need to be in

19  the jury room at 9:00, and then we'll bring you right in and

20  start -- and continue the testimony of this witness.

21            Have a very good evening.  We'll see you tomorrow.

22            (Jury excused)

23            THE COURT:  Professor Jaffee, you may step down.  You

24  probably know this already, but you should not talk to anyone,

25  any lawyer or anyone else about your testimony overnight.  And

C7gesto7                        Jaffee - cross

1    we'll see you tomorrow morning at 9:00.

2              (Witness stood down)

3              THE COURT:  Please be seated.

4              Just for the guidance of counsel, in the future, there

5    are umpires of a wide strike zone and umpires who have a narrow

6    strike zone.  When it comes to scope or the objection beyond

7    the scope, I have a pretty broad strike zone.  Or depends which

8    way you're looking at it.  I allow most questions against an

9    objection of beyond the scope.  That doesn't mean there's no

10   limits whatsoever, but usually, if there's a witness on the

11   stand who has relevant knowledge about something that is

12   relevant to the case, I think the jury should hear from that

13   witness on that subject.

14             Now, it gets a little more complicated when you're

15   dealing with experts, but nevertheless, the likelihood is I

16   will overrule that objection except in the most extreme

17   situations.  So just be aware of that.  Now --

18             MR. KEKER:  Could I ask a question about that, your

19   Honor, with this witness?

20             THE COURT:  You don't like the fact that I'm ruling in

21   your favor?

22             MR. KEKER:  No, I think it's wonderful.  I want to

23   anticipate tonight what's going to happen tomorrow.

24             This witness opined and said a lot about his

25   particular knowledge of Class V III.  I don't have a lot on it,

C7gesto7                         Jaffee - cross

but I'm planning to ask him about Class V III within the ambit

of your ruling that said he could explain and should teach the

jury about CDOs and CDO squareds.  Class V III has some

particular attributes I want to ask him about.

          THE COURT:  That's -- I mean, you hit the right point.

If it is in the process of explaining how this particular CDO

squared fits within the framework of what he has explained

generally, that's permissible.  If it goes beyond that to some

factual statement about didn't everyone who invest in this know

that they were taking on a risk or something, that would be

objectionable.

          MR. KEKER:  I do learn, your Honor.

          THE COURT:  I'm sure you do.

          All right.  We have a bunch of other things you wanted

to take up.  Why don't I give you all a five-minute break and

then we'll continue.

          (Recess)

          (Continued on next page)

C7GVSTO7

1            THE COURT:  There were some matters counsel wanted to

2     raise.

3            MR. TAYLOR:  Yes, your Honor.

4            I think the only issue that's currently hanging fire

5     for right now, I'm not sure actually is ripe, is the

6     plaintiff's sent us notice of an intention to move or at least

7     certify as business records a whole swap of documents.  They

8     did this through five different declarations of various people,

9     covers up most of their exhibit list.

10           We've objected to that.  We told them we object to

11    that.

12           We wanted to raise that before they tried to move

13    those in sort of en masse.  But if they are not planning on

14    doing that right now, they are planning on taking those

15    exhibits, they come with the witnesses, I don't know that we

16    have a problem.

17           MR. INFELISE:  Your Honor, we did not intend to offer

18    them en masse.  I believe some of them can be offered just

19    based on the certifications.  And to the extent we think

20    that -- at a point in time where it's relevant, we will offer

21    them.  But we are not going to try and put in something like 30

22    binders of exhibits at this point.

23           THE COURT:  So the only question I have is -- and

24    maybe we don't have to address this now -- is there was an

25    indication on Friday that there were some exhibits where the

C7GVSTO7

1   defense was objecting to parts of the exhibit, but not the

2   entirety.  And that's where I thought I ought to get involved

3   sooner rather than later, because that can take a while too.

4            MR. TAYLOR:  Yes, your Honor.

5            I think some of that comes in the specifics of how

6   these certifications come up.  They have a witness who

7   certifies that, for instance, an email was kept in the ordinary

8   course of business and retained in the ordinary course of

9   business, and then the attachment from the email is certified

10  by somebody else who says that that spreadsheet was -- I mean

11  I'm not sure how we deal with that until it actually comes up.

12           THE COURT:  That's fine.

13           I have no -- you know, if you can wait, I can wait.

14  That's fine.

15           All right.

16           Anything else that anyone needs to raise?

17           MR. INFELISE:  No, your Honor.

18           MR. TAYLOR:  Nothing, your Honor.

19           THE COURT:  All right.  Very good.

20           I was very interested in the last question about

21  whether short and long had to do with time duration.  And I was

22  very, very grateful that counsel didn't ask whether it had to

23  do with the physical length of parts of the anatomy.

24           So we'll see you tomorrow.

25           (Adjourned to July 17, 2012 at 9 o'clock a.m.)

INDEX OF EXAMINATION

Examination of:                              Page

NESTOR DOMINGUEZ

Direct By Ms. Peterson . . . . . . . . . . . .86

Cross By Mr. Taylor  . . . . . . . . . . . . 111

Redirect By Ms. Peterson . . . . . . . . . . 130

DWIGHT JAFFEE

Direct By Ms. Peterson . . . . . . . . . . . 134

Cross By Mr. Keker . . . . . . . . . . . . . 169

PLAINTIFF EXHIBITS

Exhibit No.                              Received

 73   . . . . . . . . . . . . . . . . . . 106

 74   . . . . . . . . . . . . . . . . . . 108