C7NVSTO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

U.S. SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

      v.                    11 CV 7388 (JSR)

BRIAN H. STOKER,

            Defendant.         JURY TRIAL

------------------------------x

                                 New York, N.Y.
                                 July 23, 2012
                                 9:43 a.m.

Before:

                     HON. JED S. RAKOFF,

                            District Judge

                    APPEARANCES

SECURITIES AND EXCHANGE COMMISSION
     Attorneys for Plaintiff
BY: JEFFREY T. INFELISE
     JANE M. E. PETERSON
     ANDREW H. FELLER

KEKER & VAN NEST
     Attorneys for Defendant
BY: JOHN W. KEKER
     JAN N. LITTLE
     STEVEN K. TAYLOR
     BROOK DOOLEY

ALSO PRESENT:  ROY CAMPOS, Technician
                CHRIS INNIS, Paralegal
                JACQUELINE HARTMANN, Paralegal
                JEFF DAHM, Technician

C7NVSTO1

(Trial resumed)

(In open court; jury not present)

THE COURT:  I received a submission from the SEC that did not have Attachments 1 and 2.

MR. INFELISE:  Did not have what, your Honor?

THE COURT:  Attachments 1 and 2.

And I received an unsolicited memo from the defense of which I will take a look at.

This is not what you emailed.

MR. INFELISE:  It is, your Honor.

THE COURT:  No, it isn't.

MR. INFELISE:  Oh, I see.  Because it was missing Attachment 1 and 2?

THE COURT:  Yes.

MR. INFELISE:  Yes, your Honor.

(Jury present)

THE COURT:  Good morning, ladies and gentlemen.

Sorry for the delay.

I was, as a good Yankees fan, in mourning over the lost weekend.  But we're ready to continue.

Although I have to say, I'm in awe of Juror No. 2's shirt.  That is really something else.

All right.  Very good.

Counsel.

MR. INFELISE:  Thank you, your Honor.

C7NVSTO1

DARIUS GRANT,previously sworn.

DIRECT EXAMINATION (continued)

BY MR. INFELISE:

Q.  Good morning, Mr. Grant.

A.  Good morning.

Q.  Sir, when we stopped on Thursday, I believe I just asked you a question.

MR. INFELISE:  And with the Court's permission, I'd like to repeat it.

Q.  (Reading)

"Sir, are you aware that in the fall of 2006 the CDO group was working on putting together a synthetic CDO squared so that the secondary trading desk would make a proprietary trade?

"A.  I don't remember.  I don't remember that circumstances."

Q.  And I believe I directed your attention to Plaintiff's Exhibit No. 30 in your binder, Mr. Grant.  And if you could take a moment to just look at that.

A.  Sure.

(Pause)

A.  Sure.

Q.  Have you had a chance to look at that?

A.  Yes.

Q.  And do you recognize this document?

A.  I mean I don't remember receiving it.

Q.  Do you have any reason to believe that you didn't send this email at the top of the page?

A.  No.

MR. INFELISE:  Your Honor, we would like to offer Plaintiff's Exhibit 30.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 30 received in evidence)

MR. INFELISE:  Publish that to the jury please.

Q.  Mr. Grant, I'll direct your attention to the top entry from you to several individuals, including Mr. Brian Stoker.

And you say -- it's regarding Sorin CDO update.

Sir, what was Sorin?

A.  Sorin was a money manager who did several CDOs, who managed several CDOs.

Q.  And was this -- do you recall whether or not this email was discussing whether or not Citigroup was going to be involved with Sorin on a CDO?

A.  I mean I don't remember the email, but I guess I'm seeing how we're responding to this, presumably referring to email below that was talking about Sorin.

Q.  And you say in the body of the email, how we respond to this, I know we are doing a prop deal on our own.

Does a prop deal refer to a proprietary trade?

A.  Again, I don't remember writing it, but "prop" would mean

C7NVSTO1                      Grant - direct

proprietary, to me, sitting here today.

Q. Do you have any recollection of in October of 2006 Citigroup was going to do or was doing a proprietary trade?

A. I don't remember. I don't remember this email, so I don't remember the circumstances.

Q. Do you recall whether or not you'd received any information from anyone by October the 27th -- excuse me, October 25th that Citigroup was doing a proprietary trade?

A. No, I don't recall.

Q. When you wrote this email, Mr. Grant, would the information have been fresh in your mind?

A. Presumably, yes.

Q. Do you recall, sir, that during this time frame, between October 25th and the 1st of November, didn't you receive information that, in fact, the secondary trading desk at Citigroup was contemplating doing proprietary trading?

A. I don't remember.

Q. Do you recall any discussions with Mr. Stoker on that topic?

A. No.

Q. And during this time frame, Citigroup was discussing structuring a synthetic CDO squared with CSAC, weren't they?

A. I don't remember the precise timing, but, you know, obviously all these emails relate to that. So one would assume so, yes.

C7NVSTO1                         Grant - direct

Q.   And I'd like to show you what's been previously marked as Defendant Exhibit 1005.

          MR. INFELISE:  And I believe this has been admitted, your Honor.

          THE COURT:  Let me double-check.

          Yes.

          MR. INFELISE:  And can we publish that to the jury, please.

Q.   Sir, this is an email from Mr. Stoker to several individuals.  And do you recall ever receiving this email?

A.   I don't remember receiving it.

Q.   Do you recall whether or not Mr. Stoker ever discussed with you putting together an analysis showing the amount of profits that Citigroup would make by shorting certain percentages of asset collateral into a CDO?

A.   I don't remember.

Q.   Do you recall any discussion with Mr. Stoker subsequent to this date about that topic?

A.   No.

Q.   Well, sir, isn't it true that in November of 2006, Mr. Stoker did tell you that the secondary desk was going to do a proprietary trading?

A.   I don't.  Sorry, I just don't remember.

          MR. INFELISE:  I'd like to show the witness Plaintiff's Exhibit No. 50.  And just take a moment, sir, and

C7NVSTO1                    Grant - direct

read through that.

              (Pause)

A.   Yes, I've read it.

Q.   And, sir, do you have any reason to believe that you did

not receive the email from Mr. Stoker on November the 3rd,

2006?

A.   No.

Q.   Do you recognize the document?

A.   I mean I don't remember it.  I don't remember receiving it.

Q.   But you have no reason to believe you did not?

A.   No.

              MR. INFELISE:  Your Honor, we'd offer Plaintiff's

Exhibit 50.

              MS. LITTLE:  No objection.

              THE COURT:  Received.

              (Plaintiff's Exhibit 50 received in evidence)

Q.   Sir, if you would look at the very bottom email.  And it's

from Mr. Stoker to several individuals, including you,

Mr. Quintin.  And it's dated November 2nd.

              "Here's an engagement letter black-lined to our CSAC

high-grade deal."

              And the subject is "CSAC CDO squared."

              Do you see that, sir?

A.   Yes.  Although I'm copied on the email, it was sent to, I

guess, Donald Quintin, Shalabh Mehrish.

C7NVSTO1                       Grant - direct

Q.   And did you receive a copy?

A.   I mean I have no reason to believe I didn't.

Q.   You have no recollection of this?

A.   No.

Q.   And in this, Mr. Stoker lays out the -- basically the key terms for that proposed CDO, does he not?

A.   Yes.

          MR. INFELISE:  Can we look at the next email in the chain above that.  And it will be the one right below that.

Q.   And this is an email from you to Mr. Stoker on November the 3rd saying, subject, again, CSAC CDO squared.  And are we doing this.

          You don't have any recollection of that, do you, sir?

A.   Sorry, no.

Q.   Do you have any reason to believe you didn't send that?

A.   No.

Q.   And right above it, do you see the response from Mr. Stoker, I hope so.  This is DQ's prop trade.  Don't tell CSAC.

          Sir, is DQ, the reference -- the abbreviation normally used for Donald Quintin?

A.   That's correct.

Q.   And is CSAC the reference to Credit Suisse?

A.   Yes.  I assume so, yes.

Q.   And it goes on to say:  "CSAC agreed to the terms, even

C7NVSTO1                          Grant - direct

though they don't get to pick the assets."

Sir, do you have any recollection of Mr. Stoker, aside from this email, ever telling you that?

A.  Sorry, I don't.  I mean I got hundreds of emails a day, so, you know, I just don't remember.

Q.  All right.

Let's go to the email just above it, please.

And this appears to be a response on November 3rd, Mr. Stoker.  And you say:  "Are you involved?  Hopefully we get the revenue.  Let's chat in Asia.  I can't discuss over email."

When you said "hopefully we get the revenue," what were you referring to?

A.  I mean I don't remember sending the email.

Q.  Well, let me ask you this --

THE COURT:  As you sit here, what does it mean to you?

THE WITNESS:  Sitting here today, I would assume that we would want to get credit for the transaction, the revenue credit, the profit, in other words.

Q.  I see.

And that would be with regard to this proprietary trading that you discuss?

A.  Yeah.  I assume it's referring to the CSAC CDO squared.

Q.  Well, when you normally structured a deal, there were structuring fees that were paid to Citigroup; correct?

A.  That's correct.

Q.  Wasn't it normal for the structuring desk to get credit for at least part of those structuring fees?

A.  Well, yeah, it was a somewhat informal process.  We would track the structuring fees that we got on every deal.  So the reality was it was a team effort between structuring and syndicate and sales force.  So it wasn't that one person could say I was -- you know, I get credit for the whole thing.

So but we would track the amount of structuring fees on any deal that we structured so that when it came to the end of the year to, you know, have our performance reviewed, we would then say, you know, here's how much money each of these deals made.

Q.  So it was important for the purposes of performance reviews to show to the extent to which you could take responsibility for revenue generated by the CDO group?

A.  Yes.

Q.  All right.

Now, you go on to say:  "Let's chat in Asia."

Do you know what that's a reference to?

A.  I presumably was going to be in Asia and, you know, didn't have time to talk about it over the phone; it would be better to talk about it in Asia.

Q.  And do you recall whether you had, when you went to Asia, any discussions with Mr. Stoker about this?

A.  I don't remember.

Q.  No recollection at all?

A.  No.  I mean I went to Asia quite a few times.  It wasn't just one trip.

Q.  And you state:  "Can't discuss over email."

Why do you say that?

A.  Again, I don't remember writing it, so I don't know what the context was at the time.

Q.  Mr. Grant, did Mr. Stoker ever tell you that in October 2006 he was approached by Donald Quintin to structure a CDO so Mr. Quintin could do proprietary trading?

A.  I don't remember.

Q.  Are you saying you don't remember it happened or you don't remember that this ever occurred?

A.  I mean if it occurred, I don't remember it.

Q.  If occurred would you remember it?

A.  No, no, no.  I don't remember.  So it may or may not have occurred.

Q.  I see.

And did Mr. Stoker ever tell you that in October 2006 he received a list of specific assets from Mr. Quintin that were subsequently -- that he wanted forwarded to CSAC?

A.  Again, I don't remember.

Q.  And do you recall what Mr. Stoker ever told you that, in fact, before that list of assets from Mr. Quintin to Mr. Khan in sales?

C7NVSTO1                     Grant - direct

A.   I don't remember.

Q.   Do you recall whether or not you had ever saw such a list?

A.   Not at the time; but, you know, I've seen -- I guess there was a list on Friday of securities that were an email, but I don't remember at the time receiving that.

Q.   And that was unusual, wasn't it, the idea that Mr. Quintin would forward a list of specific assets to Mr. Stoker to be forwarded on to sales?

A.   I mean, again, there was -- you know, the sales desk would be responsible for suggesting, you know, if Citigroup had the securities they were selling.  Then the salesperson covering that account would, you know, have a conversation with a client about securities that Citigroup wanted to sell.

          So the client would then say, Yes, I like it; or, No, I don't; or, I'll buy it at this price.

Q.   But typically, sir, the structuring desk didn't provide specific assets to sales for inclusion of CDOs, did it?

A.   I mean I -- it doesn't seem very normal.

Q.   All right.  Thank you.

          And do you recall whether or not Mr. Stoker provided you any further updates concerning the subject that was covered in that November the 3rd 2006 email?

A.   Sorry, I just don't remember.

Q.   All right, sir.  If you would look at Plaintiff's Exhibit No. 57.

C7NVSTO1                      Grant - direct

MR. INFELISE:  Just show that to the witness.

(Pause)

Q.  Have you had a chance to look at Plaintiff's Exhibit 57?

A.  Yes.

Q.  And do you recognize it?

A.  I don't remember it, but it looks like I responded to an email that Brian sent me.

Q.  And do you have any reason to believe that you didn't send this email?

A.  No.

MR. INFELISE:  Your Honor, we would offer Plaintiff's Exhibit 57.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 57 received in evidence)

Q.  All right.

Sir, at the top it appears to be from you to Brian Stoker.  The subject is "Stoker's keep-Darius-up-to-date list. 20061114."

Sir, now looking at the body of this email, let's look at the very first paragraph.  It starts with "Stack."

Did you write this entire email or did you write some portion of it?

A.  I don't believe I wrote the entire email.  I think I wrote the capital letters as a response to the original email,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C7NVSTO1                         Grant – direct

because I did that occasionally.

Q. So it would have been a practice of yours to take the original email and put your response in capital letters and then send it back?

A. Correct.

Q. Okay.

If we could go down to the paragraph which begins "DQ's CDO squared with CSAC."

And it says: "DQ's CDO squared with CSAC. Moving forward quickly. Need to market at beginning of the year. Magnetar and DQ are earmarking trades that will settle once the deal closes."

Sir, what does "earmarking trades" mean?

A. I presume that means they are identifying trades.

Q. And then it says: "CSAC is enthusiastic. We'll probably upsize to one billion dollars."

And then you say: "Keep me up to speed on this tomorrow. I don't know anything about it."

Sir, are you saying that you didn't know anything about this CDO squared with CSAC?

A. Again, I don't remember receiving the email, so I don't remember writing it. But I presumably -- I'm saying I don't know anything about it. So I have no reason to believe that's incorrect.

Q. Do you recall whether or not Mr. Stoker ever provided you a

C7NVSTO1                    Grant - direct

proposed structure for this CDO squared with CSAC?

A.   I don't remember at the time, but obviously on that previous email where we saw where he says here's the engagement letter, and then outlines the structure, that was him sending me the structure.

MR. INFELISE:  And if we could show the witness, please, Plaintiff's Exhibit No. 65.

Q.   It's a multi-page document, sir, so just take a few minutes and look at it to the extent you think it's necessary.

(Pause)

Q.   Have you had a chance to look at that?

A.   Yes.

Q.   Do you recognize the document?

A.   I don't remember this specific document, but it looks like a structure of a deal.

Q.   And do you have any reason to believe that you didn't receive this email with the attachment?

A.   No.  Again, I'm copied on the email.  It's actually sent to Shalabh, Sohail, and Brian Carosielli.

Q.   And, again, do you have any reason to believe you didn't receive a copy of this email attachment?

A.   No.

MR. INFELISE:  Your Honor, we would offer Plaintiff's Exhibit 65.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 65 received in evidence)

Q.  Sir, I'd like to direct your attention to the top email, as you said, is from Mr. Stoker to several individuals, with a copy to you.  Subject:  "CSAC CDO squared."  And it says: "Attachments CDO squared deal summary .xls."  Does that mean that xls is a form of a spreadsheet --

A.  That is correct.

Q.  -- in Excel?

A.  In Excel.

Q.  Have you had a chance to look at the documents that are actually attached to this email?

A.  The spreadsheet, copy of the spreadsheet?

Q.  Yes, sir.

A.  Yeah.  Not in detail, because it's quite extensive, but --

Q.  Let me just ask you, does that appear to be the format for the spreadsheets that were generated at the structure desk pertaining to CDOs that you were structuring?

A.  Yes, it does.

Q.  Thank you, sir.

I would like to direct your attention back to the first page, that top email.  And in the next line there it starts with "FYI."  And you notice that the sentence beginning -- sentence beginning the end of the first line, "I'm thinking the president/constellation deals should be single A."

C7NVSTO1                     Grant - direct

Mr. Grant, do you have any understanding why Mr. Stoker was suggesting president and constellation deals?

A. I don't know. I think it's quite confusing, the email.

Q. I'm sorry?

A. The email is quite confusing.

Q. Do you recall, after receiving this email, having any discussions with Mr. Stoker about what it means?

A. No.

Q. Sir, back in 2006, were you familiar with CDOs that were called president deals?

A. I don't remember the president series. I remember the constellation series.

Q. Do you recall any emails -- excuse me. CDOs that were known as Jackson?

A. The name "Jackson" rings a bell.

Q. And isn't that a CDO that Citigroup actually was the arranging bank for?

A. I think we did a deal called Jackson.

Q. How about Buchanan, were you familiar with that?

A. The name rings a bell. I don't know if that was a CDO that we did or someone else did or maybe London did.

Q. Again, you don't recall having any conversation with Mr. Stoker about this email or the topics?

A. I don't remember having conversation, no.

Q. And I think you testified earlier that you knew that

C7NVSTO1                    Grant - direct

constellation CDOs were the CDOs that Magnetar was very interested in; is that right?

A.  That's correct.

Q.  And they more or less associated with Magnetar, were they not?

A.  Very much.

Q.  Do you recall whether they ever discussed this topic with Mr. Mehrish?

A.  Who, me?

Q.  Yes, you.

A.  No, I don't remember if I did or not.

Q.  How about Mr. Khan?

A.  I don't remember.

Q.  How about Mr. Carosielli?

A.  Sorry, don't remember.

Q.  Sir, let me ask you, did you ever learn that on January the 8, 2007, that Citigroup offered to purchase protection, $250 million of protection, on specific assets in a CDO squared that CSAC was going to manage?

A.  I don't remember the specifics, no.

Q.  Sir, I'd like to show you what has been marked as Plaintiff's Exhibit 109.

        Take a moment to look at that, sir.

        (Pause)

A.  Yeah.

C7NVSTO1                    Grant - direct

Q. Have you had a chance to look at Plaintiff's Exhibit 109?

A. Yes.

Q. And do you recognize the document, sir?

A. No.

Q. Do you have any reason to believe that you did not receive this email?

A. No.

MR. INFELISE: Your Honor, I would offer Plaintiff's Exhibit 109.

MS. LITTLE: No objection.

THE COURT: Received.

(Plaintiff's Exhibit 109 received in evidence)

Q. Sir, it says it's an email from Mr. Brian Stoker to you on January the 8th of 2007. Again, the subject is "Stoker's keep-Darius-up-to-date list 20070108."

And, sir, I'm going to direct your attention to the line that starts with "CDO squared."

Now, it says: "CDO, CSAC, BSAM, and Dillon read UBS.

First of all, BSAM, is that Bear Stearns Asset Management?

A. Yes.

Q. And UBS is Bank UBS?

A. Union Bank of Switzerland.

Q. And then he says: "CSAC is buying $250 million of protection from DQ."

C7NVSTO1                        Grant - direct

MS. LITTLE:  Objection.  It doesn't say "protection."

Q.  Excuse me.  I stand corrected.

It says:  "CSAC is buying $250 million from DQ."

Do you have any understanding what that refers to?

A.  I mean I don't remember getting the email, but I assume it means that they are buying 250 million of CDOs from Donald Quintin.

Q.  CDOs or CDS, credit default swaps?

A.  It doesn't say, so it can be either.  Economically, I think it's the same thing, anyway, so --

Q.  All right.

When Citigroup purchased CDS or credit default swaps, it was buying protection, was it not?

A.  Yes.

Q.  And it says:  "Just getting started on all these deals."

Sir, based on this email, did you ever speak with Mr. Stoker about this proposed -- well, the CDO squared with CSAC?

A.  I don't remember.

Q.  Sir, when a deal manager is putting together a CDO, he has to know what assets are going into that in order to structure it, does he not?

A.  Yes.  There would be probably a dummy portfolio that would indicate placeholder assets or maybe some actual assets that would go into the deal.

Q.   But at some point in time when an actual decision is made, what assets it would include, the deal manager would have to know that, wouldn't he?

A.   Yes.

Q.   Sir, you said -- I believe you said you don't recall any discussions in the fall of 2006 with the CDO group about doing a proprietary trade.

Sir, do you recall actually telling Mr. Stoker that when you were modeling certain CDOs that were prop trades, that the assumption -- you had to make -- more careful with respect to the assumptions you were making?

A.   I don't remember having that conversation.

Q.   Can you look at Plaintiff's Exhibit No. 137.

Have you had a chance to look at Plaintiff's Exhibit 137?

A.   Yes.

Q.   Do you recognize that, Mr. Grant?

A.   I don't.

Q.   Do you have any reason to believe you didn't send this email?

A.   No.

MR. INFELISE:  Your Honor, we'd offer Plaintiff's Exhibit 137.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 137 received in evidence)

Q.  Sir, this is an email from you to Mr. Brian Stoker and Maneesh Awasthi.

Who is Mr. Awasthi?

A.  He was a deal manager.

Q.  And he worked for you also?

A.  That's correct.

Q.  And you say:  "Let's make sure we don't miss any modeling -- " talking about CDO squared.  Do you see the subject?

A.  Yes.

Q.  And "ABS" means asset-backed security CDO squared?

A.  Yes.

Q.  And it says:  "Let's make sure we don't miss any modeling assumptions for agencies as we run all or very concentrated ABS CDOs.

"DQ," again, that's a reference to Mr. Donald Quintin?

A.  That's correct.

Q.  "was mentioning as we do these prop-type deals, it's more important for our risk and revenue perspective."

Correct?

A.  Yes.

Q.  Do you recall sending that email?

A.  No.

Q.  Do you recall Mr. Grant telling you -- excuse me, Quintin telling you?

C7NVSTO1                        Grant - direct

A.  I don't remember.

Q.  Let me ask you, when you're doing a proprietary trade of an asset, that means that you're doing it for companies on account; correct?

A.  That would be the implication, yes.

Q.  And as a result, you have to look closer at those because there's a risk associated with holding an asset rather than just buying and selling for a customer; correct?

A.  I'm not sure.  I think I refer to saying that the deals were more concentrated.  So I think -- I mean, again, I don't remember writing it, but a CDO squared is much more concentrated, the risk, than a typical ABS CDO.  So I think I was probably saying, you know, let's make sure we use the most appropriate assumptions.

Q.  Especially when it involves a prop-type deal; correct?

A.  I wouldn't say the fact it was a prop deal meant that the assumption should be different.  But, again, I don't remember the details of that at the time, sitting here today.

Q.  But when you wrote this email, that information would have been fresh in your mind; correct?

A.  Yes.

Q.  Sir, is it correct to say that in late 2006 you believed that it was important for Citigroup to use an asset manager on CDOs that it was structuring to reach the market?

A.  I believe so, yeah.

C7NVSTO1                         Grant - direct

Q.  And isn't it true that this time you believe that -- the

reason you believe that is because that's what investors want,

an asset manager?

A.  Yes.

Q.  And does that mean, sir, that whether or not there was an

asset manager, you believe that whether or not there's an asset

manager would affect an investor decision whether they were

going to invest in a particular CDO?

A.  That's correct.

Q.  Sir, I think we briefly talked about -- earlier, last

Thursday, about the marketing of CDOs.

        Would the two primary documents that were used to

market a CDO be what was known as the flip book and the

offering circular or offering memorandum?

A.  Yes.

Q.  Sir, if you would look in your book, there's a Plaintiff

Exhibit No. 169.

        MR. INFELISE:  May I approach, your Honor?

        THE COURT:  Yes.

Q.  I apologize.  This was not in your book.  But I'm going to

provide it to you now.

A.  It is in there.

Q.  Oh, it is in there?

A.  Yeah.

Q.  Good.

C7NVSTO1                        Grant - direct

And if you would take a motion, sir, look at Plaintiff's Exhibit 169.

(Pause)

Q.  Have you had a chance to look at Plaintiff's Exhibit 169?

A.  Yes.

Q.  Do you recognize it?

A.  It's a flip book.

Q.  And you recognize this as a flip book that would have been produced by the structuring desk or by Citigroup?

A.  Yes.

MR. INFELISE:  Your Honor, I would offer Plaintiff's Exhibit 169.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 169 received in evidence)

MR. INFELISE:  And if you could publish that.

Q.  Sir, the very first page says it's Class V Funding III Limited, Credit Suisse Alternative Capital, Inc. as manager.

And this is one of the documents that you referred to that was used to market CDOs like Class V Funding III; correct?

A.  That is correct.

Q.  And part -- sections of this were prepared by the manager at Credit Suisse; correct?

A.  I'm sorry, part of the document.

Q.  Part of the document was prepared by Credit Suisse;

C7NVSTO1                    Grant - direct

correct?

A.   That's correct.

Q.   And parts of it were prepared by Citigroup?

A.   Correct.

Q.   And, again, the Class V III deal manager was Brian Stoker, wasn't he?

A.   Yes.

Q.   Isn't it true, sir, that even though portions of this were prepared by the manager, Citigroup retained the right to review it and suggest changes in the parts actually written by the manager; correct?

A.   Yes.

Q.   You can set that aside.

        Sir, Mr. Grant, let me ask you, did you come to believe that Class V Funding III was, in fact, a proprietary trade?

A.   I don't remember very much about it.  I don't remember at the time.  I mean we were doing 25 or so -- 30 deals at any one time.  So it just doesn't stand out to me.

Q.   Do you recall any other CDO that you were -- that Citigroup structured that was considered a proprietary trade?

A.   No.

Q.   And, again, I ask you, sir, do you recall whether or not at any point in time you believed that Class V Funding III was, in fact, proprietary trading?

C7NVSTO1                    Grant - direct

A.   I don't remember if I did or not.

Q.   If you would look, sir, at Plaintiff's Exhibit No. 327 in your book.

          (Pause)

Q.   Have you had a chance to look at Plaintiff's Exhibit No. 327, sir?

A.   Yes.

Q.   Do you have any recollection of this document?

A.   No.

Q.   Do you have any reason to believe that you did not either send or receive the emails listed on this document?

A.   No.

          MR. INFELISE:  Your Honor, we'd offer Plaintiff's Exhibit 327 into evidence.

          MS. LITTLE:  No objection.

          THE COURT:  Received.

          (Plaintiff's Exhibit 327 received in evidence)

Q.   I'm going to direct your attention, sir, once we have that on the screen, to the email at the very bottom of the page, which I understand these are in sort of reverse chronological order; the earliest email at the bottom and working up.

          You can see it's from Janice Warne.

          First, sir, who is Janice Warne?

A.   Janice was the co-head of the CDO group.

Q.   And the subject is "First Quarter Highlights."

C7NVSTO1                    Grant - direct

And she says:  "Michael wants to include a couple of references in his presentation to first quarter highlights."

Do you know who she was referring to when she said Michael?

A.  Yes, Michael Raynes.

Q.  And who is he?

A.  He was global head of structured products group.  So Janice -- that would have been Janice's boss.

MR. INFELISE:  If we could look at the next email up from that.

Q.  And it says it's from Darius Grant on May the 1st to Ms. Warne, Mr. Mehrish, Mr. Islamov.

Who is Mr. Islamov?

A.  He was originally in the structuring group, and then he moved into the trading -- on the CDO trading desk.  So at this point in time, I don't know which desk he was on.

Q.  And the subject is "First Quarter Highlights."

And if you will look at the third numbered paragraph. And it says:  "We did a proprietary CDO squared, Class V funding, which allowed the trading desk to take a significant position by shorting paper into the deal, subsequently yielding large profits for trading when spreads widened."

Sir, does that not indicate that by May the 5th, you believed that your Class V III was, in fact, a proprietary trade?

C7NVSTO1                     Grant – direct

A.   Again, I don't remember sending the email, but it would sort of seem to.  One could interpret it like that, I guess.

Q.   And based on the information you had at the time, you believed that that proprietary positioning by shorting paper into the deal resulted in huge profits?

A.   Well, someone would have had to inform me of that because I wouldn't know.

Q.   But that was your understanding on May the 5th?

A.   Presumably.  Yeah, presumably.  That's why I wrote it, yeah.

Q.   And when you say take a significant position by shorting paper, that means that Citigroup was purchasing protection on the assets in the Class V III; correct?

A.   Correct.

Q.   When you say because the spreads widened, does that mean that the price that people were willing to pay for the protection Citigroup purchased had increased?

A.   Well, that would mean that the price of the underlying bonds fell, but the cost of protection had increased.

Q.   In other words, there was a greater demand for people to buy protection on the assets that Citigroup purchased protection on?

A.   That's correct.

Q.   Thank you, sir.

          Sir, do you recall whether or not in June of 2007

C7NVSTO1                    Grant - direct

Mr. Stoker provided you with a detailed analysis of what he determined was the amount of money Citigroup made from Class V III?

A.   I don't remember.

Q.   If you would look, sir, at Plaintiff's Exhibit No. 338 in your book.

          (Pause)

Q.   Have you had a chance to look at Plaintiff's Exhibit No. 338, Mr. Grant?

A.   Yes.

Q.   And do you recognize it?

A.   I don't recognize it.

Q.   And do you have any reason to believe you did not receive this email?

A.   No.

Q.   Do you have any reason to believe you did not receive the attachment to this email?

A.   No.

          MR. INFELISE:  Your Honor, I would offer Plaintiff's Exhibit 338.

          MS. LITTLE:  No objection.

          THE COURT:  Received.

          (Plaintiff's Exhibit 338 received in evidence)

Q.   And this appears to be an email from Mr. Brian Stoker to you on June 27, 2007.  Subject is:  "Savings by selling to

C7NVSTO1                     Grant – direct

CSAC, Vandy, and Harding."

Now, the first sentence says:  "I did a detailed analysis of the CDOs that Citi sold Vandy, Harding, and CSAC."

First, Vandy is that a reference to Vanderbilt?

A.   That's correct.

Q.   What was Vanderbilt?

A.   Vanderbilt was a manager who managed CDOs.

Q.   And Harding was also an asset manager?

A.   Yes.

Q.   And, of course, CSAC was the asset manager on Class V III?

A.   Correct.

Q.   Now, did you have a chance to look at all -- look at any portions of the attachment to this email?

A.   Let me take a look now.

Q.   Okay.

(Pause)

A.   Yes.

Q.   All right.

And does that appear to be this type of information that was normally provided to you by people on your structuring desk?

A.   I think occasionally.

Q.   All right.

Now, you'll see that there are a list of what the deals were, and there are a series of names.  Besides Class V

C7NVSTO1                         Grant – direct

III, I see a reference to 888.  Is that 888 Tactical, what was known as 888 Tactical?

A.   I don't remember.

            I assume that they are CDOs structured by Citigroup.

            (Continued on next page)

C7NESTO2                        Grant - direct

BY MR. INFELISE:

Q.  You don't have any recollection of whether or not Citigroup actually structured the CDO named 888 Tactical?

A.  The name rings a bell.

Q.  All right.  Now, looking in the body of the e-mail, there's several references to various CDOs.  You'll see in the third sentence, it's Class V III made us $250 million in profits.

Do you see that?

A.  Yes.

Q.  Do you know what the structuring fee on Class V III was?

A.  No.

Q.  Wasn't it approximately between 30 and 35 million dollars? Do you have any recollection at all?

A.  The fees -- I mean, in '07 I think the fees were all over the place.  But the fees might have been -- and I know we -- the fees were higher for a CDO squared.

Q.  Do you recall, sir, ever receiving $250 million in fees to structure a billion-dollar CDO?

A.  No, that would be -- no.  The structuring fee was maybe 10 million, 15 million at most.

Q.  I see.  You can take that down now.

Okay.  Mr. Grant, isn't it true that in 2006 and 2007 there were various research papers circulated to individual -- you and other individuals on the structuring desk that were produced by Citigroup global markets and other portions of

C7NESTO2                       Grant - direct

Citigroup, correct?

A.   Correct.

Q.   And those were documents that you would, in fact, if they referred to your area, you would read those?

A.   Sometimes.  I mean, we got a lot of information, so something -- a lot of times we just wouldn't have time to read it.

Q.   How were they provided -- well, were they provided to you and the other individuals on the structuring desk by e-mail?

A.   E-mail, sometimes hard copy.

Q.   All right.  And in addition to information about CDOs, did you also receive information, research papers relating to mortgage backed securities?

A.   That's correct.

Q.   And were those research papers that were available to you and other individuals on the structuring desk?

A.   Yes.

Q.   I believe in your book will be a tab that says Plaintiff's Exhibit 161.  Have you had a chance to look at Plaintiff's Exhibit 161?

A.   I mean, briefly.

Q.   All right.  Well, my question was this:  Is this the type of research paper concerning mortgage backed securities that were provided to you and other individuals on the structuring desk in 2006/2007?

A.   Yes.

MR. INFELISE:  Your Honor, I would offer Plaintiff's Exhibit 161.

MS. LITTLE:  Objection.  Foundation and relevance.

THE COURT:  The objection on grounds of relevance is overruled.  The objection on the grounds of foundation is sustained.

Q.   Mr. Grant, if you look at Plaintiff's Exhibit 161, do you recall actually receiving it?

A.   No.

Q.   And but this is the type of background paper on mortgage backed securities that were provided to you in 2006/2007?

A.   Yeah.  Well, they were available.  I wouldn't say they were provided to us.  They were available for us to review.

Q.   And where were they available?

A.   Either on -- you know, the research person would bring them down and put a pile of them on the end of the desk for people to pick up or they would be e-mailed out to, you know, every -- clients because it was an internal and an external document, and also e-mailed to us.

Q.   So the person from the research department would bring it down and just put hard copies on desks, so that was available to anyone on the structuring desk that was working there?

A.   Yes.

Q.   And, sir, did you look at these and consider these type of

C7NESTO2                    Grant - direct

research reports when you were doing -- performing your function as structuring CDOs?

A.   Yes.

          MR. INFELISE:  Your Honor, again, we would offer Plaintiff's Exhibit 161 into evidence.

          MS. LITTLE:  Same objection, foundation.

          THE COURT:  No, I think that's sufficient.  You're not challenging the authenticity, correct?

          MS. LITTLE:  No, your Honor, but I think unless he can testify that he saw this document --

          THE COURT:  No.  No.  I understand that.  161 is received.

          (Plaintiff's Exhibit 161 received in evidence)

          MS. LITTLE:  It's also hearsay, your Honor.

          THE COURT:  It's not being offered for the truth.  As I understand it, it's being offered for the fact that it was available on the structuring desk and was -- therefore, may or may not have been something that a reasonable person structuring the deal that we're concerned with here would have read.  That, of course, is subject to further development by both sides.

          MS. LITTLE:  That goes back to my relevance objection.

          THE COURT:  Excuse me.  I have ruled, counsel.

          MS. LITTLE:  May I just make a record?

          THE COURT:  You may make a record at the break.

C7NESTO2                    Grant - direct

BY MR. INFELISE:

Q.  Mr. Grant, could you look at Plaintiff's Exhibit 47 in your binder.

A.  Yes.

Q.  And have you had a chance to look at Plaintiff's Exhibit 47?

A.  Yes.

Q.  And do you recognize this document, sir?

A.  No.

Q.  And do you recall, is this the type of research paper that was provided to you by the global CDO strategy group back in 2006 and 2007?

A.  Yes, it looks like it.

Q.  And again, is this the type of research paper that was made, provided to you and other individuals from the structuring desk, either by e-mail or hard copies that were brought right to the desk?

A.  Yes.

Q.  And is this the type of -- kind of information that you would consider when structuring a CDO?

A.  Yes.

MR. INFELISE:  Your Honor, we would offer Plaintiff's Exhibit 47 into evidence.

MS. LITTLE:  Same objection: Foundation, relevance and hearsay.

C7NESTO2                    Grant - direct

THE COURT:  Same ruling.  Received.

(Plaintiff's Exhibit 47 received in evidence)

MR. INFELISE:  Just for the record, sir, we also have a business record certification for this document.

THE COURT:  Yes.

BY MR. INFELISE:

Q.  All right.  Sir, again, is this the document -- obviously this is Plaintiff's Exhibit 47 -- and do you recall who Mr. Ratul Roy is?

A.  Yes.

Q.  Who is he?

A.  He was the head of the CDO strategy group.

Q.  Sir, as I understand it, Class V Funding III was one of the first CDO squareds that Citigroup structured, is that accurate?

A.  I think we did quite a few CDO squareds.  I don't remember when that was in context of the overall program.

Q.  Well, is it accurate to say that at least in --

A.  I think ABS CDO squareds, there weren't many of those.

Q.  All right.  And was Class V Funding III an ABS CDO squared?

A.  Yes.

Q.  And wasn't one of the reasons that there weren't many of these because they were very complex and investors had difficulty understanding them?

A.  That's partially -- yeah, I would agree with that.

Q.  And isn't that why investors wanted asset managers for all

these type of securities, because they were complex and they didn't really understand how to analyze them?

MS. LITTLE:  Objection, foundation.

THE COURT:  Sustained.

Q.  Sir, is it also true that in a CDO squared, that it's only necessary to have approximately 5 percent of the assets being weak and will double the default rate on that CDO?

MS. LITTLE:  Objection, foundation.

THE COURT:  Yes.  Sustained, but see if you can lay the foundation.

Q.  All right.  Mr. Grant, if you would look at -- and I'm referring to Plaintiff's Exhibit 47.  It's the page that's Bates numbered Citi 2993164, and we'll bring it up on the screen for you.

Have you had a chance to look at that now, Mr. Grant?

A.  Yes.

Q.  All right.  So, Plaintiff's Exhibit 47 -- which was, you said, provided to you and other individuals at the structuring desk -- in fact, indicated that with as little as what you said, 5 percent weak deals, the default -- average default rate could double?

A.  I don't remember reading this piece.  But I guess this is an analysis that Ratul Roy would have done on a specific CDO squared.  But, like, that doesn't mean anything to me.

Q.  Okay.

C7NESTO2                           Grant - direct

A.  I have no reason to believe it's not correct.  It just --
it wasn't sort of commonly knew in fact, for example.

Q.  Let's put that down.

THE COURT:  Well, at the time that you were dealing with CDO squareds, was it your understanding that they experienced more than average default rates or no?

THE WITNESS:  I don't believe so, no.

THE COURT:  What was the basis for your understanding at the time?

THE WITNESS:  I think they would experience just a typical CDO squared; asset backed CDO squared would exhibit the same default characteristics of an asset backed CDO with underlying collateral.  So in other words, it would be average. And either the selection of the collateral would determine whether the defaults were higher or lower.

THE COURT:  All right.  Go ahead, counsel.

MR. INFELISE:  Thank you.

BY MR. INFELISE:

Q.  Let me go back just a moment.  I want to take that down.  I never published to the jury Plaintiff's Exhibit 161.

Now, there's a name on the left-hand corner and, I'm sorry, I can't pronounce it.  Do you recognize that name?

A.  Yes.

Q.  Who is that?

A.  Rahul Parulekar was the person in charge of subprime

mortgage research.

Q.  And again, this is dated January 26, 2007.  When it says Worst Vintage in Subprime History, is that referring to your understanding of the mortgage backed securities that were originated in 2006?

A.  It looks like it from the document, yeah.

Q.  Thank you.  All right.  Mr. Grant, you touched on this earlier, that you were concerned that structuring did get credit for at least part of the fees made in CDO structure. And the reason you did that was because that was important at year's end when determining what kind of compensation individuals got, correct?

A.  Yes.

Q.  And so you tried to make sure that the structuring desk would get credit for their work they did in the CDO -- structured CDO?

A.  Yes.

Q.  And was, in fact, the revenue that was generated by the CDOs that were structured a relevant consideration for purposes of compensation to the people that worked on the structuring desk?

A.  You mean relevant?  Yes.  It was very relevant.

Q.  As I understand, there were actually kind of -- there were two types of factors that were considered.  One was the qualitative factors that were at work; that is, how well they

C7NESTO2                      Grant - direct

worked with others and actually in the workplace, correct?

A.   Correct.

Q.   And the other was the quantitative factors, and that included consideration of the amount of revenue that was generated by a CDO that a person worked on?

A.   That's correct.

Q.   Sir, do you recall that in late 2006 or early 2007 Brian Stoker told you that he received an offer from Merrill Lynch?

A.   I remember he received an offer from Merrill Lynch.  I don't remember exactly the time.

Q.   And did he tell you about that offer?

A.   Yes.

Q.   And did Mr. Stoker tell you that he wanted to stay at Citigroup but he needed to have Citigroup match that offer, is that accurate?

A.   Yes.

Q.   And based on that -- well, did you think at that point in time you wanted to retain Mr. Stoker at Citigroup?

A.   Yes.

Q.   And that was because of the work he was doing?

A.   Yes.

Q.   All right.  And so did you actually go to bat for him and put individuals above you, including Mr. Dominguez, to have Citigroup approve a compensation that was equal to or close to what Merrill Lynch offered, correct?

C7NESTO2                          Grant - direct

A.   Yes.

Q.   And you recall that the offer from Merrill Lynch was about total about -- in total about $2.5 million?

A.   I remember it was two-something.  I thought it was a little bit lower than that, 2.2, 2.3, something like that.

Q.   I see.  And you recall that the basis for your knowledge about that was what Mr. Stoker told you?

A.   Yes.

Q.   You didn't see the offer, did you, sir?

A.   No.

Q.   And did you, in fact, then attempt to get Mr. Stoker a compensation which would be both the salary and a guaranteed bonus equivalent to that?

A.   Yes.

Q.   Mr. Grant, did you know that Mr. Stoker lied to you about the amount that Merrill Lynch offered him?

A.   No.  I had no reason to believe he lied.

Q.   If he lied about that amount, would you have recommended he got a guaranteed bonus in his salary?

A.   No.

          MR. INFELISE:  No further questions.

          THE COURT:  Cross-examination?

          MS. LITTLE:  May I approach the witness, your Honor?

          THE COURT:  Yes.

                              - - - - -

C7NESTO2                    Grant - direct

CROSS EXAMINATION

BY MS. LITTLE:

Q.  Good morning, Mr. Grant.

A.  Good morning.

Q.  I'm Jan Little.  I represent Mr. Stoker.

          You were talking with Mr. Infelise about this February 2007 competing offer from Merrill Lynch?

A.  Mm-mm.

Q.  I think you testified you did want to keep Mr. Stoker on your team, correct?

A.  Yes.

Q.  He was a valued member of his structuring group?

A.  Yes.

Q.  And, in fact, you were frustrated about -- and worried about the fact that other companies might try to hire Mr. Stoker, right?

A.  Yes.

Q.  In fact, I think you may have told others that he was a perfect target for that, correct?

A.  I'm sorry.  I didn't hear --

          THE COURT:  Counsel, I'm sorry.  For some reason that microphone doesn't seem to be --

          MS. LITTLE:  I'll speak up.

          THE COURT:  Thank you.

Q.  In February of 2007 you considered Mr. Stoker to be a

perfect target for a competitor to hire away, did you not?

A.  Yes.

Q.  And the bonus that was paid to Mr. Stoker for 2007 was motivated by a desire to retain him, correct?

A.  That's correct.

Q.  And it was not linked to Class V III, was it?

A.  Not to my knowledge.

Q.  And it was a guaranteed bonus, correct?

A.  I believe it was guaranteed, but the final confirmation of that came from my superiors, like Ms. Warren or Dominguez or Michael Raynes.  But given that Brian stayed, yeah, I believe it was guaranteed.

Q.  And do you recall, sir, that that guarantee was negotiated before Class V III closed?

A.  I don't remember the timing of the whole Merrill offer.

Q.  Mr. Grant, you testified that you worked at Citigroup from mid-2000 until December of 2007?

A.  Yeah.

Q.  And you were reporting to Ms. Warren and to Mr. Dominguez, correct?

A.  Correct.

Q.  And I believe you testified last week that there were about 20 to 25 people in the structuring group?

A.  That's correct.

Q.  And one of them was Mr. Stoker, right?

C7NESTO2                    Grant - cross

A.   Yes.

Q.   And he was a direct report to you, correct?

A.   That's correct.

Q.   And Mr. Keith Pinniger was also a direct report to you?

A.   Yes.  He was slightly more junior than Brian, but, yes, he was another person in the structuring team.

Q.   And in terms of the -- he was actually directly reporting to you as opposed to through anybody else, correct?

A.   Yeah.  It wasn't -- there wasn't a hierarchal structure in place, if that was the question.

Q.   In fact, did everyone in the group report directly to you?

A.   Generally, yes.

Q.   And back in 2006/2007 you were a managing director, is that right?

A.   That's correct.

Q.   And you held certain professional licenses, right?

A.   Yes.

Q.   Series 7 and Series 63?

A.   Yes.  And there was another one.

Q.   Series 24?

A.   I think so, yeah.

Q.   And that's for supervisors, correct?

A.   Correct.

Q.   And you testified last week that the structuring desk was responsible for the mathematical components in the structuring

C7NESTO2                    Grant - cross

deals, right?

A.   Yes.

Q.   And that involves things such as making sure the portfolio generates enough yield for note holders, correct?

A.   Yes.

Q.   In other words, makes sure it produces enough money to pay off the note holders, right?

A.   Yes.

Q.   And it requires running a whole series of mathematical models?

A.   Correct.

Q.   And making sure that the ratings were received from a rating agencies are correct?

A.   That's correct.

Q.   And also includes things like priority of payments?

A.   Yes.

Q.   So it's basically working on the mechanical structure of the deal; that's what the structuring desk does, right?

A.   Yes.

Q.   With respect to the role of the deal manager, you testified that the deal manager is ultimately responsible for the CDO? Do you recall that testimony?

A.   Yes.

Q.   Didn't you mean by that, sir, that the deal manager is responsible for the structuring of the CDO, right?

C7NESTO2                      Grant - cross

A.   Isn't that the same thing?

Q.   Well, I think -- you're not saying the deal manager is the only person who works on the CDO and the only person responsible for the whole thing, right?

A.   No.

Q.   And then really the deal manager is a coordinator, right?

A.   Yeah.  I mean, in some respects their -- you know, as we know, there's external lawyers, there are internal lawyers. There's the syndicate desk, providing influence spreads and assets that investors like or dislike.  So the -- yeah, the deal manager was -- I mean, their real responsibility was that mechanic, I would say, the mechanics of it.  But there were a lot of other people whose input was relevant.

Q.   And a lot of other people had responsibilities for parts of the deal, correct?

A.   Sure.

Q.   The structuring desk had certain responsibilities, the asset manager had certain responsibilities, right?

A.   Mm-mm.

Q.   The lawyers had certain responsibilities?

A.   Yes.

Q.   The rating agencies had certain responsibilities?

A.   Yes.

Q.   And the deal manager is the person ultimately responsible for coordinating all of this?

C7NESTO2                     Grant - cross

A.   Correct.

Q.   One of the first documents prepared in a managed deal is an engagement letter, correct?

A.   That's correct.

Q.   And Mr. Stoker for Class V III was responsible for the engagement letter, is that correct?

A.   The engagement letter was -- a number of people would be typically be involved in the engagement letter.

Q.   Another document that's part of a CDO is the term sheet, right?

A.   You mean the term sheet for the --

Q.   For the CDO?

A.   For the manager, or the term sheet that went to the sales force?

Q.   The term sheet that goes to the sales force.

A.   Yeah.  I'm sorry.  What was the question again?

Q.   Well, that's another part, another important document in --

A.   Yes.

Q.   -- putting together a CDO, correct?

A.   Typically, yes.

Q.   And do you recall for Class V III that Mr. Frank Li was the person preparing the term sheet?

A.   I don't remember who prepared it.

Q.   You've also testified and been shown Exhibit 169, which is the flipbook?

C7NESTO2                    Grant - cross

A.   Yes.

Q.   And do you recall that Mr. Frank Li was the person responsible for putting together the flip book?

A.   I don't remember who put together the flipbook.

Q.   And you testified last week that you would, on occasion, review marketing materials like a flipbook, correct?

A.   Sure.

Q.   Would you take a look in your book, the book that I just gave you, the black book, Exhibit 1066.

A.   Yes.

Q.   Is that an e-mail from Mr. Li to you dated January 24th?

A.   That's correct.

Q.   Do you have any reason to believe you did not receive it?

A.   No.

        MS. LITTLE:  I offer Exhibit 1066.

        MR. INFELISE:  Objection, your Honor.  Relevance.

        THE COURT:  Overruled.

        MR. INFELISE:  Your Honor, could we have a side bar on this, because I believe this issue is going to come up again.

        THE COURT:  Okay.

        (Continued on next page)

C7NESTO2                    Grant - cross

          (At side bar)

          MR. INFELISE:  Your Honor, my concern isn't the e-mail

from Mr. Li to Mr. Grant.  It's the e-mail below that, which

indicates --

          THE COURT:  Sorry.  You need to speak a little louder.

          MR. INFELISE:  My concern isn't the fact that e-mail

was sent to Mr. Grant.  We don't have an objection to that.  My

concern is that there's a reference in the e-mail just below

that that it's sent to a lawyer at Milbank Tweed.

          THE COURT:  Well, now, I think about four questions

ago there was a reference to lawyers, and you didn't object.

          MR. INFELISE:  I didn't because --

          THE COURT:  And I was flabbergasted, given the fact

that there's been endless controversy about whether or not that

should be admitted or not.  And there you were, sitting there

allowing it in.

          MR. INFELISE:  And the reason is I didn't want to

highlight it to the jury, the fact of lawyers.  But, your

Honor, when you're introducing a document, which they'll be

allowed to take back with them, which, again, suggests --

          THE COURT:  So I think this is a subject that requires

a little discussion, so I'm going to excuse the jury for the

midmorning break and we'll discuss it.  But I put both counsel

on notice that if you don't object to a question that opens the

door, then you turn around later and say, oh, we object on

C7NESTO2                        Grant - cross

relevance grounds, when the jury has already heard evidence bearing on it, you have waived that objection.

MR. INFELISE:  I understand.

THE COURT:  Now, in this case there's a very fleeting reference.  It was only a few minutes ago, so I will not construe it as a waiver.  But in the future, both sides stand on notice that I meant it.

MR. INFELISE:  All right.

(In open court; jury present)

THE COURT:  So ladies and gentlemen, we have a dilemma here.  On the one hand, since the side bar is probably going to go for about 10 or 15 minutes, we could give you the pleasure of sitting there, watching our backs as we try to whisper quietly about the legal matter just raised.  I know that could be a considerable inducement.  However, the alternative is to give you your midmorning break now.

So reluctantly, we'll give you your midmorning break now.  Fifteen minutes.  We'll see you in 15 minutes.

(Jury excused)

(In open court; jury not present)

THE COURT:  Before we turn to the matter that we discussed at side bar, would someone put Exhibit 50 in front of the witness again up on the screen.

So, Mr. Grant, this is a series of e-mails between you and Mr. Stoker, yes?

C7NESTO2                    Grant - cross

THE WITNESS:  Yes.

THE COURT:  You've seen this before in preparation for your testimony here today?

THE WITNESS:  That's correct.

THE COURT:  And Mr. Stoker -- looking at the middle of the page after you had asked him, quote, are we doing this? Says, quote, I hope so.  This is DQ's prop trade (don't tell CSAC).  CSAC agreed to terms, even though they don't get to pick the assets.

What do you understand by the words "don't tell CSAC"?

THE WITNESS:  Presumably do not let the manager know that this is DQ's prop trade.

THE COURT:  And when you read that, I know you have no current recollection, but when you read that, wouldn't that have surprised you?

THE WITNESS:  I mean, I don't remember the details, but my view is the manager at the end of the day always chooses the assets.  So I don't see how it's possible the manager wouldn't get to pick the assets.

THE COURT:  Well, that --

THE WITNESS:  Assuming they were responsible.

THE COURT:  My question is:  You understood Mr. Stoker to be saying that you shouldn't tell CSAC, correct?

THE WITNESS:  Correct.

THE COURT:  And so this wasn't a question of whether

C7NESTO2                        Grant - cross

or not they ultimately get to pick it.  This was a question of whether you were being asked to conceal something from CSAC, yes?

THE WITNESS:  I guess so, yeah.

THE COURT:  And the reason is -- that was given is that CSAC agreed to terms, even though they don't get to pick the assets.  What did you understand that to mean?

THE WITNESS:  I don't remember, your Honor, the e-mail.

THE COURT:  Well, what do you understand it now?

THE WITNESS:  Well, it doesn't make much sense to me, because CSAC agreed to terms even though they don't get to pick the assets.  The manager had a fiduciary responsibility to select assets, you know, for the benefit of the CDO, for the investors in the CDO.  So it would -- it doesn't make sense to me that they would -- especially if it was Credit Suisse, which is a reputable firm.

THE COURT:  So here you receive a message from Mr. Stoker that first asks you not to tell something to CSAC, and second, says something that from your standpoint reading it now doesn't make sense, correct?

THE WITNESS:  Correct.

THE COURT:  And what action, if any, did you take when you received that?

THE WITNESS:  I -- I don't remember.

THE COURT:  Well --

THE WITNESS:  I just don't remember even receiving the e-mail.

THE COURT:  Well, isn't this -- wouldn't you have been disturbed by this e-mail?

THE WITNESS:  Well, reading it now, it definitely -- the second part of that sentence, the second sentence would seem very unusual.

THE COURT:  So you respond, going up the e-mail chain, quote, are you involved?  Hopefully so we get the revenue. Meaning what?

THE WITNESS:  That we would get structuring credit for this transaction.

THE COURT:  Because it would be good for your collective positions, reputations, compensations or whatever within Citigroup to get credit for it, yes?

THE WITNESS:  Yes, sir.

THE COURT:  And then it says, quote, let's chat in Asia.  Can't discuss over e-mail, closed quote.  Why couldn't you discuss over e-mail?

THE WITNESS:  I mean, I don't know why I wrote that, because I just don't remember it.

THE COURT:  Was that -- as you look at it now, is that a reflection of the fact that you were disturbed by Mr. Stoker's --

C7NESTO2                        Grant - cross

THE WITNESS:  I think it's possible.  I mean, it could be I wasn't even in the office at the time, or I was too busy or I -- it was something that I thought was unusual and that we shouldn't talk about it over e-mail.

THE COURT:  Okay.  Very good.  You may step down. We'll see you in 15 minutes.

THE WITNESS:  Thank you.

(Witness stood down)

THE COURT:  All right.  Now, the next thing I wanted to take up is defense counsel wanted to make a record about her objection to Exhibits 161 and 47.

MS. LITTLE:  Thank you, your Honor.

Mr. Infelise indicated that these documents were not being offered for the truth.  However, if the witness says he hasn't seen them before, they can't be -- they can only be relevant for their statement as being true.  There's no --

THE COURT:  No.  No.  I admitted these because the witness said that these were generally available both by e-mail and hard copy on the structuring desk, and they bear on important -- potentially important issues to anyone who was putting together CDO squareds.  So, we don't know whether Mr. Stoker is going to say -- at least I don't know what he's going to say when he takes the stand, if you saw these or not. But if he saw them, then there are questions about whether -- how it informed his understanding of the deal.  If he did not

C7NESTO2                          Grant - cross

see them, then the question will be was he negligent in failing to look at these items that were so directly on point, arguably, to what he was doing.

So it was because of those alternatives that I admitted it as relevant. They're not admitted for their truth. They're admitted for what he would have seen and what he -- or failed to see, as the case may be, and what steps he took or failed to take as a result.

So you have your objection, of course, preserved for appeal.

MS. LITTLE:  Thank you.

THE COURT:  All right. Next, we have the objection raised at the side bar by plaintiff's counsel to Exhibit 1066. which scholars of English history will remember is a very important year.

So let me hear from plaintiff's counsel.

MR. INFELISE:  Yes, your Honor. Again, our concern here is that not with the top e-mail, when we were not objecting that that's all there was, because it showed a communication with Mr. Grant and Mr. Stoker. Our concern is that the e-mail at the bottom referenced refers to lawyers. It says Milbank.

Again, your Honor, I've yet to hear defendants' counsel articulate how discussions or communications with attorneys in this case is relevant to anything. The only thing

C7NESTO2                     Grant - cross

it's relevant to is to raise this specter in the background --

THE COURT:  I'm sorry.  Either I'm looking at the wrong exhibit or I don't see the reference to Milbank.

MS. LITTLE:  It's at the bottom of the e-mail, your Honor, Frank Li from the structuring group sent the flipbook. In addition to sending it to Mr. Grant, he sent it to with Jane Schway, who's internal counsel at Citi, and to E. Harding, which is Elizabeth Harding at Milbank.

THE COURT:  Oh, I see.

MS. LITTLE:  I was not intending with this witness to inquire about that bottom part of the e-mail, but as you know from the brief that we filed yesterday, this is an issue that will come up with Mr. Pinniger.  And I would --

THE COURT:  Yeah.  I mean, I think we need to have a full discussion of that important issue, given what you've just said, though I wonder whether we need to have it now.

If the sole reference in this e-mail is to E. Harding at Milbank, and you're not going to ask this witness, what's Milbank, the jury doesn't know what Milbank is; or even if they do, then I don't think there's any meaningful argument that could be made, just based on this single e-mail.

MS. LITTLE:  My only purpose with this witness with this document was to show that he received the flipbook. That's all I was going to do with this witness.

THE COURT:  All right.  So when, however, so we can

C7NESTO2                        Grant - cross

plan ahead, when is this issue -- it's certainly going to come up with Mr. Pinniger.  Is it going to come up before then?

MS. LITTLE:  No, your Honor.  It will come up with Mr. Pinniger.  And I would urge the Court to read the brief that we filed last night.

THE COURT:  Well, that would be a useful thing to do. The first -- I don't know what time you filed this brief.  I was in chambers until about 10:30 last night.  I received from my law clerk at 8:59 p.m. this brief which you had e-mailed to him.  And I apologize, but I actually had some more important things to do between 9:00 p.m. and 10:30, namely complete an opinion I was writing.

So I haven't had a chance to read it, and I am not being critical, but I do think with a three-day holiday, it might have been sent a little bit earlier than Sunday night.

But in any event, I'll read it over this break.  And when is Mr. Pinniger testifying?

MS. LITTLE:  He's the next witness, but it would come up on cross-examination.  So my guess is it will --

THE COURT:  How much longer do you have with this witness?

MS. LITTLE:  Not much.

THE COURT:  I'll go read it now, then we'll reconvene in ten minutes and discuss it then.  And I'll have my courtroom deputy tell the jury we're going to be a little bit longer than

C7NESTO2                              Grant - cross

a 15-minute break.

          (Recess)

          (Continued on next page)

THE COURT:  Mr. Stoker has presented a memorandum which has several aspects.

The first is a suggestion, in effect, that the SEC has waived any objection to the admission of testimony by the role of counsel in preparation of the offering documents.  And second, that there's all sorts of documents along the line that they believe are, in any event, relevant and admissible.

I mentioned the waiver issue first because I think there may have been a waiver here.  When the Court was first confronted with this issue in the motions *in limine*, the Court reserved till it heard the specific questions that were being put.  But there was a general representation from defense counsel that there was no reliance on counsel defense.

Now, I am not sure I understand the relevance of the role of counsel in offering circulars, etc., if there's no reliance on counsel defense.  The gist of the argument that appears to be made in the memo I received and in the earlier submissions and arguments of defense counsel is that all sorts of people, including attorneys, were involved in the preparation of the offering circular; and that a reasonable person in Mr. Stoker's position would have taken that into account; and that the jury should take it into account in deciding whether Mr. Stoker acted reasonably or not.

But, of course, counsel, inside and outside counsel, are playing a different role than everyone else who reviews an

C7NVSTO3                          Grant - cross

offering memo.  They are expressly reviewing it for its legality or its compliance with legal requirements, and their determinations in that regard are only as good as the information that they receive.

Now, we just saw in Exhibit 50, the email exchange, a seeming suggestion from Mr. Stoker that arguably material information be kept hidden from CSAC.  The question then would be was that information also not revealed to counsel.  If it was not revealed to counsel, then their opinion as to the lawfulness of the offering circular is arguably defective.

I don't understand that either side proposes to call counsel and to ask them whether they knew the stuff that Mr. Stoker in that email asked Mr. Grant not to disclose to CSAC.  And absent that, I don't see the relevance of counsel's being part of the process.

Put a different way, what I think we have is an advice-of-counsel defense disguised as explaining the process, giving the context or whatnot.

Of course, the SEC, as in so many other respects, has made this a much more muddied situation than it would otherwise be.

First, despite the indication in Exhibit 50 that Mr. Stoker's failure to disclose was intentional, the SEC charged him with negligence.  Second, and more relevant to our immediate discussion, the SEC in this and virtually every other

C7NVSTO3                         Grant - cross

respect, has chosen to sit like bumps on a log throughout examinations at this trial while an endless amount of irrelevant material was introduced either through questioning by adversary counsel or, much more often, by the witnesses volunteering.

The witnesses who either were at or are still at Citigroup have an obvious motive to volunteer information helpful to the position that Citigroup has staked out in public in this case. And I don't fault them for that, because every witness I've ever encountered tries to volunteer self-serving stuff while on the stand. It's just human nature to want to put the best gloss on things that one can. And so they do it.

But what's the response of SEC counsel? Never do they object, never do they move to strike, never do they ask the Court to intervene, even though I repeatedly offered that to them. Their view is, for whatever tactical reason they may have, that it's better to sit at the table dutifully taking notes and otherwise allow the volunteering to continue.

And it was very interesting at the sidebar that we just had before the break wherein the latest instance of volunteering on this very issue, SEC counsel said, Well, we didn't want to highlight it. Well, you can't have it both ways. If you're going to object, you need to object. If you're going to move to strike, you need to move to strike.

So in the memorandum provided by defense counsel, they

C7NVSTO3                          Grant - cross

first mention part of Mr. Grant's direct examination on

Thursday, where he was asked:

"Q.   If there was something different in the CDO that was being

used as a template from the CDO that you were structuring, then

it was the responsibility of the deal manager to identify that

difference, wasn't it?"

That question, of course, could have been answered yes

or no.

But the answer was:  "To the extent it was, you know,

a part of the structuring -- " by the way, that part could have

been the end of the answer, too.  But then Mr. Grant went on.

I was actually interested that he went on, since I didn't -- I

was under the misimpression from today's testimony that

Mr. Grant was suffering from congenital amnesia.

But he went on to say:  "I mean, don't forget that the

offering document itself, I would say the primary

responsibility for the production of that was outside deal

counsel.  And so, you know, as a structuring, you'd also allow

their legal input into what should be included in the offering

document."

Now, that was, A, pure volunteer; B, nonresponsive;

and, C, dealt directly with this issue that I'm being called

upon to rule on now.

And what was the response of SEC counsel?  The

response of SEC counsel was not move to strike, was not

C7NVSTO3                         Grant - cross

objection, was not Judge, would you see that he responds to the

question, was not nonresponsive.  It was the following

question:

"Q.  Let me ask you this, sir:  The outside counsel was

responsible for legal aspects of the documents, right?

"A.  Yes."

Now, that was an attempt to narrow it, but hardly

erase the issue from the minds of the jury or from the relevant

evidence from which defense counsel would be free to argue,

given that it was received without objection.

And then also in Mr. Grant's testimony there was the

following question:  "During this period, 2006/2007, were there

any written procedures established by the structuring desk to

obtain a formal approval of the marketing materials that would

be used for CDOs?

"A.  I don't believe there were any formal procedures."

Again.  Let me pause.  That was the answer to the

question.  It should have stopped there.

But Mr. Grant, determined to, I think, inject this

whole counsel issue wherever possible, said:  "I mean there

was -- you know, Citigroup also had internal counsel who would

review -- you know, they would review some of the marketing

materials.  And occasionally outside -- well, outside counsel

would be responsible for producing the offering document, but

to the extent it was a flip book, occasionally the outside

counsel would also review the flip book, inside counsel at Citigroup might also review the flip book."

Again, nonresponsive; again, irrelevant; and, again, received without the slightest objection whatsoever from SEC counsel.

Now, earlier, as pointed out in defense counsel's memorandum, there was the following exchange on the very first day of trial between the SEC counsel and Mr. Dominguez:

"Q.  Who's responsible for the offering memorandum?

"A.  Well, there are a lot of people involved.  There are internal counsel, external deal counsel, collateral managers counsel, trustees counsel, our structuring desk, the rating agencies.  So there was -- you know, there were a lot of people of different parts of the offering circular."

That was a pretty interesting answer.  I cannot fault the witness for giving a complete answer when a question of that broad nature was put, even though the SEC had already obtained permission to ask leading questions, and those could have answered -- asked a much more narrow question.

On the other hand, it's really interesting that Mr. Dominguez, when asked who's responsible for the offering memo, feels compelled to mention internal counsel, external counsel, collateral managers counsel, trustees counsel, all before he gets to the structuring desk.  I'm glad to know that the offering memorandum provides full employment for so many

C7NVSTO3                          Grant - cross

lawyers.

But there, the SEC was not only not objecting, they were, by the very question, inviting a full response, which would include counsel.

And then when Mr. Mehrish there was -- I'm sorry.  My law clerk points out that the question, the broad question, was put by Stoker's counsel.  So it's still the same point, of course; there should have been objection or attempt to narrow.  But I apologize for thinking it was the SEC put that question.

And then there was the question from Mr. Mehrish:
"Q.   What did you do with the flip book?
"A.   The flip book was put together; it was reviewed by counsel internally and externally, and it was sent to the syndicate desk.  And the syndicate desk would send it to the sales force. The sales force would send it to the clients."

Now, I don't know who put that question, that's at transcript 735, 6 to 10.  Maybe the law clerk will tell me that, but either way, it's the same point.  If the question was put by the SEC, it was a broad question that invited this answer; if it was put by Mr. Stoker's counsel, which it was, I'm now informed, there should have been an objection or an attempt to narrow, and there was not.

So where I come down now -- and I'll hear argument from counsel -- is absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, at least

C7NVSTO3                    Grant - cross

from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this is total irrelevance.

However, if there has been already a waiver by the SEC, then we have to consider whether the defense can still be permitted to flesh out what the SEC has permitted their witnesses to testify about in this regard.

So let me hear first from the SEC and then from defense counsel.

MR. INFELISE:  Yes, your Honor.

And I concede that we did not object every occasion where the witness volunteered that information.

THE COURT:  But that, of course, was consistent with your general position, which is the word "objection" never passed your lips.

MR. INFELISE:  I do not make that many objections, I agree, your Honor.

THE COURT:  Forgive me, and then I will stop being critical about this, but I must say, to be utterly frank -- and I have, in all other respects, great respect for the two lawyers from the SEC, who have been conducting the examination. They clearly are very well-versed in the case; they have many, many good qualities.  I was very impressed, for example, when Ms. Peterson the other day made a real point of having the witness explain to the jury terms that might not be familiar to

C7NVSTO3                        Grant - cross

the jury.

But the rules of evidence, which in their broader being have come down for at least 500 years, exist so that the jury will only get before it evidence that is relevant, that passes other tests, like nonhearsay or exception hearsay, that are designed to keep the jury free of stuff that has no business being part of the case. That elementary point seems to have been completely lost on SEC counsel. And I, as a neutral, can't be the one to intervene. And it means there's already been placed before the jury all sorts of stuff that has nothing to do with the real issues in this case.

But I interrupted.

Go ahead, counsel.

MR. INFELISE: Your Honor, what I was saying was that, yes, we recognized when these witnesses were clearly, I don't know, prepared to do that or on their own were going to introduce the issue of lawyers. The decision was made that objecting would just highlight that. And this is a matter where if counsel attempted to elicit directly, that's one thing, your Honor.

And then but when the witness, as you have pointed out, the questions I ask him, gives a nonresponsive answer. We're not waiving the objection, we're deeming --

THE COURT: But you do. If you don't object, if you don't give the Court the opportunity to say to the jury this is

C7NVSTO3                          Grant - cross

irrelevant, you waive the objection.  Because now the jury has at least some inkling that some lawyers had something to do.

There is nothing on the present state of the record, for example, that would preclude defense counsel from getting up on summation and saying, ladies and gentlemen, you heard lawyers were involved, all over the place.  You have allowed that into the case.  And I can't take that away from them.

MR. INFELISE:  The fact that there's evidence that lawyers were doing something doesn't translate into the ability of the defendants to then -- defense counsel to then say that that created a defense for Brian Stoker.  That may be there. But what we intended to ask for, your Honor, was an instruction specifically pointing out, because of the fact that these witnesses are going to blurt this out, however I try to phrase these questions that, in fact --

THE COURT:  No, they are not.  Not if you seek the assistance of the Court, which you never did.  You surely must know by now that this Court can be less than gentle when the occasion requires it.

MR. INFELISE:  I do understand.

Again, the fact that these witnesses chose to give these nonresponsive answers and we did not object were -- as I said, the reason we didn't think it was highlighted, doesn't change the fact -- it's still not relevant.  I mean I still don't understand, assuming that it's there, how defense counsel

C7NVSTO3                    Grant - cross

could be allowed to argue any way, shape, or form that, in fact -- that because a counsel may have seen something or heard something, that that's relevant to the reasonableness of Mr. Stoker.

And in their response, they try to say, well, they are no different than the people that coordinated within Citigroup. Well, they are.  As the Court pointed out, these people are in a position where they knew this.  To the extent that Mr. Stoker was circulating information to them, and they weren't saying anything, then you could argue, I guess, that was somehow reasonable reliance.

But as soon as you interject the attorneys, and the idea that the attorneys is dependent upon the information you're providing, then it doesn't become relevant until there's some evidence that one was providing information at issue, and that they actually issued an opinion.

And, your Honor, there is no evidence of that.

The reason we made a motion to compel with respect to the privileged documents that Citigroup withheld, and they agreed to do it, was to try to determine was there any evidence of this information being provided.

THE COURT:  All right.

I understand your argument.

Let me hear from defense counsel.  Before I do, I want to correct one thing.

I'm told that Elizabeth Hardin from Milbank is listed as a witness, so let me ask defense counsel what's she going to say.

MR. KEKER:  I think nobody is planning to call her, your Honor.  She was on the government's witness list, and they've said that they are not calling her.

THE COURT:  Okay.

MR. KEKER:  She's not on our witness list.

THE COURT:  Thank you.

I'm sorry, you're right.  SEC has listed her as a witness.

MR. KEKER:  They told us they are not calling her.

THE COURT:  Okay.  The SEC is not calling her.

Then they, of course, have, once again, waived the ability to put her on the stand and say:  Would your opinion have been different if you had known X, Y, or Z, all of which are now not in the case.  And the SEC waived that because they thought they have been told by the other side, they were told by the other side there was no reliance on counsel defense.

MR. INFELISE:  Exactly.

THE COURT:  So I don't understand what the defense is offering here, if it's not on reliance of counsel defense.

MR. KEKER:  Let me try, your Honor.  It's obviously our fault.  I am very sad that we have made so little impact.

I said in the opening statement that Plaintiff's

C7NVSTO3                          Grant - cross

Exhibit 50, that email, does not refer to a Class V III that Mr. Stoker structured. It's talking about a different deal.

Now, we have not had the ability yet to put on that evidence. Mr. Stoker hasn't testified. We'll be talking about that and making that explanation.

THE COURT: Right.

But assuming, of course, you show that, that's important evidence in your favor, but what does that have to do with counsel?

MR. KEKER: What it has to do is that the position of the SEC is that the information that Mr. Stoker, among the things that he was negligent about, was not assuring, somehow getting, he should have known what Mr. Quintin's trading position was, and it should have been disclosed in the offering memorandum.

And what we believe the evidence will show and expect it to show is that there is nobody in the world of CDOs, not an investor -- they are going to put an investor on the stand, and I'm going to ask him, not other people that work in the CDO business, nobody thinks that secondary trading desk positions, after -- what they do with their position after they become the 100 percent protection buyer goes into an offering memorandum. And the way we are going to show that is that, among other things, the lawyers, the investors got this sheet that shows which trades were intermediated, that's the offset deal, and

then which trades were just with Citi, which means -- it's just what's in the thing.  They may immediately offset it or they may hold the position.  Everybody has that information.  There's an intermediation fee.  You can see it.  Three basis points for this guy, zero for this guy.

So at the end, everybody knows that what's in the offering memorandum says we may keep or sell.  Everybody knows that they did keep or sell.  And nobody has ever seen an offering memorandum that says that information about what you actually did on the date of closing or on some date ought to go into the offering memorandum.

Now, the reason that Mr. Stoker, I think, will explain that it didn't occur to him that it should go into the offering memorandum, he doesn't know it and it changes from day-to-day.

THE COURT:  I think what you're saying is relevant -- I want to address it more directly in a minute -- but that's only one of the allegations we're concerned with here.

The one that Exhibit 50 most speaks to, assuming arguendo that it relates to the Class V CDO, is that CSAC was snookered into accepting some dogs as part of the portfolio that the investor was told had been signed off on by CSAC.  Stoker knew that, according to these allegations, that they had blindly accepted it, knew that it was a different kind of investment from the rest of the package, and knew that he'd better keep all this hidden from CSAC in Exhibit 50, and

C7NVSTO3                    Grant - cross

ultimately, therefore, from the investors.  That has nothing to do with what you're just suggesting.

MR. KEKER:  I totally agree.

What I'm trying to say, the rabbit goes into the hat, is the assuming arguendo.  That's what they are trying to prove.  And if they prove it, they'll win.

What we are saying is that there's another side to the story which we tried to --

THE COURT:  And, of course, and you'll win if you convince the jury of that part of it.

But my point is this:  Counsel signing off has nothing to do with that issue.  Then I want to come back to the issue you were talking about, the intermediation issue.  But on this nondisclosure of how this stuff was allegedly snuck into the package, unless counsel knew that and said it doesn't matter, it's immaterial or whatever, their signing off is neither here nor there.

MR. KEKER:  We're not talking about anybody signing off.  At the end of the day, where we're going to get, we hope -- I mean what we are going to be saying to the jury is that email about don't tell CSAC and they didn't pick the assets, that was about something different that was happening.

THE COURT:  I understand.

MR. KEKER:  And so now I'm assuming arguendo that they get that, that they say yeah.

C7NVSTO3                      Grant - cross

But then the SEC goes further and they say, But still, that doesn't matter, because the way these assets were picked means that CSAC didn't really pick them, and you should have explained that in the offering memorandum. And, then, second, that Donald Quintin intended to do a proprietary trade where he would go short. And there's a lot of information about he was going to go long, he was --

THE COURT: And you're saying as to the latter that that is fully disclosed, and counsel didn't think -- fully disclosed to counsel, and not -- and no one thought it had to be disclosed to investors beyond what the investors already knew.

MR. KEKER: No, your Honor, that's not totally what I'm saying.

THE COURT: Okay.

MR. KEKER: What I'm saying is custom, practice, usage, context, however you want to call it, is that that information about what the second -- what the CDO short counterparty, the bank, does with its position once it takes it is not in the offering memorandum, and nobody would expect it to be in the offering memorandum.

And when Mr. Stoker is accused of knowing or should have known that something should be in the offering memorandum that's not, the fact that everybody in the world -- I don't care if you call them lawyers, you can call them document

C7NVSTO3                     Grant - cross

drafters, but nobody who works for this offering memorandum, including the investors, would expect that information to be in there.

So how can he be negligent because it's not in there?

That's where we're going with our side of the case. And I understand where they're going with their case of the case.

THE COURT:  On that latter issue, which I agree with you is a different kind of issue from the first one, the first one being the nondisclosure of how this was foisted on the CSAC, the second issue being the ability of Citigroup to go short with any of the portions of the investment that it wanted to, with respect to that second issue, it is relevant that it's not customary to put that into an offering circular because everyone understands it or whatever.  That's relevant.

What is not relevant is the implication that because lawyers are signing off on it, that it's, therefore, automatically legal.

MR. KEKER:  We're not saying that.

THE COURT:  This would be see *T.J. Hooper* is my point.

MR. KEKER:  But perhaps a limiting instruction is necessary.  Whatever you want to do.

But the idea that all the people that work -- what should go in an offering memorandum, you could put global climate warming in an offering memorandum, I suppose.  But what

C7NVSTO3                         Grant - cross

goes into it is not, in context, in that time, in 2007 --

THE COURT:  All right.

I'm going to -- although I'm not convinced it's relevant, but I'm not going to reach that issue, because I think it has been permitted by the SEC to be introduced into this case, and they cannot have it both ways.  And so cut it off.

What I do agree with you also is there will have to be a limiting instruction, because I don't think the jury will fully understand this aspect of the case without an appropriate limiting instruction.

MR. KEKER:  Let me just preview for that.

What I would like -- I'm going to say to the jury at the end of this case, I hope, depending on how the evidence comes in, but I'm planning to say much like what I said to you.  There's all these people, and they've all done lots of offering memoranda.  There's investors, and they all know it.  And nobody expects that to be in there; not the investors, not the lawyers, not the whatever, blah, blah, blah.  And then a limiting instruction is fine.

I'm not saying that he relied on the advice of any -- it's just why he didn't think it should go in.

THE COURT:  Now, given that ruling by the Court, if the SEC wants to put Ms. Hardin back on their list, you may.  But you need to decide that by the end of today so that defense

C7NVSTO3                     Grant - cross

counsel knows.

All right.  Anything else we need to take up now?

MR. INFELISE:  Well, I'd like to clarify a couple of things that Mr. Keker said.

There's absolutely no evidence, none, that if an arranging bank decided to use a CDO that it was structuring and marketing, that if they had taken a proprietary position, that nobody would disclose it.  The reason there's no evidence to that is because nobody did that, except Citigroup.  And that's one of the reasons we have Mr. MacLaverty here, to talk about the customer usage.

We'd also point out, your Honor, that the representations concerning Plaintiff's Exhibit 50, that this is unrelated is somewhat misleading, because at the very bottom of the document is a reference to Class V --

THE COURT:  No, but I hate to say this, counsel, because I have great respect for all counsel in this case, I think you put the Court in the position, as well as the jury, where the only way to address this and focus the jury properly is through a limiting instruction and possibly your calling Ms. Hardin, if you wish to do that.  Because they've heard now already repeated reference to lawyers.  And to just leave it out there, without some guidance to them as to what relevance it may have or what it may not have is to impose on them an undue burden and an invitation of speculation.

C7NVSTO3                        Grant - cross

Now, if you're right, then at the end of the case if counsel for the defense has not been able to establish even a custom and usage relevant to what we're calling the second issue, then, of course, you'll get a much stronger limiting instruction.  The more mixed one I would give if it was relevant to the second issue, but not to the first.

So we'll have to address that as part of the charge, but we're not there yet.

All right.

Let's get Mr. Grant back on the stand and let's get the jury back in.

(Jury present)

THE COURT:  So you can see, ladies and gentlemen, that would have been a hell of a sidebar.  But we've got it all straightened out now, so we're ready to continue.

Go ahead, counsel.

MS. LITTLE:  Thank you, your Honor.

BY MS. LITTLE:

Q.  Mr. Grant, before the break, you were looking in your binder at Exhibit 1066 in the black binder.

A.  Yes.

Q.  Is that an email dated January 24, 2007 that you received from Frank Li?

A.  That's what it looks like, yes.

MS. LITTLE:  Move its admission, your Honor.

C7NVSTO3                    Grant - cross

THE COURT:  Yes.

(Defendant's Exhibit 1066 received in evidence)

MS. LITTLE:  Is it admitted, your Honor?

THE COURT:  I'm sorry?

MS. LITTLE:  It's admitted?

THE COURT:  Yes.  Received.

MS. LITTLE:  Thank you.

Q.  Looking at the top email there, addressed to you, Darius, it says:  "When you have time, could you review the debt book of CSAC CDO squared and give any comments you may have to Wenhai."

Who's Wenhai?

A.  Wenhai was an analyst in the structuring group.

Q.  And the debt book is the same as -- you've also called it the flipbook?

A.  Typically, that is correct.

Q.  Does this indicate to you, sir, that on January 24th you did receive a copy of the flipbook?

A.  I don't remember whether I did or not, but presumably I did.  I guess it has an attachment on it.

Q.  Yes, it does.

A.  Yeah.

Q.  You could look in your book if you want to see the attachment.

A.  Oh, yeah, okay.  That's fine.

Q.   Is it also fair to assume, sir, that if you saw anything inappropriate or wrong in the flipbook you would have brought that to someone's attention?

A.   If I read it, that's correct.

Q.   You also testified --

MS. LITTLE:   You can take that down, Jeff.

Q.   You also testified last week about the offering circular and the fact that the structuring group would focus on the structuring elements of the offering circular.   Do you recall that testimony?

A.   Yes, I do.

Q.   Is it true, sir, that the main task of the structuring desk with respect to the offering circular was to make sure the mathematics and the capital structure were accurate; is that correct?

A.   That is correct.

Q.   And they would focus on things like the size of the CDO and different rating categories; is that correct?

A.   Correct.

Q.   You testified on direct last week that it would have been typical or normal procedure for Mr. Stoker to talk to you about discussions concerning structuring a new CDO.

Do you recall that testimony?

A.   No, but I'm sure -- if you said I did, yes.   Sorry.

Q.   Do you recall being asked the question:   "Would it have

C7NVSTO3                    Grant - cross

been a typical or normal procedure for Mr. Stoker to come to you and tell you if there had been some discussions about structuring a CDO?"

And you said, "Sure."

A.   Sure.   Yeah.

Q.   And we've seen a number of emails this morning called keep-Darius-up-to-date list, you recall that?

A.   Yes.

Q.   And Mr. Stoker kept you in the loop about discussions even before deals got off the ground; correct?

A.   I believe so.

MS. LITTLE:   And if we could take a look at Exhibit 78, which is in evidence.

Q.   Actually, before we put that up, do you recall, sir, that in the fall of 2006 there were discussions of a potential CDO squared with a number of ideas and variables being considered?

A.   I don't remember.   It's possible.   I just don't remember whether there was a CDO squared being discussed.   I mean there were a lot of deals being discussed, especially in '06.

(Continued on next page)

C7nesto4                          Grant - cross

BY MS. LITTLE:

Q.  And a lot of those ideas and deals never actually matured into a particular deal?

A.  Yeah.  Sometimes they didn't come into fruition.

Q.  Now let's take a look at Exhibit 78.  Blow it up, Jeff.

This is an e-mail from Mr. Stoker to you dated December 8th concerning a CDO squared with CSAC.  And it says, do you still want to do this?

Do you recall that, sir?

A.  Well, the e-mail is copied to me.  I think it's actually to Shalabh Mehrish, Donald Quintin and Brian Carosielli.  Let me just read it.

Yeah, I don't remember the e-mail.

Q.  Does this e-mail suggest to you that there was some question whether the deal being discussed was going to come to fruition?

A.  That's -- yeah, it would appear that was the case.

Q.  Would you look in your binder, sir, in the black binder -- you can take that down -- at Exhibit 1016.

A.  Ten sixteen?

Q.  One zero one six.  It should be the second tab in the black binder.

A.  Oh, yes.  Yes.

Q.  Is that an e-mail dated December 11th from Mr. Stoker to you?

C7nesto4                     Grant - cross

A.  Yes.  December the 11th, yeah.

Q.  Do you have any reason to believe you did not receive that e-mail?

A.  No.

        MS. LITTLE:  I move its admission, your Honor.

        MR. INFELISE:  No objection.

        THE COURT:  Received.

        (Defendant's Exhibit 1016 received in evidence)

        MS. LITTLE:  If we could publish that to the jury, please.

BY MS. LITTLE:

Q.  Let's go down to the bottom e-mail, from Mr. Stoker to Mr. Mehrish and others, including you.  It's that same e-mail we just saw, do you still want to do this?  Right?

A.  Correct.

Q.  And then you respond to Mr. Stoker, speak to me about this.

A.  Right.

Q.  And then Mr. Stoker responds to you, up at the top, okay. Latest is DQ may not want to do the deal.

        Do you recall, sir, that on December 11, 2006, there was still a great deal of uncertainty about whether or not a deal would be put together?

A.  I don't remember the specifics of this deal, so I honestly don't remember.

Q.  Thank you, Jeff.

C7nesto4                    Grant - cross

Q.   You testified last week about your understanding of the phrase prop trade or proprietary trade.  Do you recall that?

A.   Yes.

Q.   And you defined proprietary trade as a trade where you take risk and hopefully make a return.  Do you recall that testimony?

A.   Yes, I do.

Q.   And the term prop trade has nothing to do whether it's a long or short position, is that right?

A.   That's correct, yeah.

Q.   Could be either one?

A.   It could be either, yes.

Q.   And also, the term prop trade doesn't tell you anything about how long or for what length of time a particular position might be held, is that correct?

A.   That's correct.

Q.   You were shown earlier today a document which is now in evidence, number 161.

     Can we put that up, please, Jeff.

     Do you recall testifying about this document?

A.   Yes.

Q.   Is this a document, sir, that was available both internally and externally from Citigroup?

A.   Yes, I believe so.

C7nesto4                         Grant - cross

Q.  And it was a document that was available to customers at Citigroup?

A.  Correct.

Q.  There's nothing -- it's not a confidential document, right?

A.  No.

Q.  All right.  Take a look in your white book there, sir, Exhibit 109.  Put that up on the screen.  That's in evidence.

And this one in the middle, it talks about CSAC is buying 250 million from DQ -- right in the middle, right there.

Do you recall testifying about this document?

A.  I do.

Q.  Did you respond to this e-mail, sir?

A.  I don't remember whether I did or not.

Q.  Could you take a look in your black book at Exhibit 1041.

A.  Yes.

Q.  Is Exhibit 1041 a response to Exhibit 109 that we just looked at?

A.  Looks like it, yes.

MS. LITTLE:  I move its admission, your Honor.

MR. INFELISE:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 1041 received in evidence)

BY MS. LITTLE:

Q.  We don't really need to spend time.  This is, in fact, a response -- you received the e-mail from Mr. Stoker on

C7nesto4                       Grant - cross

January 8th at 11:55 a.m.?

A.   Correct.

Q.   And then you responded two days later, on January 10, 2007?

A.   Yeah.

Q.   And I assume you had addressed everything that you thought you needed to address in Mr. Stoker's e-mail?

A.   I mean, again, I don't remember writing it, but presumably I did.

Q.   Okay.  That's all for now, Jeff.

          Mr. Grant, Mr. Stoker worked for you for a little over two years, is that correct?

A.   I thought it was a little bit longer, but I could be wrong.

Q.   A few years?

A.   Yeah, a few years.  Yeah.

Q.   And you considered him an important member of the structuring group?

A.   Yes.

Q.   Did you ever observe Mr. Stoker not to take his job seriously?

A.   No.

Q.   Did you ever observe him to be careless?

A.   No.

Q.   And was Class V III a deal that anyone at Citigroup thought was designed to fail?

A.   No.

MR. INFELISE:  Objection, your Honor.  Speculation.

THE COURT:  Well, there are several questions put previous to this one to which one would have thought an objection would have been entered, but there was no objection was raised.  But this question is objectionable as well, and the objection is sustained.

MS. LITTLE:  Thank you, your Honor.

THE COURT:  Redirect?

MR. INFELISE:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. INFELISE:

Q.  Mr. Grant, you were asked about one of the responsibilities of the structurer to, when you structure, to look at the returns or yields on the bonds, correct?

A.  That's correct.

Q.  And that's one of the functions a structurer performs, right?

A.  Well, they would make sure that there was sufficient yield on the bonds in the portfolio in order to pay the debt and equity tranches of the CDO.

Q.  I see.  And that would be because the investors putting money into it had to have a yield or expected a certain yield?

A.  Correct.

Q.  Now, those types of calculations with respect to synthetic CDO did not include attempting to determine how much profit

C7nesto4                    Grant - redirect

Citi could make from actually taking short positions, did it?

A.  No, it didn't.

Q.  So that would be an unusual thing, for a structurer to do an analysis to see how much profit Citigroup could make from taking short positions on a collateral that was going into the CDO that they were selling to somebody else?

A.  Well, I don't recall it happening that often.

Q.  Do you recall it happening at all?

A.  Well, I think we saw an e-mail earlier that outlined the total volume of bonds that had been sold into the CDO.

Q.  And --

A.  But I don't remember.  I don't remember the e-mail, but obviously I have now read it.

Q.  Do you recall that I showed you an e-mail from Mr. Stoker where he was analyzing the profits from shorting zero, 50 and 100 percent?

        MS. LITTLE:  We're now exceeding the scope of cross. I didn't inquire about that document on cross.

        THE COURT:  No, I'll allow it.

Q.  Mr. Grant, do you recall that?

A.  I'm sorry.  Can you repeat the question.

Q.  Do you recall seeing a document that showed that Mr. Stoker had provided you information concerning the profits that could be made from shorting zero, 50 and 100 percent of the collateral on the CDO?

C7nesto4                          Grant - redirect

A.   Was that the document that we saw this morning?

Q.   Well, I'm just asking you, do you have any recollection --

          THE COURT:  Do you want to show him the document?

          MR. INFELISE:  I will, your Honor.

Q.   I apologize, Mr. Grant.  Apparently I did not show you that specific document.  However, do you recall whether or not Mr. Stoker ever did do an analysis in attempt to determine the amount of profit Citigroup could make by shorting certain amounts of collateral into a CDO?

A.   I don't recall.

Q.   That would not be the normal function of a structurer, would it?

A.   It would seem somewhat unusual.

Q.   Again, do you recall, did you ever see that occur with respect to any CDO that you were involved in structuring at Citigroup?

A.   Well, I -- I don't remember anything more than I think it would have been unusual -- I didn't see it very often.  But I don't remember actually seeing -- I don't remember the context of an e-mail that said, you know, short 20 percent --

          THE COURT:  No.  No.  His question is, other than this hypothetical possibility that -- did you -- when you said it would have been unusual, he's now asking you whether or not you ever saw something like that on any other occasion.

          THE WITNESS:  Well, I believe there is the e-mail you

C7nesto4                     Grant - redirect

referred to --

THE COURT:  Other than that.

THE WITNESS:  Oh.  Other than that.  I'm sorry.
Sorry, your Honor.  I don't think I did.

BY MR. INFELISE:

Q.  All right.  Now, you were asked some questions about
proprietary trade, and you said that was -- that's when the
company actually takes risk, is that right?

A.  Yes.

Q.  And what you mean by that is that means that Citigroup uses
their money to buy assets for purposes of investment for the
company, is that accurate?

A.  Well, Citi could buy or short assets.  But, yeah, they're
using their own capital to take a risk.

Q.  And that's not -- that instance is not the market making
function that's performed by Citigroup, when they're putting
together a CDO, correct?

A.  I'm sorry.  Can you repeat the question?

Q.  Let me rephrase it.

A.  Yeah.

Q.  When Citigroup puts together a CDO, part of their function
is market making, correct?

A.  On the bonds that were issued by the CDO?

Q.  Right.  Okay.

A.  Yeah.

C7nesto4                    Grant - redirect

Q.  So that function basically is one where they accommodate customers; they provide a means by which customers can buy and sell the assets that go into that CDO, correct?

A.  Well, I think what you referred to is the debt tranches of the CDO that are issued by the CDO.  Once they're sold, there would be -- to an extent, there might be some market making in the CDOs, in the debt paper.  Although the -- you know, the market wasn't incredibly liquid.

Q.  Let's talk about the synthetic CDO and people who purchased protection, all right?  And the market making function with respect to the synthetic CDO is for the Citigroup to buy a means by which individuals can buy and sell the protection on that synthetic CDO, correct, or the assets in the CDO?

A.  I -- yes, I guess.

Q.  All right.  And that's different than if Citigroup purchased a protection itself or as a proprietary trade to hold it for an investment, right?

A.  Yes.

Q.  All right.  I think I've found the document here.  It's Plaintiff's Exhibit 1005.  Could we show that on the screen, please.

        MS. LITTLE:  Objection as beyond the scope.

        THE COURT:  Well, I will allow recross on this, if necessary, but I'll allow it.  You may -- it's received.

        (Plaintiff's Exhibit 1005 received in evidence)

C7nesto4                    Grant - redirect

MR. INFELISE:  Could we put it up on the screen, please.

BY MR. INFELISE:

Q.  And do you see this e-mail, sir, is from Mr. Stoker on October 26th to several individuals?  And you're copied on it, correct?

A.  Correct.

Q.  And do you see the last number, number two, Citigroup short, zero, 50 percent and hundred percent collateral into the CDO.  Do you see that?

A.  Yes.

Q.  Do you recall while at Citigroup ever receiving any other analysis like this, where there's analysis done to show what profits Citigroup would make from shorting the assets into a CDO that it was creating in market making?

A.  No.

MR. INFELISE:  I have no further questions your Honor.

THE COURT:  Recross?

MS. LITTLE:  Just on that one document, your Honor.

RECROSS EXAMINATION

BY MS. LITTLE:

Q.  Mr. Grant, do you recall I was asking you about there were many ideas being discussed in the fall of 2006?

A.  Mm-mm.

Q.  Correct?

C7nesto4                    Grant – recross

A.   Correct.

Q.   And not all of them became a deal, right?

A.   Yeah, no.  No.  That's correct.

Q.   And, for example, in this e-mail it's talking about two structures to discuss, one with IC/OC and one without IC/OC. So that's an example of one type of variable, correct?

A.   Correct.

Q.   And it talks about Citi does or doesn't keep the equity. That's another variable, right?

A.   Yes.

Q.   And it talks about zero, 50 or 100 percent.  That's another variable, right?

A.   That's correct.

          MS. LITTLE:  Nothing further.

          THE COURT:  All right.  Anything else?

          MR. INFELISE:  No, your Honor.

          THE COURT:  Thank you very much.  You may step down.

          (Witness excused)

          THE COURT:  Please call your next witness.

 ROBERT KEITH PINNIGER,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. PETERSON:

Q.   Good afternoon, Mr. Pinniger.

Are you currently employed?

A.   Yes, I am.

Q.   Where are you employed?

A.   At Citigroup.

Q.   And what is your position at Citigroup?

A.   I'm a director at Citigroup global markets.

Q.   And are you in a particular division or area?

A.   I work in the special asset pool.  It's part of Citi
Holdings.

Q.   All right.  And were you an employee of Citigroup in the
2006/2007 time period?

A.   Yes, I was.

Q.   And when did you start working at Citigroup?

A.   In March or April of 2006.

Q.   And what was your position when you started working there?

A.   I was a vice president.

Q.   And what division or section were you in?

A.   In the global structure credit products group.

Q.   Did you work at a specific desk in the global structured
product group?

A.   I did.

Q.   And what desk did you work at?

A.   I worked on the CDO structuring desk, the ABS CDO
structuring desk.

Q.   And who was your supervisor on the structuring desk?

C7nesto4                    Pinniger - direct

A.  My -- I reported directly to Darius Grant, who ran that team.

Q.  All right.  And on an informal basis, you reported to the next level under Mr. Grant, is that correct?

A.  On -- on individual transactions, yes.

Q.  And the next level below Mr. Grant was Brian Stoker, is that right?

A.  In terms of his title, yes.

Q.  And, in fact, Mr. Stoker was the director level that you had the most contact with, is that right?

A.  On given transactions, yes.

Q.  And you would work on projects that were assigned to you by Mr. Stoker, correct?

A.  Either assigned by Brian or, if -- if I was added to a deal team, either by Darius or somebody else, then I would have -- I would have worked with Brian.

Q.  All right.  And one of the projects that you were assigned to was a CDO squared called the Class V III, is that correct?

A.  That's correct.

Q.  And there was another CDO that was being worked on at the time that was called the 888 Tactical, is that right?

A.  That's correct.

Q.  And the 888 Tactical was a CDO that had Harding Advisory as the asset manager?

A.  If I -- if I recall correctly, yes.

C7nesto4                        Pinniger - direct

Q. All right. Now, in late 2006 -- well, do you recall when you were assigned to the Class V III?

A. I don't remember specifically.

Q. Was it -- early January of 2007 time period sound about right?

A. It could have been.

Q. And when you worked on a specific transaction, you would be involved in working with the deal documents, is that right?

A. I -- yes, I would have had involvement.

Q. And the structuring desk had responsibility for putting together a marketing book which was typically called a flipbook, is that right?

A. That's correct.

Q. And you would on occasion meet with investors, is that right?

A. The deal team would. I may, may not have, but parts of the team could have or would have met with investors, yes.

Q. And sometimes when you were working on various transactions, you would take calls from investors, is that right?

A. That -- that's correct.

Q. And now do you recall specifically working on the Class V III?

A. The transaction?

Q. Yes.

A.   I -- I recall that I worked on it, yes.

Q.   All right.  And that was a CDO squared, right?

A.   That's correct.

Q.   And the common practice at the time, when you were assigned to work on the Class V III, was generally that Mr. Stoker would have advised you or told you you'd be working on that transaction, right?

A.   Again, I don't recall specifically if it was Brian at the time who -- Mr. Stoker told me I was working on the transaction or someone else had assigned me to the transaction.  I don't recall.

Q.   All right.  And at the time of the Class V III you were junior to Mr. Stoker on the structuring desk, is that right?

A.   That's correct.

Q.   And Mr. Stoker did stay involved in the Class V III transaction, even though you were working on it, is that right?

A.   That's correct.

Q.   And if Mr. Stoker asked you to make changes to documents, you would have made those changes, is that right?

A.   Typically, yes.

Q.   Now, how did you learn about the transaction in order to work on the documents like the flipbook?

A.   Can you repeat the question?  I'm sorry.

Q.   Certainly.  How did you learn about the transaction in order to work on the documents like the flipbook?

C7nesto4                            Pinniger - direct

A.   Either myself individually or the collective team, because there were individuals on the structuring desk junior to me who were also assigned to the transaction.  We would have gotten together as a team and generally discussed the nature of the deal, the structure, what was being envisioned for the underlying asset portfolio; just the general makeup of the transaction, any key features that we might have thought about at the time.  And that, then, would have led us to start working on it.

Q.   And was Mr. Stoker part of the team that would have been having these discussions?

A.   He would have been involved, yes.

Q.   And now, when you were putting together the marketing materials -- for example, the flipbook -- did you use the flipbook from another transaction as a template?

A.   Typically you started with -- best describe it as a precedent deal, a transaction that had come before it.  General practice would have been ideally similar structure, similar transaction, ideally the same manager.  You would start with that as a precedent.  If there were -- if it was something completely different, you would try and find the most relevant precedent to use and use that as a starting point.

Q.   And then you would take this other transaction document and change it to fit the facts of the current CDO squared, is that right?

C7nesto4                    Pinniger - direct

A.   That's right.

Q.   And do you recall that there was another CDO that was being structured around this time called the Adams Square deal?

A.   Yes, I do.

Q.   And it was the Adams Square documents that were used as a template for the Class V III documents, correct?

A.   I don't recall, but they may well have been.

Q.   All right.

        THE COURT:  All right.  Counsel, I think we're going to need to break for lunch.

        So, ladies and gentlemen, we'll take our lunch now. We'll see you at 2:00.

        (Jury excused)

        (Continued on next page)

C7nesto4                        Pinniger - direct

(In open court; jury not present)

THE COURT:  Mr. Pinniger, it's your fate to have your testimony in bits and pieces, but come back at 2:00 and we'll hopefully be able to complete it then.

THE WITNESS:  Okay.

THE COURT:  You may step down.

Anything counsel needs to raise with the Court?

MR. KEKER:  Yes, your Honor.  The next witness is Mr. MacLaverty.  Shall I wait?

THE COURT:  Until he leaves, yes.

(Pause)

MR. KEKER:  Mr. MacLaverty is the expert, you'll recall, who's relying on an interpreted Exhibit 355 about which we talked yesterday.  What you've gotten from the SEC is not what they represented to you.  Instead, what they've now told you is that they got this as -- in response to kind of a general question -- you can read it, I don't care.  A general question.  It says what it says.  It says, CDS trading log.  It comes from Murray Barnes, who's not even on the trading desk.

But the thing I wanted to point out is that apparently they didn't even give it to this expert until after he filed his initial report.  And so we renew our objections to him using it for any purpose, including these summaries that he's going to put in.

We also --

C7nesto4                         Pinniger - direct

THE COURT:  I spent the last break reading your submission on the other issue.  I haven't yet read theirs.  So I will do that over lunch, and we'll take this up right at 2:00.

MR. KEKER:  Final thing is Mr. Neuberger will not testify today at this rate, so we don't have to worry about it.  He's their last expert.  It's going to be MacLaverty, Salz from Ambac, then Neuberger.  We still have objections to his visuals.

THE COURT:  We can take that up at the end of the day.  Very good.  Thanks a lot.

(Luncheon adjournment)

C7nesto4                          Pinniger - direct

AFTERNOON SESSION

2:17 p.m.

(In open court; jury not present)

THE COURT:  We're waiting on one juror.  She is trapped in a long line down at security, but my courtroom deputy went down to try and expedite that.

In the meantime, in addition to the materials regarding Exhibit 355 that were previously put before the Court, I've received a very helpful letter from Susanna Buergel of Paul Weiss representing Citigroup and who sets forth her understanding of the history and sets forth the basis for Paul Weiss' understanding that Exhibit 355 is indeed a version of the trading log created and maintained by the CDO trading desk. So we will have that letter docketed in due course.

So, is there anything else anyone wanted to raise about this now?  It seems to me that enough has been shown to warrant the admissibility of 355.  Of course, counsel on cross-examination can attempt to raise questions about it, which the jury can consider.

MR. INFELISE:  Just for a point of clarification, your Honor, we did not attempt to introduce that entire several-page document.  Our expert Mr. MacLaverty used the spreadsheet version of that to create a series of summaries that the jury can then view.  In other words, he used a spreadsheet which is identical to the hard copy --

C7nesto4                        Pinniger - direct

THE COURT:  Well, but it still has to be admissible.

MR. INFELISE:  Yes, exactly, your Honor.

THE COURT:  So that's a variation of the same issue.

MR. INFELISE:  That's the only reason we offered it to establish its admissibility, so we can admit the summary.

THE COURT:  So your expert can be questioned about it in the same way that if it were introduced, the witness who introduced it could be cross-examined.

MR. INFELISE:  Yes, your Honor.

MR. KEKER:  And, your Honor, I'd just again point out that the SEC's submission -- they apparently sent him this Excel spreadsheet after he filed this initial report.  We object on that ground.

MR. INFELISE:  That's correct.  And the reason was is I have copies of his initial report and his rebuttal report. Initial report cites to this, very basic.  But it did not become relevant to Mr. MacLaverty's analysis until he received the defendant's expert report.

THE COURT:  Then am I misremembering, was it Mr. MacLaverty as to who I gave the defense an hour deposition, or was it someone else?

MR. INFELISE:  That was him.

THE COURT:  That's what I thought.  So they had their chance.  They're not prejudiced by it.

MR. INFELISE:  Thank you.

C7nesto4                           Pinniger - direct

THE COURT:  All right.  So, I will ask my law clerk to go knock on the jury door and see if the missing juror is here.

MR. KEKER:  Your Honor, the other matters -- I guess you said you were going to do it at the end of the day. Mr. Neuberger is tomorrow, so we don't need to worry about that now.

THE COURT:  Yes.  Well, if we have time, we'll start on it now.  But let's just see if the jury is here or not.

MR. KEKER:  The thing that's maybe more timely is we've just been given --

THE COURT:  Whoa.  I'm sorry.  The jury is now here.

THE DEPUTY CLERK:  He was on line for 20 minutes.

THE COURT:  So, Mr. Keker, unless you mind, we should really get going.

MR. KEKER:  Fine.

THE COURT:  Let's get the witness back on the stand, please.

(Continued on next page)

C7nesto4                          Pinniger - direct

(In open court; jury present)

THE COURT:  Counsel?

MS. PETERSON:  Thank you, your Honor.

BY MS. PETERSON:

Q.  Good afternoon, Mr. Pinniger.

Before we took the lunch break, I asked you about a CDO called the 888 Tactical.  Do you recall that?

A.  Yes.

MS. PETERSON:  Your Honor, may I approach?

THE COURT:  Yes.

Q.  Would you please, Mr. Pinniger, look at Exhibit 301 that I've just handed you.  And if you look at the second page of Exhibit 301, does this identify 888 Tactical?

A.  Yes, it does.

Q.  And I believe you indicated earlier that Harding Advisory was the asset manager for the 888 Tactical?

A.  That's what I recall, yes.

Q.  And is Exhibit 301 the offering circular for the 888 Tactical?

A.  It looks to be, yes.

MS. PETERSON:  Your Honor, we would offer Exhibit 301.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 301 received in evidence)

- - - - -

BY MS. PETERSON:

Q.  I asked you if the Adams Square deal was the template for the Class V III, and you, I believe, indicated you couldn't recall for sure?

A.  That's correct.  I don't remember if it was or not.

Q.  All right.  If you would look in your binder at what's been marked as Exhibit 216, two one six.  And is that an e-mail that you received from Mr. Stoker on February 14, 2007?

A.  It looks to be, yes.

Q.  And if you'll turn to the second and third pages and focus on the third page.  Is this the attachment that you received from Mr. Stoker?

A.  I'll assume it is.  I wasn't sure if it was attached to this e-mail or not.

MS. PETERSON:  Well, I will represent that this is how it was provided to us.

Your Honor, we would offer Exhibit 216.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 216 received in evidence)

MS. PETERSON:  All right.  And if you would then publish that to the jury, please.  And if you could go back to the first page, just briefly.

BY MS. PETERSON:

Q.  So, on February 14th Mr. Stoker sent you this e-mail with

C7nesto4                        Pinniger - direct

his comments on the Class V offering circular, correct?

A.   That's -- that's what it looks like, yes.

Q.   And so if we turn to the third page and highlight the top third of the document.

          This shows that the Adams Square transaction was used as the Class V funding template, is that correct?

A.   That's what it looks like.

Q.   And this is typically how you would prepare the next deal's documents, correct?  You would use the template and edit it and make the necessary changes?

A.   That's correct.  You would try and find a close precedent, if you could, and go with that.

Q.   All right.  And now, if you would look at the documents that I just recently handed up to you.  And if we could show -- I would like to show -- have the witness look at Exhibit 291, which would be the big one that I gave you.

          And if you'll look at the second page, is that the Adams Square offering circular?

A.   That's what it looks like, yes.

          MS. PETERSON:  Your Honor, we would offer Exhibit 291.

          MS. LITTLE:  No objection.

          THE COURT:  Received.

          (Plaintiff's Exhibit 291 received in evidence)

BY MS. PETERSON:

Q.   If you would now look at the other document I handed up to

you, which is Exhibit 99.  And do you recognize Exhibit 99 as the Adams Square flipbook or the marketing book for the Adams Square transaction?

A.  It looks to be the flipbook, yes.

MS. PETERSON:  Your Honor, we would offer Exhibit 99.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 99 received in evidence)

BY MS. PETERSON:

Q.  All right.  Mr. Stoker, when you began working on the Class V III, did anyone refer to it as a prop trade when you got involved?

A.  I don't recall it ever being -- that the transaction was ever described like that to me.

Q.  All right.  If we could bring up Exhibit 50 and publish it to the jury.

Now, Mr. Stoker told Mr. Grant that this is DQ's prop trade.  If you could highlight that middle e-mail.  That this is DQ's prop trade.  Don't tell CSAC.

Did Mr. Stoker ever tell you this was DQ's prop trade, don't tell CSAC?

MS. LITTLE:  Objection, your Honor.  Foundation. There's no indication that this witness has ever seen this document.

THE COURT:  Sustained.

C7nesto4                        Pinniger - direct

Q.   All right.  You can take the exhibit down.

When you began working on the Class V III, did Mr. Quintin ever tell you this was his prop trade?

A.   I don't recall ever being told that.

Q.   And Mr. Stoker never told you this was a prop trade, correct?

A.   I don't recall him ever telling me that.

Q.   And Mr. Grant never told you this was a prop trade, correct?

A.   I don't recall him ever telling me that.

Q.   And you understand -- you've worked at Citigroup for several years now, and you understand when someone uses the term prop trade, that's short for proprietary trade?

A.   Yes.

Q.   And when someone uses the term proprietary trade, they mean a trade that uses Citigroup's own capital for their own benefit rather than for a customer, right?

A.   Yes.

Q.   And now did Mr. Stoker ever tell you that Mr. Quintin purchased protection on 250 million of the assets in the Class V III?

A.   Did Brian ever tell me that Donald Quintin purchased protection on --

Q.   Correct.

A.   I don't know if I was ever told by Brian that Mr. Quintin

C7nesto4                          Pinniger - direct

directly purchased the credit protection.

Q.   Okay.

A.   As a general matter there were synthetics in this transaction.  And someone was going to be purchasing credit protection.

Q.   And that's typically an intermediary role, correct?

A.   Typically, yes.

Q.   To facilitate the transaction?

A.   That's correct.

Q.   And now, did anyone ever tell you that CSAC agreed to the terms of the deal, even though they didn't get to pick the assets?

A.   I don't recall ever being told that.

Q.   So Mr. Stoker never told you that CSAC agreed to the terms, even though they didn't get to pick the assets?

A.   I can't recall that he ever told me that.

Q.   And Mr. Grant never told you that CSAC agreed to the term, even though they didn't get to pick the assets, correct?

A.   Not that I can recall, no.

Q.   What, if anything, did Mr. Stoker tell you about the process for how the assets were selected?

A.   I don't -- sitting here today, I don't recall specifically that Brian and I had a direct discussion about asset selection for this transaction.

Q.   All right.  And so Mr. Stoker never told you that the asset

C7nesto4                      Pinniger - direct

selection process was in any way different from the process

that would have taken place for the Adams Square transaction,

is that right?

A.   Not that I can recall.

Q.   And did anyone in the course of drafting the documents, the

flipbook documents for the Class V, raise any concerns about

the description of the asset selection process for the

Class V III?

A.   Not that I can recall, no.

Q.   And in the course of working on the marketing materials, it

was important for you to know how the asset selection process

worked, is that right?

A.   In a general sense, it would have been important to know.

From my perspective on the structuring desk, it would have been

important for me to know if it was different than the norm.

Q.   And that's in part because investors would ask you how

assets were selected and who selected the assets, correct?

A.   They could or other parties could ask, yeah.

Q.   All right.  Now, please show the witness Exhibit 179.

         Mr. Pinniger, is this an e-mail that you received on

February 6, 2007, relating to the Class V CDO?

A.   It looks to be, yes.

         MS. PETERSON:  Your Honor, we would offer Plaintiff's

Exhibit 179.

         MS. LITTLE:  No objection.

C7nesto4                          Pinniger - direct

THE COURT:  Received.

(Plaintiff's Exhibit 179 received in evidence)

BY MS. PETERSON:

Q.  Now, if you would look at the bottom, the e-mail that starts this string at the bottom.

Frank Li is another member of the structuring desk, is that right?

A.  That's correct, or he was.  Yes.

Q.  And this e-mail is discussing the Class V funding, and there's a reference to SK Life.  And that is Sin Kon Life, is that correct?

A.  Drawing a blank on their exact name, but -- it could be.  I forget.

Q.  It was an Asian company that would invest in CDOs on occasion, do you recall that?

A.  It could be.  I --

Q.  Okay.  And there's a reference to the fact that they did not like static deals.  What is a static deal?  That's a deal without an asset manager, is that right?

A.  Not necessarily.  A static deal refers to a portfolio that at closing is the portfolio that will remain technically for the life of the transaction.  Typically a static portfolio would have been selected by a manager as opposed to a reinvesting deal, where the manager is given some flexibility to buy or sell in assets into the portfolio.

C7nesto4                          Pinniger - direct

So on a nonstatic deal, the portfolio could change in nature over the life of the transaction, and whereas a static deal, other than natural amortization or bonds losing value, that's the portfolio in closing.

Q.  So the thing to take away from that at a simple level is that a static portfolio typically does not change once it's created, correct?

A.  It doesn't change in the context of a manager post closing typically being able to influence the portfolio.  Bonds naturally have a life of their own.  They amortize down.  They take losses.  So a manager's influence, I guess, if you will, on the portfolio stops at closing.

Q.  All right.  And can you give us a real simple definition of amortize?  You've used that term several times with respect to bonds.  What does that mean?

A.  Sure.  Amortization on a bond.  A bond starts off at a certain size.  To the extent it receives payments and actually shrinks, that shrinkage as a result of payments coming in on the bond is the amortization.

Q.  Okay.  And now if we look back at the e-mail, there's a reference in the initial e-mail to Samir.  The Samir that's being referenced here is Samir Bhatt, is that correct?

A.  I -- I believe it is, yes.

Q.  All right.  And now if we go up to the second e-mail from the top, from Mr. Mehrish to Brian Stoker, Frank Li, Mihail

C7nesto4                          Pinniger - direct

Nikolov and a cc to you, Mr. Pinniger.  Do you see that?

A.  Yes.

Q.  And it states, Samir bought these static bonds and he should have a rationale as to why he found them attractive.

And did you understand what that meant when you read it?

A.  I don't -- sitting here today, I don't recall this e-mail exchange.

Q.  All right.  Let's go up to the top e-mail.  And this is Mr. Li's response to Mr. Mehrish's e-mail.  And he states, yes, he can come up with some stories for some of static deals in the Class V pool, but not all of them.  SK life has zero tolerance of static deal, which makes it hard to convince them.

Now, when you read this, and you saw that Mr. Li said he, referring to Mr. Bhatt, can come up with some stories for some of the static deals but not all of them, did that give you concern when you were of the understanding that they had selected the assets?

A.  Sitting here today, I don't have a recollection of this e-mail.  So I don't -- I don't recall what I was thinking at the time about this e-mail or not thinking.

Q.  Sitting here today looking at that, with the understanding that you had at the time that the asset manager selected the assets, does that give you concern when Mr. Li is saying the person who picked the assets can't come up with a story for why

C7nesto4                          Pinniger - direct

he did it?

A.  Sitting here today I would say it doesn't necessarily -- it wouldn't necessarily cause me a problem.

Q.  So you wouldn't be concerned if the asset manager couldn't come up with a story for why he picked certain bonds?

A.  Well, when I say sitting here today it wouldn't cause me a concern, this was a collateral manager who was in the markets with several different transactions, to date had already done several different transactions.

So when I see something about not being able to come up with a story on particular positions, this manager had hundreds of different assets inside of either existing portfolios or portfolios that they were considering marketing. And maybe at a particular point in time a transaction is put in front of him and they have to recall why they bought it.  They may have to rethink about it in the context of having a lot of different assets to manage.

Q.  And if you would have to rethink about it and he actually selected them, he would have a basis for explaining it, right?

A.  Right.  Looking at it here, I'm -- I'm not reading this that he's not able to remember his stories for purchase because he didn't select the assets.  It reads to me like he has to go back and, out of a much larger group of assets he's managing, remember a specific transaction.

Q.  All right.  In the course of working on the Class V

C7nesto4                        Pinniger - direct

Funding III, did you learn anything about whether there was a difference from what you understood the usual process in selecting assets to be?

A.  I -- I don't remember throughout the transaction learning that it was a different process that I was used to, normally was accustomed to.

Q.  Now, have you heard the term adverse selection?

A.  Yes.

Q.  And the adverse selection means selecting not the best quality assets or selecting assets that would create a negative result, is that right?

A.  Generally, yes.

Q.  Now, you were generally familiar with the firm Magnetar, is that right?

A.  I had a general understanding, yes.

Q.  And Magnetar was a hedge fund that sort of burst on the scenes in the 2006/2007 time period, is that right?

A.  Approximately.

Q.  And at one point you were even working on a transaction with them but it never went through, is that right?

A.  That's correct.  Me myself, that's correct.

Q.  Yeah.  And so you were familiar with the types of strategies and the things Magnetar was looking at at the time?

A.  I -- at the time of doing transactions, I don't recall that I knew specific strategies they were employing.  I knew them

C7nesto4                          Pinniger - direct

more as an investor in transactions.

Q.  All right.  And you were familiar with the CDOs that were called the constellation CDOs?

A.  Very generally.

Q.  And just generally, you knew that those were CDOs that were named after the celestial constellations, like Orion and Pyxis and that sort of thing, right?

A.  Sure.

Q.  And there was a general understanding on the structuring desk that those constellation CDOs were ones that Magnetar was interested in shorting, is that right?

A.  At the time, to be fair sitting here today, I got to know the constellation deals as a result of them being in the news. I don't recall on the structuring desk that I had any direct knowledge of Magnetar's involvement in those transactions or, frankly, even what they were.

Q.  Okay.  And now on the structuring desk you were responsible for some of the marketing efforts of the Class V III, is that right?

A.  Some, yes.

Q.  And the flipbook that we've been discussing is essentially a PowerPoint presentation that was used as a marketing device, is that fair?

A.  Yes.

Q.  And that was sent to various investors, correct?

A.  Correct.

Q.  Now, I'd like to have you look at Exhibit 207.  Now, Mr. Pinniger, you can either look in your book or on your screen.

Is this an e-mail that you sent, a string of e-mails, but the top one is an e-mail you sent to Mr. Stoker on February 13, 2007?

A.  It looks to be, yes.

Q.  And it was in response to an e-mail that Mr. Stoker had sent out, which was discussing issues with the Class V and the 888 and the Adams Square, is that right?

A.  I can't see the whole chain, but the e-mail below it, that's what it looks to be.

MS. PETERSON:  Your Honor, we would offer Exhibit 207.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 207 received in evidence)

BY MS. PETERSON:

Q.  Now, if we look at the second e-mail down from Mr. Stoker to a number of individuals, a Julian Bynum, Shalabh Mehrish, Keith Pinniger, Chaka Wade, Maneesh Awasthi and Winnie Ho, are these all individuals that work at Citigroup?

A.  They were.  Yes.

Q.  And who is Julian Bynum?

A.  Julian at the time was a member of the syndicate desk.

C7nesto4                          Pinniger - direct

Q.  All right.  And if you look at this e-mail four lines down.

This is Mr. Stoker addressing Julian.  And it says, tell

whatever story you want to sell these bonds.

When Mr. Stoker sent out that e-mail, was he telling

Mr. Bynum to just tell a story to sell the bonds that are being

discussed here?

A.  I don't recall this e-mail.

Q.  All right.  Let's move on.

Now, could you please show the witness Exhibit 360.

And now, Mr. Pinniger, is this an e-mail exchange you

had with Mr. Stoker in November 2007?

A.  It looks to be, yes.

Q.  And this is relating to the Class V IV CDO, right?

A.  That's -- looking at the subject line, that's what it looks

to be.

MS. PETERSON:  Your Honor, we would offer Exhibit 360.

MS. LITTLE:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 360 received in evidence)

BY MS. PETERSON:

Q.  And now, Mr. Pinniger, you initially were writing to

Mr. Stoker, and you asked him, when we agreed with Marshak to

pay 500,000.

Who is Marshak?

A.  I believe this is referring to Andy Marshak, who was a

C7nesto4                      Pinniger - direct

senior member of CSAC's portfolio team.

Q.  And he was an asset -- at the asset manager, correct?

A.  He was at CSAC, correct.

Q.  And so you asked Mr. Stoker, when we agreed to pay Marshak the 500,000, what were we paying for, the 500,000 for?  To say they selected the assets, etc.?

And Mr. Stoker's response was, yep.  Correct?

A.  That's what it looks like, yes.

Q.  And did you have any further discussions with Mr. Stoker about this e-mail?

A.  I don't recall this e-mail.  I don't know what followed it. I don't know what came after this e-mail.

MS. PETERSON:  All right.  Your Honor, may I approach?

THE COURT:  Yes.

Q.  Now, Mr. Pinniger, do you recall another transaction that the structuring desk was working on that was called Fab, F-A-B?

A.  Yes.

Q.  If you would look at -- these documents that I just handed you are in numerical order.  If you could look at Exhibit 13, please.

Now, is this an e-mail that you received from Mr. Stoker -- you are copied on it -- forwarding comments with respect to the Fab transaction?

A.  That's what it looks like, yes.

Q.  And at Citibank you currently are record custodian?

C7nesto4                          Pinniger - direct

A.   Yes.

Q.   And you reviewed certain documents related to this case and were asked to give a certification that they were, in fact, business records, is that right?

A.   That's correct.

Q.   And you reviewed those documents and certified that they were records made in the ordinary course of business at Citigroup, correct?

A.   That's correct.

Q.   And that they were made at or near the time of the occurrence, correct?

A.   That's correct.

Q.   So, for example, the Fab document would have been made at or near the time of the Fab transaction?

A.   That's correct.

Q.   And that they were made or transmitted from people who had knowledge of the transaction?

A.   That's correct.

Q.   And that these were maintained by Citigroup in the ordinary course of business, correct?

A.   That's correct.

Q.   And this Fab document that I just handed you, the Exhibit 13 is one of those business records, correct?

A.   I believe it is, yes.

Q.   And I also provided you with a copy of your business record

C7nesto4                     Pinniger - direct

certification, if you want to verify, but I will tell you that the Bates numbers are on there.

MS. PETERSON:  So, your Honor, we would offer Exhibit 13.

MS. LITTLE:  Objection on relevance grounds.  This pertains to a different transaction and precedes Class V III.

THE COURT:  Why don't you put some more questions to the witness so I can determine how this is or is not connected up.

MS. PETERSON:  All right, your Honor.  And I will do so, and I will also --

THE COURT:  I'm going to admit for a few minutes Plaintiff's Exhibit 13, subject to connection.  If you're unable to make the connection, then we'll strike it.  So let's see where you can go.

MS. PETERSON:  Certainly.

BY MS. PETERSON:

Q.  Now, Mr. Pinniger, Mr. Stoker was on the structuring desk in September of '06, is that right?

A.  Correct.

Q.  And you were there as well, correct?

A.  That's correct.

Q.  And the Fab transaction was one that was being worked on at the -- on the structuring desk in the September '06 time period, is that correct?

C7nesto4                         Pinniger - direct

A.   That's correct.

Q.   And the attachment to this e-mail is Mr. Stoker's work on the offering circular -- at least the part that's attached there for the Fab transaction, is that right?

A.   That's what it looks to be.

          MS. PETERSON:  Your Honor, we would offer this exhibit.  We wanted to do it with this witness because he is the business record foundation witness.

          THE COURT:  Come to the side bar.

          MS. PETERSON:  Certainly.

          (Continued on next page)

(At side bar)

THE COURT:  So I take it the objection is relevance?

MS. LITTLE:  Yes, your Honor.

MS. PETERSON:  All right.  Since we've had an issue with the business record certifications, we wanted to at least lay the foundation with this witness.

The relevance, we believe, is established with him, being Mr. Stoker, and his comments to another transaction.  And it's clear on its face, but it will be tied together with Mr. Stoker.

THE COURT:  That's the question.  She's not challenging the business record aspect of it.  She's challenging the relevance.

So how are you going to tie this to the transactions that are the subject of this case?

MS. PETERSON:  It's a CDO that was done on the desk in the relatively same time period.  There is another CDO that he worked on, and it shows the type of work he did on the transactional documents to compare to the Class V III documents to determine if his actions were reasonable under the circumstances.  It's another example of the kind of work he did on CDOs at the same time period.

THE COURT:  Well, how does this differ from or is the same as the work he did on the CDO five, Class V?

MS. PETERSON:  What we will show are the areas that he

C7nesto4                         Pinniger - direct

worked on, the issues that he addressed, including some of the risk issues in the other CDOs.  So the issue in the Class V that we are saying was not properly disclosed goes to the risk of the transaction.

So we'll show that there are these other transactions that he worked on at the time where he did address risk issues.  And this is one of the comparison CDOs, along with the Adams Square and the 888 Tactical.  They all build that picture.

THE COURT:  So let me -- hold on one second.

(Pause)

THE COURT:  So, point me, for example, on Exhibit 13 to what you think is probative.

MS. PETERSON:  Well, I mean, I believe all of it's probative.  It all shows his references.  He has specific lineouts, his specific attention to detail, the different offerings, what's going to take place.  If you look at the different areas that he touches on, principal payments, all of it goes to the relevance of his actions that he took in this case.  And it will be tied together with Mr. Stoker.  So we wanted to lay the foundation --

THE COURT:  That's what you're saying, but -- so let me ask the defense counsel:  Are you challenging the authenticity of this exhibit in any way, shape or form?

MS. LITTLE:  No, your Honor.

THE COURT:  The challenge is purely to relevance?

C7nesto4                        Pinniger - direct

MS. LITTLE:  Yes.  I did not object to the comparable document relating to Class V III coming in.  Ms. Peterson did introduce that document.

THE COURT:  Okay.  So there's clearly been raised in this case an issue of what custom and practice was, and that includes Mr. Stoker's custom and practice.

But it seems to me the time to address that is on cross-examination of Mr. Stoker, not at -- the jury I think would not be able to fully appreciate anything before that. So, if you simply want to offer these without otherwise showing them to the jury to establish they are ordinary business records, I think that can be accomplished by stipulation so we don't have to bother this witness about it.

If there's something that this witness has to bring out, I'll admit these subject to connection.  But I'm not going to allow them to be shown to the jury at this time because they won't become relevant until and unless Mr. Stoker is shown them and is asked to explain them.  And I'll deal with the relevance then.  I don't see why I should deal with it now.

So I take it that defense counsel is prepared to stipulate these are what they appear to be?

MS. LITTLE:  With respect to the pile of documents that Ms. Peterson showed me, we have no objection to their authenticity or to the fact that they're business records. What we do want to guard against -- we want to make sure that

C7nesto4                    Pinniger - direct

every document is tied to a witness.  What we don't want to have is a dump of documents into the jury room with no witness addressing them.

THE COURT:  Well, Exhibit 13 on its face shows it's from Brian Stoker.

MS. LITTLE:  Correct.

THE COURT:  So as part of your stipulation, you're stipulating that this is a document from Brian Stoker sent on or about September 25, 2006, at 1:27 p.m., etc., right?

MS. LITTLE:  Correct.

THE COURT:  And now, does this witness -- is this Mr. Stoker's handwriting?

MS. PETERSON:  Yes.

THE COURT:  But this witness can't identify it.

MS. PETERSON:  That's correct.  Mr. Stoker would --

THE COURT:  So I think we're wasting time now.  I think, given the stipulation just made at the side bar, let's see which exhibits that pertains to.  What are the -- it's Exhibits 13, 14, 39; any others?

MS. PETERSON:  That entire stack, your Honor.

THE COURT:  Well, 47 is a different kind of exhibit.  47 is already --

MS. PETERSON:  You admitted 47, along with Exhibit 5 and 161, which were the three research reports.  This witness has certified that they are, in fact, business records, so we

C7nesto4                          Pinniger - direct

believe that gets us past the hearsay objection.

THE COURT:  Well, it may or may not, because the --
well, okay.  That's fair enough.  But --

MS. PETERSON:  So that whole stack.

THE COURT:  So hold on a minute.  I'll just -- this is
not a good use of the jury's time.

MS. PETERSON:  Understood.

THE COURT:  Please, I'm giving this stack now to
defense counsel.  Tell me by numbers which ones you're prepared
to testify are authentic and admissible, except for objections
on grounds of relevance.

MS. LITTLE:  I will stipulate that all of them are
business records.  That's not the issue.

THE COURT:  Okay.  So I just want to get the record
straight.  So that includes 47, 55, all of the additional ones
I mentioned a minute ago, 64, 66, 67, 108, 169 and 194?

MS. PETERSON:  That was two.

THE COURT:  What?

MS. PETERSON:  There's another one under there.

THE COURT:  Oh, thank you.

205, 334, and you have two copies here of 334.  So, I
don't see why any of them need to be admitted now.  The
stipulation is made.  It's binding.  Let's proceed.

MS. PETERSON:  Certainly.

(Continued on next page)

C7NVSTO5

MS. PETERSON:  Your Honor, I have no further questions for Mr. Pinniger at this time.

THE COURT:  All right.

Cross-examination.

MS. LITTLE:  Your Honor, may I approach the witness?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. LITTLE:

Q.  Good afternoon, Mr. Pinniger.

A.  Good afternoon.

Q.  You've testified about the flipbook or pitch book for Class V III.  What is the pitch book?

A.  The pitch book or the flipbook was the general marketing document for the transaction.  It was used to market the transaction to investors.

Q.  Were drafts of the pitch book shared with various people during the process of putting these documents together?

A.  That would have been common, yes.

Q.  If you would take a look in your big binder I just gave you to Exhibit 1064, which is in evidence.  And this is an email dated January 24th, 2007 from Frank Li.

Who is Frank Li?

A.  Frank Li was a member of the --

MS. PETERSON:  Your Honor, I'm going to object.

I don't believe this has been admitted.

C7NVSTO5                        Pinniger - cross

MS. LITTLE:  Pardon me.  I thought it was in.  Pardon me.

Let me lay a foundation.

BY MS. LITTLE:

Q.  Would you take a look, yourself, sir, at Exhibit 1064.

(Pause)

Q.  You've had a chance to look at it?

A.  I have.

Q.  Is Exhibit 1064 an email with attachments from Mr. Li to Mr. Bhatt, Mr. Stoker, and yourself, and Ms. Pan?

A.  Mr. Pan, as well as Mr. Kornfeld.

Q.  Mr. Pan.

Is this an email that you received on or about January 24, 2007?

A.  It looks to be, yes.

MS. LITTLE:  Move for its admission, your Honor.

MS. PETERSON:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 1064 received in evidence)

Q.  Sir, who is Frank Li?

A.  Frank Li was a member of the structuring desk.

Q.  Was Frank Li responsible for preparing the pitch book?

A.  Frank Li would have been part of the team working to prepare the book, yes.

Q.  And by this email, a draft of the pitch book is being sent

to Mr. Bhatt, he's at Credit Suisse; correct?

A.   He was; correct.

Q.   And you mentioned Mr. Kornfeld.  Who is Mr. Kornfeld?

A.   Todd was CSAC's internal counsel working with Samir's team.

Q.   Mr. Kornfeld worked for Mr. Bhatt's team; correct?

A.   Yes.

        I tend to call them by first name, not last name.

        MS. LITTLE:  All right.  Let's take that down.

Q.   And I'd like you to take a look in your book at Exhibit 1066, which I think is in evidence.

        THE COURT:  Yes.

        MS. LITTLE:  Okay.  My apologies for mixing them up.

Q.   Exhibit 1066 is another email from Frank Li on January 24th about 5:52 p.m.  And this is going to Darius Grant; correct?

A.   It looks to be, yes.

Q.   And is this part of the same process of circulating the draft of the pitch book to various people?

A.   Yes.

        MS. LITTLE:  Let's take that down.

Q.   And, now, if you would look in your book, please, at Exhibit 1065.

        Have you had a chance to look at that, sir?

A.   Yes.

Q.   And I'll represent to you that for this particular email we didn't copy the entire pitch book, but I have it available if

C7NVSTO5                        Pinniger - cross

you'd like to see it.

A.   I believe you.

Q.   Is Exhibit 1065 an email that you were copied on, among others, from Frank Li on January 24th, at 5:49 p.m.?

A.   It looks to be, yes.

         MS. LITTLE:   Move its admission, your Honor.

         MS. PETERSON:   Objection, your Honor.

         THE COURT:   Overruled.

         (Defendant's Exhibit 1065 received in evidence)

Q.   At 5:49 p.m. on January 24th --

         THE COURT:   I should note that, of course, the offer of this waives the relevance objection that was made at the sidebar just five minutes ago by defense counsel.  So if you are maintaining that objection, you better not offer this.

         MS. LITTLE:   The objection at sidebar pertained to --

         THE COURT:   I know what it pertained to, and I don't think we need to burden the jury with it.

         If you want another sidebar, you can have one.

         MS. LITTLE:   Well, perhaps we should.

         THE COURT:   All right.

         (Continued on next page)

(At the side bar)

THE COURT:  So this is an email to, among others, Mr. Stoker on the Class V Funding III debt book.

"Attached please find the draft debt book of the Class V Funding III deal.  The book is pretty clean and share the same disclaimer management -- excuse me, same disclaimer manager and risk factor sections as the book of Adam Square Funding II deal, which was reviewed and signed off by various parties."

Now, putting aside the fact that the author doesn't understand basic grammar, since the word "share" should be "shares," it's being offered, I take it, to show that Mr. Stoker had the right to rely on the Class V being the same thing that was signed off on in earlier deals, yes?

MS. LITTLE:  No, your Honor.

THE COURT:  Okay.  What's the relevance then?

MS. LITTLE:  The relevance is that the draft pitch book was reviewed by a number of people, people at CSAC, people within the Citigroup organization.

THE COURT:  So but on its face, what's being represented here and what you are offering is a cover letter that says to Mr. Stoker, this is the same as the earlier deal. The jury can't disregard that regardless of what you think. And that opens the door, it seems to me, to Mr. Stoker's involvement in earlier deals as opposed to his involvement in

this deal.  So that's why it's a waiver.

So if you want it, fine.  But it waives the objection to the other exhibits.

MS. LITTLE:  Understood.

I just, for the record, would point out that the earlier document we were talking about at sidebar was the FAB deal, not the Adam Square deal.

THE COURT:  I do understand that, although there were several different deals there.  So it's up to you.  Do you want to still offer this?

MS. LITTLE:  Yes, your Honor.

THE COURT:  Very good.

MS. PETERSON:  Could I just note for the record we object based on cumulative, as well.

THE COURT:  Cumulative, schumulative, as you would say.  I'll receive it.

But if you want to make a list, you can read into the record of the ones that were previously rejected on the grounds of relevance that are now received, but they are the ones relating to the former deal.

There were some other exhibits that were just stipulated as business records, but didn't relate to former deals.  So just limit the numbers to those other ones, so we'll put that on the record in a few minutes.

MS. LITTLE:  Thank you, your Honor.

(In open court)

THE COURT:  I trust our court reporter knows how to spell "schumulative."

THE REPORTER:  I'll have to take a good stab at it.

THE COURT:  All right.  Good.

I don't want to bore you, ladies and gentlemen, but at the sidebar, one of the rulings I made was "cumulative schumulative," and I had to make sure that that important legal ruling is properly recorded.

Go ahead, counsel.

MS. LITTLE:  The usual spelling, I assume.

THE COURT:  Of course.

MS. LITTLE:  Your Honor, I take it that Exhibit 1065 is received.

THE COURT:  1065 is received with all the correlative rulings made at the sidebar.

Go ahead.

MS. LITTLE:  Thank you, your Honor.

BY MS. LITTLE:

Q.  Mr. Pinniger, Exhibit 1065 is an email dated January 24, 5:49 p.m. from Frank Li to various people, including yourself; is that correct?

A.  It looks to be, yes.

Q.  And these three exhibits we've been looking at are all sent around the same time.  Mr. Li is sending the draft book to CSAC

and to internal Citibank people, and now to these folks; is that correct?

A.   I believe so.

Q.   Who is Jane Chwe, C-H-W-E?

A.   Jane is internal counsel at Citi.

Q.   And who is ehardin@milbank.com?

A.   It's Elizabeth Hardin.  She's a partner at Milbank.

Q.   What is Milbank?

A.   Milbank Tweed is a law firm.

Q.   What was the relationship between Milbank Tweed and Citibank in connection with Class V III?

A.   They were Citi's external counsel on the transaction.

          MS. LITTLE:  You can put that down.

Q.   Mr. Pinniger, can you describe the process for putting the pitch book together?

A.   Sure.

          The general process followed one that I described before, which is, as best we could, define a precedent transaction to start with.  Again, ideally it would be a recent deal with the same transaction manager, and as close to the same transaction structure and nature that we were thinking the deal or at least envisioning at the outset of the deal might take.

Q.   Can you just -- we're having trouble hearing you.  Perhaps you can lean forward a little bit.

A.   Sorry.

Q.   Thanks.

A.   And so we would start with that precedent document.  And to the extent we had certain understanding or knowledge about the transaction at the beginning, beginning to make edits or changes, trying to have it in shape to be able to forward around to various parts of the deal team for additional comments.

Q.   Did different people have responsibilities for different portions of the pitch book?

A.   Yes.

Q.   For example, we saw that this pitch book was sent to CSAC, Credit Suisse.  What portion of the pitch book did CSAC have the primary responsibility for?

A.   Well, as a general matter, the transaction team would have been looking at the book in total.  CSAC would have had an obvious focus.

There is typically within the flipbook or pitch book a section that deals with the collateral manager, either their background, their nature in the transaction, how they analyzed the portfolio.  So they would spend a lot of time obviously making sure that that was up to date and correct and make modifications to it.

MS. PETERSON:  Your Honor, I'm going to object that this has gotten into speculation.

THE COURT:  Sustained.

Q.  And with respect to the structuring desk's focus for the pitch book, the structuring desk's primary focus was on description of the collateral and return analysis and structural lead to the deal; correct?

A.  On average, yes.  It would have been focused on structural aspects.

Q.  And the counsel's focus for the pitch book was on the risk factors; that's correct, right?

A.  Amongst looking at the rest of the document --

MS. PETERSON:  I'm going to object that this calls for speculation, your Honor.

THE COURT:  Sustained.

Q.  Could you take a look in your book at Exhibit 1067 please.

(Pause)

Q.  Have you had a chance to look at it?

A.  Yes.

Q.  This is an email sent by you on or about January 24th at 6:20 p.m.

A.  That's what it looks to be.

MS. LITTLE:  Move its admission, your Honor.

MS. PETERSON:  Objection.

MS. LITTLE:  This responds directly to the objection that was made to the prior question.

THE COURT:  Well, I'm going to receive 1067.

(Defendant's Exhibit 1067 received in evidence)

THE COURT:  But let me advise the members of the jury, I will give you at the time that this case is presented for your deliberation detailed legal instructions.  But one of my instructions will deal with what relevance, if any, there is to the fact that a particular offering statement or other document may or may not have been approved by counsel.  And among other things, I'll let you know at that time whether or not counsel have signed off, the document is a function of what information counsel have received.

So if counsel have not received all the relevant information, then their signing off on something may or may not be of any relevance to you.  But I'll give you much more detailed instructions later on.

Go ahead, counsel.

MS. LITTLE:  Is Exhibit 1067 received?

BY MS. LITTLE:

Q.  All right.

Mr. Pinniger, Exhibit 1067 is an email from you to Todd Kornfeld and Samir Bhatt; correct?

A.  It looks to be.

Q.  They are at Credit Suisse, right?

A.  They were, yes.

Q.  This email was sent about an hour or so since the last three emails we were looking at:  1064, 1065, and 1066 on

January 24th; correct?

A.   Yes.

Q.   In this email, sir, you're asking Mr. Kornfeld to please --
apologies.  I know we've crushed you a bit over the last weeks
on Adams Squared.  We'd like to get your sign-off on the
flipbook Frank sent by tomorrow.

See that, sir?

A.   Yes, I do.

Q.   And then in the second paragraph you say:  We'll see if
Citi and Milbank have any tweaks to the risk factors.

Does that refresh your recollection, sir, that the
lawyers' primary focus was on the risk factors?

A.   I know that both Citi's internal and external --

MS. PETERSON:  Objection.

Calls for speculation.

MS. LITTLE:  Can he answer the question?

THE COURT:  Sustained.

Q.   Mr. Pinniger, you began to answer that question by saying
"I know that."

THE COURT:  Doesn't matter.

I'm sustaining the objection to the question.

MS. LITTLE:  Very well.

BY MS. LITTLE:

Q.   Would you take a look in your book, sir, at Exhibit 1068.
Should be the next one.

C7NVSTO5                          Pinniger - cross

Have you had a chance to look at that, sir?

A.  Yes.

Q.  Is this an email that's addressed to you on January 25th, 2007 from Ms. Chwe?

A.  Looks to be, yes.

MS. LITTLE:  Move its admission.

MS. PETERSON:  Your Honor, we would object and request a standing objection to this type of document so we don't have to assert it each time.

THE COURT:  Well, I'm not big on standing objections.

MS. PETERSON:  Okay.

THE COURT:  But if you want to simply say you renew the objections made to the previous exhibits, we will understand what that means.

Those objections are overruled.

MS. PETERSON:  Thank you.

THE COURT:  1068 is received.

(Defendant's Exhibit 1068 received in evidence)

Q.  Exhibit 1068, Mr. Pinniger, it begins at the bottom with the email from Mr. Li sending the pitch book to Ms. Chwe and Ms. Hardin which we discussed before, right?

A.  Yes.

Q.  And the top email is a response from Ms. Chwe and Mr. Li and others, including you, indicating that he attaches comments to the -- or, excuse me, she attaches comments to the Class V

C7NVSTO5                        Pinniger - cross

funding flipbook; correct?

A.   Correct.

Q.   Thank you.

        MS. LITTLE:  Your Honor, I'm about to start a new subject.  Should I keep going or -- I didn't know when you want --

        THE COURT:  How long do you think the new subject will take?

        MS. LITTLE:  Twenty minutes.

        THE COURT:  All right.  You beat me down.

        All right, ladies and gentlemen.  We'll take a 15-minute break at this time.

        (Jury excused)

        THE COURT:  Mr. Pinniger, you may step down.

        We'll see you in 15 minutes.

        (Witness excused)

        THE COURT:  Please be seated.

        Anything counsel needs to raise with the Court?

        MR. INFELISE:  Yes, your Honor.  There is something I would like to revisit.

        I know the Court has already ruled that because I didn't object, I waived.  I have to say, I'm not sure what exactly I waived objection to, because the reason I say that, your Honor, is that defendants, in response to our motion to exclude, specifically said we're not raising advice of counsel.

C7NVSTO5                         Pinniger - cross

We're not saying it was an opinion or they received advice. That is a judicial admission.

So if I waived something, your Honor, I think it's to some sort of nebulous reliance on process. And I still haven't figured out what that is.

THE COURT: I believe it's this: The reliance on counsel would be a statement by Mr. Stoker in words or substance or by argument of counsel that he had a right to rely on the fact that counsel had approved this offering statement and similar offering statements in the past.

But independent of that, the argument was being made, as I understood it, that the statements were not false or misleading, or at least that Mr. Stoker wasn't acting with negligence; because everything in the statements had gone through an elaborate process, and that both in the past and in this case, where innumerable people had approved, and that it was not negligent on his part then not to accept the statements as given.

Now, what I tried to point out to counsel when we discussed this was that to the extent that that argument was premised on the failure to make known that anybody within Citigroup, or at least made known to counsel a material fact, then it was really a disguised reliance argument that they could not assert.

But counsel came back to me and he said that's not the

only thing being asserted by the SEC. The SEC is not simply -- this is not a pure omission case. The SEC is also maintaining that in certain other respects there was a misrepresentation. And you may recall we divided it into sort of Scenario 1 and Scenario 2.

And on the misrepresentation, counsel said, we expect to show that everything was known to counsel and everyone else that it was either explicit or implicit on the kind of deals these were; and, therefore, as to the misrepresentation claim, Mr. Stoker had no reason to question what had become the form of an offering statement.

Your response to that was to say, Well, this was different. Both this deal and the particular respects in which you believe there was a misrepresentation were unique; had never occurred before. And, therefore, he did not have a basis for assuming anything about the nature of the approval because of the unique aspects of this deal.

I decline to reach at this point whether or not there was an argument to be made on the reliance defense counsel is stating with respect to misrepresentation as opposed to omission because, it seemed to me, that there had been a waiver.

Now, you say there wasn't a waiver because you had a right to rely on the statement that there's no reliance on counsel defense, which was expressly stated. But you knew that

C7NVSTO5                       Pinniger - cross

defense counsel was attempting -- and I still have not ruled as to whether it was unsuccessful in totality or just in part -- to raise a defense relating to how many people looked over this whole thing that did not focus on reliance on advice of counsel.

So you knew that he took a different position on that; you knew that his argument, which may or may not be acceptable to the Court in the end, was out there; you knew you disagreed with it vehemently; and you chose, notwithstanding that, to allow innumerable references to counsel.  That's why I think it was a waiver.

And putting it a different way, once all that stuff came in, details in defense counsel's memorandum and it continued this morning, as well, I think the jury would inevitably want to know what, if any, relevance they should give to the fact that counsel had signed off on these various things.

And so in order that the jury was not left to speculate, we left it that there would be an instruction to the jury at the end of the case.  I felt *sua sponte* the need to at least give a very, very modest instruction of a somewhat limited fashion right now so that they weren't left totally in the dark.

But I invite and I'm happy to have you give me tomorrow morning or tonight, if you prefer, if you want to

adopt the defense position, you can send it to me some time too late for me to read a proposed instruction that I can give even earlier.  But I think that's the only way I can handle this situation at this point.

MR. INFELISE:  Your Honor, and thank you.  That was what my request was going to be.

I believe at this point there at least ought to be some sort of instruction indicating that the defendant is not raising advice of counsel, and that, therefore, wait till the --

THE COURT:  All right.

I think it is certainly appropriate that we give an instruction to the jury.  If you want to draft one right now, I'll take a look at it.  But I think since your adversary would want to be heard, the more appropriate thing is for you to get it to me tonight, they can look at it, and we'll hear argument on it first thing tomorrow morning.

MR. INFELISE:  Yes, your Honor.  We'll do that.

THE COURT:  Very good.

MS. PETERSON:  One other brief thing, based on our last sidebar with the waiver issue, could I read the exhibit numbers into the record?

THE COURT:  Yes.

MS. PETERSON:  Exhibit 13 and 14.

THE COURT:  I'm sorry, bear with me one second while I

bring these up.

13, 14.  Keep going.

MS. PETERSON:  66 and 67.

THE COURT:  56?

MS. PETERSON:  66.

THE COURT:  66 and 67.

MS. PETERSON:  Correct, your Honor.

THE COURT:  All right.  All of those are received pursuant to the statements made at the sidebar.

MS. PETERSON:  Thank you.

(Plaintiff's Exhibits 13, 14, 66, 67 received in evidence)

THE COURT:  Very good.  We'll see you in ten minutes.

(Recess)

THE COURT:  So let me ask the witness to go outside for a minute.  Hold off on the jury.

So even in attempting to articulate Mr. Keker's position just now, I had frankly difficulty in articulating it. And so maybe we should hear it again.

What is the relevance of any of this stuff about counsel, if there is no reliance on counsel defense?

MR. KEKER:  Your Honor, with respect to the marketing materials and the offering memoranda for CDOs 2007, in the hundreds of such materials, there was nobody in the market, not investors, not lawyers, not people at Citi, not structurers,

C7NVSTO5                         Pinniger - cross

not syndicate people, who believed that putting secondary trading desk information about what happened with the initial short counterparty position in a synthetic CDO should go into those materials.

THE COURT:  Yes, but are you saying then that Mr. Stoker relied on that?

MR. KEKER:  Mr. Stoker -- the reasonableness of the performance of his duties has to be understood in the context of the world in which he is performing his duties.

THE COURT:  You're saying that a reasonable person in his position would have relied on that.

MR. KEKER:  No, I'm not -- not -- reasonable person in his position would have understood how to perform his job properly.  And it's not a question of reliance.

To perform his job properly and to do a proper offering memorandum and a proper pitch book and a proper this and a proper that required all kind of things to be done properly.  One of them was not putting in this information that the SEC says should have been somehow in these offering materials.

THE COURT:  What was the basis of a reasonable person in his position?  Why would a reasonable person in his position have understood that vis-a-vis the approvals by counsel?

MR. KEKER:  Because --

THE COURT:  Because they would have believed that

C7NVSTO5                        Pinniger - cross

counsel had attested to the legal appropriateness of these documents, which is just another way of saying reliance on counsel.

MR. KEKER:  No.  I mean I respectfully disagree, your Honor.

You have to talk about what we're -- about what an offering memorandum is.  And I'll make an offer of proof.

The next two witnesses from now is going to be an investor.  The investor, you're going to find out, has got more information than could fit on this table, drilled out deeply in this, has asked information from all kind of sources, including Citigroup and Mr. Stoker, has gotten a tremendous amount of information.

At the end of all that, I'm going to ask him, Did you ever ask what the secondary trading desk had done with this position?

No, I never asked that.  That's not a standard question.  We don't ask that.

Why not?

It's not my business.  Nobody thought in the business --

THE COURT:  Well, that goes to the question of materiality.

MR. KEKER:  Not just materiality.  It also goes -- you can't say that somebody performed his duties improperly unless

you get what his duties were and what the context of those

duties are.

The SEC is attempting to impose a rule with the

benefit of hindsight about what those duties should have been.

And if such a rule existed, then they'd have a great case.  But

that rule did not exist.  If they want it to exist now, they

should pass the rule.

THE COURT:  Obviously that's neither here nor there.

No one has proposed an instruction about any rule or any lack

of a rule or anything like that.

And I was troubled, even though it was permitted by

the Court, for example, on the last exhibit, counsel pointed

out -- or it was next-to-the-last exhibit, counsel pointed out

who is Ms. Chwe, or however it's pronounced, C-H-W-E.  Oh,

she's in-house counsel.  And who is E. Hardin?  Oh, that's

Ms. Hardin at Milbank.  What's Milbank?  Milbank is an outside

law firm.  And what was the relationship between Milbank and

this situation that they were outside counsel.

This is highly what you and your statement just now

wanted to downplay.  You were saying that nothing to do with

counsel signing off per se or reliance on counsel, all of which

you disclaim.  But you say a reasonable person in your client's

position vis-a-vis at least one of the issues in this case,

that the standard applicable to him is informed by the fact

that no such disclosure that the SEC is now alleging should

C7NVSTO5                          Pinniger - cross

have been made was made in those prior offering statements, even though a whole bunch of people looked at it.  But that's not -- I'm not sure that's -- with respect to counsel, that's -- it sounds to me that's still a reliance of counsel. But even if it isn't, all the dangers of the jury misunderstanding the alleged purpose of this were invited by the questions your colleague just put to the witness.

MR. KEKER:  We'll back off from that, your Honor.

The new place that she was going to go with this is what's in the offering memorandum.  And what's in the offering memorandum is instructive because what goes into the ones that you just saw, Adams Square, all of these things say, this language which you opined about in your rulings, this language about the Citi is the initial counterparty, they can keep it or sell it.  That language.  And you've said what you've thought about that.

And what we're saying is that industry, custom, and usage is -- that's all anybody expects because they know --

THE COURT:  Yes, I understand that.

And that argument has nothing to do with the fact that counsel were involved at all.  Because counsel are not opining, are not signing off, are not taking action based on custom and usage.  They are opining, they are signing off, they are taking action based on what they believe complies with the law or fails to comply with the law.

C7NVSTO5                        Pinniger - cross

        So if you have a situation, to take an extreme hypothetical, where some fact that a reasonable investor would consider highly material was never disclosed by a given company or even a given industry because it was the custom and practice in that industry not to disclose it, that wouldn't mean beans to counsel. Counsel, if they concluded it was material, would say it has to be disclosed. And so they are making a legal determination, not a determination about what is custom or usage.

        MR. KEKER: The evidence in the case though is going to show -- I mean what the trading desk does in the second after it gets this initial short position is not something that the investors, the people -- it's sort of the form. It is a template. We're going to keep it or sell it. It would be very easy for somebody to say, Oh, there ought to be more information about that subject.

        In this industry, given who these people are, glibs and all the sophistication of it, nobody asks, nobody told. It was just -- that's what it was. And we ought to be able to show that.

        Now, we'll back off -- let me tell you the other thing that we'd like to do with this witness though. And that is there are a couple of emails where -- and we think it's also relevant that nobody was hiding anything; that there were a couple of emails where the structuring desk made sure that the

lawyers understood what the intermediation fee meant, and then provided them with the information that some of the buying protection side had been intermediated and some hadn't. And then that information the lawyers, in the excess of letting everybody know what was going on, sent to everybody, including the investors. And that seems to us relevant.

When you're Mr. Stoker --

THE COURT: So if that's not a reliance of counsel defense, I don't know what is.

You're saying, ladies and gentlemen of the jury, in assessing this, you can see that when it was Situation X, the lawyers, maybe in an excess of caution, but whatever, the lawyers said you got to do this. And you see that they didn't do that in our situation about the things that the SEC is accusing us of not disclosing.

MR. KEKER: I misspoke, your Honor.

What I'm saying is that this -- you've got in the offering memorandum under risk factors, it says we can keep it or sell it. And what the SEC says is that's not enough; there ought to be more disclosure.

And what we are saying is that the people who understood not just that you may keep it or sell it, but you are keeping it or selling it, I mean get the intermediation information, first of all, in the context of reasonableness, everybody is sharing this information with one another. And,

C7NVSTO5                          Pinniger - cross

second, everybody knows, investors, all the people working on this, know that that, in fact, there is some intermediation, there's some not.

For a reasonable person you have to say, to take the SEC's position, Well, you should have told somebody that. Well, why would you think you should tell somebody that, when everybody knows it.  I mean it's --

THE COURT:  That, of course -- again, all of that is arguably relevant, but has nothing to do with this issue of counsel.

MR. KEKER:  But in order to give -- I'm sorry.  I interrupted you.

THE COURT:  Go ahead.

MR. KEKER:  In order to give the context, so that you understand what Brian Stoker is thinking when he --

THE COURT:  What Brian Stoker is thinking, according to you, is, among other things, the lawyers have signed off. That sounds to me like reliance on counsel.

MR. KEKER:  What Brian Stoker is thinking is how in the world -- now what he's thinking is how in the world am I sitting on the structuring desk, somehow the one who's responsible for not telling the people in the industry information that nobody in this industry expects to be told or asked about.  How is that new view of this thing --

THE COURT:  Again, that's fine -- I mean there may be

C7NVSTO5                    Pinniger - cross

objection to that on other grounds, but that's basically fine

if you're talking about the customs in the industry.  But

that's not what we are focusing on now.  We are focusing on

counsel.

And I will not allow what you just said your colleague

is about to go into.  And I think I am inclined to go back to

the last exhibit.  Where is that?  What number was that?

MR. KEKER:  1067 or something like that.

THE COURT:  1067?

MR. KEKER:  Or five.

MS. LITTLE:  1068.

THE COURT:  1068.

I actually have no problem with 1068 for the reasons

stated at the sidebar.  It seems to me, if you'll excuse the

pun, the flip side of what the SEC was introducing in Exhibits

13, 14, and 66 and 67.

What I do object to is the focusing on counsel.

MR. KEKER:  We hear that.

THE COURT:  And I don't think we should have anything

more on that score whatsoever, because I think it's going to --

MR. KEKER:  Can I ask a question?

THE COURT:  -- confuse the jury about an issue that's

very difficult as it is.

Yes.

MR. KEKER:  Can we bring out the email and the emails

C7NVSTO5                      Pinniger - cross

about intermediation without focusing on counsel, without

pointing out but this information was provided to a lot of

people.

THE COURT:  Show me the exhibit.  Tell me the

exhibits.

MR. KEKER:  There's two, your Honor.

MS. LITTLE:  It would be 1132 and 1163.

THE COURT:  Okay.  1132, which, by the way, says in

parentheses, 241.  Does that mean the SEC was offering it, as

well?

MS. LITTLE:  Correct, your Honor.

THE COURT:  So let me just make sure, before we have a

discussion about this, is there any objection to the exhibit

per se, forgetting about the counsel part of it?

MS. PETERSON:  No objection, your Honor.

THE COURT:  Okay.  So that's going to come in.

(Defendant's Exhibit 1132 received in evidence)

MR. KEKER:  And the second one, your Honor, is the

document that included the indenture that includes Annex A,

which shows -- columns of it shows the assets of Class V III.

THE COURT:  All right.

So I think the way to handle it is the way you're

suggesting, Mr. Keker.  And then we'll have the instruction to

the jury tomorrow morning.

All right.  Very good.  I'm sorry.  Let's -- yes.

C7NVSTO5                    Pinniger - cross

MS. LITTLE:  I just want to make sure I don't overstep.  So I was going --

THE COURT:  Just don't even mention "counsel."

MS. LITTLE:  Don't say the "L" word.

THE COURT:  Don't say the "L" word, or any of the numerous synonyms, most of which are derogatory and could be found on cartalk.com.

MR. KEKER:  Could I speak to Ms. Little?

THE COURT:  Yes.

(Pause)

THE COURT:  Okay.  Let's bring the jury in.

Let's get the witness back on the stand.

(Jury present)

(Continued on next page)

THE COURT:  Counsel.

MS. LITTLE:  Thank you, your Honor.

BY MS. LITTLE:

Q.  Mr. Pinniger, I'd like you to look in your book at Exhibit 1153, which is in evidence.  It's a big book.  Sorry.

A.  I'm getting there.

Q.  Exhibit 1153 is the offering circular for Class V III, correct?

A.  That's what it looks like, yes.

Q.  If you could take a look, sir, at page 88.  And then in particular, I'd like you to focus on the first paragraph at the top of the page, and in the middle of that paragraph, the sentence which reads, the initial CDS asset counterparty may provide CDS assets as an intermediary with matching offsetting positions requested by the manager or may provide CDS assets alone without any offsetting positions.

Do you see that, sir?

A.  I do.  Yes.

Q.  In situations where Citi was acting as an intermediary, they generally would charge intermediate fee, correct, sir?

A.  Typically, yes.

Q.  And it would generally be 3 percent -- excuse me, three basis points?

A.  It could range, but -- it could have included three.

Q.  I'd like you to take a look in your book at Exhibit 1132.

C7nesto6                          Pinniger - cross

Is Exhibit 1132 an e-mail which you were copied on from Frank Li dated February 20, 2007?

A.  Yes, it looks to be.

MS. LITTLE:  I move its admission.

MS. PETERSON:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 1132 received in evidence)

BY MS. LITTLE:

Q.  If we could take a look, let's start with the e-mail in the middle of the page from Frank Li to various people.  And Mr. Li says at point one, we need to add intermediate -- why can't I say that word?  Intermediate fee rate column to annex A.

Do you see that, sir?

A.  Yes.

THE COURT:  By the way, I should tell the ladies and gentlemen of the jury this.  I meant to mention this earlier.

On many of these exhibits you will see two numbers. For example, you'll see there it says Exhibit 745.  When you see the original, you'll see that's a photocopy number, but the number for the purposes of this trial will be in blue.  It will be a separate tag.  The reason for that is these exhibits were used during depositions earlier on, so they had different numbers then.  But the relevant numbers for your purposes are the ones that are on the original tags that are in color and down at the bottom.

C7nesto6                              Pinniger - cross

MS. LITTLE:  Thank you, your Honor.

Q.  And then, Mr. Pinniger, if we could just jump to the top of the e-mail.  Mr. Li is addressing this intermediate fee question.  And he writes, for trades facing Citi, no intermediate fee charged.  For trades facing other firms, .03 percent is the intermediate fee.

Do you see that, sir?

A.  I do, yes.

Q.  So in other words, Citi would intermediate some of its swap counterparty positions and some it would not, correct?

A.  That's what this looks like it says, yes.

Q.  And would you take a look, sir, at Exhibit 1163.

Mr. Pinniger, on Exhibit 1163, you are in the addressee field almost at the bottom, second line from the bottom.  Do you see that?

A.  Yes.

Q.  Is Exhibit 1163 an e-mail that you and others received from someone named Linda Robinson on February 28, 2007?

A.  That looks to be, yes.

MS. LITTLE:  I move its admission, your Honor.

MS. PETERSON:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 1163 received in evidence)

BY MS. LITTLE:

Q.  Mr. Pinniger, Exhibit 1163 is an e-mail on the closing

C7nesto6                        Pinniger - cross

date, right, February 28th, 2007, a closing date for

Class V III?

A.  I -- I think that's about the same time we closed.  I

forget the exact closing date.

Q.  All right.  And in this e-mail various confirms are being

sent to various people, is that correct?

A.  That's what it looks like, yes.

Q.  And if you would take a look, sir, toward the back of the

document at the page that is Bates numbered 18461421.  The last

three digits are 421.  Do you have that, sir?

A.  Yes, I do.

Q.  And Jeff, if we could focus in on the column that says

reference entity.  Highlight that.

        Do you see that column -- do you have it there?

A.  Yes, I do.

Q.  There's a column reference entity.  Then this lists a

number of assets in Class V III, correct?

A.  I believe it does, yes.

Q.  And then if you would take a look, going across the column

that says intermediate fee.  Do you see that, sir?

A.  I do.

Q.  And the intermediate fee for these assets is zero percent,

correct?

A.  On this page, yes.

Q.  And that indicates that for these particular assets, the

C7nesto6                          Pinniger - cross

trades were not immediately intermediated, correct?

MS. PETERSON:  Objection.  Calls for speculation.

THE COURT:  Overruled.  You may answer.

A.  It may imply that, looking at the -- looking at this they look to have no intermediate fee attached to them.

MS. PETERSON:  I'm going to renew my objection, based on he said "may."

THE COURT:  Based on the answer the jury will disregard the question and answer.

Q.  If you would take a look, sir, on the next page.

And again, Jeff, if we could highlight the fourth column with the names of assets.  And then if you would highlight, Jeff, also the third from the last column with percentages.

Mr. Pinniger, looking, starting at the asset column, ACABS, 2006, let's look at the one that's ETRD 2006-5A.  And if we go across, it says 0.03 percent.

Do you see that, sir?

A.  I do, yes.

Q.  Is that the intermediate fee that was charged for that particular asset?

A.  That's what it looks like, yes.

Q.  We can take that down.

MS. PETERSON:  Your Honor, I am just going to object that that's not the document showed.

C7nesto6                          Pinniger - cross

MS. LITTLE:  I'm sorry?

MS. PETERSON:  Your columns were not correct.

MR. KEKER:  Excuse me, your Honor.  Could I speak with --

THE COURT:  Yes.

(Pause)

MS. LITTLE:  Let's go back to that exhibit.  Let's go back to the page with the last three numbers 421.  Actually, let's go back to the next page, 422.  422.  Jeff, can you highlight the entry ACABS 2006-AQA and follow it across to the intermediate fee column.

BY MS. LITTLE:

Q.  So, Mr. Pinniger, for asset ACABS 2006-AQA, the intermediate fee was 0.03 percent, correct?

A.  That's what it -- pardon me.  That's what it looks like.

Q.  And looking at the next one, ACABS 2006-AQA -- going across to the column, the intermediate fee for that particular asset is zero percent.  Do you see that?

A.  That's what it looks like, yes.

Q.  Then looking at the next one, which is E -- let's see.

A.  E-trade.

Q.  Looks like it's E-trade 2006-5A.  Tracing that across, the intermediate fee is 3 percent, is that correct?

A.  Three basis points, yes.

Q.  And the next one, Glacier 2006 for A, if you trace that

C7nesto6                              Pinniger - cross

across, intermediate fee is 0.03 percent, is that correct?

A.   That's correct.  That's what it looks like.

Q.   If we could turn back to the first page, page before this. Take a look at the very first asset listed, ACABS 2006-2A. Going across that column the intermediate fee is zero percent, correct?

A.   That's what it looks like, yes.

Q.   And looking at the next one, Baldwin 2006-4A, going across that one, the intermediate fee is 0.0 percent, correct?

A.   That's what it looks like, yes.

Q.   And going down a few more to Buchanan, 2006-1A4, going across that column the intermediate fee is 0.0 percent, correct?

A.   That's what it looks like, yes.

Q.   Now, if you could turn back to the offering circular for a minute, which is 1153.  Again, back to page 88.  I just want to highlight again that language, the initial CDS asset counterparty may provide CDS assets as an intermediary with matching offsetting positions requested by the manager or may provide CDS assets alone without any offsetting positions. Correct?

A.   That's what's written, yes.

Q.   And this intermediate fee document that you've just been looking at, some of those are trades where there are matching offsetting positions and some are trades without any offsetting

C7nesto6                        Pinniger - cross

positions, correct?

MS. PETERSON:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.  Mr. Pinniger, what goes on in terms of offsetting trades is not something that the structuring desk would be privy to, correct?

A.  As a general matter, no.

Q.  Yes.  And the trading desk generally doesn't discuss the economics on their hedging, correct?

A.  As a general matter, no.

Q.  And it wouldn't have been standard practice for the trade desk to tell what economics they would have -- would have or would not have on trades, correct?

A.  I don't recall ever being involved in discussions that involved that information.

Q.  And from a structuring perspective, from your perspective as a structuring, it would not be relevant when or if the trading desk entered into an offsetting position, correct?

A.  As a general matter, that's true.

Q.  All right.  We can take that down.

Did people on the structuring desk have contact with Ambac?

A.  Yes.

Q.  And who is Ambac?

A.  Ambac at the time was a monoline reinsurance company.

C7nesto6                          Pinniger - cross

Q.  Did Ambac meet with you to as part of their due diligence review of the Class V III deal?

A.  I -- I believe we either had a meeting --

MS. PETERSON:  Objection.  Speculation.

Q.  Let's take a look at Exhibit 1082.  Do you see that, sir?

A.  I do.

Q.  Is that an e-mail from you dated February 2, 2007, to various people at Credit Suisse?

A.  That's what it looks like, yes.

Q.  Is this an e-mail that you sent on or about February 2, 2007?

A.  It appears I did.

MS. LITTLE:  I move its admission.

MS. PETERSON:  Objection.  Relevance.

MS. LITTLE:  Well, it's responsive to --

THE COURT:  I'm sorry.  What number?

MS. PETERSON:  1082, your Honor.

THE COURT:  I can't hear you.

MS. LITTLE:  1082.  And this is in response to counsel's prior objection about speculation.

THE COURT:  1082 is received.

(Defendant's Exhibit 1082 received in evidence)

BY MS. LITTLE:

Q.  Mr. Pinniger, this is an e-mail that you sent to Michael Shackleford at Credit Suisse.  Who's Michael Shackleford?

A.  Mike was one of the portfolio managers at CSAC at the time.

Q.  And you also sent it to Samir Bhatt at Credit Suisse, correct?

A.  Correct.

Q.  And copies to Mr. Stoker and to Frank Li, correct?

A.  Correct.

Q.  And in this e-mail you are addressing Mr. Shackleford, Samir, confirming Ambac for Tuesday starting at 1:00 p.m. Should plan on about two hours.  Myself and Frank will attend from the Citi side.

Is that correct?

A.  That's what it looks like I wrote, yes.

Q.  Does this refresh your recollection about meeting with Ambac to discuss Class V III?

A.  I -- it doesn't refresh a specific meeting.  I recall we set up general meetings, but I don't recall in this context if it was for Class V or a different deal.

Q.  Do you recall having numerous communications with persons at Ambac concerning their potential investment in Class V III?

A.  We had a great deal of conversations with Ambac, yes.

Q.  Did you and CSAC give all the information that Ambac wanted?

A.  I don't recall specifically if there was information they asked for that was not provided.  If they asked for it and we could have provided it, my best recollection is we provided

C7nesto6                              Pinniger - cross

them the information they were looking for.

Q.  So when they would ask for information, you would endeavor
to provide it?

A.  If we could, yes.

         MS. LITTLE:  Your Honor, there's a number of exhibits
that during the break I discussed with SEC counsel to see if we
could speed this along and bring them all in at once.  And if I
could inquire of the Court if she has objections to those
exhibits.

         MS. PETERSON:  We do, your Honor.

Q.  Okay.  Let's start, then, with Exhibit 1108.  Do you have
that, sir?

A.  I do.

Q.  Is that an e-mail that you sent on or about February 14th
to various people, including Mr. Stoker, concerning
Class V III?

A.  Yes.

         MS. LITTLE:  I move its admission.

         MS. PETERSON:  No objection, your Honor.

         THE COURT:  Received.

         (Defendant's Exhibit 1108 received in evidence)

BY MS. LITTLE:

Q.  And in this e-mail, Mr. Pinniger, you say Hoin.  Who's --
never mind.

         You're asking that the Class V indenture be sent to

C7nesto6                         Pinniger - cross

David Salz at Ambac, is that right?

A.   It looks like I am, yes.

Q.   And as far as you know, the indenture was, in fact, sent to Mr. Salz?

          MS. PETERSON:  Objection.

          THE COURT:  Sustained.

Q.   Do you have any reason to think that the indenture was not sent to Mr. Salz?

A.   I have no reason to believe that.

Q.   Let's take a look at Exhibit 1116.  Do you have that, sir?

A.   I do.

Q.   Is that an e-mail sent on or about February 15th from Frank Li to Mr. Salz with a copy to you?

A.   Yes.

          MS. LITTLE:  I move its admission.

          MS. PETERSON:  No objection, your Honor.

          THE COURT:  Received.

          (Defendant's Exhibit 1116 received in evidence)

BY MS. LITTLE:

Q.   Is this an example, sir -- this is an e-mail from Frank Li to David Salz.  And David Salz is at Ambac, correct?

A.   He was at the time, yes.

Q.   And Mr. Li says, David and Emily.  Who's Emily?

A.   I don't remember who Emily was.

Q.   All right.  David and Emily, please see attached

C7nesto6                         Pinniger - cross

spreadsheets that includes the OC/IC triggers and projected

levels.  Moody's and S&P's recovery rates are also included.

Let me know if you need more information.

        Do you see that, sir?

A.  I do.

Q.  And this e-mail is in response to a request less than an

hour earlier from Mr. Salz asking for the OC/IC test levels,

correct?

A.  That's what it looks like, yes.

Q.  Is Mr. Li's statement there, let me know if you need more

information, is that typical of the kinds of relationships that

you had with Mr. Salz that when you ask for something, the

structure group would provide it and ask if you needed any more

information?

        MS. PETERSON:  Objection.  Calls for speculation.

Q.  In your experience is that typical?

A.  Yes, it is.

Q.  Let's take a look at Exhibit 1135.  Do you see that, sir?

A.  Yes.

Q.  Is 1135 an e-mail exchange between you and Mr. Salz in

February of 2007?

A.  That's what it looks like, yes.

        MS. LITTLE:  I move its admission.

        MS. PETERSON:  No objection.

        THE COURT:  Received.

C7nesto6                        Pinniger - cross

(Defendant's Exhibit 1135 received in evidence)

BY MS. LITTLE:

Q.  And let's start at the bottom e-mail from you to Mr. Salz, February 21.  Subject matter, Adams Square and Class V.  It says, hi, David, with the vortex in full motion I wanted to check in with you on the Class V and Adams Square II deals and see if you were missing, needing any more information from us.

Do you see that, sir?

A.  I do.

Q.  And Mr. Salz in the top e-mail responds, a full black line to the last distributed to my apartment on Saturday would help. Then he gives his address.  Do you see that?

A.  I do.

Q.  And is this, in your experience, also typical of the relationship that the structuring desk had with Mr. Salz; that you would offer to send him information, he would ask for information and you would endeavor to send it to him?

A.  That's my experience, yes.

Q.  Mr. Pinniger, did you have any reason to think -- we can take that down.

Did you have any reason to think that any of the representations in the offering circular with respect to any aspect of this transaction were untrue in any way?

A.  No, I did not.

Q.  Did you have any reason to think that the representations

C7nesto6                          Pinniger – cross

in the pitch book or flipbook were untrue in any way?

A.  No, I did not.

          MS. LITTLE:  Thank you.  No further questions.

          THE COURT:  Redirect?

          MS. PETERSON:  Yes, your Honor.

          If we could bring up Plaintiff's Exhibit 50, please.

          MS. LITTLE:  Objection.  Outside the scope.

          THE COURT:  I'm sorry, what?

          MS. LITTLE:  It's outside the scope, and same
objection I raised before.  He's not copied on it.  It's not
sent to him.

          MS. PETERSON:  Your Honor, could we have a side bar,
please.

          THE COURT:  Well, before we do that, what's the
exhibit?

          MS. PETERSON:  50.

          THE COURT:  Oh, 50.

          MS. PETERSON:  50, five zero.

          THE COURT:  All right.  Come to the side bar.

          (Continued on next page)

C7nesto6                          Pinniger - cross

(At side bar)

MS. PETERSON:  Counsel has raised the issue of due diligence on the part of the investor, and we want to point out that Mr. Pinniger was not aware of the information in Exhibit 50, and that information was not provided to Ambac when they were doing their due diligence.  We think it's very relevant to the issue.

MS. LITTLE:  Your Honor, this is cumulative.  They've already asked about Exhibit 50.  They've pursued this line of questioning.  Exhibit 50 was not discussed in cross-examination.

THE COURT:  I know, but I think it's fair response to the thrust of your cross-examination, and I adhere to my cumulative schmumulative -- you know, in a case like this, it's not the end of the world if the jury hears the same thing twice.  We don't want to have them hearing it 100 times.  And if it were to delay or obfuscate, that would be a problem.  But here's a very important exhibit that, from the perspective of plaintiff's counsel, directly goes to an issue raised on cross-examination of this witness.

I will allow it.

(Continued on next page)

C7nesto6                        Pinniger - cross

(In open court; jury present)

MS. PETERSON:  If we could show Exhibit 50 to the courtroom, please, to the jury.  And if you could highlight the middle e-mail.

REDIRECT EXAMINATION

BY MS. PETERSON:

Q.  Now, Mr. Pinniger, we talked about this a bit earlier, and you indicated that Mr. Stoker never told you this was DQ's prop trade, don't tell CSAC.  Correct?

A.  That's correct.

Q.  And Mr. Stoker never told you CSAC agreed to terms, even though they don't get to pick the assets, right?

A.  I don't ever recall being told that.

Q.  I'm sorry?

A.  I don't ever recall being told that.

Q.  All right.  So when you had these meetings that you were asked about during cross-examination with Ambac so they could look at the transaction, you never told them that it was DQ's prop trade, correct, because you didn't know that, right?

A.  That's true.  I never told them it was a prop trade.

Q.  And you never told them that CSAC agreed to the terms, even though they didn't get to pick the assets, correct?

A.  I -- I don't recall that I ever reflected that to them.

Q.  So Ambac didn't have that information when they were doing their due diligence on the transaction, right?

C7nesto6                         Pinniger - redirect

A.   I don't know if they -- if they had it from another source, but I don't -- I don't recall ever saying that to them.

Q.   You never told them that?

A.   Not that I can recall, no.

Q.   And at the meeting you had where you and Mr. Li attended, Mr. Li didn't tell them that, correct?

A.   I don't recall that he did.

Q.   All right.  And how many transactions had you done prior to the Class V III at Citigroup?

A.   Not counting Adams Square, which I think was going on at the same time, three transactions.  Three.

        MS. PETERSON:  All right.  Thank you.  I have no further questions.

        THE COURT:  Anything further?

RECROSS EXAMINATION

BY MS. LITTLE:

Q.   Mr. Pinniger, Exhibit 50 you were just looking at was on November 3rd of 2006, right?

A.   To tell you the truth, I didn't look at the date.

Q.   It was.  Take it from me, it was.

        Class V III closed in February of 2007, correct?

A.   That's correct.

Q.   And you testified earlier today that Class V III was not a prop trade, correct?

A.   From my perspective I don't remember it being a prop trade.

Q.   And Class V III, Credit Suisse did pick the assets, is your understanding, correct?

A.   As far as I know they did, yes.

Q.   That's what the offering memorandum says, correct?

A.   Based on the language we saw, that's what it said.

MS. LITTLE:   Thank you.  Nothing further.

THE COURT:   Anything else?

MS. PETERSON:   No, your Honor.

THE COURT:   Thank you very much.  You may step down.

(Witness excused)

THE COURT:   Please call your next witness.

MS. PETERSON:   Your Honor, may I approach to clear off the witness box?

THE COURT:   Yes.

MS. LITTLE:   May I approach as well?

ROBERT MACLAVERTY,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. INFELISE:

Q.   Good afternoon, Mr. MacLaverty.

A.   Good afternoon.

Q.   Sir, are you presently employed?

A.   Yes.

Q.   Where is that?

C7nesto6                        MacLaverty – direct

A.   Berkley Research Group.

Q.   And where is that located?

A.   They are based in Berkley, California, or Emeryville, with offices in various cities throughout the United States and some overseas.

Q.   And where do you work?

A.   I'm in the Chicago office.

Q.   Mr. MacLaverty, could you give us a brief description of your educational background.

A.   Sure.  I did my undergraduate degree at Boston College, Bachelor's of Arts.  Did a master's degree at Georgetown University.  Did a one-year postgraduate fellowship at the London School of Economics, and then three more years toward the PhD in economics at the University of Notre Dame, where I completed my doctoral exams but not my dissertation.

Q.   So do you have your PhD at this point?

A.   No, I do not.  I'm what's known as ABD, all but dissertation.

Q.   Well, after you completed your education, sir, did you go to work?

A.   Yes.

Q.   And could you explain -- well, where is the first place you went to?

A.   I went to -- came to New York to begin in a training program at Morgan Guaranty Trust Company here in New York,

C7nesto6                          MacLaverty - direct

which was the bank of the holding company JP Morgan.

Q.  Let me just go back.  I sort of stepped over one thing.

Sir, do you hold any licenses?

A.  Yes, I do.

Q.  What licenses are those?

A.  I hold a Series 7, Series 63 and a Series 65.

Q.  And who gives you -- who issues those licenses?

A.  When I took the exams, they were licensed by the NASD, which is now known as FINRA.

Q.  What does FINRA stand for?

A.  It's a regulatory body that authorizes and regulates licensing of securities professionals.

Q.  Okay.  Sir --

A.  Among other things.

Q.  I'm sorry.  You said -- you left college for work on your PhD.  You went to work at Morgan Guaranty Trust Company?

A.  Yes.

Q.  What was your position there?

A.  I was in the training program for a period of about five months, after which I went into the financial analysis department as a financial analyst, and soon thereafter moved down to the bond trading desk in US treasury and agency securities.

Q.  And how long did you stay at Morgan Guaranty Trust Company?

A.  I was there for about 15 months.

C7nesto6                    MacLaverty - direct

Q.  And when you left where did you go?

A.  I moved back to Chicago to trade at the Chicago Board of Trade, where I leased a seat on the exchange.  And then after a period of time I was able to purchase my seat.

Q.  And, sir, how long were you on the Chicago Board of Trade?

A.  I was on the exchange from -- for three years.

Q.  What time period are we talking about here, sir?

A.  1984 up to 1987.

Q.  All right.  And when you left the Chicago Board of Trade, where did you go?

A.  I came back to New York to trade for the First Boston Corporation, now known as Credit Suisse First Boston, or just Credit Suisse, as an interest rate swap trader to begin with.  And then I got involved as a derivative products sales specialist.

Q.  And could you give us maybe just a brief description of what a derivative product is.

A.  It's a derivation of an underlying physical security that -- whose price is tied to the movement of the actual security.

Q.  And how long -- I'm sorry, sir.  Did you say you were trading at Credit Suisse?

A.  In the beginning of my tenure there, yes, I was on the interest rate swap desk.

Q.  And did that change?

C7nesto6                         MacLaverty - direct

A.   Then -- yes, it did.  Then I moved back to Chicago to spend most of my time there as a derivative product salesperson.

Q.   And what company was that with then?

A.   That was also with CSFB, or Credit Suisse First Boston.

Q.   And how long did you stay with Credit Suisse First Boston?

A.   I was there for approximately three years, three-and-a-half years.

Q.   And when you left Credit Suisse, where did you go?

A.   I joined Continental Bank in Chicago, which at the time was a primary dealer as the long bond trader or trader in cash securities, between 10 and 30 years.  And then I was responsible for hedging my positions and working with salespeople on managing accounts, but my --

Q.   How long did you stay with Continental Bank?

A.   I was there for about 15 months.  They resigned their dealership, and I stayed on as a proprietary trader for three or four months but then moved on to another firm.

Q.   And what firm did you move on to?

A.   Then I joined Bear Stearns as a mortgage backed securities and asset backed securities sales specialist.

Q.   And where were you located at that time?

A.   It was back in New York for a lot of the time, but I was primarily out of the Chicago office.

Q.   And what time frame was that, Mr. MacLaverty?

A.   That would have been in 1992/93, maybe into early '94.

C7nesto6                          MacLaverty - direct

Q.  And did you say that you were in sales during that time?

A.  Yes.

Q.  Again, what type of products were you selling?

A.  Primarily CMOs, or collateralized mortgage obligations, asset backed securities and some other fixed income securities, including corporate bonds and United States Treasury securities.

Q.  And when you left Bear Stearns, where did you go?

A.  When I left Bear Stearns -- I rejoined JP Morgan.

Q.  Was that again in New York?

A.  That was in New York in the beginning, but then primarily in Chicago.

Q.  And what was your position at JP Morgan?

A.  I was a mortgage backed specialist salesperson, institutional.

Q.  I'm sorry.  A mortgage backed specialist?

A.  I was specializing in the sale -- I was a fixed income salesperson specializing in the sale of mortgage backed and asset backed securities.

Q.  And how long did you stay with JP Morgan?

A.  I was with them for about two years.

Q.  And when you left where did you go?

A.  I left to join Chicago Partners, which was just getting started.

Q.  And what type of business or firm was Chicago Partners?

C7nesto6                    MacLaverty – direct

A.   Chicago Partners was a litigation consulting firm, based in Chicago.

Q.   And what was your job?

A.   To be a litigation consultant.

Q.   And did you have any special area of expertise?

A.   Yes.  I specialized in securities litigation.

Q.   How long were you with Chicago Partners?

A.   Approximately seven years.

Q.   And what time period are we talking about?

A.   That would have been 1996 through part of 2004.

Q.   All right.  And when you left Chicago Partners, where did you go?

A.   I went to go back on Wall Street to join Morgan Stanley.

Q.   Was that in New York or Chicago?

A.   That was in Chicago.

Q.   And what was your position with Morgan Stanley?

A.   As a derivative products specialist working with various teams that covered foundations and endowments.

Q.   And when you say derivative products, what do you mean?

A.   That would have included newer products that were different than the ones I traded and sold in my previous sales experience at Morgan Guaranty or JP Morgan, because it included also credit default swaps and CDOs.

Q.   So did it include anything besides CDOs and credit default swaps?  That's a CDS, is that correct?

A.   Yes.

Q.   Was there anything else that you sold during that time period?

A.   Yes.  I sold a wide variety of derivative products to customers, as well as cash instruments, like treasuries and incorporates.

Q.   Sorry, sir.  So what period of time were you at Morgan Stanley?

A.   I joined there in late 2004, up to and including the very end of 2007, beginning of 2008.

Q.   And during this time period, 2004 to the end of 2008, as a salesperson were you active in the financial markets?

A.   Yes.

Q.   Was that on a daily basis?

A.   Yes.

Q.   And when you left Morgan Stanley, where did you go?

A.   I rejoined Credit Suisse, primarily in the same function, same capacity.

Q.   And what capacity was that?

A.   That would have been as a risk management person, but primarily fixed income securities and derivatives for pension funds, endowments and foundations.

Q.   And when you say fixed income derivatives, do you again mean CDOs and CMOs?

A.   Well, it wasn't in the way of CDOs at that point because

C7nesto6                    MacLaverty – direct

that market had really changed, as well as CDS, but it was primarily principal protected notes and other structured products.

Q. I see. And again, how long were you at Credit Suisse?

A. About 18 months.

Q. And when you left Credit Suisse, where did you go?

A. I joined a firm, a consulting firm called FTI Consulting.

Q. What type of firm was FTI Consulting?

A. Similar to Chicago Partners with a bigger array of areas of specialty. But my area stayed the same. I was in securities litigation consulting.

Q. And how long did you do that?

A. I was with FTI for approximately two years.

Q. And when you left FTI Consulting, is that when you began work at -- was it BRG, Berkley Research Group?

A. Yes. Yes.

Q. Now, sir, you had mentioned or talked about selling a CMO, and you also mentioned CDOs. Is there a difference between a CMO and a CDO?

A. There are differences, but one is sort of a subset of the other. I mean, a mortgage is still a debt instrument, but the terminology really refers more to the risk in a CMO as being prepayment risk and CDO as being credit risk.

Q. You said one was a subset of the other.

MR. KEKER: Excuse me, your Honor. Could I inquire,

C7nesto6                     MacLaverty - direct

before we go further, I'm worried about the time.  And I thought if I could inquire tonight, we could decide where we're going tomorrow.  I can do it in the ten minutes we have left, but if this goes on much longer, I'm not going to be able to voir dire.  We talked about me voir diring this witness.

THE COURT:  Yes.

MR. KEKER:  And I'd like to inquire now, and then when the jury goes home, we can talk about it.

MR. INFELISE:  I haven't finished my --

THE COURT:  I don't think he's up to the point, but when you get to that point, then that's a good place to stop for the day.

MR. INFELISE:  All right.  Judge --

MR. KEKER:  Except -- okay.

BY MR. INFELISE:

Q.  Mr. MacLaverty, again, I'm sorry.  You talked about one either CMO or CDO being a subset of the other?

A.  Right.

Q.  Which is the subset of the other?

A.  A CMO would be a subset of collateralized debt obligations because it's -- collateral is a debt security.

Q.  And is there -- again, I'm not sure I understand.  What's the difference between a CDO and a CMO?

A.  Well, the nomenclature CDO, it normally refers to securities that have credit exposure.  And CMOs refer to

C7nesto6                    MacLaverty - direct

structured securities that have interest rate or prepayment

risk exposure.  But as a fixed income instrument,

collateralized by mortgages, they are debt instruments and, as

such, fall under -- in my view fall under -- into the view of

most folks on the street under the --

MR. KEKER:  Objection, your Honor.

A.  -- umbrella of CDO.

MR. KEKER:  And move to strike the last comment.

THE COURT:  Yes.  The comment about the view of most

folks on the street will be stricken.  The rest of the answer

remains.

You may finish your answer.

MR. INFELISE:  Thank you.

BY MR. INFELISE:

Q.  Mr. MacLaverty, in the positions you identified here

earlier, did you ever work with the structuring desk at your

firm?

A.  Yes.

Q.  And could you explain where and which of the firms that you

worked at you actually worked with a structuring desk?

A.  My first experience was when I actually did participate in

structuring structured products was at First Boston in 1987,

where as an interest rate swap trader I worked with floating

rate Euro dollar issues to create the first ---among the

earliest synthetic assets.

C7nesto6                      MacLaverty - direct

Q.   And with respect to any of the other positions that you've described, have you worked with the structuring desk at those firms?

A.   Yes, either directly or through another person within the firm.

Q.   And what was the nature of your relationship with the structuring groups?

A.   It was direct with respect to types of collateral that would be included in the CMO, for example.  It would have been through another person on the desk with respect to CDO later in my career.

Q.   All right.  And which -- could you identify specifically which of the firms that you mentioned you actually worked with or coordinated with a structured desk during the time you were there?

A.   First Boston, Bear Stearns, JP Morgan, Morgan Stanley and then, again, Credit Suisse, which had then -- First Boston had been renamed Credit Suisse.

Q.   And based on your contact and work with the structuring desk, did you become familiar with the normal role and function of the structure desk in structured products you were selling?

         MR. KEKER:  Objection, your Honor.

A.   Yes.

         MR. KEKER:  Objection to the -- he's talking about a structuring desk that goes all across every product you can

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C7nesto6                    MacLaverty - direct

imagine.  And I object to the relevance of that, and also the vagueness of that.  Everything from interest rate --

THE COURT:  No.  I mean -- I don't know because he only got down that one question.  I didn't know whether he was going to narrow it or where he was going with it.

The question was:  Did you become familiar with the normal role and function of the structuring desk in structured products you were selling, and the answer is yes.

I will let that answer stand and see where we go from there.

MR. INFELISE:  Thank you, your Honor.

BY MR. INFELISE:

Q.  And, Mr. MacLaverty, did that familiarity include familiarity with the normal role in the function of a structuring desk in the creation and marketing of CDOs?

A.  Yes.

Q.  And did that familiarity include the understanding of the normal role and function of a structuring desk with respect to the CMOs?

A.  Yes.

MR. INFELISE:  And I think this is maybe a good point to stop.

THE COURT:  All right.  Very good.  Ladies and gentlemen, we will resume at 9:00 tomorrow.  We are still right on time, but we need to keep at it.  So have a very good

C7nesto6                        MacLaverty – direct

evening.  We'll see you tomorrow.

            (Jury excused)

            (In open court; jury not present)

            THE COURT:  Mr. MacLaverty, you may step down.  We'll see you at 9:00.

            Please be seated.  I'll hand my courtroom deputy the original of the letter from Ms. Buergel, which should be docketed.

            All right.  There were some other things counsel needed to raise?

            MR. KEKER:  Yes, your Honor.  The first one was the scheduling issue.

            We talked about Mr. Popp.  We'd like to put Mr. Popp of CSAC on the stand first thing tomorrow morning so that he can get out of here and go on.  And then I'll voir dire Mr. MacLaverty.  We'll move on.

            MR. INFELISE:  We have no objection to that.

            THE COURT:  Okay.

            MR. KEKER:  The second thing is that at some point we need to deal with the objections to Mr. Neuberger's slides, which we've been exchanging, you know, carping back and forth with each other.  We're ready to tell you about it whenever you want to hear about it.

            And then finally, you said that they need to tell us by the end of the day today whether or not they're going to

C7nesto6                        MacLaverty - direct

call Ms. Harding.  We'd like to know that.

          THE COURT:  Okay.  So what are the problems with the slides?

          MS. PETERSON:  Would you like a copy, your Honor?

          THE COURT:  Yes.

          MR. KEKER:  And, your Honor, as you look at them tonight, can I remind you what you said about it on July 12th, when we had a motion in limine about Mr. Neuberger.  And that is, the SEC concedes that he shouldn't be able to testify about what is I guess the background portion of his report.  So the relevant portion, if any, is his statistical analysis.

          We understand that ruling.  We understood it to mean that Mr. Neuberger can get up and say, I compared this to that, and I find as an economist who knows nothing about CDOs and has no background, I find differences, and I can explain the difference in terms of statistics.

          As you'll see from looking at these slides, what Mr. MacLaverty is trying to do is to go far beyond that and explain the reason for the difference in -- that he's discovered in his statistical report.  And it's that to which we object.  He can talk about the difference between these names and those names --

          THE COURT:  Give me a specific example from these --

          MR. KEKER:  Well, look at number three.  The relatively poor performance of the Citigroup names compared to

C7nesto6                          MacLaverty - direct

the hundred other candidate names corroborates that the

Citigroup names were adversely selected.  He has found a

statistical difference.  And he, with no background in CDOs or

how they're put together or what it all means, is purporting to

say what the significance of that difference is.

           That's argument.  That may be subject to other

testimony, but it shouldn't come in through Mr. Neuberger.  And

it's contrary to the ruling, when we talked about this, that

you made, which is he can come in and say that he's found the

statistical difference between --

           THE COURT:  The ruling, as you just read it to me,

only dealt with the background session.

           MR. KEKER:  No -- okay.  Well, that's --

           THE COURT:  But now let's look at this.  I'm looking

at slide three.  Based on information known at the time the 25

CDOs identified by Citigroup with higher risk and lower quality

than other candidate assets or Class V III consistent with the

view that they were adversely selected.  Citigroup names were

more heavily concentrated in late finish subprime mortgages.

The Citigroup names also include numerous CDOs in which hedge

funds had purchased protection.  As a result, the Citigroup

names were more likely to perform poorly than other candidate

assets.

           Now, if I understand what the witness is getting at

there, it's that based on circumstantial evidence, the jury

could, if it wished, infer that the 25 CDOs were adversely selected. So I'm not sure that what -- the fact that he doesn't have a background in CDOs is relevant if this is achieved through a statistical analysis. If someone got on the stand and said, I'm a statistician and I examined a particular selection for factor X, and I found that as a statistical matter factor X was 100 times more likely to be present in group A than in group B, the fact that the statistician knew nothing about how the factor operates in real life would be neither here nor there. It might be some good basis for cross. I'm not even sure about that. He's simply doing a statistical analysis and asking, then, the jury to draw an inference from the different statistical terms he found.

Now, why is this different from that?

MR. KEKER: It's completely different, your Honor. Where Mr. Taylor at the hearing said, when he comes to the conclusion of saying Citi adversely selected those, he's making that leap from a difference to a cause. And that's the leap he doesn't have any basis for.

And then the Court said at page 93, so I don't think that's a ground for total exclusion but it is ground for saying that. If he's testifying that, in fact, this is why Citi selected them, that would clearly go beyond his expertise. I don't understand that's what he's saying. But let me hear, and he went on.

C7nesto6                        MacLaverty - direct

What we're saying is sort of what you're saying in your example.  If the statistician gets up and says there's these differences, then the explanation of the differences can't come from a person who knows nothing about the underlying process.  It can come from a witness.  It can come from argument.  It can come from a lot of other places.  But why a witness who is an economist, who's done a statistical analysis and knew nothing -- I mean, everything he knows about CDOs has come from reading the record in this case, which you said he can't sort of talk about.

So what we're saying is, if they want to put on this expert, we objected that they shouldn't do it at all.  You said he's going to do it.  Let him get up and say I found a statistical difference here.  That's a significant statistical thing.  But don't let him say that this statistical difference -- don't let him make the SEC's argument through his mouth.  Let the SEC argue about it.  Because there are a lot of reasons -- I mean, what he's going to say is I found that they were adversely selected but based on two factors.  You'll remember this.  One is that they're all 2006.  A one-year old can look at this list of assets and understand they're all 2006.  A one-year old knows that everybody in the industry knew that those were tough vintages and so on.

And then the other thing is this Magnetar deal's in it.  He can say those two things, I found a difference.  But

C7nesto6                         MacLaverty - direct

for him to say why those assets happen to be the ones that made this CDO work, where you had people on both sides, is completely beyond his expertise.

So what we're asking is to do what I thought you had already decided, which is let him explain the difference but not say why.

THE COURT:  I'm having a real problem following what you're saying.  Just looking again at slide three, which is all that I'm looking at, but it seems to me that if a witness, a statistician, gets on the stand and says, we have to determine what those animals are, and I find that 99 percent of them quack and I find that 99 percent of them have webbed feet and I find that 99 percent of them can't fly, and I conclude, therefore, that they are consistent with the view of the plaintiff that they're ducks, the defendant may say, well, you're not a veterinarian or an animal specialist.  You don't necessarily know the difference between a duck and a goose. And wouldn't your opinion also fit with geese, to which you might say, yes, it would; or he might say, no, geese can fly. But I don't see why --

MR. KEKER:  What about the issue where duck-billed platypus -- you have ducks and duck-billed platypus, and that's why people were fighting about why were these assets selected, why is -- what is that bird?  You ought to have -- I mean, somebody could come in and say, I found these statistical

C7nesto6                          MacLaverty - direct

differences here, but they shouldn't be able to come in if they don't -- look at slide two, your Honor.  This is the SEC's argument through a person who knows absolutely nothing about CDOs except what they fed him.  This is not proper.

MS. PETERSON:  Your Honor, may I be heard.

MR. KEKER:  Excuse me.

This is not proper expert opinion.  There are statistical differences he can testify about.  This is just argument under the guise of an expert.  It's what we've been complaining about with all of these experts.

MS. PETERSON:  May I be heard, your Honor.

THE COURT:  Yes.

MS. PETERSON:  I believe Mr. Keker is seriously misrepresenting Dr. Neuberger's credentials.  Dr. Neuberger has a PhD in economics.  He has studied structured finance products.  He has worked at the federal reserve in San Francisco studying mortgage backed securities and how they functioned.  He has studied them over his career.  He has been a litigation consultant where he has studied structured finance products, including mortgage backed securities, applied his economic expertise and conducted economic statistical studies.  And that is exactly what he did in this case.  He knows structured products.  He understands mortgage backed securities and other structured finance products based on his experience and his education.  So it is completely misleading to suggest

C7nesto6                          MacLaverty - direct

that he has no background in collateralized debt obligations.

THE COURT:  Well, also, it seems to me that part of the objection being raised by defense counsel is precluded by Rule 704(a) of the Federal Rules of Evidence, which reads as follows:  Quote, except as provided in subdivision B, which deals with criminal cases, testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, closed quote.  And that change or that provision of Rule 704, which overruled at least 50 or more years of prior precedent, was precisely because of the argument defense counsel is making now.

It used to be that two arguments were made to the kind of opinion that apparently this expert may be offering.  One is, well, it invades the province of the jury.  Second, it's argumentative.  It's really like a mini-summation.  Well, on those objections, of course, most expert testimony would either be ruled out or its relevance to the case would become obscured.

So the drafters of the Federal Rules say we're not going to look at this that way anymore.  We're going to allow testimony by an expert in an opinion form or inference form that embraces an ultimate issue to be decided by the trier of fact.  That's what this looks like to me, on first blush.

MR. KEKER:  That's not what my argument is, your

C7nesto6                        MacLaverty - direct

Honor.  And I totally understand what you just said about --
I'm not arguing any of that.  What I'm arguing, and maybe
what -- we'd ask you to go back and look at the motion in
limine about Dr. Neuberger, because when you read it before, it
led you to say, if he's testifying -- say he can tell about the
statistics, but if he's testifying that, in fact, this is why
Citi selected them, that would clearly go beyond his expertise.

THE COURT:  Yeah.  No, I wanted -- I think that's a
good point, because I want to make sure you understand exactly
what is permissible there, what is not permissible.  If he were
asked, is this why Citi selected it for, why you tell us why
Citi selected it, and he said anything, your objection would be
sustained because he doesn't have an adequate basis for saying
that.

But if he were to say, you know, in effect we have
argued, or there is other testimony or there's other evidence
from which the jury could infer that the reasons that he
selected it was X, is your data consistent with that?  That, he
can say.  That's not an uncommon thing for any expert to say.

(Continued on next page)

C7NVSTO7

MR. KEKER:  He's saying --

THE COURT:  One is an assertion of fact, the other is an assertion of what his findings coincide with.  They don't exclude other possibilities.

MR. KEKER:  They do exclude -- I mean he says in Slide 2, summary of opinions:  "Consistent with a view that they were adversely selected."

But then the bullet points are:  "The Citigroup names are heavily concentrated in late vintage subprime mortgages. The Citigroup names also included numerous CDOs in which hedge funds had purchased protection.  As a result, the Citigroup names were more likely to perform poorly than other candidate assets."

Sticking the word "consistent" in there, and then saying it's not a statement, an assertion of fact, that's way beyond his expertise, I think is just --

THE COURT:  No, no.

Well, I'm going to go back and look at this and not make any final ruling till tomorrow.

For example, you read, which I commend to you, in your copious spare time, *Science Magazine*, which gives the reports of all new scientific studies, you will see this is precisely the language that the overwhelming majority of those studies are couched in.

Have we found the cure for cancer?  No.

C7NVSTO7

Have we found the cause for cancer?  No.

But we have found some factor that is consistent with the prevalence of this kind of cancer, like tobacco and lung cancer.  It took many, many, many studies and many years before any expert was allowed to say that tobacco caused lung cancer.  But long before that, experts were allowed to say there was a correlation between tobacco and lung cancer; and that a finding of frequent tobacco use was consistent with the prevalence of lung cancer.

I think that's really standard stuff for experts in all fields.  But I will look at it once again tonight.

MR. KEKER:  Just that fine line we're trying to draw, save the statistics, but then not the reason for --

THE COURT:  I agree that the wording has to be careful.  And I will take a look more carefully at this.  But I don't see this as being inconsistent with any prior ruling of the Court.

Okay.  Anything else?

MR. KEKER:  Just the Hardin piece, your Honor.

THE COURT:  Pardon?

MR. KEKER:  They were going to tell us whether or not --

THE COURT:  Oh, yes.  Thank you very much.

MR. INFELISE:  Yes, your Honor.

Based on the fact that counsel has repeatedly said

C7NVSTO7

this isn't an advice-of-counsel defense, we see no relevance to Ms. Hardin's testimony, and we do not intend to call her.

THE COURT:  That's fine.

But now we need to carefully work out tomorrow what the instruction is going to be.  So you're going to get me something on that, yes?

MR. INFELISE:  Yes, your Honor.

THE COURT:  Get it to your adversary, of course.

MR. INFELISE:  We will.

THE COURT:  All right.  Very good.

(Adjourned to July 24, 2012 at 9 o'clock a.m.)

INDEX OF EXAMINATION

Examination of:                                           Page

DARIUS GRANT

Direct By Mr. Infelise . . . . . . . . . . . . . 831

Cross By Ms. Little . . . . . . . . . . . . . . 872

Redirect By Mr. Infelise . . . . . . . . . . . 917

Recross By Ms. Little . . . . . . . . . . . . . 922

ROBERT KEITH PINNIGER

Direct By Ms. Peterson . . . . . . . . . . . . 923

Cross By Ms. Little . . . . . . . . . . . . . . 959

Redirect By Ms. Peterson . . . . . . . . . . .1004

Recross By Ms. Little . . . . . . . . . . . .1005

ROBERT MACLAVERTY

Direct By Mr. Infelise . . . . . . . . . . . .1006

PLAINTIFF EXHIBITS

Exhibit No.                                           Received

 30   . . . . . . . . . . . . . . . . . . . . . 832

 50   . . . . . . . . . . . . . . . . . . . . . 835

 57   . . . . . . . . . . . . . . . . . . . . . 841

 65   . . . . . . . . . . . . . . . . . . . . . 844

 109  . . . . . . . . . . . . . . . . . . . . . 847

 137  . . . . . . . . . . . . . . . . . . . . . 850

 169  . . . . . . . . . . . . . . . . . . . . . 853

 327  . . . . . . . . . . . . . . . . . . . . . 855

 338  . . . . . . . . . . . . . . . . . . . . . 858

161    . . . . . . . . . . . . . . . . . . . . . 864

47     . . . . . . . . . . . . . . . . . . . . . 866

1005   . . . . . . . . . . . . . . . . . . . . . 921

301    . . . . . . . . . . . . . . . . . . . . . 935

216    . . . . . . . . . . . . . . . . . . . . . 936

291    . . . . . . . . . . . . . . . . . . . . . 937

99     . . . . . . . . . . . . . . . . . . . . . 938

179    . . . . . . . . . . . . . . . . . . . . . 942

207    . . . . . . . . . . . . . . . . . . . . . 948

360    . . . . . . . . . . . . . . . . . . . . . 949

13, 14, 66, 67  . . . . . . . . . . . . . . . . 977

DEFENDANT EXHIBITS

Exhibit No.                                 Received

1066   . . . . . . . . . . . . . . . . . . . . 909

1016   . . . . . . . . . . . . . . . . . . . . 913

1041   . . . . . . . . . . . . . . . . . . . . 915

1064   . . . . . . . . . . . . . . . . . . . . 960

1065   . . . . . . . . . . . . . . . . . . . . 962

1067   . . . . . . . . . . . . . . . . . . . . 969

1068   . . . . . . . . . . . . . . . . . . . . 971

1132   . . . . . . . . . . . . . . . . . . . . 986

1132   . . . . . . . . . . . . . . . . . . . . 989

1163   . . . . . . . . . . . . . . . . . . . . 990

1082   . . . . . . . . . . . . . . . . . . . . 996

1108   . . . . . . . . . . . . . . . . . . . . 998

1116    . . . . . . . . . . . . . . . . . . . . 999

1135    . . . . . . . . . . . . . . . . . . . .1001